**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARTIN J. WALSH,** | : | |
| **Secretary of Labor** | : | |
| **United States Department of Labor** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 21-0096** |
| | : | |
| **LOCAL 98, INTERNATIONAL** | : | |
| **BROTHERHOOD OF ELECTRICAL** | : | |
| **WORKERS** | : | |

---

**McHUGH, J.**                                                          **April 14, 2021**

**<u>MEMORANDUM</u>**

This action was filed by the Secretary of Labor under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), which governs, *inter alia*, the conduct of local union elections. 29 U.S.C. § 401 *et seq.* The Secretary alleges that the Defendant, Local 98, International Brotherhood of Electrical Workers ("IBEW"), committed numerous violations of the LMRDA during its June 2020 officer election when it improperly interfered with and threatened reprisal against members who wished to run for office and nominate others for office. *See* 29 U.S.C. § 481(e). The Secretary further asserts that these violations "may have affected the outcome" of the election within the meaning of the LMRDA. 29 U.S.C. § 482(c). Accordingly, he seeks an order declaring the election void and directing that a new election be conducted under his supervision.

The Union vigorously disputes the Secretary's allegations, and has moved to dismiss under Civil Rule 12(b)(6), arguing that the union member who complained to the Secretary failed to exhaust internal remedies with the Union before filing a complaint with the Department of Labor. The Union is correct that, in some respects, the Secretary's suit exceeds the scope of the union member's internal election protest. The motion to dismiss, therefore, will be granted in part.

## I.     RELEVANT FACTS AND PROCEDURAL POSTURE

Plaintiff Martin Walsh is the Secretary of Labor of the United States Department of Labor ("DOL"), who is authorized to bring this action under section 402(b) of Title IV of the LMRDA, 29 U.S.C. § 482(b).[1]  Defendant is a local labor organization within the meaning of the LMRDA, which maintains its principal office at 1701 Spring Garden Street, Philadelphia, PA 19130.  Compl. ¶ 2, ECF 1.  Its approximately 4,000 members are employed as electricians in the Commonwealth of Pennsylvania, in both Philadelphia County and a number of surrounding counties.  *Id.* ¶¶ 13-14.

Defendant completed an election of its President and five executive board members on June 9, 2020.  *Id.* at 1.  A formal vote was never held because all seats were uncontested; all incumbent officers were therefore declared re-elected.  *Id.*  On June 16, 2020, in the wake of the election, Local 98 member Charles Battle filed an internal protest, raising a number of objections to the conduct of the election.  *Id.* ¶ 6.  After an investigation by the IBEW led to the dismissal of Battle's internal complaint, Battle filed an action with the Secretary.  *Id.* ¶ 10.  Then Secretary Eugene Scalia's subsequent investigation led him to the conclusion that there was probable cause for a number of violations of section 401(e) of the LMRDA during Defendant's June 2020 election.  *Id.* ¶ 12.  This Complaint followed.

### A.  Battle's Internal Complaint of June 16, 2020

In a letter submitted June 16, 2020 to IBEW's Third District International Vice President ("IVP") Michael Welsh, union member Charles Battle complained that "the election process was

---

[1] The original Plaintiff in this action was former Secretary of Labor, Eugene Scalia.  Compl. 1.  Pursuant to Rule 25(d), the Court has changed the caption to reflect the transition that occurred on March 23, 2021, when Martin J. Walsh became Secretary.  *See* Fed. R. Civ. P. 25(d).

fraudulently manipulated to secure a guaranteed outcome for the current administration." Internal Compl. of Charles Battle, Def.'s Mot. Dismiss, Ex. B at 1, ECF 6-2. His internal complaint laid out several ways in which he believed that Defendant had illegally obtained a result in which incumbent officers were re-elected without opposition.

First, he claimed that the initial notice of nominations sent to members on May 18, 2020 in the leadup to the election was "intentionally vague" and in violation of DOL guidelines. *Id.* at 2. As an example, he cited its failure to specify critical details as to the "method . . . for submitting nominations . . . including details such as whether a nomination must be seconded." *Id.* The notice stated:

> Nominations shall take place on June 9, 2020, beginning at 7:00pm at the Union's offices at 1719 Spring Garden Street. Acknowledgments of willingness to be nominated for office must be received by the Union no later than 5:00pm on June 9, 2020. Election of the Election Board, if necessary, will take place at the conclusion of the nominations . . ..

*Id.* at 1.

Pursuant to the notice, Battle arrived to submit his nomination paperwork at 4:50pm on June 9, 2020, but was purportedly greeted by a sign on the door of the Defendant's office, stating that "[t]he ONLY Members allowed into the building will be: the Nominated Candidate, the Member nominating the Candidate, [and] the Member seconding the nomination." *Id.* at 2. In his June 16 letter, Battle protested that the original "notice . . . was drafted . . . to deceive the membership and to thwart any competition to the current administration" and "did not mention anything about needing 'three people' present" in order to be nominated, which he interpreted the sign as requiring. *Id.* at 2, 3. He contends that this "was a pure attempt to intimidate [him] not to follow through with running for office." *Id.* at 3.

According to Battle, these deceptive tactics occurred within a broader framework of threats and intimidation.  He describes a situation in which, in the leadup to the election, he "garnered support from members" and "spoke with a couple of guys that also wanted to make a difference and were going to run for positions on the Executive Board." *Id.* at 3.  They were ready to work "collectively" "to help make changes to our Local Union." *Id.*  However, prior to Battle's arrival at Defendant's office to fill out the necessary paperwork acknowledging his intention to be nominated, he alleges that he was notified by the member who was going to nominate him, a fellow prospective candidate, that the member "was unable to nominate him out of fear." *Id.*  Allegedly, the member was called by Defendant's Safety Coordinator Mark Lynch, who then handed the phone to Defendant's Business Manager, John Dougherty, who told the member: "if you go through with this, it will be a long three years." *Id.*  In his June 16 letter to the Third District International Vice President Welsh, Battle went on to state that "members are scared of intimidation and they would not run on their own or support my candidacy." *Id.*

Battle complained that he was subject to threats and intimidation in the leadup to the nomination as well. *Id.*  As an example, Battle contends that Defendant's business representative, Robert Bark, showed up at his house uninvited multiple times, including the Sunday night before the nomination and "put the fear of God into [his] wife and family." *Id.*  By then, Battle had already told Bark "to never show up at my house uninvited . . . because he [wa]s scaring my family." *Id.*  In the June 16 letter, Battle claimed that "this is such a concern of ours, that we have reached out to the FBI for guidance." *Id.*

According to Battle's letter, he was "in the office filling out the paperwork" on June 9, 2020, but "no longer had anyone to sign the papers as the Nominating member." *Id.*  He reflected

on his family "and the fear they have endured so far." *Id.*  He ultimately decided to end his candidacy due to concerns for their safety. *Id.* at 3-4.

     B.  <u>Investigations by IBEW and DOL</u>

     Following Battle's June 16, 2020 letter to IVP Welsh, the matter was referred to IBEW International Representative Randy Kieffer for investigation. *Id.* ¶ 7.  In a report dated July 28, 2020, Kieffer issued his findings, and on July 31, 2020, IBEW denied Battle's internal complaint. *Id.* ¶ 9.  Following the internal investigation by IBEW, Battle filed another complaint—this time with the Secretary—on August 18, 2020, giving rise to this action. *Id.* ¶ 10**.**

     C.  <u>The DOL Complaint</u>

     The Secretary's Complaint is based upon the Department of Labor's investigation. Unlike Battle's internal complaint with the IBEW, it attacks neither the vagueness of the nomination notice nor the signage that appeared on the door of Defendant's office on the day of the nominations.  Instead, the thrust of the complaint is Battle's allegations of intimidation. According to the Secretary, "Defendant intimidated and pressured . . . rank-and-file members out of running for office in its June 2020 election," *id.* at 4, including not just Battle, but also members Timothy McConnell and Michael Coppinger. *Id.* ¶¶ 22-58.  The Secretary also alleges that the in-person nomination procedure used by the Defendant in its 2020 election was neither required by the IBEW constitution nor by Local 98's bylaws, yet Battle's written nomination was not treated as legitimate. *Id.* ¶¶ 18-19, 33, 42.  Finally, the Secretary avers that Defendant's actions during this election occurred in the shadow of a longstanding pattern of interference and retaliation against members who have challenged the union's leadership—including through the denial of jobs, *Id.* ¶¶ 59, 64-65, and that knowledge of this pattern led Battle, McConnell, Coppinger, and their supporters to believe that Defendant would retaliate against them in a similar manner if they

opposed the incumbents. *Id.* ¶ 72. The Complaint does not set forth specific violations in separate counts, but broadly asserts that the conduct it alleges violates the LMRDA.

i.     <u>Charles Battle</u>

Regarding Battle, the Secretary's Complaint alleges that he intended to run for Local 98 President in the June 2020 election and to have member Michael Coppinger nominate him for office. *Id.* ¶ 22. He submitted his nomination paperwork stating his intention to run on June 9, 2020, but, as a result of Defendant's conduct, he felt intimidated, and, "believ[ing] that his supporters would be forced out of work if they went through with nominating him," did not attend the 7:00pm meeting where formal nominations were to take place. *Id.* ¶¶ 17, 31-34, 38-41. Apparently since Battle did not attend the meeting, "Defendant did not treat Battle's written nomination as a nomination for the race of president." *Id.* ¶ 42.

The Secretary avers that the Union and its agents allegedly engaged in numerous acts that ultimately led Battle to withdraw his candidacy, including calls and visits in the months and days before the nomination event. Battle had questioned Defendant's Business Manager John Dougherty and other union leadership at membership meetings in November 2019, January 2020, and February 2020. *Id.* ¶ 23.[2] After each meeting, Defendant's business agent Robert Bark called Battle to ask why he was upset with union leadership. *Id.* ¶ 25. The Complaint alleges that after the January 2020 meeting, in which Battle questioned Business Manager Dougherty about funds that had allegedly been stolen from the union, Bark showed up unexpectedly at Battle's house, once more to speak with him about his questioning of the union's leaders. *Id.* ¶¶ 26-27. After this visit, Battle purportedly told him not to come to the house anymore. *Id.* ¶ 28. Nevertheless, Bark showed up on Sunday, June 7, 2020, just two days before the election, ostensibly "because he had

---

[2] Business Manager Dougherty, like the rest of the incumbent officers, was up for re-election in June 2020. *Id.* ¶ 24.

heard rumors that Battle was running for office and wanted to find out what Battle was so angry about." *Id.* ¶¶ 29-30.

The Secretary also alleges that the atmosphere on the day of the nomination event was "imposing." *Id.* ¶ 38. There were "at least 150 people, primarily supporters of Dougherty and his longstanding slate of incumbents, gathered on the grounds of the union hall." *Id.* ¶ 37. Apparently, "while Battle waited outside the union hall for the nomination meeting to begin, he heard Defendant's business agents talking to the crowd that had gathered. They were trying to identify Battle's nominators and anyone else who might be intending to run for office." *Id.* ¶ 36. Moreover, "[m]embers in the crowd outside the union hall refused to speak to Battle or his supporters. To get to the union hall for the meeting, nominees and nominators had to walk through the crowd of Dougherty's supporters gathered in the parking lot and down the steps to the basement, which Battle and other witnesses described as like 'walking the gauntlet.'" *Id.* ¶ 38.

ii.   Timothy McConnell

Regarding McConnell, the Secretary alleges that he had intended to run for executive board in the June 2020 election but decided not to "because of threats to his job and because he did not want to jeopardize the job prospects of family members who work in the trade." *Id.* ¶¶ 43, 54.

Threats were allegedly made through a series of phone calls prior to the June 9, 2020 nomination meeting. For example, the prior evening, after alerting Defendant's Safety Director Mark Lynch that he was considering running for office by text message, McConnell received a call from Lynch, who then handed the phone to Dougherty. *Id.* ¶¶ 44-45. Dougherty allegedly stated that "it'll be a long three years if you lose," *id.* ¶ 46, which McConnell interpreted as a threat of losing jobs. *Id.* ¶ 47. Towards the end of the call, Dougherty allegedly yelled "If you

ain't with me, you're against me!" *Id.* ¶ 48.  Moreover, following the call with Dougherty, he "received dozens of telephone calls apparently prompted by the news that he planned to run for office," including from Defendant's business agent Rodney Walker.  *Id.* ¶ 49.

Then, on the day of the nomination, he received a third-hand message from a friend and former employer named James Ryan.  *Id.* ¶ 50.  Ryan called to deliver a message he had received from Philadelphia ward leader Brian Eddis the previous night—that Eddis "did not want to see anything happen to McConnell."  *Id.*  Again, the Secretary alleges that McConnell interpreted the message as a threat of losing jobs and believed that Eddis had acted at the direction of Dougherty. *Id.* ¶¶ 52-53.

### iii.   Michael Coppinger

The Secretary alleges that Coppinger also wished to run for executive board but faced similar threats.  *Id.* ¶ 55.  The day before the nomination, he, like McConnell, "received dozens of phone calls regarding his intention to run for executive board."  *Id.* ¶ 56.  The day of the election, his uncle (and Defendant's former business agent), Ed Coppinger, allegedly called "to deliver a message from Dougherty that his career would be finished if he ran for office."  *Id.* ¶ 57. Thereafter, Coppinger decided not to run for office and not to nominate Battle.  *Id.* ¶ 58.

## II.   STANDARD OF REVIEW

Motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  When deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  But courts may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if

the plaintiff's claims are based on the document." *Id.* Because the Secretary's claims are based on an investigation prompted by Battle's internal complaint, which the Union has attached to its motion, I will also consider the internal complaint.

Additionally, in its response to the motion to dismiss, the Secretary invites me to consider numerous documents related to its investigation and attached to its responsive brief. *See* Pl.'s Resp. Br., ECF 7-1. Because these exhibits were not attached to the Complaint and were not provided by the Defendant in its motion to dismiss, they do not fall into the exception outlined in *Pension Ben. Guar. Corp..* Nor do they qualify as public records under the standard set forth by the Third Circuit. *Id.* Although I may consider any "document *integral to or explicitly relied* upon in the complaint,*" In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), I must also take heed that "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (internal citation omitted). Therefore, I will not consider the Secretary's exhibits attached to its responsive brief in deciding this motion. *See Palmeri v. Citadel Broad.*, No. 3:17-CV-00764, 2017 WL 3130282, at *3 (M.D. Pa. July 24, 2017) (declining "to consider extraneous documents" attached in opposition brief to Defendant's motion to dismiss, which would mean "delv[ing] into matters outside of the pleadings").[3]

---

[3] For that matter, both parties appear eager to go beyond the pleadings and jump to the merits of the case. They met and conferred, without the entry of any case management order from the Court, and while this motion was pending *sua sponte* docketed a Rule 26 Report. ECF 9. The Union attached documents to that filing purporting to refute allegations in the Complaint, and stating its willingness to hold a new election to prove its commitment to fair process, provided that the Secretary first acknowledge that the past election did not occur with any threats of violence or retaliation. *Id.* at 5-6. The Secretary summarily dismisses the Union's affirmative defenses, *Id.* at 1-4, and seemingly responds that the Union's reputational concerns are unfounded because he has not proceeded under Section 610 of the LMRDA, which addresses criminal acts. *Id.* at 6.

### III.    RELEVANT LEGAL STANDARD

Under Section 401 of the LMRDA, elections undertaken by labor organizations must adhere to the following requirements:

> [A] reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office . . . and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof.

29 U.S.C. § 481(e).   Moreover, "[t]he election shall be conducted in accordance with the constitution and bylaws of such organization . . .." *Id.*

When a member wishes to challenge an election on the basis that it was conducted in violation of these requirements, he must first exhaust his internal union remedies and file a complaint with the Secretary.  *See Hodgson v. Local Union 6799, United Steelworkers of Am.*, 403 U.S. 333, 336 (1971) (citing 29 U.S.C. § 482).   Only then may the Secretary investigate such complaint.  *Id.*  Afterwards, if the Secretary "finds probable cause to believe that a violation . . . occurred and has not been remedied," he is required to bring a civil action against the labor organization.  29 U.S.C. § 482(b).

In analyzing the LMRDA's exhaustion requirement, the Supreme Court has observed that the text is ambiguous in an important respect: "[w]hile the words 'a violation' might mean 'any violation whatever revealed by the [Secretary's] investigation,' the words are susceptible of other readings.  In particular, they can fairly be read to mean 'any of the violations raised by the union member during his internal union election protest.'"  *Hodgson*, 403 U.S. at 336 (citing *Wirtz v. Local Union No. 125 Laborers' International Union*, 389 U.S. 477 (1968) (alteration to original)).

To resolve this ambiguity, in a pair of decades-old decisions, the Supreme Court analyzed the text in light of its legislative history and underlying policy goals.  *See Wirtz*, 389 U.S. at 480-

486; *Hodgson*, 403 U.S. at 336-41.  It observed that "[b]y channeling members through the internal

. . . processes, Congress hoped to accustom members to utilizing the remedies made available

within their own organization; at the same time, however, unions were expected to provide

responsible and responsive procedures for investigating and redressing members' election

grievances." *Wirtz*, 389 U.S. at 484.  Similarly, "Congress intended to foster a situation in which

the unions themselves could remedy as many election violations as possible," cognizant as well

that the exhaustion requirement must serve "the needs of rank and file union members . . .."

*Hodgson*, 403 U.S. at 340.

In balancing these competing interests, the Court laid out the following guidance for

determining whether the exhaustion requirement is satisfied in any given case:

> We are not unmindful that union members may use broad or imprecise language in framing
> their internal union protests and that members will often lack the necessary information to
> be aware of the existence or scope of many election violations. Union democracy is far too
> important to permit these deficiencies to foreclose relief from election violations; and in
> determining whether the exhaustion requirement of s 402(a) has been satisfied, courts
> should impose a heavy burden on the union to show that it could not in any way discern
> that a member was complaining of the violation in question. But when a union member is
> aware of the facts supporting an alleged election violation, the member must, in some
> discernible fashion, indicate to his union his dissatisfaction with those facts if he is to meet
> the exhaustion requirement.

*Id.* at 340-41 (internal footnotes omitted).  Likewise, it instructed that courts should "permit[] the

Secretary to include in his complaint at least any s[ection] 401 violation he has discovered which

the union had a fair opportunity to consider and redress in connection with a member's initial

complaint." *Wirtz*, 389 U.S. at 484; *see Donovan v. Loc. 1235, Int'l Longshoremen's Ass'n, AFL-*

*CIO*, 715 F.2d 70, 74-75 (3d Cir. 1983) (applying *Hodgson*'s instruction that the "notice element

should be flexibly applied" to union constitution's ten-day time limit for initiating protest);

*Marshall v. Loc. 135, Laborers' Int'l Union of N. Am., AFL-CIO-CLC*, No. 78-4280, 1980 WL

18743, at *11-12, 14 (E.D. Pa. Sept. 16, 1980) (where members' protest challenged only the

exclusion of election observers, but where Secretary's investigation revealed the manipulation of ballots, Secretary could challenge both violations).

## IV.   DISCUSSION

The Complaint broadly alleges several violations of section 401(e) of the LMDRA with regard to the June 2020 election.  The Secretary alleges numerous examples of improper interference by the Defendant, including threats and intimidation directed towards three union members who intended to be nominated, as well as failure to conduct the election in accordance with Defendant's constitution and bylaws.  *See* 29 U.S.C. § 481(e).  The Union does not dispute the legal sufficiency of these claims other than to contend that Battle failed to properly exhausted internal remedies before filing a complaint with the DOL.[4]  According to IBEW, the "Secretary's pleading unfairly exceeds the substance of the member's protest letter to IVP and pursues claims which were not fairly presented to the IVP," Def.'s Mot. Dismiss 11, with the result that it did not have a "fair opportunity to consider and redress" the allegations, in violation of the LMRDA. *Wirtz*, 389 U.S. at 484.

Specifically, the Union argues that a number of alleged violations were absent from the internal complaint: 1) those related to McConnell and Coppinger; 2) that Battle and his supporters were intimidated by an estimated group of 150 Dougherty supporters from attending the

---

[4] The Union vigorously disputes the accuracy of the facts alleged, but on a motion to dismiss the Court's only role is to "determine whether the facts alleged . . . are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d at 211.  With respect to the legal sufficiency of the complaint, the case law supports a variety of violations of section 481(e) similar to those alleged here. *See, e.g.*, *Donovan*, 715 F.2d at 71 (Secretary filed suit to set aside an election on the ground that it was not conducted in accordance with defendant's constitution and bylaws); *Brennan v. Loc. Union 300, Laborers' Int'l Union of N. Am., AFL-CIO*, No. 72-3042-LTL, 1974 WL 1068, at *4 (C.D. Cal. Feb. 21, 1974) ("violations by defendant of its Local Constitution also constituted violations of Section 401(e) of the Act); *Schultz v. Radio Officers' Union of United Tel. Workers*, 344 F. Supp. 58, 61-62, 70 (S.D.N.Y. 1972) (finding violation where candidate for union office withdrew after being advised by incumbent officer that running for election might jeopardize candidate's pension).

nomination meeting on June 9, 2020; 3) that Battle submitted nomination paperwork that was not treated as valid; and 4) that Battle, McConnell, and Coppinger were further intimidated by actions allegedly taken by the Defendant to retaliate against challengers in a previous election.  I will address each claim in turn.[5]

### A.   Secretary's claims relating to McConnell and Coppinger

As stated above, the Secretary has raised claims of improper election interference by IBEW not only as to Battle, but also as to fellow candidates Timothy McConnell and Michael Coppinger. Undeniably, through Battle's internal complaint, the Defendant was on notice that two of its members other than Battle had planned to run for office, that they were planning collectively with Battle, and that they were ultimately "scared of intimidation" and chose not to run themselves or support Battle's nomination.  *See* Def.'s Mot. Dismiss, Ex. B at 3.  Furthermore, the Union was on notice that Business Manager Dougherty had purportedly made threats of reprisal to one of those members.  *Id.*  In fact, IBEW concedes that the Complaint "does make generic reference to claims of 'intimidation.'"  Def.'s Mot. Dismiss 5.  The question is whether that is sufficient for the Secretary to include violations relating specifically to McConnell and Coppinger, who were not identified by name, and who did not file their own internal complaints.  For the reasons that follow, I find that exhaustion requirements have been met as to McConnell alone.[6]

The Union makes much of the fact that neither McConnell nor Coppinger leveled their own internal protests, but I find this argument unpersuasive.  The Supreme Court has instructed that

---

[5] Plaintiff pleaded a single Count for improper election interference, which incorporates by reference a number of claims of alleged violations.  *See* Compl. ¶ 75 ("Defendant is liable for violations of Title VI of the LMRDA that occurred during its officer election that Defendant failed to remedy.").

[6] As to the alleged intimidation of Battle, the Union has not challenged the exhaustion of this specific claim in its motion to dismiss.  Rather, it argues that the facts are exaggerated, Def.'s Reply 5, an argument not relevant on a motion to dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d at 211.

district courts should "permit[] the Secretary to include in his complaint at least any s[ection] 401 violation he has discovered which the union had a fair opportunity to consider and redress *in connection with* a member's initial complaint." *Wirtz*, 389 U.S. at 484 (emphasis added). There is no requirement for every union member affected by "improper interference" in an election to lodge their own internal complaint. Otherwise, every voting member would be required to file his own complaint when the candidate of his choice was deprived of the right to pursue their candidacy. *See Schultz v. Radio Officers' Union of United Tel. Workers*, 344 F. Supp. 58, 64 (S.D.N.Y. 1972) (where member withdrew candidacy for office as a result of intimidation, his "rights under § 481(e) were violated, as were those of other voters"); *see also Marshall*, 1980 WL 18743, at *2, 4, 6 (members representing one of numerous slates of candidates filed internal complaint that no election watcher from any slate—other than the incumbents' slate—was permitted to observe the counting of the ballots); *Wirtz*, 389 U.S. at 478 (internal complaint filed by losing candidate in a runoff election objected that members not in good standing were allowed to run for office, thus impacting the validity of the election as a whole).

Turning to Battle's failure to identify McConnell, I am convinced that the Union nonetheless had a "fair opportunity to consider and redress" the assertion that McConnell was allegedly intimidated. *Wirtz*, 389 U.S. at 484. Battle provided other identifying information. First, he alerted Defendant that there were two members planning to run for office. Def.'s Mot. Dismiss, Ex. B at 3. Second, he provided specifics facts through which Defendant could have investigated and ascertained McConnell's identity. *Id.* Battle's internal complaint explicitly states that Union Safety Coordinator Mark Lynch called a "fellow candidate" before the nomination meeting and handed the phone over to Defendant's Business Manager, who informed that candidate that "it would be a long three years" if he moved forward with his candidacy. *Id.* at 4. The Union could

have made inquiries as to whether such comments had been made—and to whom they were directed.  Or Defendant could have invited any member targeted by such comments to come forward. For that matter, it could have asked Battle himself.   In finding exhaustion as to McConnell, I am guided by the instruction of the Supreme Court that "[u]nion democracy is far too important to permit . . . deficiencies" such as the use of "broad or imprecise language" in a member's internal complaint "to foreclose relief from election violations" sought by the Secretary. *Hodgson*, 403 U.S. at 340-41;  *see Wirtz*, 389 U.S. at 484-85 (where member's protest challenged only runoff election and did not challenge general election, but Secretary's investigation revealed that the same unlawful conduct had occurred at general election, Secretary could challenge both violations);  *Marshall*, 1980 WL 18743, at *12, 14 (where members' protest challenged only the exclusion of election observers, but where Secretary's investigation also revealed the manipulation of ballots, Secretary could challenge both violations).  In sum, the Secretary is not strictly limited to pursuing the specific violations contained in the member's internal complaint, and the Union has not met its "heavy burden . . . to show that it could not in any way discern" that Battle was complaining of the violation regarding McConnell.  *Hodgson*, 403 U.S. at 341.

Whereas Battle provided specific details through which IBEW could have investigated allegations of intimidation regarding McConnell, the same cannot be said for Coppinger.  I am not persuaded that the Defendant had a "fair opportunity" to investigate intimidation concerning Coppinger based on the vague facts in Battle's internal complaint.  Whether one member out of approximately 4,000 had been "scared of intimidation" and therefore did not run nor support Battle's candidacy is not a reasonable basis on which the Defendant could be expected embark on a successful investigation.  Compl*.* ¶ 13.  Unlike the presentation of facts regarding McConnell, here there was no specific factual allegation through which he could have been easily identified.

Therefore, the Defendant's motion will be denied as to the claim regarding McConnell and granted as to the claim regarding Coppinger.

      B.  <u>Secretary's claim relating to onsite intimidation by Dougherty supporters</u>

The Secretary also alleges that the Union and its members and agents committed a violation of LMRDA section 401(e) when roughly 150 supporters of Business Manager Dougherty created an intimidating atmosphere for Battle and his supporters. *Id.* ¶¶ 37-38; *see* 29 U.S.C. § 481(e). They allegedly "gathered on the grounds of the union hall," and "nominees and nominators had to walk through the crowd . . . to the basement," where the nomination meeting would take place. Compl. ¶¶ 37-38. The Secretary alleges that Dougherty's supporters "refused to speak to Battle or his supporters." *Id.* at 38. Battle and other witnesses apparently described the process as "walking the gauntlet." *Id.* IBEW argues that this allegation, having been included nowhere in Battle's internal complaint, has not been properly exhausted. Bearing in mind that "[t]he obvious purpose of an exhaustion requirement is not met when the union, during 'exhaustion,' is given no notice of the defects to be cured," *Hodgson*, 403 U.S. at 340, I agree.

The Union is correct that this allegation about intimidation by Business Manager Dougherty's supporters is nowhere to be found in Battle's internal complaint. Such facts clearly would have been known to Battle when he filed it. According to the Secretary's Complaint, Battle was present himself while he waited for the nomination meeting to begin. Compl. ¶¶ 36, 38; *see Hodgson*, 403 U.S. at 341 ("when a union member is aware of the facts supporting an alleged election violation, the member must, in some discernible fashion, indicate to his union his dissatisfaction with those facts if he is to meet the exhaustion requirement"). Because Battle necessarily knew of these facts and yet did not include them in his internal complaint, the Union

was deprived of a fair opportunity to consider and redress them. *See id.* at 340-41 (exhaustion requirement not met where member knew facts but did not include them in internal complaint).

As to this claim, therefore, Defendant's motion to dismiss will be granted.

C.   Secretary's claim that Defendant failed to treat Battle's written nomination as a legitimate nomination for the race for President

According to the Secretary, IBEW's International Constitution "permits local nominations to be made in writing," and Defendant's bylaws "do not state that officer nominations must be made in person."  Compl. ¶¶ 18-19.  And although Battle submitted his nomination form to Tara Chupka, Defendant's in-house counsel, "Defendant did not treat Battle's written nomination as a nomination for the race of president."  *Id.* ¶¶ 33, 42.  The Union argues that the facts supporting this alleged violation were not properly exhausted because Battle, although he alleged that he was in Defendant's office "filling out" the nomination paperwork on the day it was due, never specifically mentioned in his internal complaint that he *submitted* his nomination form.  Def.'s Mot. Dismiss 9-11.  I disagree with Defendant's characterization of Battle's internal complaint, as well as its argument about the level of specificity that the law requires.

Battle's choice of words—"filling out" the nomination paperwork—represents exactly the type of "imprecise language" that should be expected from a layperson and should not "foreclose relief from election violations."  *Hodgson*, 403 U.S. at 340-41.  Battle states that when he left the union building, "disgraced and let down," the Defendant had "unlawfully[] ended [his] candidacy."  Def.'s Mot. Dismiss, Ex. B at 3-4.  Use of such language clearly implies that Battle had already begun his candidacy—by submitting the paperwork that he was "filling out" minutes before.  As the Supreme Court has observed, Congress did not "intend[] the shape of the enforcement action to be immutably fixed by the artfulness of a layman's complaint."  *Wirtz*, 389 U.S. at 482.  Indeed, "the notice element should be flexibly applied," *Donovan*, 715 F.2d at 74, given that the touchstone

of the analysis is whether Defendant had a "fair opportunity" to consider the objection.  *Wirtz*, 389

U.S. at 484;  *see also Marshall*, 1980 WL 18743, at *12, 14  (where members' internal complaint

had raised only the exclusion of election observers, but where Secretary's complaint also included

manipulation of ballots, exhaustion requirement was met because "the union could be expected to

investigate whether the voting and counting had been conducted fairly").  It is difficult to conceive

of a scenario in which the Union would have investigated Battle's internal complaint and not

discovered that he did, in fact, submit the nomination paperwork (which is attached to the

Secretary's complaint).  Compl. ¶ 32.  Battle's failure to use the "magic words "is not a basis for

dismissal.[7]

### D.  Secretary's allegations of a longstanding pattern of intimidation

As stated above, the Complaint does not specifically delineate which of the factual

allegations the Secretary contends to be a violation of the statute.  In broad terms, the Secretary

avers that the Union's actions here occurred in the shadow of a longstanding pattern of interference

and retaliation against members who have challenged the union's leadership since at least 2014.

Compl. ¶¶ 59, 64-65.  I construe these allegations as evidentiary in nature—put forward to support

---

[7] The Complaint also suggests that a violation was committed because neither the Union's constitution nor its bylaws required an in-person event for a candidate to nominate himself.  Compl. ¶¶ 18-19.  The Union refers to this at the beginning of its motion but does not substantively address it with argument.  *See* Def.'s Mot. Dismiss 3.  There is no indication that Battle raised such an objection internally.  In *Hodgson,* the Supreme Court also considered an election challenge arising out of a union's bylaws and constitution.  403 U.S. at 341.  Because the member's internal complaint did not raise a claim that the union violated its governing documents, the Court held that the claim had not been exhausted.  *Id.*  Significantly, however, the appeal in *Hodgson* followed a non-jury trial, where the district court specifically found that the complaining member had been made aware of the relevant election procedure in advance of filing his complaint.  *See Shultz v. Loc. Union 6799, United Steelworkers of Am., AFL-CIO,* No. 68-326-EC, 1969 WL 4779, at *2 (C.D. Cal. May 22, 1969), *aff'd,* 426 F.2d 969 (9th Cir. 1970), *aff'd sub nom. Hodgson,* 403 U.S. at 341.  Here, it is difficult to conceive how Battle would not have known the election procedures set forth in the governing documents of the Union, and this claim might fail at summary judgement as was the case in *Hodgson.  See* 403 U.S. at 341.  But assuming that the Secretary is asserting this as a separate violation, (which is not entirely clear), the absence of any record as to Battle's personal knowledge prevents dismissal at this stage.

an inference that knowledge of this pattern would have led Battle, McConnell, and their supporters to believe that Defendant would retaliate against them in a similar manner if they opposed the incumbents.  *See id.* ¶ 72.  If instead the Secretary's intent was to advance these facts as separate violations, they would be exhausted, because the Complaint avers that Battle had knowledge of this historical pattern, but it was not raised in Battle's internal complaint.  *Id.* ¶ 71; *see Hodgson*, 403 U.S. at 340-41 (exhaustion requirement not met where member knew facts but did not include them in internal complaint).

The Union is therefore correct in arguing that these allegations cannot form the basis for a violation.

## V.      CONCLUSION

For the reasons stated above, the Union's Motion will be granted as to the Secretary's claims relating to the purported intimidation of Coppinger, purported intimidation at the nomination event by Business Manager Dougherty's supporters, and purported pattern of intimidation by Defendant stretching back to 2014.  In all other respects it will be denied.

An appropriate Order follows.

   /s/ Gerald Austin McHugh
United States District Court
