**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor, | : : : | |
| *Plaintiff,* | : : | CIVIL ACTION NO. 2:21-cv-00096 |
| v. | : : | |
| LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | : : : : | Hon. Gerald A. McHugh |
| *Defendant.* | : : | |

**ORDER**

AND NOW, this _____ day of _____, 2021, upon consideration of Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, it is hereby ORDERED that:

1. Plaintiff's Motion is DENIED;

2. Defendant's Motion is GRANTED; and

3. This Action is DISMISSED with prejudice.

BY THE COURT:

_____
HON. GERALD A. MCHUGH
United States District Court Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| MARTIN J. WALSH, Secretary of Labor, | : | |
| United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-00096 |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL | : | Hon. Gerald A. McHugh |
| BROTHERHOOD OF ELECTRICAL | : | |
| WORKERS, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Local 98, International Brotherhood of Electrical Workers, cross-moves for

summary judgment and opposes the Motion of Martin J. Walsh, Secretary, U.S. Department of

Labor, seeking Partial Summary Judgment on the grounds the admissible evidence establishes

no violation of the LMRDA occurred, specifically that (1) Member Coppinger was neither

eligible to run for or nominate others for office, nor was he subjected to improper influence or

threats of reprisal in relation to his decision not to run for or nominate Member Battle for office;

(2) that Member Battle was not subjected to improper influence or threats of reprisal in relation

to his decision not to run for office, and; (3) Member McConnell was not subjected to improper

influence or threats of reprisal in relation to his decision not to run for office.

The bases for this Motion are set forth in the accompanying Memorandum of Law, Declaration of Joseph R Podraza, Jr., Esquire, and exhibits thereto. A proposed form of Order is enclosed.

Respectfully submitted:

**LAMB MCERLANE, PC**

Dated: December 2, 2021 By: */s/ Joseph R. Podraza, Jr.*
Joseph R. Podraza, Jr., Esquire
jpodraza@lambmcerlane.com
William H. Trask, Esquire
wtrask@lambmcerlane.com
One South Broad Street, Suite 1500
Philadelphia, PA 19107
(215) 609-3170 (direct)
(610) 430-8000 (main)

*-and-*

**CLEARY, JOSEM & TRIGIANI, LLP**
William T. Josem, Esquire
wtjosem@cjtlaw.org
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
(215) 735-9099

*Counsel for Defendant, Local 98, International Brotherhood of Electrical Workers*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor, | : | |
| | : | |
| *Plaintiff,* | : | CIVIL ACTION NO. |
| | : | 2:21-cv-00096 |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | : | Hon. Gerald A. McHugh |
| | : | |
| *Defendant.* | : | |
| | : | |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**LAMB MCERLANE, PC**
Joseph R. Podraza, Jr., Esquire
jpodraza@lambmcerlane.com
William H. Trask, Esquire
wtrask@lambmcerlane.com
One South Broad Street, Suite 1500
Philadelphia, PA 19107
(215) 609-3170 (direct)
(610) 430-8000 (main)

*-and-*

**CLEARY, JOSEM & TRIGIANI, LLP**
William T. Josem, Esquire
wtjosem@cjtlaw.org
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
(215) 735-9099

*Counsel for Defendant, Local 98,
International Brotherhood of Electrical Workers*

## TABLE OF CONTENTS

INDEX OF EXHIBITS ........................................................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iv

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 2

III.    SUMMARY JUDGMENT STANDARD .............................................................. 4

IV.     DISCUSSION .......................................................................................................... 5

       a.   Member Coppinger, who was not eligible to nominate Battle or run
          for office himself, confirmed he never received threats from Local 98
          dissuading him from nominating Battle ............................................................ 7

       b.   Member Battle, who became confused and neither completed the standard
          nomination form nor sought advice from union officials regarding its
          completion, concedes he was not intimidated from seeking office ............................ 11

       c.   Member McConnell, who explained the DOL statement prepared on his
          behalf was materially inaccurate, understood the one statement relied upon
          by the Secretary as evidence of intimidation, could have been taken any ................. 15
          number of ways

V.      CONCLUSION ....................................................................................................... 22

## INDEX OF EXHIBITS

Exhibit A (Rule 11 Motion)
Motion pursuant to F.R.C.P. No. 11 (without exhibits), served by Local 98 on the Secretary on October 11, 2021

Exhibit B (Nomination-Election Notice)
Notice of Nominations and election of officers and election board of IBEW Local 98, May 18, 2020; DOL_LOCAL 98_00285

Exhibit C (Keiffer Dep.)
Deposition of IBEW International Representative Randy Keiffer, September 9, 2021.

Exhibit D (Welsh Dep.)
Deposition of IBEW International Vice President, Michael Welsh, September 9, 2021

Exhibit E (Posted Signs)
Photographs of signs posted at the IBEW Local 98 union hall, June 9, 2020; DOL_LOCAL 98_00295-96

Exhibit F (Burrows Questionnaire)
Union official interview questionnaire and report of interview of Local 98 President Brian Burrows, September 3, 2020; DOL_LOCAL 98_00436-46

Exhibit G (Chupka Dep.)
Deposition of Tara Chupka, Esquire, September 8, 2021

Exhibit H (Meeting Minutes)
IBEW Local 98 nomination meeting minutes, June 9, 2020; DOL_LOCAL 98_00321-22

Exhibit I (Welsh Letter)
Letter from International Vice President Michael Welsh to Charles Battle dated July 31, 2020; DOL_LOCAL 98_00255-264

Exhibit J (Battle Dep.)
Deposition of Charles Battle, August 12 and 26, 2021

Exhibit K (McConnell Dep.)
Deposition of Timothy McConnell, August 10, 2021

Exhibit L (Coppinger Dep.)
Deposition of Michael Coppinger, September 24, 2021

Exhibit M (Letter or Assent)

Letter of Assent recognizing Coppinger Electric, LLC as a signatory contractor, dated May 12, 2020

Exhibit N (IBEW Constitution)
IBEW Constitution and Rules for Local Unions and Councils Under Its Jurisdiction (2016) (Excerpts); DOL_LOCAL 98_00001-116

Exhibit O (IBEW Basic Laws & Policies)
IBEW Basic Laws and Policies, Member Eligibility to Vote and Hold Office (Excerpts)

Exhibit P (Siegel Declaration)
Declaration of Don Seigel, signed by Don Seigel under penalty of perjury on October 5, 2021

Exhibit Q (Battle Statement)
Statement of Charles Battle, prepared by DOL and signed by Battle on October 13, 2020; DOL-LOCAL 98_00406-10

Exhibit R (DOJ Email)
Email from Lauren DeBruicker, Esquire to Joseph Podraza, Jr., Esquire, dated August 6, 2021

Exhibit S (E. Coppinger Declaration)
Declaration of Ed Coppinger, electronically signed by Ed Coppinger under penalty of perjury on September 16, 2021.

Exhibit T (Borthwick Statement)
Statement of Philip Borthwick signed on October 15, 2020; DOL-LOCAL 98_00413-16

Exhibit U (Battle Emails)
Selected Emails from Charles Battle to Local 98, dated from October 24, 2016 to November 27, 2019; Deposition Exhibit "Battle 14"

Exhibit V (Battle Photo)
Photograph depicting Charles Battle during the first day of his deposition testimony, August 12, 2021.

Exhibit W (Election Guide)
IBEW U.S. Local Union Election Guide (2016) (Excerpts)

Exhibit X (McConnell-Lynch Texts)
Texts from Timothy McConnell to IBEW Local 98 Safety Director Mark Lynch, June 8, 2020; DOL_LOCAL 98_00294

Exhibit Y (Dougherty, Report of Interview)
Report of Interview of IBEW Local 98 Business Manager John Dougherty, November 19, 2020; DOL_LOCAL 98_00464-78

## **TABLE OF AUTHORITIES**

**Cases**

*Accord Acosta v. Loc. 101, Transp. Workers Union of Am. AFL-CIO,*
  339 F. Supp. 3d 80 (E.D.N.Y. 2018)......................................................................... 14

*Bland v. City of Newark,*
  900 F.3d 77 (3d Cir. 2018)....................................................................................... 4

*Blunt v. Lower Merion Sch. Dist.,*
  767 F.3d 247 (3d Cir. 2014)..................................................................................... 5

*Fraternal Ord. of Police, Lodge 1 v. City of Camden,*
  842 F.3d 231 (3d Cir. 2016)................................................................................ 5, 10

*In re Weinstein Co. Holdings LLC,*
  997 F.3d 497 (3d Cir. 2021)..................................................................................... 4

*Jacobs v. Cumberland Cty.,*
  8 F.4th 187 (3d Cir. 2021)....................................................................................... 4

*Jiminez v. All Am. Rathskeller, Inc.,*
  503 F.3d 247 (3d Cir. 2007)............................................................................. 5, 7, 10

*McKinley v. Meier,*
  456 F. Supp. 3d 673 (E.D. Pa. 2020) ...................................................................... 10

*Moran v. Pittsburgh-DES Moines Steel Co,*
  183 F.2d 467 (3d Cir. 1950)..................................................................................... 6

*Slater v. Erie Lackawanna Railway Co.,*
  300 F.Supp. 1 (W.D. Pa. 1968) ............................................................................... 7

Smith v. City of Allentown,
  589 F.3d 684 (3d Cir. 2009).................................................................................. 5, 10

*Tomaszewski v. City of Philadelphia,*
  460 F. Supp. 3d 577 (E.D. Pa. 2020) ...................................................................... 10

**Statutes**

29 U.S.C. § 481(e) ................................................................................................................ 5

## I.    __INTRODUCTION__

Devoid of admissible supporting facts, the Secretary moves for partial summary judgment on his claims associated with the June 9, 2020 nominations and elections held by Local 98. The Secretary's unnecessarily lengthy fulmination is based in all material respects on vague inferences and several inadmissible statements composed by the DOL for declarants who lack firsthand knowledge of the events and conversations described or who dispute the accuracy and reliability of the DOL statements, or both.   Indeed, the Secretary's papers incredibly ignore that the deposition testimony, binding on the Secretary, of the same three union members whom the Secretary contends were disenfranchised on June 9th through alleged acts of intimidation, actually refutes the Secretary's contention.  Simply, no admissible evidence exists to establish that the June 9th proceedings were anything other than properly conducted by the Union, and the DOL's assault on the legitimacy of the proceedings is a flat-out prevarication.

If it was less than obvious to the Secretary that this action lacked merit upon completion of the depositions, it was certainly known once he was served with notice of Local 98's intent to move for sanctions under Rule 11 for maintaining his otherwise meritless claims. A copy of Defendant's Motion for Sanctions is attached hereto as Exhibit "A." Rather than acknowledge these defects and own up to the contrary binding testimony of his own witnesses, the Secretary filed the within motion just before the safe harbor period expired, thereby electing, not only to proceed with a lawsuit which lacks both legal and factual support, but to demand partial summary judgment based on inadmissible half-truths and outright falsehoods that are elsewhere discredited in the admissible record.  The time has come to put an end to the governmental misuse and abuse of authority manifested by the filing of this fabricated action.  The Secretary's motion should be denied, judgment should be entered in the Union's favor, and the Union's Rule 11 sanction petition

pending against the Secretary granted.  Alternatively, the case should be directed to proceed to trial.

## II.    <u>BACKGROUND</u>

The undisputed admissible facts pertinent to the resolution of the Secretary's motion are as follows:

Local 98 mailed each of its members a notice of nominations and election on May 18, 2020, advising that nominations would take place at the Union Hall on June 9, 2020 at 7:00 PM. (Notice of Nomination-Election, Ex. B.) The Notice further provided that acknowledgments of willingness to be nominated for office must be received that same day (June 9th) by 5:00 PM. If properly completed, these nomination forms were sufficient to effectuate a nomination. (Ex. C, Keiffer Dep. at 39:12-16; Ex. D, Welsh Dep. at 60:14-19.) Due to the ongoing COVID-19 pandemic and restrictions imposed by the City of Philadelphia limiting the number of persons permitted to gather indoors, signs were posted outside the Union Hall advising members that rank and file observers would not be admitted, and access to the nomination meeting would be limited to the candidates, nominators and seconds. (Ex. E, Posted Signs; Ex. F, Burrows' Questionnaire) Although the Secretary insists on perpetuating an image of an adversarial meeting in the midst of a gauntlet-like atmosphere, in truth, according to the only admissible evidence of record, the atmosphere at the meeting was friendly, with food and ice cream trucks on site catering to the members who—due to COVID restrictions—mingled outdoors all around the property and along the street, socializing jovially. (*See e.g.* Ex. G, Chupka Dep. at 69:22-70:7.)

The nomination meeting proceeded as scheduled at 7:00 PM on June 9th. As all races were uncontested, the incumbent officers were reelected by acclamation. (Ex. H, Minutes) Such elections by acclamation are common (Ex. C, Keiffer Dep. 137:6-11) as no union member wants

to bear the costs of an election every three years particularly when, as here, all had greatly prospered under the current leadership. (*Id*. at 138:11-18.)

Subsequently, Member Charles Battle, who had neither completed a nomination form nor attended the nomination meeting, submitted a protest claiming he had been deprived of the opportunity to run for the office of president.[1] Upon investigating Member Battle's complaint, Randy Keiffer, the International Union Representative assigned to review Battle's complaint, concluded Battle had been confused about his ability to nominate himself for office (Ex. C, Keiffer 49:14-21), but that he never asked any of the number of available members in the local or district offices for guidance or assistance (*Id*. at 62:1-2, 68:14-22, 70:13-72:21, 81:9-13). Regarding Member Battle's claim that he was intimidated from seeking office by a pre-June 9th visit from a Local 98 Business Agent, Member Robert Bark, Keiffer concluded Bark was a longtime friend of Battle's who visited from time to time. (*Id*. at 84:15-85:25, 87:5-88:20, 92:18-23.) And, in any event, Member Bark's pre-June 9th visit to inquire why Battle had become irate at a recent meeting angered, rather than intimidated, Battle. (*Id*.)

During the internal union investigation, Member Battle advised Keiffer that another member, Timothy McConnell, had been intimidated out of seeking office with threats of reprisal from union officials. Keiffer was eventually able to contact Member McConnell, who described a pre-June 9th phone call with Local 98 Business Manager, John Dougherty, that made McConnell "feel funny." (Ex. C, Keiffer Dep. 122:12-123:9) According to McConnell, Dougherty stated, "if you lose the election, it could be a long three years," although Member McConnell confessed he was not sure what Dougherty meant. (*Id*. at 125:5-14) Ultimately, Member McConnell confirmed he was never directly threatened (*Id*. at 127:5-9), and was adamant that no charges be pursued or

---

[1] Battle had previously submitted a complaint to the Secretary, but was advised he must wait to challenge the propriety of the election until after the elections were completed.

investigated. (*Id*. at 130:8-16) Upon conclusion of the investigation, and after consideration by the International Vice President Michael Welsh, Member Battle's claims were found to be without merit. (Ex. I, Welsh Letter.)

Member Battle then again called-on the Secretary, although it remains unclear if Battle was consulting with federal representatives (FBI and DOL) both pre-June 9th and immediately after June 9th. DOL agents expeditiously met with Members Battle, McConnell and others identified by Battle as having information related to his claims. These agents composed skewed statements, purportedly on behalf of each witness. (Ex. J, Battle Dep. at 110:11-13, 115:13-25, 126:18-24, 130:18-22 (Battle, confirming DOL agents rather than Battle composed his statement); Ex. K, McConnell Dep. at 133:11-135:19; 144:20-145:9; 146:7-148:5; 152:11-24; 155:18-156:9 (McConnell, also confirming DOL composed his statement on his behalf).) DOL never interviewed Member Coppinger or composed a statement on his behalf, relying instead on the second- and third-hand gossip and rumors of others to make out a claim on Coppinger's behalf.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate only where the moving party demonstrates there is no genuine dispute as to any material fact such that the movant is entitled to judgment as a matter of law. At summary judgment, a district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Jacobs v. Cumberland Cty*., 8 F.4th 187, 192 (3d Cir. 2021), citing *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). The summary judgment standard does not require a court to draw improbable inferences. *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 510 (3d Cir. 2021). The "obligation to view the evidence in the light most favorable to a non-movant does *not* require the court to take into account evidence that will not be admissible at the trial."

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 297 (3d Cir. 2014) (emphasis in original). "[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*." *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (emphasis in original). But "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). As importantly, deposition testimony is deemed more reliable than a declaration or an affidavit, and, therefore, the latter cannot be allowed to contradict the former. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253-54 (3d Cir. 2007).

## IV.   DISCUSSION

Under the Labor-Management Reporting and Disclosure Act ("LMRDA), "a reasonable opportunity shall be given for the nomination of candidates and every member [meeting reasonable, uniformly imposed qualifications] … shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof."  29 U.S.C. § 481(e). The admissible evidence of record—the only evidence the Court may consider at this stage of the proceeding in considering the Secretary's motion—demonstrates every Local 98 member (over 4,000 in total) was given the same, reasonable opportunity to participate in the June 9th union nominations and elections. Of these members, the Secretary claims three (Members Coppinger, Battle, and McConnell) withdrew from consideration for office, or refrained from exercising nomination rights, due to intimidation and threats of retaliation.

To place the Secretary's action in proper context, no admissible evidence exists that either of the two potential candidates (Members Battle and McConnell) were considered viable or otherwise would have posed any threat to the leadership's incumbency, had they even decided to

follow through with their respective candidacies. It is undisputed that, unlike the incumbents who had successfully maintained high wages, affordable benefits and steady employment for the members, and greatly improved the stations of the members over their terms of office (Ex. K, McConnell Dep 223:12-226:4), Members Battle and McConnell had no union leadership experience whatsoever, did not attend executive board meetings or participate in union activities, and only very sporadically even attended regular union meetings, preferring to spend time engaged in non-union activities when not at work. (*See* Ex. K, McConnell Dep. 15:19-22:16; Ex. J, Battle Dep. 187:11-24) In fact, Member Battle, when he appeared at the Union Hall on June 9th to begin filling out his nomination form, had not even decided what office he wanted to run for, and ultimately left without completing the form at all. (Ex. J, Battle Dep. 264:3-265-13.) Even Member McConnell candidly acknowledged that John Dougherty—the business manager the Secretary claims threatened McConnell, forcing his withdrawal—had no concerns that any incumbent would be defeated in the election. (Ex. K, McConnell Dep. 215:14-217:23) This is all to say, there is simply no evidence on this record that these untested, unpopular contrarians could win, such as might motivate the current union leadership to resort to the untoward tactics alleged by the Secretary.

Nevertheless, as discussed below in turn, even putting aside the absence of motivation for the incumbent union leadership to subvert the candidacies as alleged here by the Secretary, each of these members undeniably testified under oath that the Secretary's allegations of intimidation/retaliation are unfounded. While ignored in the Secretary's papers, these three witnesses offered by the Secretary in support of his claims constitute the nexus of the Plaintiff's case, and their testimony—good, bad or indifferent—is binding on him. *See, e.g., Moran v. Pittsburgh-DES Moines Steel Co*, 183 F.2d 467, 471 (3d Cir. 1950) (party may be bound by

unfavorable testimony supplied by supposedly favorable witness); *Slater v. Erie Lackawanna Railway Co*., 300 F.Supp. 1, 3 (W.D. Pa. 1968). The Secretary may not now, after his witnesses have disclaimed allegations of improper intimidation at deposition, simply ignore that testimony in favor of conflicting, self-serving statements previously composed by DOL. *See Jiminez* , 503 F.3d at 253-54.

### a. <u>Member Coppinger, who was not eligible to nominate Battle or run for office himself, confirmed he never received threats from Local 98 dissuading him from nominating Battle.</u> [2]

The Secretary's claims based on the alleged intimidation of Member Michael Coppinger are wholly contrived. To begin with, per the IBEW Constitution, it is undisputed that Member Michael Coppinger was not eligible to run for office, eligible to nominate others for office, or even eligible to attend or participate in union meetings. Member Coppinger testified that he and his wife had founded an electrical contracting business, which had become a signatory contractor with Local 98 effective May 12, 2020. (Ex. L, Coppinger Dep. at 112:11-15; *see also* Ex. M, May 12, 2020 Letter of Assent between Coppinger Electric, LLC and IBEW Local 98.) As the IBEW Constitution provides in pertinent part,

> No [Local Union] shall allow any member who becomes an electrical employer, a partner in an electrical employing concern, a general manager, or other managerial position, to hold office in the L.U. or attend any of its meetings, or vote in any election of a L.U.

(IBEW Const. Art. XV, Sec. 5, pertinent portions of which are attached as Ex. N.) Furthermore, IBEW's Basic Laws & Policies state,

> No local union may allow any member who becomes an electrical employing concern, or a general manager or other managerial position, to hold office in the local union or attend any of its meetings or vote in any of its elections.

---

[2] Without repeating the basis thereof, Local 98 continues to contend that the Secretary's claims based on Coppinger were not preserved, are not properly before this Court for adjudication, and therefore should, for that separate reason, be summarily resolved in Local 98's favor.

(IBEW Basic Laws & Policies, "Member Eligibility to Vote and Hold Office," pertinent portions of which are attached as Ex. O.) Thus, as of May 12, 2020—nearly a month before the June 9, 2020 nominating meeting— Member Michael Coppinger was considered an electrical employer doing business with Local 98 as a signatory contractor and was, as a result, categorically ineligible to run or nominate others for office, vote in any election, or even attend union meetings. (*See* Ex. P, Declaration of Don Siegel.)

And even ignoring—as the Secretary has surely ignored— Member Coppinger's dispositive ineligibility to run or nominate others for office by virtue of his status as a signatory contractor, the Secretary's claim that Coppinger declined running for office or nominating Battle due to threats he received from local union officials is predicated solely on statements prepared by DOL agents recounting gossip or rumors attributed to this or that witness regarding a call Coppinger received from his relative. (*See* Battle Statement, Ex. Q at 409.) Member Coppinger never met with DOL or provided DOL agents with a statement, and DOL never prepared a statement on his behalf. (Ex. R, DOJ Email, Aug. 6, 2021.)

Member Coppinger was, however, deposed in this case. During that deposition, Member Coppinger testified without reservation that, although he briefly considered running for a position on the Executive Board, Coppinger decided a month prior to the June 9, 2020 nomination meeting that he would not run for any office due to health reasons, specifically a tumor discovered near his spine, painful diabetic ulcers on his feet, and the anxiety both these conditions were causing him. (Ex. L, Coppinger Dep. at 16:3-17:24.) Member Coppinger was prodded continuously by the Secretary's counsel during the course of his deposition to give some other reason, and he repeatedly confirmed that concern for his health was the only reason he decided not to get involved. (*Id*. at 24:7-8; 26:8-12; 27:13-15; 29:13-15; 30:1-3; 36:21-24; 37:16-19; 55:1-11.) Moreover, he

testified his decision not to run for any office was made well before any of the alleged threatening communications recounted in the Secretary's Amended Complaint. (*Id.* at 23:19-23; 51:22-52:4.)

Similarly, Member Coppinger confirmed his decision not to nominate Battle for office—after only reluctantly agreeing to do so in the first place—was not due to union threats issued through his relative, Ed Coppinger, as the Secretary contends. (Ex. L, Coppinger Dep. 23:3-22; 48:10-16; 53:19-24; 69:16-19.) With Member Coppinger hesitant to nominate anyone, Battle had pressed him relentlessly up into the day of the nomination itself. (*Id.* at 52:5-8.) Still struggling with ongoing health issues, Member Coppinger did not even get to the union hall the night of the nomination meeting until late. (*Id.* at 46:7-11)

When confronted directly regarding the call from Ed Coppinger, a relative, on the eve of the nomination meeting—a call the Secretary contends without evidence represented improper intimidation by the Union— Member Coppinger confirmed the call had nothing to do with his decisions not to run or nominate. (Ex. L, Coppinger Dep. at 70:16-19.)  As Member Coppinger explained: by the time of the call, he had already decided for health reasons not to run (*Id.* at 68:16-19; 70:16-19.).  Moreover, Ed Coppinger, the caller, was not even aware that Michael had ever considered running or nominating anyone for office (*Id.* at 90:12 – 91:4.); never threatened or relayed threats of retaliation should Michael become involved in the election; nor did the two even discuss the election at all. (*Id.* at 70:3-4; 91:9-15; 110:24-111:4; 111:12-20; Ex. S, Declaration of Ed Coppinger.) In fact, Member Michael Coppinger confirmed the accuracy of Ed Coppinger's own recollection of the call, which was memorialized in a sworn declaration that Michael Coppinger reviewed during the deposition. (Ex. L, Coppinger Dep. at 73:17-92:3.; *see also* Ex. S, Declaration of Ed Coppinger.)  Curiously, the Secretary elected not to depose Ed Coppinger.

The Secretary, rather than confront Member Coppinger's sworn testimony, incredibly ignores it, choosing instead to improperly rely on the hearsay/rumors/gossip of third parties as recorded in statements prepared by the Secretary's own agents. For example, to support the assertion that Member Coppinger was improperly dissuaded from nominating Battle—the only allegation in this action pertaining to Coppinger—the Secretary relies on Member Battle's statement, drafted by DOL agents, in which Battle describes learning from Member Borthwick that Coppinger told Borthwick he decided not to nominate Battle after receiving a call from his "uncle." (Secretary's Brief, Dkt. No. 27 at p. 46, citing Battle Statement, Ex. Q at 409). Member Borthwick, in turn, claims cryptically in his DOL statement he spoke to Member Coppinger after the nomination meeting and knows who Coppinger spoke to and what was said. (Ex. T, Borthwick Statement at 416)

But courts will not dignify affidavits to establish a genuine factual dispute where such affidavits conflict with sworn deposition testimony, and instead will bar the use of such contradictory affidavits at the summary judgment stage because sworn deposition testimony is inherently more reliable. *Jiminez,* 503 F.3d at 253-54. Even setting aside the unreliable nature of the rumors and gossip recounted in the DOL statements, particularly given the testimony of the "affiants" disclaiming their accuracy, hearsay within hearsay within hearsay is not admissible in any court, and may not be used here as a basis for awarding summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment"); *see also Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 238 (inadmissible hearsay may not be considered in awarding summary judgment); *McKinley v. Meier*, 456 F. Supp. 3d 673, 677 (E.D. Pa. 2020) (same); *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 596 (E.D. Pa. 2020) (same). In contrast,

the *only admissible evidence* concerning the substance of the phone call between Ed and Member Michael Coppinger is the testimony of Michael Coppinger and the unchallenged declaration of Ed Coppinger, both of whom rebut the Secretary's third-hand version of their conversation. Given Member Coppinger himself has denied the truth of the Secretary's allegations, there is simply no evidence to support the Secretary's contention that Coppinger was intimidated or threatened, even if the Coppinger claims were properly preserved (which they are not). These claims of intimidation or threats must, as a matter of law, be resolved in the Union's favor.

      **b.**  **<u>Member Battle, who became confused and neither completed the standard nomination form nor sought advice from union officials regarding its completion, concedes he was not intimidated from seeking office.</u>**

Beginning in late 2019, Member Charles Battle admittedly had become increasingly belligerent at union meetings toward local union officials. (Ex. G, Chupka Dep. 59-60) As reflected in his email communications, Battle's hostility correlated with his son-in-law's inability to reenter the coveted apprenticeship program after being dismissed from the program for his drug use. (Ex. U, emails from C. Battle.) By November 2019, Member Battle's son-in-law was still not included in the incoming apprentice class.  (*Id*.) Noticeably angered by this development, at the November 2019 general meeting, members present noticed a marked change in Member Battle's behavior, describing him as belligerent. (Ex. J, Battle Dep. 154:2-155:18) Member Battle, himself, admits he acted belligerently at the November 2019 general meeting and each other meeting which was held thereafter before the June 9th nominations and elections. (*Id*.)  Prior to June 9th, Member Robert Bark, a business agent and longtime friend of Member Battle's, reached out to learn the cause of Battle's sudden hostility, but these efforts were rebuffed. (*Id*. at 154:12-155:2; 245:11-246:1.)

Member Battle claims he decided to run for local union office, ultimately settling on the office of president. (*Id*. at 240:14-17; 129:11-12) However, according to Member Battle, he became confused by the nomination process and admittedly neither completed the paperwork nor appeared for the in-person nomination meeting, one of which was a necessary prerequisite to nomination. (*See, e.g.,* Ex. C, Keiffer Dep, 49:14-21.) Nevertheless, the Secretary, again based on the statement composed by DOL officials and without reference to or acknowledgement of Member Battle's contrary sworn testimony, claims Battle failed to secure his nomination due to threats by Local 98 officials.

But the admissible record does not support the Secretary's claims, much less provide an undisputed account that warrants the grant of partial summary judgment in his favor.

Claims by the Secretary that Member Battle was intimidated turn on a pre-June 9th visit to Battle's home by Member Robert Bark, a longtime friend.  Setting aside the dispute over the propriety of Member Bark's visiting his friend to inquire into the cause of Member Battle's recent belligerency, what remains undisputed is that Battle appeared for the June 9th meeting as directed in the notice and began filling out the necessary nomination paperwork in spite of Bark's visit. (Am. Compl., Dkt, No. 20, at ¶¶ 26-34.) Member Battle even expressly denied that he felt intimidated at the June 9th nominating proceeding. Specifically, the Secretary claims—based on the statement prepared by DOL—that Member Battle was afraid to attend the meeting, which would have required his running a "gauntlet" of the incumbents' supporters. But when asked directly at his deposition why, after failing to complete his nomination form, he did not just attend the meeting in person, he explained that he was confused about when and where he should go, and, rather than ask anyone for guidance, he just went to his truck and left. (Ex. J, Battle Dep. at 274:19-22, 263:17-22.)

Member Battle is hardly the shrinking violet the Secretary misleadingly implies in his moving papers.   Far from being intimidated, Member Battle's immature disdain for union leadership was even manifest at his deposition where he chose to continually make rude finger gestures towards those union representatives in attendance. (*See* Ex. V.) In any event, it is



*Ex. V, Member Battle, gesturing deliberately toward Local 98 representatives and their counsel during the first day of his deposition.*

undisputed that Member Battle testified that he decided against pursuing his candidacy out of unspecified imagined "consequences" to other members if one of them were to nominate him for office—not out of personal fear in any sense.  (Ex. J, Battle Dep. at 271:18-272:11, 276:7-13.) According to Member Battle, his irrational "concern" for others compelled him to reject offers by others to nominate him and to instead decide to walk away. (*Id*.) But, as discussed further below, his "concern" was unquestionably irrational since the "concern" could easily have been allayed by his self-nomination, an option then available to Member Battle.

Despite these alleged imagined and unspecified concerns, there is no dispute that Member Battle failed to complete the actual nomination form himself. (Am. Compl., Dkt, No. 20, at ¶ 33; Ex. J, Battle Dep. at 278:20-279:2; Ex. C, Keiffer Dep. 68:14-22.) Member Battle now claims he was confused about whether he could nominate himself for office, (Ex. J, Battle Dep. at 263:3-8,

266:24-267:3, 273:24-274:22.).  But the Union had a longstanding policy which allowed a member to self-nominate (a written policy about which Battle knew or should have been aware), and the right to self-nominate was widely known throughout the membership.  (Ex. C, Keiffer Dep. 81:14-19; Ex. D, Welsh Dep. 40:1-7; and Ex. W, IBEW Local Union Election Guide (confirming members' ability to self-nominate).  Admittedly, Member Battle never asked anyone for guidance, including Member Coppinger who understood self-nomination was permissible, and Battle chose to leave the Union Hall before the meeting even began. (Ex. J, Battle Dep. at 265:12-13, 304:16-305:6; *see also* Ex. L, Coppinger Dep. at 59:2-11; 102:11-13; 103:21-104:4.)

Thus, unlike in the Secretary's Amended Complaint, the record demonstrates Member Battle failed to be nominated for office, not because he was threatened or intimidated, and not due to any intimidation of Member Coppinger—who was himself ineligible and in too much pain to participate (*see* IV.a., *supra*)— but because Battle failed to self-nominate or complete the same nomination form every other prospective nominee was provided and completed. Requiring Member Battle to self-nominate or complete and submit the same form as everyone else is not an unreasonable requirement for nomination, and the Secretary does not contend otherwise in his moving papers. *Accord Acosta v. Loc. 101, Transp. Workers Union of Am. AFL-CIO*, 339 F. Supp. 3d 80, 90 (E.D.N.Y. 2018) (disqualification of member for failure to comply with facially reasonable, uniformly imposed rule requiring member to complete letter of acceptance was reasonable.) And there is certainly no allegation—much less evidence—that Member Battle was prevented or discouraged from completing the form by any representative of Local 98. In sum, Local 98 cannot be held responsible for Member Battle's failure to arrange to be nominated for office by another eligible member or himself. The Secretary's contention that threats of reprisal

caused Member Battle to withdraw himself from consideration are without evidence, unsupported even by the testimony of Battle himself.

**c.** **Member McConnell, who explained the DOL statement prepared on his behalf was materially inaccurate, understood the one statement relied upon by the Secretary as evidence of intimidation, could have been taken any number of ways.**

Finally, the Secretary's allegations concerning Member McConnell are predicated on now-known gross misrepresentations contained in his statement, which was earlier composed by DOL agents. Given his testimony at deposition, we now know that the DOL statement deliberately obscures the timeline and implies falsely that Member McConnell received numerous calls prior to deciding against running for office, and that statements attributed to Local 98 members were in relation to McConnell's decision to run for office, rather than—as McConnell would testify—McConnell's perceived association with a website created, financed and administered (by Member Battle) for the purpose of disparaging certain of Local 98's members and their families.

From Member McConnell's deposition, we further learned the Secretary's embellishments in DOL's prepared statement for him are not subtle, and exemplify the agency's tendency to stretch these statements to support the claims rather than reflect the facts. For example, in both Member McConnell's statement and the Secretary's Amended Complaint—neither of which was prepared by McConnell himself—the Secretary alleges that McConnell notified Safety Director Mark Lynch by text message on June 8, 2020 that he was considering running for office. (Am. Compl., Dkt, No. 20 at ¶ 48, and Ex. 6 thereto at DOL_LOCAL 98_00421.1.) After recounting "four hours fielding non-stop phone calls" later that night and more calls received by Member McConnell throughout the following day, the Secretary states that McConnell texted Lynch again and advised Lynch of his decision not to run. (Am. Compl., Dkt, No. 20, Ex. 6 at 412.3.) Member McConnell testified under oath that the Secretary's factual account is simply not true. The DOL statement

and Amended Complaint, by omitting the date and time of Member McConnell's second text message to Lynch, give the impression McConnell's decision not to run came *after* receiving all these calls. In truth, Member McConnell's second text to Lynch followed the first by approximately 90 minutes. (*See* Ex. X, McConnell Text Thread to Lynch.) Said another way, no "four hours" of non-stop calls impacted Member McConnell's decision not to run—he had already decided not to run and informed the union of his decision before he received any such calls. Member McConnell confirmed the shorter, accurate timeline during his deposition. (Ex. K, McConnell Dep. at 55:10-19; 89:7-22.)

Only because Member McConnell was deposed did we additionally learn that the many inaccuracies in his DOL-prepared statement were the result of DOL's composition, completed well after McConnell met with agents to be interviewed, rather from errors in his own recollection. (Ex. K, McConnell Dep. 133:8-15; 134:22-135:19.)  Member McConnell even testified that DOL's omitting any dated or chronological reference to his second June 8, 2020 text message in the DOL-prepared statement was material, even disturbingly misleading:

> Q.    Well, where in the statement attributed to you does it say that you sent a second text message to Lynch on June 8th later in the evening.
>
> A.    I don't know.
>
> Q.    Well, take your time. Go through it. Show me where it is.
>
> A.    No, I don't see it.
>
> Q.    That's important information, don't you think?
>
> A.    Yes.
>
> Q.    Yeah, wouldn't it be important to know that I initially said I'm thinking of running, and as time passed, whatever happened in between, I then said, I'm not running? That's something you'd want to put factually in your statement to be factually accurate, correct?
>
> A.    Yeah, if I – I mean –

Q.      Yeah. I mean, if you want to leave a false impression that I told them I'm going to run and never said I wasn't going to run, then you wouldn't make reference to your text, right?

A.      Yeah.

* * *

Q.      Well, why doesn't it say in there then – you know, while you may have been in your backyard fielding calls, you had already told Lynch well before that that you weren't running. So why is that not in here?

A.      I don't know.

(Ex. K, McConnell Dep. 144:20-146:5; 147:23-148:5) (objections omitted)

In another example of Member McConnell's testimony establishing that the Secretary took broad liberties with the facts in composing McConnell's DOL statement, reference is made to James Ryan who, according to the Secretary's DOL statement called McConnell and warned him against running lest he suffer union retaliation. In the statement the Secretary composed for Member McConnell, only after Ryan's warning does McConnell decide not to run and text Lynch with his decision. In reality, however, according to Member McConnell's deposition testimony, his mind was long since made up by the time Ryan called him on June 9th, and McConnell told him so. (*Id.* at 149:15-23.) Indeed, Member McConnell had already informed the Union on June 8th of his decision not to run, a day before he spoke with Ryan on June 9th.  When confronted with the obvious error in the Secretary's statement, Member McConnell conceded the Secretary's creative wording gave a wrong impression of the facts.

Q.      And if you turn to your last page, it says there, "I talked with Ryan the following morning, June 9th, 2020. Ryan said to me, I guess you decided to run." It doesn't say anything there that -- even if you accept that, that you said, no, I already told the union last night I'm not running, it's not in there.

Q.      Is it because of you or because of the representative from the DOL didn't include that?

A.      I don't recall.

17

Q.    Well, you agree with me that at least indicating that on June 8, 2020, you told the union you weren't running, and if Ryan then called you and made that mistake, you would have just said, look, it's a mistake and I'm not running, correct?

A.    I don't remember. I mean, yeah, if that's -- well, I didn't talk to Jimmy -- I didn't talk to Jimmy the day before, so I'm betting -- or Jimmy didn't know that, that I was out yet. He just -- it was from the conversation I had with Brian Eddis the night before.

Q.    But when speaking with Ryan, even if he didn't know and accepting what you're saying, you certainly told him, hey, I'm out, I already told them, I gave them a text, I'm out as of June 8, 2020, correct?

A.    Yeah. I mean, I probably told him after he said that.

Q.    But I don't see that here in this statement. Don't you think that's important information?

A.     Yeah. I mean, I don't know.

Q.    Doesn't this kind of lead you to believe that you're still a candidate on June 9, 2020, when your text has already said you're not as of June 8th, 2020?

A.    Yeah. I mean --

Q.    And I'm not blaming you. I'm just saying whoever prepared this statement didn't seem to care about the fact that you had texted Mr. Lynch, your good buddy, during the night of June 8, 2020, to say I'm not running. Isn't that your impression?

A.     I guess.

(Ex. K, McConnell Dep. 148:7-150:23) (objections omitted)

At the end of his deposition, we learned from Member McConnell that he had a single phone conversation with Business Manager John Dougherty before notifying Member Lynch on June 8th he had reconsidered running. McConnell decided not to run because he did not want to be associated with the offensive website Member Battle had created to tastelessly disparage other union members and officials. (Ex. B, McConnell Dep. at 91:1-14; *see also* Ex. X ("I'm 100% against what happened on that website and don't want to be tied in with that…."). ) And, the Secretary's portrayal of the call as nefarious is untrue.

18

Member McConnell testified that during the call, Dougherty became upset while discussing the website, which among other things disparaged Dougherty's wife and daughter. Suspecting Member McConnell's involvement with the website, Dougherty stated "If you're not with me, you're against me!" (Ex. K, McConnell Dep. at 91:1-92:21.) Member McConnell agreed during his deposition that those anonymously posting comments about Dougherty, his family, etc., clearly would not be "with him" and would be "against him." (*Id*. at 92:12-21.) Agreeing with this proposition, Member McConnell then testified that he considered Dougherty's statement as commentary on McConnell's potential association with the despicable website, but not having anything to do with McConnell considering running for the Executive Board. (*Id*.)

Member McConnell further testified that the other noteworthy statement Dougherty made during their June 8th call involved Dougherty expressing concern for the union and its members should inexperienced members (like McConnell) serve on the Executive Board:

> Q.   All right. Now, during that call didn't Mr. Dougherty question your running for the executive board because you had not served in any position with the union during the 16 years of your membership?
>
> A.   He might have, yeah, made reference to union meetings. Yeah, I mean, I don't -- I don't remember that part. Say it again. I'm sorry.
>
> Q.   Sure. Didn't Mr. Dougherty question your running for the executive board because you had not served in any position with the union during the 16 years of your membership?
>
> A.   That was part of it I think.
>
> Q.   All right. And didn't Mr. Dougherty suggest during that call an effective board requires members who are active in union activities?
>
> A.   I remember, yeah, stuff like why fix something that ain't broken and stuff like that. I don't remember exactly what you just said.
>
> Q.   All right. Well, we'll get into some of that, but if you could answer my question now because these are specific questions.
> Do you recall Mr. Dougherty suggesting that an effective board requires members who are active in union activities?

A.   I guess. I don't really remember that part.

Q.   Well, do you remember Mr. Dougherty suggesting that the experience he believes needed to serve effectively on the board could only be gained by and through service with the union?

A.   Yes.

Q.   And do you also remember Mr. Dougherty saying, you know, words to the effect that a board which is not effective during its three-year term could hurt the union and its members?

A.   Say that again.

Q.   Sure. That Mr. Dougherty said -- and I'm -- it could be words to this effect, okay -- that a board which is not effective during its three-year term could hurt the union and its members.

A.   I don't remember some of that.

Q.   Well, do you think it makes sense?

A.   It makes sense.

Q.   And didn't Mr. Dougherty infer to you during the call that you weren't ready to effectively serve the members if you won a three-year term on the board?

A.   I don't remember that.

Q.   And didn't Mr. Dougherty suggest you should run for a less prominent position with the union first before running for the board?

A.   That was never said.

Q.   You're positive?

A.   I don't recall that being said.

Q.   Well, we've gone from it never said to I don't recall. Which one is it?

A.   I don't think he said that, no.

Q.   Now, would you agree that an executive board filled with ineffective leaders serving three years could be harmful to the union?

A.   Yes.

(Ex. K, McConnell Dep. at 61:5-64:9) (objections omitted).

20

The nature and substance of this second aspect of the June 8th conversation between Dougherty and Member McConnell—a conversation lasting 45 minutes, according to Member McConnell—was inexplicably oversimplified and decontextualized in the statement DOL representatives composed for McConnell in October 2020, thereby changing its meaning altogether. Where the emphasis during the phone call was on Dougherty's concern about inexperienced members serving on the Executive Board, the DOL statement focused solely on Dougherty saying to Member McConnell words to the effect that "It'll be a long three years if you lose," without any of the accompanying context. (Ex. K, McConnell Dep. at 106:17-107:2.) The evolution over time of the substance of the second statement attributed to Dougherty in the June 8th call remains a perplexing mystery.[3] But, in any event, Member McConnell testified that he was not even sure what message Dougherty actually intended to convey, and further confirmed he (McConnell) did not perceive the statement to be a direct threat. (*Id*. at 105:18-19.)

Finally, hoping the Court will draw an inference of retaliation, the Secretary alleges that a week after signing the statement the Secretary had prepared, Member McConnell was laid off from his union job. (Am. Compl., Dkt, No. 20, at ¶ 60.) But if the Secretary was aware of that, the Secretary must have also been aware that the job on which Member McConnell was employed was coming to an end, and McConnell immediately transitioned to a new job without any loss of time or pay. (Ex. K, McConnell Dep at 183:10-184:22.) And there is no evidence of record that Union leadership was even aware Member McConnell was in contact with DOL or prepared to sign a statement composed by DOL. Even Member McConnell refused to connect his layoff to his

---

[3] In discovery, the Secretary produced a report of interview involving Dougherty in which the Secretary contends Dougherty was asked "whether he told McConnell 'you're either with us or against us. If you're against us, it'll be a long three years'," yet another iteration of the conversation between Dougherty and McConnell on June 8th. This iteration plainly establishes the second of the two alleged statements was also unrelated to the election or McConnell's running for office. (Ex. Y, Report of Interview, J. Dougherty, dated Nov. 19, 2020, at p. 7 (DOL_LOCAL 98_00591).)

criticisms of Local 98's leadership or passing electoral ambitions. (*Id*. at 184:2-22.) And moreover, it is undisputed that McConnell has suffered no loss of work, reduction in pay, or other negative consequence that could possibly qualify as retaliation. (*Id*. at 185:17-186:1.)

In sum, the Secretary bases the entire claim as it relates to Member McConnell on two admittedly ambiguous, election-neutral statements coupled with the selective omission of certain facts to mischaracterize events preceding the nominations. As for admissible evidence that supports the Secretary's contentions, there is none, and the Secretary's motion for partial summary judgment as it pertains to Member McConnell should be denied.

## V.    <u>CONCLUSION</u>

The admissible record evidence establishes that the June 9, 2020 nominations and elections were properly conducted by Local 98. Governmental claims that the proceeding was undermined by acts of intimidation or threats of retaliation are trumped-up.  The Secretary has known for some time that this action is baseless, but sadly continues to press on with it in defiance of any standard of good governance. The malicious excess of governmental power evidenced here must be curtailed, should be sharply rebuked, and cannot be allowed to disenfranchise the political will of the 4,000+ members of Local 98 expressed on June 9th.

For all the foregoing reasons, Defendant, Local 98, International Brotherhood of Electrical Workers respectfully requests that this Court deny the Motion of Plaintiff Martin J. Walsh, Secretary of Labor, for Partial Summary Judgment, and grant summary judgment in favor of Local 98 or, in the alternative, allow the case to proceed to trial.

Respectfully submitted:

**LAMB MCERLANE, PC**

Dated: December 2, 2021                    By: */s/ Joseph R. Podraza, Jr.*
                                                 Joseph R. Podraza, Jr., Esquire
                                                 jpodraza@lambmcerlane.com
                                                 William H. Trask, Esquire
                                                 wtrask@lambmcerlane.com
                                                 One South Broad Street, Suite 1500
                                                 Philadelphia, PA 19107
                                                 (215) 609-3170 (direct)
                                                 (610) 430-8000 (main)

                                                     *-and-*

                                                 **CLEARY, JOSEM & TRIGIANI, LLP**
                                                 William T. Josem, Esquire
                                                 wtjosem@cjtlaw.org
                                                 325 Chestnut Street, Suite 200
                                                 Philadelphia, PA  19106
                                                 (215) 735-9099

                                                 *Counsel for Defendant, Local 98, International*
                                                 *Brotherhood of Electrical Workers*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARTIN J. WALSH, Secretary of Labor,** **United States Department of Labor,** | : : : | |
| *Plaintiff*, | : : | CIVIL ACTION NO. **2:21-cv-00096** |
| **v.** | : : | |
| **LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,** | : : : : | Hon. Gerald A. McHugh |
| *Defendant*. | : : | |

## CERTIFICATE OF SERVICE

This is to certify that in this case a complete copy of the foregoing pleading has been filed electronically and is available for viewing and downloading from the ECF system.  This document is being served upon the following counsel by electronic filing and service procedures:

Lauren E. DeBruicker, Esquire
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Ste 1250
Philadelphia, PA 19106
Lauren.debruicker@usdoj.gov

*Attorney for Plaintiff*

Dated: December 2, 2021             **LAMB McERLANE PC**

By:  */s/ Joseph R. Podraza, Jr.*
Joseph R. Podraza, Jr., Esq. (PA 53612)
*jpodraza@lambmcerlane.com*
One South Broad Street, Suite 1500
Philadelphia, PA 19107
(215) 609-3170 (Direct)
(610) 430-8000 (Main)
(610) 692-0877 (Fax)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor,<br>United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO.<br>2:21-cv-00096 |
| | : | |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL<br>BROTHERHOOD OF ELECTRICAL<br>WORKERS, | : | Hon. Gerald A. McHugh |
| | : | |
| *Defendant*. | : | |

**DECLARATION OF JOSEPH R. PODRAZA, JR.**

I, Joseph R. Podraza, Jr., Esquire, am counsel to Local 98, International Brotherhood of Electrical Workers, the Defendant in this action, and in support of Defendant's Cross-Motion for Summary Judgment, and in Opposition to the Plaintiff's Motion for Summary Judgment, declare as follows:

1. Attached as Exhibit A is a true and correct copy of Defendant's Motion pursuant to F.R.C.P. No. 11 (without exhibits), Dkt. No. 28, served by Local 98 on the Secretary October 11, 2021.

2. Attached as Exhibit B is a true and correct copy of the Notice of Nominations and election of officers and election board of IBEW Local 98, May 18, 2020.

3. Attached as Exhibit C is a true and correct copy of Deposition of IBEW International Representative Randy Keiffer taken on September 9, 2021.

4. Attached as Exhibit D is a true and correct copy of the Deposition of IBEW International Vice President, Michael Welsh taken on September 9, 2021.

5.      Attached as Exhibit E is a true and correct copy of the photographs of signs posted at the IBEW Local 98 Union Hall, June 9, 2020.

6.      Attached as Exhibit F is a true and correct copy of the Union official interview questionnaire and report of interview of Local 98 President Brian Burrows, September 3, 2020.

7.      Attached as Exhibit G is a true and correct copy of the Deposition of Tara Chupka, Esquire taken on September 8, 2021.

8.      Attached as Exhibit H is a true and correct copy of the IBEW Local 98 nomination meeting minutes for June 9, 2020.

9.      Attached as Exhibit I is a true and correct copy of the Letter from International Vice President Michael Welsh to Charles Battle dated July 31, 2020.

10.      Attached as Exhibit J is a true and correct copy of the Depositions of Charles Battle taken on August 12 and 26, 2021.

11.      Attached as Exhibit K is a true and correct copy of the Deposition of Timothy McConnell taken on August 10, 2021.

12.      Attached as Exhibit L is a true and correct copy of the Deposition of Michael Coppinger taken on September 24, 2021.

13.      Attached as Exhibit M is a true and correct copy of the Letter of Assent recognizing Coppinger Electric, LLC as a signatory contractor, dated May 12, 2020.

14.      Attached as Exhibit N is a true and correct copy of Excerpts of the IBEW Constitution and Rules for Local Unions and Councils Under Its Jurisdiction (2016).

15.      Attached as Exhibit O is a true and correct copy of  Excerpts of the IBEW Basic Laws and Policies, Member Eligibility to Vote and Hold Office.

16.     Attached as Exhibit P is a true and correct copy of the Declaration of Don Seigel, signed by Don Seigel under penalty of perjury on October 5, 2021.

17.     Attached as Exhibit Q is a true and correct copy of the Statement of Charles Battle, prepared by DOL and signed by Battle on October 13, 2020.

18.     Attached as Exhibit R is a true and correct copy of the Email from Lauren DeBruicker, Esquire to Joseph R. Podraza, Jr., Esquire, dated August 6, 2021.

19.     Attached as Exhibit S is a true and correct copy of the Declaration of Ed Coppinger, electronically signed by Ed Coppinger under penalty of perjury on September 16, 2021.

20.     Attached as Exhibit T is a true and correct copy of the Statement of Philip Borthwick signed on October 15, 2020.

21.     Attached as Exhibit U is a true and correct copy of Selected Emails from Charles Battle to Local 98, dated from October 24, 2016 to November 27, 2019.

22.     Attached as Exhibit V is a true and correct copy of the Photograph depicting Charles Battle during the first day of his deposition testimony, August 12, 2021.

23.     Attached as Exhibit W is a true and correct copy of Excerpts of the IBEW U.S. Local Union Election Guide (2016).

24.     Attached as Exhibit X is a true and correct copy of text messages from Member Timothy McConnell to IBEW Local 98 Safety Director Mark Lynch, June 8, 2020.

25.     Attached as Exhibit Y is a true and correct copy of the Report of Interview of IBEW Local 98 Business Manager John Dougherty, November 19, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 2nd day of December, 2021.

/s/ Joseph R. Podraza, Jr.
Joseph R. Podraza, Jr., Esquire
jpodraza@lambmcerlane.com
One South Broad Street, Suite 1500
Philadelphia, PA 19107
(215) 609-3170 (direct)
(610) 430-8000 (main)

4

# Ex. A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor,<br>United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO.<br>2:21-cv-00096 |
| | : | |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL<br>BROTHERHOOD OF ELECTRICAL<br>WORKERS, | : | Hon. Gerald Austin McHugh |
| | : | |
| *Defendant*. | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____ 2021, upon due consideration of

the Motion of Defendant, Local 98, International Brotherhood of Electrical Workers for

Sanctions Pursuant to Fed. R. Civ. P. 11, and any response thereto, it is hereby ORDERED and

DECREED that Defendant's Motion is GRANTED.  Plaintiff's action is DISMISSED with

prejudice.

Defendant Local 98 is directed to submit a declaration of costs and expenses, including

attorneys' fees, within ten (10) days of the date of this Order. Plaintiff may submit any

opposition thereto within seven (7) days after receipt of Defendant's declaration.

BY THE COURT:

_____
Hon. Gerald Austin McHugh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor, | : : : | |
| *Plaintiff*, | : : | CIVIL ACTION NO. 2:21-cv-00096 |
| v. | : : | |
| LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | : : : : | Hon. Gerald Austin McHugh |
| *Defendant*. | : : | |

## DEFENDANT'S MOTION FOR SANCTIONS AGAINST PLAINTIFF PURSUANT TO FED. R. CIV. P. 11

_____

Defendant, Local 98, International Brotherhood of Electrical Workers ("Local 98"), by and through its undersigned counsel, hereby moves this Honorable Court for an Order awarding appropriate sanctions against Plaintiff Martin J. Walsh, Secretary of Labor, United States Department of Labor ("the Secretary"), for violating Federal Rule of Civil Procedure 11.

In support of this Motion, Defendant Local 98 incorporates by reference the accompanying Memorandum of Law.

Respectfully submitted:

**LAMB MCERLANE, PC**

Dated: October 11, 2021      By: */s/ Joseph R. Podraza, Jr.*
                                   Joseph R. Podraza, Jr., Esquire
                                   jpodraza@lambmcerlane.com
                                   William H. Trask, Esquire
                                   wtrask@lambmcerlane.com
                                   One South Broad Street, Suite 1500
                                   Philadelphia, PA 19107
                                   (215) 609-3170 (direct)
                                   (610) 430-8000 (main)

*-and-*

**CLEARY, JOSEM & TRIGIANI, LLP**
William T. Josem, Esquire
wtjosem@cjtlaw.org
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
(215) 735-9099

*Counsel for Defendant, Local 98, International
Brotherhood of Electrical Workers*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-00096 |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | : | Hon. Gerald Austin McHugh |
| | : | |
| *Defendant*. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SANCTIONS AGAINST PLAINTIFF PURSUANT TO FED. R. CIV. P. 11**
_____

Defendant, Local 98, International Brotherhood of Electrical Workers ("Local 98"), by

and through its undersigned counsel, submits this Memorandum of Law in Support of

Defendant's Motion for Sanctions against Plaintiff Martin J. Walsh, Secretary of Labor, United

States Department of Labor ("the Secretary"), for violating Federal Rule of Civil Procedure 11.

**I.     BACKGROUND**

The Secretary filed the instant action to compel Local 98 to conduct new nomination

proceedings, claiming the June 9, 2020 proceedings were tainted by intimidation and threats of

retaliation by certain Local 98 members and officers to discourage the participation of three

members in those proceedings. Local 98, in an effort to avoid the costs of litigation, initially

offered to hold new nomination proceedings and, if necessary, an election, but only if the

Secretary agreed to withdraw the specious intimidation claims. The Secretary declined to

withdraw these claims and, on July 16, 2021, filed an Amended Complaint to ostensibly salvage

certain of the intimidation and retaliation claims previously dismissed by the Court.

The Secretary's Amended Complaint is predicated on the "statements" prepared by DOL investigators on behalf of two of the three supposed complainants. In drafting these purported statements, DOL investigators creatively mischaracterize the positions of the witnesses who have since testified to their inaccuracy. Although during discovery it has become clear the factual predicate for these claims is nonexistent, the Secretary and his attorneys persist in advancing these false claims of intimidation and retaliation and insist on engaging in further costly and unnecessary discovery. But by continuing to advocate claims otherwise repudiated by the very witnesses on whose behalf this action was purportedly filed, and by advocating factual contentions otherwise lacking any evidentiary support, the Secretary is in violation of Federal Rule of Civil Procedure No. 11, and his failure to withdraw this action upon notice from Local 98 warrants sanctions.[1]

## II.    MOTION FOR SANCTIONS

As has become increasingly clear during this litigation, the Secretary's lawsuit was apparently never more than an attempt to exploit the personal grievances of one disaffected member to gain public notoriety, smear Local 98, and influence public opinion on the eve of its business manager's criminal trial. The facts relied upon to support the Secretary's Amended Complaint are derived solely from statements prepared by agents of the Secretary himself, in which dates and facts have been omitted and events rearranged to create the illusion of wrongdoing. Only in discovery have these witnesses, on whose behalf the "statements" were prepared, been afforded the opportunity to testify in their own words. And given that

---

[1] The Secretary was served with a copy of this motion on October 11, 2021 without the accompanying exhibits already in the possession of the Secretary. As of that date, Michael Coppinger's deposition transcript had not yet been completed. Page and line citations were added prior to filing with the Court once the transcript became available.

testimony—the only admissible evidence on which the Secretary may rely—there is no longer

any question the Secretary has no factual basis from which to maintain this lawsuit. As such,

given the Secretary's refusal to withdraw the action despite having notice the factual contentions

on which it is based lack any evidentiary support, sanctions are warranted for the willful

violation of FRCP 11.

 The Federal Rules of Civil Procedure provide in relevant part:

> (b) Representations to Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needlessly increase in the cost of litigation;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ….

Fed. R. Civ. P. 11(b)(1) and (3). If Rule 11(b) is violated, then Rule 11(c)(4) permits the Court to

impose sanctions, including reasonable attorneys' fees, expenses, or nonmonetary directives.

"[R]easonableness [under the circumstances is] defined as an objective knowledge or belief at

the time of the filing of a challenged paper that the claim was well-grounded in law and

fact." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (citations

and internal quotations omitted). Attorneys are required to conduct a "normally competent level

of legal research to support the[ir] presentation." *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir.

1994).

 Importantly, Rule 11 expressly provides that "later advocating" a previously filed

pleading once it becomes apparent the factual contentions therein lack evidentiary support also

triggers sanctions under the Rule. *See* Fed. R. Civ. P. 11, advisory committee note to 1993 amendments (noting the Rule's emphasis on "the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable."); *see, e.g., Young v. Corbin*, 889 F. Supp. 582, 585 (N.D.N.Y. 1995) (Rule 11 prohibits advocating positions contained in signed pleadings after learning those positions no longer have merit.)

The Secretary's action is predicated on the alleged intimidation of three union members: Michael Coppinger, Charles Battle, and Timothy McConnell. Because all three, as discussed in turn below, have now testified at deposition and confirmed facts on the record that dispel any potential evidentiary support for the Secretary's contentions that intimidation occurred, or that intimidation of these three members affected the nomination proceedings, the Secretary's ongoing advocacy of these claims violates Rule 11 and warrants the imposition of sanctions from this Court.

### A.      Michael Coppinger

The Secretary's claim of intimidation as it relates to Member Michael Coppinger consists of an alleged threat relayed to Coppinger over the phone through a relative, Ed Coppinger, a retired former member of Local 98. (*See* Am. Compl., Dkt. No. 20, at ¶ 63.) The sole basis for this allegation are the statements of Battle and McConnell, in which each speculates, or heard from elsewhere, that Coppinger may have received a call from his uncle Ed at the behest of Business Manager John Dougherty, warning Michael Coppinger that he would be "finished" unless he abandoned running for office. (*See* Am. Compl., Dkt. No. 20 at Exs. 5 and 6.) These statements, Battle and McConnell have since confirmed, were prepared by DOL officials and are replete with inaccuracies and mischaracterizations. (*See, e.g.*, Ex. A, Battle Dep. at 110:11-13, 115:13-25, 126:18-24, 130:18-22; *see also* Ex. B, McConnell Dep. at 133:11-135:19; 144:20-

145:9; 146:7-148:5; 152:11-24; 155:18-156:9.) Notably, the Secretary never obtained or produced statements from either Michael or Ed Coppinger during the investigation or at any time before preparing the Amended Complaint, which is curious given the substance of that single phone call constitutes the sole basis for any claim against Local 98 vis-à-vis Michael Coppinger. (*See, e.g.,* Ex. C, Email dated August 6, 2021, 2:42 PM, confirming DOL obtained no statement from Coppinger.)

Fortunately, Michael Coppinger was deposed in this litigation. During that deposition, Coppinger testified that, although he briefly considered running for a position on the Executive Board, Coppinger decided a month prior to the June 9, 2020 nomination meeting that he would not run for any office due to health reasons, specifically a tumor discovered near his spine, painful diabetic ulcers on his feet, and the anxiety both these conditions were causing him. (Ex. D, Coppinger Dep. at 16:3-17:24.) Coppinger was prodded continuously during the course of his deposition to give some other reason, and he repeatedly confirmed that concern for his health was the only reason he decided not to get involved. (*Id*. at 24:7-8; 26:8-12; 27:13-15; 29:13-15; 30:1-3; 36:21-24; 37:16-19; 55:1-11.) Moreover, he testified his decision not to run for any office was made well before any of the alleged threatening communications recounted in the Secretary's Amended Complaint. (*Id*. at 23:19-23; 51:22-52;4.)

When confronted directly regarding the call from Ed Coppinger on the eve of the nomination meeting, Coppinger confirmed the call had nothing to do with his decision not to run. (Ex. D, Coppinger Dep. at 70:16-19.)  As Coppinger explained: by the time of the call he had already decided for health reasons not to run (*Id*. at 68:16-19; 70:16-19.); Ed Coppinger was not even aware that Michael had ever considered running or nominating anyone for office (*Id*. at 90:12 – 91:4.); Ed Coppinger never threatened or relayed threats of retaliation should Michael

become involved in the election, nor did the two even discuss the election at all. (*Id*. at 70:3-4; 91:9-15; 110:24-111:4; 111:12-20.) In fact, Michael Coppinger confirmed the accuracy of Ed Coppinger's own recollection of the call, which was memorialized in a sworn declaration that Michael Coppinger reviewed during the deposition. (*Id*. at 73:17-92:3.; *see also* Ex. E, Declaration of Ed Coppinger.) Given Coppinger himself has denied the truth of the Secretary's allegations, there is simply no evidence to support the Secretary's contention that Coppinger was intimidated or threatened.

Finally, in addition to the foregoing, Coppinger testified that he and his wife had founded an electrical contracting business, which had become a signatory contractor with Local 98 effective May 12, 2020. (Ex. D, Coppinger Dep. at 112:11-15; *see also* Ex. F, May 12, 2020 Letter of Assent between Coppinger Electric, LLC and IBEW Local 98.) Per the IBEW Constitution,

> No [Local Union] shall allow any member who becomes an electrical employer, a partner in an electrical employing concern, a general manager, or other managerial position, to hold office in the L.U. or attend any of its meetings, or vote in any election of a L.U.

(IBEW Const. Art. XV, Sec. 5, pertinent portions of which are attached as Ex. G.) Furthermore, IBEW's Basic Laws & Policies state,

> No local union may allow any member who becomes an electrical employing concern, or a general manager or other managerial position, to hold office in the local union or attend any of its meetings or vote in any of its elections."

(IBEW Basic Laws & Policies, "Member Eligibility to Vote and Hold Office," pertinent portions of which are attached as Ex. H.) Thus, as of May 12, 2020—nearly a month before the June 9, 2020 nominating meeting—Michael Coppinger was considered an electrical employer doing business with Local 98 as a signatory contractor and was, as a result, categorically ineligible to run or nominate others for office, vote in any election, or even attend union meetings. (*See* Ex. I,

Declaration of Don Siegel.)

As Coppinger has made clear, notwithstanding the Secretary's unfounded contentions, as of June 9, 2020, Coppinger was not only prevented from participating solely due to his serious health issues, but he was also *ineligible* to participate in local union elections per the IBEW laws and Constitution, which flatly prohibited him from seeking office himself or nominating others. Simply stated, the Secretary's factual contention that Member Coppinger declined to run or nominate others for office because he was threatened and intimidated by Local 98 members and officials has no evidentiary support. By continuing to advocate this position, the Secretary is in violation of Rule 11 and should be subject to sanctions.

### B.    Charles Battle

The Secretary's claims of threats and intimidation as they pertain to Battle's unsuccessful nomination are similarly without evidentiary support. Despite allegations that Battle was intimidated from running, including by Member Robert Bark, a longtime friend who called and later visited Battle's home on the eve of the nomination, Battle nevertheless appeared for the meeting as instructed in the notice and began filling out the necessary nomination paperwork. (Am. Compl., Dkt, No. 20, at ¶¶ 26-34.) Battle even expressly denied that he felt intimidated at the June 9, 2020 nominating proceeding.  (Ex. A, Battle Dep. at 274:19-22.)  To the contrary, he claimed he was concerned about the unspecified "consequences" to other members if one of them were to nominate him for office.  (*Id*. at 271:18-272:11, 276:7-13.) According to Battle, his irrational "concern" compelled him to reject offers by others to nominate him and to instead decided to walk away. (*Id*.) Nevertheless, despite these alleged, unspecified concerns, Battle failed to complete the actual nomination form himself. (Am. Compl., Dkt, No. 20, at ¶ 33; Ex. A, Battle Dep. at 278:20-279:2.) Battle now claims he was confused about whether he could

nominate himself for office. (Ex. A, Battle Dep. at 263:3-8, 266:24-267:3, 273:24-274:22.)

Admittedly, Battle never asked anyone for guidance, including Coppinger who understood self-nomination was permissible, and Battle left the Union Hall before the meeting even began. (*Id.* at 265:12-13, 304:16-305:6; *see also* Ex. D, Coppinger Dep. at 59:2-11; 102:11-13; 103:21-104:4; and Ex. K, IBEW Local Union Election Guide (confirming members' ability to self-nominate).)

Thus, unlike the Secretary's Amended Complaint, the record demonstrates Battle failed to be nominated for office, not because he was threatened or intimidated, and not due to any intimidation of Coppinger—who was himself ineligible and in too much pain to participate (*see* II.A., *supra*)— but because Battle failed to complete the same nomination form every other prospective nominee was provided and completed. Having Battle complete and submit the same form as everyone else is not an unreasonable requirement for nomination. *Accord Acosta v. Loc. 101, Transp. Workers Union of Am. AFL-CIO*, 339 F. Supp. 3d 80, 90 (E.D.N.Y. 2018) (disqualification of member for failure to comply with facially reasonable, uniformly imposed rule requiring member to complete letter of acceptance was reasonable.) And there is certainly no allegation—much less evidence—that Battle was prevented or discouraged from completing the form by any representative of Local 98. Likewise, Local 98 cannot be held responsible for Battle's failure to be nominated for office. The Secretary's contention that threats of reprisal caused Battle to withdraw himself from consideration are without evidence, unsupported even by the testimony of Battle himself. The Secretary's insistence on continuing to advocate this claim without any evidentiary support is a violation of Rule 11 and warrants sanctions.

### C.     Timothy McConnell

The allegations concerning Member McConnell are predicated on gross misrepresentations contained in his statement, which was prepared by DOL agents to

deliberately obscure the timeline and imply falsely that McConnell not only received numerous calls prior to deciding against running for office, but that statements attributed to Local 98 members were in relation to McConnell's decision to run for office, rather than McConnell's perceived association with a website created for the purpose of disparaging certain of Local 98's members and their families.

In both McConnell's statement and the Secretary's Amended Complaint—neither of which was prepared by McConnell himself—the Secretary alleges that McConnell notified Safety Director Mark Lynch by text message on June 8, 2020 that he was considering running for office. (Am. Compl., Dkt, No. 20 at ¶ 48, and Ex. 6 thereto at DOL_LOCAL 98_00421.1.) After recounting "four hours fielding non-stop phone calls" later that night and more calls received by McConnell throughout the following day, the Secretary states that McConnell texted Lynch again and advised Lynch of his decision not to run. (Am. Compl., Dkt, No. 20, Ex. 6 at 412.3.) Although both the statement and Amended Complaint, by omitting the date and time of McConnell's second text message to Lynch, give the impression McConnell's decision not to run came *after* receiving all these calls, in truth McConnell's second text to Lynch followed the first by approximately 90 minutes. (*See* Ex. J, McConnell Text Thread to Lynch.) McConnell confirmed the shorter, accurate timeline during his deposition. (Ex. B, McConnell Dep. at 55:10-19; 89:7-22.)

Thus, in reality, McConnell confirmed having a single phone conversation with Business Manager John Dougherty before notifying Lynch he had reconsidered running to avoid being associated with the offensive website Battle had created to tastelessly disparage other union members and officials. (Ex. B, McConnell Dep. at 91:1-14; *see also* Ex. J ("I'm 100% against what happened on that website and don't want to be tied in with that…."]).) And regarding this

9

single call, the Secretary emphasizes two statements as proof of intimidation.

Regarding the first, McConnell testified that during the call, Dougherty became upset while discussing the website, which among other things disparaged Dougherty's wife and daughter, and perhaps suspecting McConnell's involvement with the website, Dougherty stated "If you're not with me, you're against me!" (Ex. B, McConnell Dep. at 91:1-92:21.) McConnell agreed during his deposition this comment may have been intended as commentary on McConnell's association with the despicable website, thereby having nothing to do with McConnell's recently considering a run for Executive Board. (*Id*.) The second statement relied upon by the Secretary is similarly ambiguous. McConnell recounts that Dougherty expressed "It'll be a long three years if you lose," which McConnell agreed may have referred to hardships resulting from electing ineffective leaders to the Executive Board. (Ex. B, McConnell Dep. at 107:16-23.) McConnell, in fact, was not sure what Dougherty meant, but confirmed he was never directly threatened. (*Id*. at 105:18-19.)

Finally, hoping the Court will draw an inference of retaliation, the Secretary alleges that a week after signing the statement the Secretary had prepared, McConnell was laid off from his job. (Am. Compl., Dkt. No. 20, at ¶ 60.) But if the Secretary was aware of that, the Secretary must have also been aware that the job on which McConnell was employed was coming to an end, and McConnell immediately transitioned to a new job without any loss of time or pay. (Ex. B, McConnell Dep at 183:10-184:22.) Even McConnell refused to connect his layoff to his criticisms of Local 98's leadership or passing electoral ambitions. And moreover, McConnell suffered no loss of work, reduction in pay, or other negative consequence that could possibly qualify as retaliation.

In sum, the Secretary bases the entire claim as it relates to McConnell on two admittedly

ambiguous statements coupled with the selective omission of certain facts to mischaracterize events preceding the nominations. As for evidence that supports the Secretary's contentions, there is none, and the Secretary's insistence on continuing to advocate this claim without any evidentiary support is a violation of Rule 11 and warrants sanctions.

## III.     Conclusion

For all the foregoing reasons, Defendant, Local 98, International Brotherhood of Electrical Workers respectfully requests that this Court grant Defendant's Motion against Plaintiff Martin J. Walsh, Secretary of Labor, award costs, including attorneys' fees, to the Defendant, and impose sanctions on Plaintiff for violating Federal Rule of Civil Procedure 11.

Respectfully submitted:

**LAMB MCERLANE, PC**

Dated: October 11, 2021         By: */s/ Joseph R. Podraza, Jr.*
                                Joseph R. Podraza, Jr., Esquire
                                jpodraza@lambmcerlane.com
                                William H. Trask, Esquire
                                wtrask@lambmcerlane.com
                                One South Broad Street, Suite 1500
                                Philadelphia, PA 19107
                                (215) 609-3170 (direct)
                                (610) 430-8000 (main)

*-and-*

**CLEARY, JOSEM & TRIGIANI, LLP**
William T. Josem, Esquire
wtjosem@cjtlaw.org
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
(215) 735-9099

*Counsel for Defendant, Local 98, International Brotherhood of Electrical Workers*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor,<br>United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-00096 |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL<br>BROTHERHOOD OF ELECTRICAL<br>WORKERS, | : | Hon. Gerald Austin McHugh |
| | : | |
| *Defendant*. | : | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that in this case a complete copy of the foregoing document was served upon the following counsel by email through the court's electronic filing system:

Lauren E. DeBruicker, Esquire
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Ste 1250
Philadelphia, PA 19106
<u>Lauren.debruicker@usdoj.gov</u>

*Attorney for Plaintiff*

Dated: November 5, 2021      **LAMB McERLANE PC**

By: *<u>/s/ Joseph R. Podraza, Jr.</u>*
       Joseph R. Podraza, Jr., Esq. (PA 53612)
       *jpodraza@lambmcerlane.com*
       One South Broad Street, Suite 1500
       Philadelphia, PA 19107
       (215) 609-3170 (Direct)
       (610) 430-8000 (Main)

# Ex. B

# _Local Union No. 98_____
## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

1701 Spring Garden Street
Philadelphia, Pennsylvania 19130

Phone: 215-563-5592
Fax:    215-561-2168

**NOTICE OF NOMINATIONS AND ELECTION
OF OFFICERS AND ELECTION BOARD
OF IBEW LOCAL 98**

**May 18, 2020**

Dear Brothers and Sisters:

We are writing to provide you with notice, as well as the details of the nomination procedures for the nomination of officers, and nomination and election of the Election Board, to be held at 1719 Spring Garden Street on Tuesday, June 9, 2020, as well as the election of officers, to be held on Saturday, July 11, 2020.   The nomination of officers and the nomination and election of the Election Board, if needed, will be the only order of business on June 9.

Due to the limitations placed upon us by the City of Philadelphia and Commonwealth of Pennsylvania, and to conform with CDC guidelines, strict protocols will be in place for the nomination meeting.   The Union Hall and our surrounding property will be thoroughly cleaned and disinfected before the meeting, members will be required to wear masks to the meeting, admission of members to the meeting will be staggered to assure that social distancing is maintained and the meeting room will be set up so as to assure that all members can maintain a social distance of at least 6 feet at all times.  Hand sanitizer will be available.  Members should not congregate in the parking lot or on the sidewalks before or after the meeting. Members who have symptoms that may be related to COVID-19 (such as fever, cough, or shortness of breath) should not attend the meeting.

NOMINATION FOR ELECTION OF OFFICERS OF LOCAL 98 AND NOMINATION AND ELECTION OF ELECTION BOARD - nominations shall take place on June 9, 2020, beginning at 7:00 p.m. at the Union's offices at 1719 Spring Garden Street. Acknowledgments of willingness to be nominated for office must be received by the Union no later than 5:00 p.m. on June 9, 2020.  Election of the Election Board, if required, will take place at the conclusion of the nominations. One (1) Election Judge and 4 tellers will be elected.

ELECTION OF LOCAL 98 OFFICERS – the election of Local 98 Officers shall take place on July 11, 2020 at 1719 Spring Garden Street, between the hours of 8:00 a.m. and 4:00 p.m. The officers to be elected are: Business Manager/Financial Secretary, President, Vice President, Recording Secretary, Treasurer, 5 Executive Board positions and 3 Examining Board positions.  If you will be unable to visit the polls on election day, you may apply for an absentee ballot by writing to the Election Board at 1719 Spring Garden Street.   Your application must be received by the Election Board between June 12 and July 6, 2020. Installation of officers will take place at the July 28, 2020 membership meeting.  If needed, a run-off election will be held at the same times and at the same location on August 1, 2020.

ELIGIBILITY FOR OFFICE OR FOR ELECTION BOARD – no member shall be eligible for office or for the Election Board unless he/she has been a member of Local 98 in continuous good standing for at least two (2) years prior to June 9, 2020. No candidate for office will be eligible to serve on the Election Board.

Michael Masciulli, Recording Secretary



DOL_LOCAL 98_00285

# Ex. C

Page 1

```
 1              UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF PENNSYLVANIA
 2
                                      )
 3    MARTIN J. WALSH,                )
      SECRETARY OF LABOR,             )
 4                                    )
            Plaintiff                 )
 5                                    ) Civil Action No. 21-0096
                                      )
 6            V.                      )
                                      )
 7                                    ) VIRTUAL DEPOSITION OF
      LOCAL 98, INTERNATIONAL         ) RANDY L. KIEFFER
 8    BROTHERHOOD OF                  )
      ELECTRICAL WORKERS              )
 9                                    )
            Defendant                 )
10                                    )

11
                              -   -   -
12

13

14

15

16

17

18

19

20

21

22

23
            REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
24    WITHOUT AUTHORIZATION FROM THE CERTIFYING
      AGENCY
25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1                    VIRTUAL DEPOSITION OF RANDY KIEFFER,

2      a Witness herein, called by the Plaintiff, for

3      examination, taken pursuant to the Federal

4      Rules of Civil Procedure, by and before

5      Jonathan MacDonald, a Court Reporter and a

6      notary public in and for the Commonwealth of

7      Pennsylvania, taken remotely via Zoom, on

8      Thursday, September 9, 2021, at 10:00 a.m.,

9      EDT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 3

```
 1     APPEARANCES

 2     On behalf of the Plaintiff:

 3         LAUREN DeBRUICKER, ESQ.
                   ASSISTANT UNITED STATES ATTORNEY
 4                 615 CHESTNUT STREET
                   SUITE 1210
 5                 PHILADELPHIA, PA 19106
                   215-861-8492
 6                 Lauren.DeBruicker@usdoj.gov

 7

       On behalf of the Defendant:
 8
           JOSEPH R. PODRAZZA JR., ESQ.
 9                 LAMB McERLANE P.C.
                   ONE SOUTH BROAD STREET
10                 SUITE 1500
                   PHILADELPHIA, PA 19107
11                 215-609-3170
                   Jpodrazza@lambmcerlane.com
12

13     On behalf of Randy Kieffer:

14         ROBERT D. KURNICK, ESQ.
                   SHERMAN DUNN, P.C.
15                 900 SEVENTH STREET, NW
                   SUITE 1000
16                 WASHINGTON, DC 20001
                   202-785-9300
17
       Also Present:
18
       Anna Laura Bennett, Esq., U.S. Dept. of Labor
19
       Joel Frank, Esq., Local 98
20
       Will Trask, Esq., Local 98
21
       Jon O'Neil, Esq., Local 98
22
       Bill Josem, Esq., Local 98
23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 4

1                    I N D E X

2    WITNESS                                    PAGE

3    Randy Kieffer

4            By Ms. DeBruicker               6

5            By Mr. Podrazza               146

6            By Mr. Kurnick               152

7

8                 E X H I B I T S

9    EXHIBIT          DESCRIPTION            PAGE

10   1            Battle Nomination Form       41

11   2            Battle Internal

12                Election Protest            46

13   3            7/28/20 Kieffer Letter       52

14   4            Text Messages from

15                Bark to Battle              89

16   5            7/31/20 Decision           106

17   6            Emails Kieffer and

18                Welsh 7/22/20              109

19   7            7/24/202 Kieffer Letter     114

20   8            Kieffer Notes re

21                McConnell Interview        133

22   9            Emails Kieffer and

23                Welsh 6/23/20              147

24

25

Page 5

```
 1                P R O C E E D I N G S
 2                     THE REPORTER:  The attorneys
 3     participating in this deposition acknowledge
 4     that I am not physically present in the
 5     deposition room and that I will be reporting
 6     this deposition remotely.
 7                     They further acknowledge that, in
 8     lieu of an oath administered in person, the
 9     witness will verbally declare her testimony in
10     this matter is under penalty of perjury.
11                     The parties and their counsel
12     consent to this arrangement and waive any
13     objections to this manner of reporting.  Please
14     indicate your agreement by stating your name
15     and your agreement on the record.
16                     MS. DeBRUICKER:  Lauren
17     DeBruicker, Assistant U.S. Attorney for the
18     Secretary of Labor, and I agree to the terms.
19                     MR. KURNICK:  Robert Kurnick,
20     attorney for the Deponent, Randy Kieffer, and I
21     agree.
22                     MR. PODRAZZA:  Joe Podrazza,
23     attorney for the Defendant, IBEW Local 98, and
24     I agree.
25                     RANDY KIEFFER, a Witness
```

Page 6

 1    herein, having been first duly sworn, was

 2    examined and testified as follows:

 3                      EXAMINATION

 4    BY MS. DeBRUICKER:

 5         Q.    Good morning, Mr. Kieffer.

 6         A.    Good morning.

 7         Q.    Thank you for joining us today.  My

 8    name is Lauren DeBruicker.  As you've heard,

 9    I'm an Assistant U.S. Attorney, and I represent

10    the Secretary of Labor in a civil action the

11    Secretary has brought against Local 98 alleging

12    that it violated the Labor Management Reporting

13    and Disclosure Act of 1959, in connection with

14    its June election of officers.

15                  Have you been deposed before?

16         A.    Yes.

17         Q.    About how many times have you had

18    your deposition taken?

19         A.    Once.

20         Q.    And in what context was that?

21         A.    It was just an interview.

22         Q.    Very good.  We are doing this by

23    Zoom which provides some conveniences but also

24    some challenges.  We have Mr. MacDonald here to

25    record your testimony and everything else

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 7

```
 1    that's said here.  Because we want him to have
 2    a clear record, it's very important that we try
 3    to speak one at a time.  So it's important for
 4    you to listen to my full question before you
 5    answer it, and then I will do my best to listen
 6    to your full answer before I ask my next
 7    question; okay?
 8        A.    Okay.
 9        Q.    If at any point you don't understand
10    the question that I'm asking, will you let me
11    know?
12        A.    I will.
13        Q.    I'd be happy to clarify, I want to
14    be sure that you're clear on what I'm asking
15    before you answer.  If at any time you don't
16    hear my question either because of my voice or
17    some technical issues, will you let me know
18    that as well?
19        A.    I will.
20        Q.    Very good.  If you answer a
21    question, I will both assume that you heard it
22    and understood it; okay?
23        A.    Yes.
24        Q.    I understand you are represented by
25    counsel today; is that correct?
```

Page 8

```
 1          A.    That is correct.

 2          Q.    And who is your counsel today?

 3          A.    Robert Kurnick.

 4          Q.    And did you do anything to prepare

 5   for this deposition?

 6          A.    I spoke to Mr. Kurnick.

 7          Q.    Did you speak with anyone from

 8   Local 98 to prepare for this deposition?

 9          A.    No, I did not.

10          Q.    Did you look over any documents,

11   Mr. Kieffer?

12          A.    Yes, I did.

13          Q.    What documents were those?

14          A.    My report, the filings, and some

15   other miscellaneous documents that I wrote that

16   had to do with this hearing.

17          Q.    And when you say filings, what are

18   you referring to?

19          A.    The filing of the suit, the actual

20   suit itself.

21          Q.    Did you review any of the prior

22   testimony that's been given in this case?

23          A.    I don't think so.  No.

24          Q.    Is there any reason why you wouldn't

25   be able to provide complete and truthful
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 9

1    testimony today?

2          A.    No.  There's no reason.

3          Q.    For example, are there family or

4    life pressures that are distracting you?

5          A.    Not at all.

6          Q.    Any medications that affect your

7    ability to recall things clearly?

8          A.    No.  Just my age.

9          Q.    Over the course of the morning, I

10   will probably be showing you some documents on

11   the screen.  Are you able the see your screen

12   clearly so that we can do that?

13         A.    Yes, I can.

14         Q.    And as we do that, I'll count on you

15   to tell me if you need me to make something

16   bigger or to scroll down.  I will look to you

17   for cues so you can get a full sense of the

18   document we're looking at; okay?

19         A.    Okay.  Very good.

20         Q.    Where are you joining us from today?

21         A.    My home.

22         Q.    Where is that?

23         A.    9 Ridge Crest Drive, Fleetwood,

24   Pennsylvania.

25         Q.    And is anyone with you today, in the

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 10

```
 1    room with you today?
 2         A.    No.
 3         Q.    Did you bring anything with you
 4    today?
 5         A.    My coffee cup and my phone and a
 6    mouse.
 7         Q.    A computer mouse?
 8         A.    Yes.
 9         Q.    Required on the record.
10              Mr. Kieffer, can you give me just a
11    basic sense of your educational background?
12         A.    High school graduate.  I went
13    through the apprenticeship program with IBEW
14    Local Union 743.  Did some courses through Penn
15    State and Reading Area Community College.
16    Never graduated from any college but did
17    courses.
18         Q.    What kind of coursework did you
19    pursue?
20         A.    I had electronic engineering
21    courses, some engineering courses.  And I took
22    a Spanish course one time.
23         Q.    I understand you are employed by the
24    International Brotherhood of Electrical Workers
25    Union; is that correct?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 11

```
 1        A.      That is correct.
 2        Q.      What is your position there?
 3        A.      I am an international
 4   representative.
 5        Q.      And how long have you been an
 6   international representative?
 7        A.      19 years and three months.
 8        Q.      And what are your general duties in
 9   that position?
10        A.      My general duties are to service
11   local unions that are given to me to service.
12   To do anything -- any other duties that Vice
13   President Welsh or President Stephenson call
14   upon me to do.
15        Q.      Have you held other positions at
16   IBEW?
17        A.      Yes, I did.
18        Q.      Can you take me through them briefly
19   up to the point of you becoming a
20   representative?
21        A.      Prior to being an international rep,
22   I was the business manager of Local Union 743
23   in Reading, Pennsylvania.  I was also president
24   of Local 743 in Reading.  I was also an
25   executive board member at 743 Reading, and I
```

1    was also an organizer at 743.  And prior to

2    that, I worked in the field for contractors

3    doing electrical work.

4         Q.    You had positions at Local 743?

5         A.    Yes.

6         Q.    Have you had other positions at the

7    international level besides being a

8    representative?

9         A.    No, only a representative.

10        Q.    When you say that you service local

11   unions, is there a set group of unions that

12   you're assigned to?

13        A.    Yes.  I have ten local unions.

14        Q.    And how are they assigned to you?

15   Are they a geographic area?

16        A.    They are assigned to me by President

17   Stephenson, IVP Welsh.  They do tend to be

18   geographical, but they can assign any one of

19   them that they desire to me.

20        Q.    When did you become a member of

21   Local 743?

22        A.    That was November of 1982.

23        Q.    Have you been a member of any other

24   locals?

25        A.    No.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 13

```
 1          Q.     In your role as representative, is
 2     part of your job to investigate protests made
 3     by members of the locals you are assigned to
 4     service?
 5          A.     Yes.
 6          Q.     What kinds of protests?
 7          A.     Complaints, election protests.
 8          Q.     In addition to election protests,
 9     are there other kinds that you investigate?
10          A.     I can investigate mainly complaints,
11     member complaints.
12          Q.     And can you give me a sense of what
13     kind of subject matters those complaints are?
14          A.     Yeah.  Anything to do with the
15     Collective Bargaining Agreement, the
16     constitution, referral issues, things like
17     that.
18          Q.     And how do you get those matters to
19     investigate?  Are they assigned to you?
20          A.     They are assigned to me through the
21     Third District Office.
22          Q.     I'm sorry.  Through what district
23     office?
24          A.     Through the IBEW Third District
25     Office.  The International Vice President
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1     Welsh's office.  But I can get them through the

2     international office in Washington, if

3     President Stephenson has a special assignment.

4          Q.    Are you assigned to investigate

5     protests only from the locals that you are

6     assigned to service or can you get them from

7     anywhere?

8          A.    Most of the time.  Sometimes I do

9     have special assignments to do, to go into

10    other local unions that I do not -- that I'm

11    not normally assigned to for certain

12    assignments.

13         Q.    So for about how many locals do you

14    investigate?

15         A.    I have ten locals.

16         Q.    Do you investigate election protests

17    for other bodies within the union, like at the

18    district level or international level?

19         A.    I'm not sure what that question -- I

20    investigate, and I report to the district

21    office my findings.

22         Q.    Do all the protests come from the

23    local level to you?

24         A.    Come through the Third District

25    Office to me, yes.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1        Q.    And does anyone else share those

2   duties with you or are you the guy for those

3   locals assigned to you?

4        A.    I'm, basically, the guy.

5        Q.    And how often would you say you're

6   assigned to investigate protests?

7        A.    In my 20 years, probably eight

8   times, I guess.

9        Q.    And about how many of those were

10  election protests?

11       A.    That's what I'm talking about, eight

12  times.  Complaint letters, honestly, I could

13  get them on a weekly basis.

14       Q.    We're here to discuss an election

15  protest made by Charles Battle.  We'll get to

16  that in a minute.  But aside from that election

17  protest from Mr. Battle, had you previously

18  been assigned to investigate any election

19  protest relating to Local 98?

20       A.    I was assigned for a protest that

21  was sent by a member named Rocks.  I think that

22  was back in, I would guess, 2015.  I don't have

23  my notes.  I'm not sure of that date.

24       Q.    Understood.  Do you recall whether

25  that was a pre-election protest or a

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 16

1    post-election protest?

2         A.    I believe that was a pre-election

3    protest.

4         Q.    Do you recall, basically, the

5    subject matter on that?

6         A.    The subject matter was eligibility

7    of a candidate.

8         Q.    What was the resolution of that

9    protest?

10        A.    This resolution was the candidate

11   was allowed to run as a candidate -- or, the

12   nominee was allowed to run as a candidate.

13        Q.    And do you know whether that was a

14   resolution by the local or whether that was a

15   resolution by the international organization?

16        A.    I believe it was agreed upon by the

17   local union.

18        Q.    Did you conduct a full investigation

19   of that protest?

20        A.    No.

21        Q.    Was that because it was resolved?

22        A.    It was resolved during the

23   discussions.

24        Q.    Do you recall whether you had a

25   chance to meet Mr. Rocks at all in connection

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 17

 1     with the protest?

 2         A.    I did not meet him, but I did speak

 3     to him.

 4         Q.    When you evaluate a local election

 5     protest, what is it that you're looking for?

 6         A.    I'm looking for compliance with the

 7     IBEW constitution, basic laws and policies of

 8     the IBEW, and the local union's bylaws.

 9         Q.    Do you look for any violations of

10     the LMRDA?

11         A.    Yes, I do.  That's contained within

12     our booklets for the IBEW.  Our basic laws and

13     policies has all of the structure of the LMRDA

14     within it.

15         Q.    What happens if the international

16     finds a protest to be valid or that a violation

17     may have occurred?

18         A.    The international vice president

19     writes a recommendation on how to move forward.

20         Q.    And who is the recommendation made

21     to?

22         A.    The recommendation is sent to

23     everyone, including, I believe, President

24     Stephenson who is, virtually, the person we all

25     report to.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          Q.    And moving forward from there, is
 2     something -- is there a directive issued to the
 3     local?
 4          A.    Yes, there could be.
 5          Q.    Does the direction sometimes include
 6     rerunning an election?
 7          A.    Yes.
 8          Q.    Are there other kinds of corrective
 9     measures that the international would direct
10     for an election protest?
11          A.    Offhand, I couldn't think of that.
12     It's usually either rerun or not.
13          Q.    In the event that a violation is
14     found, who decides what the appropriate remedy
15     is?
16          A.    The international vice president.
17          Q.    So when you get assigned an election
18     protest, how do you go about investigating?
19          A.    The very first thing I do is call
20     the person that wrote the letter that's
21     protesting the election.  And I walk it
22     backwards from there, whoever it may be.  You
23     know, whoever's in the letter, I contact them.
24          Q.    Is there any sort of process or
25     procedure that the international has for
```

1    investigating election protests?

2         A.    We have election guides that guide

3    us through the elections.  Again, what I do is

4    start with the letter and walk backwards

5    through the guides and the constitution.

6         Q.    How do you decide who it is you want

7    to speak to you when you're investigating?

8         A.    I decide that.  That's one of my

9    responsibilities -- because at the end result,

10   I have to give a report to the international

11   vice president of my finding.

12        Q.    So it's up to you to decide who to

13   speak to, who you want information from; is

14   that fair to say?

15        A.    That is correct.

16        Q.    Is there anyone who you must talk to

17   in your investigation of an election protest?

18        A.    No.

19        Q.    In your investigation of election

20   protests, is there a certain -- I'm a lawyer,

21   so I'll call it -- a certain burden of proof

22   that a protest has to meet in order to be

23   determined valid?

24        A.    If the election was run through the

25   proper guidelines of the constitution, bylaws,

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 20

 1     and the LMRDA.

 2          Q.    And is there a certain -- again, I'm

 3     using lawyer speak, so forgive me.  Is there a

 4     sort of standard of proof?  Does it have to be

 5     beyond a reasonable doubt that a violation

 6     happened?

 7          A.    No.

 8          Q.    Or more likely than not that a

 9     violation happened?

10          A.    I think it's more of if a violation

11     happened or not.  And it could be as simple as

12     yes or no.

13          Q.    Is there a certain factual threshold

14     that has to be met?  Does there have to be a

15     certain level of proof?

16          A.    No, I don't think so.

17          Q.    And are there any kind of

18     presumptions that are in place when you're

19     evaluating an election protest?  In the

20     criminal world --

21          A.    I'm sorry.  You froze there.

22          Q.    Are there any sort of presumptions

23     that apply in your analysis -- in your

24     investigation of a protest?  For example, in

25     the criminal world, someone is innocent until

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 21

1    proven guilty.  So if the government stops you,

2    they have to prove there's a violation.

3         A.    No, there are no presumptions.  It's

4    a fact-finding report.

5         Q.    When you investigate a local

6    election protest, what is your relationship to

7    the local?

8         A.    I'm their service rep.

9         Q.    Do you consider yourself kind of a

10   prosecutor of the protest or a defender against

11   the protest?

12        A.    I think I'm just a fact finder of

13   the protest.

14        Q.    Would you consider yourself a

15   neutral factfinder?

16        A.    Absolutely.

17        Q.    And when you investigate a local

18   election protest, what is the local's role, if

19   any, in that investigation?

20        A.    It could be interviews, it could be

21   the chairman interviewed and nominee -- it

22   could be a multitude of people interviewed.

23        Q.    Are there certain obligations that a

24   local has in connection with the investigation

25   other than responding to your inquiries?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          A.     I don't think there's an official,
 2   they have to, but I am their service rep.   I
 3   certainly expect them to cooperate.
 4          Q.     In the investigation of the local
 5   election protest, does the local have any kind
 6   of burden to disprove that any violation
 7   happened?
 8          A.     I'm not quite sure about that
 9   question.
10          Q.     Is there a certain showing that a
11   local must make in order to defeat an election
12   protest?
13          A.     The showing is if they properly
14   conducted the election.
15          Q.     So a couple of questions about what
16   authority governs union elections, but I think
17   you've touched on a couple of them already.   I
18   think that you mentioned that the IBEW
19   constitution is one of the things that covers
20   officer elections?
21          A.     Yes.
22          Q.     I've seen something called the IBEW
23   basic laws and policies.  Is that something
24   you're familiar with?
25          A.     Yes.  I am very familiar with it.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 23

1        Q.      Do those govern elections as well?

2        A.      Yes.

3        Q.      Does IBEW view its basic laws and

4    policies as a binding document in that locals

5    have to follow them?

6        A.      Yeah.   There are excerpts from the

7    constitution and explanations of the

8    constitution, I believe.   Yes.

9        Q.      I've also seen reference to an IBEW

10   local union election guide.   Is that something

11   you're familiar with?

12       A.      Yes, I am.

13       Q.      And are those binding rules as well

14   or are they more sort of guidelines?

15       A.      I think there is some flexibility

16   within that guide on how to do certain things.

17   But, basically, it's a walkthrough of how to

18   properly conduct an election at the IBEW and

19   also conforms with the LMRDA.

20       Q.      Is the local Union election guide

21   something that the local unions are expected to

22   follow?

23       A.      I think there's certain flexibility

24   within the document.   But the document as a

25   whole, yes, they should follow it.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1        Q.     And if a member is looking to

2   determine what the election rules are, is the

3   local union election guide something they could

4   look to?

5        A.     I believe they could, yeah.  Sure.

6   It's, basically, designed to have the person

7   running the election follow it.

8        Q.     And I imagine local chapters have

9   their own bylaws?

10       A.     That is correct.

11       Q.     And do some of those deal with

12   elections?

13       A.     All of them deal with the elections.

14       Q.     Am I correct in my understanding

15   that locals can create their own bylaws but

16   those bylaws have to comply with the IBEW

17   constitution and rules?

18       A.     That is correct.

19       Q.     Are you familiar with the LMRDA?

20       A.     Pretty familiar.

21       Q.     This suit is focusing on

22   Section 401(e) of the LMRDA which provides that

23   member must be given a reasonable opportunity

24   to nominate candidates.  Is that your

25   understanding of the LMRDA's requirement?

Page 25

1          A.     Yes.

2          Q.     And that members in good standing

3     should be able to run for office if they meet

4     the union's reasonable qualifications?

5          A.     Correct.

6          Q.     And that members have the right to

7     vote for or support the candidates of their

8     choice without being subject to penalty,

9     discipline or improper interference or reprisal

10    of any kind.

11               Are you familiar with that

12    provision?

13         A.     Yes, I am.

14         Q.     Just so I'm clear, are local

15    election protests evaluated pursuant to these

16    terms?

17         A.     I'm sorry.  You froze again.

18         Q.     Are local election protests

19    evaluated in accordance with those terms of the

20    LMRDA?

21         A.     Yes, they are.

22         Q.     I'd like to show you -- I'm trying

23    to share my screen.  We'll see how that works.

24    Mr. Kieffer, are you able to see what's on my

25    screen?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 26

1       A.     Yes, I do.

2       Q.     And do you recognize that document?

3       A.     I sure do.  That's the IBEW

4  constitution.

5       Q.     That's the one you were referring to

6  in the beginning?

7       A.     Yes.

8       Q.     I'm going to take you to -- this is

9  Article 16, at the top of the page here is

10  Section 10; do you see that?

11       A.     Yes.

12       Q.     And it says, no member shall be

13  nominated for office unless he is present or

14  signifies his willingness in writing.

15              Is that your understanding, that, to

16  be nominated, a member has to signify his

17  willingness either in writing or is present at

18  the meeting?

19       A.     First of all, I want to clarify that

20  the interpretation of the constitution is by

21  the international president only.  But I will

22  give you my thought on that.

23       Q.     Fair enough.

24       A.     Yes.  If you are not at the meeting

25  to get nominated, you should express your

```
 1    willingness in writing that you want to run.

 2         Q.    Do you understand that to be an

 3    either/or thing, you can be present or you can

 4    do so in writing?

 5         A.    Normally, yes.

 6         Q.    When you say normally, are there

 7    other circumstances?

 8         A.    The circumstances we had this year,

 9    because of COVID and the CDC guidelines, every

10    election in the past two years had different

11    caveats to it than before.

12         Q.    We'll talk a little bit more about

13    that.  While I have you here, I'm going to take

14    you down to Section 11, which reads, the LU --

15    what does LU stand for, do you know?

16         A.    Local union.

17         Q.    So the local union shall decide the

18    manner in which the nominations and elections

19    shall be held and such will be stated in the

20    Local Union bylaws.  This shall not conflict

21    with the IBEW constitution.

22              Did I read that correctly?

23         A.    Yes.

24         Q.    Okay.  And, again, we touched a

25    little on this.  Locals can run their own
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1     elections as long as they don't conflict with

2     the international's constitution?

3          A.     Yes.

4          Q.     This is basic laws and policies.  Is

5     that one of the documents you spoke about

6     earlier?

7          A.     Yes.

8          Q.     So this document has a section on

9     member nomination and voting eligibility; do

10    you see that?

11         A.     Yes.

12         Q.     Again, member must be present or

13    signify in writing a willingness to be a

14    candidate to being nominated to a local union

15    office.  Is that consistent with the

16    constitution we just read?

17         A.     Yes, it is.

18         Q.     This is a copy that I have of the

19    IBEW U.S. Local Union Election Guide.  Is that

20    the one you were referring to when we were

21    speaking a few minutes ago?

22         A.     Yes.

23         Q.     Under nominations, the second

24    paragraph, again, no member shall be nominated

25    for office unless he or she is present or

1    signifies his or her willingness in writing.

2             Same provision, basically?

3        A.    Yes.

4        Q.    It then goes on to say, written

5    acceptance of a nomination must be presented at

6    the meeting where nominations are held.

7             Do you have an understanding of what

8    that means?

9        A.    Yes, I do.

10       Q.    What's your understanding?

11       A.    My understanding most of the time

12   is, if a person is nominated, you cannot

13   nominate a person who is not there in the room

14   or does not have a letter of acceptance.

15       Q.    And I see the next sentence reads,

16   members who are not in attendance can make or

17   accept nominations by written letter.

18             Is that consistent with your

19   understanding?

20       A.    Yes.

21       Q.    So I read this to mean that a member

22   does not need to be present to be nominated; am

23   I correct in that?

24       A.    Correct.

25       Q.    Just a little bit further down, the

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 30

1      paragraph reads, a single notice shall be used

2      for notification of both nominations and

3      elections.  The notice shall state the

4      following.

5              There are a number of things the

6      notice needs to provide, including this third

7      bullet here, the proper form and manner for

8      nominations; do you see that?

9      A.      Yes.

10     Q.      And what's your understanding of

11     what the proper form and manner for nominations

12     is?

13     A.      If there's -- how to be nominated.

14     Q.      The elections guide does have an

15     example notice.  And I understand the foregoing

16     is intended to serve only as an example of the

17     required notice.

18              So is it your understanding that

19     this is the guidance but not binding?

20     A.      Yes, that is correct.

21     Q.      So under the provisions that we've

22     just gone through, through the constitution and

23     the laws and policies, under these terms, is

24     there anything that prohibits a member from

25     nominating him or herself?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1      A.    No.   Unless it's stated in their

2   bylaws.

3      Q.    Would such a bylaw be consistent

4   with the IBEW constitution and rules?

5      A.    I don't -- I'm not sure about that.

6   I believe it could be, but I don't have any

7   that have that.

8      Q.    None come to mind.  Under the terms

9   we just read through, is there anything

10  requiring that nominations be seconded?

11     A.    No.

12     Q.    Again, just for clarity, under these

13  terms, is there anything requiring that

14  nominations be made in person?

15     A.    No.

16     Q.    Setting aside any particular local

17  bylaws, how can a member of an IBEW local be

18  nominated for a local union office?

19     A.    Again, taking bylaws out of it,

20  normally, you go to a nomination meeting.

21  Someone nominates you or you can nominate

22  yourself, and putting your name in the

23  nominations, you become a candidate.

24          If you're not there, you can send a

25  letter to the chair for the chair to read.

1    After they read the letter, your name is, if

2    you're nominating yourself, someone nominates

3    you, and you're not there, you give the letter

4    to the chair accepting the nomination.

5        Q.    So if you're not present, you can do

6    it writing; correct?

7        A.    That is correct.

8        Q.    Other than that, does the IBEW

9    constitution specify the manner in which local

10    officer nominations must be held?

11        A.    There's guidelines in the IBEW

12    constitution that have to be followed.  But

13    each individual local can have different

14    procedures in their bylaws if their bylaws are

15    approved.

16        Q.    And the IBEW constitution delegates

17    that to the local?

18        A.    The IBEW constitution delegates

19    everything.

20        Q.    And the local is required to state,

21    in its bylaws, the manner in which its officer

22    nominations shall be held?

23        A.    Yes.

24        Q.    And the IBEW constitution specifies

25    that what's provided in the bylaws of the local

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    can't conflict with the IBEW constitution;

2    correct?

3        A.    Correct.

4        Q.    If a local had in its bylaws that

5    nominations had to be made in person, by a

6    person present at the meeting, would you

7    consider that to be contrary to the IBEW's

8    rules?

9                MR. KURNICK:  I have to object

10   to that question because it calls for

11   speculation.  Having said that, Randy, you can

12   answer.

13               THE WITNESS:  No.  I'd object.

14   BY MS. DeBRUICKER:

15       Q.    He objected, but you can still

16   answer.  Do you still have the question in your

17   mind or shall I repeat it?

18       A.    No.  I have the question.  The

19   bylaws would have to be approved first, so we

20   would never get to that point.  The bylaws

21   would have to be approved, and if they were

22   approved, then it would delegate.  But that's a

23   different procedure.  That's bylaws approval.

24       Q.    Right.  If a local submitted bylaws

25   for approval that required nominations to be

Page 34

 1    made in person, do you think that those bylaws

 2    would be approved?

 3                    MR. KURNICK:  Same objection.

 4                    MR. PODRAZZA:  I would also

 5    join in that objection and move to strike.

 6                    MR. KURNICK:  And even though

 7    I object, unfortunately, you have to answer.

 8                    THE WITNESS:  Listen,

 9    everybody's got to know that I listen to

10    whatever Bob says.  The worst thing you can do

11    is not listen to your attorney.

12                    MR. KURNICK:  What a great

13    client.

14                    THE WITNESS:  Could you repeat

15    the question?  I'm sorry.

16    BY MS. DeBRUICKER:

17        Q.    Sure.  Would a local's bylaw

18    requiring that nominations be made in person,

19    would that be contrary to IBEW rules and

20    constitution?

21        A.    It could be.  I would have to

22    investigate through the IBEW constitution.  And

23    we also have pattern bylaws.  We have what's

24    called pattern bylaws that allow flexibility

25    within your bylaws, but you have to structure

1   your bylaws to our pattern bylaws.  So I would

2   have to see if that conforms to the pattern

3   bylaws and the constitution.  And I make that

4   decision here without investigating.

5        Q.    In the course of your investigation

6   of Mr. Battle's election protest, did you have

7   an opportunity to look at Local 98's bylaws?

8        A.    I have.

9        Q.    Take you to -- this is Article 3 of

10  Local 98's bylaws, Section 4A.  At the meeting

11  of the local union when nominations are made,

12  after nominations have closed, the local union,

13  by the majority of members present, shall elect

14  an election judge and as many tellers as are

15  required who shall serve as an election board

16  to conduct to the elections.  No candidate for

17  any office shall be eligible to serve on this

18  board.

19             Do you see that?

20        A.    Yes.

21        Q.    And the following section, Section

22  4B, after nominations have been made and those

23  nominated are found to be qualified, the

24  election board shall have ballots prepared

25  listing, in alphabetical order, the names of

1    all candidates for each respective office

2    beginning with the president and continuing in

3    the order named in the IBEW constitution.  Such

4    ballots shall not contain any identifying

5    numbers or marks which would identify the

6    voter.

7            Those are about the only provisions

8    that I've seen about the process for

9    nominations.  Do you recall seeing any others?

10        A.    Offhand, no.

11        Q.    From your reading of these

12   provisions, what was your understanding of the

13   manner in which Local 98 conducts its

14   nominations?

15        A.    Local 98 normally does nominations

16   through meetings and the requirements of the

17   CDC and the requirements of the City of

18   Philadelphia.  They had to restructure their

19   normal nomination procedure.

20        Q.    The provisions as written here,

21   setting aside any sort of COVID special

22   measures, do you understand these provisions,

23   as written, to be consistent with IBEW's

24   constitution?

25        A.    Yes.

Page 37

```
 1        Q.     Now, you've mentioned the way that

 2   COVID impacted elections in 2020, as it has

 3   impacted just about everything else.  In 2020,

 4   was there a requirement that nomination

 5   meetings be in person?

 6        A.     President Stephenson sent a letter

 7   out to all local unions that were having

 8   elections giving the executive board authority

 9   to design a safe nomination procedure in their

10   local union.

11        Q.     Did you see that letter?

12        A.     From President Stephenson, yes.

13        Q.     I'm going to show you a letter dated

14   March 19, 2020, that's signed by International

15   President Lonnie Stephenson.  Would you

16   recognize this as that letter?

17        A.     Yes.

18        Q.     Do you know whether it was IBEW's

19   intention to minimize in-person proceedings in

20   2020?

21        A.     No.  I think it was our intention

22   just to be as safe as possible through our

23   normal business practices.

24        Q.     Is it your understanding that

25   nominations could be conducted by mail?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1        A.    I believe so, with -- contained in

 2   that letter, yes.

 3        Q.    Like dropping the nomination forms

 4   off at the union hall?

 5        A.    If the executive board designed it

 6   that way, yes.

 7        Q.    Could the nominations be conducted

 8   by conference call?

 9              MR. KURNICK:  I really have to

10   object to these questions.  He's identified the

11   letter, but you're asking him now to speculate

12   on what the international president's view

13   would be about what's permissible and what

14   isn't.  Again, you're asking him to speculate

15   about something he doesn't know.

16              MS. DeBRUICKER:  I'm asking

17   him about his understanding about what was

18   permitted in 2020.

19              THE WITNESS:  My understanding

20   is what was permitted is, President Stephenson

21   gave the executive board of each local union

22   the authority to design a safe nomination

23   procedure.

24   BY MS. DeBRUICKER:

25        Q.    Getting back to a person signifying
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 39

1    their willingness to run in writing.  Under the

2    IBEW constitution, would completing -- let me

3    back up.

4              In the course of your investigation,

5    did you have an opportunity to review the

6    nomination slips that Local 98 used in its

7    June 2020 election?

8         A.    No, I did not.

9         Q.    Did you have an opportunity to see a

10   blank one of those nomination slips?

11        A.    Yes, I did.

12        Q.    Under the IBEW constitution, would

13   completing that kind of nomination slip be

14   sufficient to be considered a self-nomination?

15        A.    If filled out correctly, I believe

16   it would.

17        Q.    I understand the Department of Labor

18   may have interviewed you in the course of its

19   investigation of a complaint filed with them by

20   Mr. Battle.  Do you recall being interviewed by

21   the Department of Labor?

22        A.    Yes.

23        Q.    Do you know whether IVP Welsh was

24   also interviewed by DOL?

25        A.    I do not, no.

Page 40

1        Q.    You were not present for any

2   interview of Mr. Welsh?

3        A.    I believe my interview was with Bob

4   Kurnick and Mike Clausenack (phonetic), I

5   believe.

6        Q.    I'll represent that in his interview

7   with DOL, IVP Welsh represented that the IBEW

8   constitution provisioned that no member shall

9   be nominated unless he is present or signifies

10  his willingness in writing meant that

11  completing a nomination form would be

12  sufficient for a self-nomination.

13             MR. PODRAZZA:  I'll object to

14  the representation because as I understand it,

15  there's no signed statement that was adopted by

16  the vice president at any time.

17             And what counsel is conveying at

18  this point were representations made by DOL

19  representatives with an interest in the case.

20             MS. DeBRUICKER:  You can

21  answer the question, Mr. Kieffer.

22             MR. PODRAZZA:  Same objection.

23  Move to strike.

24             THE WITNESS:  Am I supposed to

25  answer a question?  I'm sorry.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 41

```
 1    BY MS. DeBRUICKER:

 2         Q.    Actually, I didn't even ask a

 3    question.  I was representing that IVP Welsh

 4    represented to the Department of Labor that

 5    completing a nomination form would be a

 6    sufficient self-nomination under the IBEW

 7    constitution.  Would you have a reason to

 8    disagree with that?

 9         A.    No.

10         Q.    I'm going to show you what we will

11    mark as Kieffer No. 1.

12                    (Deposition Exhibit No. 1 was

13    marked for identification.)

14         Q.    And, Mr. Kieffer, I understand that

15    you reviewed a blank nomination slip.  Is this

16    consistent with the blank nomination slip that

17    you reviewed, absent the writing on it?

18         A.    Yes.

19         Q.    I'll represent that this is a

20    nomination form that was produced to DOL by the

21    union and was completed by Charles Battle.

22                    Would you -- in your understanding

23    of IBEW's constitution and bylaws, is it -- in

24    your judgement, does this form function as a

25    self-nomination?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 42

```
 1                    MR. KURNICK:  Again, I have to
 2      object because you're asking -- you're not
 3      asking him for facts, you're asking him about
 4      resolution of issues that are not normally left
 5      to an international representative.  You're
 6      asking him to speculate on what the vice
 7      president's view would be and what the
 8      international president's view would be.
 9                    MS. DeBRUICKER:  My question
10      was in his judgment, would this be a sufficient
11      self-nomination.
12                    THE WITNESS:  The form is --
13                    MR. KURNICK:  Before you
14      answer, Randy, let me just say that when you
15      ask it that way, you're making the assumption
16      that he's the one who makes these judgements.
17      And so it assumes a fact that's not in
18      evidence.
19                    All right.  Having said that, Randy,
20      please go ahead and answer.
21                    THE WITNESS:  I'm not sure.  I
22      would have to investigate further.
23      BY MS. DeBRUICKER:
24         Q.    What would you have to investigate?
25         A.    I would have to look at the form and
```

 1    see how it's filled out.

 2         Q.    Well, if you take a look at this --

 3    and I recognize you didn't have a chance to do

 4    this in your investigation, but in your

 5    judgment and based on your knowledge of these

 6    things, is there anything missing from this

 7    form that you think would be required in order

 8    for it to be a self-nomination?

 9              MR. KURNICK:  Same objection.

10              THE WITNESS:  I don't decide

11    that.  The international vice president or the

12    international president would decide if that

13    form was filled out correctly.  I would report

14    it.

15    BY MS. DeBRUICKER:

16         Q.    What do you mean you would report

17    it?

18         A.    I would show -- if I had that form,

19    I would show them that form with my report.

20    And they would be the deciding factor if that

21    nomination form was valid or not.

22         Q.    Is there anything that strikes you

23    as insufficient about this form?

24         A.    Again, I wouldn't be the one

25    deciding.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 44

 1          Q.    I'm just asking what your impression

 2    is.

 3                    MR. KURNICK:   Same objection.

 4                    THE WITNESS:   There's no

 5    nominator on the form.   And that is just my

 6    opinion, looking at it for five minutes.

 7    BY MS. DeBRUICKER:

 8          Q.    If a person were to self-nominate,

 9    would you expect to see that portion filled

10    out?

11          A.    Again, I'm not speaking for anyone

12    but me, but, yeah, I would, yes.

13          Q.    In your review of internal election

14    protests, do you make recommendations to the

15    IVP?

16          A.    I do sometimes, yes.

17          Q.    What would your recommendation be

18    regarding this form?

19                    MR. KURNICK:   Objection.

20    Calls for speculation on the part of the

21    witness.   And, Randy, please answer.

22                    THE WITNESS:   Okay.   I don't

23    think I would recommend anything on this.   I

24    would let the vice president use his judgement

25    or the international president use his judgment

1    or, as a matter of fact, our fine legal

2    counsel.

3    BY MS. DeBRUICKER:

4        Q.    Are there certain matters that you

5    do refer to counsel as opposed to anywhere

6    else?

7        A.    Yes.  I know Bob pretty good.

8        Q.    Are there certain kinds of things

9    where you go, oh, this is a Bob question?

10        A.    There are certain kinds of things

11    that I ask because I'm not an attorney, not on

12    this particular issue but on just other issues.

13    I don't use him very, very much but -- we're

14    grateful to have him.

15            MR. KURNICK:  Ms. DeBruicker,

16    you're getting awfully close to inquiring about

17    matters that are privileged.  So please don't

18    step over that line.

19            MS. DeBRUICKER:  I have no

20    intention of stepping over that line.

21    BY MS. DeBRUICKER:

22        Q.    At some point, did you receive a

23    local election protest relating to Local 98's

24    June 2020 election?

25        A.    The 3rd District Office received a

Page 46

1      protest, yes.

2              Q.     Was the protest from Charles Battle?

3              A.     Yes.

4              Q.     Would you recognize this as the

5      internal election protest that Mr. Battle

6      submitted?

7              A.     Yes.

8              Q.     I'm just going to scroll down as an

9      overview.   There are a few pages of the letter

10     and there are some attachments.  Do you recall

11     there being attachments to Mr. Battle's

12     protest?

13             A.     Yes, I do.

14             Q.     And did you review those

15     attachments?

16             A.     Yes, I did.

17             Q.     And we'll mark this as Kieffer

18     No.  2.

19                     MR. PODRAZZA:  Counsel, is

20     Kieffer No. 2 the entire document or just what

21     you're showing on the screen?

22                     MS. DeBRUICKER:  We will mark

23     the entire document as Kieffer No. 2.

24                     (Deposition Exhibit No. 2 was

25     marked for identification.)

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 47

1    BY MS. DeBRUICKER:

2        Q.    Did you determine that Mr. Battle's

3    protest was timely?

4        A.    Yes, we did.

5        Q.    Did you determine that the protest

6    was properly made, and that it wasn't missing

7    anything you needed in order to investigate?

8        A.    The protest doesn't have any

9    structure to it.

10        Q.    And you described earlier, sort of,

11    generally, your process of evaluating a local

12    election protest.  Did you take any different

13    approach here?

14        A.    No.  Normal approach.

15        Q.    Do you recall who you talked to in

16    connection with investigating this protest?

17        A.    It took me about two weeks to track

18    down Charles Battle.  He didn't give me a phone

19    number, he gave me an email address.  I went

20    through the international to try to find out

21    who he was, went through the local to try to

22    find the phone number.  I had several phone

23    numbers.  And when I contacted him, he said he

24    was going to have surgery, and he would call me

25    in a week.  There was a little time spent

1    there, and I did get a correct number and

2    Charles and I talked.

3         Q.    Do you recall speaking with anyone

4    else regarding Mr. Battle's protest?

5         A.    At first, no.  It was with Charles.

6         Q.    Do you recall there being anybody

7    you wanted to talk to about Mr. Battle's

8    protest but didn't?

9         A.    Excuse me?  I didn't hear that.

10         Q.    Do you recall there being anybody

11    that you wanted to talk to about Mr. Battle's

12    protest but did not?

13         A.    I did my normal -- I talked to

14    Charles Battle, I talked to the president of

15    Local 98, I talked to counsel, Tara Chupka,

16    down there.  Through this process, I just

17    wanted to point out the interview, how they did

18    it, because I was not at the nomination

19    process.

20              So after talking to Charles at

21    extent, I went out from there and went out to

22    start investigating what actually happened.

23         Q.    What was your understanding of the

24    crux of Mr. Battle's protest?

25         A.    Charles Battle believed -- let me

Page 49

1    back up.

2              Charles Battle went to the

3    nomination meeting, and I'm quoting him, again,

4    I was not there.

5              He told me he went to the meeting

6    with the understanding that there were two

7    other members, one member that was going to

8    nominate him, one member that was going to

9    second the nomination, and he was going to run

10   for president.  And when he got to the meeting,

11   the two that were going to assist him in his

12   nomination, the two members said they were not

13   going to assist him.

14             And it got to that point that

15   Charles, I believe, got confused, thought he

16   needed these two people to do nominations.

17   Through my interview and my notes, which you

18   probably read, he thought he could

19   self-nominate, but he was not completely sure

20   if he could.  And he was in a quandary of what

21   to do.

22        Q.   Did he indicate why the people

23   nominating and seconding his nomination would

24   not go through with it?

25        A.   He told me they were -- they just

```
 1   didn't want to be a part of it.  They were
 2   afraid of maybe reprisal or something.
 3        Q.    Was that kind of fear of reprisal
 4   something that was of concern to you?
 5        A.    No.  I find that a lot of times,
 6   people talk about they are going to do certain
 7   things, but when the time comes, they don't,
 8   they back out.  It happens a lot in elections.
 9   I certainly took it under consideration and
10   reviewed it afterwards.
11        Q.    Had Mr. Battle -- because of fear of
12   reprisal, would that have been a violation of
13   the IBEW rules?
14        A.    I'm sorry.  I didn't hear you.
15   Pardon me.
16        Q.    If Mr. Battle's nominators did not
17   nominate out of fear of reprisal, would IBEW
18   consider that a violation of union laws?
19                 MR. KURNICK:  Again, it calls
20   for speculation on the part of the witness.
21                 THE WITNESS:  Yeah.  That's
22   very speculative.  Is it their own fear, is it
23   true fear?  I can't even speculate on it.
24   BY MS. DeBRUICKER:
25        Q.    Would IBEW consider threats of
```

1    reprisal a violation of its union rules?

2                 MR. KURNICK:  I'm sorry, but I

3    have the same objection.

4    BY MS. DeBRUICKER:

5         Q.    Give me your understanding,

6    Mr. Kieffer.

7         A.    If it was true reprisal and not just

8    a thought, they may have.

9         Q.    Would a threat of reprisal

10   constitute a violation of the LMRDA in your

11   understanding?

12                MR. KURNICK:  Objection.

13   Calls for a legal conclusion by the witness.

14                THE WITNESS:  I still answer,

15   Bob?

16                MR. KURNICK:  Yes.  I'm sorry.

17   You still have to answer.

18                THE WITNESS:  I just want to

19   make sure.  It is my understanding, Randy

20   Kieffer's understanding, that a true threat of

21   reprisal would definitely violate the LMRDA.

22   BY MS. DeBRUICKER:

23        Q.    And we talked briefly about the

24   attachments to the protest.  Would this be any

25   reason not to consider the attachments to the

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 52

1    protest?

2         A.    I would think it's all a part of his

3    protest, so I took everything under

4    consideration that was sent.

5         Q.    Do you have any basis not to

6    consider, either from the IBEW rules or the

7    LMRDA, not to consider the attachments?

8         A.    I don't think there's any set rules

9    for a complaint.

10        Q.    I'm going to show you what we'll

11   mark as Kieffer No. 3.

12              (Deposition Exhibit No. 3 was

13   marked for identification.)

14        Q.    I'll scroll through it quickly.

15   Mr. Kieffer, is that your signature at the

16   bottom of this letter?

17        A.    That's my electronic signature, yes.

18        Q.    And this is a letter from you to

19   Michael Welsh dated July 28, 2020; do you see

20   that?

21        A.    That is correct.

22        Q.    And is this your report of your

23   investigation of Mr. Battle's protest?

24        A.    It is.

25        Q.    What was your purpose of writing

Page 53

1    this letter?

2          A.    For the international vice president

3    to have enough information to make a

4    determination.

5          Q.    Did anyone assist you in preparing

6    this letter?

7                      MR. KURNICK:  To the extent

8    that that question is asking to reveal

9    communications with counsel, we object, and I

10   would instruct him not to answer.  But with

11   respect to anybody else, he's free to answer.

12                      THE WITNESS:  No person, no.

13   I wrote that letter.

14   BY MS. DeBRUICKER:

15         Q.    I'm going to ask you a yes or no

16   question.  Did you confer with counsel about

17   the content of this letter?

18         A.    Yes.

19         Q.    Is that something you normally do in

20   the preparation of a report of an

21   investigation?

22         A.    Sometimes.

23         Q.    And what would indicate when you

24   would confer with counsel and when you

25   wouldn't?

Page 54

```
 1        A.    When there are legal issues, and I
 2   consider it a more complicated issue than a
 3   member filing charges against another member.
 4        Q.    This is a yes or no question.  Did
 5   your counsel provide you any input to the
 6   letter that you appropriated into the letter?
 7                  MR. KURNICK:  I object to that
 8   question.  Randy, you can answer.
 9                  THE WITNESS:  Counsel gave me
10   --  we spoke about the content of the letter.
11   BY MS. DeBRUICKER:
12        Q.    Okay.  I'm going to ask some careful
13   questions here because there are things that
14   I'm not entitled to know, and I don't want to.
15                  Did you make changes to this letter
16   based on your conversations with counsel?
17        A.    Yes.
18        Q.    And who was the counsel you spoke
19   to?
20                  MR. KURNICK:  Question assumes
21   he spoke to counsel.
22   BY MS. DeBRUICKER:
23        Q.    Who is the counsel you conferred
24   with regarding this letter?
25        A.    Jon Newman.
```

1        Q.      And is Mr. Newman with the

2    international?

3        A.      Yes.  He is counsel for IBEW.

4        Q.      Did you confer with anyone else

5    regarding the content of this letter, that we

6    haven't spoken about?

7        A.      Vice President Welsh.

8        Q.      Did you submit a draft of the letter

9    to Mr. Welsh?

10       A.      Yes, I did.

11       Q.      And did he provide you feedback in

12   terms of the content?

13       A.      We spoke.  He didn't provide much

14   feedback, but we spoke.  And I just wanted to

15   make sure I was being clear on what I found.

16       Q.      Did Mr. Welsh ask you to make any

17   changes to the letter?

18       A.      No.

19       Q.      Do you, typically, provide IVP Welsh

20   a draft of your report before finalizing it?

21       A.      Yeah, I can.  Sure.  I do on

22   occasion.

23       Q.      And at the time you dated and signed

24   this letter on July 28, 2020, did you consider

25   your role in investigating Mr. Battle's protest

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1     to be complete?

2             A.      Yes, I did.

3             Q.      Is this the form you -- did

4     Mr. Welsh ask you to do any followup

5     investigation after you submitted this letter?

6             A.      We continued to get complaint

7     letters, different letters from Mr. Battle and

8     other people.  And Mr. Welsh sent them to me

9     for my file on record.

10            Q.      Did he ask you to do any followup

11    with respect to your findings that you reported

12    on July 28, 2020?

13            A.      I don't think so.  No.

14            Q.      I'm going to ask you some questions

15    about the content of the letter.  So my

16    intention is to focus your attention kind of

17    paragraph by paragraph.  But if it would be

18    helpful to you to review the document in full

19    before I do that, I want to be sure you have

20    the opportunity to.  Would you like a chance to

21    read through this before I direct your

22    attention to particular places?

23            A.      No, I'm okay.  I know the document.

24            Q.      And is the size okay?  Are you able

25    to see it?  That's better.

1            All right.  Mr. Kieffer, starting

2    with the first paragraph, you list the number

3    of people who you spoke with during the course

4    of your investigation.

5         A.    Yes.

6         Q.    Is there anyone else you spoke to in

7    the course of the investigation who you didn't

8    list?

9         A.    I mean, besides the vice president,

10   no.  That was about it.

11        Q.    Did you have an opportunity to speak

12   with a gentleman named Timothy McConnell?

13        A.    Yes, I did.

14        Q.    And was that in the course of your

15   investigation?

16        A.    That was a separate issue.

17        Q.    Okay.  It's my understanding that

18   you had interviewed Mr. McConnell prior to

19   July 28, 2020.  Is that a recollection you had?

20        A.    Yes, I believe so.

21        Q.    So is the reason you didn't list him

22   here because you considered that to be a

23   separate issue?

24        A.    No.  I didn't list him because he

25   asked me not to use his name in anything.

1        Q.    Did you consider identifying that

2    you had interviewed another Local 98 member who

3    didn't wish to be identified?

4        A.    Excuse me?  I'm sorry, I didn't --

5        Q.    Did you consider including here,

6    among the people whom you interviewed, a note

7    that you did interview someone else who wished

8    not to be identified?

9        A.    No.  Not in this report.

10       Q.    And why was that?

11       A.    I did a separate report.  I reported

12   Tim McConnell separately to the vice president

13   to keep the confidentiality.

14       Q.    I'm going to direct your attention

15   to the third paragraph here.  The Local 98

16   executive board designed a nomination meeting

17   that was set for June 9th, which they felt

18   would be safe for all participants to comply

19   with all CDC and City of Philadelphia

20   guidelines.  The nomination notice (attached)

21   was sent in a timely manner.  The special

22   nomination meeting was designed so that only

23   candidates and members that want to nominate a

24   candidate should be present at the meeting for

25   safety.  No one was denied access to the

1    meeting.

2            Did you have the opportunity -- I

3    take it you reviewed the notice that Local 98

4    sent regarding the election?

5        A.    Yes.

6        Q.    I'm going to jump to see if I can

7    pull that notice up.  So this is Attachment A

8    to Mr. Battle's protest.  Do you recognize that

9    as the notice you were speaking of in your

10   letter?

11       A.    Yes.

12       Q.    Was it your understanding that

13   Local 98 was intending to limit the number of

14   people at the union hall at any given time?

15       A.    It was my understanding they were

16   trying to conform to the CDC guidelines, yes.

17       Q.    And it says, at the bottom of the

18   paragraph at the top of the screen, members

19   should not congregate in the parking lot or on

20   the sidewalks before or after the meeting.  Do

21   you see that?

22       A.    Yes.

23       Q.    Then this middle paragraph provides,

24   nominations shall take place on June 9th

25   beginning at 7:00 p.m. at the union's offices

```
 1    at 1719 Spring Garden Street.  Acknowledgments
 2    and willingness to be nominated for office must
 3    be received by the union no later than 5 p.m.
 4    on June 9, 2020.
 5              What was your understanding of that
 6    statement?
 7         A.    Acknowledgments of nominations
 8    should be handed in by 5:00 on June 9th.
 9         Q.    We talked about the IBEW
10    constitution requiring -- providing, that
11    nominations could be made either in person or
12    in writing.  Do you read this provision of the
13    notice as requiring both?
14              MR. KURNICK:  I hate to
15    interrupt, but I have to object.  He doesn't
16    the have any greater understanding of what this
17    language means than you or I do.  He didn't
18    draft it, it's not his document.  So he is in
19    the same position as everybody else and simply
20    reading it.  But, Randy, go ahead and answer.
21              THE WITNESS:  What was the
22    question, again?  I'm sorry.
23    BY MS. DeBRUICKER:
24         Q.    The question was, if IBEW's
25    constitution requires that nominations be made
```

1    either in writing or in person, do you read

2    this provision as requiring both, that someone

3    submit something in writing and be there in

4    person?

5         A.    Again, it's speculation on my part.

6    But no, I don't.

7         Q.    As part of your evaluation of

8    Mr. Battle's protest, did you determine the

9    sufficiency of this notice?

10        A.    I determined if Mr. Battle went

11   through the procedure.

12        Q.    Looking at the next page of your

13   July 28th letter, your next paragraph begins,

14   the notice may not have been clear to some

15   people since no one ever designed a nomination

16   meeting during a pandemic.

17              In what way may the notice have not

18   been clear to some people?

19        A.    Some people are used to doing the

20   same thing over and over and over.  And when

21   you change it, no matter how easy you make it,

22   there are questions on it.

23        Q.    And if some people, indeed, found

24   the notice unclear, for whatever reason, would

25   that be of concern to IBEW?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
1        A.    I believe if it was unclear, they

2   should have made an inquiry to clear it up.

3        Q.    Is there an obligation on the part

4   of the local to make sure their election

5   processes are clear, that their nominations

6   processes are clear?

7                    MR. KURNICK:  Objection.

8   Calls for a legal conclusion.

9                    THE WITNESS:  I mean -- could

10  you repeat the question?

11                   MS. DeBRUICKER:  Let me ask

12  our court reporter to read that back.

13                   (Reporter read back from the

14  record.)

15                   THE WITNESS:  I think that any

16  notice that went out should be clear.

17  BY MS. DeBRUICKER:

18       Q.    The paragraph continues, the

19  executive board tried to design a nomination

20  meeting so someone running for office could

21  fill out a nomination form that would be read

22  at the meeting and/or just get nominated at the

23  special nomination meeting.

24                   Is that your understanding of what

25  was required?
```

1       A.      Yes.

2       Q.      So it's your understanding that

3   someone could submit a nomination form that

4   would be read at the meeting and that would be

5   sufficient; correct?

6       A.      Yes.

7       Q.      We've heard a statement that Local

8   98 required nominations to be made by a member

9   who was present at the meeting.  Have you heard

10  such a statement or did you hear such a

11  statement during the course of your

12  investigation?

13      A.      What was the statement?  I'm sorry.

14  I didn't --

15      Q.      We've heard a statement that

16  Local 98 required nominations be made by a

17  member at the meeting in person.  Did you hear

18  such a statement during the course of your

19  investigations?

20      A.      Charles Battle thought that was the

21  case.  He did tell me that, but he didn't ask

22  anybody that.

23      Q.      Did you hear from Local 98 that that

24  was their requirement?

25      A.      No, I did not.

Page 64

1        Q.     In your understanding, would a

2    requirement that a nomination must be made in

3    person have to be consistent with IBEW's

4    constitution?

5        A.     Did you say they must be at the

6    meeting?

7        Q.     Yes.

8        A.     The consistence -- I don't know how

9    to answer that, but I'll give you my

10   interpretation.  The IBEW would take a written

11   nomination or nomination in person at the

12   meeting.

13       Q.     And if Local 98 did require a

14   nomination to be made in person at the meeting,

15   who would decide whether that was consistent

16   with the IBEW constitution or rules?

17       A.     The IBEW constitution is interpreted

18   by one person, and that's International

19   President Stephenson.

20       Q.     So that's not for the local to

21   determine, that would be for the international

22   president to determine?

23       A.     The international president

24   determines everything in the constitution.

25       Q.     We heard testimony yesterday that

```
 1   written nomination forms were not read at the

 2   meeting.  Do you have any other information

 3   indicating otherwise?

 4        A.    I don't have any information on

 5   that.

 6        Q.    We heard testimony yesterday that

 7   only the nominations made in person during the

 8   meeting were recognized.  In your opinion,

 9   would that have been proper?

10        A.    I was under the opinion that there

11   was no one running, that the offices were all

12   uncontested.

13        Q.    If nominations had been submitted in

14   writing but only nominations that were made in

15   person were considered, in your opinion, would

16   that have been improper?

17             MR. KURNICK:  Again, I have to

18   object.  You're giving him scenarios that

19   aren't necessarily consistent with his

20   understanding of the facts and asking him to

21   speculate on whether the IBEW would deem them

22   consistent with its constitution or not.  So

23   with that objection, Randy, please answer.

24             THE WITNESS:  If they were

25   properly -- if it was a proper form, given to
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    the chair properly, I would say that that would

2    be a proper nomination.

3    BY MS. DeBRUICKER:

4         Q.    In your second paragraph, you

5    stated, in my conversation with Brother Battle,

6    he told me he arrived at the union hall with

7    the belief of having a few members there to

8    support his candidacy, but when he arrived,

9    these members no longer wanted to support his

10   candidacy.

11             Brother Battle said his two

12   supporters were intimidated by some members and

13   business agents not to support his candidacy.

14   I asked Brother Battle if these members would

15   be willing to talk to me regarding the

16   allegations of intimidation, but none are

17   willing to speak to me.

18             Did you ask Mr. Battle why these

19   individuals were not willing to speak to you?

20        A.    Yes, I did.

21        Q.    And what was his response?

22        A.    He was not sure.

23        Q.    Do you recall what words he used?

24        A.    I don't recall exactly what he used.

25        Q.    Did you take notes of your

1      conversation with Mr. Battle?

2              A.      Yes, I did.

3              Q.      And would those notes indicate word

4      for word what he said or were they summaries?

5              A.      I think they were a summary.

6              Q.      In his protest, Mr. Battle indicated

7      that the people who were going to nominate him

8      didn't out of fear of intimidation; is that

9      correct?

10             A.      Yeah.  It was his opinion that

11     that's why they wouldn't speak.

12             Q.      Did you take any measures to

13     encourage those members to come forward?

14             A.      I didn't know them.

15             Q.      Did you take any measures to try to

16     identify those members?

17             A.      Yes, I did, through Charles Battle.

18     I tried to get Charles Battle to have them call

19     me several times and it was several weeks and

20     to no avail, until a few weeks -- I talked to

21     McConnell.

22             Q.      Would there have been other ways to

23     ask members like that to come forward?

24             A.      I'd have no idea who they are.

25     There are 4,000 members.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          Q.    Did you consider communicating with
 2     the local to ask members to come forward on an
 3     anonymous basis?
 4          A.    No.
 5          Q.    Next paragraph, it says that, at the
 6     nomination meeting, Brother Battle was given
 7     the nomination paper and on this paperwork,
 8     there is a line that lists nominee and
 9     nominator.  Brother Battle stated to me in our
10     discussion that he intended to nominate himself
11     for president.
12                Do you recall him stating,
13     specifically, he intended to nominate himself?
14          A.    He told me that he thought he could
15     nominate himself and he was thinking about if
16     he could.  I asked him point-blank, why didn't
17     you ask anyone.  And he did not.  He took it
18     upon himself.  He was not sure if he could
19     nominate himself.  And his exact words were, I
20     took the nomination paper, I walked out to my
21     truck, and I sat in my truck, and I
22     contemplated on what I was going to do.
23          Q.    You're saying those were his
24     exact words.  How do you know that?
25          A.    They were his exact words.
```

1       Q.      That he spoke to you?

2       A.      Yes.

3       Q.      If he had intended to nominate

4    himself, why would he have needed nominators

5    and seconders?

6       A.      I don't know.  I believe he thought

7    he needed a nominator and seconders.

8       Q.      Continuing on.  He was relatively

9    sure he could nominate himself, but not

10   positive.  Do you see that?

11      A.      Correct.

12      Q.      Do you recall him, specifically,

13   saying that?

14      A.      Yes.

15      Q.      Again, if he thought he needed

16   nominators, how is that consistent with an

17   understanding that he could nominate himself?

18      A.      His exact words were he thought that

19   he could nominate himself, but he was not sure.

20      Q.      Do you have notes of those exact

21   words or is that in your recollection?

22      A.      I don't know if I wrote that

23   exactly, but I do remember the conversation I

24   had with him.  And that synopsis is in my notes

25   somewhere, which I submitted.

```
 1          Q.    Who did you submit your notes to?

 2                    THE WITNESS:  Bob, who did we

 3      submit my notes to?

 4                    MR. KURNICK:  We submitted

 5      those notes to your office, Ms. DeBruicker.

 6      You should have them.

 7                    MS. DeBRUICKER:  I'm at the

 8      U.S. Attorney's Office.

 9                    MR. KURNICK:  I know.  I know

10      exactly where you are.  And that is where we

11      submitted them.

12      MS. DeBRUICKER:

13          Q.    You indicated that no officer gave

14      Mr. Battle any advice, nor did he ask anyone

15      for advice.

16          A.    That is correct.

17          Q.    Who should he have asked?

18          A.    He could have asked anyone.  The

19      president was present, sergeant at arms.  All

20      the officers were present, he could have asked

21      them.

22          Q.    The notice said that the written

23      forms had to be submitted by 5:00.  Were any of

24      those people there at that time, as far as you

25      know?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          A.    I don't know.  I would surmise that
 2     President Burrows was there because Charlie
 3     Battle, when he wanted to look at the forms,
 4     asked about looking at the forms.  And Brian
 5     Burrows' name came up.  So I'm surmising from
 6     Charles Battle's testimony that at least the
 7     president was there.
 8          Q.    Does the international have a
 9     resource for members who have questions about
10     nominations and elections processes?
11          A.    They could just call the District
12     Office.
13          Q.    Is there a particular person who is
14     designated to field those questions?
15          A.    The District Office, the vice
16     president could field it or give it to me to
17     field, or any one of his reps.
18          Q.    Do you know how Mr. Battle came to
19     get the nomination form?
20          A.    I imagine he went in and asked for
21     one at the window.
22          Q.    Do you have any information on that
23     or are you imagining?
24          A.    I'm imagining.
25          Q.    We heard testimony yesterday that
```

```
 1    there were no nomination forms at the union

 2    hall that night.  Would that be important to

 3    your evaluation?

 4         A.    That's the first I've heard of it.

 5         Q.    We heard testimony yesterday that

 6    even Local 98's in-house counsel couldn't -- so

 7    did you learn that at all during your

 8    investigation?

 9         A.    No, I didn't.

10               THE REPORTER:  Sorry, Counsel.

11    I didn't hear all of your question.  I got the

12    answer.

13    BY MS. DeBRUICKER:

14         Q.    We heard testimony yesterday that

15    even Local 98's in-house counsel couldn't

16    answer these questions regarding the election.

17    Did you have any information of that during

18    your investigation?

19         A.    Charles Battle told me he did not

20    ask any questions to anyone.  That is also in

21    my notes.

22         Q.    You follow up with, Brother Battle

23    left the union office with the nomination

24    paperwork and sat in his vehicle contemplating

25    what to do.  And he decided not to turn in the
```

1  paperwork and decided not to attend the 7:00

2  meeting.

3          Do you see that?

4     A.    Yes.

5     Q.    What is that based on?

6     A.    That is based on Brother Battle's

7  testimony to me.

8     Q.    Local 98 produced to us Mr. Battle's

9  nomination form that I referred to as Kieffer

10  Exhibit No. 1.  Do you have any understanding

11  as to how they came to get the form?

12     A.    I do not.

13     Q.    During your investigation, did you

14  ask Local 98 whether Mr. Battle submitted the

15  form?

16     A.    I did not.

17     Q.    Did you ask Local 98, during your

18  investigation, whether anyone else submitted

19  the form?

20     A.    I did not.

21     Q.    At some point, did you come to learn

22  that Mr. Battle had submitted the form to Local

23  98 the night of the nomination meeting?

24     A.    Yes.

25     Q.    When did you learn that?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1          A.     When I read the Complaint through

2     the Department of Labor.

3          Q.     Are you referring to the Complaint

4     that was filed in court or some other document?

5          A.     The Complaint that was filed in

6     court.

7          Q.     When were you interviewed by the

8     Department to Labor, Mr. Kieffer?

9          A.     I would have to look up the date.

10    I'm sorry, I don't have that offhand.

11         Q.     If your report was dated July 28,

12    2020, could you estimate whether it was a

13    couple of weeks or months after that, when you

14    were interviewed by DOL?

15         A.     I'm really speculating, but I think

16    it was a few months.

17         Q.     Do you think it may have been

18    sometime in the fall?

19         A.     It may have been.  I really hate to

20    give you a date and it not be accurate.

21         Q.     Is it your testimony that you were

22    unaware of Mr. Battle's nomination form --

23         A.     I was unaware --

24         Q.     -- at that time?

25         A.     Yes.

1    Q.    Moving to the next paragraph,

2    Brother Battle also claims he should have been

3    able to review all the nomination paperwork

4    that other's seeking office submitted.  He

5    claims that if it had been a normal in-person

6    nomination meeting, he would have been able to

7    see who else was running for office and for

8    what office they were seeking.

9              Do you know whether Mr. Battle was

10   allowed to see the nomination form?

11   A.    It's my understanding that he was

12   not allowed to.

13   Q.    Where did that understanding come

14   from?

15   A.    Me questioning Mr. Battle.

16   Q.    Is there an IBEW rule against

17   showing members nomination forms?

18   A.    I do not believe so.

19   Q.    Do you know whether others running

20   for office were allowed to see the forms?

21   A.    I do not know.  That was a local

22   union ruling, not an IBEW international ruling.

23   Q.    Do you know of any other way that

24   members who were not present at the union hall

25   would have become aware that Battle was running

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    for office after he submitted his nomination

2    form?

3         A.    I have no idea.

4         Q.    Generally speaking, do you think

5    there's an advantage to knowing who else is

6    seeking nominations before the nominations

7    begin?

8         A.    Purely speculation, I don't think it

9    would matter.

10        Q.    Does it make sense to you that a

11   member may want to seek a different office

12   depending on who else was running for a

13   particular office?

14        A.    They could but in my -- again, it's

15   a Randy Kieffer opinion, then they're just

16   looking for an office and not looking to run

17   for a particular position so they can help the

18   local.

19        Q.    Continuing on in the same Paragraph,

20   one, two, three, four lines down.  If Brother

21   Battle had filled out the nomination form, he

22   would have been given admission to the meeting,

23   and at the meeting, he could have seen who was

24   nominated no differently than any other

25   meeting.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1                        Is that your understanding?

2            A.    My understanding is that the

3    nomination forms would have been read.

4            Q.    And if he had filled out the

5    nomination form, he would have been given

6    admission to the meeting.

7                        What did you mean by that?

8            A.    He was given admission to the

9    meeting if he filled out the form.

10           Q.    Do you know how he would have been

11   given admission to the meeting?

12           A.    Just walked in.

13           Q.    Do you know who would have given him

14   that admission?

15           A.    I don't think anybody was in charge

16   of it.  I think they just let so many people in

17   to the union hall, the amount of people who

18   were allowed through the guidelines for

19   nominations and circulate them.

20           Q.    I think we've established that

21   presence at the meeting wasn't required,

22   correct, his form could have been read there?

23           A.    I believe so.

24           Q.    Moving to the next paragraph.

25                      Brother Battle asserts that a sign

1    at the door may have been a ploy to intimidate

2    him not to enter the building because it said

3    that he would need three people present.  The

4    sign said that only the candidate, nominator,

5    and member seconding the nomination would be

6    allowed into the building.

7              Did you see that sign during your

8    investigation?

9         A.   I saw a photo of it.

10        Q.   This is the photo that was attached

11   to Mr. Battle's protest.  Is this the photo

12   you're referring to?

13        A.   That is correct.

14        Q.   It's a little tough to read, but I

15   believe it says, the only members who will be

16   admitted into the meeting will be the nominated

17   candidate, the member nominating the candidate,

18   and the member seconding the nomination.

19             Does that sound right to you?

20        A.   Yes.

21        Q.   If Local 98 were intending to limit

22   attendance at the meeting, wouldn't the sign

23   say that nominators and seconders were not

24   needed?

25        A.   That was their ruling, I don't want

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    to speculate.  I believe they limited the

 2    amount of people by just allowing them, the

 3    three that were listed there, by not having

 4    people just show up by not being one of those

 5    three.  I think that was their way of limiting

 6    the amount.

 7         Q.    Do you see how a member might

 8    understand that notice to mean that nominators

 9    and seconders were required?

10         A.    No, I don't.

11         Q.    Why not?

12         A.    It says the nominator is allowed,

13    the candidate, the member nominating the

14    candidate, and the seconder are allowed.  Me,

15    personally, if you're any one of them, you're

16    allowed.

17         Q.    My question is, could you understand

18    how a member could read this to understand that

19    nominators and seconders were required?

20              MR. KURNICK:  That question

21    was asked and answered.

22              THE WITNESS:  I don't read it

23    that way.  I read it as the candidate could go

24    in himself.

25    BY MS. DeBRUICKER:
```

```
 1            Q.    Understanding that you don't read it
 2      that way, could you understand how someone else
 3      said might read it --
 4                  MR. KURNICK:   Counsel, I have
 5      to object to --
 6                  MR. PODRAZZA:   Speculation.
 7      And how is he supposed to step into the mind of
 8      somebody else?  We've been pretty patient about
 9      this, can we move this along?
10                  MR. KURNICK:   Let me interpose
11      my objection.  It seems to me that even though
12      you are certainly asking in a polite manner,
13      the form of the questions are, at this point,
14      argumentative.  If you want him to answer
15      again, he can answer again.
16                  THE WITNESS:   No, I don't.   I
17      -- you know, everybody has an interpretation,
18      but it would be a far reach for me to interpret
19      that you must have all three of them to be
20      admitted.  I think that it's pretty clear that
21      if you're any one of them, you would be
22      admitted.
23      BY MS. DeBRUICKER:
24            Q.    Moving to the top of the next page.
25      Brother Battle may have been confused.
```

```
 1              Would it be a concern that a member
 2   was confused, to IBEW?
 3        A.    It should be a concern to the member
 4   while he doesn't know.  But to be confused -- I
 5   can confuse members with the simplest of
 6   things.
 7        Q.    What did the local do that may have
 8   been confusing?
 9        A.    I think Charles Battle had a
10   particular thing in his mind.  He didn't ask,
11   and he was confused.  He thought he needed
12   other people to nominate him, he didn't.  But
13   he didn't ask anybody.
14        Q.    You state, he may have been
15   confused, but he could have self-nominated
16   himself on the nomination paperwork or just
17   attended the meeting and nominated himself.  If
18   he would have done either, he would have been
19   an official candidate for office.
20              Is that your finding?
21        A.    Yes.
22        Q.    The next couple of paragraphs deal
23   with Local Union 98 business agent Bob Bark.
24   Do you recall your conversations with
25   Mr. Battle regarding Mr. Bark?
```

```
 1        A.    Yes, I do.

 2        Q.    Did you speak with Mr. Bark

 3   regarding these interactions with Mr. Battle?

 4        A.    Yes, I did.

 5        Q.    Next paragraph begins, several

 6   months ago, Brother Battle started voicing

 7   disapproval with the present officers and local

 8   union practices at general meetings.  Members

 9   voicing their opinions at general union

10   meetings is a very normal practice.

11              Have you been to Local 98 meetings?

12        A.    A few.

13        Q.    Was that your assessment, that

14   members voicing their opinions at general union

15   meetings is a very normal practice?

16        A.    No.  My assessment of that was being

17   a business manager for nearly ten years.

18        Q.    But you were a business manager at

19   the local in Reading; do I have that right?

20        A.    Yes.

21        Q.    So you were basing your assessment

22   on your experience at that local, not Local 98?

23        A.    Yes.  Follow-up is that I represent

24   them, especially my home local, when I was in

25   charge as a business manager.
```

1          Q.    Did you ever attend Local 98 general

2     union meetings?

3          A.    Yeah.  A few.

4          Q.    How many?

5          A.    Possibly ten throughout the last

6     20 years, maybe eight.  Reps, normally, do not

7     attend general meetings.

8          Q.    Did you ask anyone else whether it

9     was a very normal practice for members to speak

10    out during meetings?

11         A.    I didn't think I had to.

12         Q.    You continue, after speaking with

13    several officers, it was unusual and out of

14    character for Brother Battle to be so

15    confrontational at general meetings.

16              What several officers are you

17    referring to?

18         A.    Actually, I spoke to Brain Burrows.

19    I even talked to Bark, he's not an officer, but

20    he's an agent.  And they told me that Charles

21    Battle was never any kind of confrontational

22    type of -- never had issues, was always a quiet

23    guy.  And he just started getting angry at

24    meetings.  They weren't sure why.

25         Q.    Why was it important -- was it

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    important to your investigation of Mr. Battle's

2    protest that he was speaking out at meetings?

3         A.    State that again.  I'm sorry.

4         Q.    Why was Mr. Battle's speaking out at

5    meetings a factor in your investigation of his

6    protest?

7         A.    Because Mr. Battle complained about

8    Bark coming to his residence.  And it came out

9    that he went to his residence because he wanted

10   to find why Charles was angry at the meetings.

11        Q.    When you say it came out, how did it

12   come out?

13        A.    After talking to Agent Bark and

14   Charles Battle.

15        Q.    In your next paragraph, you begin,

16   Brother Battle portrayed that, about the same

17   time he started voicing his opinion, Local

18   Union 98 business agent Bob Bark started

19   showing up at his house unannounced to

20   intimidate him.

21        A.    That was Charles Battle's

22   interpretation, yes.

23        Q.    Was there any dispute that Mr. Bark

24   showed up at Mr. Battle's house unannounced?

25        A.    No.

 1          Q.    You continue, after speaking to

 2    Agent Bark, I found that both Bark and Charles

 3    Battle were personal friends for years.  They

 4    went fishing together, went out to bars

 5    together, and Agent Bark considered Brother

 6    Battle as a friend.

 7          A.    Yes.

 8          Q.    And how is that pertinent to your

 9    analysis -- or your investigation?

10          A.    Brother Bark coming to his house as

11    a stranger just showing up, which I could see

12    where that could intimidate some people, a

13    total stranger showing up and knocking on your

14    door, standing in your driveway.  He portrayed

15    it as he -- it was just a thing that normally

16    did not happen.  And I found out that Brother

17    Bark and Charles Battle were friends.  They

18    went out together, they knew each other, they

19    were friends for years.  So it was not uncommon

20    or an out of the ordinary thing for Brother

21    Bark to stop at Charles Battle's house.

22                Charles tried to portray that to me,

23    and I thought it was important that the vice

24    president know that it was not just a random

25    person, that he did not just show up.

1          Q.     Even if they knew each other, is it

2     okay for people, even people that you know, to

3     show up at our house unannounced?

4          A.     It happens to me, yes.

5     Unfortunately, it does.

6          Q.     Why unfortunately?

7          A.     Sometimes you don't want to see

8     someone.

9          Q.     You continue, the first time, Agent

10     Bark drove to Brother Battle's house and called

11     him from the phone outside.

12               From that, did you understand that

13     Mr. Bark didn't tell Brother Battle that he was

14     coming that night?

15          A.     Yeah.  I understand that the first

16     time Battle knew that he was coming was when he

17     called him on the phone.

18          Q.     From outside of his house; right?

19          A.     Yes.

20          Q.     Did you find that a little weird?

21          A.     Not necessarily, no.

22          Q.     He asked Brother Battle to go out

23     and have a beer together.  Brother Battle went

24     and had drinks with Agent Bark.  What did

25     Mr. Battle tell you about that occasion?

1         A.      He didn't say much about that.

2         Q.      Did he tell you he took Agent Bark

3    out for beers to get him away from his house?

4         A.      No.

5         Q.      What was your understanding of why

6    Mr. Bark went to Mr. Battle's house that time?

7         A.      My understanding was he wanted to

8    talk to Battle to see what he was angry about

9    at the meetings.

10        Q.      Is that how business was conducted

11   at the local that you were in, you sent people

12   to people's houses?

13                MR. KURNICK:   Objection.

14   Wait, wait.

15                MR. PODRAZZA:   Objection.

16                MR. KURNICK:   There is no

17   testimony that anybody sent Battle to -- I'm

18   sorry, sent Bark to Battle's house.   So it

19   assumes a fact not in evidence.

20                THE WITNESS:   Again, I don't

21   know if anybody sent Bark anywhere.   I think

22   Bark might have just showed up.   I don't know

23   that.

24   BY MS. DeBRUICKER:

25        Q.      And then in the next paragraph, you

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    discuss a second time Agent Bark went to

2    Brother Battle's house.  What was your

3    understanding of why Agent Bark went to Brother

4    Battle's house the second time?

5         A.   I believe it was the same reason.

6    Brother Bark told me it was the same reason.

7         Q.   Do you know how long before the

8    nomination meeting that visit was?

9         A.   Offhand, I don't.  But I know it was

10   close to nominations.

11        Q.   Do you believe there's any

12   relationship between Bark's visit and the

13   nomination meeting?

14        A.   I don't know that.

15        Q.   Did you ask?

16        A.   Brother Battle told me that he told

17   Brother Bark not to show up anymore.  And

18   Brother Bark said, oh, okay, I'm sorry.  And he

19   left and he never showed up again.  That was

20   the conversation I was told they had.

21        Q.   When was your understanding

22   Mr. Battle told Mr. Bark he didn't want him

23   showing up anymore?

24        A.   At the second time Mr. Bark showed

25   up.

1        Q.    Mr. Kieffer, I'm going to show you a

2    text message that we will mark as Kieffer -- I

3    think we're up to 5 [sic].

4                    (Deposition Exhibit No. 4 was

5    marked for identification.)

6        Q.    It's a text from Bob Bark dated

7    June 8, 2020.  Do you understand that to be the

8    night before the nominations meeting?

9        A.    If the date is correct, yes.

10       Q.    The nominations meeting was

11   June 9th; correct?

12       A.    That is correct.

13       Q.    So at 9:08, on June 8, 2020, Mr.

14   Bark texts, hey, Charlie, that did not go the

15   way I was hoping.  I knew you would be a little

16   mad about me coming to your house from the

17   conversation we had on the job that time.

18                    Does this indicate to you when

19   Mr. Battle told -- does this indicate to you

20   that Mr. Bark knew Mr. Battle did not welcome

21   him at his home?

22       A.    I never saw this before.  I never

23   saw this text before.  I have no idea.

24       Q.    Did you ask Mr. Bark when Mr. Battle

25   told him he didn't want him showing up at his

1    house?

2         A.    Battle told me the second night he

3    was there, he told him not to show up anymore.

4    And Bark said he did not come.

5         Q.    Does this indicate to you that Bark

6    knew he was not welcome when he came?

7         A.    I don't know what that is.  I never

8    read that.  And I never verified any of that

9    document there.

10        Q.    Would it have been important to know

11   whether Mr. Bark was welcome at Mr. Battle's

12   home that evening?

13        A.    No.  I don't think that would have

14   been my matter.  That would have been a matter

15   between them.

16        Q.    It wouldn't have been important to

17   you to know that Mr. Battle had already told

18   Mr. Bark not to come to his house anymore but

19   he did anyway?

20        A.    Speculation -- I would have to think

21   about it.

22        Q.    In your last paragraph beginning

23   here on the third line, Brother Kee accompanied

24   Agent Bark because several years ago, Brother

25   Kee and Agent Bark were living alone together

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    and Brother Battle found out both of them had

2    nowhere to go for Thanksgiving.  He invited

3    both Kee and Bark to have Thanksgiving dinner

4    with him and his family at his house.

5              So from my understanding, Brother

6    Kee accompanied Agent Bark because they had

7    been to Thanksgiving at his house.  Is that the

8    general point you're making?

9         A.    Yeah.  They knew each other.

10        Q.    Okay.  So as long as they knew each

11   other, it was okay to show up at his house?

12        A.    I would think so.

13        Q.    Do you think it's appropriate for

14   two members to show up at a fellow member's

15   home unannounced to address union issues?

16        A.    I don't know if that's appropriate,

17   but I think it happens all the time.

18        Q.    Is it the kind of conduct that the

19   international expects of its locals?

20              MR. KURNICK:  Objection.  I

21   don't think Mr. Kieffer is competent to talk

22   about what the international expects.  And I

23   don't even know what that question means.  I

24   think the question is unanswerable and terribly

25   vague.

1                    THE WITNESS:  Yeah.  I don't

2     understand the question, so I can't answer it.

3     BY MS. DeBRUICKER:

4          Q.    At the end of the paragraph you

5     indicate, but when Agent Bark and Brother Kee

6     stopped at his house this time, they were met

7     by Brother Battle who was very distraught and

8     told them to get off his property.

9                    Who told you that?

10         A.    Brother Battle.

11         Q.    Did you assume from that that

12    Mr. Bark was not welcome there?

13         A.    Pretty much, yes.

14         Q.    You mentioned that Agent Bark told

15    you he apologized afterward.  Did you find that

16    to mean that Mr. Battle didn't find Mr. Bark's

17    conduct threatening?

18         A.    I don't think -- I don't know about

19    the threatening part.  I think Brother Battle

20    was mad.  I can't -- I mean, that's

21    speculation.  But the way he portrayed it to

22    me, he was just mad.  I don't know if he was

23    intimidated, but he was mad.

24         Q.    Does an apology make whatever made

25    him mad okay?

1        A.     That's for whoever to decide, not

2    me.  I don't know.

3        Q.     You conclude by mentioning that

4    Mr. Bark said he never raised his voice.

5               Does a voice have to be raised to

6    constitute intimidation or threatening

7    behavior?

8        A.     Threatening behavior can be

9    interpreted so many different ways by so many

10   different people.  It's purely speculative.

11       Q.     Does IBEW have a working definition

12   of what kind of conduct constitutes improper

13   interference with an election?

14       A.     I don't think we have a written

15   document.

16       Q.     Do you have, kind of, a working

17   concept that people use?

18       A.     The LMRDA regulations.

19       Q.     To find that a local's conduct

20   interfered with a member's right to run for

21   office, does the international require that the

22   conduct be threatening?

23       A.     I don't know how to answer that.  I

24   don't understand it.

25       Q.     To find that a local's conduct

1     interfered with a member's right to run for

2     office, does the international require that the

3     conduct be threats of physical violence?

4                    MR. KURNICK:   And I apologize

5     for interrupting, but I have to object, in

6     part, because these questions about the

7     international do this or the international do

8     that have no foundation here.   Mr. Kieffer is

9     an international rep.   You have the

10    constitution, you have basic laws and policies,

11    you have the local union election guide, and we

12    all have copies of the LMRDA, presumably.

13                    But to ask him about what the

14    international requires or thinks or believes

15    are questions that you haven't established that

16    he's competent to answer.

17    BY MS. DeBRUICKER:

18         Q.    You can answer the question,

19    Mr. Kieffer.

20         A.    I don't know.   I am not competent to

21    answer that question.   I'm really not.   Quite

22    honestly, not to make light of it, but I call

23    balls and strikes, and I write them down to

24    give them to my bosses to make decisions.

25         Q.    When you are evaluating an internal

1    election protest alleging undue influence by

2    the union in an election, do you consider

3    things other than threats of physical violence?

4         A.    I consider all things.

5         Q.    Do you consider whether the conduct

6    was intended to influence the election or not?

7         A.    I evaluate the conduct.

8         Q.    And is the intent behind the conduct

9    something you evaluate?

10        A.    If I could.

11        Q.    In your understanding of the LMRDA,

12   does someone have to intend to interfere with

13   an election in order to interfere with an

14   election?

15                MR. KURNICK:   Objection.   That

16   calls for a legal conclusion on the part of the

17   witness.

18                THE WITNESS:   I'm not an

19   attorney, so I don't have an answer or an

20   interpretation of it.

21   BY MS. DeBRUICKER:

22        Q.    I understand that Mr. Battle

23   considered -- was it your understanding that

24   Mr. Battle considered Mr. Bark's conduct

25   threatening?   I'm not saying whether it was,

Page 96

```
 1    was it your understanding that Mr. Battle

 2    considered it?

 3         A.    Mr.  Battle told me that he thought

 4    it was intimidation.

 5         Q.    In your evaluation, did you credit

 6    Mr. Bark's statement that it wasn't intended to

 7    be intimidating over Mr. Battle's statement

 8    that it was?

 9         A.    I didn't come to a conclusion on

10    that.

11              MS. DeBRUICKER:  We've been

12    going a while.  Would anyone like a break at

13    this time?

14              MR. KURNICK:  Could you give

15    me a sense -- only because we have to schedule

16    Mr. Welsh's deposition -- how far we are from

17    the finish line on this one?

18              MS. DeBRUICKER:  We're more

19    than the halfway point.  But I think at the

20    rate we're going, we will be coming up on 2:00

21    for Mr. Welsh.  I'm happy to take a break now,

22    or plug through to 2:00 with the intention of

23    getting to Mr. Welsh then.

24              MR. KURNICK:  I would like a

25    break in between the two.  Do we want to push
```

1    Mr. Welsh back to 3:00.  I also don't want to

2    be here until 8:00 tonight.  And Randy, I

3    should defer to you, you're the one doing the

4    talking, tell me if you need a break.

5                    THE WITNESS:  No.  I'm fine,

6    Bob.

7                    MR. KURNICK:  I would like

8    time in between the two.

9                    MS. DeBRUICKER:  I would be

10   happy to push Mr. Welsh back to 3:00 in order

11   to allow for a break in between.  I think that

12   makes sense for everybody, if that's okay for

13   Mr. Welsh.

14                   MR. KURNICK:  Okay.  Why don't

15   we take a five-minute break now.  I will

16   contact Mr. Welsh, and we will all be back

17   shortly.

18                   (Recess taken.)

19   BY MS. DeBRUICKER:

20       Q.    All right.  Mr. Kieffer, I'm going

21   to turn you back to your letter of July 28,

22   2020.

23                   At the top of the next page, you

24   report that Agent Bark mentions that Mr. Battle

25   is mad at current officers over a matter

1   relating to his stepson; do you recall Mr. Bark

2   telling you that?

3       A.   Yes, I do.

4       Q.   Mr. Battle said it was his

5   son-in-law.  Do you recall it being his stepson

6   in particular or could that have been a typo?

7       A.   I wrote it down as stepson.

8       Q.   You recite the issue and finish the

9   paragraph with, Brother Battle did mention this

10  issue but assured me this has nothing to do

11  with any of his complaints.

12           Do you see that?

13      A.   Yes.

14      Q.   Do you recall Mr. Battle saying that

15  to you?

16      A.   Yes, I do.

17      Q.   And why do you report on it here?

18      A.   I wanted to give a context of --

19  Brother Bark thought it was relevant.  Brother

20  Battle did not think it was relevant.  I

21  thought it was -- I wasn't sure if it was, so I

22  put it in for the vice president to see if he

23  thought it was relevant.

24      Q.   If a member has other complaints or

25  disputes with the union, other than what he or

1   she is protesting, does that play a role in

2   your evaluation of an election protest?

3       A.   It could give me a concept of why

4   they're complaining.

5       Q.   Why does it matter why they're

6   complaining?

7       A.   I get a lot of complaints that go

8   nowhere, and they're complaining just because

9   they're mad at a certain officer.

10      Q.   Does the fact if someone's mad or

11  not influence your recommendation to the IVP?

12      A.   No.

13      Q.   You mention in your next paragraph

14  that, basically, 2020 was very different for

15  everybody.  And you say, I've personally

16  fielded complaints from members complaining

17  about just about every aspect outside the

18  normal procedure that was necessary to keep our

19  members safe.

20           what other election complaints did

21  you get in 2020?

22      A.   I had two other elections -- not 98,

23  other local unions, that they were run and, of

24  course, the members complained to no avail.  A

25  lot of times it was just a phone call complaint

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 100

```
 1    that I tracked down and took care of

 2    immediately.  And it was because we changed

 3    procedures.  Human beings do not like change.

 4         Q.    What was the nature of the

 5    complaints that you got?

 6         A.    You know, why can't we nominate in

 7    person, why are we not having nominations now.

 8    Why are we having nominations now.  A gamut of

 9    -- my computer is full of them.  It's just --

10    it could -- you know, why did we have

11    nominations in the parking lot instead of the

12    union hall.  And that's other local unions.

13         Q.    Did you find any of the complaints

14    had merit?

15         A.    Of the other local unions, no.

16    Quite honestly, I believe it was members just

17    venting.  Because, after I spoke to them, they

18    were okay with it.

19         Q.    In your concluding paragraph, you

20    state that, if Brother Battle would have just

21    asked someone about the out-of-the-ordinary

22    nomination procedures or attended the actual

23    meeting, he then could have self-nominated and

24    ran for any office of his choice.

25                   Just so I'm clear, is your
```

1    conclusion that he could have self-nominated?

2         A.    Yes.

3         Q.    You also write that he may have felt

4    intimidated.  Was that your finding?

5         A.    That was his belief.

6         Q.    And you reported that he may have

7    felt intimidated?

8         A.    He may have.  He told me he did, so

9    he may have.

10        Q.    But you continue, that the

11   definition of intimidation can be subjective?

12        A.    Yes, it is.

13        Q.    So if it is subjective, is there a

14   definition -- a working concept that the

15   international uses or that you use in

16   evaluating a protest?

17        A.    There's really no written policy.  I

18   take it at face value.  For example,

19   intimidation, if someone walks up to someone,

20   some people could take it as intimidating.  If

21   that same person walked up to me, I'm 6'4" 300

22   pounds -- or just about 300 pounds -- I could

23   just not even know they're there.  So it's

24   definitely subjective.  It's to each their own

25   when it comes to that.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1      Q.    If it is subjective, whose

2  perspective matters in the evaluation of an

3  internal election protest?

4      A.    The opinion of the person who has

5  the authority to make the decision on what to

6  do next.

7      Q.    You continue, the claim of

8  intimidation is still not clearly proven.

9            Is that a standard?  Does it have to

10  be clearly proven?

11      A.    I would think it should be clearly

12  proven to the person making the decision, yes.

13      Q.    That same sentence, the claim of

14  intimidation is still not clearly proven and

15  could have taken normal communication between

16  members out of context and thought it may have

17  been an attempt to intimidate.

18            Do you agree that the conduct could

19  have been construed as intimidation, even if

20  you disagree as to whether it was intimidation?

21  Do you agree that the conduct was --

22      A.    Yeah -- I can't.  I don't know if it

23  was or not.  But anything could intimidate

24  anyone, depending on their personality.

25      Q.    Setting aside whether or not you

```
 1    agreed with him, did you find that Mr. Battle

 2    interpreted the conduct described in your

 3    letter as intimidation?

 4        A.    I found Mr. Battle told me that he

 5    thought it was intimidating.

 6        Q.    Whether or not you agreed with him,

 7    would you agree that his interpretation was a

 8    reasonable one?

 9        A.    No.  Again, that's such a choice of

10    -- Charles Battle -- again, I go back to what

11    would intimidate some people will not

12    intimidate other people.  I don't know what

13    intimidates him.  I don't know if he truly felt

14    that way, or if he just felt that it was better

15    to portray it that way.  I don't know.

16        Q.    Did you find his reports of

17    intimidation not credible?

18        A.    No.  But I found Mr. Battle left

19    certain things out, as in the friendship thing.

20    Things like that, he left certain things out in

21    my discussion.  He left out that he had

22    actually filled out paperwork and gave it to

23    the local union.  He left that out.

24              So I've got to piece things

25    together.  A lot of times I have three stories,
```

```
1      and I've got to try to piece it together as

2      best I the can in order to give the most

3      accurate information to the vice president to

4      make a decision.

5           Q.    Did you find Mr. Battle's reports of

6      intimidation unsubstantiated?

7           A.    I don't know how to answer it.  I

8      don't think he was intimidated as much as he

9      claimed.  And that's just a personal opinion.

10     I hate to do that, I know I was told not to do

11     that.

12          Q.    And why is that your personal

13     opinion?

14          A.    Because I talked to everyone

15     involved many, many times, and I get a feel of

16     their personalities.  And that's very

17     subjective.

18          Q.    Do you have any information as to

19     how many people were at the nomination meeting

20     that night?

21          A.    I heard several numbers.  There was

22     no sign-in sheet, so all the numbers are a

23     guess.  I heard anywhere from 100 to a few

24     hundred.

25          Q.    During the course of your
```

1    investigation, did you review the minutes of

2    the nomination meeting?

3         A.    No, I did not.

4         Q.    Okay.  Why didn't you?

5         A.    I didn't see a reason to look at the

6    minutes because Brother Battle did not show up

7    at the meeting and the meeting was just

8    acclamation.

9         Q.    If you had had information that

10   Mr. Battle submitted a nomination, would you be

11   interested in seeing the minutes of the

12   meeting?

13        A.    Yes, I would have.

14        Q.    And why would you be interested in

15   that?

16        A.    To see how the form was handled.

17        Q.    How would you expect the form to be

18   handled?

19        A.    I would expect, if the form was

20   properly submitted, the chairman to read it on

21   the floor and enter it into the minutes.

22        Q.    Do you have a sense -- is that how

23   written nominations are, typically, handled in

24   locals?

25        A.    Yes, they are.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1        Q.    I'm going to show you what we will

2    mark as Kieffer 6 [sic], I believe is the

3    number we're up to.

4                  (Deposition Exhibit No. 5 was

5    marked for identification.)

6        Q.    This is a letter dated July 31,

7    2020, addressed to Mr. Battle and signed by

8    Mr. Welsh.  Do you see that?

9        A.    Yes.

10       Q.    Do you recall seeing this letter

11   before?

12       A.    Can you make it a little bigger,

13   please?

14       Q.    Yes.  All right.  And I'm going to

15   scroll.  Let me know when you want me to scroll

16   again.

17       A.    No.  I recognize the letter.

18       Q.    Okay.  What do you recognize this

19   letter to be?

20       A.    I recognize this letter to be from

21   Vice President Welsh to Charles Battle.

22       Q.    Is it your understanding that this

23   is Mr. Welsh's decision to Mr. Battle's

24   internal election protest?

25       A.    I believe so, yes.

1      Q.    Did you have any role in drafting

2    this letter?

3      A.    No.  Besides his reviewing my report

4    to draft that letter, no.

5      Q.    Was it your understanding that he

6    would probably base some of his letter on your

7    report?

8      A.    If I did my job, I hope so.  Yes.

9      Q.    Did you have a chance to review this

10   letter before it was issued?

11     A.    No, I did not.

12     Q.    When did you have the opportunity to

13   review this letter?

14     A.    When it was sent, it was copied to

15   me.

16     Q.    Do you recall agreeing with the

17   conclusions?

18     A.    I don't agree or disagree with the

19   vice president.  It's his decision.  And I know

20   that sounds like I'm ducking the question, but

21   it's not.  It's his decision, so therefore, I

22   agree with it.

23     Q.    To the extent that he recites facts

24   or some of the information that you reported to

25   him, do you recall him having anything

1   incorrect?

2        A.     No.   I don't think the letter is

3   incorrect.

4        Q.     I think you mentioned you did speak

5   with Mr. McConnell while you were investigating

6   Mr. Battle's protest; is that correct?

7        A.     Yes.

8        Q.     Do you recall how many times you

9   spoke with Mr. McConnell?

10       A.     I think it was, approximately, three

11   times.  It could be more, but I think three

12   conversations.

13       Q.     And how did you come to connect with

14   Mr. McConnell?

15       A.     After the protest, and I was working

16   on the protest, continuingly, I asked Charles

17   Battle, you know, if anybody would come and

18   speak to me like we talked about prior.  And no

19   one would.  And I believe Charles Battle

20   emailed me Tim McConnell's name and address --

21   or name and phone number, and I called it.

22       Q.     When you spoke with Mr. McConnell,

23   did you have questions prepared for him?

24       A.     Yeah.  I had a few, yes.

25       Q.     Did you take notes of his responses?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 109

```
 1          A.      Yes, I did.
 2          Q.      I'll show you what we'll mark as
 3    Kieffer 7 [sic].
 4                     (Deposition Exhibit No. 6 was
 5    marked for identification.)
 6          Q.      At the top, it's an email from you
 7    to Michael Welsh dated Wednesday July 22, 2020.
 8    Do you see that?
 9          A.      Yes.
10          Q.      And like most email chains, it
11    actually starts at the bottom.  So this is a
12    two-page document.  So you're originating
13    message, at least on this chain, was from you
14    to Mr. Welsh, dated July 20, 2020.  Do you see
15    that?
16          A.      Yes.
17          Q.      And you indicate that Mr. Battle
18    told you that Mr. McConnell was going to run
19    for office.
20          A.      Yes.
21          Q.      What you report was that, a 98 agent
22    called Tim -- who I assume is Mr. McConnell --
23    called Tim's employer and told him that, if
24    your boy Timmy runs for office, it's going to
25    be a problem for you.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1                        Do you recall getting that report?

 2          A.     Yeah.  I recall hearing that, yes.

 3          Q.     You mentioned you'll try to get in

 4   contact with McConnell today and find out his

 5   story and, if need be, will talk to the

 6   employer.

 7                        Do you see that?

 8          A.     Yes.

 9          Q.     What would determine whether you

10   would talk to the employer or not?

11          A.     If Tim would talk to me.

12          Q.     If he talked to you, would you then

13   talk to the employer?

14          A.     Yes.

15          Q.     And your next line is, if this

16   happens to be true, in my opinion, it's a

17   definite game-changer to my original report.

18                        Do you see that?

19          A.     Yes.

20          Q.     When you say original report, do you

21   know what you are referring to there?

22          A.     To my report I sent to the vice

23   president -- my report that -- the draft that

24   you told me -- that you mentioned.  I had to

25   report -- if the dates -- I would have to look
```

1      at the dates, but my report just about

2      concluded with Battle by the time this came

3      about.  And because my report was just about

4      concluded, this is all new information that I

5      would have had to insert into the report.

6           Q.    So it's your understanding that you

7      had done your draft report by this time?

8           A.    Yes.

9           Q.    And why would it have been a

10     definite game-changer, to use your words?

11          A.    Well, I believe if that actually

12     took place, that could be -- and it's, you

13     know, speculation again, because I did not talk

14     to the employer.  If that actually happened, it

15     could be a total different perspective on the

16     election.

17          Q.    How so, how would that be a

18     different perspective?

19          A.    You know, you could consider it --

20     you could -- and I'm not saying it is, but you

21     could consider that a threat.  I would have to

22     dig into it further.

23          Q.    Is it fair to say that that kind of

24     information was of concern to you?

25          A.    I certainly wanted to review it and

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 112

```
 1    look into it further, yes.
 2         Q.    You copied a gentleman named Dennis
 3    Affinati on this.  Who is Mr. Affinati?
 4         A.    He's our service rep in the office.
 5    He's a desk rep.  He's in the office of Vice
 6    President Welsh.  If Vice President Welsh is
 7    not in the office, most of the time, I go
 8    through Dennis.
 9         Q.    And then in your -- in a subsequent
10    message, this one's dated July 22 at 9:30 in
11    the morning, you report, I spoke to 98 member
12    Tim McConnell last night regarding the
13    nomination intimidation.  And you say, it
14    muddies up things.
15              Do you recall what you meant by
16    that?
17         A.    Yeah.  I meant that he did not want
18    me to use anything he said.  And I think, you
19    know, I could have given the vice president a
20    little bit, and I gave the vice president a
21    report on it, a separate report, but I was told
22    at the end of the original report.  Meaning, I
23    thought that my report was over, and then they
24    throw that out there.  And if I could have used
25    it, I would have had to redo the entire report
```

1    to include that.

2         Q.    And why wouldn't you include that?

3         A.    Excuse me?

4         Q.    Why didn't you include

5    Mr. McConnell's --

6         A.    Tim McConnell told me he didn't want

7    anything to do with an official report.  He

8    only talked to me.  He didn't want anything to

9    do with any of this.  He said he was not a part

10   of Charles Battle's nomination or election

11   process.  And he just wanted to talk to me and

12   not file any kind of report or file any kind of

13   complaint.  And he, basically, had me swear

14   that I would not use his name.  He did not want

15   his name used.

16        Q.    Did you find what he told you

17   relevant to Mr. Battle's protest?

18        A.    No.  I thought it was a separate

19   issue.

20        Q.    Did you have an understanding that

21   Mr. McConnell was one of the other two people

22   Mr. Battle was referring to in his internal

23   protest?

24        A.    I believed that after I talked to

25   Tim McConnell.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 114

```
 1        Q.    So why would it not have been
 2    pertinent to Mr. Battle's protest?
 3        A.    Oh, I'm sorry.  Can I -- I don't
 4    think Tim McConnell was one of the two that
 5    Battle thought was in his camp.  I think they
 6    were other people.  Sorry if I misspoke on
 7    that.
 8        Q.    Why do you think that?
 9        A.    Tim McConnell told me directly, he
10    had nothing to do with Charles Battle's
11    nomination or election.  He was doing it all on
12    his own.  He was considering everything on his
13    own.
14        Q.    I'm showing you what we will mark as
15    Kieffer 8 [sic].
16                (Deposition Exhibit No. 7 was
17    marked for identification.)
18        Q.    This is a letter on your letterhead
19    dated July 24, 2020.  Is that your electronic
20    signature?
21        A.    Yes, it is.
22        Q.    And the RE:  line is, interview
23    Local Union 98 member Tim McConnell regarding
24    nomination of officers.
25                Do you see that?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1        A.     Yes.

2        Q.     Is this the report that you were

3    referring to of your discussions with

4    Mr. McConnell?

5        A.     Yes.

6        Q.     How is the size for you,

7    Mr. Kieffer?

8        A.     That's fine.

9        Q.     Okay.  You indicate, while

10   investigating the complaint from Local Union 98

11   member Charles Battle regarding his claim of

12   intimidation from business agents of Local

13   Union 98, prior to local union nominations,

14   Brother Battle alluded to the fact that he was

15   not the only member that was being bullied into

16   not running for office.

17              Do you see that?

18       A.     Yes.

19       Q.     And that was an accurate statement

20   of what Mr. Battle told you?

21       A.     Yeah.  That was Battle's statement,

22   yes.

23       Q.     Brother Battle told me there were

24   two other members that were considering running

25   for office at the upcoming elections but did

1    not because of intimidation from officers and

2    members.

3              Do you recall Mr. Battle telling you

4    that?

5         A.    Yes, I do.

6         Q.    Did you come to an understanding

7    that Mr. McConnell was one of those two other

8    members?

9         A.    Yes.

10        Q.    And there's no indication that

11   Mr. McConnell was going to support Mr. Battle,

12   he was another member considering running for

13   office and didn't because of intimidation?

14        A.    My understanding, Tim McConnell was

15   considering running for an office on his own.

16        Q.    You continue, I asked Brother Battle

17   if these two members would be willing to talk

18   to me about their experiences.  At first,

19   Brother Battle told me that it was not likely

20   that they would talk to me because of fear of

21   reprisal from sitting officers, but he would

22   contact these members to see if they would be

23   willing to speak to me.

24             Do you recall Mr. Battle telling you

25   that?

1      A.    Yes.

2      Q.    Was it of concern to you that these

3    members wouldn't talk to you because they

4    feared reprisal from officers?

5      A.    I didn't know if it was true.

6      Q.    And other than asking Mr. Battle,

7    did you do anything on your own to determine

8    who these two other members who considered

9    running but were intimidated out of running

10   were?

11     A.    I don't know what I would have done.

12     Q.    Could you have sent a communication

13   to Local 98 members asking them to come

14   forward?

15     A.    No.  I don't think that would have

16   been the procedure.

17     Q.    Why not?

18     A.    If they weren't coming forward now,

19   they wouldn't have come forward, I believe,

20   with a communication.

21     Q.    And if they didn't come forward

22   because they feared reprisal from officers, is

23   that an okay thing?

24     A.    If it was true, no, it's not.

25              MR. KURNICK:  Objection.  That

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 118

1    question is argumentative.

2    BY MS. DeBRUICKER:

3        Q.    If members were fearful of coming

4    forward to speak to you out of fear of reprisal

5    from officers, is there anything you could have

6    done to ameliorate that fear?

7        A.    I didn't know if it was true.

8        Q.    So would you have had to confirm it

9    was true before you did anything to --

10       A.    Yeah.  I would have to find out who

11   it was.  I mean, we're talking about a ghost.

12       Q.    Are you saying there's nothing you

13   could have done to find out who it was?

14       A.    I don't know of anything I could

15   have done.  But I also believe -- and Bob's

16   going to yell at me -- but I also believe that

17   if they had a problem, they have to come

18   forward.  I cannot hold their hand behind the

19   door all the time.  If there is an issue, they

20   must come and stand up and say there is a

21   problem.  I cannot track people down that don't

22   want to be tracked down.

23       Q.    Does the international ever have

24   people report things anonymously, to your

25   knowledge?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
1          A.     All the time.

2          Q.     What happens in those circumstances?

3          A.     That is up to -- if it's assigned to

4    someone or -- that's up to President Stephenson

5    or the vice president to either try to track it

6    down or not.

7          Q.     Do you understand not coming forward

8    because of fear of reprisal to be different

9    than just having nothing to say?

10         A.     Do I understand the difference,

11   yeah, I personally understand the difference.

12         Q.     And not coming forward because of

13   fear of reprisal, do you understand that to be

14   different than, nothing happened and

15   everything's fine?

16                MR. PODRAZZA:  I'm sorry,

17   Counsel, that question was muddled, at least on

18   my end.

19   BY MS. DeBRUICKER:

20         Q.     Do you understand not coming forward

21   because of fear of reprisal to be different

22   than someone thinking that nothing happened and

23   everything was okay?

24         A.     Well, if nothing happened and

25   everything was okay, no one would come forward
```

```
 1    for anything.  I am confused with the question.
 2         Q.    Is it your understanding that these
 3    candidates would not come forward because they
 4    feared reprisal, not because they didn't think
 5    any intimidation happened?
 6         A.    That's what Charles Battle's
 7    contention was.
 8         Q.    In your first paragraph on the
 9    second page, you indicate, Brother McConnell
10    announced his intention of running for office
11    to his friends and others on the job he was
12    working.
13              Do you recall Mr. McConnell telling
14    you that, specifically?
15         A.    Yes, I do.
16         Q.    Did he tell you who he told?
17         A.    He just told me his friends on the
18    jobsite.
19         Q.    Did he tell you why he didn't tell
20    more people?
21         A.    No, he did not.
22         Q.    Do you have notes of what Mr.
23    McConnell told you?
24         A.    Yes.
25         Q.    You write in your first paragraph,
```

Page 121

```
 1    he told you he was not running with a ticket.
 2    Was that important to you in your
 3    investigation?
 4         A.    No.  But it was important to him.
 5         Q.    Did it make a difference to your
 6    investigation as to whether members were
 7    running as ticket or not?
 8         A.    No.
 9         Q.    In your second paragraph, you
10    describe a conversation that Mr. McConnell said
11    he had with Mr. Dougherty.
12              So you recall reviewing that?
13         A.    I recall Tim McConnell telling me
14    that, yes.
15         Q.    You begin, Brother McConnell said it
16    was about that time that he started to hear
17    that the sitting officers did not want him to
18    run for office.
19              Do you recall him telling you that?
20         A.    Yes, he did tell me that.
21         Q.    Why would sitting officers not want
22    him to run for office?
23              MR. PODRAZZA:  Objection.
24    Calls for speculation and conjecture.
25              MR. KURNICK:  I'll join in
```

1    that objection.

2                    THE WITNESS:  I don't know if

3    it's true.

4    BY MS. DeBRUICKER:

5         Q.    Did you inquire with officers as to

6    whether they wanted Mr. McConnell to run for

7    office or not?

8         A.    No, I did not.

9         Q.    Why not?

10        A.    Mr. McConnell did not want me to use

11    his name with anybody.

12        Q.    You continue, Brother McConnell said

13    he got a phone call from Local Union 98

14    business manager John Dougherty, and they spoke

15    about 45 minutes about upcoming nominations.

16    Brother McConnell said that business manager

17    Dougherty did not directly threaten him not to

18    run for office, but the conversation made him

19    feel funny.

20                    What do you recall about that

21    conversation with Mr. McConnell?

22        A.    That's exactly what he told me.  I

23    wrote that verbatim.  He said that business

24    manager Dougherty did not directly threaten

25    him, it made him feel funny.  Whatever that

Page 123

```
 1    definition is, I'm not sure.
 2         Q.    You're saying the words, feel funny,
 3    were his words?
 4         A.    They were definitely his words.
 5         Q.    And the statement that business
 6    manager Dougherty did not directly threaten him
 7    not to run for office, were those
 8    Mr. McConnell's words or yours?
 9         A.    They were Mr. McConnell's words.
10         Q.    Do you distinguish between a direct
11    threat and an indirect threat in your
12    investigation?
13         A.    I try to distinguish between a
14    perceived threat and a threat.
15         Q.    And what's the distinction between
16    those things to you?
17         A.    Again, threats are different for
18    different people.  I mean, I don't know -- some
19    people are intimidated by some things and some
20    people are not.  You know, an outright threat
21    is pretty easy to see, but Mr. McConnell said
22    he was not threatened outright, blatantly, he
23    just felt funny.  Whatever that is, I'm not
24    sure.  But he did say that he wasn't directly
25    threatened.
```

1      Q.    Is there a certain kind of conduct

2   that you would consider an easily identifiable

3   threat?

4      A.    I think there's quiet a few conducts

5   that could be considered a threat, yes.

6      Q.    Could that include threats of

7   violence?

8      A.    It could, yes.

9      Q.    Does it have to be a threat of

10  violence?  Like, could a threat to somebody's

11  job be a direct threat?

12     A.    Yes.

13     Q.    Or a threat to their reputation,

14  could that be a direct threat?

15     A.    Could be.

16     Q.    Or threats to the job prospects of

17  one of their family members, could that be a

18  direct threat?

19     A.    Could be.

20     Q.    Your paragraph continues, this

21  conversation consisted of things like why

22  change officers when things are so good and

23  working well.

24           Why is that something you would make

25  note of?

1      A.     I wanted to give the vice president

2      context of the phone conversation.   The phone

3      conversation, I was told, went 45 minutes, but

4      I knew about two minutes of the conversation.

5      Q.     You continue, Brother McConnell said

6      the only thing that could have been taken as

7      intimidation was business manager Dougherty

8      said, if you lose the election, it could be a

9      long three years.

10             Did you ask him what he meant by

11     that?

12     A.     Yeah.   He didn't know either.   I

13     didn't know.   That could be taken several

14     different ways.

15     Q.     And you continue in that sentence,

16     not knowing exactly what that meant, it made

17     him reconsider running for office.

18     A.     That was his testimony to me.

19     Q.     Okay.   So you understood him to be

20     saying that Mr. Dougherty's statement, that it

21     could be a long three years, whatever that

22     meant, made him reconsider running for office?

23     A.     That's what he told me.

24     Q.     The way you have it written, I want

25     to be sure I understand.   Brother McConnell

1       said that that could be taken as intimidation?

2              A.    Yes.  He said that.

3              Q.    Your next paragraph discusses a

4       gentleman named Jim Ryan.  He is friends with

5       Mr. McConnell and you indicate, Brother

6       McConnell told me that business manager

7       Dougherty and Local Union 98 agent Brian Eddis

8       had a conference call with Jim Ryan regarding

9       Tim McConnell running for e-board and how that

10      may not be good for the local Union.

11             Do you recall Mr. McConnell sharing

12      that with you?

13             A.    Yes.

14             Q.    Did you come to recognize Mr. Ryan

15      as the employer that was referred to in your

16      email?

17             A.    Yes.

18             Q.    Did you contact Mr. Ryan?

19             A.    No.

20             Q.    Why not?

21             A.    Again, Tim McConnell did not want me

22      to use his name in any conversations with

23      anyone.  Quite honestly, I might have

24      reconsidered doing this report, but I thought

25      it was important to the vice president.  And

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    when I did this report, I thought this report

2    would be between myself and the vice president

3    only.  But when we were asked to submit that

4    report under subpoena, we had to.

5         Q.    You follow that with, Brother

6    McConnell said there were no direct threats,

7    but, again, it made him feel uncomfortable.

8              Were those his words or yours?

9         A.    They were his.

10        Q.    You continue, Brother McConnell told

11   me that even though there were no direct

12   threats, he felt that it would be best for him

13   not to run for office.  It was best for him not

14   to run for office.

15             Did you take that to mean it was the

16   calls from Mr. Dougherty to him and to Mr. Ryan

17   that caused him to think he shouldn't run for

18   office?

19        A.    I think he just came to the

20   conclusion that he wasn't going to run.

21        Q.    Are you saying that he didn't make a

22   connection between the two?

23        A.    I don't know if he did.

24        Q.    Did you ask him?

25        A.    No.  Not directly, no.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 128

```
 1        Q.      Why not?

 2        A.      At the time, I didn't think it was

 3   relevant.

 4        Q.      Because wasn't that the concern,

 5   that he was intimidated out of running?

 6        A.      Yeah.  But he told me he really

 7   wasn't directly threatened, he just felt funny.

 8   If he told me he was directly threatened in

 9   some way, it would have maybe been different.

10        Q.      Would he have had to have used the

11   words directly threatened?

12        A.      No.  I know a direct threat.

13        Q.      You continue, Brother McConnell said

14   his Brother-in-law was a Local Union 98

15   apprentice, and he was good friends of Par 4

16   Electric owner Jim Ryan.  And even though there

17   were no direct threats, he was worried there

18   might be some reprisal against himself and his

19   friends and family if he continued to pursue

20   office.

21             Do you recall Mr. McConnell saying

22   that to you?

23        A.      Yes.

24        Q.      Worried there might be some reprisal

25   against himself and his friends and family if
```

```
 1    he continued to pursue office?

 2          A.    His words.

 3          Q.    And did you consider that to be

 4    potential interference or violation of the

 5    LMRDA?

 6          A.    I considered that to be his opinion.

 7          Q.    Was that of concern to you?

 8          A.    In what way?

 9          Q.    That someone was concerned that

10    there might be reprisal against himself or his

11    friends and family if he pursued office.

12          A.    Quite honestly, there's members -- I

13    mean, not all of them tell the truth.  And

14    quite honestly, sometimes they feel they can't

15    voice their opinion to anyone.  It's just Tim

16    McConnell's opinion.  I can't tell you how Tim

17    was feeling.  I just thought it was relevant

18    for the vice president to know Tim McConnell's

19    opinion on how he felt.  Real or not, I thought

20    it was relevant to the vice president getting a

21    feel of the entire situation.

22          Q.    Did you contact Mr. Dougherty about

23    the conversation Mr. McConnell says he had with

24    him?

25          A.    I did not.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1      Q.     Why not?

2      A.     I promised Tim McConnell I would

3    not.  I actually told Tim McConnell I was going

4    to call, if he would allow me, I was going to

5    call and interview business manager Dougherty

6    on the issue.  And he made me promise that I

7    would not do that.  So I did not.

8      Q.     Did you do anything else to

9    investigate what Mr. McConnell told you?

10      A.     No, I did not.

11      Q.     Why not?

12      A.     Mr. McConnell -- if you scroll down

13    to the end of the report, I think it states

14    that he just wanted this over with, and he

15    didn't want to pursue any type of charge or any

16    kind of complaint.  So I took him for his word.

17      Q.     Does a member have to pursue a

18    formal protest for you to investigate these

19    kinds of allegations of intimidation?

20      A.     That's the only way I would know

21    about the allegations.

22      Q.     What if you learn of conduct during

23    the course of an investigation?

24      A.     I would report it to the

25    international office.  If they see it fit for

```
 1    me to investigate it, I would.  I don't
 2    investigate anything without being told to.
 3         Q.    Did you report what Mr. McConnell
 4    shared with you to the office?
 5         A.    The report right there, yes.  I sent
 6    that to the vice president.
 7         Q.    Does a member have to pursue a
 8    formal protest for the international to
 9    investigate a violation of the LMRDA?
10         A.    We wouldn't know it if no one would
11    protest it.  We wouldn't know if there was a
12    violation.
13         Q.    We just talked about information you
14    would come across over the course of an
15    investigation when there was no protest.
16    What's happens then?
17         A.    I would report it as I did.  This
18    report was, again, really never supposed to see
19    the light of day except for me and my boss.
20    And because I felt that it was important for
21    him to know what was going on here.  And Tim
22    McConnell had me promise not to pursue
23    anything.
24              If he would have said, pursue it,
25    and write the vice president a letter, it would
```

1    have been different.

2        Q.    Why?

3        A.    Because I could have contacted the

4    people he didn't want me to contact.  And I

5    respected his wishes.

6        Q.    Did the conduct Mr. McConnell

7    described, assuming it was true, count to you

8    as a potential threat of reprisal?

9        A.    He told me he felt funny.  That's

10   all I can conclude.

11       Q.    Well, he described a conversation

12   and he described words used.  Did the conduct

13   he described count to you as a potential threat

14   of reprisal?

15       A.    I wasn't there, I didn't hear the

16   context of it.  I honestly cannot say yes or

17   no.

18       Q.    Did you determine conclusively there

19   were no threats of reprisal to Mr. McConnell?

20       A.    Again, I didn't determine -- I was

21   not there.  I didn't have enough information, I

22   was not there to determine if there was or not.

23       Q.    And you didn't investigate it?

24       A.    I investigated as far as this report

25   concludes.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 133

1      Q.    Do you have any reason to believe

2   that the conduct Mr. McConnell described didn't

3   happen?

4      A.    Speaking for me, no, I believe what

5   he told me was pretty accurate.

6      Q.    You didn't have a reason to

7   disbelieve him; did you?

8      A.    No.  I did not -- Tim McConnell?

9      Q.    Correct.

10      A.    Okay.

11      Q.    Based on your conversations with

12   Mr. McConnell, did you reach a conclusion as to

13   why he did not seek nomination?

14      A.    No, I did not.

15      Q.    I'll show you what we will mark as

16   Kieffer 8, I believe.

17              (Deposition Exhibit No. 8 was

18   marked for identification.)

19      Q.    Mr. Kieffer, I'll ask you some

20   particular questions about this in a minute.

21   But do you recognize these notes?

22      A.    Yes, I do.

23      Q.    Are these your notes?

24      A.    Yes, they are.

25      Q.    It looks like dated July 22, 2020;

```
 1   is that right?

 2        A.    Yes.

 3        Q.    Okay.  Do you recall taking any

 4   additional notes?

 5        A.    No.

 6        Q.    Is it your understanding that this

 7   might be the extent of your notes regarding

 8   your conversations with Mr. McConnell?

 9        A.    Yes, it is.

10        Q.    And you have written, a buddy that

11   owns a company talked Timmy out of running.

12              Do you recall what was said that

13   prompted you to write that?

14        A.    Yeah.  It was in my report.

15        Q.    Okay.

16        A.    The Par 4, Ryan.  That was the

17   buddy.

18        Q.    Okay.  And the message was to talk

19   Mr. McConnell out of running?

20        A.    That's what Tim said, yes.

21        Q.    And you write down, did not run

22   because they will repr -- maybe this is --

23        A.    I wrote it so quickly.  It was a

24   reprisal.

25        Q.    I would cringe at the thought of
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    anyone looking at my notes.

2         A.    Yeah.  I wasn't happy when Bob made

3    me give these up.

4                    MR. KURNICK:  Randy, it's the

5    U.S. Attorney who made me make you give these

6    up.

7                    THE WITNESS:  I know that,

8    Bob.  I know that.  But you made me do it,

9    though, directly.

10   BY MS. DeBRUICKER:

11        Q.    But is that the essence of what

12   Mr. McConnell shared with you?

13        A.    Yes.

14        Q.    And your next words were, was

15   scared.  Do you recall him saying that?

16        A.    I don't think he -- I don't recall

17   him saying that.  That might have been me.

18   That might have been my thoughts because these

19   notes are not verbatim, they come out of my

20   head so I remember how to write the report.

21        Q.    Okay.  So that could have been your

22   take?

23        A.    I could have written that, and it

24   should have been a question mark, you know, was

25   he scared?  I don't remember him saying he was

1    scared.

2          Q.    You have written here, no complaint,

3    does not want to file a complaint with lots of

4    what look like exclamation marks; is that

5    right?

6          A.    Yes.  He was very adamant that I

7    didn't tell anybody about what he was talking

8    to me about.

9          Q.    And could you have reported what he

10   was telling you about without using his name?

11         A.    I don't know what the point would

12   have been.

13         Q.    If the conduct was of concern, does

14   it matter what his name was?

15         A.    I believe, that for proof that it

16   was true.

17         Q.    This looks like Tim McConnell 7-27,

18   LM 10:19.  Do you know what that indicates?

19         A.    Yeah.  I left a message for him to

20   call me back.

21         Q.    You have a note here, don't want me

22   talk to John D.  What does that mean?

23         A.    John Dougherty.  He did not want me

24   to talk to John Dougherty, at all.

25         Q.    Did you talk to anybody else about

Page 137

1    whether you should talk to John Dougherty?

2         A.    No.

3         Q.    Why not?

4         A.    I promised Tim McConnell it was

5    between he and I.

6         Q.    Do you know of any other locals who

7    regularly have no elections or have elections

8    by acclamation rather than by actual voting?

9         A.    Yes.

10        Q.    Is it a common thing?

11        A.    I would say 50/50 in my locals.

12        Q.    In the local you're a member of, are

13   there usually contested elections?

14        A.    They're usually contested.  Certain

15   offices are contested more than others.

16        Q.    Do you recall the last time Local 98

17   had a contested election?  And by contested, I

18   mean, more than one person running for an

19   office.

20        A.    That would be when Ken Rocks ran.

21        Q.    Okay.  And prior to that time, do

22   you recall when the last one was?

23        A.    That would go back to about 1993

24   when John Dougherty became business manager.

25        Q.    Do you have an understanding as to

1    why Local 98 doesn't have contested elections

2    very frequently?

3         A.    They're lucky.

4         Q.    Why are they lucky?

5         A.    Because when you're the business

6    manager, you don't want anyone running for your

7    job every three years.

8         Q.    Is wanting to avoid the cost of an

9    election a valid reason for wanting to avoid a

10   local election?

11        A.    Nobody really wants an election if

12   everything is okay.  The cost is always -- and

13   I'm speaking for myself and my home local --

14   when I was running for business manager, you

15   never want to spend money, you always want to

16   save money.  But I don't think that cost has

17   anything to really do with a true blue

18   election.

19        Q.    Are contested elections considered

20   detrimental?

21                  MR. KURNICK:  By whom?  And if

22   it's not by him, then you're asking him to

23   speculate.

24                  THE WITNESS:  I'll speculate

25   and say I don't think so.

Page 139

```
1     BY MS. DeBRUICKER:
2          Q.    Can you think of an incentive or a
3     good reason not a have an election?
4          A.    If nobody's running, if it's
5     uncontested.
6          Q.    Any other reason?
7          A.    No.
8          Q.    If a local didn't conduct
9     nominations, would that be of concern to you?
10         A.    If they didn't conduct nominations
11    per their bylaws, yeah, I would wonder why.  I
12    would find out why.
13         Q.    When we touched on the constitution
14    and the LMRDA at the beginning of our
15    conversation today, we discussed that the IBEW
16    constitution requires that members must be in
17    good standing in order to run for office.  Do
18    you recall that?
19         A.    Yes.
20         Q.    And is that your understanding of a
21    requirement to be able to be nominated for
22    office?
23         A.    It is.
24         Q.    It's my understanding, unless it's
25    some unusual circumstances, you need to be a
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1       member in good standing for at least two years;

2       is that right?

3              A.     That is correct.

4              Q.     Does the international, in your

5       understanding, impose any additional

6       qualifications that candidates must have in

7       order to get nominated?

8              A.     I don't think so.  But I think the

9       LMRDA does not allow felons to run.

10             Q.     The candidate doesn't need to be

11      running on a ticket to be nominated; do they?

12             A.     That is correct.

13             Q.     And a member does not have to meet

14      any financial qualifications to seek

15      nomination; right?

16             A.     No.

17             Q.     It's not a requirement that they

18      have a campaign war chest before they're

19      nominated?

20             A.     No.

21             Q.     The candidate does not have to have

22      a dispute with the local in order to seek

23      office; do they?

24             A.     No.

25             Q.     And having a dispute with management

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 141

```
 1    wouldn't disqualify a member from being

 2    nominated; right?

 3         A.    Having a dispute with the officers

 4    or management?

 5         Q.    I'll say the incumbent officers.

 6         A.    No.

 7         Q.    A member doesn't have to attend a

 8    certain number of meetings in order to be

 9    nominated; do they?

10         A.    No.

11         Q.    A member doesn't have to attend a

12    certain number of Labor Day parades in order to

13    be nominated; do they?

14         A.    No.

15         Q.    A member doesn't have to have a big

16    chance of winning in order to be nominated; do

17    they?

18         A.    No.

19         Q.    During your investigation of

20    Mr. Battle's internal protest, did anyone from

21    the government contact you?

22         A.    Personally, no.

23         Q.    Or in connection with your work, did

24    anyone from the government contact you during

25    your investigation of Mr. Battle's internal
```

1    protest?

2         A.    I think we had a contact with the

3    Department of Labor; correct?

4                   MR. KURNICK:  As you know, he

5    was interviewed by the Department of Labor.

6    And at some point, the IBEW received a subpoena

7    from your office, but I believe that was after

8    his investigation had been completed.  Again,

9    I'm not sure.  We'd have to go back and look.

10   BY MS. DeBRUICKER:

11        Q.    Mr. Kieffer, do you have any

12   specific recollection of someone from the

13   government contacting you while you were

14   investigating Mr. Battle's internal protest?

15        A.    No.

16        Q.    Did anyone from the government try

17   to influence your investigation of Mr. Battle's

18   protest?

19        A.    No.

20        Q.    Did anyone from the government try

21   to influence the outcome of your investigation

22   of Mr. Battle's protest?

23        A.    No.

24        Q.    Do you know who Michael Coppinger

25   is?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 143

```
 1           A.    I heard the name, but I do not know
 2    him.
 3           Q.    In what context did you hear the
 4    name?
 5           A.    I read the name on the court
 6    filings.
 7           Q.    Other than reading the court
 8    filings, at any point, did you learn of any
 9    alleged attempt by Local 98 to pressure Michael
10    Coppinger out of seeking nomination in the June
11    2020 election?
12           A.    No, I did not.
13           Q.    You mentioned that you were aware of
14    an internal election protest filed by Mr. Rocks
15    in about 2014; is that right?
16           A.    I think so, yes.
17           Q.    That was resolved before you did an
18    investigation; correct?
19           A.    That's correct.
20           Q.    Did you have any involvement with a
21    protest submitted by Mr. Rocks relating to a
22    decision by Local 98's trial board to fine him
23    $50,000?
24           A.    I did, but it had nothing to do with
25    the election that we're talking about.
```

1        Q.    Right.  Did you have any involvement

2   with that protest?

3        A.    Yes.

4        Q.    And did you investigate that

5   protest?

6        A.    I started an investigation of it,

7   yes.

8        Q.    Did you complete that investigation?

9        A.    No.

10        Q.    Why not?

11        A.    Because it was resolved before I

12   completed it.  The charges were dropped.

13        Q.    Do you recall whether the two

14   protests were resolved together or if they were

15   separate?

16        A.    They were separate.

17        Q.    Did you have any involvement in the

18   resolution of Mr. Rocks' election protest?

19        A.    No.

20        Q.    Did you consider Mr. Rocks' protest

21   in your evaluation of Mr. Battle's protest?

22        A.    Excuse me?  I didn't hear that.

23        Q.    Did you consider Mr. Rocks' election

24   protest in your evaluation of Mr. Battle's

25   protest?

```
 1        A.    No.

 2        Q.    Are there things you have learned

 3   since the conclusion of your investigation of

 4   Mr. Battle's protest that you think would have

 5   been important for you to know during your

 6   evaluation of the protest?

 7        A.    No.

 8        Q.    If, in fact, Mr. Battle submitted a

 9   nomination form, would that have been important

10   for you to know during your investigation?

11        A.    Yes.

12        Q.    If Local 98 required nominations to

13   be made in person at the June 2020 election,

14   would that have been important for you to know?

15        A.    It would have been a stipulation of

16   nominations.  It would have certainly been a

17   part of my investigation.

18        Q.    When you say it would have been a

19   stipulation of nominations, what do you mean?

20        A.    If they said you had to be there to

21   get nominated, that would be how they designed

22   to do their nominations this year.  The

23   Local 98 executive board, they designed the

24   nomination process.  I did not.

25        Q.    But if they required the nominations
```

```
 1    to be made in person, and didn't allow
 2    nominations to be made in writing, would that
 3    have been important for you to know in your
 4    investigation?
 5                 MR. PODRAZZA:  Counsel, this
 6    has been asked can and answered.
 7                 THE WITNESS:  Yes.
 8    BY MS. DeBRUICKER:
 9         Q.    Would the fact that Local 98 sued
10    Mr. Battle for defamation have been important
11    for you to know in your investigation?
12         A.    No.
13         Q.    Why not?
14         A.    It has no relevance to what I was
15    looking at.
16                 MS. DeBRUICKER:  That
17    concludes my questions.  Mr. Podrazza, do you
18    have questions?
19                 MR. PODRAZZA:  I do.
20    Mr. Kieffer, are you prepared to go forward or
21    would you like to take a short break?
22                 THE WITNESS:  No.  We can go
23    forward.
24                 EXAMINATION
25    BY MR. PODRAZZA:
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 147

1          Q.    All right.   I only have a few short

2     questions for you.   And I'm going to mark, as

3     Kieffer No. 10 [sic], a document that's been

4     produced by the Department of Labor.   Local 98

5     00240.   And I'll ask you to take a moment to

6     review it.

7                     MR. PODRAZZA:   Counsel, I

8     think you have to take yours down.

9                     MS. DeBRUICKER:   Just did

10    that.   Thank you.

11                    And if any of my colleagues need us

12    to scroll down or up or sideways for you, just

13    let us know.

14                    (Deposition Exhibit No. 9 was

15    marked for identification.)

16         Q.    So Kieffer No. 10 [sic] depicts two

17    emails; is that correct?

18         A.    Yes.

19         Q.    The first one is on June 23, 2020,

20    at 8:09 a.m., from Ms. Rizzi to you and

21    Mr. Welsh; is that correct?

22         A.    That is correct.

23         Q.    And do you see the reference to a

24    letter from Charles Battle, Local 98 appealing

25    and the current election cycle?

Page 148

```
 1          A.     Yes.

 2          Q.     That's the election protest letter

 3    that we reviewed earlier today; is that

 4    correct?

 5          A.     That is correct.

 6          Q.     And that would be the letter -- I

 7    believe it's dated June 16, 2020?

 8          A.     I believe that is the correct date.

 9          Q.     And then there's a second letter

10    that's referenced, one by Frank Haglash from

11    Local Union 98, regarding Local Union 98

12    leadership; correct?

13          A.     Yes.

14          Q.     And you have a response to receiving

15    those two letters which is above on Kieffer

16    No. 10 [sic]; is that correct?

17          A.     Correct.

18          Q.     And your response is, let's say,

19    north of 30 minutes after Ms. Rizzi sent her

20    email with the two letters to you; is that

21    correct?

22          A.     Yes.

23          Q.     I'd like to just go over your

24    response and if you can just clarify the

25    meaning of some of the representations that are
```

```
 1    made in it; would that be okay?

 2            A.    Yeah.  That's fine.

 3            Q.    You start out with, in my opinion,

 4    this is an attempt from Haglash or whoever is

 5    directing him to suck me into this issue and

 6    attempt to go over the heads of others.  He

 7    doesn't know me very well, at all.

 8                  What did you mean by the reference,

 9    or whoever is directing him to suck me into

10    this issue?

11            A.    Well, I've got to clarify something.

12    If you scroll down to the first email, that's

13    how we get certified letters.  People send

14    certified letters to me through the District

15    Office all the time.  They were two separate

16    issues.  That wasn't sent to me by one issue,

17    that was sent to me by Leslie who is the 3rd

18    District Office secretary, the office manager,

19    telling me that, hey, I received two letters

20    for you, here they are.

21                  That email is not saying that these

22    two items are related.  They're just letters

23    for me to read.

24                  And then if you scroll back, if you

25    see, I just commented on Haglash.  Haglash was
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    a member of Local 98 that was brought up on

2    charges.  It was two separate incidents.  One

3    is not married to the other one on that.  I

4    just wanted to clarify.

5        Q.   I appreciate the clarification.

6    What did you mean, however, with respect to the

7    Haglash letter, or whoever is directing him to

8    suck me into this issue?

9        A.   Haglash was brought up on charges

10    with two or three other members.  And they got

11    a -- the vice president made a decision on

12    their case.  And it was a good decision for

13    them, but they also wanted some more -- you

14    know, they wanted a public apology, for

15    instance.

16        And when the vice president or

17    President Stephenson doesn't give a member the

18    answer they look for, they look for me to give

19    them a different answer.  So they can suck me

20    into calling Vice President Welsh and saying,

21    oh, your rep said that I need a public apology.

22    And then they post it on websites and

23    everything like that.

24        What I'm saying in there is that

25    Haglash or whoever was with Haglash with these

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    charges was trying to drive a wedge between --

 2    or, getting a different opinion from me than

 3    the vice president already gave, if that makes

 4    sense.

 5         Q.   It does.  And if you go down, I

 6    believe it's three lines, you say, now, it is

 7    my belief that these letters are being sent by

 8    someone beside himself.

 9              There's a plural, letters.  Does

10    that refer to the protest election letter by

11    Mr. Battle and separately Mr. Haglash's letter?

12         A.   When I do these emails, I spell

13    check, saying, what are you trying to say.  It

14    says, now that it is my believe these letters

15    are being the sent by someone -- when I say

16    letters, I'm talking about -- we had a letter

17    from Haglash and we had letters from other

18    people that were being charged also.  We had

19    two people that protested the charge, one

20    person that pled guilty to the charge.  So I

21    had three separate letters.

22              I'm saying the Haglash letter was

23    connected to other people.  I wasn't

24    necessarily saying that it was connected to the

25    election protest.
```

Page 152

1          Q.    So the reference in your email at

2     8:44:34 a.m. is solely to the Haglash matter

3     and those associated with Haglash in that

4     matter?

5          A.    Yes.

6          Q.    Is there any reference whatsoever to

7     or meant to be a reference to the Battle

8     protest letter in addition to the Haglash in

9     your response to Ms. Rizzi?  And I should say,

10    really, Mr. Welsh.

11         A.    I was going to say -- because we

12    were in the middle of the charges.  As you see,

13    it was just the Haglash and people that we were

14    getting that letter out to drop the charges.

15              MR. PODRAZZA:  Thank you, sir.

16    Those are all the questions I have.

17              MR. KURNICK:  I would like to

18    ask just two questions just to clarify two

19    things that Mr. Kieffer said before we finish.

20                   EXAMINATION

21    BY MR. KURNICK:

22         Q.    Randy, at the beginning of your

23    testimony, you said in an election case, when

24    an election protest is filed, the vice

25    president makes a recommendation.  And I just

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    wanted to be clear, are you talking about

2    recommending something to somebody else or the

3    vice president making a decision on the

4    election protest itself?

5         A.    It's the vice president making a

6    decision.

7         Q.    And the only other question I wanted

8    to ask is, during the course of this

9    deposition, you described your conversations

10   with people.  Were they, specifically, in

11   person or on the phone?

12        A.    On the phone.

13        Q.    Were all of them on the phone?

14        A.    I believe they were.

15        Q.    Okay.

16        A.    And that was mainly due to the

17   pandemic.

18                    MR. KURNICK:  That's all I

19   have.

20                    MS. DeBRUICKER:  I have

21   nothing further.  Mr. Kieffer, thank you for

22   your time.

23                    THE WITNESS:  No.  Thank you.

24                    THE REPORTER:  Mr. Kurnick,

25   would you like a copy?

1               MR. KURNICK:  Yes.

2               THE REPORTER:  Mr. Podrazza,

3     would you like a copy?

4               MR. PODRAZZA:  I would, yes,

5     please.

6               (At 1:54 p.m., the deposition

7     was concluded.  Signature was not waived.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 155

```
 1              C E R T I F I C A T E

 2                    -   -   -

 3              I, Randy Kieffer, do hereby

 4    certify that I have read the foregoing

 5    transcript and it is a true and correct copy of

 6    my deposition, except for the changes, if any,

 7    made by me on the attached Deposition

 8    Correction Sheet.

 9

10

11
                   _____
12
                   _____
13                 Date

14

15

16

17

18

19

20

21

22

23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 156

```
 1       ERRATA SHEET                  REASON FOR
         PAGE      LINE           CHANGE/CORRECTION
 2       _____    _____    _____

 3       _____    _____    _____

 4       _____    _____    _____

 5       _____    _____    _____

 6       _____    _____    _____

 7       _____    _____    _____

 8       _____    _____    _____

 9       _____    _____    _____

10       _____    _____    _____

11       _____    _____    _____

12       _____    _____    _____

13       _____    _____    _____

14       _____    _____    _____

15       _____    _____    _____

16       _____    _____    _____

17       _____    _____    _____

18       _____    _____    _____

19       _____    _____    _____

20       _____    _____    _____

21       _____    _____    _____

22       _____    _____    _____

23       _____    _____    _____

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 157

```
 1      COMMONWEALTH OF PENNSYLVANIA        )
                                            ) SS
 2      COUNTY OF ALLEGHENY                 )

 3                        CERTIFICATE

 4           I, Jonathan MacDonald, a notary public in
         and for the Commonwealth of Pennsylvania, do
 5       hereby certify that the witness, Randy Kieffer,
         was by me first duly sworn to testify the
 6       truth, the whole truth, and nothing but the
         truth; that the foregoing deposition was taken
 7       at the time and place stated herein; and that
         the said deposition was recorded
 8       stenographically by me and then reduced to
         typewriting under my direction, and constitutes
 9       a true record of the testimony given by said
         witness.
10
             I further certify that I am not a
11       relative, employee or attorney of any of the
         parties, or a relative or employee of either
12       counsel, and that I am in no way interested
         directly or indirectly in this action.
13
             IN WITNESS WHEREOF, I have hereunto set my
14       hand and affixed my seal of office this 23rd
         day of September 2021.
15

16       _____
                    Jonathan MacDonald, Notary Public
17                      Court Reporter

18

19

20

21

22

23

24

25
```

Free State Reporting, Inc.  410-974-0947

# Ex. D

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 1

```
 1            UNITED STATES DISTRICT COURT FOR THE

 2              EASTERN DISTRICT OF PENNSYLVANIA

 3
                                )
 4    MARTIN J. WALSH,          )
      SECRETARY OF LABOR,       )
 5                              )
           Plaintiff            )
 6                              ) Civil Action No. 21-0096
                                )
 7            V.                )
                                )
 8                              ) VIRTUAL DEPOSITION OF
      LOCAL 98, INTERNATIONAL   ) MICHAEL WELSH
 9    BROTHERHOOD OF            )
      ELECTRICAL WORKERS        )
10                              )
           Defendant            )
11                              )

12
                         -   -   -
13

14

15

16

17

18

19

20

21

22

23

24    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
      WITHOUT AUTHORIZATION FROM THE CERTIFYING
25    AGENCY
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1                  VIRTUAL DEPOSITION OF MICHAEL WELSH,

 2      a Witness herein, called by the Plaintiff, for

 3      examination, taken pursuant to the Federal

 4      Rules of Civil Procedure, by and before

 5      Jonathan MacDonald, a Court Reporter and a

 6      notary public in and for the Commonwealth of

 7      Pennsylvania, taken remotely via Zoom, on

 8      Thursday, September 9, 2021, at 3:00 p.m., EDT.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 3

```
 1     APPEARANCES

 2     On behalf of the Plaintiff:

 3         LAUREN DeBRUICKER, ESQ.
                     ASSISTANT UNITED STATES ATTORNEY
 4                   615 CHESTNUT STREET
                     SUITE 1210
 5                   PHILADELPHIA, PA 19106
                     215-861-8492
 6                   Lauren.DeBruicker@usdoj.gov

 7
       On behalf of the Defendant:
 8
           JOSEPH R. PODRAZZA JR., ESQ.
 9                   LAMB McERLANE P.C.
                     ONE SOUTH BROAD STREET
10                   SUITE 1500
                     PHILADELPHIA, PA 19107
11                   215-609-3170
                     Jpodrazza@lambmcerlane.com

12

13     On behalf of Michael Welsh:

14         ROBERT D. KURNICK, ESQ.
                     SHERMAN DUNN, P.C.
15                   900 SEVENTH STREET, NW
                     SUITE 1000
16                   WASHINGTON, DC 20001
                     202-785-9300

17
       Also Present:
18
       Anna Laura Bennett, Esq., U.S. Dept. of Labor
19
       Joel Frank, Esq., Local 98
20
       Will Trask, Esq., Local 98
21
       Bill Josem, Esq., Local 98
22

23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 4

```
 1              I N D E X

 2    WITNESS                                PAGE

 3    Michael Welsh

 4           By Ms. DeBruicker               6

 5           By Mr. Kurnick                127

 6

 7                E X H I B I T S

 8    EXHIBIT           DESCRIPTION         PAGE

 9    1             Battle Nomination Form    47

10    2             Battle Internal

11                  Election Protest          64

12    3             7/28/20 Kieffer Letter    68

13    4             7/24/202 Kieffer Letter   72

14    5             7/31/20 Decision          90

15

16

17

18

19

20

21

22

23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

 1              P R O C E E D I N G S

 2                   THE REPORTER:  The attorneys

 3      participating in this deposition acknowledge

 4      that I am not physically present in the

 5      deposition room and that I will be reporting

 6      this deposition remotely.

 7                   They further acknowledge that, in

 8      lieu of an oath administered in person, the

 9      witness will verbally declare her testimony in

10      this matter is under penalty of perjury.

11                   The parties and their counsel

12      consent to this arrangement and waive any

13      objections to this manner of reporting.  Please

14      indicate your agreement by stating your name

15      and your agreement on the record.

16                   MS. DeBRUICKER:  Lauren

17      DeBruicker, Assistant U.S. Attorney for the

18      Secretary of Labor, and I agree to the terms.

19                   MR. KURNICK:  Robert Kurnick,

20      attorney for the Deponent, and I agree.

21                   MR. PODRAZZA:  Joe Podrazza,

22      for IBEW Local 98, acknowledge and consent.

23                   MICHAEL WELSH, a Witness

24      herein, having been first duly sworn, was

25      examined and testified as follows:

```
 1                    EXAMINATION

 2    BY MS. DeBRUICKER:

 3         Q.    Mr. Welsh, again, I'm Lauren

 4    DeBruicker.  I'm with the U.S. Attorney's

 5    Office in Philadelphia.  I represent the

 6    Secretary of Labor in a civil action alleging

 7    that Local 98 violated the Labor Management

 8    Reporting and Disclosure Act of 1959 in

 9    connection with its June 2020 election of

10    officers.

11              Before we get started, have you had

12    your deposition taken before?

13         A.    Yes, I think I have over the years.

14         Q.    Do you recall how many times?

15         A.    Maybe one or two, not many.

16         Q.    Do you recall when the last time you

17    had your deposition taken was?

18         A.    I'm trying to think back.  We had a

19    meeting at the beginning with one of the

20    counsel for this event, but I can't remember a

21    time for another one.

22         Q.    I imagine you have spoken with

23    Mr. Kurnick about depositions, but just a few

24    points to consider as we go forward.  It's

25    important that we speak one at a time.  So if
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    you could do your best to let me finish my

 2    question before you answer, even if you know

 3    where I'm going, that will help our court

 4    reporter keep a clear record.  And I will do my

 5    best to let you finish your answer before I ask

 6    my next question.  Does that make sense?

 7         A.    Yes.

 8         Q.    If you don't understand my question,

 9    will you let me know?

10         A.    Yes.

11         Q.    If I'm at all unclear or if you

12    don't understand what I'm getting at, please

13    let me know.  My goal is to make sure, again,

14    that we have a clear record, that you

15    understand what I'm asking before you answer;

16    okay?

17         A.    Okay.

18         Q.    And if at any point you don't hear

19    my question, will you let me know?

20         A.    Yes.

21         Q.    Whether my voice drops or we have a

22    technical glitch, I want to be sure, again,

23    that you hear and understand the full question

24    before answering; okay?

25         A.    Okay.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1          Q.    And if you answer my question, I'll

2    assume that you both heard it and understood

3    it; okay?

4          A.    Okay.

5          Q.    Are you represented by counsel

6    today?

7          A.    Yes.

8          Q.    And who is that?

9          A.    Mr. Kurnick.

10         Q.    Did you do anything to prepare for

11   today's deposition?

12         A.    Just looked over the information

13   that we provided.

14         Q.    And can you give me a general

15   description of what that was?

16         A.    A few emails, Mr. Battle's

17   complaint, our answer back to him.  Basically,

18   that was it.

19         Q.    Did you meet with anybody to prepare

20   for today?

21         A.    What do you mean, meet with

22   somebody?

23         Q.    Did you confer with Mr. Kurnick

24   regarding today's deposition?

25                      MR. KURNICK:  We can agree

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    that he met with Mr. Kurnick to prepare for the

2    deposition.

3    BY MS. DeBRUICKER:

4         Q.    Did you meet with anyone else to

5    prepare for the deposition?

6         A.    No, I did not.

7         Q.    Did speak with anyone from Local 98

8    regarding today's deposition?

9         A.    No.

10        Q.    Have you reviewed any of the

11   testimony given in the case to date?

12        A.    What do you mean, testimony in the

13   case to date?

14        Q.    There have been depositions taken.

15   Yours is not the first deposition.

16        A.    No.  I haven't seen any other

17   depositions.

18        Q.    And is there any reason why you

19   couldn't provide complete and truthful

20   testimony today?

21        A.    No.  There's no reason why I

22   couldn't.

23        Q.    You're not distracted by anything?

24        A.    No.

25        Q.    You're not on any medication that

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    affects your ability to recall facts clearly or

 2    affects your memory at all?

 3         A.    No.  Just, you know, being 63 that's

 4    where sometimes -- if I'm wondering that

 5    anymore.

 6         Q.    Mr. Welsh, can you give me a basic

 7    sense of your educational background?

 8         A.    I graduated from the University of

 9    Pittsburgh with an economics degree.

10         Q.    And I understand you are employed by

11    the International Brotherhood of Electrical

12    Workers; is that correct?

13         A.    That's correct.

14         Q.    What is you position with the IBEW?

15         A.    International Vice President of the

16    3rd District.

17         Q.    And is the 3rd District a

18    geographic --

19         A.    Yes, it is.

20         Q.    And what does the 3rd District

21    cover?

22         A.    Pennsylvania, New York, New Jersey,

23    and Delaware.

24         Q.    How long have you served in that

25    role?
```

1        A.      A little over four years.

2        Q.      Did you have a position with the

3    international prior to that?

4        A.      I was an international

5    representative.

6        Q.      And for how long were you an

7    international representative?

8        A.      15 years.

9        Q.      And did you have any other roles

10   with the international?

11       A.      No, just those two.

12       Q.      About when did you start working for

13   the international?

14       A.      September of 2002.

15       Q.      That was as a representative?

16       A.      Yes.

17       Q.      What were your general duties as a

18   representative?

19       A.      I was actually an assistant to the

20   international vice president at that time.  I

21   worked in the 3rd District Office.  I also

22   worked with local unions, you know, help them,

23   serviced local unions with clients and various

24   grievances and whatnot.

25       Q.      Did you work with Local Union 98, at

Page 12

1    all, in that capacity?

2         A.    No, I did not.  I handled the

3    industrial side, basically.

4         Q.    And can you give me a general

5    description of your role as international vice

6    president?

7         A.    You know, basically, oversight and

8    support of the locals still.  If a local needs

9    help with various issues, we have various

10   departments to be able to help them out.  And I

11   steer them in that direction.

12        Q.    What location do you work at?

13        A.    I work in my office at 500

14   Cherrington Parkway, Coraopolis, Pennsylvania.

15   That's in Moon Township.

16        Q.    Where are you joining us from this

17   afternoon?

18        A.    I'm joining you from my spare

19   bedroom at home.

20        Q.    Is anyone with you in the room

21   today?

22        A.    No, they're not.  I don't have

23   shorts on either.  Just so you know that.

24        Q.    No comment.  Are you a member of a

25   local?

Page 13

```
 1          A.     Yes, I Am.

 2          Q.     And what local are you a member of?

 3          A.     Local 459 out of Johnstown,

 4    Pennsylvania.

 5          Q.     And when did you become a member?

 6          A.     1976.

 7          Q.     Are you a member of any other

 8    locals?

 9          A.     No.

10          Q.     Is part of your job to investigate

11    or review protests from local union members?

12          A.     Yeah.  You know, they come to the

13    local office, I would assign a rep to

14    investigate, and then I'd make a decision off

15    of that.

16          Q.     What kinds of protests are you

17    involved with?

18          A.     Well, I mean, protest-wise, it's

19    usually just election protests.  You know,

20    there might be a complaint of something else,

21    but a protest is usually something to do with

22    -- in regards to an election.

23          Q.     Are there other kinds of protests or

24    are they strictly election?

25          A.     In other cases, you might call them
```

1    different things, but as far as elections, it's

2    a protest.  That's the way we look at it.  We

3    handle complaints.

4         Q.    What kind of complaints do you,

5    typically, see?

6         A.    That's a full range.  Somebody's not

7    happy with a coworker, somebody's not happy

8    with the leadership, somebody's not happy about

9    a certain event.  I mean, there's all different

10   types of complaints that we might get in.

11        Q.    And as IVP, are you involved in the

12   investigation of an election protest, or are

13   you just in a decision-making role?

14        A.    I will usually assign a rep to do

15   the actual fact gathering.

16        Q.    And how do election protests come to

17   you?

18        A.    Well, they're supposed to come to us

19   after the election judge has had an opportunity

20   to answer any questions that there might have

21   been.  If they're not happy with his decision,

22   then they come up to our office.

23        Q.    Now, are they sent to you directly,

24   or do they go someplace else?

25        A.    No, they usually come to the 3rd

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    District Office.

2         Q.    Can you tell me how many locals you

3    would decide election protests for -- or, how

4    many locals for whom election protests would be

5    directed to you?

6         A.    We have 108 local unions in the 3rd

7    District, so any election protest would have to

8    come through the office.

9              At first, the election judge would

10   have to have the opportunity to address the

11   question first.  In some case, you know, they

12   answer them and that's all there is.  It

13   doesn't get to us.

14        Q.    Do you decide election protests for

15   other bodies within the union, for example, at

16   the district level or the international level?

17        A.    No.  My role would just be for the

18   local union.

19        Q.    And are your duties shared with

20   anyone else, or are you the person?

21        A.    No.  They're not shared with anybody

22   else.  They come to me for me to make that

23   decision.

24        Q.    There's no one else within the

25   district who you share those responsibilities

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    with; is that fair to say?

 2         A.    No.   I don't share them with anybody

 3    else in the district.   There are a lot of other

 4    districts in the IBEW, so there are other vice

 5    presidents that handle their own areas.

 6         Q.    Are you familiar with the basic laws

 7    and policies of the IBEW?

 8         A.    Yes, I am.

 9         Q.    And are you aware of whether there's

10    a statement in there about the frequency of

11    protests regarding local elections?

12         A.    I'm --

13              MR. KURNICK:   I'm not sure I

14    understand that question.   Can you try it

15    again, please?

16              MS. DeBRUICKER:   I will.

17    BY MS. DeBRUICKER:

18         Q.    All right.   I'm going to share my

19    screen.   Thank you for your patience.   I'm

20    showing you a page of the IBEW basic laws and

21    policies.   This is Page 43.   And under

22    protested elections, it reads, since the

23    passage of the LMRDA, IBEW local unions in the

24    United States have had few protests of the

25    conduct of their elections filed with the
```

1    Secretary of Labor.

2              Do you see that?

3         A.    Yes, I see that.

4         Q.    Okay.  Does that ring a bell, had

5    you noted that fact before?

6         A.    Well, I read this before, so I don't

7    know what you mean by if I noted it.

8         Q.    Given your experience at IBEW, is

9    that an accurate statement from your --

10        A.    Oh, yes.  I mean, we had 55

11   elections one year and I think we had, maybe,

12   two complaints out of 55.  We have very few

13   election protests.  Like I said, that gets to

14   us -- I don't know if they're discussing things

15   back home, you know, I can't speculate on that,

16   but as far as what makes it up to our level.

17        Q.    Can you give me a sense as to how

18   many officer elections are held by IBEW local

19   unions in a given year?

20        A.    It varies depending on what year.

21   One year, we had 55, another year we had 34,

22   and another year, we had 19.  So it adds up to

23   108.  But they're all staggered, it's not all

24   one year.  One year we do have, like, 55

25   though, which is a heavy load.  But like I

1    said, out of that 55, we might have had one or

2    two protests, so no heavy load or anything like

3    that.  Not a lot.

4         Q.    Are you aware of the number of local

5    election protests of the conduct of IBEW local

6    elections that are filed with the Secretary of

7    Labor in a given year?

8         A.    I don't think there's been many at

9    all.  I don't know of any myself, to tell you

10   the truth.

11        Q.    And if they're filed with the

12   Secretary of Labor, do you get notice of that?

13        A.    I'm pretty sure I get notice, and I

14   think the international might get notice, too.

15   I would have to defer to Bob on that one, I

16   think, because I'm not exactly sure.

17        Q.    About how many protests or

18   complaints would you say you've decided?

19        A.    In my four years, a little over four

20   years, maybe half a dozen, if that.

21        Q.    And within that, how many of those

22   are election protests?

23        A.    Oh, that's what I thought you were

24   referring to.

25        Q.    Okay.  So if we were to include

1     election protests and the other kinds of

2     complaints that you mentioned, about how many

3     decisions on those would you make in a typical

4     year?

5          A.    You're talking about complaints to

6     -- that's a little bit different than an

7     election protest.  So complaints, we answer

8     them in various ways.  Sometimes we have an

9     answer to correct an issue, if there's an

10    issue.

11              So it's night and day.  I mean, it's

12    two different scenarios.  Election protests are

13    very few.  You know, we get complaints on a

14    regular basis that we address.  You know, we're

15    constantly addressing some type of complaint.

16    So it's --  I couldn't give you a number, to

17    tell you the truth.

18         Q.    Of the election protests you've

19    considered, in what proportion of those have

20    you found a violation?

21         A.    Just a couple.  I mean, probably

22    very few.

23         Q.    Are there election protests where

24    you have found a violation?

25         A.    I don't know if it's a violation so

Page 20

1     much.  I think there was some confusion with

2     some of the ballots, that things were not

3     handled right.  But, you know, we've had

4     elections where we suggest that they rerun

5     them, and that's what the local's done.  I

6     don't think that even got up to violation or

7     not because we solved the issue, basically, in

8     the district.

9          Q.    Of the election protests you've

10    considered, can you say how many resulted in a

11    rerun of the election?

12         A.    I think there were two.

13         Q.    Have you previously decided any

14    election protest from Local 98, prior to the

15    one we're discussing today that was filed by

16    Charles Battle?

17         A.    No, I haven't.

18         Q.    How many individuals are available

19    and authorized to investigate the protests that

20    you are responsible for deciding?

21         A.    Well, basically, all my reps are

22    able to go and investigate a complaint or a

23    protest.

24         Q.    How many reps do you have?

25         A.    In my district, it would be 12.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 21

```
 1          Q.     And when an election protest comes
 2     in, how do you decide who to assign to it for
 3     investigation?
 4          A.     Well, I assign a service rep.  Each
 5     of my reps have certain local unions they're
 6     assigned to.  So whoever is assigned to that
 7     local would be the one to investigate it.
 8          Q.     When you decide a local election
 9     protest, what are you looking for?
10          A.     Well, you see what the protest was
11     and then you try to go out and investigate
12     those to find the facts around what the basis
13     of the protest were.  So it all depends on what
14     somebody is protesting, what they're saying.
15     That's what you base it off of when you're
16     looking at it.
17          Q.     And do you look for potential
18     violations of the IBEW constitution?
19          A.     Yes.  We look for that, yes.
20          Q.     And potential violations of the
21     bylaws?
22          A.     Usually, that's another thing we
23     look at.  Yes.
24          Q.     Do you look for violations of the --
25     what I'll call the LMRDA?  Do you understand
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    what I'm referring to with that?

2         A.    Yeah.   I guess ours probably look

3    more or less into the local union bylaw and the

4    constitution.   Now, I guess they could look at

5    the -- because we use materials that we put out

6    from the LMRDA information.   So I guess

7    sometimes we'll look at that, too.

8         Q.    What happens if the international

9    finds the protest to be valid or that a

10   violation occurred?

11        A.    It depends what's the issue.   I

12   mean, in some cases, we might rerun the

13   election.   Basically, that's what it would come

14   down to for the most part, you know, was it

15   something egregious enough that it wasn't a

16   fair election, that you have to rehold the

17   election.

18        Q.    If a violation is found, do you make

19   a recommendation to the local, do you issue a

20   directive to the local, how does that work?

21        A.    If something was that bad that they

22   needed to rerun it, you know, we would direct

23   the local to rerun the election.   Yes, we

24   could.

25        Q.    Are there other corrective measures

1    that you would direct a local to take besides

2    rerunning an election?

3         A.    I guess it would depend on what the

4    issue is.  I mean, sometimes, maybe it wasn't a

5    violation but it may be something that we would

6    suggest maybe making a change.  So I would have

7    to say it would depend on what the issue is.

8         Q.    Who decides what an appropriate

9    remedy is when there's a violation?

10        A.    That falls back to me.

11        Q.    Can you tell me, generally, how a

12   local election protest happens?

13        A.    Well, basically, if a complaint

14   comes to the office, I would assign a rep to

15   look at, you know, what their claims are and

16   try to verify the facts on those claims or find

17   out the issues around those facts.

18        Q.    Is there sort of a process that the

19   international has for investigating local

20   election protests?

21        A.    I don't know if it's a process, but

22   it's the way we've always done it.  I mean,

23   basically, if somebody complains and files a

24   protest, you see what their protest is and then

25   look for that facts relevant to what the

Page 24

1    protest is.

2         Q.    How does the international decide

3    who to talk to when investigating a protest?

4         A.    Well, usually, you start off with

5    the person making the protest.

6         Q.    Is there anyone IBEW must talk to in

7    investigating a protest?

8         A.    I guess you have to talk to the

9    person making the protest and start there.

10        Q.    Are there any other investigative

11   steps that IBEW must take in investigating

12   protests?

13        A.    I'm not sure I understand that

14   question.

15        Q.    Are there steps that are required in

16   investigating a protest or does it just depend

17   on what the protest is and where the

18   investigation takes you?

19        A.    Yes.  Basically, that.

20        Q.    When an election protest comes in,

21   whose burden is it to prove that there was a

22   violation?  If there's an alleged violation,

23   whose burden is it to prove that?

24        A.    Well, it would be the service rep

25   doing the investigation.  He would determine

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    the facts, and he would present the information

2    back to me.  Then I would have to review the

3    facts, and then I would make a determination.

4         Q.    And is there a certain standard you

5    review the facts under?

6         A.    Just looking if there's a violation

7    against the bylaws and constitution.

8         Q.    And is there sort of a weight of the

9    evidence?  Does it have to be more likely than

10   not that a violation happened?  Does it have to

11   be beyond a reasonable doubt that the violation

12   happened?

13        A.    Well, when you say, beyond a

14   reasonable doubt, I guess it would have to be,

15   you know, the outcome of the election, too.

16   Was the information or was the act that

17   somebody did, did it affect the outcome of the

18   election.  That's something you look at, too.

19        Q.    And do you look at whether it

20   definitively did affect the outcome of the

21   election or whether it could have impacted the

22   outcome of the election?

23        A.    I think you're asking -- you know,

24   you're, basically, you're making a claim that

25   it did affect the election.  I mean, somebody

1  makes a protest, and they lost by 500 votes, I

2  mean, at that point, you have to weigh whatever

3  the facts are, whatever the protest is, to

4  determine if it would affect the outcome.

5       Q.   So if someone would have

6  statistically lost anyway, would you find that

7  there was no election violation?

8       A.   I can't necessarily -- we still

9  might have found that there was a violation,

10  but it didn't affect the outcome of the

11  election.  I guess it would be depending on how

12  you wanted to look at it, depending on the

13  circumstances.

14       Q.   And if you find a circumstance where

15  there was a violation but you find that it

16  didn't affect the outcome of the election, what

17  happens?

18       A.   Just like you said, that would be

19  the response back to the person filing the

20  protest.  That, you know, we determined that

21  there might have been something not totally

22  correct, but the thing is, it wouldn't affect

23  the outcome of the election.  And that's what

24  we would answer back.

25       Q.   So if it wouldn't have affected the

1    outcome of the election, do you issue any

2    directives to the local?  Is there any remedy?

3         A.    Well, when the election protest

4    comes in and we answer it, the local gets a

5    copy of that answer.  So they would see what

6    transpired and possibly -- if there was some

7    type of thing that they did slightly wrong, and

8    we thought it was wrong, we would let them

9    know.

10        Q.    What happens in that circumstance?

11        A.    It depends.  If it was something

12   against -- maybe they need some type of change

13   to their bylaws.  I don't know.  It depends on

14   what the facts are around the particular case,

15   you know, on the remedy might be.

16        Q.    Is directing a change in a local's

17   bylaws among the things that you could

18   recommend?

19        A.    If there was something unclear in

20   the bylaws that led to the problem, we may make

21   that recommendation.

22        Q.    In deciding a local election

23   protest, are there any presumptions -- in

24   criminal law, we talk about someone being

25   presumed innocent until proven guilty.  Are

1   there any, sort of, presumptions that IBEW

2   works with in investigating an election

3   protest?

4        A.   No, not that I'm aware of.  I mean,

5   we don't presume anything, we just go out and

6   try to gather the facts and look at the facts.

7        Q.   Is anyone given the benefit of the

8   doubt, either the member or the local?

9        A.   It's hard to say.  I don't know what

10   you mean, give them the benefit of the doubt.

11   Like I said, if something wouldn't have

12   affected the outcome of the election, it

13   wouldn't affect the outcome.  Don't know about

14   something being the benefit of the doubt.

15        Q.   When you decide a local election

16   protest, what is your relationship to the

17   local, do you consider yourself like a

18   prosecutor investigating a charge or defense

19   counsel defending against a charge?

20        A.   No.  I'm not an attorney, and I'm

21   not a defense counsel or anything like that, or

22   a prosecutor.  I'm just, basically, there --

23   we've got an election protest, just come in and

24   gather the facts and just determine the outcome

25   through those facts and determine the decision.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1          Q.     Do you consider yourself neutral in

2     that process?

3          A.     I think we try to be, as much as

4     possible.  Yes.

5          Q.     When IBEW investigates a local

6     election protest, what is the local's role in

7     that process, if any?

8          A.     It would depend probably on what

9     that protest has to do with.  You know,

10    sometimes maybe we need some additional

11    information, so the local would be requested to

12    provide it.  It would all depend on what the

13    protest is.

14         Q.     Does the local have any burden to

15    disprove allegations that are made in a

16    protest?

17         A.     I'm not sure I understand that.

18         Q.     Is there a certain showing that a

19    local needs to meet in order to defeat a

20    protest?

21         A.     No.  Usually, we just go in and look

22    at the facts, it's not so much defeating the

23    protest.  It's, basically, you know, we ask for

24    the information, look at the facts that the

25    reps report, and make a decision off of that.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          Q.     Can you give me a sense of what
 2   rules and authority applies to union elections,
 3   what governs union elections?
 4                     MR. KURNICK:  Can I ask you,
 5   are you asking union elections generally or
 6   just in the IBEW?
 7                     MS. DeBRUICKER:  Just in the
 8   IBEW.
 9                     MR. KURNICK:  Thank you.
10                     THE WITNESS:  Can you repeat
11   the question, please?
12   BY MS. DeBRUICKER:
13          Q.     Sure.  Can you give me a sense as to
14   what rules or regulations apply to IBEW officer
15   elections?  For example, does the IBEW
16   constitution have separate --
17          A.     The constitution and the bylaws.
18   Those would be the two main things that we
19   follow.
20          Q.     By bylaws, are those IBEW bylaws or
21   the local's bylaws?
22          A.     The local union bylaws.
23          Q.     I still have on my screen the IBEW
24   basic laws and policies.  Do they speak to
25   election requirements as well?
```

1        A.    Yeah.   I think this goes through

2    pretty well, another screen, and runs down

3    through, you know, how elections are to be

4    handled.   You know, time, date, place.   It

5    gives you all of that stuff.   And then,

6    usually, in the bylaws, it spells it out, how

7    the elections are to be conducted, whether in

8    person, by mail.

9        Q.    Are the IBEW basic laws and policies

10   considered binding, rules that are binding all

11   locals?

12       A.    Yes.   They would be because they are

13   an extension of the constitution.

14       Q.    I've seen reference to an IBEW local

15   union election guide.   Are you familiar with

16   that?

17       A.    Yes.

18       Q.    And is that something that would be

19   considered binding on locals or is that

20   considered as guidance, as far as you know?

21       A.    Those are recommendations that --

22   you know, we can make recommendations, I can't

23   say it's necessarily binding on all points of

24   it.   Because local unions do have some

25   flexibility, that maybe their bylaw address

1     something a little bit different.  But that's

2     the general guideline for people to follow.

3          Q.    Is the IBEW local Union election

4     guide something that's available to members?

5          A.    If they request it, they can see it,

6     yes.

7          Q.    If the local union election guide is

8     not strictly binding, if it's recommendations,

9     is that a resource that a member should rely on

10    in determining whether election processes are

11    being followed?

12         A.    I guess it could.  I mean, it's not

13    like there's a lot of deviation.  But I mean,

14    some locals have some things that might not be

15    totally the same as in the guide.  I mean, it,

16    basically, spells out the process to run an

17    election.  So, you know, it gives somebody some

18    general knowledge of how a general election is

19    run.

20         Q.    And are you familiar with Local 98's

21    bylaws?

22         A.    I can't say that I'm familiar with

23    them as far as inside and out.

24         Q.    Are they something that you would

25    have looked at in your decision relating to

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1     Mr. Battle's election protest?

2         A.    Yeah, to find out if they followed

3     what is in their bylaws, as far as making sure

4     they were followed.

5         Q.    And is that something you would do

6     personally, or is that something you would rely

7     on your representative to do as he did the

8     investigating?

9         A.    Usually, the rep would be looking to

10    verify those facts against the bylaws, yes.

11        Q.    And would that be something you

12    would, typically, also do yourself or would you

13    rely on the representative?

14        A.    If he couldn't in his investigation,

15    I would possibly look at them, too, but you

16    know, most times, the rep, you know, spells

17    things out.

18        Q.    Would you say you had a familiarity

19    with the LMRDA?

20        A.    I have some familiarity with it,

21    yes.

22        Q.    Did you have familiarity with the

23    provisions relating to members' rights in

24    connection with union elections?

25        A.    Yes.  I guess I would have to say

1    yes, I'm familiar with members' rights.  Yes.

2        Q.    And this case deals, specifically,

3    with Section 401(e) which provides that members

4    must be given a reasonable opportunity to

5    nominate candidates.  Were you familiar with

6    that requirement, generally?

7        A.    Yes, generally.

8        Q.    And that members in good standing

9    must be allowed to run for office if they meet

10   the reasonable qualifications of the local?

11       A.    Correct.

12       Q.    And that members have the right to

13   vote for and support the candidates of their

14   choice without being subject to penalty,

15   discipline or improper interference or reprisal

16   of any kind?

17       A.    Yes.

18       Q.    Are you familiar with that

19   provision?

20       A.    Yes.

21       Q.    And are those things you keep in

22   mind when reviewing local election protests?

23       A.    It depends on what the protest is,

24   as far as what's being protested.

25       Q.    Mr. Welsh, I'm going to have you

1    look at this document here.  Do you recognize

2    that document?

3         A.    Yes.

4         Q.    Are you able to see the screen

5    clearly?

6         A.    I just have to adjust my laptop

7    because the print is a little bit small.

8         Q.    If during the course of this you

9    need me to resize things, please let me know.

10   I want to be sure you can see what you need to;

11   okay?

12        A.    Okay.

13        Q.    Do you recognize this as the IBEW

14   constitution?

15        A.    Yes.

16        Q.    Would you say you're generally

17   familiar with its terms?

18        A.    Yes, generally.

19        Q.    I'm going to jump us to what is

20   Article 16 of the constitution.

21        A.    Okay.

22        Q.    And I'm going to direct your

23   attention to Section 10.  Let me see if I can

24   make it a little bit bigger.

25              Section 10 begins, no member shall

1    be nominated for office unless he is present or

2    signifies his willingness in writing.

3              Is that a provision you're familiar

4    with?

5        A.    Yes.  Yes, I'm familiar with that.

6        Q.    And what does that mean to you?

7        A.    If a candidate wants to run for

8    office, he either shows up at the nomination

9    meeting and gets nominated, or he can submit

10   his request in writing should he wish to be

11   nominated for a position.

12       Q.    So under the constitution, he can

13   either be present or indicate his willingness

14   in writing; is that right?

15       A.    Correct.

16       Q.    And moving down to Section 11 of

17   Article 16, the LU -- does that mean local

18   union?

19       A.    Yes.

20       Q.    The local union shall decide the

21   manner in which nominations and elections shall

22   be held and such shall be stated in the LU

23   bylaws.

24       A.    Correct.

25       Q.    So the local can, basically, decide

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    the manner in which nominations are made?

2         A.    Yes.

3         Q.    But they need to state them in their

4    bylaws; is that right?

5         A.    Yes.

6         Q.    And Section 11 continues, this shall

7    not be in conflict with the IBEW constitution.

8               What does that mean?

9         A.    In your bylaws, you can't do

10   anything different than what the constitution

11   spells out.

12        Q.    So the local has discretion to

13   design its nominations process as long as its

14   consistent with the constitution?

15        A.    Correct.

16        Q.    Let me go back to the basic laws and

17   policies.  Under the section where it says

18   member nomination and voting eligibility, a

19   member must be present or signify in writing a

20   willingness to being a candidate prior to being

21   nominated to the local union office.

22               Is that consistent with the

23   constitution provision we just read?

24        A.    Uh-huh.

25        Q.    So either present in person or

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    signifying in writing?

2         A.    Correct.

3         Q.    And this is what I understand to be

4    the IBEW local union election guide.  Does that

5    look familiar to you?

6         A.    Yes.

7         Q.    Under nominations, the second

8    paragraph reads, no member shall be nominated

9    for office unless he or she is present or

10   signifies his or her willingness in writing.

11   Again, consistent with the constitution?

12        A.    Yes.

13        Q.    And the written acceptance of a

14   nomination must be presented at the meeting

15   when nominations are held.

16              What's your understanding of what

17   that means?

18        A.    If a person's not there when he's

19   nominated, he has to say that he'd take the

20   nomination.  If so, if he would be nominated,

21   he should, you know, put it in writing.

22              So if he's not there, there should

23   be a letter with the local union saying, if

24   nominated, I will run for this position.

25        Q.    A little bit further down in the

1    provision, it talks about the notice of the

2    election, a single notice shall be used for

3    notification of both nominations and elections.

4    The notice shall state the following.

5              And among what it lists are the

6    proper form and manner for nominations.  Do you

7    see that?

8         A.    Yes.

9         Q.    Do you have an understanding as to

10   what proper form and manner for nominations

11   means?

12        A.    I guess whether you have be there in

13   person to either self-nominate -- I'm not

14   exactly sure, you know, proper form and manner

15   for nominations.  Because right below, it gives

16   you the date, time, place for elections; date,

17   time, place for nominations.  Proper form?  I

18   guess if the local union requires some type of

19   -- they have a form.

20        Q.    Does it indicate that the notice

21   should tell you how nominations will be made?

22        A.    Right.

23        Q.    I'm asking, is that your reading of

24   it?

25        A.    That would be my reading of it, yes.

```
 1        Q.    Under the terms that we just went
 2   through with the constitution and the election
 3   guide and the basic laws and policies, is there
 4   anything that prohibits a member from
 5   nominating him or herself?
 6        A.    No.  There's nothing that prohibits
 7   that.
 8        Q.    Under these terms that we just went
 9   through, is there anything that requires
10   nominations be seconded?
11        A.    No.
12        Q.    Under the terms we just went
13   through, is there anything requiring that
14   nominations be made in person?
15        A.    No.  It says that you can nominate
16   in writing.
17        Q.    Setting aside any particular
18   provisions that might be in the local's
19   particular bylaws, under these terms, how can a
20   member of an IBEW local be nominated for a
21   local union office?
22        A.    He can either show up at the
23   nomination meeting and have somebody nominate
24   him, send a letter in that he wishes to be
25   nominated for a particular position.
```

1      Q.    And other than that, does the IBEW

2   constitution specify the manner in which local

3   union officer nominations must be held?

4      A.    I'm not sure I understand what

5   you're asking on that one.

6      Q.    You just indicated that under these

7   terms, a member can nominate themselves, either

8   by being present at the nomination meeting or

9   signifying in writing their wish to be

10   nominated.  And we saw those in the

11   constitution.

12      A.    Correct.

13      Q.    Other than those provisions, does

14   the constitution have any other specifications

15   as to the manner in which local nominations

16   must be held, as far as you're aware?

17      A.    No.

18      Q.    And, I think, as we read, the IBEW

19   constitution delegates most of that to the

20   local as long as it's consistent with the

21   constitution; is that right?

22      A.    Correct.

23      Q.    And the local is required to state,

24   in its bylaws, the manner in which the officer

25   nominations shall be held?

```
 1        A.    Yes.  I mean, they usually have

 2   guidelines and the bylaws and, usually, they're

 3   reiterated when the nomination notice goes out.

 4        Q.    If the local has, in its bylaws,

 5   that nominations must be made in person or by a

 6   person present at the meeting, would you

 7   consider that to be contrary to the

 8   constitutional provision we just went through?

 9                    MR. KURNICK:  Objection.

10   Calls for speculation and an inadmissible

11   opinion by the witness.  Mike, even though I've

12   objected, sadly, you still have to answer

13   questions, unless I instruct you not to answer.

14                    THE WITNESS:  Could you repeat

15   the question for me?

16   BY MS. DeBRUICKER:

17        Q.    Sure.  If a local has, in its

18   bylaws, that nominations have to be made in

19   person, would you consider that to be contrary

20   to the IBEW constitution provision we just went

21   through?

22        A.    Well, there's a provision in the

23   constitution that allows for somebody that's

24   not there to be able to submit a letter that

25   they'll accept nomination.  So they would be
```

Page 43

1    able to submit a letter requesting to be

2    nominated.  They would be able to do that.

3         Q.    What if a local had bylaws that

4    eliminated that write-in option?

5         A.    I think that would be counter to the

6    constitution.  That would be something to be

7    questioned when the bylaws would be submitted.

8         Q.    And who do the bylaws get submitted

9    to?

10         A.    If they're looking to make a change,

11    or when they need to be updated, they can

12    submit it to the international president.

13         Q.    And do those have to be approved by

14    the international president?

15         A.    Yes.

16         Q.    I'm going to show you what's been

17    produced to us as the bylaws of Local 98.  Do

18    you recall, specifically, reviewing these in

19    connection with Mr. Battle's protest.

20         A.    Yes.  I've looked at parts of that,

21    not the whole bylaws, but parts that pertained.

22         Q.    Parts that pertained to nominations

23    and elections?

24         A.    Yes.

25         Q.    Article 3 of Local 98's bylaws,

1    there are a number of provisions, but the ones

2    that appear to deal with nominations are found

3    in Section 4A and 4B.  4A indicates that at the

4    meeting of the local union where nominations

5    are made, after nominations have closed, the

6    local union, by a majority of members present,

7    shall elect an election judge and as many

8    tellers as are required, who shall serve as an

9    election board to conduct the election.  No

10   candidate for office shall be eligible to serve

11   on this board.

12            Do you see that?

13        A.    Yes.

14        Q.    Do you recall reviewing that in

15   connection with Mr. Battle's protest?

16        A.    Yes.  That's pretty well standard

17   language in, basically, all bylaws.

18        Q.    And then secondly, it reads, after

19   nominations have been made and those nominated

20   are found to qualify, the election board shall

21   have ballots prepared listing, in alphabetical

22   order, the names of all the candidates for each

23   respective office.

24            Do you see that?

25        A.    Yes.

```
 1          Q.     And do you recall reviewing that in
 2    connection with Mr. Battle's protest?
 3          A.     Like I said, that's standard
 4    language, too.
 5          Q.     I will state that in my review of
 6    the bylaws, I haven't found any other
 7    provisions stating anything else about the
 8    manner in which nominations shall be held.  Do
 9    you recall seeing any other provisions?
10          A.     In the constitution or in the
11    bylaws?
12          Q.     In Local 98's bylaws, do you recall
13    seeing any other provisions dealing with the
14    manner in which nominations shall be held,
15    besides the ones we just went through?
16          A.     Not if you're referring directly to
17    nominations.  No.
18          Q.     And in reading these provisions,
19    what's your understanding of the manner in
20    which Local 98 conducts its nominations?
21          A.     They would have a nomination
22    meeting.  They would hold nominations at a
23    union meeting and present the candidates and
24    all the people running for the various
25    positions.
```

Page 46

 1          Q.    Do you understand that to be

 2     consistent with what the constitution has

 3     provided?

 4          A.    Yes.

 5          Q.    Turning to 2020 elections,

 6     generally, was there any IBEW requirement that

 7     meetings be in person?

 8          A.    You're saying nomination meetings be

 9     in person?  It was up to the local union how to

10     deal with it since the pandemic.  So locals

11     handled it their own way and different

12     limitations might have been in their area.

13          Q.    And did IBEW provide any guidance to

14     locals as to how to handle nominations and

15     elections during the pandemic?

16          A.    Yes.  There was information sent

17     out.  The possibility that you could delay your

18     election process, if need be.  You could do it

19     by mail.

20          Q.    And was election by mail something

21     specific to the pandemic or is that something,

22     under your understanding, that the constitution

23     allowed for?

24          A.    I think for the most part -- there

25     are some local unions that utilize mail-in all

1    the time.  But for the most part, the

2    nominations, that was something more or less

3    for the pandemic, basically, to give -- for the

4    whole process to be mail.  Normally that

5    doesn't happen.  Usually, nominations are made

6    in person for the most part.  We have a

7    nominations meeting with provisions that can

8    help people that can't attend.

9         Q.    Under, sort of, the pandemic

10   circumstances, I'll call them, could

11   nominations be conducted by video or conference

12   call?

13        A.    No.  We really didn't have that

14   ability.

15        Q.    Under your understanding, would it

16   have been okay to have nominations made by

17   dropping forms off at the union hall?

18        A.    Yes.  That could have been, yes.

19        Q.    All right.  I'm going to show you

20   what's been -- there's some exhibits that have

21   been in some other depositions, but for

22   clarity's sake, we'll mark this as Welsh No. 1.

23             (Deposition Exhibit No. 1 was

24   marked for identification.)

25        Q.    And actually, before I direct you to

Page 48

1     this, in particular, under the IBEW

2     constitution, would completing something like a

3     nomination form be sufficient to be considered

4     a nomination under the constitution?

5          A.    Yes.

6          Q.    Did you have a chance to review the

7     forms that Local 98 used in its June 2020

8     election in connection with your evaluation of

9     Mr. Battle's protest?

10         A.    Not until after the fact.

11         Q.    What do you mean after the fact?

12         A.    We weren't aware that he sent

13    anything in.  We were under the assumption that

14    he actually took his paperwork with him.

15         Q.    Okay.  Speaking more generally than

16    Mr. Battle's form, did you have a chance to

17    review a blank version?

18         A.    I'm sorry, no.  No.

19         Q.    You did not?

20         A.    No.

21         Q.    Do you recall being interviewed by

22    the Department of Labor in connection with

23    Mr. Battle's protest?

24         A.    Yes.

25         Q.    Do you recall telling them that the

1    provision that no member shall be nominated for

2    office unless he is present or signifies his

3    willingness in writing meant that completing a

4    form like this would be considered a

5    self-nomination under the constitution?

6         A.    If the form was completed, yes.

7         Q.    Recognizing that you may not have

8    seen this during your consideration of

9    Mr. Battle's election protest, could you take a

10   moment and look at this nomination slip and

11   tell me whether, in your consideration, it

12   meets the requirements for a written

13   nomination?

14              MR. KURNICK:  Objection to the

15   question.  It calls for an inadmissible opinion

16   by the witness.

17              THE WITNESS:  Okay.  You're

18   asking if the form is complete.  To me, the

19   form does not look complete.

20   BY MS. DeBRUICKER:

21        Q.    And in what ways is it not complete?

22        A.    There should be a nominator.

23   Whether -- if you're nominating yourself, you

24   should put your own name there.  I would assume

25   that's what the form would be for.

```
 1          Q.     The form reads, the undersigned
 2    member of IBEW Local 98 nominates -- there's a
 3    space, and Charles Battle is written, where the
 4    office of president is written in --
 5          A.     Right.
 6          Q.     -- in the 2020 election of officers
 7    of Local 98.
 8          A.     Right.
 9          Q.     And are you referring to the next
10    few lines, I believe, the name of the
11    nominator?
12          A.     The name of the nominator, yes.
13          Q.     And nominator's signature and card
14    number?
15          A.     Yes.
16          Q.     Well, it says, the undersigned
17    member nominates.  And then there is a
18    signature at the bottom of the form.
19                 MR. KURNICK:  Excuse me, but
20    that's not a question.
21    BY MS. DeBRUICKER:
22          Q.     Would that signature not be
23    sufficient for someone to nominate themselves?
24                 MR. PODRAZZA:  Objection.
25    Asked and answered.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

 1                      MR. KURNICK:  Mike, you can

 2      answer the question.

 3                      THE WITNESS:  It says

 4      candidate signature, yes.  It doesn't say

 5      anything about who nominated the person, the

 6      candidate's signature there.

 7      BY MS. DeBRUICKER:

 8          Q.    Would there be any kind of

 9      presumption that if there was no one else

10      listed as the nominator, that the candidate was

11      nominating himself?

12                      MR. PODRAZZA:  Objection.

13      Asked and answered.  I'm sorry.  You can

14      proceed.

15                      THE WITNESS:  I can't presume

16      that.  I don't know.  I mean, it's asking for a

17      name of a nominator.  To me, I would have put

18      my name down below it when I would see that.

19      BY MS. DeBRUICKER:

20          Q.    In determining the sufficiency of a

21      writing indicating a member's willingness to

22      run, whose job is it to determine the

23      sufficiency of the writing?

24          A.    Those letters are usually submitted

25      to the recording secretary.  And if there are

1    any questions, I would assume he asked that

2    person.  But it's, usually, the recording

3    secretary, when it's at a nomination meeting,

4    would be the one who's getting the letters

5    coming in requesting a run for office.

6         Q.    And the recording secretary, I

7    understand, is a position at the local; is that

8    correct?

9         A.    Correct.  They're the ones who take

10   the notes at the meeting.

11        Q.    So would the recording secretary be

12   the ultimate arbiter of whether a nomination

13   form was sufficient or not?

14        A.    I don't know if he would be the

15   final arbiter.  It may be something than an

16   election judge, if it comes to that point,

17   would look at, too, to determine if somebody

18   was eligible to run for office.

19        Q.    It is my understanding that an

20   election judge is only appointed after

21   nominations; is that right?

22        A.    Well, in this case, yes.

23        Q.    When you say in this case, what do

24   you mean?

25        A.    Well, that's how their bylaws state

1    it, that's how they would nominate their

2    election judge.

3         Q.    Do you understand that there was an

4    election judge appointed for Local 98 in the

5    June 2020 nominations?

6         A.    Not that I'm aware of.

7         Q.    It's my understanding that they

8    didn't consider any of the positions contested,

9    so there wasn't a need for a formal election;

10   is that your understanding?

11        A.    Correct.

12        Q.    So if a member were to contend that

13   this nomination form was sufficient for him to

14   be considered a candidate and -- who would he

15   take that to for a determination?

16        A.    You're saying if there's no election

17   judge?

18        Q.    Right.

19        A.    He would probably file a protest to

20   the office -- or a clarification to the 3rd

21   District Office.  That would be the next step.

22        Q.    And who at the 3rd District Office

23   would determine the sufficiency of the

24   nomination form?

25        A.    Well, I would probably assign a rep

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1      to look into this issue and then make a

2      determination after reviewing the facts

3      presented.

4           Q.    So it would be for a representative

5      to investigate and then you would be the

6      decision-maker?

7           A.    Correct.

8           Q.    And based on the constitutional

9      provisions we've gone through and Local 98's

10     bylaws, if you were to decide the sufficiency

11     of this nomination form, what would your

12     decision be?

13               MR. KURNICK:   Objection.

14     Calls for speculation and an inadmissible

15     opinion.   Mike, you can answer.

16               THE WITNESS:   To me, looking

17     at this, I would have to question why there

18     isn't the name of a nominator there.

19     BY MS. DeBRUICKER:

20          Q.    Are you aware of any bylaw or

21     constitutional provision requiring the name of

22     a nominator?

23          A.    Well, if you can self-nominate or

24     have someone nominate you -- I mean, you would

25     have to have somebody nominate you, whether

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 55

```
 1    it's yourself or another person, somebody
 2    should still be nominating.
 3         Q.    If you were reviewing this
 4    nomination form for sufficiency, would the
 5    absence of any name in the place for nominator
 6    be determinative of your decision?
 7                  MR. KURNICK:  Same objection.
 8    Mike, you can answer.
 9                  THE WITNESS:  To me, I would
10    have probably looked at the form and said it
11    wasn't completed properly.  I think you need
12    the name for a nominator in there.  Whether
13    it's yourself or another person, there should
14    be somebody on that form, on that line.
15    BY MS. DeBRUICKER:
16         Q.    Are you aware of anything requiring
17    a name be in that line, any constitutional
18    provision, any bylaw?
19         A.    Just the fact you would be
20    nominating yourself or somebody would be there
21    to nominate you.  I guess you need to be
22    nominated one way or the other.
23         Q.    If there wasn't someone else's name
24    in there, you wouldn't be willing to presume
25    that the member was nominating himself?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1                    MR. PODRAZZA:  Asked and

2       answered.  Objection.

3                    THE WITNESS:  I couldn't make

4       the presumption.  I don't know.

5       BY MS. DeBRUICKER:

6            Q.    Who would know?

7            A.    I'm sorry?

8            Q.    If you don't know, who would know?

9            A.    As far as I said about that being --

10      should be filled out either by the person

11      themselves or the nominator.  That would be my

12      thoughts on that, on a form like that.

13           Q.    At some point, did you receive a

14      protest relating to Local 98's June 2020

15      election and nomination of officers?

16           A.    Yes.

17           Q.    Was that from Charles Battle?

18           A.    Yes.

19           Q.    Did you review the protest when it

20      came in?

21           A.    Yes, I did.

22           Q.    Did you determine that the protest

23      was timely?

24           A.    Yes.

25           Q.    Did you determine that this protest

1    was properly made, and that it wasn't missing

2    anything that would be required for review?

3        A.    Yes.  If things were filled out,

4    yes, you know, if I would be able to review it.

5    Yes.

6        Q.    How did the protest come to your

7    attention?

8        A.    It was sent to the 3rd District

9    Office.  So it was given to me in the office.

10       Q.    I'm going to go back for one moment

11   to the nomination.  Does penalizing the

12   self-nominating member for not filling in his

13   own name as nominating himself constitute a

14   reasonable opportunity to nominate candidates?

15              MR. KURNICK:  Objection.  It

16   calls for a legal conclusion.  You're asking

17   him for an inadmissible opinion.  It's

18   speculative.  You can have him answer, for what

19   it's worth, but we understand that's not really

20   a proper question.

21              Mike, if she wants you to answer,

22   you should answer.

23              THE WITNESS:  could you repeat

24   the question?

25   BY MS. DeBRUICKER:

 1        Q.    Sure.

 2              MR. KURNICK:  And I don't know

 3    if I mentioned this, assumes facts not in

 4    evidence, which is that somebody was being

 5    penalized for not filling in these lines on the

 6    form.  Go ahead, Mike.

 7              THE WITNESS:  I asked for her

 8    to repeat the question.  I'm sorry.

 9    BY MS. DeBruicker:

10        Q.    We discussed earlier that the LMRDA

11    requires that members be given a reasonable

12    opportunity to nominate candidates.  Do you

13    recall that line of questioning?

14        A.    Yes, I recall you asking that.  Yes.

15        Q.    Do you recall that being a provision

16    of the LMRDA?

17        A.    Correct.

18        Q.    Would rejecting a nomination slip in

19    which a self-nominating member did not put

20    their own name as the name of the nominator be

21    to a reasonable opportunity to nominate

22    candidates -- or denying a member a reasonable

23    opportunity to nominate candidates?

24        A.    I'm not exactly sure.  I mean, this

25    form, I never saw until after the fact.

1        Q.    I understand.

2        A.    I have no way of surmising what

3   transpired.  I mean, to me, like I already

4   stated, it has a place for the nominator, so

5   you fill it in.  If in doubt, you ask a

6   question.

7             So I don't know if there was doubt.

8   I'm not there.  I don't know.  I wasn't at the

9   nomination meeting, I don't know what his frame

10  of mind was.  I don't know.

11       Q.    Members must have a reasonable

12  opportunity to nominate candidates.

13       A.    It looked like they had a reasonable

14  opportunity.  There was a meeting where they

15  could have went and got nominated or they could

16  have sent in a letter by mail, too.

17       Q.    And, in your opinion, would it be

18  reasonable to reject this nomination slip

19  because the member did not list their own name

20  as nominator?

21            MR. KURNICK:  Same objection.

22  Mike, you can go ahead and answer.

23            THE WITNESS:  I don't know how

24  I can answer any differently than how I already

25  answered it.  I said that the form wasn't

1   completed the way it was asked to be completed.

2   So I'm sort of lost.  I don't know -- I'm

3   sorry, I don't know what else to say.  It asked

4   for the name of a nominator, you put the name

5   of the nominator in.

6   BY MS. DeBRUICKER:

7        Q.   My question is, in your

8   determination, would it be reasonable to not

9   consider this member a candidate because of

10  their failure to list their own name as

11  nominator?

12                  MR. PODRAZZA:  It's been asked

13  and answered.  Objection.

14                  THE WITNESS:  I said that the

15  form wasn't complete so to me -- the form was

16  not completed entirely so it wouldn't have been

17  able to be used or wouldn't have counted as a

18  self-nomination because it wasn't filled out

19  the whole way.

20  BY MS. DeBRUICKER:

21       Q.   My question is, what would be

22  considered reasonable under the LMRDA, in your

23  judgement?

24                  MR. KURNICK:  Obviously, that

25  asks for a legal conclusion, and I object on

Page 61

1    that basis.

2                    MR. PODRAZZA:  It's been asked

3    and answered.  How many times do you want to

4    ask him this?

5                    MS. DeBRUICKER:  It hasn't

6    been answered.  I'll ask it as many times as I

7    need to.

8                    MR. PODRAZZA:  Well, he should

9    be instructed not to answer because now you are

10   becoming attacking of him because you don't

11   like the answer he gave you.  That's what this

12   is all about.

13                   MS. DeBRUICKER:  He has not

14   answered my question as to what would be a

15   reasonable opportunity to nominate under the

16   LMRDA.

17                   THE WITNESS:  Oh, okay.  Well,

18   basically, you would fill out the form and you

19   would be eligible to run for election.  Fill

20   out the form properly.

21                   In this case, the name is missing as

22   nominator.  I don't know what else to say.  I

23   mean, like I said, there was a form to submit,

24   you're supposed to have somebody nominate you,

25   whether it's yourself or somebody else.  There

 1    should have been a name on that line.

 2    BY MS. DeBRUICKER:

 3        Q.    My question is, is rejecting a form

 4    for a member's failure to list their own name

 5    as the nominator a reasonable opportunity to

 6    nominate candidates under the LMRDA?

 7                  MR. PODRAZZA:  Objection.

 8    Asked and answered.  And it's argumentative at

 9    this point.  Mr. Kurnick, I think you should

10    seriously consider instructing the witness not

11    to answer.  And if we have to take it that far,

12    we'll get Judge McHugh involved.

13                  MR. KURNICK:  Ms. DeBruicker,

14    I really think you're not going to get a

15    different answer at this point.  He's answered

16    your question a number of times.  He's given

17    you the same answer over and over and over

18    again.  If you ask the question ten more times,

19    I think you're going to get the same answer.

20                  MS. DeBRUICKER:  I haven't

21    gotten an answer, but I will move on.  If we

22    need to revisit this, we will.

23                  MR. KURNICK:  Fair enough.

24    Thank you.

25    BY MS. DeBRUICKER:

1        Q.     Mr. Welsh, earlier, we discussed the

2   process for evaluating an internal election

3   protest.  Was Mr. Battle's internal election

4   protest investigated any differently than that?

5        A.     No.  I assigned a rep to do the

6   investigation and to do a report, same as

7   anybody else's.

8        Q.     Did you participate in the

9   investigation, or did you just review the

10  report?

11       A.     No.  The rep was, actually, the one

12  doing the investigation.  I did not participate

13  in the investigation.

14       Q.     Did you give Mr. Kieffer advice

15  during the course of the investigation?

16       A.     No.

17       Q.     You didn't ask him to speak to

18  specific individuals?

19       A.     No.

20       Q.     What is your understanding of the

21  crux of Mr. Battle's protest?

22       A.     As far as --

23       Q.     What was your understanding of what

24  he was protesting?

25       A.     You mean -- overall, he was

```
 1    protesting that he felt he didn't have an
 2    opportunity to run for office, and that he felt
 3    that he was intimidated, I guess, too.
 4         Q.    Do you recall him mentioning the
 5    intimidation of other members?
 6         A.    I'm sorry?
 7         Q.    Do you recall him mentioning the
 8    intimidation of other members in addition to
 9    himself?
10         A.    It was stated in Mr. Kieffer's
11    report that, yeah, he said that there were
12    other people.
13         Q.    Looking at Page 3 of Mr. Battle's
14    protest --
15         A.    Could you increase that a little?
16         Q.    Yes.
17         A.    Thank you.
18               (Deposition Exhibit No. 2 was
19    marked for identification.)
20         Q.    So this is Page 3 of Mr. Battle's
21    protest.  And among his statements are, members
22    are scared of intimidation, and they would not
23    run on their own or support my candidacy.
24               Do you see that?
25         A.    Yes.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1          Q.     Do you recall that being a part of

2     his protest?

3          A.     Yes.  We're looking at his protest

4     now.  That was in there, yes.

5          Q.     And if members were, indeed, scared

6     of intimidation, such that they didn't run for

7     office, would that be Of concern to you?

8          A.     You're saying if they felt

9     intimidated -- I'm not exactly sure I can

10    answer that.  I'm not sure what they meant by

11    being intimidated, so I'm --

12         Q.     Just generally speaking, if members

13    are intimidated out of running for office,

14    would that be a concern to the IBEW?

15         A.     I guess if something was proven, it

16    would be a concern.

17         Q.     Because the LMRDA requires that

18    members be allowed to run for office or support

19    members without fear of reprisal of any kind;

20    is that right?

21         A.     Correct.

22         Q.     And if members were threatened with

23    reprisal for running for office, would you

24    consider that a violation of the LMRDA?

25                MR. KURNICK:  Objection.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 66

```
 1    Calls for a legal conclusion.  Mike, you can
 2    answer, if you can answer.
 3                   THE WITNESS:  I just don't --
 4    okay.  Please repeat the question.
 5    BY MS. DeBRUICKER:
 6         Q.    If members were threatened with
 7    reprisal for seeking nomination, would you
 8    consider that a violation of the LMRDA?
 9         A.    I guess I would.
10         Q.    Would you consider that a violation
11    of union rules as well?
12         A.    I'm sorry?
13         Q.    Would you consider that a violation
14    of union rules as well?
15                   MR. KURNICK:  Objection.
16    Calls for speculation by the witness,
17    inadmissible opinion.  Mike, you can answer.
18                   THE WITNESS:  I was just going
19    to say, I guess it would.
20    BY MS. DeBRUICKER:
21         Q.    And just to be clear, in deciding
22    election protests, it's your job to decide
23    whether something violated union rules or not;
24    is that correct?
25         A.    Correct.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 67

```
 1          Q.     I'm zooming out a little bit just
 2     for the sake of time and perspective.
 3     Mr. Battle had certain attachments to his
 4     protest.  Do you recall seeing them?  This one
 5     looks like it's Attachment A.
 6          A.     Yes.
 7          Q.     Attachment B.  I think there's one
 8     more, Attachment C.  Do you recall those being
 9     a part of his protest?
10          A.     Yes.
11          Q.     And did you consider these
12     attachments to be a part of his protest?
13          A.     Yes, he presented them.
14          Q.     Can you think of any reason not to
15     consider these attachments as part of his
16     protest?
17          A.     When somebody submits a protest and
18     attaches a document or something, we don't
19     control what they want to attach.  We don't
20     tell them they can't send attachments or
21     anything.  I mean, that's up to them, whatever
22     they want to present.
23          Q.     And can you think of a basis for
24     excluding any attachments from your
25     consideration?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1          A.    No.   I mean, basically, we look at
 2     everything that would come in.   I mean, how
 3     much relevance it would provide, I guess,
 4     that's what you look at.
 5          Q.    Are there any IBEW rules that
 6     provide for the exclusion of certain
 7     information during a protest?
 8          A.    Not that I'm aware of.
 9          Q.    I'm going to stop sharing for a
10     moment and get some new documents up.   We've
11     been going for almost an hour and a half.   How
12     are you doing, Mr. Welsh?   Would you like a
13     break or would you like to keep on going?
14          A.    Maybe take five, so I can get some
15     more water.
16          Q.    That sounds good.
17                     (Recess taken.)
18     BY MS. DeBRUICKER:
19          Q.    So we were talking about
20     Mr. Battle's internal election protest.   And
21     I'm now going to show you what we'll mark as
22     Welsh No. 3, which is a July 28, 2020 letter
23     from Mr. Kieffer.   Do you see that, Mr. Welsh?
24          A.    Yes.
25                     (Deposition Exhibit No. 3 was
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

 1      marked for identification.)

 2           Q.    It's a four page document.   From the

 3      front page, are you able to recognize that

 4      document?

 5           A.    Yes.

 6           Q.    And what is that document?

 7           A.    That is Randy Kieffer's report.

 8           Q.    And what was the purpose of him

 9      writing this report?

10           A.    To give me the information on the

11      background of the election protest.

12           Q.    Do reports to you, typically, take

13      this form like in the form of a letter?

14           A.    Yes.

15           Q.    Did you assist, at all, in the

16      preparation of this letter?

17           A.    Not his report.   He does the report.

18           Q.    At any point, did Mr. Kieffer send

19      you a draft of this report?

20           A.    He probably did.   I would have to go

21      back -- he probably, maybe, sent a draft.

22           Q.    Do you know whether you sent him

23      feedback on that draft?

24           A.    I probably did not.

25           Q.    Do you, typically, send your

1    representatives feedback on a draft?

2         A.    Not usually.  I mean, usually, the

3    draft comes in -- it depends.  I mean,

4    sometimes -- it depends on the type of

5    information.  You know, they may ask a question

6    or something.  They have sent me drafts on

7    things they've done and then re-clarified some

8    stuff.  But for the most part, their report

9    comes in the way they see it.

10        Q.    Do you recall whether you asked

11   Mr. Kieffer to do any further investigation

12   when this draft came in?

13        A.    No.  Not on this particular report

14   here.

15        Q.    Did you ask him to speak to anybody

16   he hadn't spoken to yet?

17        A.    Not on this report here.

18        Q.    Did you do that with any other

19   report relating to Local 98?

20        A.    He had a secondary follow-up report

21   that he attached that we had.

22        Q.    Would that have related to a Timothy

23   McConnell?

24        A.    Correct.

25        Q.    I'll ask about that in a little bit.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    But in terms of Mr. Kieffer's July 28, 2020

2    report, do you recall any substantive feedback

3    that you gave to him regarding his draft?

4         A.    No.  No substantive feedback that I

5    can recall.

6         Q.    Do you know if Mr. Kieffer made any

7    changes to his report between the draft and the

8    final he sent to you?

9         A.    Nothing stands out as anything

10   major.  Nothing that I can recall -- changes.

11        Q.    Did you review Mr. Kieffer's report

12   when he sent it to you?

13        A.    Yes.

14        Q.    And did you disagree with any of his

15   factual findings?

16        A.    No.

17        Q.    Did you disagree with anything else

18   in his letter?

19        A.    No.

20        Q.    After you received Mr. Kieffer's

21   reports, what, if anything, did you do?

22        A.    I reviewed the report and began

23   working on putting it together in a final

24   decision.

25        Q.    Did you ever speak with Mr. Battle

1    yourself?

2         A.    No.

3         Q.    Do you, typically, speak with people

4    who file protests, personally?

5         A.    No.  Usually, that just gets handed

6    off to the service rep for them to handle it.

7         Q.    I'm going to show you what we'll

8    mark as Welsh No. 4, which is another letter

9    from Mr. Kieffer, dated July 24, 2020.  Do you

10   see that?

11        A.    Yes.

12                  (Deposition Exhibit No. 4 was

13   marked for identification.)

14        Q.    Do you recall receiving this report

15   from Mr. Kieffer?

16        A.    Yes.

17        Q.    Do you see this report addresses

18   Mr. Kieffer's conversations with Timothy

19   McConnell; is that your understanding?

20        A.    Correct.

21        Q.    Did you have a role in planning or

22   arranging for Mr. Kieffer to speak with

23   Mr. McConnell?

24        A.    No.

25        Q.    Did you direct Mr. Kieffer to speak

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    with Mr. McConnell?

2         A.    No.  I think that's where his

3    investigation took him.  I didn't have to

4    direct him to do that, no.

5         Q.    Mr. McConnell writes -- how's this

6    size for you, Mr. Welsh?

7         A.    Maybe one click higher.  That's

8    good.

9         Q.    If I can get it all into one.  There

10   we go.  Mr. Kieffer writes that, while

11   investigating the complaint by Local Union 98

12   member Charles Battle regarding his claims of

13   intimidation from business agents of Local

14   Union 98 prior to local union nominations,

15   Brother Battle alluded to the fact that he was

16   not the only member who was being bullied into

17   not running for office.

18              Do you see that?

19        A.    Yes.

20        Q.    Do you agree that was part of

21   Mr. Battle's complaint?

22        A.    Yes.

23        Q.    Mr. Kieffer continues, Brother

24   Battle told me there were two other members

25   that were considering running for office for

1    the upcoming election but did not because of

2    intimidation from officers and members.

3           I asked Brother Battle if these two

4    members would be willing to talk to me about

5    their experiences.  At first, Brother Battle

6    told me that it is not likely that they would

7    talk to me because of fear of reprisal from the

8    sitting officers, but he would contact these

9    members to see if they would be willing to

10   speak to me.

11          Do you see that?

12       A.    Yes.  You're talking about the

13   second paragraph?

14       Q.    The second paragraph.

15       A.    Yes.

16       Q.    And was it your understanding that

17   there were two other members that Mr. Battle

18   indicated were intimidated out of running or

19   nominating?

20       A.    Just by the remarks that he made.

21   He said that, yes.

22       Q.    And if members were intimidated out

23   of running, would that have been of concern to

24   you?

25       A.    Yes.  I mean, if it was

1    substantiated.

2         Q.    And I understand there was no

3    contact with the third member.  Is that your

4    understanding?

5         A.    That's my understanding at that

6    time, yes.

7         Q.    Do you know if Mr. Kieffer made any

8    attempt to identify that third member?

9         A.    I'm assuming he talked to Brother

10   Battle again about the issue.  I mean, he would

11   have to -- he'd be the one to provide that

12   information.  I don't think Mr. Kieffer could

13   have gotten that information other than from

14   Mr. Battle.

15        Q.    There's no other way an investigator

16   could have figured out who might have been

17   intimidated?

18        A.    Not that I'm aware of.  I mean, he

19   said two people, and he gave him one name, and

20   he didn't give him the other name, as far as I

21   know.

22        Q.    Was there no other way Mr. Kieffer

23   could have figured out who the other members

24   were?

25        A.    Not that I'm aware of.  I mean,

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    there's 4,000 people in the local, so I don't

2    know how he would pick somebody else up that

3    somebody's made a reference to that they were

4    intimidated.  But they didn't give them a name.

5         Q.    Could he have reached out to the

6    membership and asked people to come forward?

7         A.    That's not usually how we do it.  I

8    mean, we investigate off of the facts that are

9    presented.  I mean, we don't go out and ask

10   volunteers to come out and present issues.  I

11   don't know how he would have done it.

12        Q.    Mr. Battle indicated that they would

13   not likely talk to the international because of

14   fear of reprisal from sitting officers.  Could

15   he have offered for them to come forward

16   anonymously?

17        A.    I guess we could.  But I mean,

18   somehow, I mean, if somebody has something they

19   -- if they want to complain or offer that they

20   were threatened or something, somehow we have

21   to verify.  You know, somewhere along the

22   line -- it's hard to keep somebody anonymous if

23   you have to verify the facts of what they're

24   saying.  So I don't know how you go about doing

25   an investigation and finding some information

1    out when you can't verify the facts.

2        Q.    If they wouldn't come forward for

3    fear of reprisal, is there any way you could

4    have alleviated that fear?

5        A.    I don't know the way I could have

6    alleviated their fears.

7        Q.    Did you understand that

8    Mr. McConnell was one of the two members that

9    Mr. Battle was referring to in his protest?

10       A.    I guess after Mr. Battle did give

11   his name, that's when we were aware that he was

12   the one that was being referred to.

13       Q.    Moving to the first paragraph of the

14   second page, Mr. Kieffer writes, I spoke to

15   Brother McConnell on July 22, 2020.  Brother

16   McConnell told me he considered running for an

17   executive board position in the Local Union 98

18   elections.  He told me he was not running with

19   a ticket and was not assisting Charles Battle

20   with his campaign.

21            Did it make a difference, for

22   purposes of your review, whether the other

23   members were running on a ticket with him?

24       A.    No.  That would have nothing to do

25   with it.

1        Q.     Why do you think it was something

2    Mr. Kieffer included in his report?

3                    MR. KURNICK:   Objection.

4    Calls for speculation.   You asked Mr. Kieffer

5    that question, but I don't think you get to ask

6    Mr. Welsh to speculate about what Mr. Kieffer

7    might or might not have thought.   Mike, you can

8    answer.

9                    THE WITNESS:   Can you repeat

10   the question?   I'm sorry.

11   BY MS. DeBRUICKER:

12       Q.     Did it make a difference, for

13   purposes of your review and your decision on

14   Mr. Battle's protest, whether the other members

15   were running on a ticket with him or not?

16       A.     No.   That wouldn't have made a

17   difference, no.

18       Q.     In the second paragraph, Mr. Kieffer

19   describes a phone call that he had with Local

20   98 Business Manager John Dougherty.   Before I

21   go any further, did you review this report in

22   preparation for your deposition today?

23       A.     I reviewed it, yes.

24       Q.     And Mr. Kieffer reports that

25   Mr. McConnell reported that it was about a 45

1    minute phone call.  Do you recall that?

2         A.    It's in the report here, yes.

3         Q.    He begins that paragraph, Brother

4    McConnell said it was about that time that he

5    started to hear that the sitting officers did

6    not want him to run for office.

7              Would you have any information as to

8    why that may have been?

9         A.    No.  I have no idea.

10        Q.    Mr. Kieffer continues, Brother

11   McConnell says Business Manager John Dougherty

12   did not directly threaten him not to run for

13   office but that the conversation made him feel

14   funny.  Do the words directly threaten have any

15   meaning to you in your review of an election

16   protest?

17        A.    Did not directly threaten him,

18   you're saying?

19        Q.    Yes.

20        A.    I guess it wasn't a direct threat.

21   I mean, he took it as feeling funny, I guess.

22        Q.    In your review of an election

23   protest, do you distinguish between what's a

24   direct threat and what's an indirect threat?

25              MR. KURNICK:  Objection to

 1    that question.  That calls for an inadmissible

 2    opinion and speculation.  There's no foundation

 3    here that he's ever addressed, outside of this

 4    context, an election protest involving direct

 5    or indirect threats or one requiring him to

 6    distinguish between the two.  Mike, you can

 7    answer.

 8                    THE WITNESS:  I'm just not

 9    exactly sure.  It said didn't directly

10    threaten.  I guess directly would be that, you

11    know, don't -- if you do it, I'll do something

12    and indirectly would be just hinting around at

13    something.  I don't know.  I don't know how the

14    conversation was going.  I can't really say for

15    sure.

16    BY MS. DeBRUICKER:

17        Q.    I'm not asking you to comment on a

18    conversation you weren't a part of.  I'm asking

19    you, in your role as decision-maker with

20    respect to an election protest, does it make a

21    difference to you whether a threat is direct or

22    indirect?

23                    MR. KURNICK:  Same objection.

24                    THE WITNESS:  I would have to

25    say, I don't recall having another election

1    protest where somebody claimed that they were

2    threatened.  Usually, it's procedural stuff

3    so -- I don't know how to answer that for you

4    because I don't know what -- directly or

5    indirectly, with a threat, how somebody is

6    going to follow through.  I don't know.

7    BY MS. DeBRUICKER:

8         Q.    Is there a certain kind of conduct

9    that IBEW considers to be threatening?

10        A.    I don't know what the IBEW considers

11   threatening or not threatening.

12        Q.    In investigating whether a member

13   was threatened with reprisal in violation of

14   the LMRDA, would only threats of violence

15   count?

16        A.    I'm not sure how to answer.  I mean,

17   as far as did somebody make a direct threat of

18   violence, I guess that would be something that

19   you would tend to see as directly threatening.

20   Indirectly, I'm not exactly sure.

21        Q.    Well, could threats against

22   someone's job or livelihood constitute a

23   potential violation of the LMRDA?

24             MR. KURNICK:  Objection.

25   Calls for a legal conclusion by the witness.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 82

1    And, Mike, yes, you can answer.

2                   THE WITNESS:  I guess if

3    somebody, in their thoughts, they thought they

4    were going to be somehow affected or the family

5    affected, I guess that would be a direct

6    threat, I guess, or it could be indirect, too.

7    Not knowing how the question was posed or --

8    BY MS. DeBRUICKER:

9         Q.    Yeah.  And I'm not asking you to

10   distinguish between a direct threat and an

11   indirect threat at this point.

12                  In determining whether conduct may

13   have violated the LMRDA and a union member's

14   right to seek office without fear the reprisal

15   of any kind, would a threat to someone's job --

16   could a threat to someone's job be sufficient

17   to violate --

18        A.    If it could be substantiated.

19        Q.    So economic threats could

20   potentially violate the LMRDA?

21                  MR. KURNICK:  Same objection.

22                  THE WITNESS:  Like I said, if

23   something could be substantiated, I guess it

24   would be.

25   BY MS. DeBRUICKER:

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 83

1          Q.    Could threats to someone's

2     reputation constitute a violation of the LMRDA?

3                    MR. KURNICK:  Same objection.

4     Mike, go ahead.

5                    THE WITNESS:  I'm not exactly

6     sure -- you know, a threat to somebody's

7     reputation, you know, direct threat or not, I'm

8     not sure how that would transpire.

9     BY MS. DeBRUICKER:

10         Q.    Again, I'm not asking the

11    distinction between a direct threat or any

12    other threat.  I'm asking whether a threat to

13    someone's reputation could constitute a

14    violation of the LMRDA?

15                   MR. KURNICK:  Asked and

16    answered.  Ms. DeBruicker, if you're going to

17    ask him legal questions, you can't be

18    dissatisfied or even surprised if he's not sure

19    what that answer is.

20                   MS. DeBRUICKER:  He's

21    answering a different question, so I'm trying

22    to clarify it.

23                   THE WITNESS:  I don't know how

24    to answer a question about somebody's

25    reputation.  It's all over the board.  I mean,

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 84

```
 1     I don't know how to answer that.  How
 2     somebody's reputation could be a threat, I'm
 3     not sure how to answer that.  I mean --
 4     BY MS. DeBRUICKER:
 5          Q.    How about, if you don't stop running
 6     for office, I'm going to attribute statements
 7     on a defamatory website to you?
 8                    MR. KURNICK:  Objection, calls
 9     for speculation, calls for a legal conclusion.
10                    MR. PODRAZZA:  Counsel, you
11     really are going beyond ridiculous at this
12     point.  Can we move on?
13                    MS. DeBRUICKER:  If I can get
14     an answer, we can move on.
15                    MR. PODRAZZA:  First off, he's
16     a fact witness.  You didn't notice him to be an
17     expert and yet you still give him expert
18     questions and ask him to answer them, which is
19     completely inappropriate under the Federal
20     Rules.
21                    Second, you just keep getting
22     argumentative with him.  I mean, how's he
23     supposed to know about reputation one way or
24     another when it's a case by case determination?
25     It's a silly line of questioning that's just
```

1    eating up ungodly amounts of time, as you did

2    in the first deposition with Mr. Kieffer.  Very

3    unhelpful and very unproductive to the

4    resolution of the case, which is

5    straightforward.

6                    THE WITNESS:  As far as

7    posting stuff on a website and threatening

8    stuff like -- that's a whole other issue

9    dealing with social media and stuff.  I don't

10   know much about how to speak to what somebody

11   puts on social media may entail.

12   BY MS. DeBRUICKER:

13       Q.    Mr. Kieffer reports that, Brother

14   McConnell said that the only thing that could

15   have been taken as intimidation was Business

16   Manager Dougherty said, if you lose the

17   election, it could be a long three years.

18           Do you see that?

19       A.    Yes.

20       Q.    Do you have any information as to

21   what that meant?

22       A.    No, I do not.

23       Q.    And Mr. McConnell reported, not

24   knowing exactly what that meant, it made him

25   reconsider running for office.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1              Do you see that?

2         A.    Yes, I see that.

3         Q.    So according to Mr. Kieffer,

4    Mr. McConnell said that Mr. Dougherty's

5    statement was that if you lose, it could be a

6    long three years, and that made him change his

7    mind about running.  Was that your

8    understanding?

9         A.    I guess it was part of the

10   understanding, I guess.  Is that the final

11   thing, I guess.  I guess they had a

12   conversation and stuff.  I don't know how that

13   capped all the stuff that was transpiring in

14   the meantime --  you alluded to 45 minutes, so

15   I don't know what else -- did something else

16   change his mind?  I don't know.

17        Q.    Mr. Kieffer reports that

18   Mr. McConnell reported that Dougherty spoke

19   with Brian Eddis and Jim Ryan and discouraged

20   them in a conference call regarding Tim

21   McConnell running for e-board and how that may

22   not be good for the local union.

23             Do you see that?

24        A.    Where your cursor's moving around

25   now?

1       Q.      Yes.

2       A.      Okay.  Yes, I see it.

3       Q.      Did that raise any concerns for you,

4    if Dougherty contacted other people to

5    discourage Mr. McConnell from running?

6       A.      I think it all boils down to, at the

7    end of this when I think Mr. Kieffer, you know,

8    tried to see if he would be willing to come

9    forward.

10              Mr. McConnell, basically, said he

11   didn't want anything brought up, at all.  He

12   didn't want it brought up, he didn't want his

13   name mentioned, he didn't want to file any

14   complaints.  So, basically, this piece of it

15   didn't go any further either.

16      Q.      Why was that the end of it?

17      A.      Because Mr. McConnell did not want

18   his name used at all.  He didn't want it

19   brought up at all, he didn't want to press any

20   type of charges.  He didn't want to pursue it

21   any further.

22      Q.      So if there's some evidence that

23   union conduct may have influenced the outcome

24   of an election in causing someone not to run,

25   if that member doesn't want to pursue it, does

1    that mean there's no violation?

2         A.    I don't know because I don't know

3    what all else he might have had.  I don't know

4    what type of protest or complaint or charge he

5    might have risen.  If he wasn't going to -- if

6    he wasn't willing to substantiate or bring them

7    to light, there's no way for us to make him do

8    it.

9         Q.    And if there's conduct of concern,

10   but the member doesn't want to file a formal

11   protest, is that the end of the matter?  Does

12   IBEW investigate no further?

13                   MR. KURNICK:  Objection.

14   Calls for an inadmissible opinion and

15   speculation by the witness.  Mike, you can

16   answer.

17                   THE WITNESS:  I mean, we work

18   off of, if somebody doesn't want to press

19   charges or somebody wants to remain anonymous,

20   we try to live up to that and honor their

21   request or wishes.  So if that person is not

22   going to come forward, there's no way for us to

23   go on it just by what he said.  I mean, he has

24   to be willing to stand up and, you know,

25   substantiate the claims he's making.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    BY MS. DeBRUICKER:

2         Q.    Did you make any inquiry with

3    Mr. Dougherty as to whether he had a

4    conversation with a member along these lines?

5         A.    No, we did not, because,

6    Mr. McConnell did not want his name brought up

7    at all, he did not want anything to get back to

8    anybody.  He just wanted to drop the whole

9    issue.  He didn't want anything to do with it.

10        Q.    Did you have any reason to believe

11   that the conduct described by Mr. McConnell

12   didn't happen?

13        A.    I guess I didn't have any reason to

14   think it did or did not happen.  Unless

15   somebody is willing to put it in writing or

16   summarize it by writing, and willing to sign

17   off on it, I have no way of knowing whether

18   what they're saying is true or not and not be

19   able to move forward.

20        Q.    Does IBEW have an obligation to

21   investigate potentially problematic conduct?

22             MR. KURNICK:  Objection.

23   Calls for a legal conclusion by the witness.

24   Mike, you can answer.

25             THE WITNESS:  Usually, we

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    operate of off, if somebody has an issue, we
 2    ask them to reduce it to writing and send it in
 3    and then we'll review it and look into it.
 4              It's up to the individual member to
 5    bring it to our attention and ask for us to
 6    look into it or pursue it.
 7    BY MS. DeBRUICKER:
 8         Q.    I'm going to show you what we'll
 9    mark as Welsh No. 5, I believe.
10              (Deposition Exhibit No. 5 was
11    marked for identification.)
12         Q.    And I'll just scroll through the
13    first page here, Mr. Welsh.  Do you recognize
14    this document?
15         A.    Oh, yes.  Yes.
16         Q.    What is that document?
17         A.    That's my answer back to his
18    election protest.
19         Q.    Did you prepare this letter?
20         A.    Yes.
21         Q.    Did anyone else have a role in
22    drafting or preparing this letter?
23         A.    Probably my construction rep in the
24    office would help.  We'd put a draft together
25    -- you know, we'd talk and then we'd put the
```

1    draft together and then I review it and make

2    any necessary changes if I felt there were

3    changes to be made.

4         Q.    Who is your construction rep?

5         A.    Dennis Affinati.

6         Q.    Did anyone else have input into your

7    draft of this letter?

8         A.    I'm trying to think.  In putting the

9    letter together, no.

10        Q.    Did you review this letter in

11   preparation for today?

12        A.    I looked at it, yes.

13        Q.    And you kind of break issues down by

14   number.  No. 1 looks like it address the

15   nomination notice.  You write that, Mr. Battle

16   alleges that Local 98's election notice was

17   unlawfully vague and did not provide specifics

18   with respect to seconding or nominating.

19             Do you see that?

20        A.    Yes.

21        Q.    I'm going to flip back to

22   Mr. Battle's protest which attached a copy of

23   the election notice.  Do you see that?

24        A.    Yes.

25        Q.    I'll direct your attention to the

```
1    center paragraph.  It says, nominations shall

2    take place on June 9, 2020 beginning at 7 p.m.

3    The acknowledgement of willingness to be

4    nominated for office must be received by the

5    union no later than 5:00 p.m. on June 9, 2020.

6              Do you see that?

7         A.   Barely.  It's pretty small.

8         Q.   Sorry.  Trying to save time.

9         A.   Thank you.

10        Q.   Does the notice indicate anything

11   about whether a union member can nominate

12   themselves?

13        A.   No.  I don't see anything in that

14   paragraph.

15        Q.   Does it say anything about whether

16   nominations must be seconded?

17        A.   No.

18        Q.   Did the notice say anything about

19   the nominations must be made in person?

20        A.   It says on there, if you're unable

21   to apply in person, then you can -- I'm looking

22   at the wrong thing.  I'm sorry.  It would give

23   the opportunity to mail in.

24        Q.   Does it is say anything about mail?

25        A.   Acknowledgment and willingness to be
```

```
 1    nominated must be received by -- well, I guess

 2    it wouldn't have to be mailed then.  It could

 3    be dropped off, too.

 4         Q.    Did you determine that the notice

 5    met the requirements of the IBEW constitution?

 6         A.    Yes.  But I didn't have any input

 7    into how they did the nomination letter.

 8         Q.    Understood.  You were just reviewing

 9    the notice; correct?

10         A.    Correct.

11         Q.    Because Mr. Battle indicated that he

12    thought the notice was confusing; is that

13    right?

14         A.    Correct.

15         Q.    And said it didn't say anything

16    about the need for nominations -- or the need

17    for someone else to nominate you or the need

18    for someone to second that; correct?

19         A.    Correct.

20         Q.    If seconds -- if a member couldn't

21    nominate themselves, the notice could have

22    said, but it didn't -- the notice could have

23    indicated that nominators and seconders were

24    required; correct?

25                    MR. KURNICK:  Objection.
```

```
 1    Calls for speculation, inadmissible opinion.

 2    The notice could have included an infinite

 3    number of things.  And I'm not sure it makes

 4    sense to ask him what it could have included.

 5    BY MS. DeBRUICKER:

 6         Q.    You indicated you disagreed with

 7    Mr. Battle's confusion about the notice; is

 8    that correct?

 9         A.    Correct.

10         Q.    Did you make a determination as to

11    whether Mr. Battle's perception of the notice

12    was reasonable, even if you disagreed with him?

13         A.    I'm not sure I understand your

14    question.

15         Q.    Could you understand how Mr. Battle

16    could be confused by the notice?

17         A.    I guess anybody could be confused

18    about a notice or anything.  Usually, if

19    somebody is confused, you might ask a question,

20    could you clarify, please.

21         Q.    And who is Mr. Battle supposed to

22    ask if he had a question?

23         A.    Whoever was conducting the

24    nominations.

25         Q.    And who was that?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1        A.     I'm not exactly sure who was

 2   conducting.  It would, normally, be the

 3   president conducting the nominations.

 4        Q.     Did you know whether anyone was

 5   there the night of the nominations for

 6   Mr. Battle to ask questions to?

 7        A.     I'm assuming that all the officers

 8   were probably present.

 9        Q.     Do you have any information to that

10   one way or the other?

11        A.     It was nominations night, so you

12   assume that most of the officers would be at

13   the nomination meeting.

14        Q.     Again, you're assuming?  You don't

15   have that information?

16        A.     No.

17        Q.     No. 2, you contend that Local 98's

18   form required you to list a member who would

19   nominate you and another member would second.

20             Mr. Battle indicated that it was

21   unclear to him who he needed to sign the form.

22             Does confusion over what the form

23   requires concern you?

24             MR. KURNICK:  I'm sorry.  I

25   didn't hear the question.  Could you repeat it,
```

1     please?

2                    MR. PODRAZZA:  Is that

3     question assuming that there's actual confusion

4     or just claimed confusion?

5     BY MS. DeBRUICKER:

6          Q.    In your review of a protest alleging

7     confusion over the elections process, does what

8     matter is the protester's confusion or whether

9     or not you're confused?

10                    MR. KURNICK:  Again, I'm

11    sorry, but I didn't hear the last few words.

12    BY MS. DeBRUICKER:

13         Q.    In your review of an election

14    process that alleges that a process was

15    confusing, does what matter is the protester's

16    confusion or whether you considered the process

17    confusing, Mr. Welsh?

18         A.    I'm not at nominations, so it would

19    have to be the member being confused, I guess,

20    would be the issue, not me being confused.

21         Q.    So if a member has legitimate

22    confusion about a process, what does the IBEW

23    do?

24         A.    If he would have asked a question

25    and gotten an unclear answer, or somebody told

1    him something wrong, then we would have

2    probably had that as part of his charges here.

3    And then we would have looked into it and

4    addressed it.  But in his charges, he was just

5    saying he appeared to be confused and didn't

6    ask anybody for clarification.

7         Q.    And is there a requirement that he

8    ask for clarification?

9         A.    I can only set myself in there

10   personally.  I mean, if I'm not clear on

11   something and something is going on, I'll ask a

12   question.

13        Q.    Who must he ask the question to?

14        A.    I would ask one of the officers who

15   was present, probably the president.  I would

16   ask the president.

17        Q.    I'm not asking what you would do,

18   I'm asking what he must do in order to satisfy

19   the requirement.

20        A.    He would have to ask one of the

21   officers.

22        Q.    Is that made plain to the members at

23   any point?

24        A.    Pardon me?

25        Q.    Is the expectation that they ask one

```
 1      of the officers a question made plain to

 2      members anywhere?

 3           A.    I don't see it anywhere but --

 4           Q.    You just think it's something he

 5      should have done?

 6           A.    I can't use myself again, so, to me,

 7      if a member's is confused, he should ask a

 8      question for clarification.

 9           Q.    And this was a question about the

10      form that he had filled that he turned in to

11      the local by 5:00 as required?

12           A.    We weren't aware that he turned

13      anything in.  We were told that he took the

14      paperwork back to the car, so we didn't know

15      until after the fact that he actually turned

16      anything in.

17           Q.    We heard testimony yesterday that,

18      as of 5:00, there was nobody working the tables

19      and Ms. Chupka had to be called over in order

20      to answer Mr. Battle's questions; were you

21      aware of that?

22                 MR. PODRAZZA:  That's

23      counsel's interpretation of the testimony.  So

24      he'll just have to accept what she's saying,

25      it's not necessarily reflective of what was
```

Page 99

1    actually testified to.

2              THE WITNESS:  Just what he put

3    in his complaint, that she was present and that

4    she went back to ask somebody.  I wasn't aware

5    of any -- you're saying the reason he went back

6    to his truck is because nobody was there?

7    BY MS. DeBRUICKER:

8         Q.   I said nothing about his truck.  I

9    said he went to the nomination site and there

10   was no one there to answer his question.

11             Did you have that information when

12   you decided Mr. Battle's protest?

13        A.   That there was nobody at the -- the

14   information that Tara Chupka -- she was there

15   with the forms handing them out as people came

16   in.

17        Q.   Is that your understanding of what

18   the circumstances were?

19        A.   Yes.

20        Q.   Because Ms. Chupka testified

21   yesterday that she took forms over there only

22   after Mr. Battle showed up and asked for them.

23        A.   Okay.

24             MR. KURNICK:  I don't believe

25   that's a question.  So Mike, there's no reason

Page 100

1    to answer.

2    BY MS. DeBRUICKER:

3        Q.    Did you determine whether someone

4    was at the site for someone to ask questions to

5    when you decided Mr. Battle's protest?

6        A.    There were people at the site that

7    if he had a question, he could ask, yes.

8        Q.    You determined that there were

9    people there that he could ask questions to?

10       A.    The officers would be there that he

11   could ask questions to, yes.

12       Q.    My question is, did you determine

13   whether there, in fact, were people there that

14   he could ask questions to?

15       A.    I didn't determine who,

16   specifically, was there.  No, I did not.

17       Q.    And he indicated he asked a question

18   to Ms. Chupka, and even she didn't know the

19   answer, she had to call someone else.  Did you

20   understand that?

21       A.    Yes.

22       Q.    You go on to describe, in No. 5, a

23   member that was going to nominate you that was

24   intimidated out of doing so.

25            Did you do any investigation into

1    this allegation?

2         A.    No, I did not do any additional --

3    just off of what Mr. Battle said is who

4    Mr. Kieffer reached out to.

5         Q.    You indicate, on the second line of

6    Paragraph No. 5, this allegation is without

7    evidence.

8              Did IBEW seek any other evidence?

9         A.    No.

10        Q.    Did you review the sign that was

11   posted on the door at the nomination site in

12   connection with your decision with Mr. Battle's

13   protest?

14        A.    Yes.  He included it with his

15   protest.

16        Q.    And did Mr. Battle indicate he found

17   the sign confusing?

18        A.    In his protest, he did say it was

19   confusing to him.

20        Q.    Did you determine that that sign

21   could have been interpreted the way that

22   Mr. Battle did?

23        A.    I didn't.  But, you know -- but I

24   can't speak for him.

25        Q.    Did you determine whether

Page 102

```
 1    Mr. Battle's interpretation of the sign was a
 2    reasonable one?
 3         A.    I guess it could be for him.  I
 4    mean, at the time, with the pandemic, some of
 5    the requirements, rooms had to be limited to
 6    size.  So I can understand why the poster was
 7    there to limit the number of people in the
 8    meeting room.
 9         Q.    And if it was confusing for him,
10    wasn't that enough?
11              MR. KURNICK:  Objection.
12    First of all, it's argumentative, it calls for
13    speculation and an inadmissible opinion, and a
14    legal opinion, now that I think of it.  So it's
15    problematic for all sorts of reasons.  Mike,
16    you can answer the question.
17              THE WITNESS:  Okay.  I'm
18    sorry.
19              To me, it looked like the maximum
20    number of people that one person could have
21    brought along, not saying that you had to have
22    -- all three of those people must be present.
23    It was just, that's who it was going to be
24    limited to.
25         Q.    Did you determine Mr. Battle's
```

```
 1    interpretation of the sign to be a reasonable

 2    one, even if you came to a different

 3    interpretation?

 4         A.    I can't speculate on what he

 5    thought.  I mean, I didn't see it as confusing.

 6    I understand maybe he could have.  I don't

 7    know.

 8         Q.    But because you didn't find it

 9    confusing, you denied his claim on that issue;

10    is that right?

11         A.    Correct.

12         Q.    So if you don't find it confusing,

13    does it matter whether the member found it

14    confusing?

15              MR. KURNICK:  Same objection.

16    It's argumentative at this point.  And you are,

17    ultimately, asking him for concession on a

18    legal issue.  You're asking for a legal opinion

19    from him on what matters and what the standard

20    is for finding a violation of the LMRDA.

21              MS. DeBRUICKER:  Because he's

22    the one who has to make that determination.

23    It's a fair question.

24              MR. KURNICK:  But he doesn't

25    make legal decisions.  He's not a lawyer, and
```

```
 1    you're asking him for a legal opinion.  I don't
 2    mean to be difficult, but I have to raise these
 3    objections.
 4                    MS. DeBRUICKER:  I'm asking
 5    him the basis for his determination of the
 6    protest on the various points that are
 7    addressed here.
 8                    MR. PODRAZZA:  Well, why don't
 9    you just have him read the page then?  He puts
10    his full explanation out there.  What more is
11    there?  He's written it, it's right there.  It
12    speaks for itself.
13    BY MS. DeBRUICKER:
14        Q.    By the time you wrote this letter,
15    you had received Mr. Kieffer's report of his
16    conversation with Mr. McConnell; correct?
17        A.    Correct.
18        Q.    And there's no mention of
19    Mr. McConnell, as far as I can tell, in your
20    decision letter; is that correct?
21        A.    Not by name.  Right.
22        Q.    Do you mention him in any other way?
23        A.    In No. 5 there, we addressed that
24    there was supposedly somebody else who was
25    going to be nominated.
```

1       Q.    You indicate, Representative Kieffer

2   did speak to a member who said that he had

3   contemplated running for office.

4             Is that what you're referring to?

5       A.    Correct.

6       Q.    And did you determine that the

7   conduct that Mr. McConnell described was not of

8   concern?

9       A.    I didn't say that.  He didn't want

10  us to pursue it.  So that's why.  We honored

11  his request not to pursue anything.

12      Q.    So even if it was of concern, you

13  wouldn't have pursued it because he asked you

14  not to?

15      A.    Correct.

16      Q.    In Paragraph 6, you address

17  allegations relating to Business Agent Bark.

18  Did you base your determination on the

19  information reported by Mr. Kieffer?

20      A.    Correct.

21      Q.    Do you know why Mr. Bark came to

22  Mr. Battle's house on the first occasion?

23      A.    No, I don't know why.

24      Q.    Do you know why Mr. Bark came to

25  Mr. Battle's house on the second occasion?

1          A.     No, I don't know why.

2          Q.     When he came to Mr. Battle's house

3     on the second occasion, do you know the timing

4     of that visit with respect to the nomination?

5          A.     Not at the time.

6          Q.     Would that have been important to

7     you to determine?

8          A.     I don't know if it would have been

9     important or not because -- I don't know what

10    the conversation was.  I don't know what was

11    going on as far as the conversation they were

12    having.  I don't know.  Mr. Battle alluded to

13    the fact that he didn't know these people, but

14    we, actually, found out he did.  He'd known

15    them for quite a few years.

16         Q.     Did he say he didn't know these

17    people?

18         A.     If you recall, I think back in his

19    complaint he said that he had people show up

20    that he really didn't know or knew vaguely.

21         Q.     I don't recall anything about his

22    degree of knowledge about the people who showed

23    up.  He certainly recognized Agent Bark.

24                Is it your understanding that on

25    both occasions, Mr. Bark showed up uninvited?

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

 1        A.    As far as I know.

 2        Q.    That Mr. Bark, on the first

 3   occasion, didn't even tell Mr. Battle he was

 4   there until he called from his driveway?

 5        A.    Yes.  I guess that's how he noticed

 6   he was there.

 7        Q.    Did you have an understanding as to

 8   whether Mr. Bark's visit was welcomed by

 9   Mr. Battle?

10        A.    I'm sorry.  Could you repeat that?

11        Q.    Did you have an understanding as to

12   whether either of Mr. Bark's visits were

13   welcomed by Mr. Battle?

14        A.    I guess the only way I can know that

15   they're unwelcome is, in his report, he said he

16   asked him to leave, I guess, the second time.

17   So you're asking me, do I know if he was

18   invited to the house, they weren't invited.  I

19   didn't think they were.

20        Q.    But did you determine that because

21   Mr. Battle knew Mr. Bark and Mr. Kee, that

22   these visits were not problematic?

23        A.    Yes.  I didn't think -- correct.

24        Q.    By virtue of the fact that

25   Mr. Battle knew both Mr. Bark and Mr. Kee; is

1    that correct?

2         A.    Correct.

3         Q.    You conclude this paragraph with,

4    you did not find that either Agent Bark or

5    Brother Kee came to Mr. Battle's house to

6    intimidate him into not running for office.

7               Do you see that?

8         A.    Correct.

9         Q.    Does the intent of the actor matter

10   at all in determining whether someone is

11   intimidated?

12               MR. KURNICK:  Objection.

13   Calls for a legal conclusion by the witness,

14   inadmissible opinion, and speculation.  And,

15   Mike, you can answer the question.

16               THE WITNESS:  I guess nothing

17   -- he didn't present anything -- said anything

18   that they were intimidating him other than he

19   was concerned why they showed up.

20        Q.    In deciding the protest that alleges

21   a candidate was intimidated out of running,

22   does it matter to you whether the person whose

23   conduct is an issue intended their conduct to

24   be intimidating?

25        A.    I don't know if that's what they

 1    intended to do or not.  I mean --

 2         Q.    What I'm asking is, does it matter

 3    whether they intended their conduct to be

 4    intimidating?

 5         A.    It would matter.  But if I'm not

 6    mistaken, I think they were -- basically, there

 7    were some issues ongoing for a while where they

 8    were trying to figure out what was up as far as

 9    why he was being upset.  That's what they were

10    being asked, and that's what they went to his

11    house for.

12         Q.    But if I understand your answer, you

13    said it would matter or would not matter

14    whether they intended their conduct to be

15    intimidating?

16         A.    I guess if it could be substantiated

17    that they were trying to be intimidating, it

18    would matter.

19         Q.    Sorry.  I'm just trying to hear you

20    clearly, you're saying it would matter or would

21    not?

22         A.    If the facts could be substantiated,

23    I said it could matter -- or would matter.  I'm

24    sorry.  It could matter depending on taken as a

25    whole.

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 110

```
 1          Q.    Are you aware of the last time
 2    Local 98 had a contested election?  And by
 3    contested, I mean had more than one person
 4    running for a particular office.
 5          A.    I think back in the mid 2000s, they
 6    had one.
 7          Q.    Do you know of other locals who have
 8    contested elections so rarely?
 9          A.    I'm sorry.  Can you repeat that?
10          Q.    Do you know of other locals who have
11    contested elections as rarely as Local 98 does?
12          A.    As rarely are you saying?
13          Q.    Yes.
14          A.    Yes.  Like I said in the beginning,
15    out of all the local we have, there's very few
16    election protests.
17          Q.    My question is, you said it was the
18    early 2000s, the last time Local 98 had a
19    contested election, meaning that more than one
20    person was running for office; do I have that
21    correctly?
22          A.    Oh, you're talking about somebody
23    actually running for office.  I'm sorry.  I
24    thought you meant election protests.
25          Q.    No.  Contested elections, meaning
```

```
 1    elections when more than one person is running

 2    for office.  Does that make sense?

 3          A.    Now, I understand.  We have several

 4    locals that, basically, it's the current group

 5    of officers that get reelected year after year.

 6          Q.    But do they gets reelected with

 7    someone challenging them or do they get

 8    reelected by acclamation?

 9          A.    Many get renominated by acclamation.

10          Q.    We looked at the IBEW constitution

11    which requires that members, in order to be

12    eligible to run for union office, have to be a

13    member in good standing.  Do you recall looking

14    at that language?

15          A.    Yeah.  It's continuous good

16    standing.  Not just good standing, it's

17    continuous good standing.

18          Q.    Does the IBEW impose any additional

19    requirements on candidates to be qualified to

20    seek office?

21          A.    No.

22          Q.    IBEW doesn't require that the

23    candidate be running as part of a ticket to

24    seek office?

25          A.    No.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 112

```
 1          Q.    IBEW doesn't require that a
 2    candidate meet any financial qualifications;
 3    does it?
 4          A.    No.
 5          Q.    They don't have to have a campaign
 6    war chest in order to run for office?
 7          A.    No.
 8          Q.    A candidate doesn't have to have a
 9    dispute with incumbent leadership in order to
10    want to seek office; do they?
11          A.    No.
12          Q.    And having a dispute with the
13    incumbent officers doesn't disqualify a
14    candidate from running for office; does it?
15          A.    Correct.
16          Q.    A candidate doesn't have to have
17    attended a certain number of union meetings in
18    order to run for office; do they?
19          A.    No.
20          Q.    A candidate doesn't have to have
21    attended a certain number of Labor Day parades
22    in order to run --
23          A.    No.
24          Q.    A candidate doesn't have to have a
25    likelihood of winning in order to run for
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

1    office; do they?

2         A.    No.

3         Q.    Did anyone from the government

4    contact you during the period that IBEW was

5    investigating Mr. Battle's protest?

6         A.    I'm sorry.  I'm not exactly -- I had

7    an interview, I guess, with the Department of

8    Labor, but nobody during -- you're talking

9    about leading up to the election or leading up

10   to nominations?

11        Q.    I'm talking about during IBEW's

12   investigation of Mr. Battle's election protest.

13        A.    No.  Nobody contacted us during our

14   investigation.

15        Q.    Did anyone from the government try

16   to influence IBEW's investigation of

17   Mr. Battle's protest?

18        A.    No.

19        Q.    Did anyone from the government try

20   to influence the outcome of IBEW's

21   investigation of Mr. Battle's protest?

22        A.    No.

23        Q.    Do you know who Michael Coppinger

24   is?

25        A.    I know the name, I don't know him.

1        Q.     How do you know the name?

2        A.     It came up in one of the things from

3    the Department of Labor, one of the decisions,

4    or the charges, I should say.  It came up

5    there.

6        Q.     At any point, did you learn of any

7    alleged attempt by Local 98 to pressure Michael

8    Coppinger out of seeking nomination in the

9    June 2020 election?

10       A.     No.  I knew nothing about that.

11       Q.     And if someone had been intimidated

12   out of seeking nomination in the 2020 election,

13   would that be of concern to you or something

14   you would want to investigate?

15                  MR. PODRAZZA:  Objection.

16   Asked and answered multiple times.

17                  THE WITNESS:  If somebody

18   brought a protest to us, we would have

19   investigated the allegations.

20   BY MS. DeBRUICKER:

21       Q.     Would you have investigated if a

22   formal protest had not been brought?

23       A.     We have no way to do that.  I mean,

24   we can't just go out and -- we don't have the

25   subpoena power, whatever, to just start going

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1    out and try to fish for information and stuff
 2    if nobody comes forward and gives us a charge.
 3         Q.    So if you have information but it
 4    wasn't brought to you in the form of a charge,
 5    does that mean you don't investigate it?
 6         A.    As a rule, if nobody's bringing it
 7    to our attention, or if nobody's filing a
 8    charge, we do not.
 9         Q.    And you say, as a rule.  Is there a
10    rule?
11         A.    No.  I'm just stating it as a --
12         Q.    As a common phrase?
13         A.    Yeah.
14         Q.    Understood.  That's why I ask.
15         A.    Okay.
16         Q.    Do you know who Kenneth Rocks is?
17         A.    I've heard the name, but I do not
18    know him.
19         Q.    In what context have you heard the
20    name?
21         A.    Probably going through the office --
22    you know, as far as -- I think he was involved
23    with one of the election protests in the past.
24    So I mean, just in passing.  Like I said, I
25    don't know him.
```

Page 116

1      Q.     And you didn't have any involvement

2   with that past election protest; did you?

3      A.     No.

4      Q.     Did the fact that Mr. Rocks had

5   filed a previous protest, was that something

6   that you considered in your evaluation of

7   Mr. Battle's protest?

8      A.     No.  It had nothing do to with it.

9   I mean, they were two separate cases.

10     Q.     If there have been past allegations

11  of intimidation, could you understand that

12  impacting members currently seeking nomination?

13             MR. KURNICK:  Objection.

14  Calls for speculation.  Calls for an opinion by

15  the witness.  And, Mike, you can answer her

16  question.

17             THE WITNESS:  I guess some

18  people's nature may be.  I don't know.  I mean,

19  if I want to run for office, I'll run for

20  office.  Nobody's going to tell me I can't or

21  whatever.  So I mean, I don't know how people

22  feel.  I can't assume how other people would

23  take it.

24  BY MS. DeBRUICKER:

25     Q.     Did Mr. Battle mention Mr. Rocks

```
 1      during the course of your investigation of his
 2      compliant?
 3           A.    I don't think so.  I don't know if
 4      any -- I don't recall anything.
 5           Q.    Are there things you have learned
 6      since your decision on Mr. Battle's protest
 7      that you think would have been important to
 8      know in your evaluation of his protest?
 9           A.    I mean, some of the stuff came to
10      light as far as different people, but I don't
11      see anything that would really -- how things
12      came out as far as people came to light that
13      they're claiming they're intimidated and things
14      being said.  I don't know if they would've
15      changed anything or not.  I can't say for sure
16      until I took everything in total.
17           Q.    When you say people coming to light,
18      what people are you referring to?
19           A.    Well, you brought up Michael
20      Coppinger.  I guess that was a name that was
21      not being told to anybody, and we found out
22      after the fact.  I don't know if that would
23      have changed anything or not.  I don't know.
24      I'd have to take in everything as a whole.
25           Q.    Would the nomination form that
```

1    Mr.  Battle signed have been something you

2    would have considered important to know during

3    your investigation?

4         A.   I guess -- I don't know if it would

5    be important to know or not, but it would be

6    that -- like I said before, we had to look at

7    how the form was.  It didn't list the

8    nominator.  So I guess that would be still be

9    the same position.  I don't know if -- I don't

10   want to go back into all that again.  I mean,

11   it was a surprise because we didn't know

12   anything was submitted.  But that's just a

13   surprise, I mean.

14        Q.   We've heard information that

15   Local 98 only considered nominations that were

16   made in person the night of the nominations

17   meeting.

18        A.   I'm not aware of that.  Nobody else

19   came forward saying that their nomination was

20   discredited or not allowed.

21             I would assume that if anybody had

22   an issue, that we would have had to hear from

23   it by now or within the 30 days, I should say.

24        Q.   If Local 98 considered only

25   in-person nominations and did not look at any

1   nomination forms at the nominations meeting,

2   would you consider that consistent with IBEW's

3   constitution?

4                      MR. KURNICK:  Objection.

5   Calls for speculation.  Calls for an

6   inadmissible opinion.  Mike, you can answer.

7                      THE WITNESS:  Okay.  Starting

8   to get the hang of this.  I don't know, though.

9   BY MS. DeBRUICKER:

10      Q.    If Local 98 required nominations

11  only be made in person, would that be something

12  that would need to be reflected in their

13  bylaws?

14      A.    Yeah, it should be.  For the most

15  part, I mean, it's there in writing that you

16  can nominate using mail.  I mean, I don't know

17  if they would want to go against that but --

18  I'm sorry.  Maybe better re-ask the question

19  because it didn't look like I was answering

20  what you were asking.

21      Q.    No, you did.  In making decisions on

22  election protests, you make determinations as

23  to what is in compliance with IBEW's

24  constitution and rules and what's not; don't

25  you?

```
 1          A.    Constitution and bylaws.  As you
 2     saw, the bylaws spell stuff out, too.
 3          Q.    But you make a determination as to
 4     whether a particular act of conduct complied
 5     with those constitutions and bylaws or not;
 6     correct?
 7          A.    Correct.  When looking at election
 8     protests, yeah.
 9          Q.    You don't need anybody's approval to
10     make that kind of determination on a protest;
11     do you?
12          A.    No.  I can make it on my own, yes.
13          Q.    At what point did you learn that
14     Mr. Battle had signed a nomination form?
15          A.    I'm trying to think for sure when it
16     was.  I don't know if it was when we received
17     the documents from the Department of Labor.
18     I'm thinking that timeframe there.
19          Q.    What documents did you receive from
20     the Department of Labor?
21          A.    I guess it was the charges from the
22     Labor Secretary against the local.
23          Q.    Mr. Kieffer indicated in his report
24     that the definition of intimidation is
25     subjective.  Do you agree with that?
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 121

```
 1                      MR. PODRAZZA:  I'll object to

 2      that representation because that's not what he

 3      said.

 4                      MR. KURNICK:  You can answer,

 5      Mike.

 6                      THE WITNESS:  Okay.  Yeah.

 7      What's intimidation to me might not be

 8      intimidation to somebody else.  What somebody

 9      else thinks is intimidation, I might not.  I

10      mean, I guess it is subjective.

11      BY MS. DeBRUICKER:

12          Q.    Mr. Kieffer indicated in his report

13      that the claims of intimidation were not

14      clearly proven.  Do you recall reading that?

15          A.    Correct.

16          Q.    And is that the kind of

17      determination that you would expect a

18      representative to make in their investigation?

19          A.    Yeah.  I mean, if he can't conclude,

20      then he has to let me know, here are the facts

21      he found, and there are some things you find

22      that can't be substantiated.

23          Q.    Does IBEW require something be

24      clearly proven?  Is that the standard you

25      evaluate facts under?
```

1      A.      We pretty clearly state -- I mean,

2      you don't want to go out and just ignore

3      things.  I mean, usually, we try and make sure

4      that things are substantiated from the facts we

5      gather.

6          Q.      Whether or not you agreed with him,

7      did you find Mr. Battle interpreted the local's

8      actions as intimidation?

9          A.      I don't know the relationship

10     Mr. Battle has, and I don't know if I could say

11     the actions were intimidating or not.  I don't

12     know the players down there as far as

13     Mr. Battle and how he thinks or anything.  So I

14     can't say that.

15         Q.      Whether or not you agreed with him,

16     could you see how Mr. Battle could have taken

17     the conduct he described as intimidation?

18         A.      I don't know all the things that

19     were presented to him as far as -- cumulative

20     of everything that he's saying, was he

21     intimidated because of the elections?  I don't

22     know.

23         Q.      Did you make a determination as to

24     whether or not Mr. Battle felt intimidated by

25     the conduct alleged?

 1          A.    I'm sorry.  You dropped out there a

 2     little bit.  Could you repeat it?

 3          Q.    Did you make a determination, in

 4     deciding Mr. Battle's protest, whether he

 5     construed the conduct to be intimidation?

 6                    MR. PODRAZZA:  You're asking

 7     this witness to crawl into the mind of Battle

 8     and tell you whether Battle earnestly believed

 9     what he was saying; is that what you're asking

10     this witness to do?

11                    MS. DeBRUICKER:  My question

12     stands.

13                    MR. PODRAZZA:  It's asking for

14     not only conjecture and speculation but

15     impossibility in determining what somebody else

16     thinks.

17                    MR. KURNICK:  Mike, you can

18     answer.

19                    THE WITNESS:  Like I said,

20     what I consider intimidation, what somebody

21     else considers intimidation could be two

22     different things.  We try to look to see, did

23     he substantiate the fact that he was

24     intimidated.  I don't think he did.  So that's

25     why the decision was made the way it was.

1    BY MS. DeBRUICKER:

2         Q.    So you found his claims of

3    intimidation to be unsubstantiated; do I have

4    that right?

5         A.    Correct.

6         Q.    Did you find his claims of

7    intimidation to be not credible?

8         A.    I'm not saying not credible, I'm

9    just saying not substantiated to the fact that

10   he didn't run for office.  I mean, in his eyes,

11   that's what he feels, that he was intimidated,

12   I guess.

13        Q.    Why did McConnell's account not

14   substantiate Battle's claims?

15        A.    Well, McConnell had a little bit

16   different account.  And he, more or less,

17   didn't want any part of being involved with

18   Battle's appeal, protest, or whatever.  I think

19   he made that pretty clear.  He wanted no part

20   of what Battle was presenting.

21        Q.    Right.  But didn't his accounts of

22   his conversations with Mr. Dougherty and

23   conversations with Mr. Eddis and Mr. Ryan,

24   didn't that substantiate Mr. Battle's

25   allegations regardless of whether Mr. McConnell

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1   wanted to be part of it or not?

 2                   MR. PODRAZZA:  This has been

 3   asked and answered.  We've gone over the

 4   Kieffer letter and investigation about what

 5   McConnell said to Kieffer.  And it's not what

 6   you're saying, Counselor.

 7                   MR. KURNICK:  Before you

 8   answer, I also have to mention this objection.

 9   The question is argumentative.  You're saying

10   to him, why wasn't this sufficient, why didn't

11   you do this.  And he's made his decision, he's

12   put his decision in writing.  You know that

13   it's based, as he's testified, entirely on

14   Mr. Kieffer's report.  So he didn't make his

15   own determinations of credibility, other than

16   based on what Mr. Kieffer reported to him.

17                   So to argue now and try to convince

18   him that he was wrong, or that he should have

19   reached a different conclusion would seem to be

20   an improper line of questioning.

21                   MS. DeBRUICKER:  He's

22   testified that he found Mr. Battle's

23   description of being intimidated to be

24   unsubstantiated.

25                   MR. KURNICK:  Yes.
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

```
 1                    MS. DeBRUICKER:  I'm asking
 2      whether Mr. McConnell's account of what
 3      happened to him substantiated any of
 4      Mr. Battle's claims.
 5                    THE WITNESS:  We didn't dig
 6      further.  We didn't substantiate.  Like I said
 7      before, in a couple of different answers
 8      before, it could have been intimidation if we
 9      could have substantiated it.  When people tell
10      you they don't want to be involved, don't use
11      my name, don't bring my name up, I don't want
12      any part of it, I'm not part of his complaint,
13      I'm not part of his protest, I don't want
14      anything to do with it, you honor that person's
15      request.
16                    And then the other two individuals,
17      if they had an issue, they could have come
18      forward and presented the issue just like
19      anybody else can.  They could file an election
20      protest, if that's what they thought it was, or
21      they can file a complaint or charges.  Nobody
22      elected to do that.
23      BY MS. DeBRUICKER:
24           Q.    Did you find Mr. McConnell's account
25      of what happened to him to be not credible or
```

1    did you just not investigate it?

2         A.    He didn't want anything done with

3    it, so it's not about whether it was credible

4    or not.  He chose not to have any -- didn't

5    want to pursue it.  He would have had to say

6    for us to pursue it if he wanted something

7    done, but he didn't.  He made it pretty clear

8    that he didn't want any part of it.  He just

9    wanted out.

10              MS. DeBRUICKER:  I have no

11   further questions.

12              MR. PODRAZZA:  Mr. Welsh, it's

13   been a pleasure seeing you.  Thank you for your

14   time.  I have no questions.

15              MR. KURNICK:  I just have two

16   questions.  It'll take 30 seconds, Mike, I

17   promise.

18              THE WITNESS:  That's okay.

19                   EXAMINATION

20   BY MR. KURNICK:

21        Q.    Do you recall whether, in his report

22   that he submitted to you, Randy Kieffer

23   included a copy of a blank nomination form?

24        A.    Yes, he did.

25        Q.    Okay.  This last point, do you have

1    any personal knowledge about Michael

2    Coppinger's efforts to run for a local union

3    office?

4        A.    No, not at all.

5                    MR. KURNICK:  That's all I

6    have.  Thank you.

7                    THE REPORTER:  Mr. Kurnick,

8    would you like a copy.

9                    MR. KURNICK:  Yes.

10                   THE REPORTER:  Mr. Podrazza,

11   would you like a copy?

12                   MR. PODRAZZA:  I would, yes,

13   please.

14                   (At 6:01 p.m., the deposition

15   was concluded.  Signature was not waived.)

16

17

18

19

20

21

22

23

24

25

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 129

```
 1              C E R T I F I C A T E

 2                      -  -  -

 3              I, Michael Welsh, do hereby

 4    certify that I have read the foregoing

 5    transcript and it is a true and correct copy of

 6    my deposition, except for the changes, if any,

 7    made by me on the attached Deposition

 8    Correction Sheet.

 9

10

11

                 _____
12
                 _____
13               Date

14

15

16

17

18

19

20

21

22

23

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 130

```
 1      ERRATA SHEET                 REASON FOR
        PAGE      LINE         CHANGE/CORRECTION
 2      _____    _____      _____

 3      _____    _____      _____

 4      _____    _____      _____

 5      _____    _____      _____

 6      _____    _____      _____

 7      _____    _____      _____

 8      _____    _____      _____

 9      _____    _____      _____

10      _____    _____      _____

11      _____    _____      _____

12      _____    _____      _____

13      _____    _____      _____

14      _____    _____      _____

15      _____    _____      _____

16      _____    _____      _____

17      _____    _____      _____

18      _____    _____      _____

19      _____    _____      _____

20      _____    _____      _____

21      _____    _____      _____

22      _____    _____      _____

23      _____    _____      _____

24

25
```

Martin J. Walsh, Secretary of Labor v. Local 98, IBEW, 9/9/2021

Page 131

```
 1    COMMONWEALTH OF PENNSYLVANIA        )
                                          ) SS
 2    COUNTY OF ALLEGHENY                 )

 3                    CERTIFICATE

 4        I, Jonathan MacDonald, a notary public in
      and for the Commonwealth of Pennsylvania, do
 5    hereby certify that the witness, Michael Welsh,
      was by me first duly sworn to testify the
 6    truth, the whole truth, and nothing but the
      truth; that the foregoing deposition was taken
 7    at the time and place stated herein; and that
      the said deposition was recorded
 8    stenographically by me and then reduced to
      typewriting under my direction, and constitutes
 9    a true record of the testimony given by said
      witness.

10

          I further certify that I am not a
11    relative, employee or attorney of any of the
      parties, or a relative or employee of either
12    counsel, and that I am in no way interested
      directly or indirectly in this action.

13

          IN WITNESS WHEREOF, I have hereunto set my
14    hand and affixed my seal of office this 23rd
      day of September 2021.

15

16    _____
            Jonathan MacDonald, Notary Public
17               Court Reporter

18

19

20

21

22

23

24

25
```

# Ex. E



DOL_LOCAL 98_00295



IBEW Local 98
Nominations 2020

**The ONLY Members allowed
into the building will be:*

-the Nominated Candidate

-the Member nominating
the Candidate

-the Member seconding the
nomination

*Please see the Door Worker
to be granted access.*

DOL_LOCAL 98_00296

**Ex. F**

# UNION OFFICIAL INTERVIEW QUESTIONNAIRE

## Personal Information

**Name:**   Mr. Brian Burrows

**Address:**   16 Michaelson Drive
Moorestown, NJ 08054

**Phone:**   (215) 588-7470

**Title:**   President

**Time in Current Office:**   12 years

**Length of Union Membership:**   40 years

**Union:**   Electrical Workers Local 98

**Mailing Address:**   1701 Spring Garden Street
Philadelphia, PA 19130

**Phone:**   (215) 563-5592

**Employer:**   Electrical Workers Local 98

**Address & Phone:**   1701 Spring Garden Street
Philadelphia, PA 19130
(215) 563-5592

**Length of Employment:**   23 years

☒ **Full Time Officer**        ☐ **Part Time Officer**

**Interview Date:** September 3, 2020    **Date Drafted:** September 4, 2020    **Date Completed:** September 4, 2020

**Interview Location:** Philadelphia, PA

**By:** Sr. Investigator Nicole Spallino and Investigator Angela B. Menges    **Case File:** 140-6019880 (01)

DOL_LOCAL 98_00436

**Union Officer Positions Held/Dates:**   1990- Local 98 Election Board
1997-2008- Local 98 Training Director for the Apprentice Training
Fund
2008-Present- Local 98 President

**Official Role/Duties in Challenged Election:**
No official role.

**Candidate in Challenged Election:**   ☒ **Yes**          ☐ **No**
**If yes, Office:**   President

## Union Background

| | | | |
|---|---|---|---|
| **Number of Members:** | 4,000 | **Type of Members:** | Dues paying members who would be eligible to participate in the election process. (Retirees and apprentices cannot participate in election process.) |

**Number of Employers:**   Approximately 300

**Major Employer/Locations:**   Shaeffer Electric (unsure of headquarters)
Hatzel & Buehler (nationwide)
Gordon Group (Pennsylvania)

**CBA with Interstate Employer:**   ☒ **Yes**      ☐ **No**

**If yes, Employer:**   The union is a signatory to the "Pen-Del-Jersey" Contractors Association (National Electrical Contractors Association)

| | |
|---|---|
| **Jurisdiction (Geographic/Occupational):** | Members of IBEW Local 98 are employed as electricians in Philadelphia, Montgomery, Delaware, Bucks, and Chester Counties of Pennsylvania. The union's jurisdiction also extends to Allentown, PA. IBEW Local 98 Attorney William Josem indicated during the interview that Local 98 staff members are also Local 98 members. Clerical staff members are members of an OPEIU local. |
| **Union Physical Street Address (location to direct legal documents):** | 1701 Spring Garden Street Philadelphia, PA 19130     **Telephone:**   (215) 563-5592 |
| **Attorney/Firm Address:** | William Josem, Cleary & Josem LLP 325 Chestnut Street Philadelphia, PA 19106     **Telephone:**   (215) 735-9099 |
| **Membership Meetings (Frequency/Location):** | Membership meetings are held the 4th Tuesday of every month at the IBEW Local 98 union hall for the members designated as "south" members. Local 98 members in the sound and telecommunications division have membership meetings the 2nd Tuesday of each month at the union hall. Members located in the Collegeville, PA area have union meetings quarterly at a building owned by IBEW Local 98 in the Collegeville, PA area. |
| **Executive Board Meetings (Frequency/Location):** | Every Thursday at 4:00 pm at the union hall. After the e-board meeting, at 4:30, the meeting is open to members to bring up concerns to the e-board. |

| Union Governing Documents/Dates: | 1) Bylaws of Local Union 98 International Brotherhood of Electrical Workers, dated 4/17/2020.<br>2) International Brotherhood of Electrical Workers Constitution and Rules for Local Unions and Councils Under Its Jurisdiction, September 2016.<br>3) IBEW Practical & Policy Book |
|---|---|

## Nomination Procedures

**NOMINATION NOTICE**

**Date(s):**  May 18, 2020          **Method(s):**  Mailed to members' home addresses.

**NOMINATIONS**

**Date(s):**  June 9, 2020          **Time:**  7:00 pm          **Location:**  Union Hall
1719 Spring Garden Street
Philadelphia, PA 19130

**Term of Office:**  3 years                    **Number of Positions on Ballot:**  13

**LMRDA Officer Positions:**  President, Vice President, Treasurer, Business Manager/ Financial Secretary, Recording Secretary, Executive Board (5)

**Non-LMRDA Positions:**  ☒ Yes          ☐ No

**If yes, list:**  Examining Board (3)

**Description of Nominating Procedures:**
See narrative for nominating procedures.

**Uncontested Positions:**  ☒ Yes          ☐ No

**If yes, Identify:**  All races were uncontested.

**ELECTION OFFICIALS**

**Names/Telephone:** No election officials were selected because all races were uncontested. If the election was contested, an election board would have been elected at the nomination meeting. The union hired Elections USA to attend their nomination meeting. In the event there was a contested election, Elections USA would have facilitated the election for election board. There were some individuals who campaigned for their positions on the potential election board.

**Selection Method/Date:** n/a

**Other Nomination Information:** See narrative

## Election Mechanics

**ELECTION NOTICE**

**Date(s):** All races were uncontested, therefore the union did not hold an election.    **Method(s):**

**ELECTION TYPE**    ☐ Polls    ☐ Mail    ☐ Polls/Mail Ballot    ☐ Polls/Absentee Ballot

**Regular, periodic election of officers:** ☐ Yes    ☐ No

**POLLS**

**Date(s):**    **Time(s):**    **Place(s):**

**Polling Place Procedures:**

**Mail Ballot Procedures:**

**Campaign Mailings:** ☐ Yes    ☐ No

**Slates:** ☐ Yes    ☐ No

**Details:**

DOL_LOCAL 98_00440

| **Candidate Observers Present:** | ☐ **Polls** | ☐ **Ballot Tally** | ☐ **Ballot Mailing** |
| --- | --- | --- | --- |

**BALLOT TALLY**

**Date:**        **Time:**        **Location:**

| **Date Results Announced:** | **Recount:** ☐ **Yes** ☐ **No** **Date:** |
| --- | --- |

**Other Election Information:**

## Complaint to the Secretary of Labor

**Complainant:**   Charles Battle

| **In Good Standing at Time of Election:** | ☒ **Yes** | ☐ **No** |
| --- | --- | --- |
| **At Time of Complaint to DOL:** | ☒ **Yes** | ☐ **No** |

**If no, explain:**   n/a

**Election Protest/Appeal Constitution Provisions:**

IBEW Basic Laws & Policies, Revised October 2005:

Pre-Election Protest: To the election judge in writing if one has been appointed and then with the appropriate International Vice President in writing. (No time limit stated.) The decision of the International Vice President is final.

Post-Election Protest: To the appropriate International Vice President in writing within 30 days of certification of the election results by the election judge. The decision of the International Vice President is final.

| **Initial Protest To/Title:** | IBEW International Vice President Michael Welsh | **Date:** | June 16, 2020 |
| --- | --- | --- | --- |
| **Union Response:** | ☒ **Yes**    ☐ **No** | **Date:** | July 31, 2020 |
| **Appeal To/Title:** | | **Date:** | |
| **Union Response:** | ☐ **Yes**    ☐ **No** | **Date:** | |

DOL_LOCAL 98_00441

**Complainant properly followed union election protest procedures:** ☒ **Yes** ☐ **No** ☐ **Not Sure**

**If no or not sure, why?:**  n/a

**Interviewee's role in handling the protest:**  None.

**Union Records Provided:**

☒ **Constitution/Bylaws** ☐ **Election Rules** ☒ **Nomination Notice** ☒ **Meeting Minutes**

☐ **Election Notice** ☐ **Mail Ballot Package** ☐ **Ballot** ☐ **Polling Place Records** ☒ **Election Results**

**Other:** 1) "Nomination Slip for Candidates for Office" regarding the IBEW Local 98 2020 Election of Officers.
2) Meeting Minutes- "Notified Meeting for Nominations of Officer- Tuesday, June 9, 2020 7:00 pm"
3) Nomination Forms and meeting minutes regarding the 2017 Nomination of IBEW Local 98 Officers.
4) Several pictures of the nomination meeting room on the day of nominations and the exterior of the union hall on the day of nominations.
5) "IBEW Local 98 Nominations 2020" sign hung on the outside door of the IBEW Local 98 union hall.
6) Nominations Notice and Nomination and Election Notice dated May 18, 2020.

In addition to the information contained in the preceding questionnaire, Mr. Burrows provided the following information in the presence of IBEW Local 98 Attorney Bill Josem of Cleary & Josem and IBEW Local 98 in-house counsel Jack O'Neill:

**<u>Nomination Procedures</u>**

This election cycle was different because usually nominations are held the 1st Tuesday in May and elections are held the last Saturday in June. In light of COVID-19, nominations were postponed. Due to COVID-19, Local 98 reached out to IBEW International Representative Randy Kieffer to determine if any other local in the area held an election. Kieffer advised that IBEW Local 3 in New York, which is five or six times larger than Local 98, was moving forward with their election. Local 98 adopted guidelines pertaining to COVID-19 from Local 3. Local 3's notice and procedures were approved by DOL and the international, so therefore Local 98 followed Local 3's polices. IBEW Local 98's nomination notice must go out 20 days prior to nominations as per Article III, Section 9 of the Local 98 bylaws. The language in the nomination notice was drafted and reviewed by IBEW Local 98 attorneys Jack O'Neill and Bill Josem.

Based on the amount of space in the IBEW Local 98 meeting room, only 50 people at one time were permitted in the room where nominations were held. *(Burrows provided OLMS with pictures of the meeting room. The pictures were taken on the day of the nomination meeting in case the city questioned whether or not the union did anything prohibited according to COVID 19 restrictions).* The union also hired a company called Med Tech to take everyone's

temperatures before entering the meeting room. If more than 50 people would have wanted to participate in the nomination meeting, the meeting would have been conducted in shifts beginning with the line officers. If a member wanted to know if a particular individual was nominated in the first shift/wave of nominations, so that they would not chance running against a friend, they could have just talked to each other between waves.

Since the meeting room space was limited, the union put a sign on the front door of the union hall as well as the back door in the parking lot that only candidates, nominators, and the person seconding the nomination would be permitted in the union hall.

The nomination notice instructed members who were seeking nomination to submit an acknowledgement of willingness to run for office by 5:00 pm on June 9, 2020. This form was not a requirement. If an individual did not fill out this form, they would still be granted entry to the nomination meeting. The acknowledgement of willingness form was so the union did not have over 50 people in the meeting space at one time. There is no particular reason why the nomination form included a line for which office the nominee was seeking.  If a member wishing to be nominated for office did not go to the nomination meeting, the member would still need to have someone go to the meeting for them to make the nomination. Someone has to be present to be nominated.

Self-nominations are permitted. Nomination seconds are not required. There is nothing in the local's governing documents that says seconds are required. The governing documents are silent on self-nominations and Burrows is not aware of any candidate in prior elections who submitted a self-nomination; it may have occurred in the 1990s. Self-nomination is not a past practice of the union. *(Attorney Josem added that there are no governing documents that say you cannot self-nominate. Even OLMS's model nomination notice does not mention self-nominations; the union does not have to include every negative possibility of nomination submissions.)* The nomination form filled out by Complainant Battle alone is not sufficient for a nomination; he would still have to attend the meeting or have someone else go to the meeting for him to submit a nomination. *(Local 98 Attorney Jack O'Neill added that the nomination notice is clear, and that he cannot see the ambiguity of the notice, or think of another way to interpret the notice; the notice lists where, and when the nominations will be. If anyone had questions about the process, they could have asked the union and the union would have made sure they had an answer).*

*Regarding International Representative Kieffer's report specifically Kieffer's statement:*

> *"Brother Battle may have been confused but he could have self-nominated himself on the nomination paperwork or just attended the meeting and nominated himself. If he would have done either he would have been an official candidate for office."*

*Attorneys Josem and O'Neill stated they had not yet seen Kieffer's investigative report.  When asked why if Battle submitted his nomination form as is, why it would not be considered a self-nomination, Attorney Bill Josem stated someone has to be present at the meeting. If a nominee can't be there, the nominee can signify their willingness to run, "it's always been that way."*

*Regarding the IBEW Local Election Guide, Attorneys Josem and O'Neill had never seen this document. When asked specifically about the nomination procedures outlined in this guide, particularly, "Written acceptance of a nomination must be presented at the meeting when nominations are held. Members who are not in attendance can make or accept nominations by written letter," and whether or not the nomination form is a letter, the attorneys had different clarifications.*

On the day of the nomination meeting, Battle came into the union hall to fill out the nomination paperwork. Local 98 employee Tara Chupka gave Battle the paperwork. He told Chupka that the person who was going to nominate him had not arrived yet. Chupka told Battle that was okay, and that his paperwork would be here. *(Attorney Josem added, just because someone turned in the nomination slip, does not mean they would end up being nominated.)*

Burrows would not allow Battle to review the nomination slips already filled out by other individuals because the union has never allowed anyone in the past to see the forms.  Burrows did not review the forms for himself, and does not know if any other incumbent officer reviewed the forms prior to the nomination meeting.  *(Attorney Josem added that people should learn at the same time who is running for office.)*

Burrows believes that Local 98 Sergeant-at-Arms Rodney Walker maintained the forms because he eventually came up with a list of individuals for the nomination meeting. Burrows has historically filled out nomination forms prior to the meeting for himself just in case there was an emergency and he could not make it to the nomination meeting. For every nomination meeting, there have always been forms for someone who is unable to make the nomination meeting. If a member couldn't make it to the nomination meeting, they'd fill out the form. *(Attorney Josem added, that this was not unusual, you can either nominate yourself, or have someone else nominate you. OLMS further asked, "If someone cannot make it to the meeting, or find someone to nominate them at the meeting, then they are screwed?" Josem said "yeah, or ask us what to do.")*

*Attorney Jack O'Neill added that Complainant Battle has a chip on his shoulder because his son-in-law was not able to get into the union after failing a drug test. There is no secret that Battle just wants to cause havoc in the union. Attorney Josem added that he (Josem) finds Battle's protest to be disingenuous based on what he read in the protest and the international's response. Josem questions why Battle was at the nomination meeting if his nominator bailed out one hour before the meeting and he thought he could not self-nominate. O'Neill explained that Complainant Battle created a website that published "awful things" about the Local 98 office staff. The website postings were involving sexual and criminal allegations. Some office staff members are pursing individual defamation lawsuits. Local 98 is also a party to the lawsuit against Battle.  The union knows it was Battle who created the website because it was revealed during the discovery portion of the lawsuit.  The company that created the website and hosted it for Battle turned him over as part of the discovery process.  The attorney for the Battles*

*contacted the newspaper to get his name in the press. The paper called Local 98 for comment, but union officials declined to comment.*

Burrows has "no idea" who was supposed to nominate Battle. Burrows saw Battle standing with four or five other guys in the parking lot on the day of the nomination meeting. Burrows did not know who the guys were. Burrows did not know that Battle had the intention to run for union office prior to the day of nominations. During a membership meeting, Battle said he was not running for union office.

## Alleged Intimidation

Burrows cannot recall if he attended the business agent meeting that took place the day before the nomination meeting. Burrows does not usually attend business agent meetings. Aside from business agents, Business Manager John Dougherty and Local 98 employee Tara Chupka attend business agent meetings. Local 98 Safety Coordinator Mark Lynch would have attended the meeting as well.

Burrows does not have any firsthand information regarding business agents being instructed to dissuade or intimidate any other member from running for union office. Burrows has "no idea" about any reprisal that a member would have received for running for union office. Burrows has no knowledge of Business Agent Bob Bark going to Battle's house the Sunday before the nomination meeting. Burrows referred OLMS to Bark for further information regarding his visit to Battle's home. It is Burrow's understanding that Battle and Bark were friends for years. Burrows has no firsthand knowledge of any reprisal or financial hardship that member/ 2014 Candidate for Executive Board Ken Rocks, allegedly received for running for union office in 2014. When asked about a $50,000 fine imposed on Ken Rocks that was later dismissed by the international union, Burrows could not recall if that happened but stated it had nothing to do with Rocks running for office. *(IBEW Local 98 Attorney Josem added that members are brought up on all sorts of charges for various violations of the union's membership, such as working on non-union jobs, and some have been fined up to $100,000.)* As far as Burrows is aware, Rocks has never had a problem working.

Burrows was contacted by an official of the IBEW international informing him of the receipt of Battle's protest, but not for an interview. Burrows does not know if Business Manager Dougherty was contacted by the international concerning the allegations in the protest.

## Changes to IBEW Local 98 Bylaws

In 2015, IBEW Local 380 merged with IBEW Local 98 and therefore IBEW Local 98 needed to update their local bylaws. Prior to the December 2019 membership meeting, a notice was mailed to the membership regarding changes to the local's bylaws. During the December 2019 membership meeting, the first reading of the bylaw changes took place. At the January 2020 meeting there was a second reading and a vote to pass the bylaw changes. None of the election

RI – Mr. Brian Burrows
September 3, 2020
Page 11 of 11

procedures outlined in the prior bylaws changed during this update. Copies of the new bylaws were not mailed to the members but are available at the union's financial office and anyone can get a copy upon request.

DOL_LOCAL 98_00446

# Ex. G



Compressed Transcript of the Testimony of
# TARA D. CHUPKA, ESQUIRE, 9/8/21

**Case:** Walsh v. Local 98

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 3

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                     - - -
  MARTIN J. WALSH,      :  CIVIL ACTION
  Secretary of Labor,   :
  United States         :
  Department of Labor,  :
                        :
        Plaintiff,      :
                        :
        VS.             :
                        :
  LOCAL 98, INTERNATIONAL:
  BROTHERHOOD OF         :
  ELECTRICAL WORKERS,   :
                        :
        Defendant.  : NO. 21-CV-96
                     - - -
        Videotaped deposition of TARA D. CHUPKA,
  ESQUIRE, taken at U.S. Department of Justice,
  United States Attorney's Office, 615 Chestnut
  Street, Suite 1250, Philadelphia, Pennsylvania, on
  Wednesday, September 8, 2021, beginning at
  approximately 2:10 p.m., before Robin Frattali,
  Professional Court Reporter and Notary Public in
  and of the Commonwealth of Pennsylvania.
                     - - -
        SUMMIT COURT REPORTING, INC.
    Certified Court Reporters and Videographers
      1500 Walnut Street, Suite 1610
      Philadelphia, Pennsylvania  19102
    424 Fleming Pike, Hammonton, New Jersey  08037
  (215) 985-2400 * (800) 447-8648 * (609) 567-3315
              www.summitreporting.com
```

| 1 | ALSO PRESENT: |
| 2 | |
| 3 | ANNA LAURA BENNETT, ESQUIRE |
| | Senior Attorney |
| 4 | Division of Civil Rights and Labor Management |
| | Officer of the Solicitor |
| 5 | U.S. Department of Labor |
| | (Present via telephone) |
| 6 | |
| 7 | |
| | JOHN "JACK" O'NEILL, ESQUIRE |
| 8 | Attorney and Chief of Staff |
| | IBEW Local Union 98 |
| 9 | |
| 10 | |
| | SIROD DENNY |
| 11 | Legal Videographer |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 2

```
 1  APPEARANCES:
 2
 3  U.S. DEPARTMENT OF JUSTICE
    UNITED STATES ATTORNEY'S OFFICE
 4  Eastern District of Pennsylvania
    BY:  LAUREN DeBRUICKER, ESQUIRE
 5  Assistant United States Attorney
    615 Chestnut Street
 6  Suite 1250
    Philadelphia, Pennsylvania  19106-4476
 7  (215) 861-8492
    lauren.debruicker@usdoj.gov
 8  Counsel for Plaintiff
 9
10  LAMB McERLANE PC
    BY:  JOSEPH R. PODRAZA, JR., ESQUIRE
11  One South Broad Street
    Suite 1500
12  Philadelphia, Pennsylvania  19107
    (215) 609-3170
13  jpodraza@lambmcerlane.com
    Counsel for Defendant
14
15
    CLEARY, JOSEM & TRIGIANI, LLP
16  BY:  WILLIAM T. JOSEM, ESQUIRE
    325 Chestnut Street
17  Suite 200
    Philadelphia, Pennsylvania  19106
18  (215) 735-9099
    wtjosem@cjtlaw.org
19  Counsel for Defendant
20
21
22
23
24
25
```

Page 4

| 1 | I N D E X | |
| 2 | - - - | |
| 3 | WITNESS: | PAGE |
| 4 | TARA D. CHUPKA, ESQUIRE | |
| 5 | EXAMINATION | |
| 6 | By Ms. DeBruicker | 8,71 |
| 7 | By Mr. Podraza | 64,72 |
| 8 | | |
| 9 | EXHIBITS | |
| 10 | | |
| | | PAGE FIRST |
| 11 | EXHIBIT NO.   DESCRIPTION   REFERENCED |
| 12 | Chupka-1   Nomination Slip for Candidates   43 |
| | for Office, Bates stamped |
| 13 | DOL_LOCAL 98_00298 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1 (Pages 1 to 4)

Page 5

DEPOSITION SUPPORT INDEX

DIRECTIONS NOT TO ANSWER:
PAGES:    None

REQUESTS FOR DOCUMENTS OR INFORMATION:
PAGES:    None

STIPULATIONS AND/OR STATEMENTS:
PAGES:    6

CERTIFIED QUESTIONS:
PAGES:    None

Page 6

1     MR. PODRAZA:  I represent the
2   witness.  We will read and sign, and we'll
3   take copies of the videotape, as well, and
4   the transcript as well.  Might as well get
5   that out of the way.
6            - - -
7     (By agreement of counsel, the
8   sealing, certification and filing are
9   waived; and all objections, except as to
10   the form of the question, are reserved
11   until the time of trial.)
12            - - -
13     THE VIDEOGRAPHER:  This is
14   media number one for the videotaped
15   deposition of Tara Chupka in the matter of
16   Martin J. Welsh, Department of Labor,
17   Plaintiff, versus the International
18   Brotherhood of Electrical Workers, Local 98,
19   Defendants, being heard before the United
20   States District Court for the Eastern
21   District of Pennsylvania, Civil Action
22   number 21-CV-96.
23     This deposition is being held
24   at the United States Attorney's Office,
25   Eastern District of Pennsylvania, 615

Page 7

1   Chestnut Street, Suite 1250, Philadelphia,
2   Pennsylvania 19106.  Today's date is
3   September 8th, 2021, and the time on the
4   video record is 2:13 p.m.
5     My name is Sirod Denny and I am
6   the videographer.  The court reporter is
7   Robin Frattali.
8     Counsel, will you please
9   introduce yourselves and affiliation and the
10   witness will be sworn.
11     MS. DeBRUICKER:  Lauren
12   DeBruicker, Assistant U.S. Attorney, for the
13   Secretary of Labor.
14     MR. PODRAZA:  Joe Podraza on
15   behalf of defendant IBEW Local 98, and also
16   representing the witness for today, and with
17   me is Bill Josem.
18     MR. JOSEM:  Bill Josem, also
19   representing defendant.
20            - - -
21     TARA D. CHUPKA, ESQUIRE, having
22   been first duly sworn to tell the truth, was
23   examined and testified as follows:
24            - - -
25     EXAMINATION

Page 8

1   BY MS. DeBRUICKER:
2     Q.   Good afternoon, Ms. Chupka.
3     A.   Hi.
4     Q.   We spoke when you came in.  I'm Lauren
5   DeBruicker.  I'm the attorney for the Secretary of
6   Labor in a civil action that the Secretary of
7   Labor has brought alleging that Local 98 violated
8   the Labor Management Reporting and Disclosure Act
9   of 1959 in connection with its June 2020 officer
10   elections.
11     Have you ever been deposed
12   before?
13     A.   Not that I can recall.
14     Q.   Okay.  Have you ever taken a
15   deposition before?
16     A.   No, I have not.
17     Q.   Have you ever defended a deposition
18   before?
19     A.   No.
20     Q.   I expect your counsel has given you
21   sort of the run-down as to how these things work.
22   We do have you on video.  We have our court
23   reporter here, all to take down on record what we
24   say.
25     The goal is to have a clear

**Walsh v. Local 98**                                    **TARA D. CHUPKA, ESQUIRE, 9/8/21**

Page 9

1  record of my questions and your answers, and so to
2  that end, it's important that you listen to my
3  whole question before you answer, and I'll do my
4  best to listen to your whole answer before I ask
5  my next question.  Okay?
6      A.   Thank you.
7      Q.   If you don't understand my question,
8  will you let me know?
9      A.   Yes.
10     Q.   Okay.  And if you don't hear my
11 question, will you let me know?
12     A.   Yes.
13     Q.   Very good.
14          Again, all in the interest of
15 having a clear record, and if you answer my
16 question, I'll assume that you both heard it and
17 understood it.  Okay?
18     A.   Yes.
19     Q.   Did you do anything to prepare for
20 this deposition today?
21     A.   I met with my attorney last week.
22     Q.   Okay.  And who was that attorney?
23     A.   Joe Podraza.
24     Q.   Did you meet with anyone else?
25     A.   No.

Page 10

1      Q.   Did you review any documents to
2  prepare for today?
3      A.   Yes.  I reviewed my interview from the
4  original DOL interview in 2020 sometime.
5      Q.   Did you review anything else?
6      A.   No.
7      Q.   Did you review any of the transcripts
8  of the depositions that have been taken in this
9  case so far?
10     A.   No.
11     Q.   Is there any reason why you wouldn't
12 be able to provide complete and truthful testimony
13 today?
14     A.   No.
15     Q.   No family issues distracting you?  No
16 medications that might affect your ability to
17 recall facts or speak accurately?
18     A.   No.
19     Q.   We have to ask the questions.  They're
20 awkward.
21          THE REPORTER:  I didn't hear
22     you, Lauren.
23 BY MS. DeBRUICKER:
24     Q.   We have to ask the questions, they're
25 awkward, so I apologize.

Page 11

1          THE REPORTER:  Thank you.
2  BY MS. DeBRUICKER:
3      Q.   Are you a member of Local 98?
4      A.   Yes.
5      Q.   How -- when did you become a member of
6  Local 98?
7      A.   I believe I became a member of
8  Local 98 in approximately 2013.
9      Q.   Are you currently employed by
10 Local 98?
11     A.   Yes.
12     Q.   What is your current position at
13 Local 98?
14     A.   In-House Counsel.
15     Q.   And how long have you held that
16 position?
17     A.   Approximately 2013.
18     Q.   Do I take it that you became a member
19 about the time that you were hired for Local 98?
20     A.   No.
21     Q.   Help me understand that.
22     A.   I have been working for Local 98 in
23 some capacity since I was 16, 17, and in 2013 was
24 when I became In-House Counsel.
25     Q.   I see.

Page 12

1          And did you become a member
2  about the time that you became In-House Counsel?
3      A.   Approximately about that time frame.
4      Q.   When -- about what year did you first
5  start working for Local 98?
6      A.   I'm thirty-seven.  20 years ago.
7  2001, give or take, approximately.
8      Q.   And I don't want to dwell on it too
9  much, but can you give me a sense of when you
10 started for Local 98, what was your position?
11     A.   Sure.  In the beginning, when I
12 started working for Local 98, it was a strictly
13 clerical role.  I likely held that clerical role
14 until approximately 2006.
15     Q.   And in 2006, did you take on another
16 position for --
17     A.   I would --
18     Q.   -- Local 98?
19     A.   I would say that I was -- I moved from
20 clerical to Executive Assistant to the Business
21 Manager.
22     Q.   And who was the Business Manager at
23 that time?
24     A.   John J. Dougherty.
25     Q.   And it's my understanding that he has

3  (Pages 9 to 12)

**Walsh v. Local 98**                          **TARA D. CHUPKA, ESQUIRE, 9/8/21**

| Page 13 | Page 15 |
|---|---|
| 1   been Business Manager since that time, correct? | 1   How far down and how much more questioning |
| 2     A.   Yes. | 2   do you have on this? |
| 3     Q.   So you became Executive Assistant to | 3     MS. DeBRUICKER: I'm going to |
| 4   the Business Manager around 2006. | 4   keep asking my questions, and the faster I |
| 5     A.   Yes. | 5   can do that, the faster we'll get out of |
| 6     Q.   At some point did you take on another | 6   here. |
| 7   position? | 7     MR. PODRAZA: Well, then I'll |
| 8     A.   I attended Temple Law in the evening, | 8   do some instructing. |
| 9   and I passed the bar exam in 2013. After passing | 9     Go ahead. |
| 10   the bar exam, around that time period, I had took | 10     THE WITNESS: Could you repeat |
| 11   on more of a legal role and would say In-House | 11   the question? I apologize. |
| 12   Counsel. | 12   BY MS. DeBRUICKER: |
| 13     Q.   Would you describe yourself as having | 13     Q.   You -- you describe your role as -- as |
| 14   done legal work for Local 98 prior to becoming | 14   sort of mixed. Could you give us sort of a rough |
| 15   In-House Counsel? | 15   percentage of what you would describe as your sort |
| 16     A.   No. | 16   of purely legal work, as opposed to other work |
| 17     Q.   And can you sort of give me a job | 17   that you do in your position? |
| 18   description of what you do as In-House Counsel. | 18     A.   I honestly wouldn't feel comfortable |
| 19     A.   I consider myself one of the liaisons | 19   putting a percentage on it. It's something that |
| 20   between our outside counsel and our building. | 20   could change literally day-to-day, hour-to-hour, |
| 21     Q.   When you say "building," what do you | 21   and I don't really keep track in my own head. |
| 22   mean? | 22     Q.   In your role at the Union, do you have |
| 23     A.   Excuse me. The Union, itself. | 23   occasion to use or refer to the Labor Management |
| 24     Q.   Okay. And as a -- as a liaison, can | 24   Reporting and Disclosure Act of 1959? |
| 25   you tell me what that means. | 25     A.   I am aware of it. I have likely read |

| Page 14 | Page 16 |
|---|---|
| 1     A.   Sure. I assist both our President and | 1   it in its entirety once. However, I could not |
| 2   our Business Manager in any issue that may come | 2   quote it. |
| 3   up, small, large. I couldn't even really give you | 3     Q.   Okay. I'm going to refer to it as the |
| 4   an example because it could be anything. | 4   LMRDA. Okay? |
| 5     I also assist in just a general | 5     A.   That's fine. |
| 6   role at the Union of having been there for a very | 6     Q.   Okay. If that's a fair request. |
| 7   long time, so I tend to know where things are, | 7     Would you say that the LMRDA is |
| 8   what things are, to a point. | 8   not something that you sort of typically refer to |
| 9     Q.   Okay. Would you describe your role | 9   in your day-to-day work at the Union? |
| 10   as -- as purely legal, or are you sometimes | 10     A.   It is not. |
| 11   providing sort of other kinds of work and support? | 11     Q.   In your work at the Union, in your |
| 12     A.   I would say that it's a mixed role. | 12   role as -- as counsel, have you provided legal |
| 13     Q.   And if it's a mixed role, could you | 13   advice to Local 98 relating to its June 2020 |
| 14   sort of give me a percentage, roughly, as to how | 14   officer election? |
| 15   much you would sort of describe as purely legal | 15     A.   No. |
| 16   and how much -- | 16     Q.   In your role at the Union, have you |
| 17     MR. PODRAZA: Counsel, how | 17   provided legal advice to Local 98 regarding the |
| 18   far -- | 18   nominations process for the June 2020 election? |
| 19   BY MS. DeBRUICKER: | 19     A.   No. |
| 20     Q.   -- would be other? | 20     Q.   In your role at the Union, have you |
| 21     MR. PODRAZA: Excuse me. How | 21   provided legal advice to Local 98 in connection |
| 22   far are we going to go down this road? I | 22   with Charles Battle's protest of the June 2020 |
| 23   mean, we're here to talk about a nomination | 23   election? |
| 24   proceeding, not her relationship with the | 24     A.   No. |
| 25   Union to the, you know, microscopic view. | 25     Q.   In your role at the Union, have you |

4 (Pages 13 to 16)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

---

Page 17

1   provided Local 98 legal advice relating to this
2   lawsuit?
3       A.   No.
4       Q.   In your role at the Union, have you
5   provided Local 98 legal advice regarding its
6   compliance with the LMRDA?
7       A.   No.
8       Q.   As a part of your current job duties,
9   do you attend Business Agent meetings?
10      A.   Yes.
11      Q.   And can you sort of describe in what
12  capacity you attend those meetings.
13      A.   In my opinion, the term Business Agent
14  is -- Business Agent meeting is a generalized term
15  that we just use for a meeting of quite a few
16  different groups or different employees that we
17  have.
18      Q.   Can you tell me what a Business Agent
19  is.
20      A.   A Business Agent is a representative
21  of Local 98 that may likely have a territory where
22  they would be in charge of a certain location in
23  regarding to job sites in that location.
24      Q.   And how does someone become a Business
25  Agent?

---

Page 18

1       A.   That's not something I know.
2       Q.   So getting back to my question about
3   Business Agent meetings, is there such a thing as
4   a formal Business Agent meeting that Local 98
5   convenes?
6       A.   In my opinion, I wouldn't say that I'm
7   aware of a formal Business Agent meeting. I know
8   I'm repeating myself, but we use that term just
9   more generally to have a bunch of different type
10  of people in the meeting.
11      Q.   Do I understand correctly that that
12  would mean there would be more than just Business
13  Agents?
14      A.   Yes.
15      Q.   Is that what you're meaning?
16           And does the attendance vary
17  depending on what the meeting is for?
18      A.   Sometimes, yes.
19      Q.   Does Mr. Dougherty attend Business
20  Agent meetings in his capacity as Business
21  Manager?
22      A.   Sometimes, yes.
23      Q.   Not always?
24      A.   I -- I couldn't give you a percentage
25  or anything along those lines.

---

Page 19

1       Q.   Are you aware of any sort of what --
2   what makes the difference between whether he
3   attends or not? Are there certain --
4       A.   No, I'm not aware of anything.
5       Q.   How often are Business Agent meetings
6   held would you say?
7       A.   There is no set calendar. So it could
8   be every day. It could be once a month.
9       Q.   So it's not like there's a standing
10  meeting every first Tuesday of the month.
11      A.   No.
12      Q.   Who decides when to hold the Business
13  Agent meeting?
14      A.   It could be a combination of people.
15  It could be our President. It could be our
16  Assistant Business Manager, our Business Manager.
17  It all depends on the subject, I suppose.
18      Q.   Okay. And do you know how Business
19  Agent meetings are announced, or how people learn
20  that there's a meeting that they should come to?
21      A.   Usually an email is sent out,
22  sometimes a phone call, sometimes a text message.
23      Q.   And is there a list of people who that
24  kind of message would go out to?
25      A.   Yes.

---

Page 20

1       Q.   And what general types of things are
2   discussed at Business Agent meetings?
3       A.   It could be job issues or just jobs
4   going on in the City or in any of our territories.
5   It could be really anything. I really couldn't
6   put a specific certain bullet point list together.
7       Q.   Would you say that you attend most
8   Business Agent meetings?
9       A.   Yes.
10      Q.   Do you attend all Business Agent
11  meetings?
12      A.   I -- I wouldn't say all.
13      Q.   Would there be a particular reason why
14  you wouldn't attend a Business Agent meeting?
15      A.   Nothing in particular except just
16  personal circumstances.
17      Q.   Availability?
18           So I'm going to take us to June
19  of 2020, and I understand that there was a
20  nominations meeting held on June 9th of 2020.
21  Does that jive with your recollection?
22      A.   Yes.
23      Q.   Okay. So that's sort of our time
24  frame that we're looking at. Was there a Business
25  Agent meeting on June 8th, 2020?

---

5 (Pages 17 to 20)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 21

1   A.   Yes.
2   Q.   Did you attend that meeting?
3   A.   Yes.
4   Q.   What was the subject of that meeting?
5   A.   In all honesty, I was there.  I don't
6   necessarily recall most of it.  I had just
7   received shoulder surgery, and in all honesty,
8   I -- I was there but I wasn't necessarily
9   interacting.
10   Q.   Do you recall having a speaking role
11   at the June 8th meeting?
12   A.   No.
13   Q.   Was the June 9th officer nominations
14   meeting discussed at that Business Agent meeting?
15   A.   I believe so.
16   Q.   Do you recall what was discussed?
17   A.   No.
18   Q.   Was there any discussion of the
19   Business Agent's role in the election?
20   A.   Not that I recall of.
21   Q.   Was there discussion about not holding
22   an election?
23   A.   Not that I recall.
24   Q.   Or not wanting to hold an election.
25   A.   Not that I recall.

Page 22

1   Q.   Would you recall if there was such a
2   discussion?
3   A.   I honestly don't know the answer.  I
4   mean, I think I would, but I -- I'm -- I'm not
5   positive.
6   Q.   Okay.  I'm trying to get a sense as to
7   sort of your recollection of the meeting and
8   whether you would be able to say either way
9   whether something was discussed or not.
10   A.   Sure.  My recollection of June 8th
11   meeting is honestly that it was extremely warm
12   out, and that I was in an immobilizer sling and
13   hot.  I'm -- that's what it was.
14   Q.   Where was that meeting held?
15   A.   It was held in -- at our parking lot
16   in 1719 Spring Garden Street.
17   Q.   So it was outdoors?
18   A.   Yes.
19   Q.   Why was it outdoors?
20   A.   Due to COVID at the time.
21   Q.   Were any potential nominees discussed
22   at that meeting?
23   A.   Not that I can recall.
24   Q.   Was Charles Battle discussed at that
25   meeting?

Page 23

1   A.   Not that I can recall.
2   Q.   Do you recall of Charles Battle not
3   being discussed at that meeting?
4   A.   I don't recall, either.
5   Q.   So you couldn't say either way.
6   A.   Either way, no.
7   Q.   Was Timothy McConnell discussed at
8   that meeting?
9   A.   Not that I can recall.
10   Q.   Was Timothy McConnell not discussed at
11   that meeting?
12   A.   Not that I could recall.
13   Q.   You couldn't say either way.
14   A.   No, I couldn't.
15   Q.   Was Michael Coppinger discussed at
16   that meeting?
17   A.   Not that I recall.
18   Q.   Was Michael Coppinger not discussed at
19   that meeting?
20   A.   Not that I recall.
21   Q.   You couldn't say either way.
22   A.   I could not.
23   Q.   So that was the June 8th meeting.
24   Do you recall other Business Agent meetings
25   leading up to the June 2020 election where the

Page 24

1   election was discussed?
2   A.   I don't recall, and I -- I honestly
3   don't recall if I was present in the -- the few
4   weeks prior to the election due to the shoulder
5   surgery.
6   Q.   Do you recall what your last Business
7   Agent meeting would have been prior to that?
8   A.   No.
9   Q.   In the time since then, have you heard
10   any discussions as to what was discussed at the
11   June 8th Business Agent meeting?
12   A.   No.
13   Q.   Have you ever run for Local 98 office?
14   A.   No.
15   Q.   Why not?
16   A.   I have no desire to.
17   Q.   Why not?
18   A.   I like my job.
19   Q.   Did you have a role in the 2020 -- let
20   me say that again.  Did you have a role in the
21   2020 officers election?
22   A.   I did.
23   Q.   How would you describe your role?
24   A.   I nominated John Dougherty for his
25   position.

6  (Pages 21 to 24)

**Walsh v. Local 98**                          TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 25

1      Q.   And did you have any role in the
2   election process, itself?
3      A.   Strictly clerical.
4      Q.   Okay.
5      A.   I potentially had printed documents
6   out, maybe made copies, small things along those
7   lines.
8      Q.   You say "potentially" and "maybe." Do
9   you recall specifically doing those things?
10     A.   I don't recall specifically doing
11  those things. However, there is a high chance
12  that I could have.
13     Q.   And what makes you say that?
14     A.   Based on our office being small and
15  not -- there not being that many people there to
16  make copies.
17     Q.   Is that the kind of thing that you --
18  that you would have done in your role for other
19  circumstances?
20     A.   No.
21     Q.   Had you had a -- any role in any prior
22  elections?
23     A.   Possibly the same type of very small
24  clerical role, just helping someone out.
25     Q.   So staying on, you know, June 9th,

Page 26

1   2020, which I understand was the -- the
2   nominations meeting, do you recall what time the
3   nomination meeting started?
4      A.   7 p.m., or shortly after.
5      Q.   On that night, did you go to the Union
6   Hall prior to the meeting?
7      A.   Yes.
8      Q.   Around what time would you have gone?
9      A.   It was before 5 p.m. Sometime
10  between, say, 4:30, 4:45, potentially.
11     Q.   So before 5 p.m.
12     A.   In between 4:30, 4:45 I -- I would
13  think.
14     Q.   So pretty close to 5 p.m.
15     A.   Yeah.
16     Q.   And why did you go to the Union Hall
17  at that time?
18     A.   Our office received a phone call that
19  there was a member at the 1719 location seeking to
20  fill out the nomination form to run for office.
21  There were scheduled to have other Local 98
22  members man a desk for members that wanted to come
23  and seek nomination.
24         They were running late, I
25  think, due to traffic. So the office called my

Page 27

1   office, and I went down to service the member.
2      Q.   It's my understanding that 1719 is the
3   Union Hall; is that correct?
4      A.   Yes. We use them both
5   interchangeably. So the physical meeting room is
6   located at 1719. My office is located at 1701.
7   We use the term -- terminology Business Office.
8      Q.   Okay. So you were at the Business
9   Office when that call came in.
10     A.   Yes.
11     Q.   Do you recall who made that -- who
12  called?
13     A.   No.
14     Q.   Did you answer that call?
15     A.   I don't recall.
16     Q.   Did the person who called said who the
17  member was?
18     A.   I don't recall.
19     Q.   Do you recall being on the phone
20  during that call?
21     A.   I don't recall.
22     Q.   Do you know who would have taken that
23  call if not for you?
24     A.   I don't know who would have taken the
25  call.

Page 28

1      Q.   Do you know who else was in the 1701
2   location who could have taken that call?
3      A.   It could have possibly been the person
4   that answers the phones at the front desk.
5      Q.   You mentioned some people were running
6   late. Tell me about what they were supposed to do
7   that night.
8      A.   I don't know exactly what their job
9   was. I do know that part of it was that they were
10  going to be at a table that we had set up in the
11  Union Hall first floor so if a member wanted to
12  come in and seek nomination, they would be able to
13  assist them with the paperwork.
14     Q.   And do you know that the tables were,
15  in fact, set up for that purpose?
16     A.   Yes.
17     Q.   Do you know when those tables were set
18  up?
19     A.   No.
20     Q.   Do you know who the table workers were
21  supposed to be?
22     A.   I only know of one, Rodney Walker, and
23  I don't know who was supposed to be with him.
24     Q.   Was that something that was arranged
25  ahead of time?

7 (Pages 25 to 28)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 29

1      A.   I knew it that day, so it was arranged
2  before I went down there at 4:30, 4:45.
3      Q.   When were table workers supposed to be
4  there?
5      A.   I don't know.
6      Q.   Would there be record of that
7  somewhere?
8      A.   I don't believe so.
9      Q.   And it's my understanding that forms
10 were due by 5 p.m.; is that right?
11     A.   Yes.
12     Q.   Do you know who the member was who was
13 inquiring --
14     A.   Yes.
15     Q.   -- about a form?
16          Who was it?
17     A.   Charles Battle.
18     Q.   Had you met Charles Battle before?
19     A.   Not face-to-face, to the best of my
20 recollection.
21     Q.   Had you known who he was prior to that
22 time?
23     A.   Yes.
24     Q.   What was -- tell me the -- how you
25 knew him and what that knowledge was.

Page 30

1      A.   He had attended a meeting that I had
2  been at as well, and was vocal and slightly
3  outspoken with his vocalness, so it made me
4  remember him and his face.
5      Q.   So at the time that you went from your
6  office to the Union Hall, did you know at the time
7  who the member was?
8      A.   Not that I recall.
9      Q.   Did you have any discussions with
10 anyone at the office before going to the Union
11 Hall?
12     A.   I believe that I received the phone
13 call and/or was told by someone that there was a
14 member down there that needed to be assisted.  I
15 went to our President's office, which is across
16 the hall from my office, and said there's a member
17 down there, they need assistance, would you like
18 me to just go handle it, and he had said please.
19     Q.   Do you recall any discussions about
20 who that member might be at the time?
21     A.   No.
22     Q.   Do you recall any other instructions
23 or guidance that --
24     A.   No.
25     Q.   -- you may have gotten?

Page 31

1           Did you take anything with you
2  to the meeting hall?
3      A.   Yeah.
4      Q.   What did you take?
5      A.   I believe it was a manila folder with
6  blank and filled out nomination forms in them.  In
7  it.  Excuse me.
8      Q.   Did you look in the folder to see what
9  was in it?
10     A.   Likely not until Mr. Battle had asked
11 for a form and I opened it.
12     Q.   And where did you get the folder from?
13     A.   From the President, Brian Burrows.
14     Q.   Am I correct in understanding that
15 there were both blank forms and completed forms in
16 that folder?
17     A.   To the best of my knowledge, yes.
18     Q.   Did you know who the completed forms
19 belonged to?
20     A.   No.
21     Q.   At any time did you go through and
22 look to see whose forms had been included?
23     A.   No.
24     Q.   Do you know where the completed forms
25 had come from?

Page 32

1      A.   Just Brian's office.
2          THE REPORTER:  Just?
3          THE WITNESS:  Oh, I'm sorry.
4  Just Brian, Brian's office.
5  BY MS. DeBRUICKER:
6      Q.   Do you have any information as to when
7  they were submitted?
8      A.   No.
9      Q.   Or who put them in the folder?
10     A.   No.
11     Q.   Or when?
12     A.   No.
13     Q.   Do you know whether they were put in
14 the folder that day or sometime before?
15     A.   I don't know.
16     Q.   So it's my understanding you have the
17 folder, you go to the Union Hall.  What happens
18 next?
19     A.   I walked in.  I believe that
20 Mr. Battle was standing there.  I'm not sure if I
21 approached him or if he approached me, and I said,
22 you know, I have the form, here you go.  I handed
23 him a pen.
24          Go on?
25     Q.   Yes.

8 (Pages 29 to 32)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

---

Page 33

1      A.   Okay.  So I handed him a pen.
2  Mr. Battle was very cordial to me.  He was kind.
3  He actually asked about my injury.  We had a
4  little bit of a talk about that.  There are three
5  things that I kind of remember, but I don't
6  remember what time frame they happened in, meaning
7  I don't know what came first.
8           At one point, Mr. Battle asked
9  if that folder contained forms that were
10 completed, and I said yes.  He asked if he could
11 see them, and I said, I don't know, I would have
12 to make a call.  So I had stepped away from the
13 table and went into another room, where I called
14 the President and asked if I could show him the
15 forms, and he said no, that no member can see
16 those forms.  So I told Mr. Battle, you know, no.
17          At some point, Mr. Battle did
18 step away from the table, or the generalized area
19 where I was, and I believe he went into our
20 atrium.  It's -- it's -- atrium's probably too
21 strong of a word, but just in a doorway, and
22 seemed to be on his cell phone.
23          At another point, he also took
24 the form from the table and went to a second table
25 that was a couple feet to my right, and was, I

Page 34

1  believe, on his phone again and -- and writing on
2  the form.
3      Q.   All right.  I'm going to go back a
4  little bit to kind of fill in --
5      A.   Sure.
6      Q.   -- some of my questions.
7           Why did you take blank forms to
8  the Union Hall that night?
9      A.   I believe that the phone call we
10 received stated that a member wanted to nominate
11 himself or be nominated, so that form would have
12 been part of the process.
13     Q.   Okay.  Was it your understanding that
14 there weren't any forms at the Union Hall before
15 you brought them?
16     A.   I -- I don't know if I agree with that
17 statement because there were forms -- I believe
18 there would have been forms at 1701 since I
19 received them at that 4:30 time.  Just because
20 they weren't at 1719 Spring Garden Street, in my
21 opinion, that doesn't mean that they weren't
22 there.
23     Q.   Did you -- did you have any knowledge
24 of forms being at 1719 Spring Garden Street before
25 you brought them there?

Page 35

1      A.   Not that I know of.
2      Q.   So if I understand, your forms may
3  have been available at 1701, correct?
4      A.   Our buildings are interchanged, and
5  our 1719 office does not -- it consists of our
6  financial office, our apprentice training, and a
7  third-party fund administrator.  So this would not
8  be something in their purview.
9           So I don't -- to my knowledge,
10 there was no forms there, but that does not
11 surprise me in any means.
12     Q.   Okay.  Why is that?
13     A.   Because it wouldn't have been their
14 purview, and they wouldn't have had anything to do
15 with that.
16     Q.   Do you know where the Union members
17 were told where to find forms in advance of the
18 5:00 deadline?
19     A.   I mean, a letter was mailed out to
20 every member.  I don't remember the exact content.
21 Once again, if the letter said to arrive at 1719,
22 to us, they're interchangeable, so a member
23 simply -- somebody would have just simply called
24 the other office and a form would have been
25 brought down to them.

Page 36

1      Q.   Why did you take completed forms with
2  you when you went to 1719?
3      A.   That was just the folder I was handed.
4      Q.   And I understand you gave Mr. Battle a
5  blank nomination form.
6      A.   Yes.
7      Q.   Did you give him any instructions
8  about the form?
9      A.   No.
10     Q.   Did you tell him what portions he
11 needed to fill out?
12     A.   I don't believe I did.
13     Q.   Do you recall specifically whether you
14 did or not?
15     A.   I don't recall specifically.
16     Q.   Did you provide a nomination form to
17 anyone else that night?
18     A.   No.
19     Q.   Did you provide a nomination form to
20 anyone else at any other time?
21     A.   Not that I can recall.
22     Q.   And you mentioned that Mr. Battle
23 asked if he could see the completed forms; is that
24 right?
25     A.   Yes.

9 (Pages 33 to 36)

**Walsh v. Local 98**                          TARA D. CHUPKA, ESQUIRE, 9/8/21

---

Page 37

1    Q.   Did he tell you why he wanted to see
2  the completed forms?
3    A.   He did not.
4    Q.   Do you recall him indicating he wanted
5  to see if anyone else was running who he might not
6  want to run against?
7    A.   I don't recall.
8    Q.   Do you have a specific recollection of
9  him not saying that?
10   A.   I don't have a specific recollection.
11   Q.   All right.  So you couldn't say either
12 way.
13   A.   Either way, no.
14   Q.   You mentioned when Mr. Battle asked if
15 he could see the forms you -- you didn't know the
16 answer; is that correct?
17   A.   Yes.
18   Q.   And so you called Mr. Burrows; is that
19 right?
20   A.   Yes.
21   Q.   Why did you call Mr. Burrows?
22   A.   He's the President of the Union, and I
23 also work directly and closely with him.
24   Q.   And did you consider him the
25 appropriate person who would know the answer to

Page 38

1  those things?
2    A.   Yes.
3    Q.   Was there anyone else at the Union who
4  would have known the answer to those things?
5    A.   Possibly.
6    Q.   Who might that be?
7    A.   Possibly the Business Manager, John
8  Dougherty.
9    Q.   In his role as President, did Mr. --
10 was Mr. Burrows sort of in charge of overseeing
11 the election?
12   A.   I don't know if that was his role as
13 President, or if he just was tasked with it.
14   Q.   Was it your understanding that he was
15 overseeing the election?
16   A.   I'm -- I wouldn't say overseeing, but
17 he had an active role in planning it.
18   Q.   Okay.  Do you know what -- what he did
19 in planning the election?
20   A.   I'm sorry, could you repeat that?
21   Q.   What was his role in planning the
22 election?
23   A.   Logistics of physically having a date
24 picked, membership mailings sent out, setup of the
25 actual Union Hall, and things along those lines.

Page 39

1    Q.   But just so I'm clear, you wouldn't --
2  are a -- are you not sure that that was because --
3  that he did those things because he was President,
4  or he did those things because --
5    A.   He was a -- so I -- I, personally,
6  don't know if that was a job assigned to him by
7  like the IBEW Constitution, or if that was just
8  him as an employee of the Union.
9    Q.   Okay.  Thank you.
10        When you spoke to Mr. Burrows,
11 did you tell him that it was Mr. Battle who was
12 asking the question?
13   A.   I don't recall.
14   Q.   Did Mr. Burrows tell you why
15 Mr. Battle was not allowed to see the completed
16 forms?
17   A.   No.
18   Q.   Do you have any understanding on your
19 own as to why he was not allowed to see the
20 completed forms?
21   A.   No.
22   Q.   Did you understand why somebody who
23 was considering running might want to see the
24 completed forms?
25        MR. PODRAZA:  Objection.  Calls

Page 40

1  for speculation.  Move to strike.
2        You can answer.
3        THE WITNESS:  I, personally,
4  don't have an opinion on that.
5  BY MS. DeBRUICKER:
6    Q.   You could understand someone not
7  wanting to run against a friend who they might
8  support --
9        MR. PODRAZA:  Objection.
10        MS. DeBRUICKER:  -- right?  Is
11 that --
12        MR. PODRAZA:  Calls for
13 conjecture and speculation.  Move to strike.
14        THE WITNESS:  I have no opinion
15 on that.
16        MS. DeBRUICKER:  Counsel, we've
17 agreed to reserve all objections except to
18 form for trial, so --
19        MR. PODRAZA:  Ma'am, I'll
20 protect my record the way -- the best way,
21 too.  So please proceed.
22  BY MS. DeBRUICKER:
23    Q.   So I understand you gave Mr. Battle a
24 form.  Did you give him a pen, did you say?
25    A.   I believe so.

10  (Pages 37 to 40)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 41

1      Q.   Okay.  Were there others present
2  around those tables at the time?
3      A.   Yes.
4      Q.   Who was there?
5      A.   No one that I can name specifically.
6  Members were being serviced at both the
7  third-party fund administrator's side and the
8  financial office side.
9      Q.   Would those have been election-related
10  activities?
11      A.   Not that I'm aware of.
12      Q.   Do you recall whether people were
13  coming in and out or standing around?
14      A.   I believe the people were coming in
15  and out, not standing around.
16      Q.   At some point did Mr. Battle give his
17  form back to you?
18      A.   Yes.
19      Q.   And he had written on it at that time?
20      A.   Yes.
21      Q.   Did you review the form at the time he
22  gave it to you?
23      A.   Mr. Battle had said to me that his
24  nominator was not there, and I believe I said
25  something along the lines, You don't have to worry

Page 42

1  about that, you're here.  You were here by 5:00.
2  Your section is filled out.  Your -- your form --
3  you know, section, excuse me, is filled out.
4      Q.   When you said, "You don't have to
5  worry about that," what did you mean?
6      A.   In my mind, I meant that the letter
7  that was mailed out to the members asked for them
8  to be there by 5:00 if they wanted to be
9  nominated, and so therefore, he was there by 5.
10      Q.   Did you have an understanding as to
11  whether Mr. Battle needed a nominator?
12      A.   No.
13      Q.   Did Mr. Battle need a nominator?
14      A.   No, he did not.
15      Q.   Did you tell him that?
16      A.   No.  We didn't speak of if he needed
17  someone or not.
18      Q.   Okay.  But you recall him saying he
19  didn't have his -- his nominator wasn't there at
20  the time?
21      A.   Yes.
22      Q.   And you didn't tell him you don't need
23  a nominator.
24      A.   I don't believe I said anything.  I
25  just said you were here by 5:00.

Page 43

1      MS. DeBRUICKER:  I'm going to
2  have this marked as Exhibit Chupka-1.
3              - - -
4      (Nomination Slip for Candidates
5  for Office, Bates stamped DOL_LOCAL
6  98_00298, marked Plaintiff's Exhibit
7  Chupka-1 for identification purposes.)
8              - - -
9      MR. PODRAZA:  Thank you.
10      THE WITNESS:  Thank you.
11  BY MS. DeBRUICKER:
12      Q.   Ms. Chupka, I'll give you a moment to
13  look at that, and then I'll ask you a couple
14  questions.
15      A.   I'm ready when you are.
16      Q.   Okay.  Would you recognize this as the
17  form that Mr. Battle gave to you?
18      A.   Yes.
19      Q.   And did you consider this form to be
20  complete at the time he gave it to you?
21      A.   I didn't consider anything.
22      Q.   And if I understand your testimony,
23  you understood that he didn't need a nominator,
24  correct?
25      A.   Yes.

Page 44

1      Q.   So if he didn't need a nominator, in
2  your mind, is there anything else that he would
3  have needed to fill out on this form to be
4  nominated?
5      A.   To be nominated, no.
6      Q.   Unrelated to this form, was there
7  anything else he needed to do to be nominated that
8  night?
9      A.   Not that I'm aware of.
10      Q.   From your interactions with
11  Mr. Battle, was it your understanding that he
12  thought there were other things he needed to do in
13  order to be nominated?
14      A.   No.
15      Q.   Did Mr. Battle -- when he submitted
16  your form -- his form to you, did Mr. Battle ask
17  you any other questions?
18      A.   No.
19      Q.   Did you have any further conversation
20  with Mr. Battle at that time?
21      A.   No.
22      Q.   So Mr. Battle gave you his form.  What
23  did you do with it then?
24      A.   I put it in the folder.
25      Q.   Why?

11  (Pages 41 to 44)

**Walsh v. Local 98**                               TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 45

1     A.   Just I -- I felt it should go with the
2  other forms.
3     Q.   At some point, did you do something
4  with the folder?
5     A.   Yes.  When Rodney Walker arrived, I
6  gave him the folder, and I went back to my own
7  office at 1701.
8     Q.   And about what time was that would you
9  say?
10    A.   I don't recall.
11    Q.   Who is Mr. Walker?
12    A.   He is an employee of Local 98.
13    Q.   Does he have a title at Local 98?
14    A.   I believe he does, but I honestly
15  don't remember what it is.
16    Q.   I've heard reference to the term
17  Sergeant at Arms.  Does that mean anything to you?
18    A.   That sounds familiar to what
19  Mr. Walker's title would be.
20    Q.   Okay.  And do you know what a Sergeant
21  at Arms is?
22    A.   I wouldn't want to speculate.
23    Q.   Is Mr. Walker also a Business Agent?
24    A.   Yes.
25    Q.   If I wanted to learn what the duties

Page 46

1  are of a Sergeant at Arms, who should I ask?
2     A.   I believe we -- you could look at the
3  IBEW Constitution.
4     Q.   Did Mr. Walker have a role in the
5  election?
6     A.   I don't recall.
7     Q.   Why did you give the folder to
8  Mr. Walker, as opposed to someone else?
9     A.   From what I had understood, he was
10  going to man that desk orig -- or that table
11  originally, and he was the person that was running
12  late.
13    Q.   Do you recall when Mr. Walker arrived?
14    A.   I don't recall.
15    Q.   Do you recall whether Mr. Battle was
16  still there when Mr. Walker arrived?
17    A.   I don't recall.
18    Q.   When you put the form in the folder
19  and gave the folder to Mr. Walker, what was your
20  understanding as to what was going to happen next
21  with Mr. Battle's form?
22    A.   My understanding was that the forms
23  were necessary for a head count due to COVID
24  protocols.  I believe at that time the City of
25  Philadelphia had like a square footage requirement

Page 47

1  of how many people were allowed in a certain
2  square foot.  So there were only so many chairs
3  that could be set up in the basement, our Union
4  meeting hall, and if there was going to be an
5  over-amount of people running for Business
6  Manager, then the nomination meeting would have to
7  be split up by office or however else they had
8  decided to.
9     Q.   So other than for head-count purposes,
10  were there any other purposes of the forms?
11         THE REPORTER:  Were there any
12      other purposes?
13         MS. DeBRUICKER:  For the forms.
14         THE REPORTER:  Thanks.
15         THE WITNESS:  Not that I am
16      aware of.
17  BY MS. DeBRUICKER:
18    Q.   Did you have an understanding as to
19  whether there were any differences between
20  Mr. Battle's form and the other completed forms in
21  the folder?
22    A.   Nothing that I was aware of.
23    Q.   And any differences in what would
24  happen to them next, once you turned the folder
25  over to Mr. Walker?

Page 48

1     A.   No.
2     Q.   Did you tell Mr. Walker that the
3  folder included Mr. Battle's form?
4     A.   Yes.
5     Q.   Why?
6     A.   Because I wanted to make sure that
7  Mr. Walker knew that Mr. Battle was there by 5:00.
8     Q.   Did you mention the names of any other
9  candidates to Mr. Walker?
10    A.   No.
11    Q.   Did you review any other forms in the
12  folder and compare them to Mr. Battle's?
13    A.   No.
14    Q.   Did you say anything else to
15  Mr. Walker about the file folder when you gave it
16  to him?
17    A.   Not that I can recall.
18    Q.   And what was your understanding of
19  what Mr. Walker was going to do with the file
20  folder?
21    A.   I assumed he was going to count out
22  how many people were running for each office so
23  then they could figure out what they had to do at
24  the actual nomination meeting.
25    Q.   So it was your understanding that

12  (Pages 45 to 48)

**Walsh v. Local 98**                                    **TARA D. CHUPKA, ESQUIRE, 9/8/21**

Page 49

1  Mr. Walker would -- would look at the completed
2  nomination forms?
3           MR. PODRAZA:  I object.  All
4  she said is she had an assumption.  She
5  didn't say she knew anything.
6           THE WITNESS:  And I only
7  assumed that's what he did.  I did not know
8  for sure.
9  BY MS. DeBRUICKER:
10     Q.   Was it your understanding that that
11  was what would happen?
12           MR. PODRAZA:  Objection.  Asked
13  and answered.
14           THE WITNESS:  Answer, though,
15  correct?
16           MR. PODRAZA:  You can, yes.
17           THE WITNESS:  I -- I don't -- I
18  don't know if I would use the word
19  "understanding."  I am using what I would
20  consider my brain to say that someone had to
21  count.
22  BY MS. DeBRUICKER:
23     Q.   Was it your understanding that
24  Mr. Walker was permitted -- permitted to look at
25  the completed nomination forms?

Page 50

1     A.   In my -- in my non-Local 98 role, I
2  would think that he would be able to.  I do not
3  know IBEW Constitution-wise or anything along
4  those lines.
5     Q.   Whether there was -- did you have any
6  understanding as to whether there were rules about
7  who could see the nomination forms or not?
8     A.   I don't know the rules.
9     Q.   Did you have an understanding as to
10  whether Mr. Walker would show the completed forms
11  to other incumbent officers?
12     A.   Not that I'm aware of.
13     Q.   Would there be a reason for Mr. Walker
14  to show the nomination forms to other incumbent
15  officers?
16           MR. PODRAZA:  Objection.  Calls
17  for speculation and conjecture.  Move to
18  strike.
19           But you can answer it.
20           THE WITNESS:  In my personal
21  opinion, possibly someone else did the
22  counting.
23  BY MS. DeBRUICKER:
24     Q.   Was it your understanding that
25  Mr. Walker would eventually give the completed

Page 51

1  forms to someone else?
2     A.   Yes.
3     Q.   And who would that be?
4     A.   I believe that he would have given
5  them to Brian Burrows, the President, who was the
6  Chairperson of all the nomination meetings.
7     Q.   And what would be the purpose of
8  Mr. Walker providing the forms to Mr. Burrows?
9     A.   To either do the counting out, or --
10  I -- I don't remember exactly the meeting
11  minutes -- or I shouldn't say the minutes, excuse
12  me, the meeting schedule of events.  So possibly
13  to call someone's name out, if necessary.
14     Q.   Did you attend the nomination meeting?
15     A.   Yes.
16     Q.   Was there -- do you recall whether
17  there being a head-count issue for those who
18  attended the nomination meeting?
19     A.   No.
20     Q.   Did you see the completed forms at the
21  nomination meeting?
22     A.   No.
23     Q.   Do you know who had -- do you know
24  whether the forms were present during the
25  nomination meeting?

Page 52

1     A.   I don't know.
2     Q.   Do you recall the nomination forms
3  being used for any purpose during the meeting?
4     A.   I don't recall.
5     Q.   Do you recall anyone reading the forms
6  aloud during the meeting?
7     A.   No.
8     Q.   At some point during the meeting, were
9  nominees announced?
10     A.   Yes.
11     Q.   Do you recall how that was
12  communicated?
13     A.   The Chair of the meeting I believe
14  said something along the lines the first office
15  we're going to nominate is Business Manager, are
16  there any nominees -- not -- are there -- is there
17  anybody who would like to be nominated, something
18  along those lines.
19     Q.   Okay.  And the Chair of the meeting
20  was who?
21     A.   President Brian Burrows.
22     Q.   And do you recall the forms being used
23  for that purpose at all?
24     A.   Not that I can recall.
25     Q.   Okay.  So the question was is anyone

13  (Pages 49 to 52)

**Walsh v. Local 98**                              TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 53

1  here going to nominate someone for?
2      A.   I wouldn't say it like that.  It would
3  be more so just is there anybody here that wishes
4  to be nominated.
5      Q.   And did anyone identify themselves?
6      A.   Yes.
7      Q.   Who did?
8      A.   For what office?  I apologize.
9      Q.   Oh.  Did anyone identify themselves
10  for nomination for any office during the meeting?
11      A.   Yes.
12      Q.   And do you recall what offices people
13  identified themselves to run for?
14      A.   Sure.
15           This may -- I may be missing a
16  few, but Business Manager, President,
17  Vice President, Recording Secretary, Treasurer,
18  Executive Board, which consists of multiple
19  members, Examining Board, which consists of
20  multiple members, and there could be possibly one
21  or two others that I'm just...
22      Q.   Was Mr. Battle at that meeting?
23      A.   Could you clarify what you mean by --
24      Q.   Was Mr. Battle at the nominations
25  meeting?  Did you --

Page 54

1      A.   In the physical room?
2      Q.   Yes.
3      A.   He was not.
4      Q.   Did anyone mention Mr. Battle's name
5  during that meeting?
6      A.   No.
7      Q.   Did anyone say Mr. Battle has
8  submitted a nomination form during the meeting?
9      A.   Not that I recall.
10      Q.   Was it your understanding that
11  nominations had to be made at that meeting in
12  person?
13      A.   In all honesty, I do not know the
14  rules and regulations in regards to the election,
15  so I don't know.
16      Q.   Do you recall any discussion of people
17  not having to attend the meeting for COVID
18  reasons?
19      A.   No.
20      Q.   Do you recall anyone saying, Look, if
21  you submitted a form, you don't have to come into
22  the building?
23      A.   No.
24      Q.   Do you recall there being more than
25  one nominee for any position during that meeting?

Page 55

1      A.   No.
2      Q.   Was there any discussion as to whether
3  there were other nominees not present at the
4  meeting?
5      A.   Not with me.
6      Q.   Do you recall any discussion of that
7  during the meeting?
8      A.   No.
9      Q.   If I recall correctly, you said that
10  you were going to nominate Mr. Dougherty for
11  Business Manager.
12      A.   Yes.
13      Q.   And did you do that?
14      A.   Yes.
15      Q.   Did you -- how did you do that?
16      A.   When the Chairman said along the lines
17  does anybody want to be nominated, I don't
18  remember the exact words, for the office of
19  Business Manager, I stood up and said, I would
20  like to nominate John J. Dougherty.
21      Q.   And you had submitted a form
22  nominating Mr. Dougherty, hadn't you?
23      A.   I filled out this form as a nominee,
24  yes.
25      Q.   And when did you do that in relation

Page 56

1  to the 7:00 nominations meeting?
2      A.   Sometime during my workday.
3      Q.   Prior to the meeting?
4      A.   Prior to the meeting I filled out my
5  part.
6           THE REPORTER:  My card?
7           THE WITNESS:  I'm sorry.  My
8  part.
9           THE REPORTER:  Thank you.
10  BY MS. DeBRUICKER:
11      Q.   Who did you give your nomination form
12  to?
13      A.   I don't recall.
14      Q.   Do you recall giving it to somebody
15  prior to the nomination meeting?
16      A.   Yes.
17      Q.   Was it your understanding you still
18  needed to be present at the nomination meeting to
19  nominate Mr. Dougherty?
20      A.   I don't have an understanding of the
21  rules and regulations, if that was a necessity or
22  not.
23      Q.   I understand you and Mr. Dougherty
24  have known each other for quite some time.
25      A.   Yes.

14  (Pages 53 to 56)

**Walsh v. Local 98**                          TARA D. CHUPKA, ESQUIRE, 9/8/21

---

Page 57

1      Q.   Do you know the last time anyone ran
2   against him as Business Manager?
3      A.   No.  I think it was way before my time
4   working in the office.
5      Q.   Maybe further back than you could
6   remember?
7      A.   Yeah.
8      Q.   Do you recall the last time anyone ran
9   against any incumbent officer at Local 98?
10     A.   I, personally, don't recall.
11     Q.   In your knowledge of Mr. Dougherty,
12  does he --
13     A.   Can I change that answer?
14     Q.   Sure.  Please.
15     A.   I apologize.
16     Q.   Yeah, please.
17     A.   I -- I do recall there being a prior
18  election where there were people that ran for
19  Executive Board.  I don't remember which year it
20  was.
21     Q.   Do you recall who those people were?
22     A.   I know that one gentleman was named
23  Ken Rocks, and there was another one that I cannot
24  think of the name right now.
25     Q.   Do you recall having any involvement

---

Page 58

1   in that election?
2      A.   No recollection except for a small
3   clerical scene type of thing.  If someone just
4   needed help, then I just helped them, meaning make
5   a copy, along those lines.
6      Q.   In your knowledge of Mr. Dougherty,
7   was he considered a point of pride that people
8   don't run against the incumbents of Local 98?
9          MR. PODRAZA:  Objection.  Calls
10     for conjecture and speculation.  Move to
11     strike.
12         But you can answer it.
13         THE WITNESS:  I can only speak
14     for myself, and I, personally, consider him
15     a point of pride, but I don't know what
16     other people think.
17  BY MS. DeBRUICKER:
18     Q.   Do you have a sense as to whether it
19  was important to him that his team be unopposed in
20  the election?
21         MR. PODRAZA:  The same
22     objection.  Calls for conjecture,
23     speculation.  Move to strike.
24         You can answer.
25         THE WITNESS:  I don't know what

---

Page 59

1   he thought.
2   BY MS. DeBRUICKER:
3      Q.   Prior to the nomination meeting, had
4   you had any conversations with Mr. Dougherty about
5   Charles Battle?
6      A.   Yes.
7      Q.   Can you tell me the nature of those
8   conversations.
9      A.   In fall of 2019, I believe it likely
10  was the November Union meeting, Mr. Battle was a
11  little outspoken.  I shouldn't say a little.  He
12  was very outspoken, and it honestly made me feel a
13  little bit uncomfortable.
14         So after the fact, I had a
15  brief conversation just saying that that Union
16  meeting was rather boisterous, and personally, it
17  made me feel uncomfortable, not that Mr. Battle
18  said anything particularly to me, just the general
19  feeling of the room.
20     Q.   Do you recall what the subject matter
21  was that made you -- was -- well, let me ask a
22  better question.
23         What about it made you
24  uncomfortable?
25     A.   His tone.  He was antagonizing.  I

---

Page 60

1   personally felt like he was looking to start an
2   argument, start a fight, something along those
3   lines.
4          MR. PODRAZA:  Who is "he"?
5          THE WITNESS:  Excuse me.
6      Charles Battle.
7   BY MS. DeBRUICKER:
8      Q.   Did you have any other conversations
9   with Mr. Dougherty regarding Charles Battle prior
10  to the election?
11     A.   Not that I can recall.
12     Q.   Have you had conversation with
13  Mr. Dougherty regarding Charles Battle since the
14  election?
15     A.   Yes.
16     Q.   Can you tell me the nature of those
17  conversations.
18     A.   Pretty much the same conversation.  I
19  believe it was our July 2021 meeting.  Mr. Battle
20  was present and also was antagonizing, in my
21  opinion, and just afterwards I just, you know,
22  said that it made the room uncomfortable to me.
23     Q.   Prior to the nominations meeting in
24  June 2020, did you ever speak with Mr. Dougherty
25  about Timothy McConnell?

---

15 (Pages 57 to 60)

**Walsh v. Local 98**                                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 61

1   A.   No.
2   Q.   Do you know who Timothy McConnell is?
3   A.   No.
4   Q.   Have you had conversations with
5   Mr. Dougherty since the June 2020 meeting
6   regarding Mr. McConnell?
7   A.   No.
8   Q.   Prior to the nominations meeting of
9   June 2020, did you have any conversations with
10  Mr. Dougherty regarding Michael Coppinger?
11  A.   Not that I can recall.
12  Q.   Since the June 2020 meeting, do you
13  recall having any conversations with Mr. Dougherty
14  about Michael Coppinger?
15  A.   No.
16  Q.   Do you know who Mr. Coppinger is?
17  A.   No.
18        THE REPORTER:  Pardon me?
19        MS. DeBRUICKER:  Do you know
20  who Mr. Coppinger is.
21  BY MS. DeBRUICKER:
22  Q.   Just a moment.
23        Going back to the Business
24  Agent meeting of June 8th, 2020 --
25  A.   Okay.

Page 62

1   Q.   -- do you recall whether Mark Lynch
2   was in attendance?
3   A.   I believe so, yes.
4   Q.   You -- you know who Mark Lynch is --
5   A.   Yes.
6   Q.   -- is that right?
7   A.   I know who Mark Lynch is, yes.
8   Q.   Did you see or hear that Mr. Lynch got
9   a text from Mr. McConnell during that meeting?
10  A.   In all honesty, I -- I -- honestly, I
11  just didn't really pay attention that night.
12  Q.   Do you recall there being a phone call
13  being made during that meeting?
14  A.   I don't know.
15  Q.   Do you have any recollection that a
16  phone call was not made at that meeting?
17  A.   No.
18  Q.   Do you recall seeing or hearing
19  Mr. Dougherty on the phone during that meeting?
20  A.   I don't recall.
21  Q.   So Mr. Battle submitted his form, and
22  you said there's nothing else he -- else he needed
23  to do to be nominated that night.  Do I have that
24  correct?  Is that --
25        MR. PODRAZA:  That was -- I

Page 63

1   don't think she gave him any advice.  She
2   never said that she -- that's all that he
3   has to do.
4        THE WITNESS:  I -- I never said
5   anything to Mr. Battle.
6        MR. PODRAZA:  She wouldn't even
7   know the procedure.
8        THE REPORTER:  What did you
9   say?
10       MR. PODRAZA:  She wouldn't even
11  know the procedure.
12       THE REPORTER:  Thank you.
13       THE WITNESS:  I just know that
14  I said to Mr. Battle that he was here by
15  5:00.
16  BY MS. DeBRUICKER:
17  Q.   Were you surprised to hear that
18  Mr. Battle was not a nominee in that election
19  process?
20  A.   I don't think I gave thought to that.
21  Q.   Did you mention to anyone that
22  Mr. Battle had submitted a form and should be
23  considered a nominee?
24  A.   Not that I can recall.
25  Q.   Do you have any other information

Page 64

1   regarding the June 2020 election you think it
2   would be important for the Secretary of Labor to
3   know?
4   A.   Just that Mr. Battle was there by
5   5:00 and was at the Union Hall.
6        MS. DeBRUICKER:  Okay.  I have
7   no further questions.
8        THE WITNESS:  Thank you.
9   BY MR. PODRAZA:
10  Q.   Tara, did you feel competent to give
11  advice on the nomination process, and how it was
12  going to go in 2020?
13  A.   No.
14  Q.   Why not?
15  A.   I did not know the rules.
16  Q.   And did you give anybody advice on the
17  nomination process in June 2020?
18  A.   No.
19  Q.   In the Secretary's Complaint, let me
20  read you something.  At paragraph 24 of the
21  Complaint it says, At defendant's member meetings,
22  meaning Local 98's membership meetings, in
23  November 2019, January 2020 and February 2020,
24  Battle questioned defendant's Business Manager
25  John Dougherty and other Union leadership about

16  (Pages 61 to 64)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 65

1  the -- about how the Union was being run. That's
2  in the pleading.
3             Were you at any of those
4  meetings?
5      A.   I apologize. Could you read those
6  dates again?
7      Q.   Sure. November 2019, January 2020 and
8  then February 2020.
9      A.   I know I was there for January --
10 excuse me, for November of '19 and January of
11 2020. I don't recall February of 2020.
12     Q.   And normally, how many members attend
13 the members meeting, generally?
14     A.   I would say maybe 150 to 200.
15 However, I've never counted.
16     Q.   Okay. Did you consider Mr. Battle's
17 behavior to be rude at any of those meetings that
18 you attended?
19     A.   Yes.
20     Q.   Which ones?
21     A.   Specifically the November of 2019 I
22 remember.
23     Q.   And did Mr. Battle appear to be
24 antagonistic at that meeting?
25     A.   Yes.

Page 66

1      Q.   Did Mr. Battle appear to be
2  confrontational?
3      A.   Yes.
4      Q.   Did Mr. Battle appear to be provoking
5  an argument?
6      A.   Yes.
7      Q.   And I think you said his behavior made
8  you feel uncomfortable; is that correct?
9      A.   Yes.
10     Q.   Is what we just reviewed and your
11 description of Mr. Battle's behavior why you felt
12 uncomfortable?
13     A.   Yes.
14     Q.   And --
15          MS. DeBRUICKER: Objection.
16 Counsel, what's the relevance of this to the
17 leading issues in the case?
18          MR. PODRAZA: Well, I think we
19 disagree on that, but I don't find
20 Mr. Battle to be a shrinking violet, and I
21 think his behavior pre the June 2020 and
22 post reflects that so as to address his
23 concerns of being intimidated and fearful of
24 retaliation, but we can argue that in
25 briefings with the Court.

Page 67

1  BY MR. PODRAZA:
2      Q.   Did you -- at the membership meetings
3  prior to the June 2020 nomination proceeding, did
4  Mr. Battle appear to be timid when he was speaking
5  before the membership?
6      A.   Not in my opinion.
7      Q.   Did he seem to be afraid to speak up
8  when he was speaking in front of the membership?
9      A.   Not in my opinion.
10     Q.   Now, you interacted with Mr. Battle on
11 June 9, 2020 when the nomination proceeding was
12 occurring, right?
13     A.   Yes.
14     Q.   Did Mr. Battle appear, from your
15 vantage point, to be uncomfortable?
16     A.   No.
17     Q.   Did he appear to be intimidated?
18     A.   No.
19     Q.   Did he appear to be anything but
20 relaxed and open in his conversation with you?
21     A.   He didn't appear to be anything except
22 cordial with me, kind.
23     Q.   And did Mr. Battle raise with you any
24 concerns that he had regarding the nomination
25 process?

Page 68

1      A.   Not that I can recall.
2      Q.   Did he ask you for any instructions on
3  how the process was to be done, or have any
4  questions seeking guidance from you to answer?
5      A.   He did not ask me any questions
6  regarding the process.
7      Q.   And I believe you said that
8  Mr. Battle's behavior from November 2019 continued
9  after the June 2020 nomination proceeding at the
10 membership meetings; is that correct?
11     A.   Yes.
12          MS. DeBRUICKER: Objection to
13 form.
14 BY MR. PODRAZA:
15     Q.   Right?
16          When -- the most recent you
17 went to that Mr. Battle was at, when was that?
18     A.   It would have been in July of 2021,
19 the fourth Tuesday.
20     Q.   And did you observe Mr. Battle's
21 behavior to be rude?
22     A.   Yes.
23     Q.   Did you observe Mr. Battle's behavior
24 to be antagonistic?
25     A.   Yes.

17 (Pages 65 to 68)

**Walsh v. Local 98**                    TARA D. CHUPKA, ESQUIRE, 9/8/21

Page 69

1     Q.   Did you appear -- did you observe
2  Mr. Battle's behavior to be confrontational?
3     A.   Yes.
4     Q.   Did you observe Mr. Battle's behavior
5  to be argumentative?
6     A.   Yes.
7     Q.   Did Mr. Battle's behavior at that
8  meeting make you uncomfortable?
9          MS. DeBRUICKER:  I'm going to
10  object.  Judge McHugh has ruled that this
11  line of questioning is not relevant.
12          THE REPORTER:  I'm sorry.  Has?
13          MS. DeBRUICKER:  I'm going to
14  object that Judge McHugh has ruled this line
15  of questioning is not relevant to the case.
16          MR. PODRAZA:  You got your
17  objection.
18  BY MR. PODRAZA:
19     Q.   Did you -- did he make you
20  uncomfortable?
21     A.   Yes.
22     Q.   Now, could you describe for me, going
23  back now to June 9, 2020, the nomination night,
24  what was the mood, or how would you describe the
25  mood of the membership that you observed?

Page 70

1     A.   It was a friendly atmosphere.  There
2  was food trucks.  I am almost positive there was
3  an ice cream truck.  Members were just gathering,
4  socializing, you know, in large groups, small
5  groups, everywhere, in our parking lot, in front
6  of our building, and all kind of along Spring
7  Garden to a point.
8     Q.   Did you sense any tension among the
9  membership?
10     A.   No.
11     Q.   Did you sense any stress among the
12  membership?
13     A.   No.
14     Q.   Did you sense any agitation among the
15  member?
16     A.   No.
17     Q.   Did you sense any apprehension among
18  the -- the membership?
19     A.   No.
20     Q.   Did you sense any worry among the
21  membership?
22     A.   No.
23     Q.   Did you sense any anxiety among the
24  membership?
25     A.   No.

Page 71

1     Q.   Did you sense any unease among the
2  membership?
3     A.   No.
4     Q.   Did you sense any intimidation or
5  threats among the membership?
6     A.   No.
7     Q.   In your interactions with Mr. Battle
8  on the night of June 9th, 2020, did he leave you
9  with the impression that he was tense, under
10  stress, agitated, apprehensive, worried, anxious,
11  uneasy, or felt intimidation towards it?
12          MS. DeBRUICKER:  Objection to
13  form.
14          THE WITNESS:  No.
15          MR. PODRAZA:  That's all I have
16  at this time.  Thank you.
17  BY MS. DeBRUICKER:
18     Q.   Ms. Chupka, you mentioned sort of
19  the -- the atmosphere the -- the night of the
20  elections.  About how many people were there, in
21  your estimation?
22     A.   200 to 250.
23     Q.   Who arranged for the food trucks?
24     A.   The Business Office.
25     Q.   Were people wearing campaign shirts?

Page 72

1     A.   I don't recall.
2     Q.   Does Mr. Dougherty have campaign
3  shirts made for elections, typically?
4     A.   I couldn't answer that question.  I --
5  I don't recall.
6     Q.   You don't recall whether people were
7  wearing Doc 2020 shirts, is what --
8     A.   I don't recall.
9     Q.   Why were that many people there?
10     A.   That's up to them.  The members were
11  notified, so I -- I suppose that if a member wants
12  to come, they could.
13     Q.   But there was a limited capacity in
14  the meeting hall, correct?
15     A.   Based upon the letter sent to the
16  members, yes.
17          THE REPORTER:  Based upon the
18  what?
19          THE WITNESS:  The letters sent
20  to the members.
21          MS. DeBRUICKER:  I have no
22  other questions.
23          THE WITNESS:  Thank you.
24          MR. PODRAZA:  Just one.
25  BY MR. PODRAZA:

18  (Pages 69 to 72)

Page  73

```
 1        Q.   In prior nomination proceedings, had
 2    you also observed a large number of members
 3    present, whether inside the building or outside
 4    the building?
 5        A.   Yes.
 6        Q.   So it wouldn't be unusual that on
 7    June 9, 2020, the members would take interest in
 8    what was going to happen and be present in -- in a
 9    decent number, correct?
10        A.   Yes, it would be --
11             MS. DeBRUICKER:  Object to the
12    form.
13             THE WITNESS:  -- a -- a regular
14    occurrence.
15             MR. PODRAZA:  Thank you.
16             MS. DeBRUICKER:  Okay.  I think
17    we're done.
18             THE VIDEOGRAPHER:  This
19    concludes media one and the end of the
20    videotaped deposition of Tara Chupka.  We
21    are going off the video record on
22    September 8th, 2021 at 3:26 p.m.
23             - - -
24             (Whereupon, at 3:26 p.m., the
25    witness was excused and the deposition was
```

Page  74

```
 1             concluded.)
 2             - - -
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  75

```
 1             C E R T I F I C A T E
 2
 3    COMMONWEALTH OF PENNSYLVANIA  :
 4                         :  SS
 5    COUNTY OF PHILADELPHIA       :
 6
 7
 8             I, ROBIN FRATTALI, Registered
 9    Professional Reporter - Notary Public, within and
10    for the Commonwealth of Pennsylvania, do hereby
11    certify that the proceedings, evidence, and
12    objections noted are contained fully and
13    accurately in the notes taken by me of the
14    preceding deposition, and that this copy is a
15    correct transcript of the same.
16
17
18
19             _____
20             ROBIN FRATTALI
21             Registered Professional
22             Reporter - Notary Public
23             NOTARY ID:  1053372
24
25
```

Page  76

```
 1        INSTRUCTIONS TO THE WITNESS
 2             Read your deposition over
 3    carefully.  It is your right to read your
 4    deposition and make changes in form or substance.
 5    You should assign a reason in the appropriate
 6    column on the errata sheet for any change made.
 7             After making any changes in form or
 8    substance which have been noted on the following
 9    errata sheet along with the reason for any change,
10    sign your name on the errata sheet and date it.
11             Then sign your deposition at the
12    end of your testimony in the space provided.  You
13    are signing it subject to the changes you have
14    made in the errata sheet, which will be attached
15    to the deposition before filing.  You must sign it
16    in front of a witness.  Have the witness sign in
17    the space provided.  The witness need not be a
18    notary public.  Any competent adult may witness
19    your signature.
20             Return the original errata sheet to
21    your counsel promptly.  Court rules require filing
22    within thirty days after you receive the
23    deposition.
24
25
```

19  (Pages 73 to 76)

**Walsh v. Local 98**

Page 77

1          ERRATA SHEET

2    Attach to Deposition of:  Tara D. Chupka, Esquire

       Taken on:  September 8, 2021

3    In the matter of:  Walsh vs. Local 98

4    PAGE    LINE NO.    CHANGE    REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 78

1          SIGNATURE PAGE

2

3             - - -

4

5         I hereby acknowledge that I have

6    read the aforegoing transcript, dated September 8,

7    2021 and the same is a true and correct

8    transcription of the answers given by me to the

9    questions propounded, except for the changes, if

10   any, noted on the Errata Sheet.

11

12            - - -

13

14

15

16

17   SIGNATURE: _____

18       Tara D. Chupka, Esquire

19   DATE: _____

20

21   WITNESSED BY: _____

22

23

24

25

**A**

**ability** 10:16
**able** 10:12 22:8
  28:12 50:2
**accurately** 10:17
  75:13
**acknowledge** 78:5
**Act** 8:8 15:24
**action** 1:4 6:21 8:6
**active** 38:17
**activities** 41:10
**actual** 38:25 48:24
**address** 66:22
**administrator** 35:7
**administrator's**
  41:7
**adult** 76:18
**advance** 35:17
**advice** 16:13,17,21
  17:1,5 63:1 64:11
  64:16
**affect** 10:16
**affiliation** 7:9
**aforegoing** 78:6
**afraid** 67:7
**afternoon** 8:2
**Agent** 17:9,13,14
  17:18,20,25 18:3
  18:4,7,20 19:5,13
  19:19 20:2,8,10
  20:14,25 21:14
  23:24 24:7,11
  45:23 61:24
**Agent's** 21:19
**Agents** 18:13
**agitated** 71:10
**agitation** 70:14
**ago** 12:6
**agree** 34:16
**agreed** 40:17
**agreement** 6:7
**ahead** 15:9 28:25
**alleging** 8:7
**allowed** 39:15,19
  47:1
**aloud** 52:6
**and/or** 5:9 30:13
**ANNA** 3:3
**announced** 19:19
  52:9
**answer** 5:3 9:3,4,15
  22:3 27:14 37:16
  37:25 38:4 40:2
  49:14 50:19 57:13
  58:12,24 68:4
  72:4

**answered** 49:13
**answers** 9:1 28:4
  78:8
**antagonistic** 65:24
  68:24
**antagonizing** 59:25
  60:20
**anxiety** 70:23
**anxious** 71:10
**anybody** 52:17 53:3
  55:17 64:16
**apologize** 10:25
  15:11 53:8 57:15
  65:5
**appear** 65:23 66:1,4
  67:4,14,17,19,21
  69:1
**APPEARANCES**
  2:1
**apprehension**
  70:17
**apprehensive**
  71:10
**apprentice** 35:6
**approached** 32:21
  32:21
**appropriate** 37:25
  76:5
**approximately** 1:18
  11:8,17 12:3,7,14
**area** 33:18
**argue** 66:24
**argument** 60:2 66:5
**argumentative** 69:5
**Arms** 45:17,21 46:1
**arranged** 28:24
  29:1 71:23
**arrive** 35:21
**arrived** 45:5 46:13
  46:16
**asked** 31:10 33:3,8
  33:10,14 36:23
  37:14 42:7 49:12
**asking** 15:4 39:12
**assign** 76:5
**assigned** 39:6
**assist** 14:1,5 28:13
**assistance** 30:17
**Assistant** 2:5 7:12
  12:20 13:3 19:16
**assisted** 30:14
**assume** 9:16
**assumed** 48:21
  49:7
**assumption** 49:4
**atmosphere** 70:1

71:19
**atrium** 33:20
**atrium's** 33:20
**Attach** 77:2
**attached** 76:14
**attend** 17:9,12
  18:19 20:7,10,14
  21:2 51:14 54:17
  65:12
**attendance** 18:16
  62:2
**attended** 13:8 30:1
  51:18 65:18
**attends** 19:3
**attention** 62:11
**attorney** 2:5 3:3,8
  7:12 8:5 9:21,22
**Attorney's** 1:15 2:3
  6:24
**Availability** 20:17
**available** 35:3
**aware** 15:25 18:7
  19:1,4 41:11 44:9
  47:16,22 50:12
**awkward** 10:20,25

**B**

**back** 18:2 34:3
  41:17 45:6 57:5
  61:23 69:23
**bar** 13:9,10
**Based** 25:14 72:15
  72:17
**basement** 47:3
**Bates** 4:12 43:5
**Battle** 22:24 23:2
  29:17,18 31:10
  32:20 33:2,8,16
  33:17 36:4,22
  37:14 39:11,15
  40:23 41:16,23
  42:11,13 43:17
  44:11,15,16,20,22
  46:15 48:7 53:22
  53:24 54:7 59:5
  59:10,17 60:6,9
  60:13,19 62:21
  63:5,14,18,22
  64:4,24 65:23
  66:1,4,20 67:4,10
  67:14,23 68:17
  71:7
**Battle's** 16:22
  46:21 47:20 48:3
  48:12 54:4 65:16
  66:11 68:8,20,23

69:2,4,7
**becoming** 13:14
**beginning** 1:17
  12:11
**behalf** 7:15
**behavior** 65:17
  66:7,11,21 68:8
  68:21,23 69:2,4,7
**believe** 11:7 21:15
  29:8 30:12 31:5
  32:19 33:19 34:1
  34:9,17 36:12
  40:25 41:14,24
  42:24 45:14 46:2
  46:24 51:4 52:13
  59:9 60:19 62:3
  68:7
**belonged** 31:19
**BENNETT** 3:3
**best** 9:4 29:19
  31:17 40:20
**better** 59:22
**Bill** 7:17,18
**bit** 33:4 34:4 59:13
**blank** 31:6,15 34:7
  36:5
**Board** 53:18,19
  57:19
**boisterous** 59:16
**brain** 49:20
**Brian** 31:13 32:4
  51:5 52:21
**Brian's** 32:1,4
**brief** 59:15
**briefings** 66:25
**Broad** 2:11
**Brotherhood** 1:9
  6:18
**brought** 8:7 34:15
  34:25 35:25
**building** 13:20,21
  54:22 70:6 73:3,4
**buildings** 35:4
**bullet** 20:6
**bunch** 18:9
**Burrows** 31:13
  37:18,21 38:10
  39:10,14 51:5,8
  52:21
**Business** 12:20,22
  13:1,4 14:2 17:9
  17:13,14,18,20,24
  18:3,4,7,12,19,20
  19:5,12,16,16,18
  20:2,8,10,14,24
  21:14,19 23:24

24:6,11 27:7,8
  38:7 45:23 47:5
  52:15 53:16 55:11
  55:19 57:2 61:23
  64:24 71:24

**C**

**C** 75:1,1
**calendar** 19:7
**call** 19:22 26:18
  27:9,14,20,23,25
  28:2 30:13 33:12
  34:9 37:21 51:13
  62:12,16
**called** 26:25 27:12
  27:16 33:13 35:23
  37:18
**Calls** 39:25 40:12
  50:16 58:9,22
**campaign** 71:25
  72:2
**candidates** 4:12
  43:4 48:9
**capacity** 11:23
  17:12 18:20 72:13
**card** 56:6
**carefully** 76:3
**case** 10:9 66:17
  69:15
**cell** 33:22
**certain** 17:22 19:3
  20:6 47:1
**certification** 6:8
**Certified** 1:22 5:12
**certify** 75:11
**Chair** 52:13,19
**Chairman** 55:16
**Chairperson** 51:6
**chairs** 47:2
**chance** 25:11
**change** 15:20 57:13
  76:6,9 77:4
**changes** 76:4,7,13
  78:9
**charge** 17:22 38:10
**Charles** 16:22
  22:24 23:2 29:17
  29:18 59:5 60:6,9
  60:13
**Chestnut** 1:15 2:5
  2:16 7:1
**Chief** 3:8
**Chupka** 1:13 4:4
  6:15 7:21 8:2
  43:12 71:18 73:20
  77:2 78:18

**Chupka-1** 4:12 43:2
43:7
**circumstances**
20:16 25:19
**City** 20:4 46:24
**civil** 1:4 3:4 6:21
8:6
**clarify** 53:23
**clear** 8:25 9:15 39:1
**CLEARY** 2:15
**clerical** 12:13,13,20
25:3,24 58:3
**close** 26:14
**closely** 37:23
**column** 76:6
**combination** 19:14
**come** 14:2 19:20
26:22 28:12 31:25
54:21 72:12
**comfortable** 15:18
**coming** 41:13,14
**Commonwealth**
1:20 75:3,10
**communicated**
52:12
**compare** 48:12
**competent** 64:10
76:18
**Complaint** 64:19,21
**complete** 10:12
43:20
**completed** 31:15
31:18,24 33:10
36:1,23 37:2
39:15,20,24 47:20
49:1,25 50:10,25
51:20
**compliance** 17:6
**concerns** 66:23
67:24
**concluded** 74:1
**concludes** 73:19
**confrontation**
66:2 69:2
**conjecture** 40:13
50:17 58:10,22
**connection** 8:9
16:21
**consider** 13:19
37:24 43:19,21
49:20 58:14 65:16
**considered** 58:7
63:23
**considering** 39:23
**consists** 35:5 53:18
53:19

**Constitution** 39:7
46:3
**Constitution-wise**
50:3
**contained** 33:9
75:12
**content** 35:20
**continued** 68:8
**convenes** 18:5
**conversation** 44:19
59:15 60:12,18
67:20
**conversations** 59:4
59:8 60:8,17 61:4
61:9,13
**copies** 6:3 25:6,16
**Coppinger** 23:15
23:18 61:10,14,16
61:20
**copy** 58:5 75:14
**cordial** 33:2 67:22
**correct** 13:1 27:3
31:14 35:3 37:16
43:24 49:15 62:24
66:8 68:10 72:14
73:9 75:15 78:7
**correctly** 18:11
55:9
**counsel** 2:8,13,19
6:7 7:8 8:20 11:14
11:24 12:2 13:12
13:15,18,20 14:17
16:12 40:16 66:16
76:21
**count** 46:23 48:21
49:21
**counted** 65:15
**counting** 50:22
51:9
**COUNTY** 75:5
**couple** 33:25 43:13
**court** 1:1,19,22,22
6:20 7:6 8:22
66:25 76:21
**COVID** 22:20 46:23
54:17
**cream** 70:3
**current** 11:12 17:8
**currently** 11:9

**D**

**D** 1:13 4:1,4 7:21
77:2 78:18
**date** 7:2 38:23
76:10 78:19
**dated** 78:6

**dates** 65:6
**day** 19:8 29:1 32:14
**day-to-day** 15:20
16:9
**days** 76:22
**deadline** 35:18
**DeBRUICKER** 2:4
4:6 7:11,12 8:1,5
10:23 11:2 14:19
15:3,12 32:5 40:5
40:10,16,22 43:1
43:11 47:13,17
49:9,22 50:23
56:10 58:17 59:2
60:7 61:19,21
63:16 64:6 66:15
68:12 69:9,13
71:12,17 72:21
73:11,16
**decent** 73:9
**decided** 47:8
**decides** 19:12
**defendant** 1:10
2:13,19 7:15,19
**defendant's** 64:21
64:24
**Defendants** 6:19
**defended** 8:17
**Denny** 3:10 7:5
**Department** 1:5,14
2:3 3:5 6:16
**depending** 18:17
**depends** 19:17
**deposed** 8:11
**deposition** 1:13 5:1
6:15,23 8:15,17
9:20 73:20,25
75:14 76:2,4,11
76:15,23 77:2
**depositions** 10:8
**describe** 13:13 14:9
14:15 15:13,15
17:11 24:23 69:22
69:24
**description** 4:11
13:18 66:11
**desire** 24:16
**desk** 26:22 28:4
46:10
**difference** 19:2
**differences** 47:19
47:23
**different** 17:16,16
18:9
**DIRECTIONS** 5:3
**directly** 37:23

**disagree** 66:19
**Disclosure** 8:8
15:24
**discussed** 20:2
21:14,16 22:9,21
22:24 23:3,7,10
23:15,18 24:1,10
**discussion** 21:18
21:21 22:2 54:16
55:2,6
**discussions** 24:10
30:9,19
**distracting** 10:15
**District** 1:1,1 2:4
6:20,21,25
**Division** 3:4
**Doc** 72:7
**documents** 5:6
10:1 25:5
**doing** 25:9,10
**DOL** 10:4
**DOL_LOCAL** 4:13
43:5
**doorway** 33:21
**Dougherty** 12:24
18:19 24:24 38:8
55:10,20,22 56:19
56:23 57:11 58:6
59:4 60:9,13,24
61:5,10,13 62:19
64:25 72:2
**due** 22:20 24:4
26:25 29:10 46:23
**duly** 7:22
**duties** 17:8 45:25
**dwell** 12:8

**E**

**E** 4:1 75:1,1
**Eastern** 1:1 2:4
6:20,25
**either** 22:8 23:4,5,6
23:13,21 37:11,13
51:9
**election** 16:14,18
16:23 21:19,22,24
23:25 24:1,4,21
25:2 38:11,15,19
38:22 46:5 54:14
57:18 58:1,20
60:10,14 63:18
64:1
**election-related**
41:9
**elections** 8:10
25:22 71:20 72:3

**Electrical** 1:9 6:18
**email** 19:21
**employed** 11:9
**employee** 39:8
45:12
**employees** 17:16
**entirety** 16:1
**errata** 76:6,9,10,14
76:20 77:1 78:10
**Esquire** 1:14 2:4,10
2:16 3:3,7 4:4
7:21 77:2 78:18
**estimation** 71:21
**evening** 13:8
**events** 51:12
**eventually** 50:25
**evidence** 75:11
**exact** 35:20 55:18
**exactly** 28:8 51:10
**exam** 13:9,10
**EXAMINATION** 4:5
7:25
**examined** 7:23
**Examining** 53:19
**example** 14:4
**excuse** 13:23 14:21
31:7 42:3 51:11
60:5 65:10
**excused** 73:25
**Executive** 12:20
13:3 53:18 57:19
**Exhibit** 4:11 43:2,6
**EXHIBITS** 4:9
**expect** 8:20
**extremely** 22:11

**F**

**F** 75:1
**face** 30:4
**face-to-face** 29:19
**fact** 28:15 59:14
**facts** 10:17
**fair** 16:6
**fall** 59:9
**familiar** 45:18
**family** 10:15
**far** 10:9 14:18,22
15:1
**faster** 15:4,5
**fearful** 66:23
**February** 64:23
65:8,11
**feel** 15:18 59:12,17
64:10 66:8
**feeling** 59:19
**feet** 33:25

Page 80

**Walsh v. Local 98**

TARA D. CHUPKA, ESQUIRE, 9/8/21

**felt** 45:1 60:1 66:11
71:11
**fight** 60:2
**figure** 48:23
**file** 48:15,19
**filing** 6:8 76:15,21
**fill** 26:20 34:4 36:11
44:3
**filled** 31:6 42:2,3
55:23 56:4
**financial** 35:6 41:8
**find** 35:17 66:19
**fine** 16:5
**first** 4:10 7:22 12:4
19:10 28:11 33:7
52:14
**Fleming** 1:24
**floor** 28:11
**folder** 31:5,8,12,16
32:9,14,17 33:9
36:3 44:24 45:4,6
46:7,18,19 47:21
47:24 48:3,12,15
48:20
**following** 76:8
**follows** 7:23
**food** 70:2 71:23
**foot** 47:2
**footage** 46:25
**form** 6:10 26:20
29:15 31:11 32:22
33:24 34:2,11
35:24 36:5,8,16
36:19 40:18,24
41:17,21 42:2
43:17,19 44:3,6
44:16,16,22 46:18
46:21 47:20 48:3
54:8,21 55:21,23
56:11 62:21 63:22
68:13 71:13 73:12
76:4,7
**formal** 18:4,7
**forms** 29:9 31:6,15
31:15,18,22,24
33:9,15,16 34:7
34:14,17,18,24
35:2,10,17 36:1
36:23 37:2,15
39:16,20,24 45:2
46:22 47:10,13,20
48:11 49:2,25
50:7,10,14 51:1,8
51:20,24 52:2,5
52:22
**fourth** 68:19

**frame** 12:3 20:24
33:6
**Frattali** 1:18 7:7
75:8,20
**friend** 40:7
**friendly** 70:1
**front** 28:4 67:8 70:5
76:16
**fully** 75:12
**fund** 35:7 41:7
**further** 44:19 57:5
64:7

**G**

**Garden** 22:16 34:20
34:24 70:7
**gathering** 70:3
**general** 14:5 20:1
59:18
**generalized** 17:14
33:18
**generally** 18:9
65:13
**gentleman** 57:22
**getting** 18:2
**give** 12:7,9 13:17
14:3,14 15:14
18:24 36:7 40:24
41:16 43:12 46:7
50:25 56:11 64:10
64:16
**given** 8:20 51:4
78:8
**giving** 56:14
**go** 14:22 15:9 19:24
26:5,16 30:18
31:21 32:17,22,24
34:3 45:1 64:12
**goal** 8:25
**going** 14:22 15:3
16:3 20:4,18
28:10 30:10 34:3
43:1 46:10,20
47:4 48:19,21
52:15 53:1 55:10
61:23 64:12 69:9
69:13,22 73:8,21
**good** 8:2 9:13
**gotten** 30:25
**groups** 17:16 70:4
70:5
**guidance** 30:23
68:4

**H**

**hall** 26:6,16 27:3

28:11 30:6,11,16
31:2 32:17 34:8
34:14 38:25 47:4
64:5 72:14
**Hammonton** 1:24
**handed** 32:22 33:1
36:3
**handle** 30:18
**happen** 46:20 47:24
49:11 73:8
**happened** 33:6
**happens** 32:17
**head** 15:21 46:23
**head-count** 47:9
51:17
**hear** 9:10 10:21
62:8 63:17
**heard** 6:19 9:16
24:9 45:16
**hearing** 62:18
**held** 6:23 11:15
12:13 19:6 20:20
22:14,15
**help** 11:21 58:4
**helped** 58:4
**helping** 25:24
**Hi** 8:3
**high** 25:11
**hired** 11:19
**hold** 19:12 21:24
**holding** 21:21
**honestly** 15:18 22:3
22:11 24:2 45:14
59:12 62:10
**honesty** 21:5,7
54:13 62:10
**hot** 22:13
**hour-to-hour** 15:20

**I**

**IBEW** 3:8 7:15 39:7
46:3 50:3
**ice** 70:3
**ID** 75:23
**identification** 43:7
**identified** 53:13
**identify** 53:5,9
**immobilizer** 22:12
**important** 9:2 58:19
64:2
**impression** 71:9
**In-House** 11:14,24
12:2 13:11,15,18
**included** 31:22 48:3
**incumbent** 50:11
50:14 57:9

**incumbents** 58:8
**INDEX** 5:1
**indicating** 37:4
**information** 5:6
32:6 63:25
**injury** 33:3
**inquiring** 29:13
**inside** 73:3
**instructing** 15:8
**instructions** 30:22
36:7 68:2 76:1
**interacted** 67:10
**interacting** 21:9
**interactions** 44:10
71:7
**interchangeable**
35:22
**interchangeably**
27:5
**interchanged** 35:4
**interest** 9:14 73:7
**International** 1:8
6:17
**interview** 10:3,4
**intimidated** 66:23
67:17
**intimidation** 71:4
71:11
**introduce** 7:9
**involvement** 57:25
**issue** 14:2 51:17
**issues** 10:15 20:3
66:17

**J**

**J** 1:4 6:16 12:24
55:20
**JACK** 3:7
**January** 64:23 65:7
65:9,10
**Jersey** 1:24
**jive** 20:21
**job** 13:17 17:8,23
20:3 24:18 28:8
39:6
**jobs** 20:3
**Joe** 7:14 9:23
**John** 3:7 12:24
24:24 38:7 55:20
64:25
**Josem** 2:15,16 7:17
7:18,18
**JOSEPH** 2:10
**jpodraza@lamb...**
2:13
**JR** 2:10

**Judge** 69:10,14
**July** 60:19 68:18
**June** 8:9 16:13,18
16:22 20:18,20,25
21:11,13 22:10
23:23,25 24:11
25:25 60:24 61:5
61:9,12,24 64:1
64:17 66:21 67:3
67:11 68:9 69:23
71:8 73:7
**Justice** 1:14 2:3

**K**

**keep** 15:4,21
**Ken** 57:23
**kind** 19:24 25:17
33:2,5 34:4 67:22
70:6
**kinds** 14:11
**knew** 29:1,25 48:7
49:5
**know** 9:8,11 14:7
14:25 18:1,7
19:18 22:3 25:25
27:22,24 28:1,8,9
28:14,17,20,22,23
29:5,12 30:6
31:18,24 32:13,15
32:22 33:7,11,16
34:16 35:1,16
37:15,25 38:12,18
39:6 42:3 45:20
49:7,18 50:3,8
51:23,23 52:1
54:13,15 57:1,22
58:15,25 60:21
61:2,16,19 62:4,7
62:14 63:7,11,13
64:3,15 65:9 70:4
**knowledge** 29:25
31:17 34:23 35:9
57:11 58:6
**known** 29:21 38:4
56:24

**L**

**Labor** 1:4,5 3:4,5
6:16 7:13 8:6,7,8
15:23 64:2
**LAMB** 2:10
**large** 14:3 70:4 73:2
**late** 26:24 28:6
46:12
**LAURA** 3:3
**Lauren** 2:4 7:11 8:4

**Walsh v. Local 98**

**TARA D. CHUPKA, ESQUIRE, 9/8/21**

10:22
**lauren.debruicke...** 2:7
**Law** 13:8
**lawsuit** 17:2
**leadership** 64:25
**leading** 23:25 66:17
**learn** 19:19 45:25
**leave** 71:8
**legal** 3:11 13:11,14 14:10,15 15:16 16:12,17,21 17:1 17:5
**letter** 35:19,21 42:6 72:15
**letters** 72:19
**liaison** 13:24
**liaisons** 13:19
**limited** 72:13
**line** 69:11,14 77:4
**lines** 18:25 25:7 38:25 41:25 50:4 52:14,18 55:16 58:5 60:3
**list** 19:23 20:6
**listen** 9:2,4
**literally** 15:20
**little** 33:4 34:4 59:11,11,13
**LLP** 2:15
**LMRDA** 16:4,7 17:6
**Local** 1:8 3:8 6:18 7:15 8:7 11:3,6,8 11:10,13,19,22 12:5,10,12,18 13:14 16:13,17,21 17:1,5,21 18:4 24:13 26:21 45:12 45:13 57:9 58:8 64:22 77:3
**located** 27:6,6
**location** 17:22,23 26:19 28:2
**Logistics** 38:23
**long** 11:15 14:7
**look** 31:8,22 43:13 46:2 49:1,24 54:20
**looking** 20:24 60:1
**lot** 22:15 70:5
**Lynch** 62:1,4,7,8

**M**

**Ma'am** 40:19
**mailed** 35:19 42:7
**mailings** 38:24

**making** 76:7
**man** 26:22 46:10
**Management** 3:4 8:8 15:23
**Manager** 12:21,22 13:1,4 14:2 18:21 19:16,16 38:7 47:6 52:15 53:16 55:11,19 57:2 64:24
**manila** 31:5
**Mark** 62:1,4,7
**marked** 43:2,6
**Martin** 1:4 6:16
**matter** 6:15 59:20 77:3
**McConnell** 23:7,10 60:25 61:2,6 62:9
**McERLANE** 2:10
**McHugh** 69:10,14
**mean** 13:22 14:23 18:12 22:4 34:21 35:19 42:5 45:17 53:23
**meaning** 18:15 33:6 58:4 64:22
**means** 13:25 35:11
**meant** 42:6
**media** 6:14 73:19
**medications** 10:16
**meet** 9:24
**meeting** 17:14,15 18:4,7,10,17 19:10,13,20 20:14 20:20,25 21:2,4 21:11,14,14 22:7 22:11,14,22,25 23:3,8,11,16,19 23:23 24:7,11 26:2,3,6 27:5 30:1 31:2 47:4,6 48:24 51:10,12,14,18,21 51:25 52:3,6,8,13 52:19 53:10,22,25 54:5,8,11,17,25 55:4,7 56:1,3,4,15 56:18 59:3,10,16 60:19,23 61:5,8 61:12,24 62:9,13 62:16,19 65:13,24 69:8 72:14
**meetings** 17:9,12 18:3,20 19:5,19 20:2,8,11 23:24 51:6 64:21,22 65:4,17 67:2

68:10
**member** 11:3,5,7 11:18 12:1 26:19 27:1,17 28:11 29:12 30:7,14,16 30:20 33:15 34:10 35:20,22 64:21 70:15 72:11
**members** 26:22,22 35:16 41:6 42:7 53:19,20 65:12,13 70:3 72:10,16,20 73:2,7
**membership** 38:24 64:22 67:2,5,8 68:10 69:25 70:9 70:12,18,21,24 71:2,5
**mention** 48:8 54:4 63:21
**mentioned** 28:5 36:22 37:14 71:18
**message** 19:22,24
**met** 9:21 29:18
**Michael** 23:15,18 61:10,14
**microscopic** 14:25
**mind** 42:6 44:2
**minutes** 51:11,11
**missing** 53:15
**mixed** 14:12,13 15:14
**moment** 43:12 61:22
**month** 19:8,10
**mood** 69:24,25
**Move** 40:1,13 50:17 58:10,23
**moved** 12:19
**multiple** 53:18,20

**N**

**N** 4:1
**name** 7:5 41:5 51:13 54:4 57:24 76:10
**named** 57:22
**names** 48:8
**nature** 59:7 60:16
**necessarily** 21:6,8
**necessary** 46:23 51:13
**necessity** 56:21
**need** 30:17 42:13 42:22 43:23 44:1 76:17

**needed** 30:14 36:11 42:11,16 44:3,7 44:12 56:18 58:4 62:22
**never** 63:2,4 65:15
**New** 1:24
**night** 26:5 28:7 34:8 36:17 44:8 62:11 62:23 69:23 71:8 71:19
**nominate** 34:10 52:15 53:1 55:10 55:20 56:19
**nominated** 24:24 34:11 42:9 44:4,5 44:7,13 52:17 53:4 55:17 62:23
**nominating** 55:22
**nomination** 4:12 14:23 26:3,20,23 28:12 31:6 36:5 36:16,19 43:4 47:6 48:24 49:2 49:25 50:7,14 51:6,14,18,21,25 52:2 53:10 54:8 56:11,15,18 59:3 64:11,17 67:3,11 67:24 68:9 69:23 73:1
**nominations** 16:18 20:20 21:13 26:2 53:24 54:11 56:1 60:23 61:8
**nominator** 41:24 42:11,13,19,23 43:23 44:1
**nominee** 54:25 55:23 63:18,23
**nominees** 22:21 52:9,16 55:3
**non-Local** 50:1
**normally** 65:12
**notary** 1:19 75:9,22 75:23 76:18
**noted** 75:12 76:8 78:10
**notes** 75:13
**notified** 72:11
**November** 59:10 64:23 65:7,10,21 68:8
**number** 6:14,22 73:2,9

**O**

**O'NEILL** 3:7
**object** 49:3 69:10 69:14 73:11
**objection** 39:25 40:9 49:12 50:16 58:9,22 66:15 68:12 69:17 71:12
**objections** 6:9 40:17 75:12
**observe** 68:20,23 69:1,4
**observed** 69:25 73:2
**occasion** 15:23
**occurrence** 73:14
**occurring** 67:12
**office** 1:15 2:3 4:12 6:24 24:13 25:14 26:18,20,25 27:1 27:6,7,9 30:6,10 30:15,16 32:1,4 35:5,6,24 41:8 43:5 45:7 47:7 48:22 52:14 53:8 53:10 55:18 57:4 71:24
**officer** 3:4 8:9 16:14 21:13 57:9
**officers** 24:21 50:11,15
**offices** 53:12
**Oh** 32:3 53:9
**Okay** 8:14 9:5,10,17 9:22 13:24 14:9 16:3,4,6 19:18 20:23 22:6 25:4 27:8 33:1 34:13 35:12 38:18 39:9 41:1 42:18 43:16 45:20 52:19,25 61:25 64:6 65:16 73:16
**once** 16:1 19:8 35:21 47:24
**ones** 65:20
**open** 67:20
**opened** 31:11
**opinion** 17:13 18:6 34:21 40:4,14 50:21 60:21 67:6 67:9
**opposed** 15:16 46:8
**order** 44:13
**orig** 46:10
**original** 10:4 76:20

originally 46:11
outdoors 22:17,19
outside 13:20 73:3
outspoken 30:3
  59:11,12
over-amount 47:5
overseeing 38:10
  38:15,16

**P**

p.m 1:18 7:4 26:4,9
  26:11,14 29:10
  73:22,24
PAGE 4:3,10 77:4
  78:1
PAGES 5:4,7,10,13
paperwork 28:13
paragraph 64:20
Pardon 61:18
parking 22:15 70:5
part 17:8 28:9 34:12
  56:5,8
particular 20:13,15
particularly 59:18
passed 13:9
passing 13:9
pay 62:11
PC 2:10
pen 32:23 33:1
  40:24
Pennsylvania 1:1
  1:16,20,23 2:4,6
  2:12,17 6:21,25
  7:2 75:3,10
people 18:10 19:14
  19:19,23 25:15
  28:5 41:12,14
  47:1,5 48:22
  53:12 54:16 57:18
  57:21 58:7,16
  71:20,25 72:6,9
percentage 14:14
  15:15,19 18:24
period 13:10
permitted 49:24,24
person 27:16 28:3
  37:25 46:11 54:12
personal 20:16
  50:20
personally 39:5
  40:3 57:10 58:14
  59:16 60:1
Philadelphia 1:16
  1:23 2:6,12,17 7:1
  46:25 75:5
phone 19:22 26:18

27:19 30:12 33:22
  34:1,9 62:12,16
  62:19
phones 28:4
physical 27:5 54:1
physically 38:23
picked 38:24
Pike 1:24
Plaintiff 1:6 2:8
  6:17
Plaintiff's 43:6
planning 38:17,19
  38:21
pleading 65:2
please 7:8 30:18
  40:21 57:14,16
Podraza 2:10 4:7
  6:1 7:14,14 9:23
  14:17,21 15:7
  39:25 40:9,12,19
  43:9 49:3,12,16
  50:16 58:9,21
  60:4 62:25 63:6
  63:10 64:9 66:18
  67:1 68:14 69:16
  69:18 71:15 72:24
  72:25 73:15
point 13:6 14:8 20:6
  33:8,17,23 41:16
  45:3 52:8 58:7,15
  67:15 70:7
portions 36:10
position 11:12,16
  12:10,16 13:7
  15:17 24:25 54:25
positive 22:5 70:2
possibly 25:23 28:3
  38:5,7 50:21
  51:12 53:20
post 66:22
potential 22:21
potentially 25:5,8
  26:10
pre 66:21
preceding 75:14
prepare 9:19 10:2
present 3:1,5 24:3
  41:1 51:24 55:3
  56:18 60:20 73:3
  73:8
President 14:1
  19:15 31:13 33:14
  37:22 38:9,13
  39:3 51:5 52:21
  53:16,17
President's 30:15

pretty 26:14 60:18
pride 58:7,15
printed 25:5
prior 13:14 24:4,7
  25:21 26:6 29:21
  56:3,4,15 57:17
  59:3 60:9,23 61:8
  67:3 73:1
probably 33:20
procedure 63:7,11
proceed 40:21
proceeding 14:24
  67:3,11 68:9
proceedings 73:1
  75:11
process 16:18 25:2
  34:12 63:19 64:11
  64:17 67:25 68:3
  68:6
Professional 1:19
  75:9,21
promptly 76:21
propounded 78:9
protect 40:20
protest 16:22
protocols 46:24
provide 10:12
  36:16,19
provided 16:12,17
  16:21 17:1,5
  76:12,17
providing 14:11
  51:8
provoking 66:4
public 1:19 75:9,22
  76:18
purely 14:10,15
  15:16
purpose 28:15 51:7
  52:3,23
purposes 43:7 47:9
  47:10,12
purview 35:8,14
put 20:6 32:9,13
  44:24 46:18
putting 15:19

**Q**

question 6:10 9:3,5
  9:7,11,16 15:11
  18:2 39:12 52:25
  59:22 72:4
questioned 64:24
questioning 15:1
  69:11,15
questions 5:12 9:1

10:19,24 15:4
  34:6 43:14 44:17
  64:7 68:4,5 72:22
  78:9
quite 17:15 56:24
quote 16:2

**R**

R 2:10 75:1
raise 67:23
ran 57:1,8,18
read 6:2 15:25
  64:20 65:5 76:2,3
  78:6
reading 52:5
ready 43:15
really 14:3 15:21
  20:5,5 62:11
reason 10:11 20:13
  50:13 76:5,9 77:4
reasons 54:18
recall 8:13 10:17
  21:6,10,16,20,23
  21:25 22:1,23
  23:1,2,4,9,12,17
  23:20,24 24:2,3,6
  25:9,10 26:2
  27:11,15,18,19,21
  30:8,19,22 36:13
  36:15,21 37:4,7
  39:13 41:12 42:18
  45:10 46:6,13,14
  46:15,17 48:17
  51:16 52:2,4,5,11
  52:22,24 53:12
  54:9,16,20,24
  55:6,9 56:13,14
  57:8,10,17,21,25
  59:20 60:11 61:11
  61:13 62:1,12,18
  62:20 63:24 65:11
  68:1 72:1,5,6,8
receive 76:22
received 21:7 26:18
  30:12 34:10,19
recognize 43:16
recollection 20:21
  22:7,10 29:20
  37:8,10 58:2
  62:15
record 7:4 8:23 9:1
  9:15 29:6 40:20
  73:21
Recording 53:17
refer 15:23 16:3,8
reference 45:16

REFERENCED
  4:11
reflects 66:22
regarding 16:17
  17:5,23 60:9,13
  61:6,10 64:1
  67:24 68:6
regards 54:14
Registered 75:8,21
regular 73:13
regulations 54:14
  56:21
relating 16:13 17:1
relation 55:25
relationship 14:24
relaxed 67:20
relevance 66:16
relevant 69:11,15
remember 30:4
  33:5,6 35:20
  45:15 51:10 55:18
  57:6,19 65:22
repeat 15:10 38:20
repeating 18:8
reporter 1:19 7:6
  8:23 10:21 11:1
  32:2 47:11,14
  56:6,9 61:18 63:8
  63:12 69:12 72:17
  75:9,22
Reporters 1:22
Reporting 1:22 8:8
  15:24
represent 6:1
representative
  17:20
representing 7:16
  7:19
request 16:6
REQUESTS 5:6
require 76:21
requirement 46:25
reserve 40:17
reserved 6:10
retaliation 66:24
Return 76:20
review 10:1,5,7
  41:21 48:11
reviewed 10:3
  66:10
right 29:10 33:25
  34:3 36:24 37:11
  37:19 40:10 57:24
  62:6 67:12 68:15
  76:3
Rights 3:4

TARA D. CHUPKA, ESQUIRE, 9/8/21

**road** 14:22
**Robin** 1:18 7:7 75:8
    75:20
**Rocks** 57:23
**Rodney** 28:22 45:5
**role** 12:13,13 13:11
    14:6,9,12,13
    15:13,22 16:12,16
    16:20,25 17:4
    21:10,19 24:19,20
    24:23 25:1,18,21
    25:24 38:9,12,17
    38:21 46:4 50:1
**room** 27:5 33:13
    54:1 59:19 60:22
**rough** 15:14
**roughly** 14:14
**rude** 65:17 68:21
**ruled** 69:10,14
**rules** 50:6,8 54:14
    56:21 64:15 76:21
**run** 24:13 26:20
    37:6 40:7 53:13
    58:8 65:1
**run-down** 8:21
**running** 26:24 28:5
    37:5 39:23 46:11
    47:5 48:22

--- **S** ---

**saying** 37:9 42:18
    54:20 59:15
**says** 64:21
**scene** 58:3
**schedule** 51:12
**scheduled** 26:21
**sealing** 6:8
**second** 33:24
**Secretary** 1:4 7:13
    8:5,6 53:17 64:2
**Secretary's** 64:19
**section** 42:2,3
**see** 11:25 31:8,22
    33:11,15 36:23
    37:1,5,15 39:15
    39:19,23 50:7
    51:20 62:8
**seeing** 62:18
**seek** 26:23 28:12
**seeking** 26:19 68:4
**Senior** 3:3
**sense** 12:9 22:6
    58:18 70:8,11,14
    70:17,20,23 71:1
    71:4
**sent** 19:21 38:24

72:15,19
**September** 1:17 7:3
    73:22 77:2 78:6
**Sergeant** 45:17,20
    46:1
**service** 27:1
**serviced** 41:6
**set** 19:7 28:10,15
    28:17 47:3
**setup** 38:24
**sheet** 76:6,9,10,14
    76:20 77:1 78:10
**shirts** 71:25 72:3,7
**shortly** 26:4
**shoulder** 21:7 24:4
**show** 33:14 50:10
    50:14
**shrinking** 66:20
**side** 41:7,8
**sign** 6:2 76:10,11
    76:15,16
**signature** 76:19
    78:1,17
**signing** 76:13
**simply** 35:23,23
**Sirod** 3:10 7:5
**sites** 17:23
**slightly** 30:2
**sling** 22:12
**Slip** 4:12 43:4
**small** 14:3 25:6,14
    25:23 58:2 70:4
**socializing** 70:4
**Solicitor** 3:4
**somebody** 35:23
    39:22 56:14
**someone's** 51:13
**sorry** 32:3 38:20
    56:7 69:12
**sort** 8:21 13:17
    14:11,14,15 15:14
    15:14,15 16:8
    17:11 19:1 20:23
    22:7 38:10 71:18
**sounds** 45:18
**South** 2:11
**space** 76:12,17
**speak** 10:17 42:16
    58:13 60:24 67:7
**speaking** 21:10
    67:4,8
**specific** 20:6 37:8
    37:10
**specifically** 25:9,10
    36:13,15 41:5
    65:21

**speculate** 45:22
**speculation** 40:1
    40:13 50:17 58:10
    58:23
**split** 47:7
**spoke** 8:4 39:10
**Spring** 22:16 34:20
    34:24 70:6
**square** 46:25 47:2
**SS** 75:4
**Staff** 3:8
**stamped** 4:12 43:5
**standing** 19:9
    32:20 41:13,15
**start** 12:5 60:1,2
**started** 12:10,12
    26:3
**stated** 34:10
**statement** 34:17
**STATEMENTS** 5:9
**States** 1:1,5,15 2:3
    2:5 6:20,24
**staying** 25:25
**step** 33:18
**stepped** 33:12
**STIPULATIONS** 5:9
**stood** 55:19
**Street** 1:16,23 2:5
    2:11,16 7:1 22:16
    34:20,24
**stress** 70:11 71:10
**strictly** 12:12 25:3
**strike** 40:1,13 50:18
    58:11,23
**strong** 33:21
**subject** 19:17 21:4
    59:20 76:13
**submitted** 32:7
    44:15 54:8,21
    55:21 62:21 63:22
**substance** 76:4,8
**Suite** 1:16,23 2:6,11
    2:17 7:1
**SUMMIT** 1:22
**support** 5:1 14:11
    40:8
**suppose** 19:17
    72:11
**supposed** 28:6,21
    28:23 29:3
**sure** 12:11 14:1
    22:10 32:20 34:5
    39:2 48:6 49:8
    53:14 57:14 65:7
**surgery** 21:7 24:5
**surprise** 35:11

**surprised** 63:17
**sworn** 7:10,22

--- **T** ---

**T** 2:16 75:1,1
**table** 28:10,20 29:3
    33:13,18,24,24
    46:10
**tables** 28:14,17
    41:2
**take** 6:3 8:23 11:18
    12:7,15 13:6
    20:18 31:1,4 34:7
    36:1 73:7
**taken** 1:14 8:14
    10:8 27:22,24
    28:2 75:13 77:2
**talk** 14:23 33:4
**Tara** 1:13 4:4 6:15
    7:21 64:10 73:20
    77:2 78:18
**tasked** 38:13
**team** 58:19
**telephone** 3:5
**tell** 7:22 13:25
    17:18 28:6 29:24
    36:10 37:1 39:11
    39:14 42:15,22
    48:2 59:7 60:16
**Temple** 13:8
**tend** 14:7
**tense** 71:9
**tension** 70:8
**term** 17:13,14 18:8
    27:7 45:16
**terminology** 27:7
**territories** 20:4
**territory** 17:21
**testified** 7:23
**testimony** 10:12
    43:22 76:12
**text** 19:22 62:9
**Thank** 9:6 11:1 39:9
    43:9,10 56:9
    63:12 64:8 71:16
    72:23 73:15
**Thanks** 47:14
**thing** 18:3 25:17
    58:3
**things** 8:21 14:7,8
    20:1 25:6,9,11
    33:5 38:1,4,25
    39:3,4 44:12
**think** 22:4 26:13,25
    50:2 57:3,24
    58:16 63:1,20

64:1 66:7,18,21
    73:16
**third-party** 35:7
    41:7
**thirty** 76:22
**thirty-seven** 12:6
**thought** 44:12 59:1
    63:20
**threats** 71:5
**three** 33:4
**time** 6:11 7:3 11:19
    12:2,3,23 13:1,10
    14:7 20:23 22:20
    24:9 26:2,8,17
    28:25 29:22 30:5
    30:6,20 31:21
    33:6 34:19 36:20
    41:2,19,21 42:20
    43:20 44:20 45:8
    46:24 56:24 57:1
    57:3,8 71:16
**timid** 67:4
**Timothy** 23:7,10
    60:25 61:2
**title** 45:13,19
**today** 7:16 9:20
    10:2,13
**Today's** 7:2
**told** 30:13 33:16
    35:17
**tone** 59:25
**track** 15:21
**traffic** 26:25
**training** 35:6
**transcript** 6:4 75:15
    78:6
**transcription** 78:8
**transcripts** 10:7
**Treasurer** 53:17
**trial** 6:11 40:18
**TRIGIANI** 2:15
**truck** 70:3
**trucks** 70:2 71:23
**true** 78:7
**truth** 7:22
**truthful** 10:12
**trying** 22:6
**Tuesday** 19:10
    68:19
**turned** 47:24
**two** 53:21
**type** 18:9 25:23
    58:3
**types** 20:1
**typically** 16:8 72:3

## U

**U.S** 1:14 2:3 3:5
7:12
**uncomfortable**
59:13,17,24 60:22
66:8,12 67:15
69:8,20
**understand** 9:7
11:21 18:11 20:19
26:1 35:2 36:4
39:22 40:6,23
43:22 56:23
**understanding**
12:25 27:2 29:9
31:14 32:16 34:13
38:14 39:18 42:10
44:11 46:20,22
47:18 48:18,25
49:10,19,23 50:6
50:9,24 54:10
56:17,20
**understood** 9:17
43:23 46:9
**unease** 71:1
**uneasy** 71:11
**Union** 3:8 13:23
14:6,25 15:22
16:9,11,16,20,25
17:4 26:5,16 27:3
28:11 30:6,10
32:17 34:8,14
35:16 37:22 38:3
38:25 39:8 47:3
59:10,15 64:5,25
65:1
**United** 1:1,5,15 2:3
2:5 6:19,24
**unopposed** 58:19
**Unrelated** 44:6
**unusual** 73:6
**use** 15:23 17:15
18:8 27:4,7 49:18
**Usually** 19:21

## V

**vantage** 67:15
**vary** 18:16
**versus** 6:17
**Vice** 53:17
**video** 7:4 8:22
73:21
**videographer** 3:11
6:13 7:6 73:18
**Videographers**
1:22
**videotape** 6:3

**videotaped** 1:13
6:14 73:20
**view** 14:25
**violated** 8:7
**violet** 66:20
**vocal** 30:2
**vocalness** 30:3
**vs** 1:7 77:3

## W

**waived** 6:9
**walked** 32:19
**Walker** 28:22 45:5
45:11,23 46:4,8
46:13,16,19 47:25
48:2,7,9,15,19
49:1,24 50:10,13
50:25 51:8
**Walker's** 45:19
**Walnut** 1:23
**Walsh** 1:4 77:3
**want** 12:8 37:6
39:23 45:22 55:17
**wanted** 26:22 28:11
34:10 37:1,4 42:8
45:25 48:6
**wanting** 21:24 40:7
**wants** 72:11
**warm** 22:11
**wasn't** 21:8 42:19
**way** 6:5 22:8 23:5,6
23:13,21 37:12,13
40:20,20 57:3
**we'll** 6:2 15:5
**we're** 14:23 20:24
52:15 73:17
**we've** 40:16
**wearing** 71:25 72:7
**Wednesday** 1:17
**week** 9:21
**weeks** 24:4
**Welsh** 6:16
**went** 27:1 29:2 30:5
30:15 33:13,19,24
36:2 45:6 68:17
**weren't** 34:14,20,21
**WILLIAM** 2:16
**wishes** 53:3
**witness** 4:3 6:2
7:10,16 15:10
32:3 40:3,14
43:10 47:15 49:6
49:14,17 50:20
56:7 58:13,25
60:5 63:4,13 64:8
71:14 72:19,23

73:13,25 76:1,16
76:16,17,18
**WITNESSED** 78:21
**word** 33:21 49:18
**words** 55:18
**work** 8:21 13:14
14:11 15:16,16
16:9,11 37:23
**workday** 56:2
**workers** 1:9 6:18
28:20 29:3
**working** 11:22 12:5
12:12 57:4
**worried** 71:10
**worry** 41:25 42:5
70:20
**wouldn't** 10:11
15:18 18:6 20:12
20:14 35:13,14
38:16 39:1 45:22
53:2 63:6,10 73:6
**writing** 34:1
**written** 41:19
**wtjosem@cjtlaw...**
2:18
**www.summitrep...**
1:25

## X

**X** 4:1

## Y

**Yeah** 26:15 31:3
57:7,16
**year** 12:4 57:19
**years** 12:6

## Z

## 0

**08037** 1:24

## 1

**1053372** 75:23
**1250** 1:16 2:6 7:1
**150** 65:14
**1500** 1:23 2:11
**16** 11:23
**1610** 1:23
**17** 11:23
**1701** 27:6 28:1
34:18 35:3 45:7
**1719** 22:16 26:19
27:2,6 34:20,24
35:5,21 36:2
**19** 65:10

**19102** 1:23
**19106** 2:17 7:2
**19106-4476** 2:6
**19107** 2:12
**1959** 8:9 15:24

## 2

**2:10** 1:18
**2:13** 7:4
**20** 12:6
**200** 2:17 65:14
71:22
**2001** 12:7
**2006** 12:14,15 13:4
**2013** 11:8,17,23
13:9
**2019** 59:9 64:23
65:7,21 68:8
**2020** 8:9 10:4 16:13
16:18,22 20:19,20
20:25 23:25 24:19
24:21 26:1 60:24
61:5,9,12,24 64:1
64:12,17,23,23
65:7,8,11,11
66:21 67:3,11
68:9 69:23 71:8
72:7 73:7
**2021** 1:17 7:3 60:19
68:18 73:22 77:2
78:7
**21-CV-96** 1:10 6:22
**215** 1:24 2:7,12,18
**24** 64:20
**250** 71:22

## 3

**3:26** 73:22,24
**325** 2:16

## 4

**4:30** 26:10,12 29:2
34:19
**4:45** 26:10,12 29:2
**424** 1:24
**43** 4:12
**447-8648** 1:24

## 5

**5** 26:9,11,14 29:10
42:9
**5:00** 35:18 42:1,8
42:25 48:7 63:15
64:5
**567-3315** 1:24

## 6

**6** 5:10
**609** 1:24
**609-3170** 2:12
**615** 1:15 2:5 6:25
**64,72** 4:7

## 7

**7** 26:4
**7:00** 56:1
**735-9099** 2:18

## 8

**8** 1:17 77:2 78:6
**8,71** 4:6
**800** 1:24
**861-8492** 2:7
**8th** 7:3 20:25 21:11
22:10 23:23 24:11
61:24 73:22

## 9

**9** 67:11 69:23 73:7
**98** 1:8 3:8 6:18 7:15
8:7 11:3,6,8,10,13
11:19,22 12:5,10
12:12,18 13:14
16:13,17,21 17:1
17:5,21 18:4
24:13 26:21 45:12
45:13 50:1 57:9
58:8 77:3
**98's** 64:22
**98_00298** 4:13 43:6
**985-2400** 1:24
**9th** 20:20 21:13
25:25 71:8

# Ex. H

<u>Notified Meeting for Nominations of Officers</u>
<u>Tuesday, June 09, 2020</u>
<u>7:00 PM</u>

<u>Pledge of Allegiance</u>

<u>Roll Call of Officers</u>
- All Officers were present

President Burrows asked for a motion which was seconded and approved to disburse with the normal order of business to address the purpose of the Notification (Notice of Nominations and Election Board of IBEW Local 98).

<u>President – Brian Burrows</u>
- Nominated by Bryan Burrows
- Seconded by Michael Mascuilli

<u>Vice President – Tim Browne</u>
- Nominated by James Reppert
- Seconded by George Rodney Walker

<u>Recording Secretary – Michael Mascuilli</u>
- Nominated by Gabrielle Edwards
- Seconded by Bryan Burrows

<u>Treasurer – Todd Neilson</u>
- Nominated by Ed Neilson
- Seconded by Robert Henon

<u>Business Manager/Financial Secretary – John Dougherty</u>
- Nominated by Tara Chupka
- Seconded Tim Browne

<u>Executive Board (1) – Robert Cresswell</u>
- Nominated by Zach Gneiwoz
- Seconded by James Foy

<u>Executive Board (2) – Robert Gormley</u>
- Nominated by Shawn Gormley
- Seconded by Robert Cresswell

<u>Executive Board (3) – Nick Gummel</u>
- Nominated by Michael Gummel
- Seconded by James Snyder

Executive Board (4) – James Foy
- Nominated by Michael Gillespie
- Seconded by Nick Gummel

Executive Board (5) – James Snyder
- Nominated by Anthony Sabo
- Seconded by Robert Gormley

Examining Board (1) – Robert Thompson
- Nominated by Steve Moscinski
- Seconded by Kirk Henon

Examining Board (2) – Kirk Henon
- Nominated by Robert Henon
- Seconded by Robert Thompson

Examining Board (3) – Nehamiah Devine
- Nominated by George Rodney Walker
- Seconded by John Dougherty

President Burrows announced that there was an exact number of Candidates and that all Offices were closed. President Burrows then asked Recording Secretary Mascuilli to cast the Ballots in favor of the Candidates.

A motion was made to adjourn, the motion was seconded, and the meeting ended at 7:21 PM.

Respectfully submitted,

Michael Mascuilli
Recording Secretary

# Ex. I



# International Brotherhood of Electrical Workers



**Michael D. Welsh,** International Vice President
500 CHERRINGTON PARKWAY, SUITE 325
CORAOPOLIS, PA 15108
(412) 269-4963  •  Fax (412) 269-4964

**Lonnie R. Stephenson,** International President
**Kenneth W. Cooper,** International Secretary-Treasurer

| New York | New Jersey | Pennsylvania | Delaware |

July 31, 2020

**By Certified Mail**
Charles Battle
2548 Brooke Road
Pennsburg, PA 18073

Dear Brother Battle:

This is in response to your letter dated June 16, 2020, in which you protest the election of officers for IBEW Local Union #98. Nominations for officers of Local #98 occurred on June 9, 2020. Because there was no more than one nominee for each office, the election scheduled for July 11, 2020, was not held, and those nominated were deemed elected.

In accordance with the IBEW U.S. Local Union Election Guide, p.7, "[a]ny member, including a defeated candidate, may challenge an election by filing a written protest with the appropriate International Vice President . . . within 30 days of the certification of the election results." Your June 16, 2020, letter was received by my office on June 22, 2020, and is a timely protest.

As you know, I assigned International Representative Randy Kieffer to investigate your protest. He has reported to me, and for the reasons set forth below, I deny your protest. Your protest raises six issues, each of which is addressed below:

1) You allege that Local #98's nomination notice was unlawfully vague and did not provide specifics with respect to seconding or nominating. You state that the Department of Labor's (DOL) guidelines state that whether a nomination is required to be seconded must be included in the notice.

DOL's regulations, rather than its guidelines, are binding. Those regulations state that the notice for nominations must be "reasonably calculated to inform members of the offices to be filled in the election as well as the time, place, and form for submitting nominations." 29 CFR § 452.56. Local# 98's notice unquestionably sets forth the offices to be elected, and the time and place for nominations. It also clearly stated that nominees would have to submit an acknowledgement of their willingness to be nominated, and when the acknowledgement needed to be received. I read your protest to contend that the notice needed to do more and was required specifically to set forth that you could self-nominate. I disagree.

DOL_LOCAL 98_00261

Charles Battle
July 31, 2020
Page 2

First, the IBEW U.S. Local Union Election Guide does not require that the notice for nominations state that a member can self-nominate.  Indeed, the Election Guide contains a model notice, which does not state whether a second is required, or whether a member can self-nominate.

Second, your contention regarding the guidance given in DOL's election guide is mistaken.  That guidance states that the notice "should" include "details such as whether a nomination must be seconded . . . See Figure 3 – Nomination Notice."  DOL's own model nomination notice that is referred to in the quote upon which you rely – " (Figure 3)" – does not state anything about whether a second is required.  Therefore, at best, the guidance means that where a second is, in fact, required, that requirement should be set forth in the notice.  But where, as here, a second is not required, and a member can self-nominate, those details need not be included in the notice.

2)  You contend that Local #98's form required you to list a member who would nominate you, and another member who would second.  Your protest states, "at this point it was clear to me that the rules had changed and that this was a pure attempt to intimidate me not to follow through with running for office."

First, if as you contend, "the rules had changed," then you can hardly contend that the notice was inadequate because you must have thought that you could self-nominate.  Second, the form did not require a second.  In fact, there is no place on the form to list anyone who would be seconding the nomination.  Instead, the form sought the identity of the nominator and the candidate to be nominated.  Although there are separate spaces for each, nowhere does the form indicate that the nominator and candidate have to be different people.  Instead, if you wanted to self-nominate, you could have listed yourself in both spaces.  You indicated to International Representative Kieffer that, although you were pretty sure you could nominate yourself, you questioned your own judgment.  Then, rather than ask someone for clarification, you took the paperwork, went to your car to contemplate what to do, and then left.  You did not return the paperwork, nor attend the meeting.  Nor did you ask for clarification from anyone.  If you had any questions about the forms, there were Local #98 officials present to answer them.  But, instead of asking any questions, you simply left.

3)  You assert that the sign that Local #98 placed on its door on the day of nominations, "was a ploy . . . to intimidate [you]" because it said that you would need three people present.  The sign did not say that.  Instead, it stated that only the candidate, nominator and member seconding the nomination would be allowed in.  That doesn't mean that a candidate must have had a nominator and a second to enter, but rather only that all three types of individuals -- and only those – would be admitted.  Again, if you had any question whether you could nominate yourself, you could have inquired.  But you chose not to do so and left.

DOL_LOCAL 98_00262

Charles Battle
July 31, 2020
Page 3

4) You also contend that you should have been able to see who had filled out a form seeking office. You claim that if it had been an "in-person election," you would have been able to see who else was running. Presumably, you mean that if the nominations were in person, you would have been able to see who else had been nominated.

The nominations were conducted in person. If you had filled out the form, you would have been given admission to the meeting, and at the meeting you could have seen who was nominated, no differently than at any other meeting. Here, the only difference is that admission was limited, and candidates had to – consistent with the notice – complete an acknowledgement indicating a willingness to run in advance so Local #98 could control the size of the meeting in light of the COVID-19 crisis and City of Philadelphia rules.

5) You also claim that the member who was going to nominate you was intimidated by Local #98. That member, however, would not speak with International Representative Kieffer, and therefore, this allegation is without evidence. At your request, Representative Kieffer did speak to a member who said that he had contemplated running for office but had decided not to do so. That member said that he had considered running on his own, not as a part of a ticket, and did not assist you with your campaign. He also stated that he was not part of your protest, did not want to file his own, and had made his own personal decision not to run.

6) Finally, you allege that Local #98 business agent Bob Bark tried to intimidate you into not running, and when you thought about Brother Bark's actions, you left Local #98 on the day of nominations. The investigation showed that Brother Bark and you were, at one-point, personal friends for years. The first time Brother Bark came to your house, the two of you went and had drinks together. During that time together, Brother Bark tried to understand why you had become upset at recent general membership meetings. There is no evidence that Brother Bark tried to intimidate you into not running during that encounter. Subsequently, on another occasion, Brother Bark came to your house with Brother Rich Kee. At one point in the past, you invited Brothers Bark and Kee to your home for Thanksgiving dinner, and thus, you clearly knew Brother Kee. Regardless, when Brothers Bark and Kee came to your home to speak with you, you became angry and directed them to leave. They did so, and I do not find that either Brother Bark or Brother Kee came to your house to intimidate you into not running for office.

DOL_LOCAL 98_00263

Charles Battle
July 31, 2020
Page 4

Accordingly, for the reasons set forth above, I am denying your election protest.  Pursuant to the IBEW U.S. Local Union Election Guide, this is a final internal union decision.

Best wishes.

Fraternally,

Michael D Welsh
International Vice President

MDW:jm

cc:      Randy Kieffer, International Representative

DOL_LOCAL 98_00264

# Ex. J

Page 1

```
 1

 2      IN THE UNITED STATES DISTRICT
        FOR THE EASTERN DISTRICT COURT OF PENNSYLVANIA
 3      CIVIL ACTION NO. 2:21-CV-00096
        ---------------------------------------x
 4

        MARTIN J. WALSH, SECRETARY OF LABOR,
 5      UNITES STATES DEPARTMENT OF LABOR,
 6              Plaintiff,
 7          - against -
 8      LOCAL 98, INTERNATIONAL BROTHERHOOD OF
        ELECTRICAL WORKERS,
 9

                Defendant.
10      ---------------------------------------x
11                      One South Broad Street
                        Philadelphia, Pennsylvania
12
                        August 12, 2021
13                      3:42 p.m.
14
15              VIDEOTAPED DEPOSITION of CHARLES
16      BATTLE, held at the above-entitled time and
17      place, taken before Carolyn Crescio, a
18      Professional Shorthand Reporter and Notary
19      Public of the State of Pennsylvania.
20
21
22                  *     *     *
23
24
25
```

Page 2

1
2  A P P E A R A N C E S :
3
   HAINES AND ASSOCIATES, ESQ.
4  Attorneys for the Witness
      1339 Chestnut Street
5     5th Floor
      Philadelphia, Pennsylvania 19107
6  BY: CLIFFORD HAINES, ESQ.
7
8
   UNITED STATES ATTORNEY'S OFFICE
9  Attorneys for Plaintiff
      615 Chestnut Street
10    Suite 1250
      Philadelphia, Pennsylvania 19106
11 BY: LAUREN E. DE BRUICKER, ESQ.
12
   LAMB MC ERLANE, PC
13 Attorneys for Defendant
      One South Broad Street
14    Suite 1500
      Philadelphia, Pennsylvania 19107
15 BY: JOSEPH R. PODRAZA, ESQ.
      -and-
16    JOEL L. FRANK, ESQ.
      -and-
17    WILLIAM TRASK, ESQ.
18
   ALSO PRESENT:
19    Daniel Grbich, Videographer
20    Anna Laura Bennett, Esq., DOL, (via phone)
21    John Jack O'Neill, ESQ.  IBEW 98
22    John Dougherty
23
24
25

Page 3

1
2          THE VIDEOGRAPHER:  Good
3  afternoon.  We are going on the
4  record at 3:42 p.m. on August 12th,
5  2021.  Please note that the
6  microphones are sensitive and may
7  pick up whispering, private
8  conversations and cellular
9  interference.  Please turn off all
10 phones cell and place them away from
11 the microphone as they can interfere
12 with the deposition audio.
13         This is media unit Number 1 of
14 the video-recorded deposition of
15 Charles Battle, taken in the matter
16 of Walsh v. Local 98, filed in the
17 United States District Court for the
18 Eastern District of Pennsylvania.
19 Civil Action Number 2:21-CV-00096.
20         This deposition is being held,
21 located at One South Broad Street,
22 Philadelphia, Pennsylvania .  My
23 name is Daniel Grbich from the firm
24 Veritext and I'm the videographer.
25 The court reporter is Carolyn

Page 4

1
2          Crescio from the firm Veritext.  I'm
3  not authorized to administer an
4  oath, nor am I related to any party
5  in this action, nor financially
6  interested in the outcome.
7          Counsel, please state your
8  appearance and affiliations for the
9  record.
10         MS. DeBRUICKER:  Lauren
11 DeBruicker, Assistant United States
12 Attorney for the Secretary of Labor.
13         MR. PODRAZA:  And Joe Podraza on
14 behalf of the defendant, Local 98
15 IBEW.
16         MR. HAINES:  Clifford Haines,
17 personal counsel to Mr. Battle, the
18 witness.
19         THE VIDEOGRAPHER:  Will the court
20 reporter please swear in the
21 witness.
22 C H A R L E S   B A T T L E , the witness herein,
23 after having been first duly sworn by a Notary
24 Public of the State of Pennsylvania, was examined
25 and testified as follows:

Page 5

1          C. BATTLE
2  BY THE COURT REPORTER:
3      Q.   Please state your name for the
4  record.
5      A.   Charles Battle.
6          MR. PODRAZA:  Before we proceed,
7      Mr. Battle, we just have a couple of
8      housekeeping matters.  Counsel for
9      the government, as well as myself,
10     have agreed that all depositions in
11     this matter will be subject to the
12     usual stipulation, which is that all
13     objections are reserved until the
14     time of trial, except to the form of
15     question.  Correct, Counsel?
16         MS. DeBRUICKER:  Correct.
17     A.   Charles Battle.
18 EXAMINATION
19 BY MR. PODRAZA:
20     Q.   Okay.  Mr. Battle, good afternoon.
21 My name is Joe Podraza, as you heard, and I'm
22 representing Local 98 in the matter of the
23 Department of Labor versus Local 98.
24     You're a witness here today for a deposition.
25 Have you ever been deposed before?

2 (Pages 2 - 5)

Page 6

C. BATTLE

1
2     A.   No.
3     Q.   Then why don't we review generally
4  the format of a deposition, so hopefully you
5  will feel comfortable as we proceed forward.
6  Essentially, a deposition is just a
7  question-and-answer format.  Myself and opposing
8  counsel will have an opportunity to ask you
9  questions, to which you will supply an answer,
10  unless there's an objection and an instruction
11  for you not to answer.  Okay?
12     A.   Yes.
13     Q.   Very importantly, it's a process
14  where the court reporter is only able to take
15  down one person speaking at a time, so it will
16  be very important that you wait until I complete
17  my question, before you begin to answer, and I,
18  in turn, will do my best to allow you to
19  complete your answer before I proceed with the
20  next question.  Okay?
21     A.   Sure.
22     Q.   If at any time you don't understand
23  the question that I'm posing, please let me know
24  and I'm happy to reframe or rephrase it until
25  you feel comfortable that you can respond to it.

Page 7

C. BATTLE

1
2  All right?
3     A.   Yes.
4     Q.   Now, this is not a test of
5  endurance.  If at any time you need to take a
6  break, restroom, stretch your legs, et cetera,
7  just let me know, and we will be happy to
8  accommodate that request.  The one thing I will
9  ask is, if there's a question pending, that you
10  provide the response to the question before we
11  go off record and allow you to do whatever may
12  need to be done.  Okay?
13     A.   Sure.
14     Q.   I take it you're represented today
15  by Mr. Haines; is that correct?
16     A.   Yes.
17     Q.   All right.  Now, is there any reason
18  today why you would not be able to either
19  understand a question I'm posing, assuming that
20  it's understandable, or be able to respond to
21  that question truthfully?  And by that I mean,
22  are you under any medications, any substances,
23  anything whatsoever that would impact your
24  ability to understand or answer truthfully?
25     A.   No.

Page 8

C. BATTLE

1
2     Q.   Prior to being here in this
3  conference room with us today, did you do
4  anything to prepare for your deposition?
5     A.   Yes.
6     Q.   All right.  What did you do?
7     A.   Had counsel with my attorney.
8     Q.   That's Mr. Haines?
9     A.   Yes.
10     Q.   And when did you do that?
11     A.   Tuesday.
12     Q.   Where did the session take place?
13     A.   In his office.
14     Q.   And approximately how long?
15     A.   Two hours.
16     Q.   Was any -- let me try English.
17     Was anybody else participating in that
18  session?
19     A.   Yes.
20     Q.   Who else?
21     A.   Lauren DeBruicker.
22     Q.   Now, in that session then, tell me
23  the nature of the discussions, what did you talk
24  about --
25     A.   My statements.  Sorry.

Page 9

C. BATTLE

1
2     Q.   That's all right.  So your statement
3  that you gave to the Department of Labor?
4     A.   Yes.
5     Q.   All right.  Did you go through your
6  protest letter?
7     A.   Yes.
8     Q.   Did you go through any other
9  documents besides your Department of Labor
10  statement or the protest letter?
11     A.   Yes.
12     Q.   What else did you review?
13     A.   The international organization's --
14  my statement with the international
15  organization, my rejection letter and a few
16  texts.
17     Q.   Was there any discussion about
18  Mr. McConnell's deposition?
19     A.   No.
20     Q.   No update as to what he was asked or
21  what his responses were?
22     A.   No.
23     Q.   All right.  And was there anything
24  else covered in your prep session?
25     A.   No.

3 (Pages 6 - 9)

C. BATTLE

1
2    Q.   Then why don't we begin --
3    generally, where did you go to high school?
4        A.   Roxborough.
5        Q.   Are you native, meaning you were
6    born in Philadelphia?
7        A.   Yes.
8        Q.   How long have you been associated
9    with Local 98?
10       A.   Thirty-one years.
11       Q.   Now, for -- I take it then you
12   became affiliated around 1991 --
13       A.   Yes.
14       Q.   -- with Local 98?
15   Were you part of the apprentice program?
16       A.   Yes.
17       Q.   All right.  So from 1991 to the year
18   2020, 30-year period, I'd like to ask you, am I
19   correct that you did not hold any positions with
20   the union?
21       A.   You're correct.
22       Q.   And am I also correct that during
23   that 30-year period, you did not run for any
24   union office?
25       A.   No, I did not.

C. BATTLE

1
2    Q.   Okay.  Do I also -- strike that.
3    Am I also correct that during that 30-year
4    period, you did not volunteer to be a union
5    steward?
6        A.   That would be wrong.
7        Q.   Wrong?
8        A.   Yeah.
9        Q.   When did you volunteer?
10       A.   Hold on.  '98, I was a steward.
11       Q.   Okay.  For how long?
12       A.   Approximately six months.
13       Q.   Other than that six-month period,
14   would I then be correct that you did not
15   volunteer to be a union steward?
16       A.   You don't volunteer to be a steward.
17   You're appointed.  So no, I was not appointed or
18   given the opportunity to be a steward.
19       Q.   And did you make a request that was
20   turned down, that you didn't get an appointment?
21       A.   You don't request to be a steward.
22       Q.   I'm asking -- I don't mean to be
23   combative, but my question is pretty precise.
24   Did you ever request to be a steward?
25       A.   No one does, so no.

C. BATTLE

1
2    Q.   Okay.  So you never requested -- you
3    never made such a request that was turned down
4    by the union, correct?
5        A.   Yes, that is correct.
6        Q.   So, therefore, the extent of your
7    experience as a steward is the six months that
8    you just testified about, being in 1998?
9        A.   Yeah.
10       Q.   Now, am I also correct that during
11   the 30-year period, you did not march with the
12   union in any of the St. Patrick's Day parades?
13       A.   Yeah, that would be correct.
14       Q.   And am I also correct during that
15   30-year period, you did not attend any of the
16   union picnics?
17       A.   That would be correct.
18       Q.   Would it be fair to say that during
19   the 30-year period, you would spend your free
20   time on activities that were not union-related?
21       A.   Ask that one more time.
22       Q.   Sure.  During the 30-year period,
23   would it be correct that you spent your free
24   time predominantly on activities that were not
25   union-related?

C. BATTLE

1
2        A.   Yes.
3        Q.   You're aware of an indictment having
4    been filed by the United States Government in
5    2019, are you not?
6        A.   Yes.
7        Q.   And did you read the indictment?
8            MR. HAINES:  Objection.  I'm
9            going to make the assumption that we
10           are talking about -- well, let me
11           rephrase it.  Can you be more
12           specific about what indictment
13           you're talking about?
14       Q.   You understand the indictment I'm
15   talking about, don't you, sir?
16       A.   Which --
17           MR. HAINES:  I think the record
18           needs to --
19       A.   Which one?
20       Q.   The one in early 2019, where
21   representatives associated with the union were
22   indicted by the United States Government for
23   alleged criminal activity?
24       A.   Yes.
25       Q.   And you read that indictment,

Page 14

C. BATTLE

```
1                C. BATTLE
2   correct?
3       A.   Partial.
4       Q.   Who's Bindu George?
5       A.   Who is what?
6       Q.   Bindu George.  B-I-N-D-U George,
7   G-E-O-R-G-E.
8       A.   I must have not read that far into
9   it.
10      Q.   Do you know who Bindu George is?
11      A.   No.
12      Q.   Did you speak with anybody about the
13  indictment, such as Mr. McConnell?
14      A.   I have spoken to a lot of people.
15  So, yes, I have.
16      Q.   And have you spoken to Mr. Coppinger
17  about the indictment?
18      A.   Michael Coppinger?
19      Q.   Yes.
20      A.   Yeah.
21      Q.   And generally, when did your
22  discussions with Mr. McConnell about the
23  indictment occur?
24      A.   I would not be able to give you a
25  date.
```

Page 15

C. BATTLE

```
1                C. BATTLE
2       Q.   I'm not asking for a specific day.
3   Just generally, what years?  From 2019 to
4   present, have you had ongoing --
5       A.   I'm going to say 2020.
6       Q.   2020?
7            MR. HAINES:  Let him finish his
8       answer -- question, before you --
9       Q.   And how about Mr. Coppinger?
10      A.   The same.
11      Q.   Were those discussions at meetings
12  that were held at your house or at
13  Mr. McConnell's house or Mr. Coppinger's house?
14           MS. DeBRUICKER:  Objection.
15      Q.   You can answer.
16      A.   Ask it again, please.
17      Q.   Sure.  When you said in 2020 you had
18  discussions with Mr. McConnell, Mr. Coppinger
19  and perhaps even others about the indictment
20  that was entered into in early 2019, did that
21  occur at meetings that were held at either your
22  house, Mr. Coppinger's house or Mr. McConnell's
23  house?
24      A.   No.
25      Q.   But there were meetings among
```

Page 16

C. BATTLE

```
1                C. BATTLE
2   members of the union that were held at your
3   house; is that correct?
4       A.   I would not call it a meeting.  I
5   would call it a social gathering.
6       Q.   All right.  And at the social
7   gatherings, was the indictment discussed?
8       A.   No.
9       Q.   All right.  How many social
10  gatherings did you have in 2020 prior to the
11  June 9, 2020, nomination proceeding?
12      A.   Three.
13      Q.   And approximately what months did
14  they occur?
15      A.   Sometime in the winter.  January
16  maybe.  I could not tell you.  I don't remember.
17      Q.   So January of 2020.  Were all three
18  during January of 2020 or --
19      A.   No.
20      Q.   -- did they occur differently?  All
21  right.  How about in February?
22      A.   Yeah, like, I don't recall.
23      Q.   But the meetings were, at least the
24  three you recall, they were held at your house?
25      A.   Yup, yes.
```

Page 17

C. BATTLE

```
1                C. BATTLE
2       Q.   Approximately what time to what time
3   did the social gatherings begin and end?
4       A.   Roughly 6 p.m. to 10 p.m.
5       Q.   Was Mr. McConnell in attendance at
6   any of the social gatherings?
7       A.   No.
8       Q.   Was Mr. Coppinger?
9       A.   Yes.
10      Q.   Was Mr. Borthwick present at any of
11  the social gatherings?
12      A.   Yes.
13      Q.   Who else?
14      A.   You want me to give you every name
15  that was there, because I don't remember.
16      Q.   Well, why don't we start with how
17  many people attended, to the best of your
18  recollection?
19      A.   Twenty to 30, maybe.
20      Q.   And how was notification given to
21  the members to attend?
22      A.   They were people from my
23  neighborhood.
24      Q.   How close to the June 9, 2020,
25  nomination proceeding was the last social
```

5 (Pages 14 - 17)

Page 18

C. BATTLE

1
2 gathering?
3     A.  I can't recall.
4     Q.  Was it within weeks or months?
5     A.  I can't recall.
6     Q.  Do you have any knowledge of the
7 criminal conduct discussed in the indictment?
8     A.  Do I have knowledge?
9     Q.  Yeah.  Firsthand knowledge of any of
10 the indicted representatives of the union --
11     A.  When you say "firsthand," meaning
12 what?
13     Q.  Meaning that, firsthand.  That you
14 either observed it or participated in it or have
15 direct knowledge of it.
16     A.  That's a ridiculous question.  No.
17 That's ridiculous.
18     Q.  And have you spoken with any
19 government officials about the criminal conduct
20 discussed in the indictment?
21     A.  No.
22     Q.  Sometime in 2020, you received
23 notice about the upcoming union elections,
24 correct?
25     A.  Correct.

Page 19

C. BATTLE

1
2     Q.  And the union elections run on a
3 cycle of three years, correct?
4     A.  Correct.
5     Q.  And the last election then would
6 have been in 2017?
7     A.  If anyone would have ran, yes.
8     Q.  Well, okay.  The last nominating
9 proceeding prior to 2020 was in 2017, correct?
10     A.  Yeah.  I guess it would have to be
11 nominations, yeah.
12     Q.  Now, do you remember how you
13 received the notice?
14     A.  Through the mail.
15     Q.  I'm going to show you what we are
16 marking here as Exhibit 1.  We are going to call
17 it Battle-1.  I'm going to ask you if you can
18 identify this document for me.
19         (Notice is received and marked as
20         Battle Exhibit 1 for identification,
21         as of this date.)
22     Q.  All right.  Before you is a document
23 we marked as Battle-1.  Take a moment to review
24 the document, and when you feel comfortable that
25 you're aware of it, let me know, and I'll have a

Page 20

C. BATTLE

1
2 couple of questions.
3     A.  Okay.
4     Q.  All right.  When I asked you whether
5 you received notice about the upcoming elections
6 in 2020, is what we marked as Battle-1 the
7 notice that you received?
8     A.  Yes.
9     Q.  Okay.  And did you read the notice
10 when you received it?
11     A.  Yes.
12     Q.  And did you receive it around the
13 time of it's date, May 18, 2020?
14     A.  I don't know.
15     Q.  But certainly before the June 9,
16 2020, nomination proceeding, correct --
17     A.  Yes.
18     Q.  -- you received it?
19         All right.  You can put that aside.  Thank
20 you.  Now, I'm told that before the May 2020 notice
21 was sent, that at a union meeting, before the
22 coronavirus, when the union members would meet in
23 person, that you stood up and said you were not
24 intending to run for office in the June 2020
25 election, or words to that effect; is that true?

Page 21

C. BATTLE

1
2     A.  Yes.
3     Q.  Which union meeting was that?
4     A.  February of '20.
5     Q.  And if I'm not mistaken, that was
6 the last in-person membership meeting, correct,
7 because of the -- before the coronavirus
8 precluded gatherings of that type?
9     A.  That was the last meeting before the
10 gathering of the nominations, so that would be
11 correct.
12         MR. PODRAZA:  I would like to
13         show you what we are marking as
14         Battle-2.
15         (Letter to DOL dated June 6, 2020
16         is received and marked as Battle
17         Exhibit 2 for identification, as of
18         this date.)
19     A.  Okay.
20     Q.  Okay.  Looking at Battle-2, do you
21 recognize the document?
22     A.  Yes.
23     Q.  What is it?
24     A.  It's a letter to the DOL.
25     Q.  From you; is that correct?

6 (Pages 18 - 21)

C. BATTLE

1
2     A.   Yes.
3     Q.   And if I represented to you that the
4  this letter, that's been marked as Battle-2, was
5  sent on June 6, 2020, before the June 9, 2020,
6  nomination proceeding, does that go with your
7  recollection?
8     A.   Yes.
9     Q.   So it was sent prior to the
10  nominating proceeding, correct?
11     A.   Yes.
12     Q.   All right.  Did you type the letter?
13     A.   Did I type -- type it myself?  No, I
14  didn't type it.
15     Q.   Who did?
16          MR. HAINES:  Objection.  You
17       don't have to answer that question.
18          MR. PODRAZA:  Yes, he does,
19       Counsel.
20     Q.   Who wrote the letter?
21          MR. HAINES:  No, he doesn't.  If
22       I tell him he doesn't, he doesn't,
23       he doesn't.  End of subject.  Call
24       Judge McHugh.
25          MR. PODRAZA:  Well, we will put a

C. BATTLE

1
2  record together and we will go
3  forward --
4          MR. HAINES:  That's fine.  Judge
5       McHugh invites you when there are
6       disputes during the deposition to
7       call him.  I'm asking you to call
8       him.  Are you refusing to do that?
9          MR. PODRAZA:  No, let's do it
10       then.
11          THE VIDEOGRAPHER:  The time is
12       now 4:06.  We are going off the
13       video record.
14       (A recess was taken.)
15          THE VIDEOGRAPHER:  The time is
16       now 4:10.  Back on the video record.
17     Q.   Mr. Battle, looking again at
18  Battle-2, are the words that are in this letter,
19  that's been marked here as Battle-2, your
20  specific words?
21     A.   I signed off on them, so I'm going
22  to say yes.
23     Q.   That's not my question, though, sir.
24  Did you specifically pick these words to be put
25  in the letter, or did somebody else?

C. BATTLE

1
2     A.   I did.
3     Q.   So how -- tell me how the letter was
4  constructed?
5     A.   With a lot of help, from a lot of
6  people.
7     Q.   Who were the people that helped you?
8     A.   I --
9          MR. HAINES:  Objection.
10     Q.   Did your counsel help you, sir?
11          MR. HAINES:  Objection.  Don't
12       answer the question.
13     Q.   Did you have representation at that
14  time, sir?
15          MR. HAINES:  What he means when
16       he says "representation," is did you
17       consult with a lawyer?
18     A.   No.
19     Q.   Did you retain a lawyer at that
20  time?
21     A.   No.
22     Q.   All right.  Did you -- just tell me
23  then who comes to mind who helped you write this
24  letter.
25          MR. HAINES:  Same objection.

C. BATTLE

1
2     Q.   Did you choose the words --
3          MR. HAINES:  Charles --
4     Q.   -- in the letter "blind eye"?
5          MR. HAINES:  Let me get the words
6       out of my mouth, so the record is
7       clear.  I'm objecting to the
8       question and instructing my client
9       not to answer that.
10       And so we are clear, that will be
11       the instruction every time you ask
12       about somebody who is not,
13       otherwise, identified in that case.
14       You're not getting what you think
15       you're going to get, until Judge
16       McHugh orders it.
17     Q.   Did you choose the words "blind eye"
18  that are used in the letter, sir?
19     A.   I don't understand the question.
20     Q.   Well, in the letter, there's the
21  term "blind eye," that is used in there.  Was
22  that your words?
23     A.   I signed the paper.
24     Q.   That not my question, sir.  My
25  question is:  Did you construct this letter, and

Page 26

C. BATTLE

1
2    put the words "blind eye" in the letter?
3         A.   I put the word "immediate" in there
4    --
5              MR. HAINES:  Mr. Battle, the
6         question calls for a yes-or-no
7         answer.
8         A.   I don't recall.
9         Q.   Was the letter presented to you to
10   read, and then decide whether you agreed with it
11   or not?
12        A.   No.
13        Q.   Then tell me how the letter was
14   constructed.  Walk me through that.
15        A.   Through a lot of talking to friends.
16        Q.   Well, somebody had to put it on
17   paper, correct?
18             MR. HAINES:  You can answer the
19        question.
20        A.   Yeah.  Somebody did put it on paper,
21   yes.
22        Q.   And was it put on paper first, and
23   then offered to you to review, or did you
24   dictate it, and somebody typed down --
25        A.   A little bit of both.

Page 27

C. BATTLE

1
2         Q.   -- what you dictated?
3         If you turn to the last page of Battle-2, you
4    see the courtesy copy, sir?
5         A.   Yes.
6              MR. HAINES:  This is D-63?
7              MR. PODRAZA:  That is correct,
8         yes, the last page.
9         Q.   Do you see the name Bindu George?
10        A.   Yes.
11        Q.   All right.  You told me before you
12   didn't know who Bindu George is?
13        A.   I have not read this letter in a
14   year.  I mean, I don't know who Lonnie
15   Stephenson is, Kenneth Cooper.  I don't know
16   them.
17        Q.   Well, where did you get the names to
18   put them in the letter?
19        A.   I did some research.
20        Q.   Well, your research, who is Bindu
21   George?
22        A.   He works for the Department of
23   Labor.
24        Q.   What is his position?
25        A.   I could not tell you.  I don't know.

Page 28

C. BATTLE

1
2         Q.   How is it then that you chose Bindu
3    George to send it to, out of all of the other
4    members of the Department of Labor?
5         A.   I don't recall.
6         Q.   Isn't it a fact, sir, that Clifford
7    Haines and his office assisted in the writing of
8    this letter?
9              MR. HAINES:  Objection.  Let's
10        assume that to be a fact.  Why on
11        earth would he answer that?  That's
12        attorney/client privilege.  You're
13        going nowhere with that question.
14             MR. PODRAZA:  Well, you can say
15        that.  That's your basis, sir?
16             MR. HAINES:  Don't answer the
17        question.
18        Q.   All right.  And where in the letter
19   do you indicate that others, other than you,
20   assisted in the preparation of this letter?
21   Show me.
22        A.   You want me to tell you what page
23   and what words they wrote and --
24        Q.   No.  I'm asking you where in the
25   letter is it indicated that others, other than

Page 29

C. BATTLE

1
2    you, assisted in preparing and completing this
3    letter?
4         A.   I don't understand the question.  I
5    just don't understand it.
6         Q.   Well, as the Department of Labor
7    would receive this letter, show me the language
8    in here that you used, that they would know that
9    someone other than you assisted in preparing
10   this letter?
11             MR. HAINES:  Objection.  You want
12        him to tell you how the Department
13        of Justice -- the Department of
14        Labor knew something?
15             MR. PODRAZA:  Well, I'm asking --
16             MR. HAINES:  How does that work?
17        Q.   Where do you reveal in this letter
18   that someone other than you did this letter?
19             MR. HAINES:  Let's agree that it
20        doesn't, and move on.
21             MR. PODRAZA:  I want him to say
22        it, Counsel.  Your testimony means
23        nothing to me.
24             MR. HAINES:  You're such a
25        gentleman.

8 (Pages 26 - 29)

C. BATTLE

1
2     Q.   Do you accept your counsel's
3  statement?
4     A.   I just don't understand the
5  question.
6     Q.   You're the only signator to this
7  letter that's been marked as Battle-2, correct?
8     A.   Yeah.
9     Q.   All right.  And where else in this
10  letter do you indicate to anybody in the
11  Department of Labor that you were assisted in
12  completing this?
13     A.   Does your secretary type letters for
14  you?
15          MR. HAINES:  Objection to the
16       form of the question.
17     Q.   Actually, sir, you're here to answer
18  my questions.
19     A.   I'm not answering that question.
20     Q.   Your counsel said it's nowhere in
21  the letter.  Do you agree with your counsel's
22  representation?
23     A.   If that's what he says.
24     Q.   And do you agree with that and
25  accept it?

C. BATTLE

1
2     A.   Maybe.
3     Q.   Now, did you pay anybody for their
4  services in assisting in the completion of this
5  letter?
6     A.   Like who?  Who would I pay?
7     Q.   I'm asking you.
8          MR. HAINES:  The question is a
9       yes-or-no -- the answer is "yes" or
10       "no."
11     A.   No.
12     Q.   Before the letter was completed, did
13  you, Clifford Haines or anyone at his office
14  have contact with the Department of Labor?
15          MR. HAINES:  Objection. I'm
16       instructing him not to answer that
17       question.
18          MR. PODRAZA:  On what basis?
19          MR. HAINES:  You want a basis
20       this time?  Attorney/client
21       privilege.
22     Q.   Prior to this letter being
23  completed, did you, Clifford Haines or anybody
24  from his office have any contact with the
25  Department of Justice?

C. BATTLE

1
2          MR. HAINES:  Objection.  Don't
3       answer that question.
4          MR. PODRAZA:  And the basis?
5          MR. HAINES:  Same objection.
6          MR. PODRAZA:  Attorney/client
7       privilege; is that your basis?
8          MR. HAINES:  Yes, that's my
9       basis.
10     Q.   Did you have any contact with the
11  Department of Labor prior to the sending of the
12  June 6, 2020, letter?
13     A.   No.
14     Q.   Did you have any contact with the
15  Department of Justice prior to the sending of
16  the June 6, 2020, letter, that's been marked
17  here as Battle-2?
18     A.   No.
19     Q.   Once the letter was sent, and prior
20  to the June 9, 2020, nomination proceeding, did
21  you, Cliff Haines or anybody in his office have
22  contact with the Department of Labor?
23          MR. HAINES:  Objection. I
24       instruct him not to answer that
25       question on the grounds of

C. BATTLE

1
2  attorney/client privilege.
3     Q.   Same time period, did you, Clifford
4  Haines or anybody in his office have contact
5  with the Department of Justice?
6          MR. HAINES:  Same objection.
7       Don't answer.
8     Q.   Did you personally, sir, during that
9  time period have contact with anybody from the
10  Department of Labor?
11     A.   No.
12     Q.   Did you, sir, personally have
13  contact with anybody during that same time
14  period, with the Department of Justice?
15     A.   No.
16          MS. DeBRUICKER:  May we pause for
17       a moment.  We lost Anna Laura.
18          THE VIDEOGRAPHER:  The time is
19       4:14.  Going off.
20          (A break was taken.)
21          THE VIDEOGRAPHER:  The time is
22       now 4:19.  Back on the video record.
23     Q.   Sir, I'm going to show you what we
24  are marking here as Battle-3, and I'll ask you
25  if you can identify this document.

9 (Pages 30 - 33)

C. BATTLE

1
2     (Protest letter dated 6/16/20 is
3     received and marked as Battle
4     Exhibit 3 for identification, as of
5     this date.)
6     A.   This is another statement there.
7  Okay.
8     Q.   Okay?
9     A.   Yeah.
10    Q.   What is Battle-3?
11    A.   This is my letter to Vice President
12 Welsh.
13    Q.   What we would call the protest
14 letter; is that correct?
15    A.   Yes.
16    Q.   All right.  Did you type this
17 letter?
18    A.   Did I physically type it?  No.
19    Q.   Who did?
20       MR. HAINES:  Objection.  I'm
21    instructing him not to answer that
22    question.
23       MR. PODRAZA:  And the legal
24    basis?
25       Counsel?

C. BATTLE

1
2       MR. HAINES:  I'm thinking about
3    what I want to say.
4       My interaction with Local 98 has
5    been nothing but experiencing
6    harassment and threats and physical
7    violence.
8       I believe that a lawsuit filed
9    against Mr. Battle is a threat and a
10   harassment.  I'm not going to let
11   him or put him in the position where
12   he has to identify other individuals
13   who will be subjected to the same
14   experience.
15      MR. PODRAZA:  That's your
16   objection and the basis?
17      MR. HAINES:  Pardon me?
18      MR. PODRAZA:  Is that the basis
19   for your objection?
20      MR. HAINES:  That's the basis for
21   the objection -- well, it's not
22   relevant.  It doesn't matter who
23   typed it.  It's his letter.  He
24   signed it.  He vouched it.  Who
25   cares who typed it?  Where does that

C. BATTLE

1
2    take anybody?  Except to where I
3    think you're headed, or your
4    client's headed.
5       MR. PODRAZA:  Are you through,
6    Counsel?
7       MR. HAINES:  You want me to go
8    on?
9       MR. PODRAZA:  I take it he's
10   through.
11      MR. HAINES:  I have nothing more
12   to say than that.
13    Q.   Mr. Battle, did you have assistance
14 in completing the letter that's been marked here
15 as Battle-3?
16    A.   Did I have other input on the
17 letter?
18    Q.   Sure.
19    A.   Yes.
20    Q.   And was the letter typed at the Law
21 Offices of Clifford Haines?
22      MR. HAINES:  Objection.  You
23   don't have to answer that question.
24   That's privileged information.
25    Q.   Was the letter typed up and then

C. BATTLE

1
2  presented for you to review?
3    A.   This one here?  Yes.
4    Q.   I'd like you to take Battle-2 and
5  put next to it Battle-3.
6       Do you know what a font is, sir?
7    A.   Yes.
8    Q.   When you compare Battle-2 with
9  Battle-3, would you agree with me that they are
10 the same font?
11      MR. HAINES:  Objection.  You can
12   answer the question, if you can.
13    A.   No.  I guess they are different.
14    Q.   You think they are different?
15    A.   This is blurry, so I would say yes.
16    Q.   Would you agree with me that both
17 Battle-2 and Battle-3 have paragraphs where the
18 paragraphs -- the beginning of the paragraph is
19 not indented?
20    A.   Yes.
21    Q.   Would you agree with me that both
22 letters were typed up by the same person?
23    A.   Possibly.
24    Q.   And would you agree with me that
25 both letters share certain portions being

**10 (Pages 34 - 37)**

C. BATTLE

1   C. BATTLE
2   bolded?
3      A.   Yes.
4      Q.   And if you go through the letters,
5   they share references to going to the FBI, the
6   use of the phrase "blind eye."
7      Would you agree with me that that appears in
8   both of these letters?
9      A.   If you see them, I guess they are
10  there.  Yes.
11     Q.   Now, would you also agree with me
12  that nowhere in Battle-3 is it indicated that
13  anyone but you drafted, completed and finalized
14  this letter?
15     A.   Sure.  Yeah.  My name is Charles
16  Battle.
17     Q.   And did you pay anybody to assist in
18  the completion of this letter?
19     A.   No.
20     Q.   Had you retained the Haines Law Firm
21  at this point, sir?
22        MR. HAINES:  Objection.  That's
23        privileged information.
24        MR. PODRAZA:  Are you instructing
25        him not to answer?

C. BATTLE

1   C. BATTLE
2        MR. HAINES:  I am.
3      Q.   Was it Mr. Haines who suggested to
4   you to put the reference into contacting the
5   FBI?
6        MR. HAINES:  Objection.  Don't
7        answer that question.
8        Attorney/client privilege.
9      Q.   Did you actually contact the FBI?
10     A.   No.
11     Q.   Did you speak to the FBI, at all,
12  regarding conduct by Mr. Bark, that you contend
13  happened on June 7, 2020?
14     A.   They reached out to me.
15     Q.   The FBI called you?
16     A.   Yes.
17     Q.   And how was it that the FBI became
18  aware that you had a situation with Mr. Bark?
19        MR. HAINES:  Objection.  If you
20        know.  If you know how the FBI knew
21        something, you would likely be the
22        first person on the face of the
23        earth who is able to testify to
24        that.  But go ahead, if you can.
25     Q.   Please answer.

C. BATTLE

1   C. BATTLE
2      A.   Repeat the question again.
3      Q.   Sure.
4        MR. PODRAZA:  Can you read that
5        back, please?
6        (The requested portion of the
7        transcript was read back.)
8      A.   I don't recall.
9      Q.   Isn't it a fact that Mr. Haines
10  contacted the FBI, advised them of that, and, in
11  turn, they called you?
12        MR. HAINES:  Objection.  You
13        don't have to answer that question
14        on the grounds of attorney/client
15        privilege.
16     Q.   Did you authorize Mr. Haines to have
17  contact with any representatives of the
18  Department of Justice on or before June 16,
19  2020?
20        MR. HAINES:  Same objection.
21        MR. PODRAZA:  And the basis?
22        MR. HAINES:  Same objection, same
23        basis.  You're asking him about
24        communications between him and his
25        lawyer.  I object on the grounds of

C. BATTLE

1   C. BATTLE
2   attorney/client privilege.
3      Q.   Did Mr. Haines, in fact, have
4   contact with representatives of the Department
5   of Justice prior to June 16, 2020 on your
6   behalf?
7        MR. HAINES:  You can tell him
8        what you know, about that question.
9      A.   No.
10     Q.   Did you or anybody else or anybody
11  acting on your behalf have contact with the
12  Department of Justice prior to the sending of
13  June 16, 2020, letter?
14     A.   No.
15     Q.   Well, you did have contact with the
16  FBI, correct, prior to June 16, 2020?
17     A.   Like I said, they contacted me.
18     Q.   Well, when I say had contact,
19  whether they contacted you or you contacted
20  them, prior to June 16, 2020, who on your behalf
21  had contact with the government on your behalf,
22  whether the government contacted them or they
23  contacted the government?
24        MR. HAINES:  Objection to the
25        question.  I'm instructing you not

Page 42

C. BATTLE

1  
2      to answer.
3          MR. PODRAZA:  The basis?
4          MR. HAINES:  Same basis.
5      Mr. Battle is not going to disclose
6          to you the names of anybody who is
7          not otherwise in the record in this
8          case.
9      Q.   Did Mr. Haines at any point, prior
10 to June 16, 2020, have contact with government
11 officials on your behalf?
12         MR. HAINES:  Objection.
13     Q.   You can answer.
14         MR. HAINES:  No, you're
15         instructed not to answer that
16         question.
17         Mr. Battle is not here to testify
18         about me.
19         MR. PODRAZA:  And the basis for
20         your instruction?
21         MR. HAINES:  I just told you.
22         He's not here to testify about me.
23         I'm his lawyer.  You can't ask him
24         questions about his relationship
25         with his lawyer.  You know that.

Page 43

C. BATTLE

1  
2      Q.   Did you pay Mr. Haines or his law
3  firm for any assistance in the completion of the
4  June 16, 2020, letter?
5          MR. HAINES:  Objection. I'm
6          instructing you not to answer on the
7          grounds of attorney/client
8          privilege.
9      Q.   Prior to the sending of your June 6
10 and 16 letters, you were aware Mr. Haines was
11 representing someone in a civil case against
12 John Dougherty, personally, correct?
13     A.   No.
14     Q.   Are you suggesting you were not
15 aware of the fisticuff at one of the picket
16 lines between Mr. Dougherty and a non-union
17 member?
18     A.   When he was hired?
19     Q.   No, I'm asking you.  Were you aware
20 of the situation of a non-union person at a
21 picket line, allegedly entering into some sort
22 of altercation or fistfight with Mr. Dougherty?
23 Were you aware of that?
24     A.   It was all over the news.  Yes.
25     Q.   And that was prior to June 16, 2020,

Page 44

C. BATTLE

1  
2  correct?
3      A.   I don't know.
4      Q.   Well, were you aware that that
5  individual who was involved in an incident with
6  Mr. Dougherty, is represented by Mr. Haines?
7      A.   Was I, did I know?
8      Q.   Yes.
9      A.   No, I did not know that.
10     Q.   Did you at some point learn about
11 that?
12     A.   Possibly.
13     Q.   Would you have learned about
14 Mr. Haines' representation of that other
15 individual, prior to giving your statement to
16 the Department of Labor in October of 2020?
17     A.   I don't recall.
18     Q.   Isn't it a fact that you sought the
19 representation by Mr. Haines because of his
20 representation of that other person against
21 Mr. Dougherty?
22     A.   If I just told you I didn't know,
23 then the answer is no.
24     Q.   Now, if you take a look at the
25 June 6 and the June 16th letters, would you

Page 45

C. BATTLE

1  
2  agree with me that the same individuals are
3  courtesy copied?  If you look at what we marked
4  as D-57, the Bates stamped, and then look at
5  D-63.
6          MR. HAINES:  Don't these letters
7          kind of speak for themselves?  They
8          say what they say.  They identify
9          who they identify.  I'm not quite
10         sure why you need him to verify a
11         document that you have, that you've
12         shown him.
13     A.   I would say you're correct.
14     Q.   Now, prior to the signing of the
15 June 16th letter, did you, Mr. Haines or anybody
16 from his office have contact with any
17 representative of the Department of Labor?
18         MR. HAINES:  Objection. I'm
19         instructing you not to answer that
20         question on the grounds of
21         attorney/client privilege.
22     Q.   Same question with respect to the
23 Department of Justice.
24         MR. HAINES:  Same response.
25     Q.   And did you --

12 (Pages 42 - 45)

Page 46

C. BATTLE

1         C. BATTLE
2      MR. HAINES: I'm objecting and
3      instructing you not to answer the
4      question on the grounds of
5      privilege.
6   Q.  And, sir, did you, prior to the
7 sending of the June 16, 2020, letter have any
8 contact with a representative of the Department of
9 Labor?
10   A.  You know, I can't recall. I'm going
11 to say no. No. I'm pretty sure it was no.
12   Q.  And how about with a representative
13 of the Department of Justice, prior to --
14   A.  Look, I never talked to anybody from
15 the Department of Justice. So that line of
16 questioning, just -- I've never spoken to them.
17   Q.  Okay. When is the first time you
18 spoke with somebody from the Department of
19 Labor?
20   A.  I don't remember the date.
21   Q.  Was it before or after your protest
22 letter or your protest was denied?
23   A.  After.
24   Q.  Now, who is Frank Halgash? Did I
25 pronounce that right?

Page 47

C. BATTLE

1         C. BATTLE
2   A.  Local 98 member.
3   Q.  Did I pronounce his name right?
4   A.  Yeah, Halgash.
5   Q.  And he's with the union?
6   A.  Yes.
7   Q.  Did you speak with him prior to the
8 sending of either your June 6 or June 16th
9 letter?
10   A.  Frank reached out to me, so, yes.
11   Q.  Tell me the circumstances of
12 Frank -- Mr. Halgash reaching out to you, when
13 and how?
14   A.  By phone. And he reached out
15 because I was speaking up at meetings. And he
16 was kind of thanking me. It's about time
17 somebody stood up and, you know...
18   Q.  Which meetings are you referring to?
19   A.  The general meetings.
20   Q.  All right. So the last general
21 meeting would have been in February of 2020; is
22 that correct?
23   A.  Yes.
24   Q.  And when did Mr. Halgash call you?
25   A.  I don't recall.

Page 48

C. BATTLE

1         C. BATTLE
2   Q.  Well, was it between the time of
3 your June 6 letter of 2020, to the time of your
4 June 16, 2020, letter?
5   A.  I don't recall.
6   Q.  Did you at least speak with him
7 prior to the sending of your June 16, 2020,
8 letter?
9   A.  Possibly.
10   Q.  And what did you talk about?
11   A.  Just the state of the union, how
12 dissatisfied we were with the leadership.
13   Q.  And how many times would you have
14 spoken with him?
15   A.  Maybe twice.
16   Q.  Did you discuss Mr. Halgash
17 contacting the IVP about when you were going to
18 be making your protest?
19   A.  No.
20   Q.  The topic never came up in
21 discussion between you and Mr. Halgash?
22   A.  Not that I recall.
23   Q.  You knew that Mr. Halgash was not a
24 fan of Mr. Dougherty before you sent your
25 June 16th letter, correct?

Page 49

C. BATTLE

1         C. BATTLE
2   A.  Neither are 3000 members of the
3 local.
4   Q.  Can you answer my question, please?
5   A.  Neither are 3000 member of the
6 local.
7      MR. PODRAZA: I'll move to strike
8      as nonresponsive.
9   Q.  My question is: You knew that
10 Mr. Halgash was not a fan of Mr. Dougherty prior
11 to the signing of your June 16th letter,
12 correct?
13   A.  Yes.
14   Q.  And you know that Mr. Halgash sent a
15 letter to the IVP about when you sent your
16 June 16th letter, correct?
17   A.  No.
18   Q.  Let's take a look then at Exhibit 4.
19      (Letter dated 6/15/20 is received
20      and marked as Battle Exhibit 4 for
21      identification, as of this date.)
22   Q.  Take a look at Exhibit 4, that's
23 been presented before you, and when you are
24 through let me know, because I'll have a few
25 questions.

13 (Pages 46 - 49)

C. BATTLE

1               C. BATTLE
2     All right.  Now I'm going to ask you to put
3  next to what we marked as Exhibit 4, both Battle-2
4  and Battle-3.
5     A.  Do I have to open to the last page?
6     Q.  Excuse me?
7     A.  Am I opening to the last page?
8     Q.  At some point you may.  Now, what
9  has been produced in this litigation by the
10  Department of Labor is the letter by
11  Mr. Halgash, as you can see by the indication at
12  the bottom right-hand corner, the DOL Local 98,
13  and then there's a Bates stamp number.
14     Do you see that?
15     A.  Yes, sir.
16     Q.  Okay.  And the date of the letter is
17  June 15, 2020, correct?
18     A.  Yes, sir.
19     Q.  And the date of your protest letter
20  is June 16, 2020, correct?
21     A.  Uh-huh.
22     Q.  All right.  And would you agree with
23  me that both letters start out with the name of
24  the signator, and in Mr. Halgash's case, it says
25  Frank Halgash and then his address, correct?

C. BATTLE

1               C. BATTLE
2     A.  Yeah, look at that.
3     Q.  And your June 16th letter also has
4  your name at the top and your address, correct?
5     A.  No.
6     Q.  Well, if you look at Battle-3, sir
7  --
8     A.  I see it.  I see it.
9     Q.  So you would agree with me that your
10  letter starts out with your name and your
11  address, same as Mr. Halgash's, correct?
12     A.  Our names are not the same, no.
13     Q.  Like his name being there with his
14  address, on your June 16th, Battle-3, your name
15  with your address, appears in the same place on
16  the letter as --
17     A.  No.
18     Q.  -- Mr. Halgash?  What is the
19  difference, sir?
20     A.  That's not my address.
21     Q.  Okay.  Why don't we simply this a
22  little bit more for you.  Do you see in Exhibit
23  4, Mr. Halgash, at the very top of the page sir,
24  what does it say?
25        MR. HAINES:  Objection.

C. BATTLE

1               C. BATTLE
2     Repetitive.  He's answered your
3  question.  The documents speak for
4  themselves.  Everybody in this room
5  and everybody in the jury box is
6  going to be able to look at this.
7     Q.  Sir, at the very top of the page,
8  what is the very first thing on the first page
9  of Mr. Halgash's letter?
10     A.  Frank Halgash.
11     Q.  And beneath that, it says?
12     A.  His address.
13     Q.  And then if we turn to your letter
14  of June 16, 2020, which is Battle-3, at the very
15  top of the page, what appears there?
16     A.  I'll say it again.  My name.  His
17  address.
18     Q.  His address or your address?
19     A.  His address.
20     Q.  I see.  So whoever typed up this
21  letter used the wrong address -- is that
22  correct -- for you?
23     A.  Looks that way.
24     Q.  Do you know who typed up Mr. Hal-
25  gash's letter?

C. BATTLE

1               C. BATTLE
2     A.  No.
3     Q.  Mr. Haines's office did, didn't he,
4  sir?  No?
5        MR. HAINES:  Wait a minute.  Wait
6  a minute.  You take me for being a
7  lot dumber than I really am.  But I
8  will object to that question on the
9  grounds of attorney/client
10  privilege.
11        MR. PODRAZA:  Well, I don't know
12  how you can have attorney/client
13  privilege with Halgash, and have it
14  go to him.
15        MR. HAINES:  Well, I don't know
16  how you can ask him what I did,
17  so...
18     Q.  You know that the Haines' office
19  typed up the Halgash letter, don't you, sir?
20        MR. HAINES:  Go ahead and answer
21  that question.
22     A.  I'd like to take a nap right now.
23        MR. HAINES:  No, no, no.  Just
24  answer the question.
25     A.  No.

14 (Pages 50 - 53)

Page 54

C. BATTLE

1
2    Q.   Did you pay for the services of the
3  Haines's office to assist in the completion of
4  the Halgash letter?
5    A.   No.
6    Q.   Would you agree with me that the
7  type of both Battle-3, your June 16, 2020,
8  letter, and the letter by Mr. Halgash of
9  June 15, 2020, are the same?
10    A.   How would I answer that?  I don't
11  know what printer it came off of or what
12  typewriter, so how would I know?
13    Q.   I'm asking you, if you look at them,
14  would you agree it's the same font, both
15  letters?
16        MR. HAINES:  Objection.
17    A.   I can look at the piece of paper you
18  have, it will look like the same font.
19    Q.   Sir, if you can't answer it, you can
20  just say that.
21    A.   I'm not going to answer a dumb
22  question.
23    Q.   Would you agree with me that the
24  structure of the letter has each paragraph not
25  indented?  In other words, they are squared off?

Page 55

C. BATTLE

1
2  Both letters have that, correct?
3        MR. HAINES:  Objection.  Can we
4        do something relevant here this
5        afternoon?  And not waste our time
6        with nonsense, what this is.
7    Q.   Would you answer the question, sir?
8    A.   No.  I'm not going to answer the
9  question.
10    Q.   Would you disagree that much like
11  your June 16, 2020, letter, the Halgash letter
12  also has certain portions that are bolded?
13        MR. HAINES:  Go ahead.  Answer
14        the question.
15    A.   Yes.
16        MR. HAINES:  We're going to play
17        games here for a while.
18    Q.   And when you turn to the signature
19  page of your letter and, well, Mr. Halgash's
20  signature page, which is Local 98, 00243, in
21  comparison with D-57, the courtesy copy
22  individuals are the same, correct?
23    A.   Ask that again, please.
24    Q.   Sure.  The courtesy copy recipients,
25  they are the same, correct, between the Halgash

Page 56

C. BATTLE

1
2  letter and your June 16, 2020, protest letter?
3  Correct?
4        MR. HAINES:  Assuming I'm able to
5        read the English language, it would
6        appear that you're correct about
7        that.
8        MR. PODRAZA:  Counsel, I'd rather
9        your client testify.
10        MR. HAINES:  Please don't waste
11        my client's or my time with this
12        nonsense or we will be gone.
13    Q.   Will you please answer the question:
14  The same courtesy copy recipients appear on both
15  letters, correct?
16        MR. HAINES:  Counsel, move on.
17        MR. PODRAZA:  And your reason for
18  it --
19        MR. HAINES:  He's not answering
20        the question.
21        MR. PODRAZA:  Your reason for
22        your instruction?
23        MR. HAINES:  You're -- you are
24        badgering the witness at this point.
25    Q.   Isn't it a fact that you

Page 57

C. BATTLE

1
2  collaborated with Mr. Halgash to send both your
3  letter and his letter to the Department of
4  Labor?
5    A.   No.
6    Q.   Isn't it a fact that you discussed
7  with Mr. Halgash and said it would be very
8  helpful if he would send a letter, in the matter
9  that he did, to DOL, along with you sending your
10  protest letter?
11    A.   Absolutely not.
12    Q.   And isn't it a fact that the common
13  denominator for Mr. Halgash and you would be the
14  Haines -- The Haines Law Firm and Mr. Haines,
15  himself?
16        MS. DeBRUICKER:  Objection.
17        MR. HAINES:  Where do you come up
18        with this garbage?
19    A.   This is a joke.
20    Q.   And did you pay for anyone's
21  services with respect to your June 16, 2020,
22  letter?
23        MR. HAINES:  You can answer the
24        question.
25    A.   No.

15 (Pages 54 - 57)

C. BATTLE

1
2     Q.    Do you have any explanation as to
3  why the Halgash letter has the same courtesy
4  copy recipients as your June 16, 2020, letter?
5           MR. HAINES:  Objection.  Don't
6        answer the question.  Move on.
7           MR. PODRAZA:  And the basis?
8           MR. HAINES:  We have been down
9        this road.  You're just harassing
10       him and keeping us here
11       unnecessarily.  So if you want to
12       ask irrelevant questions, he won't
13       answer them.
14          We are not playing who -- what
15       font is what font on two letters.
16       It's not why he's here.
17          MS. DeBRUICKER:  Counsel, would
18       proposing some stipulations allow us
19       to move on?
20          MR. PODRAZA:  I don't think we
21       have much more.  We will deal with
22       Judge McHugh.
23       Q.   It's been brought to my attention,
24  thank you, by this witness, that your June 16,
25  2020, letter has the address for Mr. Halgash on

C. BATTLE

1
2  it, correct?
3       A.   We just went over that.
4           MR. HAINES:  Asked and answered.
5       Q.   Does it?
6           MR. HAINES:  Asked and answered.
7        He said that.  Let's move on.
8       Q.   Why?  Why?
9           MR. HAINES:  If you know, you can
10       answer the question.
11      A.   I don't know.
12      Q.   When you were interviewed by IVP,
13  did you make any reference to any contacts you
14  had had with Mr. Halgash prior to your
15  speaking --
16      A.   When I was interviewed by who?
17      Q.   The investigator for IVP.
18      A.   Who is IVP?
19      Q.   Kieffer.  Randy Kieffer.  Did you
20  make any representations to Mr. Kieffer about
21  Mr. Halgash?
22      A.   No.  Not that I recall, no.
23      Q.   Let's talk about, a little bit of
24  the interaction you had with the investigator
25  for IVP.  When you were --

C. BATTLE

1
2      Prior to sending your June 16, 2020, letter,
3  did you have any conversations with Mr. McConnell?
4       A.   Ask it again, please.
5       Q.   Sure.  Prior to sending your June
6  16th, 2020, letter, the protest letter that we
7  reviewed here, did you have any conversations
8  with Mr. McConnell?
9       A.   Any particular subject or any
10  conversation?
11      Q.   Any conversations.
12      A.   Yeah.
13      Q.   About what?
14      A.   About our line (phonetic) for
15  office.
16      Q.   What did you say and what did he
17  say?
18      A.   I can't recall.  It was over a year
19  ago.
20      Q.   At some point, did you ask
21  Mr. McConnell to allow himself to be interviewed
22  by Mr. Kieffer?
23      A.   Possibly.
24      Q.   What did you say to Mr. McConnell?
25      A.   Yeah, I could not recall.  I don't

C. BATTLE

1
2  know.
3       Q.   Did you request that Mr. McConnell
4  support your claims of intimidation and
5  retaliation with respect to --
6       A.   No, I would not have done that --
7       Q.   Let me finish my question.
8       A.   Sorry.
9       Q.   -- with respect to the June 9, 2020,
10  nomination proceeding?
11      A.   No, that would not have happened.
12      Q.   Did you explain to Mr. McConnell
13  what it is you expected him to speak about with
14  Mr. Kieffer?
15      A.   Absolutely not.
16      Q.   And I believe you spoke with
17  Mr. Kieffer several times; is that correct?
18      A.   I would say maybe two, maybe three.
19      Q.   Were they in person or by telephone?
20      A.   Telephone.
21      Q.   And was Mr. Kieffer pleasant?
22      A.   Yes.
23      Q.   Did he act professionally?
24      A.   Yes.
25      Q.   Did he do or say anything that was

Page 62

C. BATTLE

1
2  offensive to you?
3      A.  No, uh-uh.
4      Q.  And were you honest with
5  Mr. Kieffer?
6      A.  Absolutely.
7      Q.  And were you truthful?
8      A.  Absolutely.
9      Q.  I'd like to show you then what we
10  are going to mark as Battle-5.
11          (Letter dated 7/28/20 is received
12          and marked as Battle Exhibit 5 for
13          identification, as of this date.)
14      Q.  While you're looking at that, in
15  preparation for your deposition today, did you
16  have the opportunity to review the June 6, 2020,
17  letter, which we have marked as Exhibit 2 and
18  your June 16, 2020, letter, that we have marked
19  as Exhibit 3?
20      A.  I have copies, yes.
21      Q.  Right.  And did you review them in
22  your prep session prior to the deposition here
23  today?
24      A.  Yes.
25      Q.  Please take a look at what we are

Page 63

C. BATTLE

1
2  marking as Battle-5, and when you had an
3  opportunity to review it, I'll have a few
4  questions for you.
5      A.  Sure.
6  I never said that.
7          MR. HAINES:  Talk to yourself.
8      A.  Okay.
9      Q.  Okay?
10      A.  Yup.
11      Q.  Before today have you ever had an
12  opportunity to review what has been marked here
13  as Battle-5, the July 28, 2020, letter by
14  Mr. Kieffer?
15      A.  Yes.
16      Q.  When did you review it?
17      A.  Tuesday.
18      Q.  And you read it in total?
19      A.  Yes.
20      Q.  Then I'd like to turn your attention
21  to the second page, which has the Bates stamp
22  00252.
23      A.  Uh-huh.
24      Q.  You see the third full paragraph,
25  starting out with:  At the nomination meeting?

Page 64

C. BATTLE

1
2      A.  By the way, these are not indented,
3  these --
4          MR. HAINES:  Charlie --
5      A.  Go ahead.
6          MR. PODRAZA:  I'll move to strike
7          the voluntary statement.
8      Q.  But I appreciate you bringing it to
9  my attention.
10      A.  You're welcome.
11      Q.  But if you look at the third
12  paragraph on the second page, at 252, starting
13  out with:  At the nomination, and then it ends
14  with:  Premises, is there any portions of that
15  paragraph that you disagree with?
16      A.  Yes.  Hold on.  Let me read the
17  whole paragraph.
18  Can I have a pencil or a pen or something?
19  Thank you.  Pretty much the whole paragraph.
20      Q.  Well, I need you to be specific.
21  Can you point out what you disagree with, that's
22  repre --
23      A.  Okay.  I never -- never intended to
24  self-nominate.
25      Q.  Okay.  Anything else?

Page 65

C. BATTLE

1
2      A.  Yeah, I don't remember saying this.
3  After discussing with him, he told me he didn't
4  ask anyone, nor did he tell anyone at the time
5  to have a nominator run for
6  office. [unintelligible] -- no, I never said
7  that.
8      Q.  What portion of it are you saying
9  you never did, and which part --
10      A.  He was relatively sure he could
11  nominate himself, but not positive.
12      Q.  Okay.  That, you never said to
13  Mr. Kieffer?  Is that what you're saying?
14      A.  Not that I recall.  I just -- here's
15  the whole point of this, if I could have
16  nominated myself, I would have done it.
17      Q.  Well, I'm more focused on what
18  Mr. Kieffer said.  I'm asking:  Do you agree or
19  disagree with his representations?  And more,
20  I'm interested in what is, from your vantage
21  point, absolutely incorrect, and what do you not
22  know for sure that you may or may not have
23  shared with him.
24          MS. DeBRUICKER:  Objection to the
25          form.

17 (Pages 62 - 65)

Page 66

C. BATTLE

1     C. BATTLE
2   MR. HAINES:  I think you asked
3 him four questions.  Same objection.
4   THE WITNESS:  Are we answering
5 this or no?
6   MR. HAINES:  Start with the
7 sentence that begins:  Brother
8 Battle stated.
9  A. Brother Battle stated to me in our
10 discussion that he intended to nominate himself
11 for president; that's absolutely false.
12  Q. Okay.  Continue.
13   MR. HAINES:  Next sentence.
14  A. After he read the notice -- which
15 I'm assuming is the notice that was sent in the
16 mail?
17  Q. Yes.
18   MR. HAINES:  The question is what
19 is not true.
20  A. So that's not true.  I never --
21   MR. HAINES:  What is that?  What
22 are you saying is not true?
23  A. So this says:  After he read the
24 notice, he thought he might need a nominator run
25 for office, but after discussing this with him,

Page 67

C. BATTLE

1 he told me he didn't ask anyone.
2 I never said that.
3  Q. Did you ask anyone?
4  A. Yes.
5  Q. Who did you ask?
6   MR. HAINES:  Objection.
7  A. Nor did anyone tell him --
8  Q. Mr. Battle, who did you ask?
9  A. I'm reading this.
10  Q. I know, but I'm asking you the
11 question.
12   MR. HAINES:  Well, let him finish
13 answering what you asked him to do.
14  Q. Mr. Battle, who did you ask?
15   MR. HAINES:  Objection.  Don't
16 answer that question.  He's either
17 going to finish what you asked him
18 to do, or he's not.  Are you
19 instructing him to stop where he is?
20   MR. PODRAZA:  He can proceed
21 through, and we will come back to
22 the question.
23   MR. HAINES:  Then stop where you
24 are.  You have not finished the

Page 68

C. BATTLE

1 paragraph.  Go ahead and answer his
2 question.  No, no, Charlie.  There's
3 a question pending --
4   MR. PODRAZA:  Excuse me,
5 Mr. Haines.  You're here as a
6 personal counsel.  As a personal
7 counsel, you have not entered your
8 appearance.  You have intervened,
9 and you have a very limited purpose.
10 Let's not overstep our boundaries.
11 We have been very patient with your
12 childish behavior to this moment.
13 That comes to a limited end.
14  Q. Now, Mr. Battle, I've asked --
15   MR. HAINES:  You don't advance
16 your ball when you accuse me of
17 childish behavior.  I've invited you
18 to call Judge McHugh.  I'll repeat
19 the invitation.  If you want to stop
20 the deposition and you want to ask
21 the judge to review the testimony so
22 far, that's fine.
23   MR. PODRAZA:  And we will at the
24 end of the deposition.  That's fine.

Page 69

C. BATTLE

1   MR. HAINES:  My purpose here is
2 to protect the interest of my
3 client.
4  Q. Mr. Battle, you were saying that you
5 did ask somebody when you were reading the
6 question about -- or excuse me, the passage
7 where he says:  Discussed it with him.  He told
8 me he didn't ask anybody.  And you said that's
9 not true, correct?
10  A. Correct.
11  Q. Who did you ask?
12  A. Michael Coppinger.
13  Q. Anyone else?
14  A. You only need one person to
15 nominate, so no.
16  Q. And did that discussion with
17 Mr. Coppinger occur prior to the June 9, 2020,
18 nomination proceeding?
19  A. Yes.
20  Q. Okay.  Now, if you can continue on
21 with the paragraph, from:  Ask anybody, is there
22 any other representation that Mr. Kieffer
23 makes in that paragraph with which you disagree?
24  A. I don't understand this.  Nor did

C. BATTLE

1                  C. BATTLE
2  anyone tell him he had to have a nominator to
3  run for office.
4      I don't even know why I would even say that,
5  so that does not sound like something I would say.
6      Q.   Okay.  Anything else in that
7  paragraph?
8      A.   I'm reading.  See, I don't think I
9  would say this either.  He was relatively sure
10  he could nominate himself, but not positive.
11      I never, like I said, knew that you could
12  nominate yourself, so I don't think I would have
13  said that.
14      Q.   Anything further?
15      A.   I'm reading.
16      So I know this -- this is not true.  No
17  officer gave him any advice, nor did he ask anyone
18  for advice.  And he questioned himself if
19  self-nomination was self-satisfactory.
20      No, that's not true.
21      Q.   Did you ask anybody who was at the
22  hall on June 9, 2020 for any instructions or
23  guidance?
24      A.   That's not a simple yes-or-no
25  answer.  If you want the answer, I can give it

C. BATTLE

1                  C. BATTLE
2  to you.
3      Q.   Sure.
4      A.   Okay.  Who would I ask?  Would I ask
5  the agent that came to my house twice?  Would I
6  ask the agent that intimidated my job and
7  threatened my career when I was a foreman at the
8  convention center?  Would I ask someone who's
9  suing me?  Would I ask an agent when I was in
10  Poland?  I asked for his help, and he pretty
11  much told me to go F-off and hung up on me?  Who
12  would I ask?
13      Q.   The agent you're making reference
14  to, is that Mr. Bark?
15      A.   There's many agents.  Not just one.
16  So I'm not saying anyone's name.
17      Q.   You said somebody came to your
18  house.  Was that Mr. Bark?
19      A.   I'm not saying anyone's name.
20      Q.   Well, you will in your statement
21  on --
22      A.   Right now I'm not saying anyone's
23  name.
24      Q.   Is it Mr. Bark who was in contact
25  with you when you were in Poland?

C. BATTLE

1                  C. BATTLE
2      A.   I'm not saying anyone's name.
3      Q.   Anything further?
4      A.   Let me continue, please.  The point
5  to the question is, in a hostile environment,
6  who am I going to ask?  No one is there to help
7  me.
8      Q.   And so you didn't ask anybody,
9  correct?
10      A.   I think I answered the question.
11      Q.   Anything else in that paragraph?
12      A.   I'm reading.
13      Okay.  So the whole -- the whole last
14  sentence is just bullshit.
15      Q.   Okay.  Why don't we put that side.
16  And I'd like to turn to Exhibit 6.  And after
17  Exhibit 6, we will take a break because the
18  videographer needs to change his tape; is that
19  okay?
20      A.   Sure.
21      (Letter dated 7/31/20 is received
22      and marked as Battle Exhibit 6 for
23      identification, as of this date.)
24      Q.   What is before you is what we are
25  marking as Exhibit 6, which is a letter dated

C. BATTLE

1                  C. BATTLE
2  July 31, 2020, addressed to you, from Michael
3  Welsh, senior national vice president.  Take a
4  look at it, and when you feel comfortable, I'll
5  have a few questions for you.
6      A.   Yeah, I'm good.
7      Q.   Okay.  Did you receive this letter
8  dated July 31st, 2020?
9      A.   Yes.
10      MR. PODRAZA:  Why don't we take
11      that break now?
12      THE VIDEOGRAPHER:  The time is
13      now 5:12.  This concludes media unit
14      Number 1.
15      (A break was taken.)
16      THE VIDEOGRAPHER:  The time is
17      now 5:27.  This begins media unit
18      Number 2.  You may proceed.
19      Q.   Thank you.  Sir, I'm going to show
20  you a document that we are going to mark now as
21  Battle-7, and I'm going to ask if you review it,
22  and then if you can identify for me what it is.
23      (Hand-written document is
24      received and marked as Battle
25      Exhibit 7 for identification, as of

19 (Pages 70 - 73)

Page 74

C. BATTLE

1
2     this date.)
3         MR. HAINES:  We are not doing
4     anything with Battle-6?
5         MR. PODRAZA:  That is correct.
6     A.   I'm sorry.  Sorry about that.  I was
7     zoned out for a minute.  Okay.
8     Q.   Okay.  What is Battle-7?
9     A.   I don't know.
10    Q.   It appears to be the appeal you took
11   to the Department of Labor.  Would that help you
12   in understanding what Battle-7 is?
13    A.   Okay.
14    Q.   Does that help?
15    A.   I really don't remember this, but
16   okay.
17    Q.   It's a document, though, dated
18   August 18, 2020; is that correct?
19    A.   That's what it's dated.
20    Q.   And it's in your handwriting; isn't
21   it?
22    A.   No.  That isn't even how I sign my
23   name.
24    Q.   Whose handwriting is it?
25    A.   I could not tell you.  I don't even

Page 75

C. BATTLE

1
2     remember this.
3     Q.   That's not your signature?
4     A.   That's not how I sign my last name.
5     No, uh-uh.
6     Q.   Well, are you giving authority to
7     somebody to take an appeal for you -- strike
8     that.
9         Did you give anybody authority to file a
10   document taking an appeal from the denial by the
11   IVP to the DOL?
12    A.   So, I'm sorry.  Ask it one more
13   time.
14         (The requested portion of the
15         transcript was read back.)
16    A.   No.  I would have done everything
17   myself.
18    Q.   You're positive that's not your
19   signature?
20    A.   I mean, it's similar, but it's --
21   the last name would be different.  It's similar
22   to my handwriting, but I can't say for sure that
23   that's mine.  I really can't.
24    Q.   And the handwriting above, is that
25   yours?

Page 76

C. BATTLE

1
2     A.   It looks similar, but like I said, I
3     can't say for sure that's mine.
4     Q.   Well, besides yourself, who would
5     have had authority --
6     A.   No one.
7     Q.   -- to act on your behalf?
8     A.   No one.
9     Q.   At the time, though, that this
10   document was created, August 18, 2020, it's a
11   fact that you were then being represented by the
12   Rains firm -- excuse me, the Haines firm,
13   correct?
14    A.   Let me think about that for a
15   minute.  So I can't recall the date that I
16   sought out his representation, so I don't know.
17    Q.   Well, prior to August 18, 2020, you
18   had already been sued with respect to the
19   website in the state court, correct?
20    A.   If you say so.  I don't know the
21   date.
22    Q.   And your representation in the state
23   court case is with the Haines Law Firm; is that
24   correct?
25    A.   In the lawsuit?

Page 77

C. BATTLE

1
2     Q.   Yes.
3     A.   I don't understand the relevance
4     to --
5         MR. HAINES:  Answer the question.
6     You're right, it doesn't --
7     A.   So ask again.  Ask again.
8     Q.   And Mr. Haines is representing you
9     in that lawsuit that was filed in state court
10   over the website; is that correct?
11    A.   Yes.
12    Q.   And if I told you that that
13   litigation started in July of 2020, would you
14   agree with me then that the lawsuit over the
15   website came before the date of the document
16   that's been marked here as Battle-7?
17    A.   If your dates are accurate, then
18   this is mine.
19    Q.   Okay.  Did somebody from the Haines
20   Law Firm --
21    A.   Oh, my God.  Here we go again.
22    Q.   -- create what has been marked here
23   as Exhibit 7, and ultimately then given to the
24   Department of Labor?
25    A.   No.

20 (Pages 74 - 77)

C. BATTLE

1
2    Q.   At the time of the creation of what
3  has been marked here is as Battle-7, Bob Bark
4  was a plaintiff in that lawsuit over the website
5  against you; is that correct?
6    A.   He was one, yes.
7    Q.   And the lawsuit also named your wife
8  as a defendant, correct?
9    A.   Yes.
10   Q.   And you were not very happy about
11  the fact that Mr. Bark and others had sued you,
12  correct?
13       MS. DeBRUICKER:  Objection.
14       MR. HAINES:  You want to talk
15         about childish.  Where are we going
16         with this non-sense?
17   A.   I was thrilled.
18   Q.   Were you happy that you had been
19  sued by Mr. Bark and others?
20       MS. DeBRUICKER:  Objection.
21   A.   I'm not answering that.
22   Q.   Now, prior to the Department of
23  Labor receiving what has been marked here as
24  bottle Battle-7, you can see up at the top,
25  left-hand corner they received that on

C. BATTLE

1
2  August 18, 2020.  Do you see that?
3    A.   Uh-huh.
4    Q.   Okay.  Had anybody on your behalf
5  had any contact with a representative of the
6  Department of Labor?
7        MS. DeBRUICKER:  Objection.  At
8          what point?
9        MR. PODRAZA:  Any time before
10         August 18, 2020.
11        MS. DeBRUICKER:  Aside from the
12         communications that you already
13         covered?
14        MR. PODRAZA:  Which I have not
15         been able to cover because of
16         assertions of privilege.
17   Q.   Had anybody, prior to August 18,
18  2020, spoken with a representative from the
19  Department of Labor on your behalf?
20        MR. HAINES:  If you know.  You
21         should not have made that comment
22         about childish on my part.  That was
23         a stupid question.  How would he
24         know?  Are you asking him what he
25         knows, or are you asking him to

C. BATTLE

1
2  speculate about something?
3    Q.   Sir, had anybody been in contact
4  with a representative from the Department of
5  Labor on your behalf prior to August 18, 2020?
6        MR. HAINES:  If you know.  It
7          goes without saying.  But that's not
8          what he said in his question, so if
9          you know.
10   A.   No.
11   Q.   Had anybody from the Haines Law Firm
12  or Mr. Haines himself been in contact with
13  representatives from the Department of Labor,
14  prior to the Department of Labor receiving what
15  has been marked here as Exhibit 7, speaking on
16  your behalf?
17        MR. HAINES:  Objection.  You're
18         instructed not to answer that
19         question.
20        MR. PODRAZA:  And the basis?
21        MR. HAINES:  It would require him
22         to disclose attorney/client
23         privilege information.
24   Q.   And prior to the Department of Labor
25  receiving what has been marked here as Battle-7,

C. BATTLE

1
2  on August 18, 2020, had you or anyone on your
3  behalf had contact with the Department of
4  Justice?
5    A.   I already answered that.
6        MR. HAINES:  Answer it again.
7    A.   No.
8    Q.   And no one else on your behalf had
9  contact with the Department of Justice; is that
10  your testimony?
11        MR. HAINES:  Is there a question?
12   Q.   Did anyone from the Haines Law Firm
13  or Mr. Haines himself have contact with
14  representatives from the Department of Justice,
15  prior to the Department of Labor receiving this
16  document on August 18, 2020?
17        MR. HAINES:  Objection.  You're
18         instructed not to answer that
19         question.  It calls for
20         attorney/client communication, and
21         it's privileged.
22   Q.   When the appeal was taken to the
23  Department of Labor, what did you expect them to
24  do?
25   A.   Listen to my story.

Page 82

C. BATTLE

1
2     Q.    And what action did you hope they
3  would take?
4     A.    I would hope they would overturn the
5  nomination process.
6     Q.    And in doing so, did you believe
7  that such action by the Department of Labor
8  would put more pressure on the representatives
9  of the union who had been indicted by the
10  Department of Justice?
11     A.    No, sir.
12     Q.    Did you or did it cross your mind,
13  at all, that there would be possibly contact
14  between the representatives of the Department of
15  Labor and the Department of Justice, because of
16  the fact that there was an indictment
17  outstanding against representatives of Local 98
18  and now this election issue?
19     A.    No, sir.
20     Q.    By this point, were you aware that
21  Mr. Haines was representing that individual who
22  had an altercation with Mr. Dougherty on the
23  picket line?
24     A.    I would not know the date that I
25  realized that.  I just don't know that.

Page 83

C. BATTLE

1
2     Q.    Did you consider when you took the
3  appeal to the Department of Labor that the
4  appeal might help or assist Mr. Haines in his
5  representation of that personal injury case?
6     A.    Absolutely not.
7     Q.    The Department of Justice has
8  attached to their amended complaint from the
9  Department of Labor, a copy of our website, the
10  website litigation.  And in there are examples
11  of postings that were on the website, such as,
12  quote, Marita Crawford takes it in the butt, end
13  quote.
14         And I'll show you some of the other postings.
15         MR. PODRAZA:  Can I have exhibit
16         8, please?
17         (Anonymous postings is received
18         and marked as Battle Exhibit 8 for
19         identification, as of this date.)
20         MR. HAINES:  Was that a question
21         or just a statement?  I'm not sure
22         what that was.  I move to strike
23         whatever it was, because it was not
24         a question.
25         MR. PODRAZA:  Well, Counsel,

Page 84

C. BATTLE

1
2  since you're not counsel of record
3  --
4     Q.    All right.  Sir, what we have before
5  you is a collection of the postings from the
6  website that appear in the amended complaint of
7  Department of Labor, which was just filed
8  recently by the Department of Justice.  And as
9  you can see, some of the postings have like --
10  accuses a, quote, Larry, unquote, sodomizing
11  Mr. Dougherty's mother.
12         Were you aware of that posting?
13     A.    Which one?
14     Q.    That's the very first one.
15     A.    Well, I can tell you this -- no.
16     Q.    Okay.  And then if you go to the
17  next one, the next posting refers to
18  Mr. Dougherty's daughter as a, quote, carpet
19  muncher, end quote.
20         Were you aware of that posting?
21     A.    I might have read it.
22     Q.    And there's a posting, if you
23  continue to the next one that makes a reference
24  to a Marita being sodomized by her new lawyer
25  boyfriend.

Page 85

C. BATTLE

1
2  Do you see that?
3     A.    What page?
4     Q.    It's the third page of Exhibit 8.
5     A.    Third page?
6     Q.    Uh-huh.
7     A.    So the question?
8     Q.    Were you aware of that posting, sir?
9     A.    Maybe.
10     Q.    Did you make any effort to remove
11  any of these postings from the website?
12     A.    Why would I?  How could I do it?
13     Q.    As I understood it, you're the
14  admitted creator, payor and administrator of the
15  website.
16     A.    What does that have to do with the
17  election?
18         MR. HAINES:  There's no question.
19         He made a statement.
20     Q.    Were you not the creator, payor and
21  administrator of the website?
22     A.    I'm not answering that.
23         MR. PODRAZA:  Excuse me.  We have
24         the court.
25         (Whereupon, an off-the-record

22 (Pages 82 - 85)

C. BATTLE

1    C. BATTLE
2    discussion was held.)
3        THE VIDEOGRAPHER:  The time is
4    5:41.  Off the record.
5        (A break was taken.)
6        JUDGE MC HUGH:  For the record,
7    this is Judge McHugh.  I'm assigned
8    to the case.  Counsel reached out to
9    chambers, and I've returned their
10   phone call at the deposition.
11       And I've had a description from
12   counsel for defendants as to the
13   discovery that they sought.  I've
14   heard off the record and have a
15   sense of what the posture of the
16   deposition is at this point.  And
17   I've also heard a summary from
18   counsel for the witness.
19       For purposes of the record, this
20   is probably already clear from what
21   has transpired, the objection is not
22   interposed by the Department of
23   Labor, but rather from counsel for
24   the witness.
25       So with respect to the discovery

1    C. BATTLE
2    in question, there are a series of
3    letters that have been identified as
4    part of the deposition.  They are
5    associated with Mr. Battle, who is
6    the witness at the deposition, and
7    there was an inquiry of counsel for
8    the defendant union as to who typed
9    the letters, and who was involved in
10   the preparation of the letters.
11       Would that be a fair summary,
12   Mr. Podraza?
13       MR. PODRAZA:  It would be, Your
14   Honor.  Yes.
15       JUDGE MC HUGH:  So with that as
16   the proposed discovery, let me ask
17   Mr. Haines now to state on the
18   record what objections he has or
19   what privilege he's asserting.
20   Mr. Haines?
21       MR. HAINES:  Sure.  The question
22   is irrelevant, given the fact that
23   this witness has -- is the only
24   signature on the letter, and has,
25   heretofore and presently adopted the

1    C. BATTLE
2    substance of the letter.  I
3    understand that I can't preclude him
4    from answering a question based on
5    relevance.
6        But Mr. Podraza seems to be of
7    the mind that somehow I wrote these
8    letters.  And in light of that
9    representation to the court, his
10   question invades the attorney/client
11   privilege.
12       In addition, your Honor, this
13   case, as well as many others,
14   involves threats, intimidation of
15   union members by Mr. Dougherty, who
16   happens to be in the room, for
17   reasons -- well, he happens to be in
18   the room, listening to this
19   deposition.
20       Mr. Battle has no reason to begin
21   identifying other members of this
22   union.  It has a long history of
23   anonymous complaints made by members
24   who are intimidated and threatened
25   and fearful for the well-being of

1    C. BATTLE
2    their families, to include
3    Mr. Battle.  I don't want
4    Mr. Battle, nor does he want to be
5    in a position where he's identifying
6    people by name, whose identity is
7    not relevant to the issues before
8    you.
9        Who typed the letter is of no
10   consequence.
11       My position,
12       JUDGE MC HUGH:  All right.  Does
13   the Department of Labor have any
14   position it wants to take?
15       MS. DeBRUICKER:  Your Honor, the
16   Department of Labor's position is
17   that this case is relatively simple.
18   The issue is whether the secretary's
19   investigation yielded information
20   that by a preponderance of the
21   evidence shows that there may have
22   been interference in the June 2020
23   nominations.
24       To Mr. Haines's point, there's
25   been no question that Mr. Battle

23 (Pages 86 - 89)

C. BATTLE

1  
2 stands by his statements, and so --
3 and setting aside the significant
4 exception I take to the implication
5 that the government has done
6 anything untoward, none of this has
7 anything to do with the matter
8 before the court.
9    The government has no objection
10 to the line of questioning.  The
11 government is an open book as far as
12 we are concerned.
13    JUDGE MC HUGH:  All right.
14 Mr. Podraza, is there anything you
15 want to add?
16    MR. PODRAZA:  I just wanted to
17 add, Your Honor, these are very
18 significant letters.  These are the
19 protest letter, and it's a
20 third-party, Mr. Haglash, so I don't
21 know how there can be an
22 attorney/client privilege.  And if,
23 in fact, there has collaboration --
24 been collaboration, this is
25 information that should be brought

C. BATTLE

1  
2 to bear to the court in its
3 consideration then, of the merits of
4 the case against Local 98.
5    MR. HAINES:  That has nothing to
6 do with who typed the letter, Judge.
7    MR. PODRAZA:  If I may, Your
8 Honor, it's not who typed the
9 letter.  It's the fact that there's
10 a manufacturing of the evidence in
11 the representations in the letter,
12 that if you look at the letter, it
13 would appear to be Mr. Battle.  But
14 by Mr. Battle's own account, it was
15 others, and those others, we
16 believe, have manufactured this
17 claim, which then will ultimately
18 result in the civil action that's
19 before Your Honor, and is relevant
20 to the court's consideration as to
21 the legitimacy of the claims.
22    MR. HAINES:  And I'm sorry Your
23 Honor is not here to see the union
24 representatives over Mr. Podraza's
25 shoulder, while this discussion is

C. BATTLE

1  
2 going on.
3    The original issue was whether
4 they were entitled to know who typed
5 the letter --
6    MR. PODRAZA:  No, that's
7 not correct.
8    MR. HAINES:  -- now they are
9 whistling a different tune.  My
10 position does not change.
11    Mr. Halgash's letter is not
12 before Mr. Battle.  Mr. Battle
13 stands by what he said.  In the
14 letter, he signed it.  He's adopted
15 it.  He knows he's responsible for
16 it.  Who talked to him about it or
17 who helped compose it, or whether
18 his wife read it, is really
19 irrelevant and an inappropriate
20 invasion into information that these
21 folks don't need, nor should they
22 have.
23    JUDGE MC HUGH:  All right.  I'm
24 going to go ahead and make a ruling
25 here.

C. BATTLE

1  
2    First, it's not entirely clear to
3 me that the microcosm of the detail
4 of the preparation of the letter is
5 going to have all of the
6 significance that counsel might
7 think.
8    Having said that, I don't think
9 that there's an actual
10 attorney/client privilege.  To that
11 extent, and even if Mr. Battle did
12 confer with counsel, given the
13 history between the parties and the
14 upcoming elections, even if
15 Mr. Battle did consult with counsel,
16 I don't know whether that would, in
17 any way, change the validity of his
18 concerns, or as Ms. DeBruicker say,
19 the validity of the department's
20 investigation.
21    So I think I will permit the
22 inquiry for whatever relevance it
23 may have.  To the extent there's
24 obviously a history between
25 Mr. Battle and the union, I assume

24 (Pages 90 - 93)

Page 94

C. BATTLE

1
2     it's abundantly clear, that
3     everybody involved in the case, that
4     the court would take a very dim view
5     of any kind of threats or
6     intimidation against Mr. Battle or
7     anyone, who else who may be
8     identified as having concerns.  I'll
9     take that as a given, but say it on
10    the record for whatever added
11    protective effect Mr. Haines thinks
12    that either Mr. Battle or some other
13    union member or some other
14    individual might be entitled to.
15        So I will overrule the objection,
16    and allow the inquiry to proceed.
17    Is there anything further, Counsel
18    that requires the attention of the
19    court?
20        MR. HAINES:  Yes, Judge.  Would,
21    Your Honor, direct that this
22    deposition be sealed, so that it is
23    only available to the immediate
24    parties and the witness, and cannot
25    be distributed broadly?

Page 95

C. BATTLE

1
2        JUDGE MC HUGH:  Let me hear from
3     the Department of Labor on that.
4        MS. DeBRUICKER:  Your Honor, I
5     think the government takes no
6     position.
7        JUDGE MC HUGH:  Mr. Podraza, do
8     you have a position?
9        MR. PODRAZA:  If I may, Your
10    Honor.
11        JUDGE MC HUGH:  I'm inviting you
12    to state your position.
13        MR. PODRAZA:  I'm sorry, Your
14    Honor.  You're not here in the
15    conference room.  I have chirping in
16    my ears from multiple people, so
17    apologize for the loss of train of
18    thought.
19        We don't have any objection
20    because there is no such thing as
21    violence, et cetera, that Mr. Haines
22    is recounting.
23        MR. HAINES:  Well, can I show,
24    Your Honor the videotape?  You want
25    to open that door, Mr. Podraza?  I'm

Page 96

C. BATTLE

1
2     fine with that.  I'll take my
3     videotape of Mr. Dougherty to Judge
4     McHugh, and let him see it.
5        MR. PODRAZA:  Well, as a mentor
6     of mine, Mr. Richard Sprague, used
7     to say, when you're ahead in the
8     game, you don't continue to argue.
9     And since I will do whatever the
10    court wants to do with the
11    transcript, I don't know if there's
12    really need for more argument.
13        JUDGE MC HUGH:  Well, I am going
14    to order that the transcript be
15    sealed, and no one should draw any
16    inference from that, other than I
17    don't see, until such time we get to
18    some actual resolution of
19    the matter, that is of relevance,
20    and I also enter the sealing order.
21    And I'm not going to do it by a
22    written order.  We will do it
23    verbally on the transcript, because
24    in the age of social media,
25    all manner of things manage to fly

Page 97

C. BATTLE

1
2     around and create havoc.  There's no
3     need for that in any litigation.
4     And so, yes, the deposition
5     transcript will be sealed.
6        Mr. Podraza, do you anticipate
7     any other radioactive areas of
8     inquiry, because believe it or not,
9     I may go home at some point.
10        MR. PODRAZA:  Your Honor,
11    actually, it has been a pleasant
12    experience, thus far, in the
13    deposition before this short, bumpy
14    road.  I don't anticipate, but in
15    the event there is a disagreement,
16    is it the court's wish then that
17    we -- well, what is the court's
18    wishes?
19        JUDGE MC HUGH:  My wish is that
20    as officers of the court, you'd find
21    a reasonable resolution on your own
22    and not call my cell phone later
23    tonight.
24        MR. PODRAZA:  That is fair
25    enough, Your Honor.  And we will do

25 (Pages 94 - 97)

C. BATTLE

1  C. BATTLE
2  our best. And unfortunately if
3  that's not satisfactory, I guess, we
4  can apprize the court and get
5  direction then as to how to proceed.
6      We do not intend to disturb you
7  tonight, Your Honor.
8      JUDGE MC HUGH: Let the record
9  reflect your tax dollars are still
10  at work at 6:58 on an August
11  night -- 5:58 on an August night.
12  Let me correct that. All right
13  then. Counsel proceed.
14      MR. PODRAZA: Thank you, Your
15  Honor.
16      MR. HAINES: Thank you, Your
17  Honor.
18      (A break was taken.)
19      THE VIDEOGRAPHER: The time is
20  now 6:15. Back on the video record.
21  Q.   Mr. Battle, before we had a break
22  with the court, which you were present for, we
23  were discussing some of the postings on the
24  website known as Truth About Your Local. And we
25  had reviewed a few, and I believe we had gotten

1  C. BATTLE
2  to the third of the postings, where, in part, it
3  has that Marita is sodomized by her new lawyer
4  boyfriend.
5      Do you see that there?
6  A.   I see it on this page, yes.
7  Q.   Were you aware of that posting?
8  A.   No.
9  Q.   Would it have upset you if someone
10  anonymously posted such filthy things about your
11  loved ones?
12      MR. HAINES: Objection.
13      MS. DeBRUICKER: Objection.
14      MR. HAINES: You can answer the
15  question.
16  A.   Would it upset me?
17  Q.   Yes.
18  A.   Well, no one would probably write
19  that about me. So probably, yeah.
20  Q.   Now, there was a second website that
21  was created, is that correct, sir?
22  A.   I guess.
23  Q.   Well, you're the creator and payor
24  and administrator of the second website,
25  correct?

1  C. BATTLE
2  A.   I am?
3      MR. HAINES: Objection.
4      MS. DeBRUICKER: Objection.
5  Q.   So you said in your state court
6  proceeding and pleading, you said you were.
7  A.   I did?
8  Q.   Yes.
9  A.   Okay, if you say so.
10  Q.   And I'd like to show you then what
11  we have marked as -- or will mark as Battle-9.
12      (Aboutyourlocal.com screenshots
13      is received and marked as Battle
14      Exhibit 9 for identification, as of
15      this date.)
16  Q.   Now, what we marked as Battle-9 are
17  postings that are on the website
18  aboutyourlocal.com. Do you see that, sir, on
19  the very top, it says: Aboutyourlocal.com?
20  A.   These are two of the same local
21  websites?
22  Q.   They are -- I can't answer that
23  question. I don't know for sure.
24  A.   So, but you're saying --
25      MR. HAINES: Let him ask the

1  C. BATTLE
2  question.
3  Q.   I didn't say you created anything.
4  I just said that these are postings on the
5  website, aboutyourlocal.com. And, in fact, the
6  website itself, you paid for and administered,
7  correct? I'm not saying you posted any of this
8  stuff. I'm just saying you created the website,
9  correct?
10      MS. DeBRUICKER: Objection to
11      form.
12  A.   Which one?
13  Q.   The truth about the union, and also,
14  aboutyourlocal.
15  A.   Uh-uh.
16  Q.   Neither one?
17  A.   What was first question?
18      MR. HAINES: You can answer the
19  first question.
20  A.   What was the first question?
21  Q.   Sure. Did you pay for, and are you
22  the administrator of the aboutyourlocal.com
23  website?
24  A.   Which one? I'm confused here.
25  Q.   There's a website, truthaboutyour

C. BATTLE

1
2  local, and there's a website aboutyourlocal.
3  There's two separate ones.  Are you the creator,
4  payor and administrator of both?
5      A.   No.
6      Q.   Which one are you the creator, payor
7  and administrator of?
8          MS. DeBRUICKER:  Objection to
9      form.
10     A.   I don't understand the question.
11     Q.   What is your connection to either of
12 these websites?
13     A.   I read them.
14     Q.   And that's it?  You didn't pay for
15 some of these services to create either one of
16 them?
17     A.   I can't recall.
18     Q.   Well, on the aboutyourlocal, if you
19 take a look, there are postings.
20     A.   Uh-huh.
21     Q.   And you can go through each one, if
22 you'd like.  They're of a sexual-type nature,
23 links to mothers and daughters having sex, links
24 to brothers and sisters having sex, links to
25 young children, teens having sex in various

C. BATTLE

1
2  capacities, et cetera.
3          Have you made any effort to remove any of
4  these links from that website?
5      A.   How would I?
6      Q.   You're the administrator --
7          MR. HAINES:  The question is yes
8      or no.  Either you have or you
9      haven't.  If you haven't, the answer
10     --
11         THE WITNESS:  Well, I don't know
12     what website he's talking about.
13     A.   This one here?
14     Q.   That is correct, sir.
15     A.   No -- I'm sorry.  Ask the question,
16 again.
17         MR. PODRAZA:  Can you read back
18     the question, please.
19         (The requested portion of the
20     transcript was read back.)
21     [No answer was heard.]
22     Q.   With respect to what had been marked
23 here as Battle-9, have you made any effort to
24 remove the links that appear in the exhibit
25 that's been marked here is as Battle-9?

C. BATTLE

1
2      A.   I would not know how to do that.
3          MR. HAINES:  So the answer is no,
4      you did not.
5      A.   No.
6      Q.   Are you aware that it's a crime to
7  promote and facilitate child pornography?
8      A.   Yes.
9          MR. HAINES:  Just to be clear,
10     Exhibit 9 is a posting made 60 days
11     ago, right?
12     Q.   Before you took the appeal to the
13 Department of Labor, did you have any
14 conversations with Mr. McConnell?
15     A.   Before I took the appeal?  You asked
16 that already.
17     Q.   Did you have any conversations with
18 Mr. McConnell?
19     A.   I answered that already.
20     Q.   And your answer is?
21     A.   Yes.
22     Q.   And what was the nature of the
23 contact?  What did you discuss?
24     A.   I don't remember.
25     Q.   I'm sorry?

C. BATTLE

1
2      A.   I would not remember.
3      Q.   Did any representative on your
4  behalf have contact with Mr. McConnell prior to
5  the taking of the appeal to the Department of
6  Labor?
7      A.   Representative, no.
8      Q.   Did Mr. Haines or his office have
9  contact with Mr. McConnell, prior to the taking
10 of the appeal?
11         MR. HAINES:  Objection.  That
12     calls for attorney/client
13     communications, which are protected.
14     I instruct you not to answer.
15     Q.   In -- when was your first contact
16 with a representative from the Department of
17 Labor?
18     A.   I answered this already.
19     Q.   And your answer is?
20     A.   Look in the transcript.
21         MR. HAINES:  Charlie, you got to
22     answer the question.  You can't be a
23     smart ass.
24     A.   The question was?
25     Q.   When was your first contact with a

27 (Pages 102 - 105)

C. BATTLE

1
2  representative from the Department of Labor?
3      A.   After the nomination process -- I'm
4  sorry. After my appeal with the IO was denied.
5      Q.   And the document that we looked at
6  indicated that the Department of Labor received
7  your appeal on or about August 18, or actually
8  on August 18, 2020. If you look at Battle-7,
9  you see the stamp of the Department of Labor.
10 Do you see that there?
11     A.   Battle-7.
12     Q.   Right. That indicates that your
13 appeal paper was received by the Department of
14 Labor on August 18, 2020. Do you see the stamp
15 up in the top, left corner?
16     A.   Yeah, uh-huh.
17     Q.   All right. And how was the document
18 delivered to the Department of Labor? Did you
19 mail? Did you hand-deliver it? Did you email
20 it? What did you do?
21     A.   No, I gave an in-person statement.
22     Q.   How was that arranged?
23     A.   I called them, I believe.
24     Q.   Did anybody else assist you in
25 making contact with the Department of Labor?

C. BATTLE

1
2      A.   Not that I recall.
3      Q.   Who did you call?
4      A.   The Department of Labor.
5      Q.   Just a general number?
6      A.   Yes.
7      Q.   What did you say to them?
8      A.   I wanted to file an appeal -- I
9  don't remember. It was a year ago. Probably
10 would have said, I want to file appeal on the
11 election or the nomination process.
12     Q.   And what did they say to you?
13     A.   I can't recall.
14     Q.   And did you literally walk down to
15 the Department of Labor and hand in documents,
16 or what did you do to -- did you mail --
17     A.   No. I just tried -- from what I
18 remember, I tried to set an appointment to tell
19 my story.
20     Q.   And did -- how close in time did you
21 go to tell your story to DOL, to the Department
22 of Labor receiving your appeal on August 18,
23 2020?
24     A.   I can't recall.
25     Q.   In fact, it was that same day,

C. BATTLE

1
2  correct?
3      A.   I don't recall.
4      Q.   And your wife attended with you,
5  correct?
6      A.   She attend what?
7      Q.   She went to the interview with you?
8      A.   She did?
9      Q.   I'm asking you. Is that correct?
10         MS. DeBRUICKER: Objection to
11 form.
12     A.   I'm not answering that. I don't
13 know why you're bringing my wife into this.
14     Q.   So you had an interview on
15 August 18, 2020 at the time that you delivered
16 your appeal papers to the Department of Labor,
17 correct?
18     A.   I don't recall that, no.
19     Q.   Well, according to the Department of
20 Labor's Exhibit DOL Local 98, 00287, your
21 initial interview was on August 18th, 2020.
22 That's the same date of the marking on the
23 appeal paper, correct?
24     A.   Which appeal paper? The one --
25 Battle-7?

C. BATTLE

1
2      Q.   Exhibit 7, yes.
3      A.   Yeah, I don't remember that paper.
4      Q.   But the same date, correct, August
5  18, 2020?
6      A.   That's what it says.
7      Q.   And were you accompanied by your
8  wife?
9      A.   Again, I'm not going to answer any
10 question about my family.
11         MR. PODRAZA: Make sure we mark
12 that then.
13     Q.   How many meetings after that first
14 meeting did you have with representatives of the
15 Department of Labor?
16     A.   Maybe two.
17     Q.   Well, you tell me. I was not there.
18 You went on August -- at least, according to the
19 DOL, you went on August 18, 2020, for an
20 interview, the day you handed in your appeal
21 papers. And we do know that there was a time
22 that you signed a statement, correct?
23     A.   Yes.
24     Q.   Are those the only two times that
25 you spoke with representatives from the

28 (Pages 106 - 109)

C. BATTLE

1
2  Department of Labor?
3      A.  Spoke with them or phoned or
4  anything?
5      Q.  Anything.
6      A.  No.
7      Q.  Walk me through it then.  When is
8  the next time, after you had your first
9  interview, that you had contact with the
10  Department of Labor?
11      A.  I think I had to come in, read the
12  statement, sign it, make sure everything was
13  pretty accurate.  And I may have been in touch
14  to find out how things were progressing, and
15  that that would have been the extent of that.
16      Q.  Who accompanied you each of the
17  times that you went personally to the Department
18  of Labor?
19      A.  No one.
20      Q.  You just went by yourself?
21      A.  Yeah.
22      Q.  Did Mr. Haines ever go to a meeting
23  with you --
24      A.  No.
25      Q.  -- at the time DOL?

C. BATTLE

1
2      A.  No.
3      Q.  Did Mr. Haines have any contact with
4  the Department of Labor on your behalf, at that
5  time?
6          MR. HAINES:  Objection.  That
7          calls for attorney/client
8          communications that are protected
9          and are privileged.  I instruct you
10          not to answer.
11      Q.  Was a statement written up for your
12  wife to sign?
13      A.  I'm not answering that.
14      Q.  Do you know whether a statement was
15  written up for your wife to sign?
16      A.  I'm not answering that.
17      Q.  What did your wife know about the
18  June 9, 2020, nomination proceeding that would
19  have --
20      A.  I'm not answering that.
21      Q.  -- with the Department of Labor?
22      A.  I'm not answering that.
23      Q.  As far as you know, what did your
24  wife know about the June 9, 2020, nomination
25  proceeding or any of the events leading up to it

C. BATTLE

1
2  --
3      A.  I'm not answering that.
4      Q.  -- to speak with the Department of
5  Labor?
6      A.  I'm not answering that.
7      Q.  But you don't deny that your wife
8  did go and speak with a representative from the
9  Department of Labor, after you took your appeal,
10  correct?
11      A.  I'm not answering that.
12      Q.  Walk me through the other contact
13  you had with the Department of Labor.
14      A.  I just walked you through every one.
15  I wanted to see how the case was progressing,
16  and that's it.
17      Q.  So one in person or two in-persons?
18      A.  Two definitely.
19      Q.  Two in-persons?
20      A.  Yes.
21      Q.  And then telephone calls?
22      A.  Yes.
23      Q.  Who did you speak with?
24      A.  Angela Menges.
25      Q.  How many times do you believe you

C. BATTLE

1
2  spoke by phone with Angela Menges before signing
3  your statement?
4      A.  How many times did I talk to her on
5  the phone before I signed my statement?
6      Q.  Uh-huh.
7      A.  I don't know.  I don't recall.
8      Q.  More than five times?
9      A.  No.
10      Q.  So more than two?
11      A.  No.  Probably one, I would say.
12      Q.  Did you have contact information for
13  Ms. Menges, or did she call you?
14      A.  No. I had contact information for
15  her.
16      Q.  Did you have her cell phone number,
17  or was it just her office number?
18      A.  It was just her business card, so
19  whatever was on there.
20      Q.  Did you voluntarily agree to
21  interview with the Department of Labor, or were
22  you subpoenaed?
23      A.  Voluntarily.
24      Q.  I'd like to then talk about your
25  Department of Labor statement, and we will mark

29 (Pages 110 - 113)

C. BATTLE

1      C. BATTLE
2   that as Exhibit 10 or Battle-10, really.
3           (Statement dated 10/13/20 is
4           received and marked as Battle
5           Exhibit 10 for identification, as of
6           this date.)
7      Q.   Before we get into some substantive
8   questions that I may have, your statement is
9   three pages, single-typed, correct?
10     A.   I don't know what single-type is.
11  I'm a construction worker.
12     Q.   Single type is when you return it,
13  it's just one space between --
14          MR. HAINES:  We can stipulate to
15          that.  We don't have to spend time
16          asking Charlie Battle about it.
17     Q.   Did you type this, sir?
18     A.   No.
19     Q.   All right.  How did this document
20  get produced, as far as you know?
21     A.   I gave a statement and someone
22  produced it.
23     Q.   In your statement, did the
24  representative write down word for word what you
25  were saying and just type it up?

C. BATTLE

1      C. BATTLE
2      A.   I don't know what she wrote down.  I
3   don't know that.
4      Q.   I'm asking you:  Is this what you
5   dictated?
6      A.   I could not tell you that.  I could
7   not remember word for word what I said over a
8   year ago.
9      Q.   Well, when you look at the document,
10  are those the words that you told Ms. Menges?
11     A.   This is what I signed off on,
12  correct.
13     Q.   Well, Mr. McConnell explained to us
14  that he went to the interview, representatives
15  for the Department of Labor took notes.  They
16  then put together a statement and had him come
17  in to review it and sign it, if you wanted to.
18  Was that the same process that you had?
19     A.   Yes.
20     Q.   So you gave information at an
21  interview to the representative.  And then at
22  some point, they called you in to have -- and
23  gave you then this typed-up document for you to
24  review, correct?
25     A.   Correct.

C. BATTLE

1      C. BATTLE
2          MS. DeBRUICKER:  Objection to
3          form.
4      Q.   Now, yours is a statement subject to
5   perjury.  Do you recognize that on the last page
6   of Battle-10?
7          MR. HAINES:  Objection to the
8          form of that question.
9      Q.   Do you see where it says:  I declare
10  under penalty of perjury that the foregoing
11  statement consisting of three pages, each of
12  which I initialed, is true and accurate?
13     A.   Yes, sir.
14     Q.   And you read that language at the
15  time that you signed on October 13, 2020,
16  correct?
17     A.   I don't know if that was the date,
18  but I did read the statement I gave and signed
19  off on it.
20     Q.   And what did the representatives
21  from the Department of Labor say to you was what
22  they were going to use it for?
23     A.   They didn't say.
24     Q.   They just took a statement from you
25  and made no indication of what you could expect

C. BATTLE

1      C. BATTLE
2   the next events to be?
3      A.   No, uh-uh.
4      Q.   You're sure that the representatives
5   didn't suggest to you that your statement would
6   be used to bring a civil action against Local 98
7   for the June 9, 2020, nomination proceeding?
8      A.   No.  They didn't tell me that.
9          MS. DeBRUICKER:  Objection to
10          form.
11     Q.   They didn't tell you, that
12  representatives of the Department of Labor
13  didn't suggest to you that your statement might
14  be used by other government officials to
15  continue their investigation of Local 98?
16     A.   No, sir.
17     Q.   When you went and signed the
18  statement, did you go -- you went to the
19  Department of Labor premises, correct?
20     A.   Yes.
21     Q.   Was it a weekend day?
22     A.   I don't recall.
23     Q.   How long were you at the Department
24  of Labor before you signed the statement?
25     A.   So you're asking -- when I read the

30 (Pages 114 - 117)

Page 118

C. BATTLE

1
2  statement and signed it, how long was I there?
3      Q.   Sure.
4      A.   Maybe a half hour, maybe.
5      Q.   Was anybody present with you while
6  you were reviewing the statement?
7      A.   Did anyone go with me personally, is
8  that what you're asking?
9      Q.   Well, we will do that first.  Did
10 anyone accompany you -- I thought you we already
11 covered that, but --
12     A.   No.
13     Q.   Okay.  And when you were at the
14 Department of Labor, where were you on the
15 premises, to take a look at the statement?  In
16 other words, were you in a conference room?
17 Were you in an office?  Were you just in a lobby
18 area?  Where were you?
19     A.   When I went to sign, I was in an
20 office.
21     Q.   And was that the Department of
22 Labor's representative's office?
23     A.   I assume so.
24     Q.   And was anybody present with you at
25 the time that you were reviewing the document?

Page 119

C. BATTLE

1
2      A.   Yes.
3      Q.   Who was with you?
4      A.   Megan Underwood and Angela Menges.
5      Q.   So both representatives?
6      A.   Yes, sir.
7      Q.   And were they there for the whole
8  time, from the beginning to the end?
9      A.   Yes.
10     Q.   Did either representative from the
11 Department of Labor indicate if others were also
12 going to be giving statements, in addition to
13 you?
14     A.   No, they didn't tell me that.
15     Q.   You had conversations with
16 Mr. McConnell, though, and you knew he was going
17 to be giving a statement, correct?
18     A.   I assumed he would be, yes.
19     Q.   Why did you assume that?
20     A.   Just from the treatment we received
21 from our Local.
22     Q.   How did you know that Mr. McConnell
23 had actually had contact with the Department of
24 Labor?
25     A.   I didn't.

Page 120

C. BATTLE

1
2      Q.   So you did not know -- strike that.
3      You're just assuming that he would be
4  involved or contacted by DOL?
5      A.   No, I didn't assume anything.
6      Q.   Well, I thought you just said that
7  you believed that McConnell was going to be
8  giving a statement?  Is that just conjecture?
9      A.   I knew it was going to rain today.
10 No.  I didn't know what was going to go on with
11 Tim McConnell.
12     Q.   Didn't you speak with Mr. McConnell
13 between the time you signed your statement and
14 before he signed his statement?
15     A.   I don't recall that.
16     Q.   Did you tell Mr. McConnell the
17 substance of your statement and what you were
18 generally saying in your statement?  In order
19 words, you kind of summarized your statement for
20 Mr. McConnell before he came in and signed his?
21         MS. DeBRUICKER:  Objection to
22 form.
23     A.   I don't recall that.
24     Q.   Did anyone else, as far as you know,
25 give a statement to the Department of Labor, in

Page 121

C. BATTLE

1
2  this matter of your appeal?
3      A.   Yes.
4      Q.   And who else?
5      A.   Philip Borthwick.
6      Q.   And when did you become aware that
7  Mr. Borthwick was speaking with the Department
8  of Labor?
9      A.   I don't recall.
10     Q.   Was it prior to your signing of your
11 statement with the DOL?
12     A.   Yes.
13     Q.   And how did you become aware?  Did
14 you speak with him?
15     A.   Yes.
16     Q.   And tell me the substance of the
17 conversation.
18     A.   I don't recall.
19     Q.   Did you indicate to Mr. Borthwick
20 what you were generally saying to the Department
21 of Labor?
22     A.   I wouldn't have to, so no.
23     Q.   Did you encourage Mr. Borthwick to
24 tell the Department of Labor, or words to the
25 effect, that the nomination process was tainted

31 (Pages 118 - 121)

C. BATTLE

1
2     by intimidation, et cetera?
3         A.   No.
4         Q.   Any other aspects of the
5     conversation you can remember?
6         A.   No.
7         Q.   Was it by cell phone?  Was it in
8     person?
9         A.   Yeah, I don't remember.
10        Q.   Looking at the statement, the very
11    first page, page 1 of 3 --
12            MR. HAINES:  408?
13            MR. PODRAZA:  Correct.
14        Q.   The statement reads, quote:  I was
15    going to run for president on a slate with
16    Timothy McConnell and Michael Coppinger, and it
17    continues.  Do you see the words there?
18        A.   I do.
19        Q.   Mr. McConnell said he never would
20    have campaigned with you.  He would have
21    campaigned independently.  Why did you
22    represent --
23        A.   So to clear that up --
24            MR. HAINES:  Wait.  Let him ask
25        the question.

C. BATTLE

1
2         A.   I'm sorry.
3         Q.   Why would you tell the Department of
4     Labor that you were going to be running on a
5     slate with McConnell and Coppinger, when
6     McConnell denies that he ever would have
7     considered running on the slate with you?
8             MS. DeBRUICKER:  Objection.
9             MR. HAINES:  That's two different
10        questions.  You want to break it
11        down?
12        Q.   Why did you tell the Department of
13    Labor that you were part of a slate with
14    McConnell and Coppinger, when McConnell denies
15    he ever would have run with you?
16            MS. DeBRUICKER:  Objection.
17            MR. HAINES:  I object.  I'm not
18        going to let him answer that
19        question because you have
20        misrepresented what he said.  You're
21        not going to do that, and you can
22        call McHugh.
23        Q.   Are you aware that McConnell has
24    specifically denied being part of a slate with
25    you?

C. BATTLE

1
2         A.   Yes.
3         Q.   Why would you tell the Department of
4     Labor then that he was on the slate with you?
5             MR. HAINES:  Objection.  Do not
6         answer that question --
7             MS. DeBRUICKER:  Objection to
8         form.
9             MR. HAINES:  -- goddammit.
10        You're not going to do that.  That's
11        not what he said.
12        Q.   Were you aware McConnell said that
13    he was not going to run on a campaign with you,
14    prior to signing this statement?
15            MS. DeBRUICKER:  Objection.
16        Asked and answered.
17        Q.   On what basis then -- well, answer
18    my question.  Were you aware that McConnell
19    represented that he would not be running as a
20    candidate with you, prior to signing this
21    statement by DOL?
22            MS. DeBRUICKER:  Objection.
23        Asked and answered.
24            MR. HAINES:  Yes, asked and
25        answered.  He said that.

C. BATTLE

1
2         Q.   You can answer.
3             MR. HAINES:  No, he can't.
4             MR. PODRAZA:  Excuse me.  He did
5         not answer it.
6             MR. HAINES:  You're badgering
7         him.  He answered the question.  If
8         you don't remember it, then ask the
9         court reporter to read it back.
10            MR. PODRAZA:  Fine.  Let's go
11        back and let's go through all of the
12        questions, please, on this, and
13        let's see what he said about whether
14        he knew that McConnell denied being
15        part of a slate with him.  And we
16        will clear up whether you've
17        answered that or not.
18            (The requested portion of the
19        transcript was read back.)
20        Q.   And my question is:  Were you aware
21    of that prior to signing this statement with
22    DOL?
23            MR. HAINES:  He wants to know --
24        yes, he can answer that question.
25        He changed the question, so you can

Page 126

C. BATTLE

1
2        answer that one.
3        A.   So was I aware --
4        Q.   That McConnell denies ever being
5    willing to participate on a slate with you in
6    running in the election?
7        A.   No.
8        Q.   No, what?  Did you know that prior
9    to signing this --
10       A.   I don't know --
11       Q.   -- statement with the DOL?
12       A.   -- that question.
13              MR. PODRAZA:  Can you go back to
14    his testimony where he said --
15       A.   You said "ever." I'm not aware of
16    that, that he was never going to run on a slate
17    of that?  No, I'm not aware.
18       Q.   Are you aware McConnell denies he
19    was going to run on the slate with you?
20       A.   Yes.
21       Q.   And were you aware of that at the
22    time you were signing this DOL statement?
23       A.   So I probably skimmed through it,
24    but I would have known, yes.
25       Q.   And yet you don't correct this part

Page 127

C. BATTLE

1
2    of the DOL statement, do you?
3              MR. HAINES:  Objection.  You are
4    suggesting -- you're inferring that
5    there's a misrepresentation here.
6    You're not going to misstate things
7    to him.  What he said was, I was
8    going to run for president on a
9    slate with Timothy McConnell and
10    Michael Coppinger.  He said, I was
11    going to run.
12              He didn't say there was a slate.
13    He said, I was going to run with
14    them.  So why don't you ask him what
15    happened?
16       Q.   And you're aware that prior to
17    signing this DOL statement, that Mr. McConnell
18    denied that he was ever going to run on the
19    slate with you --
20              MR. HAINES:  Okay.  We are not --
21              MS. DeBRUICKER:  Objection to
22    form.
23              MR. HAINES:  -- doing this.  Joe,
24    we are not doing this.  Okay.
25              You're not going to keep badgering

Page 128

C. BATTLE

1
2    him and you're not going to
3    misrepresent what he said.  If you
4    want to know what he said, ask him.
5    If you want to know what he said --
6              MR. PODRAZA:  Cliff, I'm a
7    patient man.  I have four children.
8    I try to be patient.  And I think at
9    this point --
10              MR. HAINES:  I have four
11    children, too, and I'm not.  I'm not
12    patient to lawyers who abuse their
13    power and their authority.  And
14    that's what you're doing.
15              If you want to know what the
16    circumstances were, ask him.
17              MR. PODRAZA:  Well, I think we
18    will take this up with Judge McHugh.
19    I want to know why that
20    representation is being made here,
21    despite you're knowing McConnell
22    denied that he was going to run on a
23    slate with you.
24              MR. HAINES:  Okay.  That's what
25    he wants to know.  Explain to him.

Page 129

C. BATTLE

1
2    Now he opened the door to you
3    explaining to him the situation with
4    the slate.
5        A.   Okay.  So this was kind of a
6    preliminary thing.  Timmy and I were not in
7    touch a whole lot before this was going to
8    happen.  I didn't even know Tim before any of
9    this was going to play out.  I assumed he was
10    going to run for e board, Mike Coppinger was
11    going to e board.  I was going to run for
12    president.  And we were all talking, and I
13    assumed we were going to run under the same
14    slate.  So it was an assumption --
15       Q.   But prior to the signing of this
16    statement --
17              MR. HAINES:  Let him finish
18    answering the question.  He has not
19    finished.
20       A.   So the reason that this never came
21    about is because those two fellows were
22    intimidated out of this race.  They were
23    threatened and intimidated.  That's the bottom
24    line.
25       Q.   And what is your understanding as to

33 (Pages 126 - 129)

Page 130

C. BATTLE

1
2  why Mr. McConnell denies he was going to run on
3  the slate with you?
4      A.   Because we never discussed it.
5      Q.   Did you advise the DOL
6  representatives that Mr. -- that you're aware
7  that Mr. McConnell denies he was going to run on
8  the slate --
9      A.   I was never asked the question.
10     Q.   You continue on in the next
11  paragraph:  I have stood up during membership
12  meetings and said some hard words for business
13  manager John Dougherty.
14          Did I read that accurately?
15     A.   What do you consider hard words?
16          MR. HAINES:  Charlie, answer his
17      question.
18     A.   No, I don't agree with that.  No.
19     Q.   Did you advise the DOL
20  representatives October 13th, 2020, that you
21  disagree with those representations?
22     A.   No, uh-uh.
23     Q.   If you turn to the next page of your
24  statement, you say on June 7, 2020, the Sunday
25  before the nomination meeting:  I learned that

Page 131

C. BATTLE

1
2  McConnell and Coppinger, my intended running
3  mates, were not going to run for office.
4          Have I read that accurately?
5      A.   Yes.
6      Q.   And am I correct that June 7, 2020
7  is the date that Mr. Bark came to your home?
8      A.   Is that a Sunday?
9      Q.   It is.
10     A.   Yeah, I believe that was the day he
11  showed up, yes.
12     Q.   And that date sticks in your mind
13  because of Mr. Bark?
14     A.   That date doesn't stick in my mind,
15  at all.
16     Q.   Well, would it help, the fact that
17  Mr. Bark had come to your home on that date, and
18  then you're getting the call from Mr. McConnell?
19     A.   No.
20     Q.   No?  Then why do you give the date
21  of June 7, 2020, the Sunday?
22     A.   That would be the date that I had a
23  conversation with Tim on the phone.  He told me
24  he was out.  And that would be the day Robert
25  Bark showed up at my house, that was the Sunday

Page 132

C. BATTLE

1
2  before nominations.
3      Q.   On June 9, 2020, after you left the
4  union hall, where did you go?
5      A.   Home.
6      Q.   You didn't go to Kelly's Bar?
7      A.   Oh, my God.  That's funny.  Where is
8  Kelly's Bar?
9      Q.   I'm asking you, sir.
10     A.   I'm asking you.  I don't know what
11  that is.  What is Kelly's Bar?
12     Q.   Have you ever been to a Kelly's or
13  Kelliann's Bar?
14     A.   Have I ever been there?  Yes.
15     Q.   Where is that located?
16     A.   Spring Garden Street.
17     Q.   Is that near the union hall?
18     A.   Yes.
19     Q.   Are you sure you didn't go there
20  after handing in your nomination papers?
21     A.   Am I sure I didn't go?  I'm positive
22  I didn't go.
23     Q.   Did you stay at the Kelliann's Bar
24  while the 7 p.m. nominations were happening?
25          MS. DeBRUICKER:  Objection to

Page 133

C. BATTLE

1
2      form.
3      A.   That's a stupid question.
4          MR. HAINES:  Answer it.
5      A.   No.
6      Q.   Were you accompanied by anybody at
7  the Kelliann's Bar on June 9, 2020?
8      A.   No.
9      Q.   Is it your testimony that you never
10  went to Kelliann's Bar on June 9, 2020?
11     A.   That's my testimony.
12     Q.   Did you ever ask the representatives
13  from the DOL whether you could handwrite your
14  statement?
15     A.   Whether I could handwrite?  No, I
16  did not ask that.
17     Q.   Did they ever make that offer to
18  you?
19     A.   No, sir.
20          MR. PODRAZA:  We kind of
21      agreed -- it's seven o'clock.  I'm
22      probably going to have maybe a
23      couple of more hours, and you've got
24      to get your questions done.  Do you
25      want to stop here, and we will pick

34 (Pages 130 - 133)

Page 134

```
1              C. BATTLE
2     it up on the next date, and you can
3     talk to him?
4         MR. HAINES:  That's fine with me.
5     Are you all right with that?  This
6     is your case.
7         MS. DeBRUICKER: I'm fine.  Well,
8     right now, it's his deposition.
9         MR. HAINES:  Yeah, I know, it is
10    his deposition.
11        MS. DeBRUICKER:  I think it makes
12    sense to conclude sometime soon.
13        MR. PODRAZA:  This is a logical
14    break.
15        (Continued on the next page to
16    include jurat.)
17
18
19
20
21
22
23
24
25
```

Page 136

```
1
2                I N D E X
3     WITNESS                    PAGE
4     CHARLES BATTLE
5
      By MR. PRODRAZA          5
6
7
            E X H I B I T S
8
      BATTLE
9     FOR IDENT.    DESCRIPTION    PAGE
10    Exhibit 1  Notice dated 5/18/20    19
11    Exhibit 2  Letter to DOL dated June 6,  21
             2020
12
      Exhibit 3  Protest letter dated    34
13          6/16/20
14    Exhibit 4  Letter dated 6/15/20    49
15    Exhibit 5  Letter dated 7/28/20    62
16    Exhibit 6  Letter dated 7/31/20    72
17    Exhibit 7  Hand-written document    73
18    Exhibit 8  Anonymous postings    83
19    Exhibit 9  Aboutyourlocal.com    100
             screenshots
20
      Exhibit 10  Statement dated 10/13/20  114
21
22
23
24
25
```

Page 135

```
1
2         THE VIDEOGRAPHER:  The time is
3     now 6:52.  This concludes media unit
4     Number 2 of today's deposition.
5
6     (Time noted: 6:52 p.m.)
7
8
9         _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 137

```
1
2          REQUEST FOR DOCUMENTS
3
      PAGE  LINE
4     53    3
5
             MARKED FOR RULING
6
      PAGE  LINE
7
8     22    15
9     24    7
10    24    10
11    25    2
12    28    6
13    31    12
14    31    22
15    32    19
16    33    3
17    34    19
18    36    20
19    38    20
20    40    9
21    40    16
22    41    18
23    42    9
24    43    2
25    45    14
```

35 (Pages 134 - 137)

Page 138

```
1
2     45   22
3     56   13
4     58    2
5     58    2
6     78   18
7     80   11
8     81   12
9    105    8
10   108    7
11   109    7
12   111    3
13   111   11
14   111   14
15   111   17
16   111   23
17   112    7
18   123   12
19   124    3
20
21
22
23
24
25
```

Page 139

```
1
2          C E R T I F I C A T I O N
3       I, CAROLYN C. CRESCIO, a Notary
4   Public, within and for the State of
5   Pennsylvania, do hereby certify that the
6   foregoing witness, CHARLES BATTLE, was duly
7   sworn on the date indicated, and that the
8   foregoing is a true and accurate transcription
9   of my stenographic notes.
10      I further certify that I am not
11  related to any of the parties to this action by
12  blood or marriage; and that I am in no way
13  interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto
15  set my hand this 12th day of August, 2021.
16
17
                _____
18                CAROLYN C. CRESCIO
19
20
21
22
23
24
25
```

Page 140

```
1   Clifford Haines, Esquire
2   chaines@haines-law.com
3             August 20, 2021
4   RE:   Martin J. Walsh v. Local 98
5     8/12/2021, Charles Battle (#4737617)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 141

```
1   Martin J. Walsh v. Local 98
2   Charles Battle (#4737617)
3        E R R A T A   S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Charles Battle                 Date
25
```

36 (Pages 138 - 141)

Page 142

1   Martin J. Walsh v. Local 98

2   Charles Battle (#4737617)

3          ACKNOWLEDGEMENT OF DEPONENT

4     I, Charles Battle, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Charles Battle              Date

13   *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 144

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4
 5  MARTIN J. WALSH,          :   CIVIL ACTION
    Secretary of Labor,       :
 6  United Stated Department   :
    of Labor,                 :   NO.
 7          Plaintiff,        :   2:21-cv-00096
                              :
 8       vs.                  :
                              :
 9  LOCAL 98, INTERNATIONAL    :
    BROTHERHOOD OF            :
10  ELECTRICAL WORKERS,       :
            Defendant.        :
11                      - - -
                   August 26, 2021
12                     Day 2
                        - - -
13
14              Videotaped deposition of CHARLES
15  BATTLE, taken at the offices of Lamb McErlane,
16  One South Broad Street, Suite 1500,
17  Philadelphia, PA 19107, beginning at 3:45 p.m.,
18  before Paulette B. Cox, a Court Reporter and a
19  Notary Public in and for the Commonwealth of
20  Pennsylvania.
21                      - - -
22
              VERITEXT LEGAL SOLUTIONS, LLC
23               MID-ATLANTIC REGION
            1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania 19103
```

Page 145

1 A P P E A R A N C E S :
2
3 UNITED STATES DEPARTMENT OF JUSTICE
   UNITED STATES ATTORNEY'S OFFICE
4 BY: LAUREN DeBUICKER, ESQ.
   By: ANNA LAURA BENNETT, ESQ.
5 Eastern District of Pennsylvania
   615 Chestnut Street, Suite 1250
6 Philadelphia, PA 19106
   215-861-8200
7 Lauren.DeBruicker@usdoj.gov
   Representing the Plaintiff, Department of Labor
8
   LAW OFFICES OF CLIFFORD HAINES
9 BY: CLIFFORD E. HAINES, ESQ.
   The Widener Building, 5th Floor
10 1339 Chestnut Street
   Philadelphia, PA 19107
11 215-246-2200
   Info@haines-law.com
12 Representing the Plaintiff, Charles Battle
13
   LAMB McERLANE, PC
14 BY: JOSEPH R. PODRAZA, ESQ.
   BY: WILLIAM H. TRASK, ESQ.
15 BY: JOEL L. FRANK, ESQ.
   One South Broad Street
16 Suite 1500
   Philadelphia, PA 19107
17 215-609-3170
   jpodraza@lambmcerlane.com
18 Representing the Defendant, Local 98
19
20
21 A L S O   P R E S E N T :  Ryan Morton
                 Videographer
22
                 John Dougherty
23               John O'Neill, Esq.
                 - - -
24

Page 146

1         I N D E X
2           - - -
3 Testimony of:  Charles Battle
4 By Mr. Podraza              148, 298
5 By Ms. DeBruicker              238
6
7
8
9           - - -
10       E X H I B I T S
11          - - -
12 EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED
13
14
15 Battle No. 11  Report of Interview      150
16 Battle No. 12  Text Message       164
17 Battle No. 14  E-Mails         179
18 Battle No. 15  Photographs        257
19 Battle No. 16  Nomination Slip        261
20 Battle No. 17  Meme          281
21
22           - - -
23
24

Page 147

1       DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4 Page   Line
5   168   2
6   231   3
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9 Page   Line     Description
10  175    20 Phone Log of FBI Call to
11          Battle
12
13
14 STIPULATIONS
15 Page   Line
16 None
17
18 QUESTIONS MARKED
19 Page   Line
20 None
21
22
23
24

Page 148

1          THE VIDEOGRAPHER:  Good
2     afternoon.  We're going on the record at
3     3:45 p.m. on August 26th, 2021.  This is
4     Media Unit No. 1 of the continued
5     video-recorded deposition of Charles
6     Battle.
7          Mr. Battle has already been
8     sworn in.
9          Counsel, you may proceed.
10         MR. PODRAZA:  Thank you.
11 BY MR. PODRAZA:
12    Q.    Good afternoon, Mr. Battle.
13    A.    Hello.
14    Q.    I'd like to begin with what we
15 have marked previously as Exhibit No. 10, that
16 was a copy of the statement that you signed
17 with the Department of Labor.
18         And the very first page, sir, do
19 you see that it's a cover page with the U. S.
20 Department of Labor marking in the top
21 left-hand corner?
22    A.    All right.
23    Q.    I just want to draw your
24 attention to the language that says, "Prior to

CHARLES BATTLE

Page 149

1 signing, OLMS discussed the purpose of the
2 statement with Battle;" do you see what I just
3 read?
4     A.     No.
5     Q.     It's the very last sentence just
6 above all the blacked-out stuff?
7     A.     Okay.
8     Q.     Okay.  It says, as I said,
9 "Prior to signing OLMS discuss the purpose of
10 the statement with Battle."  What do you recall
11 the discussion was that you had with the
12 representative from the Department of Labor?
13     A.     What happened on the nomination
14 night.
15     Q.     I'm sorry?
16     A.     What happened on the night of
17 the nomination.
18     Q.     And what did they say the
19 purpose of the statement from you was going to
20 be?
21     A.     I don't remember.
22     Q.     Do you remember whether there
23 was any reference to any other governmental
24 action being taken after you gave the

Page 150

1 statement?
2     A.     No.
3     Q.     Do you recall though that a
4 search warrant was issued on the headquarters
5 of Local 98, days after you gave your statement
6 to the Department of Labor?
7     A.     No.
8     Q.     Did you know at the time you
9 were giving the statement, that your statement
10 would help contribute to the search warrant
11 being issued from that search?
12     A.     No.
13         MS. DeBRUICKER:  Objection to
14     form.
15         THE WITNESS:  No.
16 BY MR. PODRAZA:
17     Q.     I'd then like to move on to what
18 we're going to mark today as Exhibit No. 11.
19             - - -
20         (Whereupon the document was
21     marked, for identification purposes, as
22     Battle's Exhibit No. 11.)
23             - - -
24         MR. HAINES:  I'm sorry.  Does

Page 151

1 somebody have an extra pen?
2         MR. TRASK:  (Mr. Trask
3     indicated.)
4         MR. HAINES:  Thank you.  Remind
5     me to give it back later.
6         MR. PODRAZA:  It's a keepsake.
7 BY MR. PODRAZA:
8     Q.     All right.  While you're
9 reviewing what's been marked here as Exhibit
10 No. 11 for your deposition, I'm just going to
11 represent for the record, it is a Report of
12 Interview involving Robert Bark, B-a-r-k,
13 completed on September 4, 2020.  And review the
14 document, and when you're comfortable, I have
15 just some questions to ask regarding it.  Okay?
16     A.     Yeah.
17     Q.     All right.  Let's go over the
18 first page.  Third full paragraph.  As of 2020,
19 did you know Mr. Bark for about 25 years?
20     A.     As of 2020?
21     Q.     Yes.
22     A.     It was, I would have known him
23 22 years.
24     Q.     Okay.  And did you grow up with

Page 152

1 Mr. Bark's cousin?
2     A.     No, I didn't grow up with him.
3 I know him from the neighborhood.  I didn't
4 grow up with him.
5     Q.     And did you, Mr. Richie Kee, and
6 Mr. Bark go to concerts?
7     A.     No.
8     Q.     Did the three of you hang out
9 and drink?
10     A.     Yes.
11     Q.     Did the three of you take the
12 children fishing together?
13     A.     No.  I don't -- my kids, no.
14     Q.     And did the three of you attend
15 weddings of mutual friends and members?
16     A.     No.
17     Q.     If you go to the next paragraph,
18 there is reference to a garage being built.
19 Did Mr. Bark help you get a zoning lawyer for
20 the garage?
21     A.     Yes.
22     Q.     And if you continue down to the
23 next paragraph there is reference to a meeting,
24 a members' meeting of the union in November

3 (Pages 149 - 152)

CHARLES BATTLE

Page 153

1 2014; do you see that there?
2   A.   Yes.
3   Q.   And it continues saying that you
4 spoke with Mr. Bark and invited him if he had
5 nowhere else to go for Thanksgiving; is that
6 true?
7   A.   No, I asked him what he was
8 doing for Thanksgiving.
9   Q.   And were you intending to invite
10 him if he didn't have plans?
11   A.   No, I can't say.  Maybe, maybe
12 not.  I don't know.
13   Q.   And if you continue to the next
14 paragraph, there is further reference to the
15 membership meeting in 2019; do you see that?
16   A.   I'm sorry.  The next paragraph?
17   Q.   Yes.  The one that starts,
18 "During the aforementioned membership meeting."
19   A.   Uh-huh.
20   Q.   All right.  There is reference
21 there that you got up and asked the question,
22 and that Bark was sitting maybe two chairs away
23 from you; is that correct, or not correct?
24   A.   It could be possible.  I don't

Page 154

1 know.
2   Q.   Okay.  And according to Mr.
3 Bark's perspective, that he thought that you
4 were being disrespectful to the union
5 leadership?
6   A.   Yeah, I don't know why at that
7 point, why they would get that.  I mean, I
8 remember that meeting.  I think that one was
9 the bylaw changes.  They went over a lot of
10 changes in a short amount of time, and we were
11 having to vote on it right there.
12   Q.   And in the next paragraph, still
13 making reference to that meeting in November of
14 2019, Mr. Bark says after that meeting he spoke
15 with you, and you know, words to the effect,
16 what's up, what's the problem; do you recall
17 that?
18        MS. DeBRUICKER:  Objection to
19 form.
20 BY MR. PODRAZA:
21   Q.   You can answer.
22   A.   I received a phone call.
23   Q.   And what was said in that phone
24 call?

Page 155

1   A.   He wanted to know what my
2 problem was.
3   Q.   All right.  And did Mr. Bark
4 make a reference to use the Frank McGhee
5 method, "ask respectfully, get a respectful
6 answer?"
7   A.   I don't know.  Maybe.
8   Q.   And what was your response to
9 Mr. Bark when he asked you what your problem
10 was?
11   A.   All I do was ask the question in
12 a union meeting, so I wanted to know what the
13 problem is.
14   Q.   Was Mr. Bark indicating to you
15 that he thought you were disrespectful to union
16 leadership at that meeting?
17   A.   I heard this many a times,
18 something about my tone.
19   Q.   And was it the tone that Mr.
20 Bark was speaking with you about in that call?
21   A.   You would have to ask him.  I
22 don't know.
23   Q.   Well, from your vantage point,
24 did you get the impression that Mr. Bark was

Page 156

1 talking to you about the tone that you used at
2 the membership meeting --
3   A.   No.  I did really didn't
4 understand why he was calling.
5   Q.   Okay.  I have to finish my
6 question.
7   A.   I'm sorry.
8   Q.   We could have review the --
9   A.   I'm sorry.
10   Q.   -- so my question is, was it
11 your impression that Mr. Bark was taking issue
12 with the tone that you used at that November
13 2019 meeting when he was speaking with you?
14   A.   I can't really say 'cause I
15 didn't think I had a tone at that meaning.
16   Q.   Then if you go to the next page,
17 Page No. 2 of the report of interview, the
18 second full paragraph, there is reference to,
19 there was a time where you asked Mr. Bark to
20 leave your home; is that accurate?
21   A.   Which time are we speaking of
22 here?
23   Q.   I'm going to ask you that.  Did
24 you at some time ask, tell Mr. Bark or ask him

4 (Pages 153 - 156)

CHARLES BATTLE

Page 157

1 to leave your home?
2    A.    The second time he showed at my
3 house, yes.
4    Q.    All right.  And it says, it was
5 the second time Mr. Bark went there.  And is it
6 true that Mr. Bark was with Mr. Kee?
7    A.    Yes.
8         MS. DeBRUICKER:  Objection to
9    form.
10 BY MR. PODRAZA:
11   Q.    And then if you go to the fourth
12 paragraph on Page No. 2, at least from the
13 vantage point of Mr. Bark, he indicates that
14 when he went to the door, that you were excited
15 and angry.  Were you excited and angry when Mr.
16 Bark appeared at your door that second time?
17   A.    Yes.
18   Q.    And then Mr. Bark says you
19 extended your hand for a handshake to Mr. Kee,
20 but not to Mr. Bark; is that true?
21   A.    No.
22   Q.    What's wrong with that
23 statement?
24   A.    I came out of my house and asked

Page 158

1 him what he was doing at my house.
2    Q.    And did Mr. Bark say to you,
3 words to the effect that he made a mistake
4 coming to your house, that he was sorry, and
5 thought you were friends?
6         MS. DeBRUICKER:  Objection to
7    form.
8         THE WITNESS:  I wouldn't put it
9    in those exact words, but maybe something
10   to that effect.
11 BY MR. PODRAZA:
12   Q.    And your wife was there; is that
13 correct?
14   A.    Yes.
15   Q.    And if I'm not mistaken, in your
16 protest letter of June 16, you indicate that
17 Mr. Bark appearing at the house, quote, he put
18 the fear of God into my wife and family, end
19 quote; is that correct?
20        MS. DeBRUICKER:  Objection.
21        THE WITNESS:  My family's still
22   scared when someone knocks on my door, so
23   I'm going to say, yeah.
24 BY MR. PODRAZA:

Page 159

1    Q.    And the next paragraph
2 indicates, at least Mr. Bark estimated that he
3 and Mr. Kee were at your house for say
4 two-and-a-half to three minutes; is that about
5 correct?
6    A.    Yes.
7    Q.    Now, on Page No. 3 of the Report
8 of Interview, do you see that Mr. Bark makes
9 reference to quote, issue, end quote, and he
10 identifies the issue involved your stepson?
11   A.    Yes, I see that.
12   Q.    And it's really your son-in-law;
13 is that correct?
14   A.    That is correct.
15   Q.    And by the way, going back, why
16 were you angry and excited when Mr. Bark
17 appeared at your door?
18   A.    The second time?
19   Q.    The second time.
20   A.    Okay.  So, the first time I
21 wasn't happy 'cause you know, you're bringing,
22 you're bringing business stuff to my house, my
23 personal residence.  My wife is already scared
24 to death of this man, so she doesn't want

Page 160

1 anything to do with this.  He showed up at the
2 job, talked to me again, after text message,
3 after text message, after text message, I told
4 him, "Don't come to my house."
5    Q.    Okay.
6    A.    "Don't bring this nonsense to my
7 front door."  And he did it again on a Sunday
8 night, two nights before nomination.
9    Q.    Now, the second time that we're
10 talking about, is that a Sunday, June 7th,
11 2020?
12   A.    It was a Sunday night.  I'm not
13 even sure of the date.
14   Q.    All right.  Well, if I told you
15 the nomination proceeding was June 9th, a
16 Tuesday; June 8th would have been the Monday;
17 June 7th would be the Sunday; does that help?
18   A.    Yes.
19   Q.    Okay.  So, we're talking now
20 about June 7th, 2020, the second visit of Mr.
21 Bark?
22        MS. DeBRUICKER:  Objection.
23        THE WITNESS:  Yes.
24 BY MR. PODRAZA:

5 (Pages 157 - 160)

CHARLES BATTLE

Page 161

1    Q.    Now, Mr. Bark indicates that
2  your son-in-law was passed over for an
3  apprenticeship; is that correct?
4    A.    Passed over?
5    Q.    He uses those words.  Did your
6  son-in-law apply for an apprenticeship?
7    A.    He did.
8    Q.    And did he get it?
9    A.    Well, which year are we speaking
10 of here?
11   Q.    Well, walk me through the
12 chronology of your son-in-law's involvement in
13 the union?
14   A.    I don't remember the years.  It
15 might have been three or four times.  He tried
16 the first year, but Local lost his paperwork,
17 didn't know who he was, disappeared off the
18 planet.
19         Second, third year, he didn't
20 get in.  I think it might have been the fourth
21 year, he did, and I think the next year after
22 that he didn't.
23   Q.    Well, if he got in, why did he
24 have to apply subsequently?

Page 162

1    A.    Because he failed a drug test.
2    Q.    Oh, he failed a drug test?
3    A.    Yes.
4    Q.    And then subsequently, he
5  applied again to try to get into the
6  apprenticeship program?
7    A.    Yes.
8    Q.    And can we agree that the
9  apprentice program is, it's a program where
10 those who are selected are paid to learn the
11 trade or craft while they are learning and
12 studying?
13   A.    Yes.
14   Q.    And it's a stepping stone into
15 becoming a very competent electrical worker,
16 correct?
17         MS. DeBRUICKER:  Objection to
18    form.
19         THE WITNESS:  For most people,
20    yes.
21 BY MR. PODRAZA:
22   Q.    And you yourself went through
23 that program, correct?
24   A.    I did.

Page 163

1    Q.    And there is reference then on
2  the third paragraph of Page No. 3 to you being
3  upset about paying union dues while you were
4  working in Poland.
5    A.    Correct.
6    Q.    Is that accurate?
7    A.    Yes.
8    Q.    How long were you in Poland?
9    A.    For a year.
10   Q.    And during that year period, did
11 Mr. Bark or Mr. Kee have any interaction with
12 your wife?
13   A.    You would have to ask her.
14   Q.    Your wife knew, though, Mr. Kee
15 correct, prior to the June 7th, 2020, visit?
16   A.    They have met, so --
17   Q.    And your wife was familiar with
18 Mr. Bark prior to June 7th, 2020, correct?
19   A.    Yes.
20   Q.    In fact, they interacted on
21 numerous occasions prior to June 7th, 2020 --
22   A.    No, no.
23   Q.    -- haven't they?  And then on
24 the last page it, Page No. 4, Mr. Bark says,

Page 164

1  "On one occasion he teased you by nickname, by
2  saying you earned the nickname, quote, Bitter
3  Battle, end quote;" do you see that there?
4    A.    I see it.
5    Q.    Did he in fact share that with
6  you?
7    A.    No, not to my recollection.
8    Q.    All right.  And he then says,
9  your response was quote, don't worry, Bob,
10 you're not the problem, end quote; does that
11 help refresh your recollection?
12   A.    No.
13   Q.    Now, I'd like to show you what
14 we're going to mark as Exhibit No. 12.
15         - - -
16         (Whereupon the document was
17    marked, for identification purposes, as
18    Battle's Exhibit No. 12.)
19         - - -
20 BY MR. PODRAZA:
21   Q.    And you'll see that the second
22 page is a duplication of the first page, and
23 then there is a little, like the last paragraph
24 at the bottom.

6 (Pages 161 - 164)

CHARLES BATTLE

Page 165

1    A.    Okay.
2    Q.    Do you recall receiving this
3 text from Mr. Bark?
4    A.    I do.
5    Q.    And why don't we review that a
6 little bit.  It starts out with, first you
7 received it on June 8th, 2020; is that correct?
8    A.    It would have been, I think it
9 was the same night when he showed up at my
10 house, so whatever the date was.
11    Q.    Okay.  That would be June 7th,
12 but I can represent to you is a Sunday, and
13 June 8th would be a Monday.
14    A.    Okay.  Well, date's right there.
15 I thought it was the same night, but okay.
16    Q.    Okay.  Do you have any reason to
17 disagree that the text was received by you on
18 June 8th, 2020, around 9:00 p.m. at night?
19    A.    No.  It's what it says.
20    Q.    And it says, "hey, Charlie," and
21 that's you, correct?
22    A.    Yes.
23    Q.    "That did not go the way I was
24 hoping.  I knew you would be a little mad about

Page 166

1 me coming to your house from the conversation
2 we had on job that time.  You told me you were
3 a little taken aback, that is why I brought
4 Richie" -- Richie is Mr. Kee; is that correct?
5    A.    Yes.
6    Q.    All right.  "Let me clear the
7 air, I did not say you were on drugs because I
8 was not at the meeting."  What did you
9 understand Mr. Bark was meaning by saying, "I
10 did not say you were on drugs because I was not
11 at the meeting?"
12    A.    So I had a few people telling
13 me, he is asking other members or actually
14 telling other members that I'm on drugs.
15    Q.    "He" being Mr. Bark?
16    A.    Yes.
17    Q.    All right.  Without getting too
18 personal, were you on drugs at any of the
19 meetings or any activities that were union
20 related?
21    A.    Absolutely not.
22          MS. DeBRUICKER:  Objection.
23 BY MR. PODRAZA:
24    Q.    Have you ever been under the

Page 167

1 influence of either alcohol, or narcotics, or
2 any medications at any of these meetings?
3          MS. DeBRUICKER:  Objection.
4          MR. HAINES:  I'm going to
5      interpose an objection as well.  Any of
6      these meetings?
7 BY MR. PODRAZA:
8    Q.    Have you ever been under the
9 influence of either alcohol or any other
10 controlled substance at any of the membership
11 meetings?
12          MR. HAINES:  Objection.
13          MS. DeBRUICKER:  Objection.
14          MR. HAINES:  Where are we going
15      with this?  Are we going back 20 years?
16      Is that what you're asking him?  Has he
17      ever showed up --
18          MR. PODRAZA:  Sure.
19          MR. HAINES:  And the relevance
20      of that is?
21          MR. PODRAZA:  Well, the
22      statement, I don't have to explain myself
23      to your, Mr. Haines.
24 BY MR. PODRAZA:

Page 168

1    Q.    Please answer the question.
2          MR. HAINES:  Well, you do not
3      have to answer the question if he doesn't
4      want to explain --
5          MR. PODRAZA:  All right.  For
6      each of the instructions by counsel,
7      would you please mark them separately so
8      with have a separate section for them in
9      the transcript?
10          MR. HAINES:  That's an improper
11      question --
12 BY MR. PODRAZA:
13    Q.    And it continues, "somebody said
14 you were very animated at the meeting, and that
15 you were on drugs."  What did you understand
16 Mr. Bark was conveying to you with that
17 statement?
18    A.    I guess somebody was telling him
19 I was on drugs.  You would have to ask him.  I
20 don't know.
21    Q.    From your vantage point, have
22 you ever had behavior at a union meeting, or
23 membership meeting that would indicate to
24 somebody or have somebody consider it to be

7 (Pages 165 - 168)

CHARLES BATTLE

Page 169

1 that you were under the influence --
2          MS. DeBRUICKER: Objection.
3          MR. HAINES: Objection.
4 BY MR. PODRAZA:
5      Q.    -- either alcohol or controlled
6 substance?
7          MS. DeBRUICKER: Objection.
8          THE WITNESS: Am I answering
9      that?
10          MR. HAINES: Yes, you can
11      answer.
12          THE WITNESS: You would have to
13      ask, how could I answer that? I wouldn't
14      even know how to answer that.
15 BY MR. PODRAZA:
16      Q.    Well, the question was --
17      A.    I heard the question. I just
18 don't understand how I would -- you would have
19 to ask everybody else. How could I answer
20 that?
21      Q.    And then the text continues,
22 "the most I may have said was, quote, maybe,
23 could have been, who knows? I did call people
24 today because that is what I was told. I came

Page 170

1 here again to talk to you as a friend. I truly
2 mean that, and it is obvious that you have
3 something that is bothering you. I'm sorry you
4 feel that way, and I will respect you and your
5 privacy in the future. I honestly thought we
6 were better friends than that."
7          Do you recall reading those
8 statements on June 8th, 2020?
9      A.    I recall reading them. I
10 couldn't tell you what date it was, but sure.
11      Q.    All right. And then it ends,
12 "We had some good times together, and some
13 great memories." Would you agree with that
14 statement by Mr. Bark?
15      A.    Yeah.
16      Q.    "I do not know how things got
17 here, and I was hoping to talk to you several
18 times, but you have your mind made up that for
19 some reason I am your enemy. I am not. All I
20 can say is, sorry." And then it ends with,
21 capital T, capital T, capital Y, capital L; do
22 you know what that stands for?
23      A.    Talk to you later.
24      Q.    Now, when you received this

Page 171

1 text, did you share it with your wife to calm
2 her down?
3          MS. DeBRUICKER: Objection to
4      form.
5          THE WITNESS: I don't remember.
6 BY MR. PODRAZA:
7      Q.    Did you share it with the FBI?
8      A.    At some point, yeah.
9      Q.    When?
10      A.    I don't remember.
11      Q.    What year?
12      A.    What year? That was the
13 question, what year?
14      Q.    Yes.
15      A.    2020.
16      Q.    When did you speak with the FBI
17 in 2020?
18      A.    They called me. I don't even
19 remember when.
20      Q.    Was it when you were --
21      A.    Hold on. It was after a
22 meeting, I got a call from them after one of
23 the meetings.
24      Q.    Was this a meeting before or

Page 172

1 after the June 9, 2020 nomination proceeding?
2      A.    Before.
3      Q.    Was the meeting sometime between
4 when the indictment was filed against certain
5 members of the leadership of the union in
6 January of 2020, to June 9th, 2020, the
7 nomination proceeding; is that when the call
8 occurred?
9          MS. DeBRUICKER: Objection to
10      form.
11          THE WITNESS: I don't remember.
12 BY MR. PODRAZA:
13      Q.    Was it in the wintertime, or was
14 it in the early spring that you received the
15 call from the FBI?
16          MS. DeBRUICKER: Objection to
17      form.
18          MR. HAINES: Objection, you can
19      answer.
20          THE WITNESS: I just don't
21      remember.
22 BY MR. PODRAZA:
23      Q.    Do you recall who the agent was?
24      A.    No. I don't remember his name.

8 (Pages 169 - 172)

CHARLES BATTLE

Page 173

1    Q.     What was said?  What did you
2  say, and what did they say?
3    A.     I was told that they understood
4  I was standing up at a meeting, at meetings, or
5  a meeting, and you know, just asking questions,
6  and I said, well, I asked them what they
7  wanted, and I didn't get an answer, and I said,
8  if you're looking for anything on John, I said,
9  "I don't know what John does on a daily basis.
10 I just want to know where the Local's money is
11 being spent, where it is being spent, and why
12 it is being spent.  That's all I want to know."
13   Q.     Was there anything else in the
14 conversation with the FBI?
15   A.     Not that I recall.
16   Q.     Was there any follow-up with the
17 FBI, either by them or by you?
18   A.     After I felt frightened, yeah.
19   Q.     When was the next contact with
20 the FBI?
21   A.     I couldn't tell you.
22   Q.     Well, it was after June 9, 2020;
23 is that correct?  That's the nomination
24 proceeding day?

Page 174

1    A.     I just don't remember.
2    Q.     Was it before or after the IBP
3  denied your protest?
4    A.     Don't remember.
5    Q.     Was it before or after you had
6  contact with the Department of Labor on August
7  18, 2020?
8    A.     Don't remember.
9    Q.     Was it before or after you gave
10 the statement to the Department of Labor?
11   A.     Don't remember.
12   Q.     Was it at the time that the --
13 strike that.
14          Was it around the time when the
15 FBI executed the search warrant on the
16 headquarters of the union in October of 2020?
17   A.     I just don't remember.
18   Q.     It wasn't in 2021; is that
19 correct?
20   A.     No, was not.
21   Q.     What was the purpose of the
22 second contact by the FBI?  What was said, and
23 what did you say?
24   A.     I don't remember.  I don't

Page 175

1  recall.
2    Q.     Was the FBI looking for
3  information in order to assist them in
4  establishing probable cause for the issuance of
5  the search warrant in October 2020?
6          MS. DeBRUICKER:  Objection to
7    form.
8  BY MR. PODRAZA:
9    Q.     Is that what they told you?
10   A.     I don't recall.  I don't recall
11 what it was.
12   Q.     Do you have any records or any
13 -- strike that.
14          Did the FBI contacted you on
15 your cell phone?
16   A.     Yes, yes.
17   Q.     Does your cell phone records
18 indicate incoming calls?
19   A.     I would say, yeah.
20   Q.     And may I make a request if you
21 could take a look at your cell phone records to
22 see if you could, you know, when the FBI
23 contacted you, that will establish the date and
24 time for us, which would be very helpful?

Page 176

1          THE WITNESS:  You're good with
2    that?
3          MR. HAINES:  He made the
4    request, so whether we do it or not
5    remains to be seen.
6          THE WITNESS:  Yeah, sure.
7  BY MR. PODRAZA:
8    Q.     Okay.  You don't have to do it
9  right at this moment, we could maybe do a break
10 or something, you can take a look at your phone
11 and help us establish that date.
12          Did you supply any
13 representative from the Department of Labor
14 with any text that we just reviewed by Mr.
15 Bark?
16   A.     I don't recall.  I don't think
17 so.
18   Q.     I don't recall in your statement
19 to the Department of Labor that you made any
20 reference to the text that we marked here as
21 Exhibit No. 12; is that correct?
22          MS. DeBRUICKER:  Objection.
23    You're asking what you recall?
24 BY MR. PODRAZA:

9 (Pages 173 - 176)

CHARLES BATTLE

Page 177

1    Q.    Well, I don't recall him making
2  reference to it; is that correct, or did you
3  make reference to it?
4    A.    I don't recall.
5    Q.    All right.  Why don't you take a
6  look at your statement?  It's going to
7  be Exhibit --
8        MR. HAINES:  Since it's a
9        document, doesn't it speak for itself and
10       either answers the question or it
11       doesn't?  Why are we being --
12       MR. PODRAZA:  If -- we'll follow
13       up.
14  BY MR. PODRAZA:
15    Q.    Take a look at Exhibit No. 10.
16       MR. HAINES:  I'm an old man.  I
17       do have an early bedtime.
18       MR. PODRAZA:  Counsel, I think
19       it may have actually been in front of you
20       'cause we started out with Exhibit No.
21       10.
22       MR. HAINES:  Oh, there it is.
23       Okay.
24  BY MR. PODRAZA:

Page 178

1    Q.    Take your time and let me know
2  if there is any reference in there by you,
3  regarding the text that's been marked here as
4  Exhibit No. 12.
5        MS. DeBRUICKER:  Objection.
6        THE WITNESS:  Is it in here?
7        I'm not going to read it.
8        MR. PODRAZA:  I don't believe it
9        is, that's why I'm asking you.
10       THE WITNESS:  If it's not in
11       here, then it's not in here.
12  BY MR. PODRAZA:
13    Q.    Okay.  Am I correct that since
14  June 9, 2020, you have not lost any employment?
15    A.    You're correct.
16    Q.    And you haven't lost any
17  employment, despite any exchanges you may have
18  had with Mr. Dougherty at any union membership
19  meeting at any time, correct?
20       MS. DeBRUICKER:  Objection.
21       THE WITNESS:  I haven't lost any
22       employment because I'm a damn good
23       electrician.
24  BY MR. PODRAZA:

Page 179

1    Q.    So, the answer to my question
2  would be, yes, you haven't lost any employment
3  --
4    A.    That's the answer to the
5  question or the statement just made, I haven't
6  lost any employment because I'm a damn good
7  electrician.
8    Q.    And I'd like to review with you
9  what we're going to mark as, well, first, let
10  me, yeah, we're going to mark as Exhibit No.
11  14 --
12       MS. DeBRUICKER:  Counsel, are we
13       at 13?
14       MR. PODRAZA:  I'm going to
15       bypass that right now since these are
16       premarked, I'm going to stay with the
17       premarked right now, thank you.
18       - - -
19       (Whereupon the document was
20       marked, for identification purposes, as
21       Battle's Exhibit No. 14.)
22       - - -
23       MR. HAINES:  This is 14?
24       MR. PODRAZA:  This is 14.

Page 180

1        THE WITNESS:  Okay.
2  BY MR. PODRAZA:
3    Q.    Okay?
4    A.    Yeah.
5    Q.    For the record, Exhibit No. 14
6  is a collection of e-mails to Mr. Dougherty by
7  you or vice versa; is that correct?
8    A.    Yes.
9    Q.    All right.  And they begin in
10  October of 2016; is that correct?
11    A.    Yep, that's the date on it, yep.
12    Q.    And am I also correct that these
13  e-mails relate to your son-in-law and desiring
14  to get him into the apprentice program?
15    A.    Yes.
16    Q.    And the effort to do so goes
17  from October of 2016 through 2017, through
18  2019, ending in November of 2019; do you see
19  that?
20    A.    I do.
21    Q.    All right.  And at that point in
22  November of 2019, your son-in-law was not
23  accepted into the apprentice program, correct?
24    A.    I believe that the time is

10 (Pages 177 - 180)

CHARLES BATTLE

1 accurate?
2    Q.    Meaning, that he wasn't accepted
3 at that time, in November of 2019?
4    A.    Yes.
5    Q.    All right.  And you're aware
6 that, I had misspoken earlier, the federal
7 indictment of certain members of leadership in
8 the union occurred in January of 2019; I'll
9 represent that to you.
10    A.    Okay.
11    Q.    And while that indictment was
12 pending, there is at least one e-mail of
13 September 24, 2019; do you see that there, sir?
14    A.    September --
15    Q.    24, 2019?
16        MS. DeBRUICKER:  Objection to
17    form.
18        THE WITNESS:  September 24, do I
19    see September 24?  Yes.
20 BY MR. PODRAZA:
21    Q.    Right.  And it's written by you;
22 is that correct?
23    A.    Yes.
24    Q.    All right.  So, whenever there

1 is an e-mail in this compilation that's sent
2 from Jeanette Battle's e-mail address, it was
3 authored by you; is that correct?
4        MS. DeBRUICKER:  Objection to
5    form.
6        THE WITNESS:  Yes.
7 BY MR. PODRAZA:
8    Q.    In other words, your wife didn't
9 create these e-mails and send it to Mr.
10 Dougherty, correct?
11    A.    Yes.
12    Q.    Okay.  And, so, what you wrote
13 in September of 2019, "Hello John, it's Charles
14 Battle, I hope all is well with you and your
15 family," correct?
16    A.    Yes.
17    Q.    And then, thereafter, four days
18 later you say the same thing, correct?  If you
19 go to the next e-mail, September 28?
20    A.    Uh-huh.
21    Q.    And --
22    A.    Okay.
23    Q.    In November of 2019, on November
24 15, is it you who wrote, "Hey John, hope all is

1 well with you?"
2    A.    Yeah, I'm pretty sure that was
3 me.
4    Q.    It appears that you were really
5 desirous for your son-in-law to be become or be
6 included in the apprentice program, that you
7 were very committed to that; is that correct?
8        MS. DeBRUICKER:  Objection.
9        THE WITNESS:  Like what any
10    other family member would do for their
11    family, so yes.
12 BY MR. PODRAZA:
13    Q.    Why did you want to see that
14 your son-in-law accepted into the apprentice
15 program?
16    A.    98 gave me a great life, and I
17 wanted my daughter to have a good life, simple
18 as that.
19    Q.    Was it important to you for your
20 son-in-law to be accepted into the apprentice
21 program?
22    A.    Was it important for me?
23    Q.    Yes.
24    A.    No.

1    Q.    Did you feel disappointed when
2 your son-in-law was not ultimately accepted
3 into the program and allowed to graduate from
4 it?
5        MS. DeBRUICKER:  Objection.
6        THE WITNESS:  No.
7 BY MR. PODRAZA:
8    Q.    No?  Did your son-in-law feel
9 disappointed that he was not allowed to be in
10 the program and complete the program?
11        MS. DeBRUICKER:  Objection.
12        THE WITNESS:  You have to ask
13    him.
14 BY MR. PODRAZA:
15    Q.    Am I correct that failure of the
16 drug test is, essentially, disqualifies someone
17 from --
18    A.    Absolutely.
19    Q.    -- getting into the apprentice
20 program?
21    A.    Absolutely.
22    Q.    So, after your son-in-law was
23 dismissed from the program for having failed
24 the drug test, you continued though to reach

11 (Pages 181 - 184)

CHARLES BATTLE

Page 185

1 out to Mr. Dougherty to ask him to help you get
2 your son-in-law into the program, correct?
3          MR. HAINES: Objection.
4          THE WITNESS: So, I mean, I
5     tried to help him out. I mean, you see
6     the e-mails.
7 BY MR. PODRAZA:
8     Q.     But my question to you is a
9 little more pointed. After your son was
10 dismissed from the apprentice program because
11 he failed the drug test, you nevertheless
12 continued sending e-mails over time to Mr.
13 Dougherty, requesting that your son-in-law be
14 put into the apprentice program, correct?
15          MR. HAINES: Objection.
16          MS. DeBRUICKER: Objection.
17          THE WITNESS: The following year
18     I did.
19 BY MR. PODRAZA:
20     Q.     And would it be fair to say
21 you're asking a favor of Mr. Dougherty to
22 overlook the failure of the drug test by your
23 son-in-law to let him in?
24          MR. HAINES: Objection.

Page 186

1          THE WITNESS: Absolutely not.
2 BY MR. PODRAZA:
3     Q.     Are you aware that the failure
4 of that drug test disqualifies somebody from
5 being considered further for inclusion in the
6 apprentice program?
7     A.     No.
8     Q.     Is this the first you're hearing
9 of that?
10     A.     I can tell you I know kids that
11 have failed the drug test and have been taken
12 in the next year, or however many years, I
13 don't know what it takes, whatever, I don't
14 know the whole process of anybody getting in, I
15 don't care, you know, my son-in-law is not in
16 this Local because my son-in-law is a dope.
17 That's the bottom line. I never blamed John,
18 never said it was his fault. My son-in-law is
19 not an apprentice in this program because my
20 son-in-law is an idiot.
21     Q.     You never, you never took issue
22 with Mr. Dougherty saying that your son --
23 son-in-law should, essentially, should not have
24 been excluded from consideration in the

Page 187

1 apprentice program because of his failing the
2 drug test?
3          MS. DeBRUICKER: Objection.
4          MR. HAINES: Objection, where is
5     that, is that in response to one of his
6     e-mails?
7          THE WITNESS: No.
8          MR. HAINES: Did you say that?
9          THE WITNESS: No.
10 BY MR. PODRAZA:
11     Q.     Do you, I think we established
12 over the years that you consistently attended
13 union membership meetings; is that correct?
14     A.     Over the years?
15     Q.     Yes.
16     A.     Consistently?
17     Q.     Yeah.
18     A.     No.
19     Q.     All right. How about like the
20 last five years, prior to the coronavirus when
21 there were membership meetings, how would you
22 describe your regularity in attendance?
23     A.     Two or three meetings a year,
24 maybe.

Page 188

1     Q.     And at those meetings, were
2 there other members?
3     A.     Yes.
4     Q.     And, generally, would it vary
5 from, from what to what, the number of
6 attendees?
7     A.     I don't know.
8     Q.     Well, let's just say this past
9 Tuesday, what, a hundred to 200 members in
10 attendance?
11          MS. DeBRUICKER: Objection.
12          THE WITNESS: Maybe.
13 BY MR. PODRAZA:
14     Q.     And those meetings that you
15 attended, you would freely speak up before the
16 members with any issues that you felt
17 important, correct?
18     A.     What meetings? What meetings
19 are we speaking of?
20     Q.     We're talking about the number
21 of meetings?
22     A.     The past five years?
23     Q.     Yes.
24          MS. DeBRUICKER: Objection.

12 (Pages 185 - 188)

CHARLES BATTLE

Page 189

1        THE WITNESS:  I just don't
2    understand the question.
3 BY MR. PODRAZA:
4    Q.    If you felt that there was an
5 issue that was important to you, you would
6 stand up and express it to leadership, correct?
7        MR. HAINES:  Objection.
8        THE WITNESS:  No.
9 BY MR. PODRAZA:
10   Q.    No?  Why not?
11   A.    Same reason why no one speaks up
12 at meetings, because if you speak up, you're on
13 the outs.
14   Q.    Let's talk about this past
15 membership meeting, this past Tuesday, is that
16 fresh in your mind?
17   A.    Yeah.
18   Q.    And this past meeting was
19 attended by approximately 100 to 150 members,
20 correct?
21       MS. DeBRUICKER:  Objection.
22       THE WITNESS:  If you say so.
23 BY MR. PODRAZA:
24   Q.    And towards the end of the

Page 190

1 meeting, there is a time when the members can
2 pose questions to the union officers, correct?
3    A.    There are supposed to be, good
4 at the union...
5    Q.    And did that occur at this past
6 Tuesday, correct?
7    A.    No.
8    Q.    No?  You didn't stand up and ask
9 a question, be the first person to ask a
10 question?
11   A.    No.
12       MS. DeBRUICKER:  Objection.
13 BY MR. PODRAZA:
14   Q.    No?  You didn't stand up and ask
15 a question, pointing over to Mr. O'Neill, and
16 say, "Isn't that Jack O'Neill?"
17   A.    I did that, yes.
18   Q.    And you did this in front of 100
19 to 150 members, correct?
20   A.    Yeah, yes.
21   Q.    And this is after everyone in
22 the union knows that you had given a statement
23 to the Department of Labor, you had filed a
24 protest, you had taken an appeal, correct?

Page 191

1        MR. HAINES:  Objection.
2        MS. DeBRUICKER:  Objection.
3        MR. HAINES:  That's a speech,
4    and argumentative, you can interpret any
5    way you want, but you can't make him
6    interpret --
7 BY MR. PODRAZA:
8    Q.    And you also stand up, you
9 pointed to Mr. O'Neill, words to the effect of,
10 "does he have a ticket," correct?
11       MS. DeBRUICKER:  Objection.
12       THE WITNESS:  That's exactly
13    what I said.
14 BY MR. PODRAZA:
15   Q.    And Mr. Dougherty responded,
16 "yes," correct?
17   A.    Uh-huh.
18   Q.    And you continued in front of
19 full membership, "how does he have a ticket?"
20 And "why doesn't he have to pay the normal
21 union deductions and other members do?"  Isn't
22 that what you said?
23       THE WITNESS:  Can we have a
24    minute?

Page 192

1        MR. HAINES:  Bap, bap, bap, bap,
2    bap, bap, bap.  Answer his question.
3        THE WITNESS:  Ask it again, I'm
4    sorry.
5        MR. PODRAZA:  Sure.
6 BY MR. PODRAZA:
7    Q.    And you continued standing up
8 before the membership saying words to that
9 effect, "how does he," meaning Mr. O'Neill,
10 "have a ticket?  And, "why doesn't he have to
11 pay the normal union deductions that other
12 members do," correct?
13       MS. DeBRUICKER:  Objection.
14       THE WITNESS:  I don't remember
15    that being phrased quite that way, but
16    okay.
17 BY MR. PODRAZA:
18   Q.    And Mr. Dougherty responded,
19 "they do pay the normal deductions and it's
20 normal for union staff to have to be given a
21 ticket, and to be paid accordingly," correct?
22       MS. DeBRUICKER:  Objection.
23       THE WITNESS:  You would have to
24    ask Mr. Dougherty that.  I don't remember

13 (Pages 189 - 192)

CHARLES BATTLE

Page 193

1 that.
2 BY MR. PODRAZA:
3      Q.      You were in attendance.  He was
4 responding to your question that you posed
5 while you were at the membership meeting?
6      A.      You're asking me if that's what
7 he said.
8      Q.      And you continued then to ask
9 questions, standing in front of the membership
10 about Bob Bolling, Tara chupka and Maria
11 Crawford, and about tickets relating to them,
12 correct?
13      A.      Yes.
14           MS. DeBRUICKER:  Objection.
15 BY MR. PODRAZA:
16      Q.      And, Mr. Dougherty responded the
17 same way to the questions that you posed,
18 correct?
19           MS. DeBRUICKER:  Objection.
20           THE WITNESS:  Yes.
21 BY MR. PODRAZA:
22      Q.      And you asked Mr. Foy -- who is
23 on the executive board, correct?
24      A.      Yes.

Page 194

1      Q.      -- how legal expenses get
2 approved, correct?
3      A.      Uh-huh.
4      Q.      And Mr. Foy explained to you
5 that they are reviewed by attorneys and --
6      A.      That's not the question I asked.
7      Q.      No?  What was the question you
8 asked?
9      A.      It's in the records, isn't it?
10      Q.      No, I'm asking you.  What
11 question did you ask?
12      A.      I asked him, why I was getting
13 deposed by John and four lawyers, how that
14 money gets approved.
15      Q.      And you made that question in
16 front of the full membership, correct?
17      A.      The full membership.
18      Q.      You felt confident that you
19 could say that in front of the full membership,
20 correct?
21      A.      I'm not allowed to?  I'm a
22 member, right?
23      Q.      You stood up and did it, didn't
24 you?

Page 195

1           MR. HAINES:  A, bap, bap, bap,
2 bap, bap.  Hold the phone.  We're not
3 doing that.  We're not having an argument
4 between the two of you.
5 BY MR. PODRAZA:
6      Q.      And you said words to the effect
7 that it's unfair that the union was paying for
8 you to be deposed in the defamation case
9 regarding a web site, right?
10      A.      I did not say it was unfair.
11      Q.      But you raised the issue of the
12 union paying to sue you in the defamation case,
13 right?
14           MS. DeBRUICKER:  Objection.
15           THE WITNESS:  Possibly.
16 BY MR. PODRAZA:
17      Q.      And Mr. Dougherty stated that
18 it's the web site that has a statement on
19 there, such as", John's wife should die because
20 she cost the Health and Welfare Fund too much
21 money;" do you remember him saying that to you?
22           MS. DeBRUICKER:  Objection.
23           THE WITNESS:  I do remember him
24 saying that.

Page 196

1 BY MR. PODRAZA:
2      Q.      And while you're still
3 standing -- are you standing at this point or
4 are you sitting in your chair?
5           MR. HAINES:  Can we stop here?
6 You go outside.  I want you outside.
7           THE VIDEOGRAPHER:  The time is
8 now 4:38, this ends Media Unit No. 1.
9           MR. HAINES:  Please stay on the
10 record.
11           What are we doing?
12           MR. PODRAZA:  You know what
13 we're doing.  You want to pull him?  You
14 pull him and we go to Judge McHugh.
15           MR. HAINES:  I don't care if we
16 go to the Pope.
17           MR. PODRAZA:  You know exactly
18 what we're doing, and you're interfering
19 with that.  You're here as personal
20 counsel.  You don't even have a notice of
21 representation on record, and you have
22 intervened.  You have no right to do
23 this, none.
24           MR. HAINES:  Get your finger out

14 (Pages 193 - 196)

CHARLES BATTLE

Page 197

1    of my face.
2         MR. PODRAZA:  Haines, you have
3    no right to do this.
4         MR. HAINES:  Get your finger out
5    of my face.
6         MR. PODRAZA:  So, bring your
7    witness back in so we can complete.
8         MR. HAINES:  No.  No.  You're
9    not going to do this.
10        MR. PODRAZA:  You're calling the
11   deposition?  You're calling it an
12   expense?  Are you calling it?
13        MR. HAINES:  Don't threaten me.
14        MR. PODRAZA:  I'm not
15   threatening you.  I'm asking what are you
16   doing?
17        MR. HAINES:  You're raising your
18   voice, you're threatening me.
19        MR. PODRAZA:  Are you calling
20   it?
21        MR. HAINES:  Now, I am telling
22   you this is a fact deposition.
23        MR. PODRAZA:  It is a fact
24   deposition.

Page 198

1         MR. HAINES:  It is not about
2    what happened last Tuesday.  If you want
3    to ask him questions, historical
4    questions, do that.  If Mr. Dougherty
5    wants to testify about a conversation
6    that he had with my client, he can do
7    that, but that's not the purpose.  You
8    are trying --
9         MR. PODRAZA:  Mr. Haines, you
10   are not even counsel of record.  How dare
11   you come here and tell us about our
12   subject matter of this case?  Counsel for
13   the government hasn't even objected.  How
14   dare you?
15        MR. HAINES:  Excuse me?
16        MR. PODRAZA:  The witness comes
17   in or you do this at your own cost and
18   expense.
19        MR. HAINES:  Excuse me?
20        MR. PODRAZA:  You have no right
21   to do this.  You are out of line.
22        MR. HAINES:  Excuse me?  What
23   did you say?  How dare you?
24        MR. PODRAZA:  And you are out of

Page 199

1    line.
2         MR. HAINES:  And you are acting
3    inappropriately.
4         MR. PODRAZA:  Write it down.  He
5    called the deposition.  We will be filing
6    a motion with the Court.
7         Thank you.
8         MS. DeBRUICKER:  Counsel.
9         MR. HAINES:  No, no, walk out.
10   I want him to walk out.  Nobody called
11   the deposition.  He walked out on it.
12        MR. PODRAZA:  Your witness isn't
13   even here for God's sake.  You're letting
14   him in.  You're letting him in, Cliff?
15        MR. HAINES:  Walk out.  Cool
16   down and decide whether you want to come
17   back here and act like a lawyer.
18        MR. PODRAZA:  I'm calm, cool and
19   --
20        MR. HAINES:  I asked my client
21   to step out so that you and I --
22        MR. PODRAZA:  Ask him to step
23   in.  Let's go, Cliff.  We're not going to
24   stay here all night with these antics.

Page 200

1    These childhood antics, they might work
2    in other forms, we're not going to put up
3    with it.
4         MS. DeBRUICKER:  Counsel for the
5    government will put on the record that
6    none of this questioning is relevant to
7    the legal issues in this case.  It is
8    relevant to the procedural issues in this
9    case.  To the extent that you're asking
10   him questions that could be construed as
11   intimidation.
12        MR. HAINES:  They are clearly
13   intended to intimidate.  Clearly
14   intended.
15        MR. PODRAZA:  Are we bringing
16   the witness back in or are we done?
17        MR. HAINES:  I want you to stop
18   intimidating my client.
19        MR. PODRAZA:  I don't think --
20        MR. HAINES:  I don't care what
21   you think.
22        MR. PODRAZA:  Mr. Haines, we
23   have a video tape.  Are we bringing the
24   witness in or not?

15 (Pages 197 - 200)

CHARLES BATTLE

Page 201

1   MR. HAINES: That's right. We
2   do. We do. And you are acting
3   inappropriately. This is not proper
4   deposition.
5   MR. PODRAZA: Are we bringing
6   the witness in or not?
7   MR. HAINES: You canceled the
8   deposition. You put your coat on and
9   told us the deposition was over, and
10  you're going to file a motion. Walk out.
11  MR. PODRAZA: Mr. Haines, are
12  you bringing your witness in or not?
13  MR. HAINES: I suggest that you
14  walk out and cool down, and maybe I will
15  do the same thing.
16  MR. PODRAZA: Mr. Haines.
17  MR. HAINES: And maybe you can
18  talk to your co-counsel, and maybe you
19  can get Mr. Dougherty to talk to you.
20  There is no dispute about what happened
21  last Tuesday. What the hell does that
22  got to do with anything? Who is wasting
23  time here?
24  MR. PODRAZA: Well, we have a

Page 202

1   few more questions, and you will see the
2   relevance, if you don't see it already.
3   MR. HAINES: Oh, I know the
4   relevancy. I understand the relevancy.
5   MR. PODRAZA: Are we going to
6   proceed?
7   MR. HAINES: This is not, this
8   is not your opportunity to impeach Mr.
9   Battle. You can ask him fact questions
10  related to this action. You called the
11  deposition. It's on the record. Are you
12  backing off that?
13  MR. PODRAZA: I'm willing to go
14  forward.
15  MR. HAINES: No, no, no. You
16  called the deposition. You told the
17  court reporter you were going to file a
18  motion. Is that what you're going to do?
19  Then file your motion.
20  MR. PODRAZA: I take it you will
21  not bring your witness back?
22  MR. HAINES: I didn't say that.
23  You called the deposition. I didn't.
24  MR. PODRAZA: What's the Court's

Page 203

1   number?
2   MR. TRASK: I don't know if Mr.
3   Morton had it. Lauren had it readily
4   available last time.
5   MS. DeBRUICKER: We will need to
6   hang up with the other lawyer.
7   MR. PODRAZA: Cliff, we have a
8   few more questions along this line. Can
9   we have this done?
10  MR. HAINES: No. Quit this
11  threatening me. Call the Judge. You
12  think you're on the right side? You
13  think you're on God's side? Call the
14  Judge. I'm interested in hearing what
15  you're going to tell him. And then I'll
16  ask you to read the record back to the
17  Judge that you are calling the
18  deposition.
19  MR. PODRAZA: I'm sorry. Who is
20  on the phone right now?
21  MS. DeBRUICKER: Anna Laura is
22  on the phone. She is prepared for you to
23  hang up the phone and --
24  MR. PODRAZA: Anna, we're going

Page 204

1   to have to hang this up.
2   MS. BENNETT: Okay.
3   MR. PODRAZA: All right. Thank
4   you. What do we have for chambers? Can
5   I have the caption for the case?
6   MS. DeBRUICKER: I don't think
7   you'll need it. Are you ready?
8   MR. PODRAZA: Oh, yeah.
9   MS. DeBRUICKER: (267) 299-7301.
10  MR. PODRAZA: I'm sorry. I did
11  that wrong. 267 --
12  MS. DeBRUICKER: 299 --
13  MR. PODRAZA: I'm sorry. He's
14  got it written down here. Can you hand
15  me that e-mail?
16  MS. DeBRUICKER: I'm calling
17  from my phone.
18  MS. BENNETT: Okay. Thanks.
19  MR. TRASK: 299-7301.
20  THE CLERK: Judge McHugh's
21  chambers.
22  MR. PODRAZA: Hi, good
23  afternoon. My name is Joe Podraza, I'm a
24  lawyer with Lamb McErlane.

16 (Pages 201 - 204)

CHARLES BATTLE

1    I'm at a deposition in a case
2    that's been assigned to his Honor, and we
3    have an issue that has arisen in the
4    deposition.
5        THE CLERK:  Okay.  An issue that
6    arose in the deposition?
7        MR. PODRAZA:  Yeah.
8        THE CLERK:  What's the Docket
9    Number?
10        MR. PODRAZA:  2:2100096, it's
11    the Secretary of Labor v. Local 98.
12        THE CLERK:  Uh-huh, yep.  And
13    what's the issue with the deposition?
14        MR. PODRAZA:  Well, personal
15    counsel for the witness has asked him to
16    leave the room, and we're going back and
17    forth trying to restore the deposition,
18    so we can proceed, and unfortunately,
19    it's going to have to be an issue, I take
20    it, that we're going to need an
21    intercession by the Court.
22        THE CLERK:  Okay.  Give me one
23    second.  Let me check with him.
24        MR. PODRAZA:  Thank you.

1        THE COURT:  Counsel, this is
2    Judge McHugh.  Who is on the line,
3    please?
4        MR. PODRAZA:  Your Honor, Joe
5    Podraza, with me, Clifford Haines,
6    personal counsel for the witness, and
7    Lauren DeBruicker, obviously for the
8    government, Department of Labor.
9        MR. HAINES:  And Mr. Dougherty
10    and several other people, Judge.
11        MR. PODRAZA:  And, Your Honor, I
12    also would like to bring to the Court's
13    attention, you're on the record, unless
14    you're asking to go off the record?
15        THE COURT:  I was about to ask,
16    are we on the record?  And then can
17    somebody please tell me who the witness
18    is.
19        MR. PODRAZA:  The witness is
20    Charlie Battle, Your Honor.
21        THE COURT:  So, Mr. Battle has
22    returned, I take it for a second day?
23        MR. PODRAZA:  He has, Your
24    Honor.

1        THE COURT:  All right.  What's
2    the issue this time?
3        MR. PODRAZA:  Well, we've
4    touched upon an emotional part of the
5    deposition where we're trying to
6    discredit the claim of intimidation, and
7    retaliation, and we're using it as a
8    typical case, the most recent union
9    member meeting this past Tuesday, where
10    Mr. Battle appeared without any
11    reservations, spoke up against
12    leadership, use coarse words, accused
13    leadership of various things, and then
14    also conceded that his dislike for the
15    leadership is based upon the failure of
16    his son-in-law, over many years, to be
17    put into the apprentice program, and
18    we're trying to bring this out in the
19    questioning.  We think we are being
20    successful.  Counsel stopped the line of
21    questioning, and had the witness depart
22    the room.
23        THE COURT:  All right.  So let
24    me hear from Mr. Haines.

1        MR. HAINES:  Your Honor, Mr.
2    Podraza is correct up to a point.  The
3    last 10 minutes, 15 minutes, have been a
4    back and forth with interrogating Mr.
5    Battle about apparently a give and take
6    between him and Mr. Dougherty last
7    Tuesday.  I'm not quite sure what that
8    has to do with this case, nor am I sure
9    that the purpose of a deposition is to
10    impeach a witness, but I am sure that
11    it's not to intimidate that witness, and
12    this question in the presence of Mr.
13    Dougherty, and representatives of the
14    union is nothing but intimidation.  I
15    asked my witness to step out of the room
16    in order to raise with Mr. Podraza what
17    he thought we were doing here.  I thought
18    we were here, I got a diatribe of how I'm
19    not entitled to be here, I haven't
20    entered my appearance, don't interfere, a
21    hostile response, Mr. Podraza put his
22    coat on, said we're calling this
23    deposition, said I'm filing a motion.
24    Obviously, he's got the ability to be as

17 (Pages 205 - 208)

CHARLES BATTLE

Page 209

1  hot-headed as I do, but I stopped simply
2  to challenge what I thought was the
3  intimidation of my client. I am prepared
4  to proceed, but I would like some
5  guidance from the Court, since the call
6  has been made, about whether this is
7  appropriate line of questioning at a
8  deposition.
9       THE COURT: Is the deposition
10 being videotaped, counsel?
11      MR. PODRAZA: It is, Your Honor.
12 We have taken that measure.
13      THE COURT: All right. Let me
14 hear from the Department of Labor, if I
15 may.
16      MS. DeBRUICKER: Your Honor, I
17 agree that last many minutes and that
18 line of questioning is not relevant to
19 the narrow issue in this case, which is
20 whether the secretary's investigation of
21 Mr. Battle's complaint determined by,
22 yielded by a preponderance of the
23 evidence that the Local 98's membership
24 election may have been influenced by the

Page 210

1  union, and not corrected by the union.
2  Whether Mr. Battle spoke with confidence
3  or any other characteristic at a union
4  meeting last Tuesday bears no
5  relationship to the issues in this case.
6       THE COURT: I have to say, at
7  this juncture, it is difficult for me to
8  see where we are with something that
9  happened last Tuesday.
10      MR. PODRAZA: If I may, Your
11 Honor, it's Joe Podraza. The point of
12 the matter is, these individuals, we call
13 them malcontents, whatever you want to
14 refer to them as, have claimed that they
15 have been intimidated. They are in an
16 intimidating atmosphere, they can't speak
17 up because of an overbearing leadership,
18 but yet this gentleman by way of
19 illustration, even as late as this past
20 Tuesday, at membership meeting, not only
21 stands up in front of 100 to 150 members
22 of the union, but then proceeds to berate
23 the leadership, refer to them using the P
24 word, using other vulgarity, and then

Page 211

1  expressing that the reason that he is
2  discontent with the union leadership is
3  not due to an indictment or irresponsible
4  behavior, but because the leadership
5  failed to allow his son-in-law to be
6  placed in the apprentice program --
7       THE COURT: Okay. Let me
8  interrupt you, Mr. Podraza, and you
9  elicited 10 minutes of that from Mr.
10 Battle; is that correct?
11      MR. PODRAZA: I wouldn't say 10
12 minutes, but we've gotten probably about
13 a half of the way through.
14      THE COURT: All right. And
15 isn't it obvious at this point, and it's
16 really a factual dispute that he stood up
17 at meetings and showed his convictions in
18 a potentially intimidating atmosphere,
19 with that point having been made, for
20 whatever relevance it might have, and
21 with this being a nonjury proceeding
22 where I will look at this video and make
23 any judgment I need to make, is it really
24 important to going further?

Page 212

1       MR. PODRAZA: The only point I
2  would make, Your Honor, is that the
3  intimidation is not coming from the union
4  and its leadership, but in fact, Mr.
5  Battle himself, imposing himself at the
6  proceeding, and seeking to intimidate vis
7  a vis, abusive behavior. And I think
8  it's important for the Court to see, this
9  is not a shrinking violet who is fearful
10 of the shambles of the leadership of the
11 union. This is an individual --
12      THE COURT: I, I. I, I
13 understand your point, counsel, okay?
14 And so, I think we're, where I am at this
15 juncture is for whatever relevance it
16 has, it strikes me that the point has
17 been made, and given that, and given
18 history between the, what I'll call the
19 antagonist here, then I just don't think
20 it is a need to go further.
21      MR. PODRAZA: The only other --
22      MR. HAINES: Thank you, Judge.
23      MR. PODRAZA: The only guidance,
24 though, Your Honor, by interjection of

18 (Pages 209 - 212)

CHARLES BATTLE

Page 213

1   personal counsel, we actually didn't get
2   Mr. Battle to respond to the aspects of
3   his presentation at this past meeting,
4   that we believe establishes the point
5   that the Court is touching upon.
6        MR. HAINES:  Your Honor, may I
7   have, this is Mr. Haines.  May I respond?
8        THE COURT:  Yes, you may.
9        MR. HAINES:  We spent another 10
10  minutes discussing Mr. Battle's
11  son-in-law not getting into the
12  apprentice program.  Why he didn't, what
13  Mr. Dougherty did, why it's the rule that
14  you can't get in if you fail a drug test,
15  don't you know that, that lasts forever?
16  We did that for 10 minutes without
17  objection, Judge.  This is just, let's
18  see how long we can beat up on Charlie
19  Battle, and maybe we will back him down.
20       THE COURT:  All right.  I
21  understand the parties' respective
22  positions.  I think I understand what the
23  relevant issues are in the case, and Mr.
24  Podraza, I don't see the need to go any

Page 214

1   further down this path at this juncture.
2        MR. PODRAZA:  Very well, Your
3   Honor.
4        THE COURT:  All right.  So, my
5   instruction would be that you proceed to
6   your next line of questioning, and you
7   know, all parties can be certain that I'm
8   perfectly capable of watching this
9   videotape.  If it's relevant at the
10  appropriate time, and so that I can
11  decide, particularly since it's already
12  clear to me, based upon the submissions
13  in this case that there is a history here
14  between Mr. Battle and the union, and
15  some of the leaders in the union, and
16  that's self-evident.  All right?  So, I
17  think at this point you should move on to
18  your next line of questioning.
19       Are we going to finish with Mr.
20  Battle today?
21       MR. PODRAZA:  We definitely,
22  Your Honor, probably, unless counsel for
23  DOL have an extensive examination, within
24  an hour at the latest.

Page 215

1        THE COURT:  All right.  And I'm
2   not going to offer you my cell phone.
3   I'm just going to ask you to be officers
4   of the Court, make the point you need
5   to make, and then terminate the
6   examination.
7        MR. PODRAZA:  Very well, Your
8   Honor, thank you.
9        THE COURT:  Anything further,
10  counsel?
11       MS. DeBRUICKER:  Actually, Your
12  Honor, while we have you on the phone,
13  when we were last here, we called the
14  Court regarding a line of questioning
15  asking Mr. Battle to disclose the names
16  of people who may have been involved or
17  consulted with in connection with his
18  communications with the Secretary of
19  Labor.  We have not revisited that line
20  of questioning.  I don't know whether Mr.
21  Podraza intends to revisit that line of
22  questioning.  To the extent that he does,
23  the government has a, partly a
24  recommendation, partly a request, Your

Page 216

1   Honor.  Your Honor put the transcript of
2   this deposition under seal during our
3   last conversation.  The government
4   suggests that, that line of questioning,
5   both from Mr. Battle, as well as for
6   other witnesses, who Mr. Podraza has
7   described to the court as malcontents,
8   that Your Honor consider putting these
9   deposition transcripts not only under
10  seal, but designate them as attorneys
11  eyes only, so that they can only be
12  viewed to Local 98's very able outside
13  counsel of record, such that union
14  leaders then would not be privy to this
15  testimony, at least until later time when
16  the parties have a chance to review it
17  and determine the possible effect on
18  other witnesses who may yet come forward.
19       THE COURT:  All right.  Let me
20  hear from Mr. Podraza.
21       MR. PODRAZA:  Well, Your Honor,
22  the transcript is under seal.  I don't
23  know what more protection would be
24  required, but second, it's insulting to

19 (Pages 213 - 216)

CHARLES BATTLE

1  my client who is present to accept that
2  proposal without then accepting that he
3  is a thug and that there is, therefore,
4  fear by the Court of physical violence.
5  There has never been fear of physical
6  violence, even alleged in this, and in
7  fact, the government has even denied
8  that.  By Mr. Battle's own account, he
9  has never lost any work, et cetera,
10  despite the disagreement, despite what
11  transpired in the nomination proceeding.
12  There is nothing establishing before this
13  court to establish that beyond just
14  simply the shear speculation and
15  conjecture being thrown, and quite
16  frankly the stereotyping of what the
17  union is stereotyped as, and I would ask
18  the court not to go to that degree, and
19  condone what is essentially the
20  government saying they are goons.
21        THE COURT:  First of all, on the
22  record, I'm implying nothing that from
23  you know of witnesses or litigants or
24  lawyers, and particularly in that cast an

1  aspersion on organized labor.
2        Second, I understood counsel for
3  the department merely to say that counsel
4  would first like the chance to look at it
5  to determine whether there is something
6  of any particular sensitivity, and before
7  the transcript is shared, I mean, to the
8  extent that the parties are in the room,
9  they know what the witness has said, and
10  our last setting, I think we made
11  reference to the presence of social media
12  and how things get posted, and bandied
13  about, and that's never particularly a
14  good thing, so not casting any
15  aspersions, I think that it's an
16  appropriate question of the Department to
17  say, at least initially, transcripts,
18  we're not limiting anybody's ability to
19  be present, but transcripts will be
20  attorneys eyes only, and then after
21  counsel has had an opportunity to review
22  them, that if there is some additional
23  limitation, we will flush it out at that
24  point.  So, I take it as simply an

1  interim step being requested by the
2  Department, and to the extent that it is
3  such an interim step, I will approve
4  that, but again, let me be clear, I
5  understand there is strong feeling within
6  the union among past and present
7  leadership, and members.  I don't draw
8  any negative inferences from that, you
9  know, people can have strong views.
10        MS. DeBRUICKER:  Your Honor, may
11  I address one more point?
12        THE COURT:  You may.
13        MS. DeBRUICKER:  Thank you.  I
14  would submit, Your Honor, that the
15  presence of union leadership in these
16  depositions is, without casting
17  aspersions, without making argument that
18  counsel already has, is having an impact
19  on the witnesses.  There has been
20  testimony that there have been, you know,
21  communications with witnesses who have
22  come forward in this case with the
23  indication that there has been attempts
24  to persuade people not to testify; I will

1  note that Mr. Podraza did attempt to
2  subpoena Mr. Coppinger who is one of the
3  three union members at issue within the
4  Complaint.  Mr. Coppinger was not
5  successfully served with a subpoena, and
6  I do believe that witnesses will be more
7  willing to come forward if union
8  leadership were not in the deposition
9  room for these depositions, again with
10  the opportunity to, you know, in the
11  interest of having the questions
12  answered, that counsel wishes to pose, as
13  well as witnesses to come forward who
14  counsel wishes to speak with, that the
15  appropriate, that it would be appropriate
16  to consider the attorneys eyes only
17  measure to include people in the room,
18  while the, again using Mr. Podraza's
19  word, malcontent witnesses, so any other
20  witness who may wish to speak in a way
21  that the union may not find favorable, to
22  have that protection to come forward.
23        THE COURT:  Well, if we were in
24  a courtroom and I was hearing testimony,

20 (Pages 217 - 220)

CHARLES BATTLE

1   that would be hard pressed to say that
2   the union wouldn't have the right to be
3   present, and I think that would be, for
4   me to enter such a ruling to extend the
5   deposition would necessarily be drawing
6   inferences within the present time I'm
7   not willing to draw.  Look, I'll agree
8   that it's obviously a great deal of
9   social pressure on the part of those
10  weren't current union membership, who
11  reserve their rights and be asserted, but
12  I don't think it's appropriate ruling
13  that union membership can't be present
14  for this.  And if Mr. Coppinger is served
15  and if there is some question about any
16  reluctance to appear, and necessary for
17  me to be involved in some way, even if we
18  need to have the deposition here at the
19  courthouse with me immediately available,
20  we'll discuss that, if and when the time
21  comes, but I'm not prepared now to enter
22  an order that would bar union leadership
23  from attending.
24          MR. PODRAZA:  Thank you, Your

1   Honor.  It's Joe Podraza.  I would also
2   like to draw the Court's attention that
3   Mr. Dougherty was present during Mr.
4   McConnell's deposition, the government
5   never made such a motion, and Mr.
6   McConnell said he had no problem
7   whatsoever with the presence of Mr.
8   Dougherty.
9          We are now in the second day of
10  this deponent, and there has been no
11  suggestion that there is disruption or
12  influence by having Mr. Dougherty or
13  anyone else from the union here, nor has
14  the government suggested it until this
15  very day, on the tail end of the second
16  day of Mr. Battle's deposition.  I just
17  wanted to bring that to the Court's
18  attention, that there has only been
19  professionalism in this conference room,
20  and while Mr. Haines and I may have a
21  disagreement here and there on two
22  points, that's been the extent of any
23  type of dispute.
24          THE COURT:  Yeah, Mr. Podraza, I

1   remember the last deposition, after I
2   ruled in favor of Mr. Haines, and he
3   wanted to add something, you said, Mr.
4   Haines, you forgot the point.  I expect
5   Mr. Haines is sitting here wanting to
6   issue that same rejoinder.
7          MR. HAINES:  Judge --
8          MR. PODRAZA:  You are right,
9   Your Honor.
10         MR. HAINES:  Judge, I have no
11  rejoinder, but I have concerns, and there
12  are two areas that Mr. Podraza has
13  indicated he is going to explore further,
14  that may require your Honor's
15  intervention.
16         As counsel for the Department of
17  Labor has pointed out, we kind of ended
18  on a note of nonresponsiveness from the
19  witness, I agree.  I anticipate that Mr.
20  Podraza is going to go back there, and I
21  don't know what --
22         THE COURT:  No, no.  He is not,
23  because I ruled that he won't.
24         MR. HAINES:  Well, no, I'm not

1   talking about, I'm not talking about what
2   happened last Tuesday.  I'm talking about
3   a different issue, altogether.  Mr.
4   Podraza at the last deposition was
5   challenging Mr. Battle about a letter
6   that he had written, and who actually
7   typed it, and the witness refused to
8   answer the question, and that was the
9   predicate for the call to you then.  So,
10  I anticipate we're going back there.
11         There is a second concern I
12  have, the Court may or may not be aware
13  that the union has sued Mr. Battle and I
14  won't characterize that for the moment,
15  and there have been certain rulings out
16  of the Court of Common Pleas, concerning
17  information that Mr. Podraza tried to get
18  in that proceeding.  Should he go there,
19  in this proceeding, and I anticipate he
20  is going to try to do that.  I'm going to
21  instruct my witness not to answer, based
22  on the fact that there is an order that
23  Mr. Podraza is not entitled to the
24  information he is seeking from my client.

21 (Pages 221 - 224)

CHARLES BATTLE

Page 225

1        Now, Mr. Podraza may tell you he
2  is not going down either road in which
3  event, have a pleasant evening, and I'll
4  be quiet.
5        MR. PODRAZA:  Your Honor, there
6  was the Court ruling, as I understood it,
7  the first day of Mr. Battle's deposition,
8  when there was a dispute, where Mr.
9  Battle would be required to identify
10  those who participated in the drafting of
11  the documents, the protests, the appeal,
12  and then there is a third letter by a
13  third-party that was submitted at the
14  same time, and as I was candid with The
15  Court, it's our position with the union,
16  at least the union's position that smells
17  of staging, and they would like to
18  explore that.  Mr. Haines -- there is no
19  such order in the state court that
20  precludes that.  What Mr. Haines is
21  making reference to is with respect to
22  the website and anonymous posters, you
23  need to establish, obviously, overcoming
24  the person that has protection of

Page 226

1  anonymity, and that we are working with
2  the state court to do, so we can get the
3  identity for the defamation case.  A
4  completely different issue, so therefore
5  I don't understand, and I would ask the
6  Court to reaffirm his ruling that Mr.
7  Battle will be required to identify who
8  are the participants in the three letters
9  that have been marked, the protest
10  letter, the June 6th letter, and the
11  third-party letter that was filed at or
12  about the same time as the protest was
13  taken to the IBP.
14        MR. HAINES:  Your Honor, that's
15  not the ruling.  Mr. Podraza has a way
16  with words that don't always characterize
17  accurately what happened.  What Your
18  Honor ruled was that I could not object,
19  and I won't, but that doesn't mean that
20  Mr. Battle is going to give Mr. Podraza
21  what he wants.  And we will be back
22  before the Court --
23        THE COURT:  Mr. Haines, here is
24  where we are, if the witness says, I'm

Page 227

1  not going to answer the question, then,
2  and it's not because of your instruction,
3  at the appropriate time I assume Mr.
4  Podraza will file a motion for me, and it
5  will be briefed and argued, and I will
6  make a ruling about whether the witness
7  has to answer the question.
8        MR. HAINES:  Great.  That makes
9  sense.  Simple, then we don't have to
10  call you.
11        THE COURT:  You know, we're
12  getting to a point, counsel, where I
13  think positions are going to tend to
14  border on frivolous, right, particularly
15  if you look at what the legal standard is
16  going to be down stream, so Mr. Podraza,
17  do you anticipate, sitting here now, any
18  other radioactive hearing inquiry?
19        MR. PODRAZA:  I don't think so,
20  Your Honor, I think we pretty much
21  covered them.
22        THE COURT:  All right.  And if
23  the witness takes the position, that will
24  be addressed in the appropriate way and

Page 228

1  hear motion practice at the appropriate
2  time, if counsel thinks the answers to
3  those questions are of significance.
4        MR. PODRAZA:  Very well, thank
5  you, Your Honor, and thank you for the
6  directive.
7        MR. HAINES:  Thank you, Judge.
8        MS. DeBRUICKER:  Thank you, Your
9  Honor.
10        MR. PODRAZA:  I think that's the
11  end.
12        THE VIDEOGRAPHER:  The time is
13  now 5:27, this begins Media Unit No. 2,
14  we're back on the record.
15  BY MR. PODRAZA:
16    Q.     All right.  Mr. Battle, at your
17  prior day of deposition you were asked a series
18  of questions regarding letters, the June 6th
19  letter, the June 16th letter, which is the
20  protest let from the nomination proceeding, as
21  well as, I believe the gentleman Helgash
22  (phonetic); does that -- did I pronounce that
23  right?
24    A.     I don't think I, I think that's

22 (Pages 225 - 228)

CHARLES BATTLE

Page 229

1  it, yeah.
2      Q.     I'd like you, if you could put
3  those letters in front of you, they would be
4  Exhibits No. 2, 3, and 4, and starting with
5  what we marked as Battle No. 2, this is that
6  June 6th, 2020 letter.
7      A.     Uh-huh.
8      Q.     I'm going to ask you again,
9  first, who typed it?
10     A.     I'm not answering that question.
11     Q.     Second, who participated in the
12  drafting of the letter?
13     A.     I can't even tell you the amount
14  of people, so it was a lot of people.
15     Q.     Give me who you can recall?
16     A.     No.  I don't know who did what.
17  I don't recall.
18     Q.     And who made any contributions
19  to any content of the letter?
20     A.     I don't recall.
21     Q.     Who provided you with a copy to
22  review prior to your signature?
23     A.     I don't recall.
24     Q.     Where were you when the letter

Page 230

1  was provided to you for review?
2          MS. DeBRUICKER:  Objection to
3      form.
4          THE WITNESS:  Yeah, it's over a
5      year ago, I don't remember.
6  BY MR. PODRAZA:
7      Q.     Who was present with you while
8  you reviewed it?
9      A.     I don't recall.
10     Q.     You did review the letter prior
11  to signing it, correct?
12     A.     Yeah, yeah.  The first letter
13  we're talking about?
14     Q.     Right.  We're talking about
15  Battle No. 2?
16     A.     Okay.
17     Q.     Were you in the Philadelphia
18  region when you were reviewing what has been
19  marked here as Battle No. 2?
20     A.     I'd say, yes.
21     Q.     Were you at your home when you
22  were reviewing Battle No. 2?
23     A.     I don't recall.
24     Q.     Did anybody associated with Mr.

Page 231

1  Haines' office or Mr. Haines himself have any
2  involvement whatsoever, with respect to Battle
3  No. 2?
4          MR. HAINES:  Objection, instruct
5      you not to answer on the grounds of
6      attorney/client privilege.
7  BY MR. PODRAZA:
8      Q.     Are you going to follow that
9  instruction?
10     A.     Sure.
11     Q.     All right.  Now, let's start
12  with, or I'm sorry, move on to Battle No. 3,
13  this is the June 16th, 2020 letter?
14     A.     Uh-huh.
15     Q.     Who assisted in the completion
16  of what's been marked here as Battle No. 3?
17     A.     I don't recall.
18     Q.     Do you recall any participants
19  who contributed to what has been marked here as
20  Battle No. 3?
21     A.     I just remember talking to Frank
22  about his situation.
23     Q.     Who is Frank?
24     A.     Helgash.

Page 232

1      Q.     Anyone else?
2      A.     No.
3      Q.     What was the nature of the
4  conversation with Mr. Helgash?
5      A.     He was just explaining to me
6  what he had been through intimidation-wise and
7  everything else with the hall.
8      Q.     And did you encourage him to
9  send a letter to the IBP?
10     A.     Did I?  No.  Absolutely no.
11     Q.     Did Mr. Helgash express to you
12  that he would be sending a letter?
13     A.     No.
14     Q.     Now, focusing on Battle No. 3,
15  which is June 16, 2020?
16     A.     Uh-huh.
17     Q.     The protest letter, right?
18     A.     Uh-huh.
19     Q.     Okay.  Who supplied you a copy
20  to review prior to your signature?
21          MS. DeBRUICKER:  Objection to
22      form.
23          THE WITNESS:  I don't recall
24      that.

23 (Pages 229 - 232)

CHARLES BATTLE

1 BY MR. PODRAZA:

2    Q.    And where were you when the
3 letter was presented to you for signature?

4    A.    Maybe on the job, maybe.

5    Q.    And who brought it to you?

6    A.    I don't remember.

7    Q.    Which job were you on?

8    A.    At this date it would have been
9 Penn First.

10    Q.    And where is Penn First located?

11    A.    University of Pennsylvania.

12    Q.    And then drawing your attention
13 to Exhibit No. 4, the letter I'm going to call
14 that the Frank Helgash letter.

15    A.    Uh-huh.

16    Q.    Do you know of anybody who
17 participated in the completion of that letter?

18    A.    No.

19    Q.    Do you know who actually typed
20 up the letter?

21    A.    No.

22    Q.    Do you know how Mr. Helgash
23 received a copy of it for signature?

24    A.    No.

1    Q.    Have you ever spoken to Mr.
2 Helgash regarding the completion of what has
3 been marked here as Exhibit No. 4?

4    A.    No.

5    Q.    And going back to Battle No. 3,
6 forgive me if I asked this already, who typed
7 Battle No. 3?

8    A.    You asked me that already.

9    Q.    And your answer, just to make
10 sure, in case.

11    A.    Yeah, I'm not going to answer
12 that.

13    Q.    Do you have word processing
14 available to you to type any one of these three
15 letters?

16        MS. DeBRUICKER:  Objection to
17    form.

18        THE WITNESS:  Meaning -- I don't
19 understand the question.

20 BY MR. PODRAZA:

21    Q.    Sure.  Do you have a printer or
22 laptop?  Did you type what has been marked as
23 either Battle No. 2 or Battle No. 3?

24    A.    I'm not going to answer that

1 question.

2    Q.    Did your wife participate in the
3 completion of either Battle No. 2 or Battle 3?

4    A.    I'm not going to answer that
5 question.

6    Q.    Did she participate in the, what
7 we have marked here as Exhibit No. 4?

8    A.    I'm not going to answer that
9 question.

10    Q.    You indicated earlier today that
11 your wife is fearful of Mr. Dougherty, you
12 specifically said that; is that correct?

13    A.    So, let me rephrase that.  She
14 is afraid of the union and what they represent
15 -- well, she's afraid.  She's afraid.

16    Q.    Has your wife ever interacted
17 with Mr. Dougherty?

18    A.    I'm not going to say she's
19 afraid of him, John Dougherty.  She's afraid of
20 the Dougherty machine, let's put it that way.

21    Q.    Has your wife every interacted
22 with Mr. Dougherty.

23    A.    Not that I know of.  You have to
24 ask her.

1    Q.    And you have been with the union
2 for how long?

3    A.    Thirty years.

4    Q.    And you have been married for
5 how long?

6    A.    Married?  Thirty-four years.

7    Q.    And what is it about the union
8 machine, in quotes, that you think your wife is
9 afraid of?

10    A.    You would have to ask her.

11    Q.    Well, I'm asking you.

12    A.    How can I answer that question
13 for my wife?

14    Q.    I'm asking you what is your
15 understanding of the fear that she has for the,
16 quote, union machine?

17    A.    You would have to ask her.

18    Q.    You have no understanding
19 separate from her?

20    A.    You have to ask her that
21 question.  I cannot put words in my wife's
22 mouth.

23    Q.    I'm asking you what do you
24 understand is your wife's fear --

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

CHARLES BATTLE

1    A.    You're asking me what I'm afraid
2 of?
3    Q.    No. I'm asking what is your
4 understanding of your wife's fear of the quote,
5 union machine?
6    A.    You would have to ask Jeanette
7 Battle what her fear is.
8    Q.    Well, how do you know that she
9 has that fear?
10    A.    'Cause every time someone knocks
11 on my door she jumps, but again, you would have
12 to ask her.
13    Q.    And she's told you that she
14 jumping because of fear --
15    A.    You would have to ask her.
16    Q.    So, you don't know for sure --
17    A.    You would have to ask Jeanette
18 Battle those questions.
19    Q.    I suppose we can depose her.
20    A.    Knock yourself out.
21        MR. PODRAZA: Okay. I think at
22 this time that's the extent of my
23 questioning subject to follow-up after
24 opposing counsel has some questions for

1 you.
2        MS. DeBRUICKER: May we go off
3 the record briefly?
4        THE VIDEOGRAPHER: The time is
5 now 5:36, we are going off the record.
6        MS. DeBRUICKER: Only because I
7 understand I need the microphone.
8        THE VIDEOGRAPHER: Time is now
9 5:38, back on the video record.
10 BY MS. DeBRUICKER:
11    Q.    Good afternoon, Mr. Battle.
12    A.    Good afternoon.
13    Q.    I'm Lauren DeBruicker, I'm an
14 attorney for the Secretary of Labor in this
15 matter. I have some questions for you. I'm
16 going to do my best not to ask you questions
17 that Mr. Podraza already has. In the interest
18 of that, I may be skipping around a little bit,
19 so if you're at all unclear what my question
20 is, or what I'm asking you about, please let me
21 know, okay?
22    A.    All right.
23    Q.    Also, at the end of the day my
24 voice tends to drop a little bit, so if you

1 can't hear me, will you let me know?
2    A.    Sure.
3    Q.    Mr. Podraza concluded his
4 questioning by asking you about a couple of
5 letters, specifically what's been marked as
6 Battle's Exhibit No. 2. Do you have that in
7 front of you?
8    A.    Yes.
9    Q.    Did anyone from the government
10 have any involvement in the preparation of this
11 letter?
12    A.    Not to my recollection, no.
13    Q.    Did anyone from the government
14 ask you to write this letter?
15    A.    No.
16    Q.    I'm going to ask you about
17 Battle No. 3, which is the protest letter to
18 the International.
19    A.    Yes.
20    Q.    Did anyone from the government
21 have any involvement in preparation of this
22 letter?
23    A.    No.
24    Q.    Did anyone from the government

1 ask you to write this letter?
2    A.    No.
3    Q.    Mr. Battle, can you tell us why
4 you decided to run for office?
5    A.    I'm very dissatisfied with
6 leadership's spending of money; I'm very
7 dissatisfied with members being afraid to go to
8 union meetings and feeling intimidated, and
9 afraid to ask questions; I feel that's our
10 Local, and we, as members do not work for John
11 Dougherty, it's quite the opposite, John works
12 for us, and nobody in this Local feels that
13 way. He just intimidates everyone.
14    Q.    About when did you decide to run
15 for office?
16    A.    I probably made my final
17 decision in the spring, I would say, of '20.
18    Q.    Did you share that information
19 with anyone?
20    A.    Very few people.
21    Q.    Why did you share that
22 information with very few people?
23    A.    So, through a mutual friend, I
24 found out some other people might be interested

CHARLES BATTLE

1 in running for other positions, and we just
2 started talking.
3     Q.     Who is the mutual friend?
4     A.     Phil Borthwick.
5     Q.     And who are the people Mr.
6 Borthwick connected you with?
7     A.     Timmy McConnell and Mike
8 Coppinger.
9     Q.     Did you have any relationship
10 with Mr. McConnell prior to that?
11    A.     No.
12    Q.     We understood that Mr. McConnell
13 intended to run for IB board; is that your
14 understanding?
15    A.     Yes.
16    Q.     Does his decision to run for
17 office affect your decision to run for office?
18    A.     No.
19    Q.     Who else did Mr. Borthwick
20 connect you with?
21    A.     Michael Coppinger.
22    Q.     Did you have any relationship
23 with Mr. Coppinger prior to that?
24    A.     I might have worked with him on

1 the job before, but I don't quite remember.
2 When I met him his face looked familiar, I
3 can't say for sure.
4     Q.     Do you have an understanding
5 the Mr. Coppinger intended to seek office as
6 well?
7     A.     Yes.
8     Q.     What office was he going to
9 seek?
10    A.     Executive board.
11    Q.     Did his decision to run for
12 executive board impact your decision to run?
13    A.     No.
14    Q.     I'm going to direct your
15 attention back to Battle No. 11. Do you have
16 that in front of you? It is the report of Mr.
17 Bark's interview.
18    A.     Yes.
19    Q.     And it's my understanding that
20 Mr. Bark made several visits to your home; is
21 that right?
22    A.     Two.
23    Q.     About when was the first visit?
24    A.     Maybe February, somewhere around

1 there.
2     Q.     Was he alone on that visit or
3 was Mr. Kee with him?
4     A.     He was by himself.
5     Q.     How did that visit occur? Did
6 you arrange for him? Did you invite him over?
7     A.     No.
8     Q.     Did he call to tell you he was
9 coming?
10    A.     No.
11    Q.     Did he just knock at your door?
12    A.     No.
13    Q.     How did you know he was there?
14    A.     I was in my garage working on my
15 cars, I received a phone call, he wanted to
16 meet to talk. I didn't want to meet, I was
17 tired from the day at work. I was in the
18 middle of something in my car, and he just kept
19 at it. I don't know for how long. I can't
20 remember, but I finally said, "Where are you
21 at? I'll meet you." And he informed me he was
22 standing in my driveway.
23    Q.     So, he was calling you from your
24 driveway?

1     A.     Yes.
2     Q.     How did that make you feel?
3     A.     Shook up.
4     Q.     Why?
5     A.     Not because, listen, Bob and I
6 have a history, but I know what he was there
7 for.
8     Q.     What was he there for?
9     A.     I feel like he was there on
10 John's behalf to find out what my issue was,
11 and that doesn't make me comfortable.
12    Q.     Did you invite him into your
13 home?
14    A.     No.
15    Q.     What did you do?
16    A.     I wanted him off my property, so
17 we got in his car and went and had a talk.
18    Q.     Where did you go?
19    A.     To Graeme's Park.
20    Q.     You mentioned he -- I understand
21 he visited you on your job site.
22    A.     Yes.
23    Q.     And Mr. Podraza took you through
24 a line of questioning of him calling you Bitter

26 (Pages 241 - 244)

CHARLES BATTLE

1 Battle.
2     A.     Yeah.
3     Q.     Do you have a recollection of
4 that?
5     A.     No.
6     Q.     When did he visit you on the job
7 site?
8     A.     I'm not even sure.  I know it
9 was after the first visit, but I don't know
10 what date, what day.  I don't remember.
11     Q.     Tell me what you remember at
12 that visit?
13     A.     Again, it was the same
14 conversation we had when we went out
15 previously.
16     Q.     What was that?
17     A.     He wanted to know what my issue
18 was, and that, I just told him it's not one or
19 two things, it's numerous.
20     Q.     Did you tell him anything about
21 his visits to your home?
22     A.     Yes.
23     Q.     What did you say?
24     A.     I told him not to come to my

1 house unannounced or uninvited.
2     Q.     If you turn to Page No. 2 of
3 Battle No. 11.
4     A.     I'm there.  I'm sorry.
5     Q.     I'm going to direct your
6 attention to the third full paragraph.
7     A.     Yes.
8     Q.     On the page that begins, "When
9 Battle came to the door" --
10     A.     Uh-huh.
11     Q.     Says, "he," meaning you, "was
12 very excited and very angry."  Is that an
13 accurate description of how you felt when he
14 showed up?
15     A.     Yes, uh-huh.
16     Q.     And, can you tell, would this
17 have been the second time he came to your
18 house?
19     A.     Yes.
20     Q.     And just so I'm clear, that was
21 a few days before the June 2020 nomination
22 meeting, correct?
23     A.     Yes.
24     Q.     And the last sentence of that

1 paragraph is, Bark said, "I've got a finger in
2 my face.  Charlie said, I told you not to come
3 here;" do you see that?
4     A.     Yes.
5     Q.     Do you recall saying something
6 like that to Mr. Bark?
7     A.     Yes.
8     Q.     So, it sounds to me like he was
9 clear, you had already asked him not to come to
10 your house before?
11     A.     Yes.
12         MR. PODRAZA:  Objection, calls
13     for speculation, move to strike.
14 BY MS. DeBRUICKER:
15     Q.     Going to direct your attention
16 to Page No. 3 of the document, Battle No. 11,
17 the second paragraph up from the bottom that
18 begins, "When asked whether something
19 happened," do you see that?
20     A.     Uh-huh, yes.
21     Q.     Okay.  The second, the end of
22 the second line of the paragraph reads, "When
23 asked what he was trying to accomplish by going
24 to Battle's home, Bark stated, I'm hearing

1 rumors on the job, Charlie's running for
2 office, and I'm saying to myself, what's he so
3 angry about;" do you see that?
4     A.     I do.
5     Q.     How do you think that Mr. Bark
6 learned you were running for office?
7         MR. PODRAZA:  Objection, calls
8     for speculation, move to strike.
9         THE WITNESS:  Am I answering
10     that?
11         MS. DeBRUICKER:  (Ms. DeBruicker
12     indicated).
13         THE WITNESS:  I have no idea.
14 BY MS. DeBRUICKER:
15     Q.     Did you have any doubt that when
16 you, when he showed up to your house a few days
17 before the election, that he knew you were
18 running?
19     A.     I can't say 'cause he really
20 didn't get a word out, so I couldn't say.
21     Q.     Why do you think he came to your
22 house on June 7th?
23     A.     In my mind, thinking about it,
24 it's one of two things:  It's either to

27 (Pages 245 - 248)

CHARLES BATTLE

Page 249

1 intimidate, or to make some kind of a deal,
2 telling me, you know, if, maybe if I back off,
3 my son-in-law would be in the union. Other
4 than that, I can't for the life of me figure
5 out why he would show up at my house since
6 we're such great friends, and I asked him not
7 to, he still did it anyway.
8    Q.    There has been some discussion
9 about the mention of Thanksgiving; do you
10 recall that?
11    A.    Yes.
12    Q.    Did asking Mr. Bark what he was
13 doing for Thanksgiving meaning he was welcome
14 to show up at your house uninvited?
15    A.    The two nights before nomination
16 you're asking about?
17    Q.    At any time. Was he welcome to
18 show up at your house uninvited?
19    A.    No, but that's not the first
20 time he did that either or not even the second
21 time he did it.
22    Q.    What other time did he do it?
23    A.    I had a party, and I can't
24 remember what year, 98 party. He wasn't

Page 250

1 invited. He showed up. I can't tell you what
2 year it was. It was quite some time ago
3 though.
4    Q.    What was your reaction to that?
5    A.    I really, at the time, didn't
6 mind 'cause I didn't have any, I'm not going to
7 say I didn't have any issues with the Local,
8 and how you perceive them to conduct business,
9 but I wasn't upset that he was there.
10    Q.    The time Mr. Bark showed up at
11 your house on June 7th, 2020, were you aware of
12 any criminal charges pending against him?
13    A.    I don't know. I knew he was
14 going through something, but I don't know if
15 he, I don't know when I know, so I can't say
16 for sure.
17    Q.    What was the something he was
18 going through?
19    A.    My understanding was, and again,
20 this is, I don't know for sure, just how rumors
21 and 98's kind of like 13th grade, but he had
22 issues with his girlfriend from what I
23 understand.
24    Q.    Do you have any understanding as

Page 251

1 to whether there were any charges of violence
2 against him?
3    A.    Again, from what I hear, there
4 were, but I don't know that for sure, and I
5 don't want to speculate that they were. I just
6 I don't know.
7    Q.    But you had heard those rumors
8 at the time?
9    A.    Yeah.
10    Q.    Getting back to your intention
11 to seek office at the June 2020 election, what
12 was the process you planned to go through to
13 get nominated?
14    A.    So every other nomination since
15 I have been in, there is a general meeting,
16 and/or it's actually a nomination meeting I
17 think you call it. You stand up at the end of
18 the union meeting, meeting business, stand up
19 at the end, you get nominated, you get second,
20 and that's pretty much the process, as far as I
21 understood it.
22    Q.    And when you say you "get
23 nominated," does that mean somebody else
24 nominates you?

Page 252

1    A.    Yes.
2    Q.    So what was your plan? What was
3 your plan for getting nominated in June of
4 2020?
5    A.    So that was a whole different
6 animal.
7    Q.    How so?
8    A.    For some reason and I guess
9 we're going to blame it on corona, we had to
10 show up at the hall and let them know our
11 intention of being nominated, two hours before
12 the start of the meeting.
13    Q.    Do you have Battle No. 1?
14    A.    No, I don't think.
15       MR. HAINES: Here, I got it.
16       THE WITNESS: Thank you.
17       MR. HAINES: Hand me those.
18       THE WITNESS: Yeah.
19       MR. HAINES: Copies are yours,
20    right?
21       THE WITNESS: Okay. I have it.
22 BY MS. DeBRUICKER:
23    Q.    Don't want to retread other
24 ground, but this is the notice of the election

28 (Pages 249 - 252)

CHARLES BATTLE

Page 253

1 that you received?
2    A.    Yes.
3    Q.    The bottom of the first
4 paragraph of Battle No. 1, the last sentence
5 reads, "The nomination of officers, and the
6 nomination of the election board, if needed,
7 will be the only order of business on June
8 9th;" do you see that?
9    A.    Yes.
10    Q.    Do you know what they meant by,
11 "if needed?"
12    A.    I would say if nobody else was
13 running for election board.
14    Q.    So it's your understanding you
15 had to appear before the meeting to indicate
16 you were running; is that correct?
17    A.    Yes.
18        MR. PODRAZA:  Objection to the
19    form of the question, move to strike.
20 BY MS. DeBRUICKER:
21    Q.    Is it your understanding you
22 needed someone to nominate you?
23    A.    Yes.
24    Q.    Did you have a plan as to who

Page 254

1 would nominate you?
2    A.    Yes.
3    Q.    Who was that going to be?
4    A.    Michael Coppinger.
5    Q.    Did you have any communications
6 with Mr. Coppinger in the days before the
7 election about his intention to run?
8    A.    Yes.
9    Q.    At some point did Mr. Coppinger
10 tell you he did not intend to run?
11    A.    No -- so do me a favor, ask that
12 question again.  Ask the last two questions,
13 please.
14    Q.    This might not be the same two
15 questions, but I'll give it another shot.  At
16 some point before the nomination meeting, did
17 Mr. Coppinger inform you that he did not intend
18 to run after all?
19    A.    Yes, he did.
20    Q.    How did he communicate that to
21 you?
22    A.    I actually found that out
23 through Tim McConnell.
24    Q.    How did Mr. McConnell

Page 255

1 communicate that to you?
2    A.    By phone.
3    Q.    Phone call or text?
4    A.    I don't remember.
5    Q.    Do you know why Mr. Coppinger
6 decided not to run?
7    A.    I don't remember what happened
8 here.  I don't remember why he decided to pull
9 out.  I don't know if it was a conversation.  I
10 can't speculate.  I think I know why, but I
11 just don't, never sure.
12    Q.    What is your understanding of
13 why he decided not to run?
14    A.    I think it was a conversation
15 with someone from the hall.
16        MR. PODRAZA:  Objection, move to
17    strike, speculation.
18 BY MS. DeBRUICKER:
19    Q.    When you learned that Mr.
20 Coppinger had decided not to run, was it on the
21 understanding that he would still nominate you?
22        MR. PODRAZA:  Objection, calls
23    for speculation.
24        THE WITNESS:  No.  I know that

Page 256

1    for sure.
2 BY MS. DeBRUICKER:
3    Q.    How do you know that for sure?
4    A.    I remember the conversation, and
5 I said to him, "I understand why you're out.
6 You have a family, you have a mortgage, you
7 need to work."  I said, "Do me a favor," 'cause
8 apparently Michael's word has, holds weight, in
9 our Local, to my understanding, "if you're not
10 going to run, just nominate me."  He said,
11 "Okay, brother, I'll do that."
12    Q.    And in what form was that
13 communication?
14    A.    That was on the phone call.
15    Q.    So, I understand you went to the
16 union hall on June 9th; is that correct?
17    A.    I did, yes.
18    Q.    Can you describe the atmosphere
19 of the union hall that night?
20    A.    It was, it was intimidating.  It
21 was my first time running for office.  I didn't
22 know what to expect.  It was a little
23 intimidating.
24    Q.    How so?

29 (Pages 253 - 256)

CHARLES BATTLE

1    A.    I think I was more, it's hard to
2  explain.  Was I physically threatened by that
3  nature?  No, I wasn't.  I just felt it was an
4  intimidating atmosphere.
5    Q.    Were there other people when you
6  got there?
7    A.    Are we talking about when I went
8  in to sign the paperwork or --
9    Q.    So, let's start, let me ask you,
10 about what time arrived at the union hall on
11 June 19?
12   A.    A little before 5:00.
13   Q.    And why did you arrive at the
14 union hall at that time?
15   A.    To fill out paperwork to let
16 them know my intent on being nominated for
17 office.
18   Q.    And what was the atmosphere
19 outside the union hall?
20   A.    At that point, nothing going on
21 outside.
22   Q.    Were there any signs posted at
23 the union hall?
24   A.    Yes.

1    Q.    Where was it posted?
2    A.    On the door, front door.
3    Q.    I apologize in advance for how
4  slow --
5    A.    No, you're good.
6          MS. DeBRUICKER:  I'm going to
7    have this marked as -- there is no No. 13
8    for clarification; is that right?
9          MR. PODRAZA:  Correct.
10         MS. DeBRUICKER:  So can we
11   marked this as Battle 13 (sic)?
12         - - -
13         (Whereupon the document was
14   marked, for identification purposes, as
15   Battle's Exhibit No. 15.)
16         - - -
17 BY MS. DeBRUICKER:
18   Q.    Mr. Battle, are those, there's
19 two photographs that make up Exhibit Battle No.
20 15, are those the signs you saw on the night of
21 the election?
22   A.    That's what it looks like, yes.
23   Q.    Do you recall reading those
24 signs?

1    A.    Yes.
2    Q.    What did those signs indicate to
3  you?
4    A.    So, three people allowed in the
5  building.
6    Q.    And who would those people be?
7    A.    The candidate, nominating
8  person, and the person seconding candidate.
9    Q.    What did they indicate to you?
10   A.    It was kind of confusing.
11   Q.    How so?
12   A.    Well, do we all come in at the
13 same time?  Do we know when do we come in?  It
14 was just kind of vague to me.
15   Q.    Did it indicate to you that you
16 needed someone to nominate you, and you needed
17 someone to second you?
18   A.    Absolutely, yes.
19   Q.    And I believe it reads at the
20 bottom, "Please see the door worker to be
21 granted access."
22   A.    Uh-huh.
23   Q.    Who was the door worker?
24   A.    There was no one there.

1    Q.    So you arrived at the union
2  hall.  What did you do then?
3    A.    I entered the building, no one
4  was at the desk, the table that they had set
5  up, I guess for the paperwork.
6    Q.    Where was that table?
7    A.    In the lobby.
8    Q.    So on the doors there?
9    A.    Yes, yes.
10   Q.    On Battle No. 15?  So what did
11 you do then?
12   A.    I don't know.  I think I asked
13 someone what the process was.  I can't remember
14 who it was, and I was told somebody would be
15 right out.
16   Q.    And did someone come out?
17   A.    Plenty of people came out.
18   Q.    Who came out?
19   A.    Officers, you know, Tara chupka
20 came out to put the paperwork, I believe
21 Michael Neal came out.
22   Q.    Who is he?
23   A.    The head of apprentice training.
24   Q.    Why would he have come out?

30 (Pages 257 - 260)

CHARLES BATTLE

Page 261

1     A.     I have no idea.  Kind of felt
2 like the shark for shark boy kind of
3 (phonetic).
4     Q.     Why would Ms. Chupka have come
5 out?
6     A.     I guess to present me with the
7 paperwork to be filled out.
8     Q.     Do you recall anyone else who
9 came out at the time?
10     A.     No, I remember it being at least
11 seven or eight people that just came out of
12 nowhere, kind of, but I can't remember everyone
13 that was there.
14     Q.     At some point, were you given
15 the nomination form?
16     A.     Yes.
17     Q.     Did you ask for the form?
18     A.     I don't recall that.  I don't
19 think I did.
20     Q.     Pretty sure everybody knew what
21 I was there for though.
22          MS. DeBRUICKER:  I'm going to
23     ask that this be marked as Battle No. 16.
24               - - -

Page 262

1          (Whereupon the document was
2     marked, for identification purposes, as
3     Battle's Exhibit No. 16.)
4               - - -
5 BY MS. DeBRUICKER:
6     Q.     Mr. Battle, take a look at what
7 was marked as Battle No. 16 and tell me if you
8 recognize that document?
9     A.     I do.
10     Q.     What is it?
11     A.     It's the paper that Tara chupka
12 gave me.
13     Q.     Did you exchange any words with
14 Ms. Chupka regarding the completion of this
15 form?
16     A.     I did.
17     Q.     What do you recall of that
18 conversation?
19     A.     I asked her why I had to let her
20 know what office I was running for, and why she
21 needed the name of the person who was going to
22 nominate me.
23     Q.     What was her response?
24     A.     It's, it's, I think, I believe

Page 263

1 it was just, this is the information they ask
2 for.  Something to that fact.
3     Q.     Did anyone tell you, you didn't
4 need someone to nominate you?
5     A.     No.
6     Q.     Did anyone tell you, you could
7 nominate yourself?
8     A.     No.
9     Q.     Did anyone tell you that
10 submitting your indication that you were
11 willing to accept the nomination was sufficient
12 to be nominated?
13     A.     No.
14          (Whereupon there was a brief
15     interruption.)
16 BY MS. DeBRUICKER:
17     Q.     Once you completed the form,
18 what did you do?
19     A.     I left the form there.  I told
20 Tara when the person comes that's going to
21 nominate me, he will in to fill out the rest of
22 the sheet, went out and sat in my truck.
23     Q.     Did you ask who else was
24 running?

Page 264

1     A.     I did.
2     Q.     What was the answer?
3     A.     So, there was a stack of papers
4 -- so, Tara came out from the back, she pulled
5 this paper out of the bottom of the stack,
6 flipped it over, put the other papers down,
7 face down.  I would say, I don't know, maybe
8 20, 25 papers before I filled out what I wanted
9 to run for, I asked her if the other papers
10 were people that were intending on running for
11 office.  She said, "yes," so I said, well, do
12 you mind if take a look at them, because, you
13 know, if a good buddy of mine is running for
14 president, I wouldn't want to run against him,
15 and take votes from him, which is, this isn't
16 standard, but that's what people do, if we're
17 in a regular meeting, and just say I wanted to
18 run for president, and my buddy was running for
19 president, then I would be like, you know what,
20 I'll run for vice president, 'cause I don't
21 want to take votes away from him, so that's why
22 I wanted to see the papers.  Tara said I have
23 to go in the back and check, see if you can see
24 that, whatever the back was, she took every

31 (Pages 261 - 264)

CHARLES BATTLE

Page 265

1 paper, except for this one, went in the back,
2 came out a few minutes later, however long it
3 was, and say, "I can't let you see who is
4 running for what." I got a little bent, but I
5 was like, okay, all right. So I filled out the
6 paper the way you said, here, and left it with
7 her.
8    Q.    Did you give it to her?
9    A.    I don't remember. I don't
10 remember if I left it there or I gave it to
11 her.
12    Q.    What did you do next?
13    A.    Went out to my truck.
14    Q.    Did you have any communications
15 with Mr. McConnell the night of the nomination
16 meeting?
17    A.    I don't remember.
18    Q.    Do you recall whether Mr.
19 McConnell was at the nominations meeting?
20    A.    I don't remember seeing him. At
21 that point I don't think I had met him yet.
22    Q.    Did you have any communications
23 with Mr. Coppinger the night of the meeting?
24    A.    I did not.

Page 266

1    Q.    Did someone else you're aware of
2 have communications with Mr. Coppinger that
3 evening?
4    A.    Yes.
5    Q.    Who is that?
6    A.    Phil Borthwick.
7    Q.    What's your understanding of the
8 communication between Mr. Borthwick and Mr.
9 Coppinger?
10    A.    So it was probably close to
11 seven o'clock. I remember Phil getting off the
12 phone and saying to me Cop's out.
13    Q.    Were you with Mr. Borthwick at
14 that time?
15    A.    Yes.
16    Q.    What did that mean to you?
17    A.    That he is not coming to
18 nominate me.
19    Q.    What was your reaction to that?
20    A.    I was a little disturbed.
21    Q.    Why?
22    A.    You say you're going to do
23 something, you do it.
24    Q.    Were you under the understanding

Page 267

1 that you needed someone to nominate you in
2 order to be able to run?
3    A.    Yes.
4        MR. PODRAZA: Objection to form,
5    move to strike.
6 BY MS. DeBRUICKER:
7    Q.    Are you familiar with a Mr.
8 Kerr, K-e-r-r?
9    A.    Yes.
10    Q.    Was he there that night?
11    A.    Yes.
12    Q.    Were you with him?
13    A.    Yes.
14    Q.    I represent that Mr. Kerr
15 indicated to the Department of Labor that when
16 you heard Mr. Coppinger was out, that you
17 turned white?
18        MR. PODRAZA: Objection, move to
19    strike. Statement by counsel
20    inappropriate.
21        THE WITNESS: That's what he
22    said?
23 BY MS. DeBRUICKER:
24    Q.    That's what he said.

Page 268

1        MR. PODRAZA: Objection, again,
2    move to strike.
3        THE WITNESS: Yeah, he's going
4    to hear about that one.
5 BY MS. DeBRUICKER:
6    Q.    Would that accurately describe
7 how you were feeling?
8        MR. PODRAZA: Objection.
9        MR. FRANK: Keep your voice up,
10    please.
11 BY MS. DeBRUICKER:
12    Q.    Would you accurately describe
13 how you were feeling?
14        MR. PODRAZA: Same objection,
15    move to strike.
16        THE WITNESS: Am I answering?
17        MS. DeBRUICKER: (Ms. DeBruicker
18    indicated).
19        THE WITNESS: Okay. I would say
20    I had a range of emotions at that point,
21    you know, besides being scared and
22    nervous, I was frustrated, angry, upset,
23    you know, I was pretty much the whole
24    gamut of emotions.

32 (Pages 265 - 268)

CHARLES BATTLE

1 BY MS. DeBRUICKER:
2     Q.     At some point did you get a call
3 from David Kelly?
4     A.     Yes.
5     Q.     Who is Mr. Kelly?
6     A.     So David Kelly and I have a
7 history of growing up in the same neighborhood,
8 and his father coached me in little league
9 ball, and his father sponsored me in getting me
10 into the union.
11     Q.     Did you hear from Mr. Kelly the
12 night of the nominations' meeting?
13     A.     Yes.
14     Q.     When did you hear from Mr. Kelly
15 on the night of the nominations?
16     A.     After I filled out the
17 paperwork, sitting in my truck in the air
18 conditioning, I guess, maybe 10/15 minutes,
19 sitting my truck.
20     Q.     Did Mr. Kelly call you?
21     A.     Yes.
22     Q.     What was the nature of your
23 communication with Mr. Kelly?
24     A.     He wanted to know if I was

1 running for president, if I was really running
2 for president, and my response is, "How the
3 hell would you know that?"
4     Q.     Did he respond?
5     A.     He kind of, from what I
6 remember, chuckled, but I never got how he
7 found out.
8     Q.     Is it your assumption that he
9 found out because you had submitted your form?
10         MR. PODRAZA:  Objection, calls
11     for speculation, move to strike.
12         THE WITNESS:  Yes.
13         MR. PODRAZA:  Same objection,
14     same motion.
15 BY MS. DeBRUICKER:
16     Q.     Had you ever told Mr. Kelly that
17 you intended to run?
18     A.     No.
19     Q.     Did you have any communications
20 with a Dominic Bassiano that night?
21     A.     I think just a hello.
22     Q.     Did you have any communications
23 with Mr. Bassiano about the nominations meeting
24 at any point?

1     A.     No.
2     Q.     Did anyone communicate to you at
3 any point that they thought Mr. Bassiano was
4 going to nominate you?
5     A.     Say that again, I'm sorry.
6     Q.     Did anyone communicate to you at
7 any point that they thought Mr. Bassiano was
8 going to nominate you that night?
9     A.     No.
10     Q.     When you learned that Mr.
11 Coppinger could not come to nominate you, did
12 you have someone else to nominate you?
13     A.     Did I have someone else lined up
14 to nominate me, no, uh-uh.
15     Q.     Did anyone else express
16 willingness to nominate you?
17     A.     No.
18     Q.     Did you ask anyone to nominate
19 you -- anyone else to nominate you?
20     A.     No.
21     Q.     Why not?
22     A.     So, I had two other friends that
23 were going to second me.  I think at that point
24 I kind of felt like, I saw, I felt like there

1 was a certain, certain actions being taken to
2 keep this from happening, and I kind of didn't
3 want to put anybody else in that position.  I
4 knew, you know, no one else would be
5 comfortable doing it, so yeah, I didn't ask
6 anyone else.
7     Q.     Why didn't you want to put
8 anyone else in that position?
9     A.     You know, just fear that, you
10 know, anybody who is going to stand with me is
11 now going to pay some kind of price.
12     Q.     What kind of price would that
13 be?
14     A.     Monetary, you know, lack of
15 work, just giving, just basically being
16 intimidated financially, and I wouldn't want to
17 put anybody through that situation, so --
18     Q.     You ever know anyone else who
19 tried to run for office in Local 98 to suffer
20 negative consequences?
21     A.     Yes.
22     Q.     Who is that?
23     A.     Kenneth Rocks.
24     Q.     And what negative consequences

33 (Pages 269 - 272)

CHARLES BATTLE

Page 273

1 do you understand that Mr. Rocks suffered?
2    A.    There is, you know, all kinds of
3 rumors and innuendos, and the machine, you
4 know, this is what they do, you go against the
5 machine, you're a wife beater, you're a drug
6 addict, you know, contractors get called, if
7 they are hired, that sort of thing.
8    Q.    Did someone say Mr. Rocks was a
9 wife beater?
10    A.    From what I understand, yes.
11    Q.    Did you hear that someone had
12 said Mr. Rocks was a wife beater?
13    A.    I heard that someone had said
14 it, yes.
15    Q.    Did you have an understanding
16 where Mr. Rocks lost work after running for
17 office?
18    A.    From my understanding, yes.
19    Q.    Were you aware that the
20 International constitution, the constitution of
21 the International, you understand what I'm
22 referring to?
23    A.    Uh-huh, yes.
24    Q.    Did you know that the

Page 274

1 International constitution says that to be
2 nominated for office, you have to either be
3 present or signify your willingness to run in
4 writing?
5    A.    No, I wasn't aware of that.
6    Q.    Turn back to Battle No. 16, your
7 nomination form.
8    A.    Uh-huh.
9    Q.    If you could have nominated
10 yourself, would you understand that form to be
11 sufficient to do that?
12    A.    That --
13        MR. PODRAZA:  I'm sorry.
14    Objection, and I'm going to move to
15    strike.
16        THE WITNESS:  In my eyes, this
17    pretty much is a self-nomination.
18 BY MS. DeBRUICKER:
19    Q.    Now, you submitted this form.
20 You weren't intimidated about submitting this
21 form, correct?
22    A.    No, uh-huh.
23    Q.    But you didn't attend the
24 meeting, correct?

Page 275

1    A.    So, that's another tricky thing
2 with the wording and the letter that we got.
3 When was I supposed to go?  Was I supposed to
4 go down there at seven o'clock?  Was I supposed
5 to down in the first wave?  The second wave?
6 How many people supposed to go?  The whole
7 night was very confusing.
8    Q.    Was there any communication to
9 you as to when you were to come inside?
10    A.    No.
11    Q.    Where was the actual meeting
12 held or to be held?
13    A.    1719 Spring Garden.
14    Q.    And where in the building?
15    A.    I believe down in the hull,
16 that's where meetings are usually held.
17        MR. PODRAZA:  Objection, move to
18    strike, based on conjecture.
19 BY MS. DeBRUICKER:
20    Q.    When you say down in the hull,
21 does that mean going downstairs?
22    A.    Yes.
23    Q.    Did you go down to the hull that
24 night?

Page 276

1    A.    I did not.
2    Q.    Why not?
3    A.    After Michael wasn't going to
4 nominate me, well, first of all, I didn't know
5 when to go.  I didn't know how this whole thing
6 was playing out.  I had no idea.
7        Secondly is, when Michael said
8 he wasn't going to nominate me, when I found
9 this out, I wasn't going to put my other two
10 friends that were there to second me through
11 any other kind of, well, not that they suffered
12 anything that night in particular, but I wasn't
13 going to put their livelihood into jeopardy.
14    Q.    Did you ask anyone to go into
15 the meeting for you?
16    A.    No.
17    Q.    Why not?
18    A.    I just wouldn't even have
19 thought to have done that.
20    Q.    So your understanding is that
21 there could have been negative consequences for
22 someone nominating you?
23        MR. PODRAZA:  Objection,
24    statement by counsel, move to strike.

34 (Pages 273 - 276)

CHARLES BATTLE

1          THE WITNESS:  Is it possible?
2      Yes, I feel it is.
3  BY MS. DeBRUICKER:
4      Q.      Was it your understanding you
5  had to be present at the meeting in order to
6  run for office?
7      A.      Yes.
8      Q.      Why would the union have made
9  such a requirement?
10         MR. PODRAZA:  Objection, calls
11      for speculation, move to strike.
12         THE WITNESS:  I wouldn't know
13      from the union's standpoint.  I just know
14      for mine, I have never seen anyone
15      nominated who wasn't present, so I would
16      just assume you had to be there.
17  BY MS. DeBRUICKER:
18      Q.      Do you know who Rodney Walker
19  is?
20      A.      Yes.
21      Q.      Who is Rodney Walker?
22      A.      Rodney Walker is an agent for
23  Local 98.
24      Q.      We have information that Ms.

1  Chupka gave your nomination form to Mr. Walker.
2      A.      Yeah, I --
3          MR. PODRAZA:  Objection, move to
4      strike statement by counsel.
5  BY MS. DeBRUICKER:
6      Q.      Do you know why?
7      A.      No, I have no idea.  I didn't
8  know.
9      Q.      Is it your understanding that
10  Mr. Walker had any role in the elections
11  process?
12      A.      No.
13      Q.      Would it surprise you to learn
14  that your statement was given to Mr. Walker?
15      A.      No.
16      Q.      Why not?
17      A.      It wouldn't surprise me if it
18  was given to anyone in that Local that works
19  for John.
20      Q.      As far as you know, did the
21  union accept your nomination form and
22  considered you a nominee?
23      A.      No.
24      Q.      Why do you think that is?

1      A.      'Cause nominators never finished
2  the form.
3      Q.      Were you ever notified by Local
4  98 that you were a candidate?
5      A.      No.
6      Q.      Did you ever hear that Local 98
7  announced that all positions were unopposed
8  that night?
9      A.      I didn't hear that myself.  I
10  heard secondhand, yes.
11      Q.      Was it your impression that the
12  union was trying to find out who your
13  nominators were?
14      A.      Absolutely.
15      Q.      What was that impression based
16  on?
17      A.      Phone call from David Kelly,
18  conversation with Dominic Bassiano.
19      Q.      Tell me more about your
20  conversation with Mr. Bassiano?
21      A.      I really couldn't tell you for
22  sure.  I just don't remember it in detail.
23      Q.      Do you know who would have
24  contacted Mr. Bassiano?

1      A.      It was an agent.
2      Q.      Do you know who?
3      A.      I don't remember.
4      Q.      Why do you think the union was
5  trying to find out who was nominating you?
6          MR. PODRAZA:  Objection, move to
7      strike, calls for speculation.
8          THE WITNESS:  I think for
9      intimidation factor.
10  BY MS. DeBRUICKER:
11      Q.      Why did you think it would
12  matter to the union who would nominate you?
13         MR. PODRAZA:  Same objection,
14      move to strike.
15         THE WITNESS:  Just so they could
16      get in his ear.
17  BY MS. DeBRUICKER:
18      Q.      Get in whose ear?
19      A.      Whoever was going to nominate
20  me, if they found out who it was, they would
21  definitely want to have a conversation.
22      Q.      Is it your understanding they
23  would try to dissuade anyone from nominating
24  you?

35 (Pages 277 - 280)

CHARLES BATTLE

1      MR. PODRAZA: Objection,
2  statement by counsel, move to strike.
3      THE WITNESS: I would assume
4  that.
5  BY MS. DeBRUICKER:
6  Q.    Why would that be your
7  assumption?
8  A.    Just from prior elections, not
9  just from Rocks either, just from either, you
10 know, things that have happened in the history
11 of this local, trying to have elections, it's
12 almost comical.
13 Q.    How so?
14 A.    You know, my thought process is,
15 if you're doing the right thing by your
16 membership, you're doing the right things,
17 well, you should have no problem being
18 reelected, so have an open, fair, honest
19 election, and that just doesn't happen in 98.
20 Q.    I'm going to ask that this be
21 marked as Battle No. 17.
22      - - -
23      (Whereupon the document was
24  marked, for identification purposes, as

1  Battle's Exhibit No. 17.)
2  BY MS. DeBRUICKER:
3  Q.    Mr. Battle, I'll have you look
4  at what has been marked as Battle No. 17; do
5  you see that?
6  A.    Yeah.
7  Q.    Do you recognize that?
8  A.    I do.
9  Q.    What is it?
10 A.    This is a, I think they call
11 them memes, I think, or it says a GIF or a GIF,
12 yeah.
13 Q.    And what does it show?
14 A.    This whole scene plays out is me
15 being knocked out, and the other guy is John
16 Dougherty kind of waving around at his groin,
17 slamming me to the mat.
18 Q.    So this is obviously a still
19 picture.
20 A.    Yes.
21 Q.    Was this actually a video at
22 some point --
23 A.    Yes.
24 Q.    -- or something in motion?

1  A.    Yes.
2  Q.    Is that your picture of the
3  gentleman laying on the mat?
4  A.    Yeah.
5  Q.    And I know you can't see it
6  here, but in the video was the face of the
7  person jumping in the air that of Mr.
8  Dougherty?
9  A.    Sure was.
10 Q.    Do you recall how you came to
11 see this?
12 A.    Somebody sent it to me.
13 Q.    Do you know who was responsible
14 for this?
15 A.    I've heard, but I can't say for
16 sure.
17 Q.    What did you take this video to
18 imply?
19 A.    That John knocked me the hell
20 out.
21      MR. PODRAZA: Counsel, could we
22  have a time frame on whatever this is?
23 BY MS. DeBRUICKER:
24 Q.    Mr. Battle, do you recall when

1  you recall seeing this?
2  A.    It was a day or two after
3  nominations.
4      MS. DeBRUICKER: How is
5  everybody doing? Six thirty. Anybody
6  want a break or keep going?
7      THE WITNESS: I'm good.
8      MR. PODRAZA: How much more do
9  you have?
10      MS. DeBRUICKER: Hard to tell.
11 I don't think it's very long.
12      MR. PODRAZA: Okay.
13      MS. DeBRUICKER: I'll count on
14  someone to speak up if we need a break.
15 BY MS. DeBRUICKER:
16 Q.    Mr. Battle, I'm going to ask you
17 to look back at Battle No. 3, which is your
18 protest letter to the international?
19      MR. HAINES: I did put this
20  away.
21      MS. DeBRUICKER: Keeping you on
22  your toes, Cliff.
23      MR. HAINES: Keep working.
24 BY MS. DeBRUICKER:

36 (Pages 281 - 284)

CHARLES BATTLE

1    Q.    Mr. Battle, you've had some
2  questions about the preparation of this letter.
3  Did you sign this letter?
4    A.    Yes.
5    Q.    Did you adopt this as your
6  letter?
7    A.    Yes.
8    Q.    Do you stand behind this letter?
9    A.    Absolutely.
10    Q.    You have been asked to identify
11  who may have had involvement in this letter.
12    A.    Uh-huh.
13    Q.    And I understand no one from the
14  government was involved in this letter.
15    A.    Correct.
16    Q.    Are you willing to identify
17  anyone else who may have been involved in the
18  preparation of this letter?
19    A.    No.
20    Q.    Why not?
21    A.    For fear of monetary, physical,
22  and mental retribution of my local.
23    Q.    And when you saw monetary, does
24  that mean they might lose a job?

1    A.    Yes.
2    Q.    Any other monetary penalties
3  that the local could levy against someone?
4    A.    Who knows, you know, with the
5  way the roles are, they bring someone up on
6  charges, they could fine someone, who knows.
7    Q.    Did you speak to anyone from the
8  Department of Labor about this protest letter
9  before submitting it?
10    A.    No.
11    Q.    Did you speak with anyone from
12  the Department of Justice about your protest
13  letter before submitting it?
14    A.    No.
15    Q.    Do you stand by the contents of
16  this letter?
17    A.    Hundred and fifty percent.
18    Q.    Mr. Battle, I'm going to have
19  you look at what we have marked as Battle No.
20  7, the last time we were together.  Do you
21  recall being asked about that document?
22    A.    The last deposition, I do,
23  uh-huh.
24    Q.    Do you recall having any contact

1  with the Department of Labor prior to August
2  18th, 2020?
3    A.    Not for sure, not that I can
4  recall.
5    Q.    Do you recall having any contact
6  with the Department of Justice prior to August
7  18th, 2020?
8    A.    No, I never talked to them.
9    Q.    Did anyone from the government
10  pressure you to contact the Department of Labor
11  on August 18th, 2020?
12    A.    No.
13    Q.    You made this contact of your
14  own free will?
15    A.    Yes.
16    Q.    I'm going to have you turn to
17  what's been marked as Battle No. 10.
18    A.    Okay.
19    Q.    And as we have established,
20  Battle No. 10 is a cover Memorandum from the
21  Department of Labor, dated October 13, 2020; is
22  that correct?
23    A.    Yes.
24    Q.    And then attached to that,

1  starting on Page No. 3 of that document is a
2  statement signed by you; is that correct?
3    A.    Yes.
4    Q.    Mr. Podraza asked you some
5  questions about the preparation of this
6  document.
7    A.    Uh-huh.
8    Q.    And correct me if I'm wrong, but
9  it's my understanding of your testimony that
10  you gave an interview to the Department of
11  Labor at some point in August of 2020; does
12  that sound correct?
13    A.    Not positive about the date, but
14  yeah, uh-huh.
15    Q.    At some point you spoke to the
16  Department of Labor and told them what happened
17  to you in June 2020?
18    A.    Yes.
19    Q.    And I understand that someone
20  prepared this typewritten document; is that
21  correct?
22    A.    Yes.
23    Q.    And that you did not prepare
24  this typewritten document; is that correct?

37 (Pages 285 - 288)

CHARLES BATTLE

Page 289

1    A.    Correct.
2    Q.    Was it your understanding that
3 this document was prepared based on the
4 conversation you had, had with the Department
5 of Labor when you reported your issue?
6    A.    Yes.
7    Q.    Did you have chance to review
8 this document?
9    A.    Yes.
10    Q.    Did you have a chance to make
11 changes to this document?
12    A.    Yes.
13    Q.    Were you asked to make sure that
14 everything in this document was correct?
15    A.    I was.
16    Q.    And did you in fact make some
17 changes to this document?
18    A.    I did.
19    Q.    And did you initial those
20 changes?
21    A.    I did.
22    Q.    Were you under any time pressure
23 to review this document when you reviewed it?
24    A.    No, uh-uh.

Page 290

1    Q.    Following your corrections that
2 you made, was everything in the statement true
3 and accurate to the best of your knowledge?
4    A.    To the best of my knowledge,
5 yes.
6    Q.    Do you stand by this statement?
7    A.    Absolutely.
8    Q.    Were you pressured by the
9 government into giving this statement?
10    A.    No.
11    Q.    Were you pressured by anyone
12 else into giving this statement?
13    A.    No.
14    Q.    I'm going to have you take a
15 look at what was marked as Battle No. 5 when
16 you were last here.
17    A.    Okay.
18    Q.    Battle No. 5 is a July 28, 2020
19 letter authored by Mr. Randy Kieffer; is that
20 correct?
21    A.    Yes.
22    Q.    Did you speak with Mr. Kieffer
23 during the course of the International's
24 investigation of your complaint?

Page 291

1    A.    Did I speak with him during,
2 after my initial statement you're asking or --
3    Q.    So let me back up, I guess.
4    A.    Yes, back up.  I don't
5 understand.
6    Q.    I understand you submitted your
7 complaint to the International which was Battle
8 No. 3 in June of 2020; is that right?
9    A.    Yes.
10    Q.    And at some point, is it your
11 understanding that the International
12 investigated your complaint?
13    A.    Yes.
14    Q.    Did you speak with Mr. Kieffer
15 in the course of that investigation?
16    A.    No.
17    Q.    Did you speak with a Mr. Welsh
18 over the course of that investigation?
19    A.    No.
20    Q.    Did you give any interviews at
21 all, to the International, over the course of
22 the investigation?
23    A.    No.
24    Q.    Mr. Kieffer indicates that he

Page 292

1 did speak with you.
2    A.    Yes.
3    Q.    Okay.  So, I want to be sure I'm
4 clear on your testimony.  Did you speak with
5 Mr. Kieffer?
6    A.    I did for the initial, for my
7 initial protest I spoke with him.
8    Q.    That's what I'm referring to.
9    A.    Yes, okay.
10    Q.    Did you meet with Mr. Kieffer in
11 person?
12    A.    No.
13    Q.    Did you speak with Mr. Kieffer
14 by phone?
15    A.    Yes.
16    Q.    Do you recall how many times you
17 spoke with Mr. Kieffer?
18    A.    I spoke with him, I believe, two
19 or three times.
20    Q.    Mr. Podraza asked you some
21 questions regarding Mr. Kieffer's letter, and
22 I'm going to do my best not to overlap anything
23 he has already asked you.  I'm going to direct
24 your attention to the second page of that

38 (Pages 289 - 292)

CHARLES BATTLE

Page 293

1 letter?
2    A.    Uh-huh.
3    Q.    The third paragraph on that
4 page?
5    A.    Yep.
6    Q.    The second sentence begins,
7 "Brother Battle stated to me in our discussion
8 that he intended to nominate himself for
9 president;" do you see that?
10    A.    I see it.
11    Q.    Was that correct?
12    A.    No.  If that was my intention,
13 it would have been done.
14    Q.    To be clear, it was not your
15 intention to nominate yourself?
16    A.    No.
17    Q.    Did you understand that you
18 could nominate yourself?
19    A.    No, not at the time, I did not.
20    Q.    In the middle of the paragraph
21 there is a line that begins, "He was relatively
22 sure he could nominate himself, but not
23 positive;" do you see that?
24    A.    I do.

Page 294

1    Q.    Do you recall ever saying that
2 to Mr. Kieffer?
3    A.    No.  I could have, but I just
4 don't remember saying that to him.
5    Q.    At the end of that paragraph
6 there is a sentence that says, "Brother Battle
7 left the union office with the nomination
8 paperwork and sat in his vehicle, contemplating
9 what to do, and he decided not to return with
10 the paperwork;" do you see that?
11    A.    I do.
12    Q.    I didn't read the full sentence
13 of it.  It's your testimony that you did submit
14 your nomination form, correct?
15    A.    Yes.
16    Q.    And the next paragraph, which is
17 the fourth paragraph on the page, about the
18 fourth line down reads, "If Brother Battle
19 filled out the nomination form, he would have
20 been given admission to the meeting," I'll stop
21 there.  You filled out the nomination form?
22    A.    I did.
23    Q.    Were you given admission to the
24 meeting?

Page 295

1    A.    I didn't even know you needed to
2 be given admission to the meeting.
3    Q.    When you handed in the
4 nomination form, did anyone tell you to come
5 back at seven o'clock?
6    A.    No.
7    Q.    And if they were staggering the
8 people coming into the building, did anyone
9 tell you at what point you needed to come into
10 the building?
11    A.    No, uh-uh.
12        THE VIDEOGRAPHER:  Counsel, I
13    have about 10 minutes before I have to
14    change SD card.
15        MS. DeBRUICKER:  Why don't we
16    stop and do that, it will give me a
17    chance to condense and streamline in the
18    interest of everyone's time.
19        THE VIDEOGRAPHER:  The time now
20    is 6:47, this ends Media Unit No. 2.
21        (Whereupon there was a recess in
22    the proceeding from 6:47 p.m. to 7:09
23    p.m.)
24        THE VIDEOGRAPHER:  The time is

Page 296

1    now 7:09, this begins Unit No. 3, back on
2    the video record.
3 BY MS. DeBRUICKER:
4    Q.    Mr. Battle, Mr. Podraza has
5 mentioned a lawsuit that the union has filed
6 against you, do you recall that line of
7 questioning?
8    A.    Yes.
9    Q.    Has the union indicated they
10 have other legal actions to bring against you?
11    A.    Not to my knowledge, no.
12    Q.    Have you heard anything to that
13 effect from anyone?
14    A.    I have.
15    Q.    I don't want to know about your
16 communications with counsel, but who have you
17 heard that from, other than Mr. Haines?
18    A.    I'd rather not say.
19    Q.    Why would you rather not say?
20    A.    For fear of monetary, physical,
21 mental retribution.
22    Q.    To the person who shared that
23 information with you?
24    A.    Yes.

CHARLES BATTLE

Page 297

1    Q.    When Mr. Podraza asked you
2  whether you had lost work since filing your
3  complaint; do you recall that?
4    A.    Yes.
5    Q.    And as I recall, you said, no,
6  because you're a damn good electrician.
7    A.    Yes.
8    Q.    Any other reason why you think
9  you did not lose work?
10    A.    No, uh-uh.
11    Q.    Did Mr. McConnell lose work?
12    A.    Not to my knowledge, no.
13    Q.    Did you recently help Mr.
14  McConnell get a job?
15    A.    About a year ago or so, yeah,
16  uh-huh.
17    Q.    Has anyone from the union spoken
18  to you about this case, about this case, I
19  mean, about this action arising from your
20  complaint to the Department of Labor?
21    A.    No.
22    Q.    Mr. Podraza asked you about a
23  recent union meeting.  I'm not going to ask you
24  about that.  Have you had other communications

Page 298

1  with Mr. Dougherty in the last week?
2    A.    No.
3      MS. DeBRUICKER:  I have no
4  further questions at this time.
5  BY MR. PODRAZA:
6    Q.    All right.  Mr. Battle, if you
7  put before you Battle No. 17.
8      THE VIDEOGRAPHER:  Microphone.
9      MR. PODRAZA:  I'm sorry.
10      MR. HAINES:  The answer is no.
11  He doesn't have it here.
12      MR. PODRAZA:  I think you gave
13  it back.  I'm not -- just for your
14  edification.
15      MR. HAINES:  That one.
16      MR. PODRAZA:  Yes, that is the
17  one we're looking for.  There it is.
18  BY MR. PODRAZA:
19    Q.    All right.  Let's begin.  Before
20  you is what deposing counsel marked as Battle
21  No. 17; do you have that before you?
22    A.    Yes.
23    Q.    And that's a, looks like a
24  wrestling, two wrestlers and a referee in a

Page 299

1  ring; is that correct?
2    A.    Yes.
3    Q.    All right.  Who made this?
4    A.    How would I know that?
5    Q.    I'm asking, do you know?
6    A.    No.
7    Q.    Who authorized its making; do
8  you know?
9    A.    No.
10    Q.    And where was this posted; do
11  you know?
12    A.    Where was it posted?
13    Q.    Right.
14    A.    No.
15    Q.    Do you know if Mr. Dougherty has
16  ever seen this image as portrayed on Battle No.
17  17?
18    A.    I heard he did.  I heard he had
19  a pretty good chuckle out of it, as did I.
20    Q.    Do you know any of the
21  circumstances of the creation as to what's been
22  parked here as Battle No. 17?
23    A.    No, I do not.
24    Q.    Now, you made some reference in

Page 300

1  your examination about contractors punishing
2  union members, and you're concerned about that.
3  Do you remember that statement?
4    A.    I never said contractors punish.
5    Q.    No?  Union going through
6  contractors to punish members; is that more
7  accurate?
8    A.    Yes.
9    Q.    Which contractors?
10    A.    Well, I couldn't even tell you.
11    Q.    Give me one instance where that
12  happened?
13    A.    --
14    Q.    Where the union went to a
15  contractor in order to punish one of its
16  members?
17    A.    Never happened to me.
18    Q.    I'm asking you, just identify
19  one contractor that you know of.
20    A.    Let me think about this for a
21  minute here.  Yeah, I can't recall.
22    Q.    You mentioned that, going back
23  to Battle No. 17, that someone told you that
24  Mr. Dougherty had seen it and got a chuckle out

40 (Pages 297 - 300)

CHARLES BATTLE

Page 301

1 of it; is that your testimony?
2     A.     Yes.
3     Q.     Who is that?
4     A.     I don't remember.
5     Q.     About what time would you have
6 had that conversation or contact with that
7 person?
8     A.     Don't remember.
9     Q.     Counsel's voice dropped when she
10 was referring to a Mr. Kerr; do you remember
11 that questioning?
12     A.     Yes.
13     Q.     What was the statement that Mr.
14 Kerr made?
15     A.     Something about --
16         MS. DeBRUICKER:  Objection.
17         THE WITNESS:  -- about I turned
18     white, I guess, is that what you're
19     referring to?
20 BY MR. PODRAZA:
21     Q.     I didn't hear it, that's why I'm
22 asking.
23     A.     Yes, something to that effect.
24     Q.     Do you know Mr. Kerr?

Page 302

1     A.     Yes.
2     Q.     Do you consider yourself
3 friendly?
4     A.     Yes.
5     Q.     Do you understand why Mr. Kerr
6 would make such a statement?
7     A.     You're going to turn this into a
8 race thing now?
9     Q.     I don't know.  I'm asking you
10 why would he make such a statement?
11     A.     Why isn't there a black attorney
12 sitting here with you?
13     Q.     So, I take it, you don't know
14 why Mr. Kerr, have an understanding why Mr.
15 Kerr made such a statement --
16     A.     You tell me why there is not one
17 black attorney sitting here with you?
18     Q.     Did that bother you that besides
19 yourself, there was nobody of the African
20 American persuasion seeking the nomination on
21 June --
22         MR. HAINES:  Wait, wait --
23         MS. DeBRUICKER:  Objection.
24         MR. HAINES:  You don't want to

Page 303

1 say that.  The African American
2 persuasion?  How offensive.
3         MR. PODRAZA:  I don't even know
4     if any of it is offensive anymore.  I
5     don't know how to refer to it.
6         MR. HAINES:  It's not a
7     persuasion, counsel.
8 BY MR. PODRAZA:
9     Q.     Were you bothered by the fact
10 that minority --
11     A.     Counsel, I'm not going to
12 dignify that question, come on.
13     Q.     As to the nomination form, do
14 you have that before you?
15     A.     Yes, yes, sir.
16     Q.     On, before, before June 9 of
17 2020, I take it you didn't ask anybody or pose
18 any questions to anyone regarding the
19 nomination form, correct?
20         MS. DeBRUICKER:  Objection to
21     form.
22         THE WITNESS:  I wouldn't have
23     seen it.
24 BY MR. PODRAZA:

Page 304

1     Q.     That's what I'm saying.  So, you
2 didn't ask anybody about the form prior to June
3 9th --
4     A.     I don't know about, I can't
5 answer the question.
6         MS. DeBRUICKER:  Objection.
7 BY MR. PODRAZA:
8     Q.     And on June 9, 2020, I take it,
9 similarly, you didn't ask anybody for any
10 guidance regarding the form, correct?
11         MS. DeBRUICKER:  Objection
12     mischaracterize his question (sic).
13         THE WITNESS:  I just don't even
14     understand that question.
15 BY MR. PODRAZA:
16     Q.     Sure.  When you had the form or
17 any time, did you ask anybody for assistance on
18 how to either complete the form or any
19 questions you had regarding the form?
20     A.     No.  I think I can read, so,
21 which is pretty self-explanatory I would
22 imagine.
23     Q.     So, the answer would be no?
24     A.     Did I ask anyone to help me fill

41 (Pages 301 - 304)

CHARLES BATTLE

Page 305

1 out the form, no.
2    Q.    Did you ask anybody any
3 questions about the form whatsoever that night,
4 and how it is to be completed, or the process
5 about it?
6    A.    No.
7         MS. DeBRUICKER:  Objection to
8 form.
9 BY MR. PODRAZA:
10    Q.    And am I correct that before the
11 seven o'clock nomination proceeding occurred,
12 you had already exited the premises?
13    A.    No.
14         MS. DeBRUICKER:  Objection to
15 form.
16 BY MR. PODRAZA:
17    Q.    You were still on the premises
18 at the union hall?
19    A.    To the best of my recollection,
20 I believe I was.
21    Q.    Did you ask anybody why you were
22 there on the premises, the process on how the
23 seven o'clock nomination proceeding would be
24 conducted?

Page 306

1    A.    No.
2    Q.    Did you ask anybody, like, what
3 groups would go in first?
4    A.    No.
5    Q.    What groups would go in later?
6    A.    Uh-uh, no.
7    Q.    Your question and answer with
8 opposing counsel seemed to go a lot more
9 fluidly than with me.  Have you had any
10 interaction with opposing counsel between your
11 first day of deposition to, as you're sitting
12 here today?
13    A.    No.
14    Q.    Did you speak with anybody in
15 preparation, in preparing for today's
16 continuation of your testimony?
17    A.    No.
18    Q.    Looking at Battle No. 15, this
19 is the two photographs?
20    A.    I got 13 here.
21    Q.    Okay.  Did you take either of
22 these photographs?
23    A.    No, sir.
24    Q.    Who did?

Page 307

1    A.    I don't know.
2         MR. PODRAZA:  That's all the
3 questions I have at this time.  Thank
4 you.
5         MS. DeBRUICKER:  I have nothing
6 further.
7         MR. HAINES:  Let's get out of
8 here.
9         THE VIDEOGRAPHER:  The time is
10 now 7:21, this ends Media Unit No. 3 in
11 the video deposition of Charles Battle.
12         - - -
13    (Witness excused.)
14         - - -
15 (Deposition concluded at 7:21 p.m.)
16
17
18
19
20
21
22
23
24

Page 308

1         C E R T I F I C A T E
2
3 COMMONWEALTH OF PENNSYLVANIA:
4 COUNTY OF PHILADELPHIA:
5
     I do hereby certify that I am a Notary
6 Public in good standing, that the aforesaid
  testimony was taken before me, pursuant to
7 notice, at the time and place indicated; that
  said deponent was previously sworn to tell the
8 truth, the whole truth, and nothing but the
  truth; that the testimony of said deponent was
9 correctly recorded in machine shorthand by me
  and thereafter transcribed under my supervision
10 with computer-aided transcription; that the
  deposition is a true record of the testimony
11 given by the witness; and that I am neither of
  counsel nor kin to any party in said action,
12 nor interested in the outcome thereof.
13     WITNESS my hand and official seal this
  6th day of September, 2021.
14
15
16
17     _____
  Paulette Cox, Court Reporter
  Notary Public
18
19
20
21
22
23
24

42 (Pages 305 - 308)

Page 309

1   INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the appropriate
6   space on the errata sheet for any corrections
7   that are made.
8       After doing so, please sign the errata
9   sheet and date it.
10      You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed
18  to be accurate and may be used in court.
19
20
21
22
23
24

Page 311

1       ACKNOWLEDGMENT OF DEPONENT
2       I, _____, do hereby
3   certify that I have read the foregoing pages __
4   to ___ and that the same is a correct
5   transcription of the answers given by me to the
6   questions therein propounded, except for the
7   corrections or changes in form or substance, if
8   any, noted in the attached Errata Sheet.
9
10  _____  _____
11  DATE       SIGNATURE
12
13
14      Subscribed and sworn to before
15  me this _____ day of _____,
16  2021.
17
18      My commission expires:
19      _____
20
21      _____
22      Notary Public
23
24

Page 310

1       - - - - -
2       E R R A T A
3       - - - - -
4   PAGE  LINE   CHANGE
5   ___ ___ _____
6   Reason for Change: _____
7   ___ ___ _____
8   Reason for Change: _____
9   ___ ___ _____
10  Reason for Change: _____
11  ___ ___ _____
12  Reason for Change: _____
13  ___ ___ _____
14  Reason for Change: _____
15  ___ ___ _____
16  Reason for Change: _____
17  ___ ___ _____
18  Reason for Change: _____
19  ___ ___ _____
20  Reason for Change: _____
21  ___ ___ _____
22  Reason for Change: _____
23  ___ ___ _____
24  Reason for Change: _____

43 (Pages 309 - 311)

# Ex. K

Page 1

        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1
2                         - - -
3   MARTIN J. WALSH,          :
    Secretary of Labor,       :
4   United States             :
    Department of Labor,      :
5                             :
             Plaintiff,    : CIVIL ACTION NO.:
6                          : 2:21-cv-00096
             vs.           :
7                          :
    LOCAL 98,              :
8   INTERNATIONAL          :
    BROTHERHOOD OF         :
9   ELECTRICAL WORKERS,    :
                           :
10          Defendant.    :
11                        - - -
12            TUESDAY, AUGUST 10, 2021
13                        - - -
14
15        Videotaped Deposition of TIMOTHY
16   MCCONNELL, taken at Lamb McErlane, PC, One South
17   Broad Street, Suite 1500, Philadelphia,
18   Pennsylvania, commencing at 3:41 p.m., before
19   Lauren Sweeney, a Court Reporter and Notary Public.
20
                          - - -
21
22
           VERITEXT LEGAL SOLUTIONS
23             MID-ATLANTIC REGION
         1801 Market Street - Suite 1800
24       Philadelphia, Pennsylvania 19103

Page 2

A P P E A R A N C E S :
1    U.S. DEPARTMENT OF JUSTICE
     UNITED STATES ATTORNEY'S OFFICE
2    BY:  LAUREN DEBRUICKER, ESQUIRE
     Eastern District of Pennsylvania
3    615 Chestnut Street
     Suite 1250
4    Philadelphia, Pennsylvania 19106-4476
     215-861-8492
5    lauren.debruicker@usdoj.gov
     Representing the Plaintiff
6
7    LAMB MCERLANE, PC
     BY:  JOSEPH R. PODRAZA, JR., ESQUIRE
8       WILLIAM TRASK, ESQUIRE
     One South Broad Street
9    Suite 1500
     Philadelphia, Pennsylvania 19107
10   215-609-3148
     jpodraza@lambmcerlane.com
11   Representing the Defendant
12
13
14        - - -
15
ALSO PRESENT:
16
     JOHN "JACK" O'NEILL, ATTORNEY AND CHIEF
17   OF STAFF IBEW 98
18
     JOHN DOUGHERTY
19
20        - - -
21
22
23
24

Page 4

DEPOSITION SUPPORT INDEX

1 DIRECTIONS TO WITNESS NOT TO ANSWER

2 Page   Line

3 (None)

4

5

6

7 REQUEST FOR PRODUCTION OF DOCUMENTS

8 Page   Line   Description

9 38    3     Notice of election

10 163   19    Date/time at DOL

11 180   4     Phone records

12 STIPULATIONS

13 Page   Line

14 (None)

15

16 QUESTIONS MARKED

17 Page   Line

18 (None)

19

20

21

22

23

24

Page 3

I N D E X

1         - - -

2 TESTIMONY OF:  TIMOTHY MCCONNELL,      PAGE

3 By MR. PODRAZA. . . . . . . . . . . .  7, 212, 220

4 By MS. DEBRUICKER. . . . . . . . . .   191, 220

5         - - -

6      EXHIBITS

7         - - -

8 NUMBER      DESCRIPTION          PAGE

9 McConnell-1  Text messages        55

10 McConnell-2  Website postings     70

11 McConnell-3  Statement            84

12 McConnell-4  Investigation document   100

13 McConnell-5  DOL statement        130

14 McConnell-6  Work history         181

15

16

17

18

19

20

21

22

23

24

Page 5

1         THE VIDEOGRAPHER:  Good

2 afternoon.  We are going on the record

3 at 3:41 p.m. on August 10th, 2021.

4 Please note that the microphones are

5 sensitive and may pick up whispering,

6 private conversations, and cellular

7 interference.  Please turn off all

8 cell phones or place them away from

9 the microphones as they can interfere

10 with the deposition audio.

11        This is media unit one of the

12 video recorded deposition of Timothy

13 McConnell taken in the matter of

14 Martin J. Walsh versus Local 98, et

15 al., filed in the U.S. District Court

16 for the Eastern District of

17 Pennsylvania, Civil Action Number

18 221-cv-00096.

19        This deposition is being held

20 at the offices of Lamb McErlane,

21 located at One South Broad Street,

22 Philadelphia, Pennsylvania.

23        My name is Matt MacMurchy from

24 the firm Veritext, and I am the

TIMOTHY MCCONNELL

Page 6

1 videographer.  The court reporter is
2 Lauren Sweeney from the firm Veritext.
3 I'm not authorized to administer an
4 oath, I am not related to any party in
5 this action, nor am I financially
6 interested in the outcome.
7 Counsel will now please state
8 their appearances and affiliations for
9 the record.
10 MS. DEBRUICKER:  Lauren
11 DeBruicker, Assistant United States
12 Attorney for the Secretary of Labor.
13 MR. PODRAZA:  And Joe Podraza
14 on behalf of the Defendant, Local 98,
15 IBEW.
16 THE VIDEOGRAPHER:  Is that all
17 counsel of record?
18 MR. PODRAZA:  Correct.
19 THE VIDEOGRAPHER:  Okay.  The
20 time is now 3:42.  Will the court
21 reporter please swear in the witness.
22 - - -
23 TIMOTHY MCCONNELL, after having
24 been first duly sworn, was examined

Page 7

1 and testified as follows:
2 - - -
3 BY MR. PODRAZA:
4 Q.    All right.  Good afternoon,
5 Mr. McConnell.  I appreciate your taking the
6 time after work to come in for this
7 deposition.  As you heard, my name is Joe
8 Podraza, and I'm representing Local 98 in
9 litigation with the Department of Labor.
10 A.    Uh-hum.
11 Q.    We've asked you to come today
12 for a deposition.
13 Have you ever been deposed
14 before?
15 A.    No.
16 Q.    Well, why don't we go over some
17 of the general rules and format that will
18 hopefully make it more comfortable for you.
19 This is a question-and-answer
20 format, and what means is that I'll ask you a
21 question to which you'll have to supply an
22 answer, as well as my opposing counsel may at
23 the right time ask you a question and you'll
24 have to answer it.

Page 8

1 Very importantly, we have a
2 court reporter as well as a videographer, but
3 only one person can speak at a time.  So when
4 I'm asking my question I'll just ask that you
5 would wait until I've completed the question
6 before you begin your answer, and I'll do my
7 best to restrain myself from interfering or
8 interrupting your response so we move onto the
9 next question.
10 I'm happy to rephrase any
11 question if you are having trouble
12 understanding it, and if you just tell me,
13 I'll do everything I can to make it more
14 understandable.  This is not a marathon today,
15 so if you need to take a bathroom break,
16 stretch, or whatever, you just let us know,
17 and we'll be happy to accommodate whatever
18 needs you have.
19 Are you represented today?
20 A.    No.
21 Q.    All right.  Is there any reason
22 why you would be unable to answer my questions
23 truthfully or follow the instructions I just
24 gave you?

Page 9

1 A.    No.
2 Q.    Prior to today have you spoken
3 with anybody about your deposition?
4 A.    Yes.
5 Q.    And who did you speak with?
6 A.    Lauren.
7 Q.    That's my opposing counsel?
8 A.    Uh-hum.
9 Q.    And when was that?
10 A.    Thursday or Friday.  Friday.
11 Q.    And how was that done?  In
12 person, by telephone?
13 A.    In person.
14 Q.    In person.  And where was that
15 meeting?
16 A.    At her office.
17 Q.    Is that down at 8th & Market?
18 A.    Yeah.
19 Q.    Okay.  And when did the meeting
20 begin and approximately when did it end?
21 A.    After work, 3:30 to 4:30.
22 Q.    And what was discussed?
23 A.    Just how this was going to go,
24 the deposition.

3 (Pages 6 - 9)

TIMOTHY MCCONNELL

Page 10

1    Q.    There was no review of your
2  statements or --
3    A.    Review of the statement and
4  pretty much just a time line.
5    Q.    All right.  Tell me, what did
6  you discuss about the time line?
7    A.    I guess, how it began and how,
8  you know, we got to this point.
9    Q.    And what was the nature of the
10  discussion?  What was said?
11    A.    In reference to what part?
12    Q.    Any part of it.  Tell me what
13  you remember from the conversation.
14    A.    I guess read over the report,
15  and then we went step by step on how it went.
16    Q.    Meaning the report, you went
17  line by line through the -- well, you call it
18  the report -- it's your statement is what
19  you're saying?
20    A.    Yes, my statement.  So I went
21  through -- I read my statement and then just
22  explained to Lauren how it went.
23    Q.    Was there any other document
24  that there was reference made to?

Page 11

1    A.    Oh, the international report,
2  the internationalist report.
3    Q.    Yeah.  It's Mr. Kieffer.  Is
4  that the IVP report you're referring to?
5    A.    I don't even know who wrote it.
6    Q.    That's okay.  I think in this
7  deposition we'll probably review that
8  ourselves, and maybe you can then say whether
9  this is the document you're referring to.
10        Was there any other document?
11    A.    Not that I - I mean, not that I
12  remember.
13    Q.    Did you review like Charlie
14  Battle's statement?
15    A.    I didn't.
16    Q.    Was there any discussions about
17  Charlie Battle's statement?
18    A.    No.
19    Q.    Did you review Jim Ryan's
20  statement?
21    A.    I did.
22    Q.    All right.  Which statement did
23  you review, the typewritten one or the
24  handwritten one?

Page 12

1    A.    I think the handwritten one.
2    Q.    All right.  And what was the
3  conversation related to that?
4    A.    Nothing.  I really just read
5  it; that's it.  We didn't really talk much
6  about it.
7    Q.    There was no explanation as to
8  why you were being shown it?
9    A.    I think I asked to see it.
10    Q.    And were you told at all that
11  that statement's been referred to in a
12  document that's been filed in the action
13  between the union and the Department of Labor?
14    A.    Say that again.
15    Q.    Sure.  The statement by
16  Mr. Ryan, did anybody indicate to you that
17  that's been referred to in a document that's
18  been filed in this litigation?
19    A.    I'm not sure.  I don't
20  remember.  I don't recall.
21    Q.    And that was how many days ago?
22  Four days ago?
23    A.    That was Friday.
24    Q.    Okay.  Anything else you can

Page 13

1  recall about discussions surrounding the
2  statement?
3    A.    No, not really.
4    Q.    Was there any other document
5  that was discussed with you and opposing
6  counsel?
7    A.    Not really, no.
8    Q.    Okay.
9    A.    Not that I remember.
10    Q.    Where did you grow up?
11    A.    Northeast Philly.
12    Q.    And where did you go to high
13  school?
14    A.    Cardinal Dougherty.
15    Q.    And did you have any subsequent
16  education past high school?
17    A.    No.
18    Q.    Now, I understand your
19  association with the union began in 2004?
20    A.    Yes.
21    Q.    All right.  Now, was that
22  during the apprentice program or was that
23  after you had graduated the apprentice
24  program?

4 (Pages 10 - 13)

TIMOTHY MCCONNELL

Page 14

1    A.    That's when I started.
2    Q.    All right.  And normally the
3 apprentice program is four years; is that
4 correct?
5    A.    Yes.
6    Q.    All right.  And it took you
7 nine and a half years to complete the program?
8    A.    Yes.  I mean, I don't know
9 offhand.
10    Q.    But more than four years?
11    A.    More than four years.
12    Q.    Significantly more than four
13 years, right?
14    A.    Probably a couple years longer.
15    Q.    All right.  Now, I'd like to
16 ask you some questions between the period
17 of 2004 and 2020, before the nomination
18 proceeding that we're going to talk about in
19 detail here today.  Is that all right?  So
20 that's a 16-year period that you've been a
21 member of the union.
22        Am I correct that you did not
23 attend union meetings during that period of
24 time, that 16 years?

Page 15

1    A.    No.  I've been to meetings
2 before.
3    Q.    All right.  How many meetings
4 would you say in that period of 16 years did
5 you attend?
6    A.    I couldn't tell you a number.
7 I mean, I used to go a lot in the beginning.
8 The last probably eight years not so much.
9    Q.    And when you say not so much,
10 would you go to one meeting a year perhaps?
11    A.    One or two.
12    Q.    And that's for the last eight
13 years?
14    A.    Probably, outside of the last
15 three.
16    Q.    And how often are the meetings
17 held before the Corona Virus occurred?
18    A.    Once a month.
19    Q.    So in the last eight years you
20 would attend maybe one or two meetings which
21 were held each month during that period of
22 time, over those years, right?
23    A.    Yes.
24    Q.    Would you say that that's

Page 16

1 sporadic?
2    A.    Yes.
3    Q.    Now, during that 16-year period
4 am I correct that you didn't hold a union
5 position?
6    A.    No.
7    Q.    I'm wrong or I'm correct?
8    A.    No, no, no.  You're correct.
9    Q.    All right.  And am I also
10 correct that during that 16-year period you
11 didn't run for office for the union or with
12 the union?
13    A.    No.
14    Q.    Am I also correct during the
15 16-year period you didn't volunteer to be a
16 union steward?
17    A.    Yeah.
18    Q.    You never did?
19    A.    Never did.
20    Q.    And am I also correct that
21 during that 16-year period you did not attend
22 executive board meetings?
23    A.    I didn't.
24    Q.    And am I also correct during

Page 17

1 that 16-year period you didn't march in any of
2 the St. Patrick Day parades with the union
3 members?
4    A.    St. Patrick's Day Parade I did
5 twice.
6    Q.    All right.  Twice in 16 years.
7 Which years?
8    A.    That was early on, same thing.
9    Q.    Early on, meaning 2004 or 2005,
10 somewhere in there.
11    A.    Probably '06, '07, '08,
12 somewhere around there.
13    Q.    Okay.  So 2006 to 2008,
14 somewhere in there.
15    A.    Early.
16    Q.    But for the last say eight
17 years you haven't attended the St. Patrick's
18 Day Parade and marched with the members?
19    A.    No.
20    Q.    You did not.
21    A.    No, I did not.
22    Q.    Am I also correct that during
23 the 16-year period you did not attend the
24 union's picnics?

5 (Pages 14 - 17)

TIMOTHY MCCONNELL

Page 18

1    A.    I used to go every year.
2    Q.    When did you go and when did
3 you stop?
4    A.    I probably stopped about -- I
5 don't know the exact date, but five, six years
6 ago.
7    Q.    Now, would it be fair to say
8 that you prefer to spend your free time on
9 nonunion-related activities?
10    A.    What do you mean?
11    Q.    Meaning outside of work.  After
12 you've completed your 40-plus-hour week of
13 working, the free time then that you have
14 outside of work, you would prefer to spend it
15 on activities other than going to union events
16 or activities and things of that nature; is
17 that correct?
18    A.    I've been to a lot of Labor Day
19 walks.  I go to the Down Under every year. I
20 actually go to a lot of different events for
21 the union.  But besides that, yeah, I've got
22 four kids and soccer, so I don't really have
23 as much time.
24    Q.    Right.  So you have a lot of

Page 19

1 free time outside of your responsibilities as
2 a father for your children; is that right?
3    A.    Yes.
4    Q.    And you said you had four kids?
5    A.    Yes.
6    Q.    Add when did you get married?
7    A.    2008.
8    Q.    Would it be fair to say then
9 from 2008 going forward that your free time
10 was devoted more towards family activities
11 than union activities?
12    A.    Probably 2009, 2010.
13    Q.    Going forward, right?
14    A.    Yeah.
15    Q.    Okay.  And I just violated my
16 own rule.  I spoke over you.
17    A.    No, no.  That's --
18    Q.    Just so we have a clear record.
19         So from 2009, to as we sit here
20 today, as a father you spend more time doing
21 family activities in your free time than union
22 activities, correct?
23    A.    More time, yes, I spend more
24 time.

Page 20

1    Q.    Considerably more time?
2    A.    Yes.
3    Q.    And would it also be fair to
4 say that from 2009, going forward, during your
5 free time you also work at your family store?
6    A.    What year was that?
7    Q.    2009 going forward.
8    A.    That was -- I started that in
9 2002.
10    Q.    So from 2002, to as we sit here
11 today, you also spent some of your free time
12 working at the family store?
13    A.    Yes.
14    Q.    And how often would you work at
15 the family store?
16    A.    Free time.
17    Q.    A lot?
18    A.    I mean, you know -- I mean, not
19 a lot but often.
20    Q.    Frequently, right?
21    A.    Not every day but a couple
22 times a week.
23    Q.    More frequently than you would
24 go to union activities in your free time you

Page 21

1 would work at the family store?
2    A.    Probably.
3    Q.    And you got paid to work at the
4 family store, correct?
5    A.    Yeah.  I mean, I personally own
6 it.
7    Q.    Right.  But you got paid for
8 your time that you would spend working at the
9 family store, correct?
10    A.    Yeah.
11    Q.    And that would be in addition
12 to whatever money you made working as an
13 electrician during the week, correct?
14    A.    Yes.
15    Q.    And what is the nature of the
16 family store?
17    A.    It's a coin shop.
18    Q.    And even today, meaning today,
19 this year, you continue to use your --
20 predominantly most of your free time for
21 family activities or working at the family
22 store relative to union activities; is that
23 correct?
24    A.    It just took up more of my time

6 (Pages 18 - 21)

TIMOTHY MCCONNELL

1 in the last year than that did, so now, yes.
2      Q.    All right.  Well, if we took
3 the time that you spent on union activities
4 and your free time and we put that all on one
5 side of the scale and then we took the time
6 that you devoted of your free time for working
7 in the family store and doing family
8 activities, which one would tilt more?
9      A.    Family activities would
10 probably tilt more.
11      Q.    Considerably?
12      A.    Probably, yes.
13      Q.    And would that be the case for
14 say the last eight years since you became a
15 father or got married I should say?
16      A.    Yes.
17      Q.    Now, I'd like to ask you a
18 couple questions about an indictment that was
19 filed in 2019.
20           Did you know that an indictment
21 was filed against certain union
22 representatives in 2019?
23      A.    Yeah, I'm sure I did.
24      Q.    Well, you knew an indictment

1 was filed by the United States government
2 against certain representatives of the union,
3 correct?
4      A.    Yes.
5      Q.    All right.  Did you read the
6 indictment?
7      A.    Whatever was in the paper or,
8 you know, in the paper.
9      Q.    So did you at least go to a
10 site that had a copy of the indictment and
11 read through it?
12      A.    I might have browsed through
13 it, yeah.
14      Q.    Did you speak with other
15 individuals about the indictment?
16      A.    I'm sure I have.
17      Q.    All right.  How about Charlie
18 Battle?
19           Did you speak to Charlie about
20 the indictment?
21      A.    I've talked to Charlie about,
22 yeah, some of the stuff in there.
23      Q.    Okay.  And just tell me, what
24 do you recall of the conversations with

1 Charlie?
2      A.    Hum.  I don't even -- I
3 couldn't even tell you.
4      Q.    Did Charlie seem convinced that
5 the allegations in that indictment were true?
6      A.    Yeah.
7      Q.    All right.  And did he convey
8 that to you?
9      A.    Yeah.  I mean --
10      Q.    Did you believe, just reading
11 the indictment, that those charges were true?
12      A.    I wouldn't know either way.  I
13 would say that I, you know, would lean more
14 towards probably.
15      Q.    Did you attend meetings at
16 Charlie Battle's house with other members?
17      A.    Once.
18      Q.    And when was that?
19      A.    Not even sure.
20      Q.    Do you recall it being in the
21 year of 2020?
22      A.    No.  I think it would be this
23 year.
24      Q.    And what was the nature of the

1 meeting at his house?  What were the
2 discussions?
3      A.    I guess more or less like this
4 kind of stuff like with the election.
5      Q.    You met to discuss the
6 nomination proceeding on June 9, 2020?
7      A.    We didn't - I didn't even --
8 probably a year -- a lot of time afterwards.
9 I couldn't tell you exactly when the meeting
10 was, but it was nowhere near that time.
11      Q.    But it was to discuss the
12 June 9th, 2020 nomination proceeding?
13      A.    Yeah, like I guess moving
14 forward with the election.
15      Q.    And who was in attendance?
16      A.    It was Charlie, Bill Borthwick,
17 me, and Mike Coppinger.
18           MR. PODRAZA:  That's
19 C-O-P-P-I-N-G-E-R.
20 BY MR. PODRAZA:
21      Q.    And besides Mr. Coppinger,
22 Mr. Borthwick, yourself, and Mr. Battle gave
23 statements to the Department of Labor in 2020
24 regarding the elections, correct?

7 (Pages 22 - 25)

TIMOTHY MCCONNELL

Page 26

1    A.    Yes.
2    Q.    Do you personally have any
3  knowledge of the criminal conduct discussed in
4  the indictment?
5    A.    I don't.
6    Q.    And do you have any direct
7  knowledge of criminal conduct by any union
8  representative who was named in the
9  indictment?
10   A.    No.
11   Q.    Okay.  Have you spoken with any
12 government officials about criminal conduct in
13 the indictment?
14   A.    Ask that -- what's that
15 question again?
16   Q.    Sure.  Have you spoken with any
17 government officials about criminal conduct
18 that's discussed in the indictment?
19   A.    Say it again, I'm sorry.
20   Q.    Sure.  Have you spoken with any
21 government officials about the criminal
22 conduct discussed in the indictment?
23   A.    Once.
24   Q.    Who?

Page 27

1    A.    Well, I don't know -- I don't
2  -- I don't know what the question is asking.
3    Q.    Well, you know there's an
4  indictment, right?
5    A.    Uh-hum.
6    Q.    Did anybody from the government
7  come to talk with you about criminal conduct
8  or criminal-related conduct in the union?
9    A.    I got a phone call.
10   Q.    From whom?
11   A.    From the FBI.
12   Q.    When was this?
13   A.    When I was getting laid off at
14 the W.
15   Q.    So this would have been in the
16 October 2020 period?
17   A.    I don't remember exactly when
18 it was.
19   Q.    Well, you gave your statement
20 in early October 2020, and the layoff at the
21 Hotel W occurred then in October of 2020.
22        Does that help refresh your
23 recollection?
24   A.    So it had to be somewhere

Page 28

1  around there, yeah.  I mean, it was the last
2  day.
3    Q.    Did they call you because you
4  had given your statement to the Department of
5  Labor?
6    A.    I don't know.
7    Q.    Had you had any other contact
8  from the FBI prior to that?
9    A.    No.
10   Q.    So did the call from the FBI --
11 well, strike that.
12        But the call from the FBI came
13 after you gave your statement to the
14 Department of Labor, correct?
15   A.    I don't remember.  I would have
16 to look.
17   Q.    Well, it had to be, because you
18 weren't laid off until after you gave your
19 statement to the Department of Labor, correct?
20   A.    It had to be, yes.
21   Q.    So we know then you gave a
22 statement to the Department of Labor, and then
23 you're laid off.
24   A.    Uh-hum.

Page 29

1    Q.    Did you inform anybody at the
2  Department of Labor or anybody with the
3  government about your layoff?
4    A.    I don't remember.
5    Q.    Well, you know you had to
6  contact somebody in order for the FBI to know
7  that you were laid off, correct?
8        MS. DEBRUICKER:  Objection.
9        THE WITNESS:  I don't remember.
10 BY MR. PODRAZA:
11   Q.    Well, does it help refresh your
12 recollection that when you were informed of
13 your layoff that you contacted the Department
14 of Labor representatives who took your
15 statement?
16        MS. DEBRUICKER:  Objection to
17 form.
18        THE WITNESS:  Yeah, I really
19   don't remember.
20 BY MR. PODRAZA:
21   Q.    Well, how do you believe that
22 the FBI became aware that you were laid off
23 that they would contact you and call you to
24 discuss it?

8 (Pages 26 - 29)

TIMOTHY MCCONNELL

Page 30

1    A.    I don't know.
2    Q.    Well, did the FBI call you on
3  your home phone or on your cell phone?
4    A.    On my cell phone.
5    Q.    And you gave your cell phone
6  number to the Department of Labor
7  representatives when you were speaking with
8  them and they were taking a statement from
9  you, correct?
10    A.    I don't recall, but, I mean,
11  it's probably some of the information I gave.
12  I don't remember.
13    Q.    Do you recall how else the FBI
14  would have known your cell phone number and
15  also known that you'd been laid off other than
16  through the Department of Labor and its
17  representatives?
18    A.    Not that I know of.
19    Q.    Were you surprised that the FBI
20  just called you out of the blue on your cell
21  phone?
22    A.    Yes.
23    Q.    What did you say to them?
24    A.    Again, it's a while ago.

Page 31

1    Q.    So you can remember the facts
2  surrounding the election on June 9, 2020 and
3  before that, but you can't remember what the
4  discussion was with the FBI in October of
5  2020?
6        MS. DEBRUICKER:  Objection.
7  BY MR. PODRAZA:
8    Q.    Is that true?
9    A.    Yeah, I don't remember.
10    Q.    Now, you'd agree with me you
11  don't get a call from the FBI every day; is
12  that correct?
13    A.    That's correct.
14    Q.    That's something to remember
15  when it happens, right?
16    A.    Yeah.  Well, I mean, I just
17  don't remember what the conversation was.
18    Q.    Okay.  Do you remember even
19  generally what the conversation was with the
20  FBI?
21    A.    Just that -- I mean, from what
22  I recall, it was just about is there any
23  reason I thought I was getting laid off.
24    Q.    And what did you say?

Page 32

1    A.    I don't remember.  I mean,
2  mostly I don't know.
3    Q.    You didn't give them an
4  explanation or your best guess as to why you
5  believed you were laid off?
6    A.    I mean, the job was coming
7  towards an end, and I don't know what the
8  reason was.
9    Q.    You never suggested to the FBI
10  that you were being retaliated against because
11  you had spoken with the Department of Labor,
12  right?
13    A.    I might have said that before.
14  I don't know.  I don't remember.
15    Q.    I mean, at that point do you
16  have any reason to believe that Local 98 even
17  knew that you were interviewed by the
18  Department of Labor?
19    A.    Again, I don't know that data.
20    Q.    Now, did the call with the FBI
21  -- well, strike that.
22        Am I correct that the call with
23  the FBI agent occurred after the search and
24  seizure occurred in October of 2020?

Page 33

1        MS. DEBRUICKER:  Objection to
2    form.
3        THE WITNESS:  I don't know.
4  BY MR. PODRAZA:
5    Q.    Well, if I told you that you
6  give a statement in early October of 2020, and
7  the next day search warrants were executed on
8  the headquarters of Local 98, do you remember
9  that?
10        MS. DEBRUICKER:  Objection to
11    form.
12        THE WITNESS:  I don't remember.
13  BY MR. PODRAZA:
14    Q.    Well, you remember the search
15  warrants --
16    A.    I do remember.
17    Q.    -- being executed, right?
18    A.    I do.
19    Q.    And you do remember that the
20  search warrants were executed after your
21  interview and your statement taken by the
22  Department of Labor, correct?
23    A.    Yes, it was afterwards.
24    Q.    And it's one day afterwards, so

9 (Pages 30 - 33)

TIMOTHY MCCONNELL

Page 34

1 it's something that you would remember in your
2 mind, right?
3         MS. DEBRUICKER:  Objection to
4     form.
5         THE WITNESS:  Yeah, I mean, if
6     that's the dates, that's the dates.
7 BY MR. PODRAZA:
8     Q.    All right.  And after your
9 interview you understood that search warrants
10 were going to be issued on the union at some
11 point, didn't you?
12    A.    I didn't.
13    Q.    Nobody at DOL, a
14 representative, said anything to you about
15 what the use of your statement might be?
16    A.    They didn't.
17    Q.    Well, we'll get into that in a
18 little bit more detail later.  I'd like to now
19 take you to 2020.  So we've covered the 16
20 years.  Now we're going to go into 2020.
21         Sometime in 2020 you received
22 notice about the upcoming union elections,
23 right?
24    A.    Yes.

Page 35

1     Q.    And do you remember how you
2 received it?  Was it sent by mail?  Was it
3 sent by e-mail?  How was it done?
4     A.    Wait a second.  Go back to that
5 question before that.
6     Q.    Sure.  You got a notification
7 that there's going to be an upcoming election
8 with the union in 2020, right?
9     A.    I personally don't remember
10 getting that.
11    Q.    So you don't even remember if
12 you did get something how you would have
13 gotten it?
14    A.    E-mail or mail.  I don't know.
15 I mean, I just knew that they were coming.
16    Q.    Well, in the past when the
17 union would have elections, do you recall how
18 you received notification or notice about it?
19    A.    No, probably because I never
20 really paid any attention to it.
21    Q.    Why not?
22    A.    Really, I mean, I don't
23 remember ever an election.
24    Q.    And you don't ever recall

Page 36

1 desiring to run for a position up to 2020; is
2 that correct?
3     A.    I mean, I would say I don't
4 know -- I don't remember when it was, but it
5 was right around the time that they were
6 looking to get the -- somehow they were taking
7 the benefits away from wives that were working
8 or they had to go on their own medical.
9     Q.    Okay.  And that's the 2020
10 period.  Do you recall in your conversation
11 that we'll get into with Mr. Dougherty that
12 you mentioned that your wife was not on the
13 healthcare benefits or something to that
14 effect and that it was part of that
15 discussion?  Do you remember that?
16         MS. DEBRUICKER:  Objection to
17     form.
18         THE WITNESS:  Reask that
19     question.
20 BY MR. PODRAZA:
21    Q.    Sure.  That in the conversation
22 we're going to get into before the June 9th,
23 2020 election, you spoke with Mr. Dougherty,
24 and one of the things you spoke about and

Page 37

1 raised was the fact that -- your wife not
2 being allowed to have the full coverage under
3 that, the healthcare or something along those
4 lines.
5     A.    Yes.
6     Q.    Do you remember that?
7     A.    Yes.
8         MS. DEBRUICKER:  Objection to
9     form.
10 BY MR. PODRAZA:
11    Q.    And was that the time that
12 you're talking about the healthcare concerns
13 that you just mentioned in 2020?  Do you
14 recall?
15    A.    I don't -- I think it was
16 months prior.
17    Q.    Okay.  But in 2020, because
18 we're talking, the election would be in June
19 of 2020, so that's six months in?
20    A.    I would have to look.  I mean,
21 that probably -- I still have the letter that
22 was sent out.
23    Q.    All right.  You're talking now
24 the notice of the upcoming election?

10 (Pages 34 - 37)

TIMOTHY MCCONNELL

1    A.    No.  The notice of the wives
2 being taken off the benefits.
3    Q.    All right.  And we can look for
4 that too, and if you can, if you can find that
5 and supply that to both opposing counsel and
6 myself we'd appreciate that.  Okay?
7    A.    Yeah.
8    Q.    Can you tell me what positions
9 were up for election in 2020?
10    A.    I was going to -- I personally
11 was going to run for the executive board.
12    Q.    All right.  But I asked you
13 what positions.
14         Was that the only position that
15 was up for election in 2020?
16    A.    No.  I think they all were.
17    Q.    What's all?
18    A.    From business manager all the
19 way down to the examining board.
20    Q.    Tell me what they are.
21    A.    Business manager, president,
22 vice president, executive board, examining
23 board.
24    Q.    And how many members are on the

1 union's executive board?
2    A.    Five.
3    Q.    It's actually seven since it's
4 including the president and the vice
5 president, correct?
6    A.    Yes.
7         MS. DEBRUICKER:  Objection to
8    form.
9 BY MR. PODRAZA:
10    Q.    And what's the term for the
11 executive board members?
12    A.    I don't know what you're
13 asking.  I don't know.
14    Q.    How long did the executive
15 board members serve before there's another
16 election?
17    A.    Three years.
18    Q.    Now -- so after 16 years of not
19 running, you say you were thinking in 2020
20 about running for a union office; is that
21 correct?
22    A.    Yes.
23    Q.    All right.  And that office was
24 on the executive board of a very high position

1 in the union, correct?
2         MS. DEBRUICKER:  Objection to
3    form.
4         THE WITNESS:  It's a position.
5    I don't know.
6 BY MR. PODRAZA:
7    Q.    Well, it's the executive board.
8 It's like the board of directors of a company,
9 wouldn't you agree?
10    A.    It's I guess comparable.
11    Q.    So it's a pretty high position,
12 wouldn't you say?
13    A.    Yeah.
14    Q.    Okay.  Now, you're thinking
15 about running.  You knew you would be likely
16 running against some incumbents and others
17 grouped with the incumbents, correct?
18    A.    Yes.
19    Q.    All right.  And who did run in
20 June of 2020 for the executive board?
21    A.    The same people that were there
22 before.
23    Q.    And who were they?
24    A.    It was Cresswell, Micky Gummel

1 -- Micky Gummel.
2    Q.    Gumble?
3    A.    Gummel.
4    Q.    Gummel.
5    A.    I think it was Jimmy Foy.  I'm
6 trying to think of -- I can't remember
7 offhand.
8    Q.    Okay.  Now, did you think your
9 prospects were good to defeat one of the five
10 opponents who ran for the board?
11    A.    I don't know.  I mean, who
12 knows.
13    Q.    Well, unlike you over the
14 years, your opponents, from Gormley, to
15 Cresswell, to Snyder, to Foy, and Gummel, had
16 held various positions with the union, right?
17    A.    Yes.
18    Q.    And, again, unlike you over the
19 years, all your opponents presumably had
20 gained some sort of experience from their
21 service with the union or even prior service
22 on the board, correct?
23         MS. DEBRUICKER:  Objection to
24    form.

11 (Pages 38 - 41)

TIMOTHY MCCONNELL

Page 42

1 BY MR. PODRAZA:
2      Q.    Do you understand my question?
3      A.    No.  Say it again.
4      Q.    Well, since these people, your
5 opponents, had served in positions with the
6 union, they gained experience about the union
7 from those positions, and some of them, in
8 fact, all but one, had served on the executive
9 board and got that experience, correct?
10         MS. DEBRUICKER:  Objection to
11      form.
12         THE WITNESS:  I mean, you
13      usually do if you're in a position.
14 BY MR. PODRAZA:
15      Q.    Yeah.  And you didn't have,
16 either, experience of being an officer with
17 the union, correct?
18      A.    No.
19      Q.    And no experience of having
20 been on the executive board, correct?
21      A.    No.
22      Q.    And would you agree that your
23 opponents, you know, from serving in positions
24 with the union or running for elections also

Page 43

1 had some notoriety among the members of the
2 union?
3      A.    Probably.
4      Q.    And over the last three terms
5 of the board -- I'm talking now between the
6 2017 period and the 2020 period, that
7 three-year term -- isn't it a fact that the
8 union wages had increased?
9      A.    Yes.
10      Q.    All right.  And isn't it a fact
11 that the benefits were held in check?  In
12 other words there weren't substantial
13 increases in contributions that the members
14 would have to make towards their benefits?
15         MS. DEBRUICKER:  Objection to
16      form.
17         THE WITNESS:  I mean, they were
18      taking the wives off the benefits, so,
19      I mean, you lose, in the way I look at
20      it.
21 BY MR. PODRAZA:
22      Q.    All right.  So I understand the
23 wife issue, but your deductible was still kept
24 reasonably low, correct?

Page 44

1         MS. DEBRUICKER:  Objection to
2      form.
3         THE WITNESS:  Yeah.
4 BY MR. PODRAZA:
5      Q.    And am I mistaken, didn't the
6 members receive a $10.50 increase in wages
7 over that three-year period?
8      A.    If that was the contract, yeah.
9      Q.    All right.  And there was no
10 increase in healthcare cost over that period
11 of time?
12      A.    I would have to look.
13      Q.    Okay.  And work was pretty
14 steady during that three-year period, correct?
15      A.    '17 to '20?
16      Q.    Yeah.
17      A.    Yeah.
18      Q.    Okay.  Now, let me ask you
19 something.
20         Have you ever negotiated a
21 contract on behalf of the union for wage
22 increases?
23      A.    Me personally, no.
24      Q.    Had you ever negotiated or been

Page 45

1 involved in a negotiation for an increase --
2 or I'm sorry, did you ever negotiate or been
3 involved in the negotiations for healthcare
4 coverage in the union?
5      A.    I haven't.
6      Q.    And had you been involved in
7 any of the negotiations with prospective
8 projects for, you know, using union members?
9         MS. DEBRUICKER:  Objection to
10      form.
11         THE WITNESS:  No.
12 BY MR. PODRAZA:
13      Q.    So am I correct that you had no
14 role in the wage increases that occurred in
15 2017 to 2020?
16      A.    No.
17      Q.    I'm not correct or I am
18 correct?
19      A.    You are correct.
20      Q.    And am I correct that you also
21 had no role in keeping healthcare costs in
22 check between 2017 to 2020 for the union?
23      A.    Yeah.
24      Q.    All right.  And you also had no

12 (Pages 42 - 45)

TIMOTHY MCCONNELL

Page 46

1 role in maintaining steady work over that
2 three-year period for union members, correct?
3      A.    Yes.
4      Q.    Now, your opponents, in
5 considering your run, you expected them to run
6 as a group, correct?
7           MS. DEBRUICKER:  Objection to
8      form.
9           THE WITNESS:  Yeah, I was
10      wasn't sure who -- which ones were --
11 BY MR. PODRAZA:
12      Q.    Well, prior groups that had run
13 that had associated -- they called themselves
14 the Dougherty team.
15           Does that sound familiar?
16      A.    Yes.
17      Q.    Okay.  And you expected then
18 that Brian Burrows, Tim Brown, Bob Gormley,
19 Bobby Cresswell, Jimmy Snyder, Jimmy Foy, and
20 Nick Gummel, G-U-M-M-E-L, would run as the
21 Dougherty team, correct?
22      A.    I wasn't sure.  The examining
23 board changed.  I wasn't sure what positions
24 were going to change.

Page 47

1      Q.    Well, as between the executive
2 board as it was comprised in 2017, all right,
3 and those who were then running in 2020, how
4 many candidates were different?
5      A.    '17 to '20?
6      Q.    Yeah.  In other words, if I
7 took 2017, and put the executive board right
8 here with all the members, and then I take in
9 June of 2020, the guys who are going to run
10 for the executive board, how many different
11 individuals would I have in that comparison?
12           MS. DEBRUICKER:  Objection to
13      form.
14           THE WITNESS:  You would have
15      the same.
16 BY MR. PODRAZA:
17      Q.    Well, actually, you would be
18 wrong because Mr. Cresswell was a new
19 candidate in 2020.
20      A.    Yes.
21      Q.    Okay.  Does that help refresh
22 your recollection?
23      A.    Yes.
24      Q.    Everybody else was the same,

Page 48

1 right?
2      A.    Yes.
3      Q.    All right.  And in 2017, all
4 those other guys had run as the Dougherty
5 team, correct?
6      A.    Yes.
7      Q.    Okay.  Now, would you agree
8 with me that running as a team had some
9 advantages in an election?
10      A.    Yeah.
11      Q.    All right.  In, fact, they can
12 pool resources, right, money, and, you know,
13 put out literature and things of that nature
14 more easily as a team versus an individual
15 candidate, right?
16           MS. DEBRUICKER:  Objection to
17      form.
18           THE WITNESS:  Probably.
19 BY MR. PODRAZA:
20      Q.    And you're not aware of any
21 criminal conduct by any of the opponents that
22 you would have been facing in 2020, correct?
23      A.    No.
24      Q.    You personally, while you were

Page 49

1 thinking of running, am I correct that you
2 didn't commit to run with a group or slate of
3 candidates?
4      A.    Yeah, I didn't try to put a
5 team together, no.
6      Q.    And am I also correct that you
7 personally didn't put money aside to finance a
8 campaign?
9      A.    Ask that question again.
10      Q.    Sure.  While you were
11 considering running, did you take personal
12 money and put it aside and say, geez, if I do
13 it, I know I got this money here that I can
14 use to finance my campaign?  You didn't do
15 that, did you?
16      A.    No.  I mean, I have money.  I
17 mean, I -- yeah, I mean, I didn't put it
18 aside, no.
19      Q.    Do you think you as an
20 individual would have more money than the
21 Dougherty team to run against?
22      A.    Probably not.
23      Q.    And while you were thinking
24 about running no one gave you any assurances

13 (Pages 46 - 49)

TIMOTHY MCCONNELL

Page 50

1 or commitments to contribute to your campaign,
2 correct?
3    A.   I really didn't tell many
4 people.
5    Q.   Okay.  You didn't tell them, so
6 you didn't get anybody to say like, hey, Tim,
7 if you run, you got my financial support, I'll
8 give you X numbers of dollars, correct?
9         MS. DEBRUICKER:  Objection to
10    form.
11        THE WITNESS:  No.
12 BY MR. PODRAZA:
13    Q.   And what you just said there,
14 as I understand it, there was a very, very few
15 number of people who even knew that you were
16 considering or thinking of running, correct?
17        MS. DEBRUICKER:  Objection to
18    form.
19        THE WITNESS:  Yeah.  I mean,
20    there wasn't many people that knew.
21 BY MR. PODRAZA:
22    Q.   Okay.  So do you know what an
23 exploratory campaign is?
24    A.   No.

Page 51

1    Q.   An exploratory campaign is when
2 a person thinking about running for office
3 puts out feelers to see, you know, what are
4 their prospects of possibly winning, losing,
5 or how they think they're going to do before
6 they ultimately say, hey, I'm in and I'm going
7 to run.  All right?
8         You didn't do anything along
9 those lines, did you?
10        MS. DEBRUICKER:  Objection to
11    the preamble and the form.
12        THE WITNESS:  No.
13 BY MR. PODRAZA:
14    Q.   And you can take my definition
15 of it, and if I'm incorrect exactly -- just
16 use my definition.
17        You didn't make any efforts to
18 find out how receptive the other members would
19 be to you running for a position, correct?
20    A.   Yes.
21    Q.   So you weren't out actively
22 talking or communicating with your fellow
23 union members to get their support before
24 deciding whether to run for office, correct?

Page 52

1         MS. DEBRUICKER:  Objection to
2    form.
3         THE WITNESS:  No.
4 BY MR. PODRAZA:
5    Q.   Now, in fact, if I understand
6 this, it was not until June 8, 2020, the day
7 before the union nomination proceeding, that
8 you even notified the union that you were
9 thinking of running, correct?
10    A.   Yes.
11    Q.   I believe that in a text to a
12 Mr. Lynch -- and we'll get into the full
13 details of that in a second -- you said the
14 reason you were considering to run was because
15 you, quote, wanted a different face, end
16 quote.
17         Do you recall writing that?
18         MS. DEBRUICKER:  Objection to
19    form.
20         THE WITNESS:  I remember
21    texting, but I don't remember what was
22    written exactly.
23 BY MR. PODRAZA:
24    Q.   Okay.  Well, we'll cover this

Page 53

1 then when we have the chance to have the text
2 before you.
3         But just from our discussion
4 here, it just doesn't sound like you felt you
5 would actually win if you ran; is that
6 correct?
7    A.   That's not true.
8    Q.   Not true.  I mean, did you
9 really believe the membership would vote for
10 you to be on the union's highest board over
11 your opposition when you never sought or let
12 alone served in a union position, you had
13 spotty attendance at best at union meetings,
14 never attended any executive board meetings,
15 had no involvement or limited involvement in
16 union sponsored events, and limited
17 involvement in union sponsored activities,
18 spent most of your free time on family
19 activities or working at the family store for
20 more pay, rather than union events or
21 activities, had no committed campaign money,
22 and your platform was according to a text,
23 quote, I'm a different face, end quote?  Did
24 you really think you were going to win under

14 (Pages 50 - 53)

TIMOTHY MCCONNELL

Page 54

1 those circumstances?
2          MS. DEBRUICKER:  Objection to
3     form.
4          THE WITNESS:  I've been to
5     a lot of union functions, so that
6     statement isn't true.  I said I've
7     been to a lot of union functions
8     through the years, and, you know, I
9     just haven't been to union meetings.
10 BY MR. PODRAZA:
11     Q.    Okay.  Well, your earlier
12 testimony was, at least as I understood it,
13 over the last eight years your involvement in
14 union activities or events was less than your
15 activities for family matters, as well as
16 working at the store, correct?
17     A.    It was less.
18     Q.    All right.  So, again, using my
19 statement, with all of those characteristics
20 you really thought you were going to win?
21     A.    Yeah.
22     Q.    Let's talk now about the text
23 that you sent.  We're going to mark this as
24 McConnell-1.  What's the easiest way of doing

Page 55

1 this?  Mr. McConnell, could I ask you if you
2 could pass that to the court reporter, please.
3          - - -
4          (Exhibit McConnell-1 was marked
5     for identification.)
6          - - -
7 BY MR. PODRAZA:
8     Q.    Okay.  Mr. McConnell, we have
9 what we've marked here as McConnell-1.
10          And would you agree with me
11 that this is a copy of texts you sent on
12 June 8, 2020?
13     A.    Uh-hum.
14     Q.    Okay.  I'm sorry, you have to
15 say yes or no.
16     A.    Yes.
17     Q.    All right.  And these texts
18 were sent to a Mr. Lynch; is that correct?
19     A.    Yes.
20     Q.    All right.  And who is
21 Mr. Lynch?
22     A.    He's the safety director for
23 Local 98.
24     Q.    Did you know him personally?

Page 56

1     A.    Yes.
2     Q.    How well did you know him
3 personally?
4     A.    Pretty well.
5     Q.    All right.  Describe to me --
6 well, what I mean, pretty well, did you go to
7 social events with him?  Do you participate in
8 family events with him?  Let's start there.
9     A.    I've been to social events.  I
10 mean, family events.  Yeah, I mean, yes.
11     Q.    All right.  So you felt
12 comfortable talking with him and being honest
13 with him?
14     A.    Yes.
15     Q.    Okay.  And it appears that on
16 June 8th, 2020, your text was sent around
17 5:59 p.m.
18          Do see that there, sir?
19     A.    Yes.
20     Q.    Okay.  And the words, those are
21 your words that you typed; is that correct?
22     A.    Yeah.
23     Q.    Now, we can also agree that the
24 nomination proceeding was the next day,

Page 57

1 June 9th, 2020; is that correct?
2     A.    Yes.
3     Q.    Now, what I'd like to do is
4 just review what you've written here.
5          You say, "yo, I am thinking
6 about running for e-board."
7          That's executive board; is that
8 correct?
9     A.    Yes.
10     Q.    All right.  And then you say,
11 "I'm not on a team."
12          What did you mean by that?
13     A.    Like just running
14 independently.
15     Q.    And then you continue on and
16 you say, "I had nothing to do with the
17 website" -- strike that.  "I had nothing to do
18 with the website.  I swear on my kids."
19          What did you mean by that?
20     A.    He texted me earlier that my
21 name came up on a website, that somebody sent
22 out a text message and my name came up on it.
23     Q.    Well, what website are we
24 making reference to?  Is this Disney or what

15 (Pages 54 - 57)

TIMOTHY MCCONNELL

1 website in particular are we talking about?
2    A.    There was a website, I don't
3 remember when or what.  It was called Local
4 98.  It was something -- I don't remember what
5 it was called.
6    Q.    It's called "The Truth About
7 Your Local"?
8    A.    Yes.
9    Q.    All right.  And you say I had
10 nothing to do with the website, I swear on my
11 kids.
12         Is that the website where
13 comments were being posted anonymously by
14 people?
15    A.    Yes.
16    Q.    And would you agree with me
17 that some of the comments were crude?
18    A.    I would.
19    Q.    All right.  And some of those
20 crude comments were directed at Mr. Dougherty,
21 correct?
22    A.    Yes.
23    Q.    And directed against his
24 family, correct?

1    A.    Yes.
2    Q.    And directed against other
3 members of the union, correct?
4    A.    Yes.
5    Q.    And other what we would call
6 representatives or officers of the union; is
7 that correct?
8    A.    Yes.
9    Q.    And you didn't want to be
10 associated with that website, did you?
11    A.    No.
12    Q.    And you later learned that that
13 website was created and paid for by Charlie
14 Battle, correct?
15    A.    I didn't.
16    Q.    I'm sorry?
17    A.    No, I didn't.  I don't know
18 that.
19    Q.    As you're here today you don't
20 know that the website was created, paid for,
21 and administered by Charlie Battle?
22         MS. DEBRUICKER:  Objection to
23    form.
24         THE WITNESS:  No.

1 BY MR. PODRAZA:
2    Q.    Then you say at the very end of
3 your text, "if anyone wants to call me, I'm
4 free to talk."
5         Did I read that accurately?
6    A.    Yeah.
7    Q.    And you meant that, didn't you?
8    A.    Yes.
9    Q.    Okay.  And, in fact, you were
10 taken up on that offer, weren't you?
11    A.    Yes.
12    Q.    Okay.  As I understand it, you
13 received a call after the text where you spoke
14 with Mr. Dougherty; is that correct?
15    A.    Yes.
16    Q.    Now, I believe somewhere you
17 said that the call with Mr. Dougherty was
18 fairly long, maybe 45 minutes; is that
19 correct?
20    A.    I mean, it was long.  I don't
21 know exactly how long.
22    Q.    Okay.  But I think somewhere
23 it's attributed 45 minutes.  But it was more
24 than just a couple minute of just passing,

1 correct?  It was a nice -- or there was a long
2 discussion with Mr. Dougherty; is that
3 correct?
4    A.    Yes.
5    Q.    All right.  Now, during that
6 call didn't Mr. Dougherty question your
7 running for the executive board because you
8 had not served in any position with the union
9 during the 16 years of your membership?
10    A.    He might have, yeah, made
11 reference to union meetings.  Yeah, I mean, I
12 don't -- I don't remember that part.  Say it
13 again.  I'm sorry.
14    Q.    Sure.  Didn't Mr. Dougherty
15 question your running for the executive board
16 because you had not served in any position
17 with the union during the 16 years of your
18 membership?
19    A.    That was part of it I think.
20    Q.    All right.  And didn't
21 Mr. Dougherty suggest during that call an
22 effective board requires members who are
23 active in union activities?
24    A.    I remember, yeah, stuff like

16 (Pages 58 - 61)

TIMOTHY MCCONNELL

Page 62

1 why fix something that ain't broken and stuff
2 like that. I don't remember exactly what you
3 just said.
4     Q.    All right. Well, we'll get
5 into some of that, but if you could answer my
6 question now because these are specific
7 questions.
8         Do you recall Mr. Dougherty
9 suggesting that an effective board requires
10 members who are active in union activities?
11     A.    I guess. I don't really
12 remember that part.
13     Q.    Well, do you remember
14 Mr. Dougherty suggesting that the experience
15 he believes needed to serve effectively on the
16 board could only be gained by and through
17 service with the union?
18     A.    Yes.
19     Q.    And do you also remember
20 Mr. Dougherty saying, you know, words to the
21 effect that a board which is not effective
22 during its three-year term could hurt the
23 union and its members?
24     A.    Say that again.

Page 63

1     Q.    Sure. That Mr. Dougherty said
2 -- and I'm -- it could be words to this
3 effect, okay -- that a board which is not
4 effective during its three-year term could
5 hurt the union and its members.
6         MS. DEBRUICKER: Objection to
7     form.
8         THE WITNESS: I don't remember
9     some of that.
10 BY MR. PODRAZA:
11     Q.    Well, do you think it makes
12 sense?
13     A.    It makes sense.
14     Q.    And didn't Mr. Dougherty infer
15 to you during the call that you weren't ready
16 to effectively serve the members if you won a
17 three-year term on the board?
18     A.    I don't remember that.
19     Q.    And didn't Mr. Dougherty
20 suggest you should run for a less prominent
21 position with the union first before running
22 for the board?
23     A.    That was never said.
24     Q.    You're positive?

Page 64

1     A.    I don't recall that being said.
2     Q.    Well, we've gone from it never
3 said to I don't recall. Which one is it?
4     A.    I don't think he said that, no.
5     Q.    Now, would you agree that an
6 executive board filled with ineffective
7 leaders serving three years could be harmful
8 to the union?
9     A.    Yes.
10     Q.    Now, during the call with
11 Mr. Dougherty, there was discussions about
12 whether you were going to run as an
13 independent or with others, correct?
14     A.    Yes.
15     Q.    All right. And didn't
16 Mr. Dougherty suggest that if you run, make
17 sure you're on a campaign which helps the
18 union and not hurts the union or words to that
19 effect?
20         MS. DEBRUICKER: Objection to
21     form.
22         THE WITNESS: I remember him
23     saying, you know, you're going to need
24     a lot of money, and, you know, you're

Page 65

1     going to need a team to put a campaign
2     together.
3 BY MR. PODRAZA:
4     Q.    And you were going to run
5 independent, correct?
6     A.    I was.
7     Q.    You didn't view those words
8 from Mr. Dougherty to be threatening, correct,
9 that he was pointing out that having a team
10 helps with the finances versus running
11 independent?
12         MS. DEBRUICKER: Objection to
13     form.
14         THE WITNESS: Say the question
15     again.
16 BY MR. PODRAZA:
17     Q.    Yeah. Did you feel threatened
18 by Mr. Dougherty's statement of the elections
19 are expensive and running independent is
20 harder than running with a team?
21     A.    That specific, no.
22     Q.    Okay. And didn't Mr. Dougherty
23 also say to you that he understood that you
24 had worked four or five jobs with Charlie

17 (Pages 62 - 65)

TIMOTHY MCCONNELL

1 Battle?
2          MS. DEBRUICKER:  Objection to
3     form.
4          THE WITNESS:  What was it
5     again?
6 BY MR. PODRAZA:
7     Q.    Yeah.  In the conversation with
8 Mr. Dougherty, didn't he also say that he
9 believed you had worked four or five jobs with
10 Charlie Battle?
11          MS. DEBRUICKER:  Objection to
12     form.
13          THE WITNESS:  I've never worked
14     with Charlie Battle before, no.
15 BY MR. PODRAZA:
16     Q.    Okay.  And in the conversation
17 did Mr. Dougherty suggest that, you know,
18 Charlie Battle becoming a union officer really
19 wouldn't be good for the union or words to
20 that effect?
21     A.    I don't remember that.
22     Q.    Well, was Mr. Dougherty kind of
23 suggesting that he thought that you might be
24 associating with Charlie Battle and guys who

1 were considering running?
2     A.    He did.
3     Q.    Didn't he express concern that,
4 hey, those guys, you might want to be
5 concerned about the stigma that might come by
6 you campaigning with them on the same slate?
7 Wasn't that part of the conversation?
8          MS. DEBRUICKER:  Objection to
9     form.
10          THE WITNESS:  I mean, I don't
11     remember, but I can't answer that.  I
12     don't remember.
13 BY MR. PODRAZA:
14     Q.    And didn't Mr. Dougherty, you
15 know, suggest to you -- or strike that.
16          During that conversation there
17 was also reference made to the website,
18 correct?
19     A.    Yes.
20     Q.    Okay.  And Mr. Dougherty said
21 something along the lines that on that website
22 there were postings anonymously that were
23 hurtful of him, like he was hiding behind his
24 sick wife, correct?

1          MS. DEBRUICKER:  Objection to
2     form.
3          THE WITNESS:  He didn't say
4     what it was.
5 BY MR. PODRAZA:
6     Q.    Because I think in your
7 statement you say that Mr. Dougherty said
8 something along the lines that they were
9 posting, and one of the examples were they
10 were saying he was hiding behind his sick
11 wife.
12          Does that help refresh your
13 recollection?
14          MS. DEBRUICKER:  Objection to
15     form.
16          THE WITNESS:  I remember seeing
17     it after the fact, not during that --
18     I mean, I didn't know anything about
19     that before the conversation.
20 BY MR. PODRAZA:
21     Q.    All right.  But Mr. Dougherty
22 was saying to you that they were posting stuff
23 that was hurtful to him, correct?
24          MS. DEBRUICKER:  Objection to

1     form.
2          THE WITNESS:  He screamed at
3     the end of the conversation in the
4     microphone.
5 BY MR. PODRAZA:
6     Q.    Okay.  And did Mr. Dougherty
7 refer to that website as the postings that
8 were quote, sexist and racist, end quote?
9          MS. DEBRUICKER:  Objection to
10     form.
11          THE WITNESS:  Not to me he
12     didn't, no.
13 BY MR. PODRAZA:
14     Q.    No?  Did Mr. Dougherty say, you
15 know, if you associate with that other group,
16 which he thought was connected to the website,
17 you'll be remembered for the disgusting
18 postings on the website like, quote, Marita
19 Crawford takes it in the butt, end quote, if
20 you ran with guys connected to that website?
21          Do you remember him saying
22 that?
23     A.    He didn't say it on that
24 conversation, no.

18 (Pages 66 - 69)

TIMOTHY MCCONNELL

Page 70

1    Q.    When did he say it to you?
2    A.    I never -- he never said that
3 to me.
4    Q.    Okay.  At some point you became
5 aware of the nasty posting on that website,
6 correct?
7    A.    I did.
8    Q.    All right.  And one of the
9 postings accused a Larry of sodomizing
10 Dougherty's mother.
11          Were you aware of that posting?
12    A.    No, I don't.
13    Q.    Okay.  Well, let me show you
14 what we're going to mark as Exhibit-2.
15          - - -
16          (Exhibit McConnell-2 was marked
17    for identification.)
18          - - -
19 BY MR. PODRAZA:
20    Q.    If you want to take a moment to
21 go through them, you're welcome to, but just
22 let me know when you're ready to proceed.  And
23 while you're doing that I'm going to grab some
24 water.

Page 71

1          - - -
2          (There was a discussion held
3    off the record.)
4          - - -
5          MR. PODRAZA:  Why don't we take
6    a break now.  It would be great.
7          THE VIDEOGRAPHER:  The time is
8    4:41.  Going off the video record.
9          - - -
10          (There was a brief recess in
11    the proceeding.)
12          - - -
13          THE VIDEOGRAPHER:  The time is
14    4:46.  We are on the video record.
15 BY MR. PODRAZA:
16    Q.    All right.  Mr. McConnell,
17 before you we've marked a collection of what
18 I'll represent to you are postings on "The
19 Truth About Your Union" website.
20    A.    Uh-hum.
21    Q.    And the first one I kind of
22 summarized in my last question to you on
23 whether you were aware of about the quote,
24 Larry, end quote.

Page 72

1          And then it continues.  There's
2 a posting that follows in which
3 Mr. Dougherty's daughter is referred to as a
4 quote, carpet muncher, end quote.
5          Do you see that there, sir?
6    A.    I do.
7    Q.    Were you aware of that posting?
8    A.    I don't remember exactly what
9 postings.
10    Q.    Well, my specific question is
11 were you aware of this posting which refers to
12 Mr. Dougherty's daughter as a quote, carpet
13 muncher, end quote?
14    A.    I don't remember.
15    Q.    And the next posting refers to
16 a Marita as being sodomized by her new lawyer
17 boyfriend.
18          Were you aware of that posting?
19    A.    I don't remember that one
20 either.
21    Q.    Would it upset you if postings
22 like this were made about your loved ones?
23    A.    It would.
24    Q.    And you wouldn't consider the

Page 73

1 person making such postings to be your friend,
2 would you?
3    A.    No, I wouldn't.
4    Q.    You would not?
5    A.    I wouldn't, no.
6    Q.    It would be just the opposite.
7 You'd consider the poster of such vile claims
8 to be an enemy, wouldn't you?
9    A.    Yes.
10    Q.    And you would agree with me
11 that generally a friend is someone who
12 supports you, while an enemy is someone who's
13 against you, correct?
14    A.    Yes.
15          MS. DEBRUICKER:  Objection to
16    form.
17 BY MR. PODRAZA:
18    Q.    Is it fair to say that
19 Mr. Dougherty seemed pretty upset about the
20 disgusting website postings about him and his
21 family that people posed to him in your call
22 with him on June 8th, 2020?
23    A.    Yes.
24    Q.    From your vantage point, do you

19 (Pages 70 - 73)

TIMOTHY MCCONNELL

1 think he was upset because of how vile these
2 postings were and how offensive they were
3 about him and his family?
4         MS. DEBRUICKER:  Objection to
5     form.
6         THE WITNESS:  I would be angry
7     too.
8 BY MR. PODRAZA:
9     Q.    By the way, do you consider
10 yourself a friend of business agent Rodney
11 Walker?
12    A.    I've known Rodney for a while,
13 yes.
14    Q.    Do you consider him a close
15 friend?
16    A.    He's a friend.
17    Q.    Is your wife related to Pat
18 Gillespie?
19    A.    No.
20    Q.    Do you vacation in North
21 Wildwood?
22    A.    I do.
23    Q.    All right.  And does Jim Foy
24 also vacation there?

1    A.    Yes.
2    Q.    And do you socialize with
3 Mr. Foy while you're on vacation there?
4    A.    I do.
5    Q.    Okay.  Now, there's reference
6 at some point to a separate call by a
7 gentleman named Jim Ryan.  Okay?
8         You've known Mr. Ryan for many
9 years, haven't you?
10    A.    Yes.
11    Q.    All right.  He's your best if
12 -- he's one of your best, if not your best
13 friend, correct?
14    A.    Yes.
15    Q.    Okay.  And as I understand, you
16 were in each other's weddings, correct?
17    A.    Yes.
18    Q.    You both are godparents to each
19 other's kids?
20    A.    Yes.
21    Q.    Was it Mr. Ryan who got you
22 into Local 98?
23    A.    I mean, I was trying to get in
24 for four years, but, no, he was only a

1 first-year apprentice when I got in.
2    Q.    Okay.  So he wasn't the one
3 responsible for getting you into the
4 apprentice program?
5    A.    No.
6    Q.    All right.  And what does
7 Mr. Ryan do for a living?
8    A.    He's an electrician.
9    Q.    Okay.  Do you find Mr. Ryan to
10 be trustworthy?
11    A.    Yes.
12    Q.    Is he honest?
13    A.    Yeah.
14    Q.    Reliable?
15    A.    Yeah.
16    Q.    Now, do you also know that
17 Mr. Ryan and Brian Eddis have known each other
18 for many years?
19    A.    Yes.
20    Q.    Okay.  And Mr. Eddis is a ward
21 leader, correct?
22    A.    Yes.
23    Q.    And Mr. Ryan is a democratic
24 committeeman; is that correct?

1    A.    Yes.
2    Q.    And am I correct that you have
3 known Mr. Eddis through politics for several
4 years?
5    A.    Yes.
6    Q.    You're a democrat and Mr. Eddis
7 is a democrat, correct?
8    A.    He's my ward leader.  He was my
9 ward leader.
10    Q.    Now, some time before the call
11 -- this is before the call we're going to get
12 into with Mr. Ryan -- you had -- Mr. Ryan was
13 one of the few people that you had told that
14 you were thinking about running for office; is
15 that correct?
16    A.    I don't even think Jim knew.
17    Q.    Well, Mr. Ryan says that he did
18 and said he spoke with you before the call
19 that we'll get into.
20         Does that help refresh your
21 recollection?
22         MS. DEBRUICKER:  Objection to
23     form.
24         THE WITNESS:  I don't remember,

20 (Pages 74 - 77)

TIMOTHY MCCONNELL

Page 78

1 but -- I don't remember him knowing,
2 no.
3 BY MR. PODRAZA:
4     Q.    Would you have any reason to
5 disagree with what Mr. Ryan says?
6     A.    No.  If I said it, I mean, it
7 might be true.
8     Q.    All right.  Now, if Mr. Ryan
9 said that during that talk he told you that
10 being a union officer was a big commitment,
11 a lot of work in addition to your 40-plus-hour
12 week as an electrician, do you remember that
13 conversation?
14         MS. DEBRUICKER:  Objection to
15     form.
16         THE WITNESS:  I talked to
17     Jimmy.  I don't really recall it.
18 BY MR. PODRAZA:
19     Q.    All right.  Well, if Mr. Ryan
20 says that he told you that, well, would you
21 have any reason to disagree with him?
22         THE WITNESS:  I wouldn't, no.
23         MS. DEBRUICKER:  Objection to
24     form.

Page 79

1 BY MR. PODRAZA:
2     Q.    All right.  And Mr. Ryan then
3 said that he also said he did not think many
4 union positions were paid positions.
5         Do you recall that?
6         MS. DEBRUICKER:  Objection to
7     form.
8         THE WITNESS:  No.
9 BY MR. PODRAZA:
10     Q.    All right.  If Mr. Ryan, again,
11 said that that's what he relayed to you or
12 said to you, would you have any reason to
13 disagree with him?
14         MS. DEBRUICKER:  Objection to
15     form.
16         THE WITNESS:  Resay that, what
17     was said.
18 BY MR. PODRAZA:
19     Q.    Yeah.  So Mr. Ryan also said he
20 did not think many union positions were paid
21 positions.
22         MS. DEBRUICKER:  Objection to
23     form.
24         THE WITNESS:  I already knew --

Page 80

1         I would have known that information.
2         Maybe he said it, but I don't recall.
3 BY MR. PODRAZA:
4     Q.    Okay.  Now, according to
5 Mr. Ryan he also said to you words to the
6 effect that you have four kids, where are you
7 going to get the time to be an officer.
8         Do you remember that?
9         MS. DEBRUICKER:  Objection to
10     form.
11         THE WITNESS:  I remember him
12     saying that after the fact, after.
13 BY MR. PODRAZA:
14     Q.    Okay.  And he said that because
15 he knew you were a family man and enjoyed
16 spending your free time with your family and
17 attending your kids events.
18         Do you recall him talking to
19 you about that?
20         MS. DEBRUICKER:  Objection to
21     form.
22         THE WITNESS:  Again, I don't
23     know -- I don't -- you know, we talk
24     a lot, so I don't really remember that

Page 81

1         exact conversation.
2 BY MR. PODRAZA:
3     Q.    Well, if he does, would you
4 have any reason to doubt him?
5     A.    No.
6     Q.    All right.  Now, that type of
7 subject area we just went over, that Mr. Ryan
8 says that he had a conversation with you
9 before he had a telephone call with you, those
10 were the kind of issues that Mr. Dougherty
11 also raised in your June 8th call with him,
12 didn't he?
13         MS. DEBRUICKER:  Objection.
14         THE WITNESS:  In the call you
15     mean?
16         MR. PODRAZA:  Yeah, in that
17     45-minute or so -- the long call.
18         THE WITNESS:  He might have
19     said some of them things.
20 BY MR. PODRAZA:
21     Q.    Okay.  And according to
22 Mr. Ryan he said to you that -- words to the
23 effect that you'd be crazy to want to be a
24 union officer.

21 (Pages 78 - 81)

TIMOTHY MCCONNELL

Page 82

1    Do you remember that?
2         MS. DEBRUICKER:  Objection to
3    form.  Foundation.
4         THE WITNESS:  I mean, he --
5    yeah, I mean, he said that before,
6    but, yeah, I would think, yeah, that's
7    something he would have said.
8  BY MR. PODRAZA:
9    Q.    Now, the Department of Labor
10 makes a mention of a call between you and
11 Mr. Ryan on June 9th, correct?
12        MS. DEBRUICKER:  Objection.
13   Foundation.
14        THE WITNESS:  I don't remember
15   exactly when the phone call was made.
16   It was within two days after.
17 BY MR. PODRAZA:
18   Q.    Well, you reviewed your
19 statement.  Your statement says the call with
20 Mr. Ryan occurred on June 9th.
21        Do you recall that in your
22 statement?
23        MS. DEBRUICKER:  Objection.
24   Foundation.

Page 83

1         THE WITNESS:  Yeah.  I mean, if
2    that's -- I would have remembered
3    better back then than I do now, but I
4    don't -- if that's what it says, it's
5    probably --
6  BY MR. PODRAZA:
7    Q.    And you were being truthful
8  when you were doing your statement with the
9  Department of Labor, right?
10   A.    Yes.
11   Q.    All right.  Now, if you spoke
12 with Mr. Ryan on June 9th, then you spoke with
13 him after you had already notified the union
14 of your intention not to run, correct?
15   A.    Yes, after backing out, yes.
16   Q.    Okay.  So you already sent your
17 text on June 8th saying I'm not going to run,
18 I'm not going to be a candidate, and then,
19 according to your statement, you spoke with
20 Mr. Ryan, correct, on June 9th?
21   A.    Yes.
22   Q.    Okay.  So what Mr. Ryan said to
23 you didn't have any bearing on your decision
24 not to run since you already made the decision

Page 84

1  before you spoke with him, correct?
2         MS. DEBRUICKER:  Objection to
3    form.
4         THE WITNESS:  No, that really
5    didn't, no.
6  BY MR. PODRAZA:
7    Q.    No, it didn't impact it?
8    A.    It didn't impact it, no.
9    Q.    Okay.  Now, I'm going to show
10 you what Mr. Ryan says was the nature of the
11 call that he had with you, and we're going to
12 mark this as Exhibit-3.
13             - - -
14        (Exhibit-3 was marked for
15        identification.)
16             - - -
17 BY MR. PODRAZA:
18   Q.    And take a moment, and when
19 you're done reviewing it let me know, and I'll
20 have a couple questions.
21   A.    Okay.
22   Q.    Okay.  Do you recognize this to
23 be the handwriting of Mr. Ryan?
24   A.    I don't know what his

Page 85

1  handwriting looks like.
2    Q.    Okay.  Well, at least according
3  to the document it says, "was called by Brian
4  Eddis when Tim McConnell was running for
5  office in Local 98 election.  Phone
6  conversation" -- I believe the next word is
7  supposed to be consistent, but it's
8  misspelled.
9    A.    Uh-hum.
10   Q.    "Brian Eddis telling me that
11 Tim was being used and manipulated in running
12 in the election.  The people he was running
13 with would not look out for him.  I spoke with
14 Tim on the phone about what Brian said shortly
15 after.  I told Tim it is not worth the
16 aggravation to run.  People do not care.  Take
17 care of your family."
18        Now, and as you can see,
19 Mr. Ryan signed the document under penalty of
20 perjury.  Do you see that there?
21   A.    Uh-hum.
22   Q.    All right.  Now, Mr. Ryan's
23 description of the call with you in his sworn
24 statement, that's accurate, correct?

22 (Pages 82 - 85)

TIMOTHY MCCONNELL

Page 86

1     A.    It said shortly after, but I
2 think it was the following day I wound up
3 talking to him.
4     Q.    But the way he describes the
5 call in his sworn statement is accurate,
6 correct?
7         MS. DEBRUICKER:  Objection.
8         THE WITNESS:  Yeah.
9 BY MR. PODRAZA:
10     Q.    Okay.  You can put that aside.
11 I'd like to now ask you some questions about
12 your decision not to run.
13     A.    Uh-hum.
14     Q.    Now, after you spoke with
15 Mr. Dougherty -- and you may or may not have
16 spoken with Mr. Ryan -- I don't know if that
17 call occurred before or on June 8th or if it's
18 on June 9th -- you did send a text to union
19 safety director Lynch, correct?
20     A.    Uh-hum.
21     Q.    And that's Exhibit-1, which you
22 have in front of you.
23     A.    Uh-hum.
24     Q.    Now, if you take a look at

Page 87

1 Exhibit-1, that text was received at 7:33 p.m.
2     A.    Uh-hum.
3     Q.    Take your time.
4     A.    Yeah.
5     Q.    Okay.  And that's about an hour
6 and a half after your first text to Mr. Lynch
7 to say you were thinking about running for the
8 union board, correct?
9     A.    Yes.
10     Q.    All right.  And in between the
11 two texts you had spoken with Mr. Dougherty,
12 correct?
13     A.    Uh-hum.
14     Q.    And that was for a long call.
15 You say about 45 minutes of the hour and a
16 half, correct?
17     A.    Uh-hum.
18     Q.    And then possibly separately
19 with Mr. Ryan, correct?
20     A.    I didn't talk to Jimmy 'til the
21 next day.
22     Q.    Okay.  So then it was just
23 Mr. Dougherty?
24     A.    I got a couple other phone

Page 88

1 calls too.
2     Q.    Okay.  In your text to
3 Mr. Lynch you say, "yo, I'm out, I thought
4 about it."
5         Do you see that there?
6     A.    Uh-hum.
7     Q.    When you say "yo, I'm out",
8 you're telling him you're not going to run,
9 correct?
10     A.    I'm not going to run, no, not
11 at that point, no.
12     Q.    You weren't going to run,
13 period?
14     A.    Yes, no.
15     Q.    So you're telling the union
16 that you thought about it and I'm not running,
17 period, correct?
18     A.    At that point when I send the
19 text, yes.
20     Q.    Well, did that point change at
21 some point?
22         MS. DEBRUICKER:  Objection to
23 form.
24 BY MR. PODRAZA:

Page 89

1     Q.    Because I'm not aware of any
2 other texts to Mr. Lynch where you said, oh,
3 changed my mind or words to that effect.
4     A.    I would say the couple phone
5 calls I got between the two texts changed my
6 mind.
7     Q.    So changed your mind to say I
8 don't want to run?
9     A.    Yes.
10     Q.    Okay.  And you never changed
11 your mind after that.  You weren't running as
12 of June 8th, 2020, 7:33 p.m. to Mr. Lynch,
13 correct?
14     A.    Not at that time.  No, I was
15 out.
16     Q.    All right.  Well, did you
17 change your mind after that?
18     A.    Um --
19     Q.    Because I didn't see anything
20 in your statement about flipping back and
21 forth.
22     A.    No.  At that point I was out.
23     Q.    Well, when you say at that
24 point, that means you're opening the door that

23 (Pages 86 - 89)

TIMOTHY MCCONNELL

Page 90

1 some time on June 9th you could have changed
2 your mind or some time after June 8th, at 7:33
3 p.m.
4         Did you as of June 8th, 7:33
5 p.m., say I am not running, and that was the
6 final decision?  Or did it flip-flop some time
7 later?
8         MS. DEBRUICKER:  Objection to
9     form.
10        THE WITNESS:  No.  It was
11    probably the phone calls in between
12    that made me back out, yes.
13 BY MR. PODRAZA:
14    Q.    And those phone calls occurred
15 before the text on June 8th, 7:33 p.m.,
16 correct?
17    A.    Yes.
18    Q.    All right.  So as of June 8th,
19 7:33 p.m., you were no longer in the election,
20 and you never changed your mind after that,
21 correct?
22    A.    No, correct.
23    Q.    Correct?
24    A.    Yes.

Page 91

1    Q.    All right.  So your text then
2 continues, "I'm a hundred percent against what
3 happened on that website."
4        What did you mean by that?
5    A.    I didn't agree with the
6 comments that were written there.
7    Q.    So you had reviewed some of
8 those comments by that point; is that correct?
9    A.    After the conversation with
10 John, I did go on the website and looked and
11 seen some of the comments.
12    Q.    All right.  And did you find
13 them to be offensive?
14    A.    I did.
15    Q.    And your text continues, "don't
16 want to be tied in with that."
17        What did you mean by that?
18    A.    Well, when I was talking on the
19 phone conversation with John, he made mention
20 that, you know -- that, you know, if you're
21 not with them you're against them and said --
22 and pretty much said I would be tied with the
23 website.
24    Q.    Because he thought you were

Page 92

1 connected with the people who made those kind
2 of postings, right?
3        MS. DEBRUICKER:  Objection to
4     form.
5        THE WITNESS:  I guess he
6     thought that.
7 BY MR. PODRAZA:
8    Q.    Well, I'm just -- was that your
9 impression?
10    A.    Yeah, I guess.  Yeah, that's
11 what I thought he thought.
12    Q.    And you could understand that
13 people posting stuff that was so offensive and
14 vile about Mr. Dougherty, his friends, and his
15 family, would make them enemy, no, wouldn't
16 it?
17    A.    It would.
18    Q.    And you can understand that
19 people who are doing that would be against him
20 and not for him, correct?
21    A.    Correct.
22        MS. DEBRUICKER:  Objection to
23     form.
24 BY MR. PODRAZA:

Page 93

1    Q.    Now, your text continues, "just
2 wanted a different face."  That's where I had
3 earlier gotten that phrase.
4        What did you mean by that?
5    A.    I really -- you know, I wanted
6 -- one of the problems I think is that the
7 five members that are on the board all had
8 paid positions that are appointed by the
9 business manager.
10    Q.    But the board is elected,
11 correct?
12    A.    It is.
13    Q.    Okay.  Not appointed by a
14 business manager, correct?
15    A.    You're right, yep.
16    Q.    Okay.  Any other explanation
17 for just wanting a different face?
18    A.    No.  That's it.
19    Q.    Okay.  Were you being truthful
20 when you sent the 7:33 p.m. June 8th, 2020
21 text to Mr. Lynch?
22        MS. DEBRUICKER:  Objection to
23     form.
24        THE WITNESS:  Yeah.

24 (Pages 90 - 93)

TIMOTHY MCCONNELL

Page 94

1 BY MR. PODRAZA:
2      Q.    Okay.  And you meant what you
3 said in the text, correct?
4      A.    Yep.
5      Q.    Did you ever post on the
6 website?
7      A.    Did I ever post on --
8      Q.    The Truth About your Union.
9      A.    No, I didn't.
10      Q.    Did you ever post on the other
11 one?
12      A.    I did.  I put my name on it.
13      Q.    Do you know anybody else who's
14 posted on the first website?
15      A.    I don't.
16          MS. DEBRUICKER:  Objection to
17      form.  Counsel, can we distinguish
18      between the first and second?
19 BY MR. PODRAZA:
20      Q.    Well, there's a Truth About the
21 Union -- there's so subtle difference, the
22 name of the thing.  There's website one and
23 then website two after website one was
24 disabled.

Page 95

1          You understand what I'm talking
2 about, right?
3      A.    So website one was the one with
4 these comments in it.
5      Q.    Right.
6      A.    And -- okay.  Yeah, that's --
7 I've never posted on that website.
8      Q.    Okay.  And then the second
9 website, did you post on that?
10      A.    I did, and I put my name on it.
11      Q.    All right.  And do you know of
12 anybody else who's posted on either the first
13 one or the second one?
14      A.    Just the people that put their
15 name on it.
16      Q.    None of the anonymous posters?
17      A.    I don't.
18      Q.    Nobody at the work site said
19 anything, has expressed taking ownership of
20 some of the postings anonymously?
21      A.    Maybe messing around, but not
22 -- you know, not a hundred percent, you know,
23 anything.
24      Q.    All right.  When you say

Page 96

1 messing around, who were you messing around
2 with?
3      A.    Oh, I don't know, just
4 different people, you know, on the jobs.
5 Just, you know, maybe make like a comment.
6 Yeah, I mean, but outside of that I don't know
7 a hundred percent that anybody put anything on
8 there.
9      Q.    No one said to you -- well,
10 strike that.
11          You had no knowledge of anybody
12 who has posted more than once or either one of
13 the websites beside those who have identified
14 themselves?
15          MS. DEBRUICKER:  Objection to
16      form.
17          THE WITNESS:  No, not really,
18      no.
19 BY MR. PODRAZA:
20      Q.    Did you go to the union hall on
21 June 9th, 2020?
22      A.    That was the nomination?
23      Q.    Nomination.
24      A.    No, I didn't.

Page 97

1      Q.    At some time did you become
2 aware that Mr. Battle had filed a protest over
3 the June 9th, 2020 nomination proceeding?
4      A.    I did.
5      Q.    How did you find out?
6      A.    I got a phone call.  I think I
7 got a phone call actually from the
8 International first, from Randy Kieffer.
9      Q.    Okay.  And then you said you
10 got a call first from Randy Kieffer.
11          Did you speak with anybody else
12 after that call?
13      A.    Randy called me a couple times,
14 and then after that the Department of Labor.
15      Q.    Did Charlie Battle ever speak
16 with you?
17      A.    Probably.  I don't remember.
18      Q.    Do you remember Charlie
19 reaching out to you and saying, look, the
20 International is looking into my protest, they
21 want to know if you'll speak with them about
22 your experience?
23      A.    I don't remember the
24 International, when that was going, I don't

25 (Pages 94 - 97)

TIMOTHY MCCONNELL

1 think until they called me.  But the
2 Department of Labor I probably knew before
3 they called.
4        Q.    All right.  Meaning you spoke
5 with Charlie Battle before that?
6        A.    Right.  I think he made it
7 known he put a protest in.
8        Q.    Did you speak with Cliff
9 Haines, Charlie Battle's lawyer?
10       A.    No.
11       Q.    Do you know who Cliff Haines
12 is?
13       A.    I don't.
14       Q.    Are you sure before you
15 actually spoke with Randy Kieffer that you
16 didn't have a conversation with -- well,
17 strike that.  I always hate doing the
18 negative.
19             Did you have a conversation
20 with Mr. Battle prior to speaking with
21 Mr. Kieffer about what you could expect in
22 your conversation with International?
23       A.    I don't remember having that
24 conversation.

1        Q.    Did you ever say to Mr. Battle
2 that you were too afraid to speak with the
3 International?
4        A.    Again, I don't recall.
5        Q.    You don't look like the type
6 that scares easily; is that right?
7        A.    Well, I don't know.  I mean, he
8 -- I thought by talking to International it
9 was going to get back anyway; that's what I
10 thought.  So that's why, you know, I really
11 didn't -- I mean, I still -- I talked to them,
12 but -- that's my personal -- that was my
13 personal thing.
14       Q.    Well, that's what I was going
15 to say.  You didn't say I'm not going to speak
16 with them.  You agreed to do so, right?
17       A.    Yes.
18       Q.    And we already established that
19 was Randy Kieffer?
20       A.    Yes.
21       Q.    All right.  Now, before we get
22 into the conversation you had with Mr. Kieffer
23 -- well, let's first establish -- I believe
24 from Mr. Kieffer's notes it indicates he spoke

1 with you at least two times; is that about
2 right?
3        A.    Yes.
4        Q.    Okay.  Was Mr. Kieffer
5 pleasant?
6        A.    Yes.
7        Q.    Okay.  Did he act
8 professionally?
9        A.    Yeah.
10       Q.    Did he say or do anything that
11 was offensive to you?
12       A.    No.
13       Q.    Did he give you every
14 opportunity to answer his questions?
15       A.    Yeah.
16       Q.    All right.  And were you
17 truthful in your responses to Mr. Kieffer?
18       A.    Yes.
19       Q.    And were you honest?
20       A.    Yes.
21       Q.    Now, I'd like to show you what
22 we're going to mark here as McConnell-4.
23             - - -
24             (Exhibit McConnell-4 was marked

1      for identification.)
2             - - -
3 BY MR. PODRAZA:
4        Q.    And take a moment to review
5 what we're marking here as McConnell-4, and
6 after you're done I have a few questions for
7 you.  Just let me know when you've completed
8 it.
9        A.    Okay.
10       Q.    Okay.  This document that we've
11 marked here as McConnell-4, it's a document
12 that was generated by Mr. Kieffer on
13 January 24, 2020.
14             Do you see that?
15       A.    Uh-hum.
16             MS. DEBRUICKER:  Counsel --
17             THE WITNESS:  It was July.
18 BY MR. PODRAZA:
19       Q.    I'm sorry, did I say January?
20       A.    You did.
21       Q.    Excuse me.  I'm sorry.  Let me
22 try that over again.
23             This is a document by
24 Mr. Kieffer that's dated July 24th, 2020.  Is

26 (Pages 98 - 101)

TIMOTHY MCCONNELL

Page 102

1 this the document that you were referring to
2 earlier when we first started that opposing
3 counsel went over with you?
4     A.    Yes.
5     Q.    All right.  So you're familiar
6 generally with the contents?
7     A.    Yes.
8     Q.    Okay.  If you turn to the
9 second page it states, "I spoke to Brother
10 McConnell on July 22, 2020"; is that correct?
11     A.    Uh --
12     Q.    Or maybe a better way to say
13 it, do you have any reason to disagree with
14 that?
15     A.    I don't.
16     Q.    All right.  And Mr. Kieffer --
17 excuse me.  Yeah, Mr. Kieffer goes on saying,
18 "Brother McConnell told me that he considered
19 running for an executive board position in the
20 Local Union 98 elections.  He told me he was
21 not running with a ticket and was not
22 assisting Charles Battle with his campaign.
23 Brother McConnell stated he considered running
24 for an e-board position because he just

Page 103

1 thought he could help Local Union 98 move
2 forward."
3           Do you disagree -- excuse me --
4 do you agree or disagree with what Mr. Kieffer
5 has attributed to you?
6     A.    That's right.
7     Q.    Okay.  Now, in the next
8 paragraph Mr. Kieffer writes, "Brother
9 McConnell said he got a phone call from Local
10 Union 98 business manager John Dougherty and
11 he spoke about 45 minutes about upcoming
12 nominations.  Brother McConnell said business
13 manager Dougherty did not directly threaten"
14 -- it says "threaten," but I believe he meant
15 threatened him -- "not to run for office, but
16 conversation made him, quote, feel funny, end
17 quote."
18     A.    That part, I never said, but --
19     Q.    The feel funny you never said?
20     A.    Yeah, I don't remember ever
21 saying that.
22     Q.    But you did say you were not
23 directly threatened; is that correct?
24     A.    So I was never physically

Page 104

1 threatened.  I personally thought I was
2 threatened work-wise, employment-wise.
3     Q.    Okay.
4           THE VIDEOGRAPHER:  Counsel,
5     we're at the end of the tape.  I just
6     need to go off the record for a
7     moment.
8           MR. PODRAZA:  All right.
9           THE VIDEOGRAPHER:  The time is
10     5:16.  Going off the video record.
11     This concludes media unit one.
12           - - -
13           (There was a brief recess in
14     the proceeding.)
15           - - -
16           THE VIDEOGRAPHER:  The time is
17     5:17.  We are on the video record.
18     This begins media unit two.
19 BY MR. PODRAZA:
20     Q.    All right.  Why don't we
21 clarify your testimony here.
22           Mr. Kieffer writes, "Brother
23 McConnell said he got a phone call from Local
24 98 business manager John Dougherty, and they

Page 105

1 spoke about 45 minutes about upcoming
2 nominations."
3           Is that true that you said that
4 to him?
5     A.    Yes, probably.
6     Q.    All right.  "Then Brother
7 McConnell said business manager Dougherty did
8 not directly threaten him not to run for
9 office."
10           Is that true, that you told
11 Kieffer that Mr. Dougherty did not directly
12 threaten you not to run for office?
13     A.    When he asked the question, he
14 asked physically, did he physical threaten.
15 Like that's what he said.  I don't know what
16 part of the conversation.  Or we talked twice,
17 so I don't know where he -- what he's trying
18 to say.  I mean, directly threatened, I never
19 was directly threatened.
20     Q.    Okay.  And then he goes on to
21 write, "but the conversation made you" --
22 Mr. McConnell -- "quote, feel funny, end
23 quote."
24           Did you say that to

27 (Pages 102 - 105)

TIMOTHY MCCONNELL

Page 106

1 Mr. Kieffer?
2     A.    I don't remember saying that.
3     Q.    All right.  And then
4 Mr. Kieffer goes on, "this conversation
5 consisted of things like why change officers
6 when things are so good and working well."
7           Did you say that to Mr. Kieffer
8 that that's what Mr. Dougherty said in the
9 conversation?
10     A.    I did.
11           MS. DEBRUICKER:  Counsel, where
12     are you?
13           MR. PODRAZA:  I was halfway
14     through the second paragraph.
15           MS. DEBRUICKER:  Thank you.
16 BY MR. PODRAZA:
17     Q.    And then he continued, "Brother
18 McConnell said the only thing that could have
19 been taken as intimidation was business
20 manager Dougherty said, quote, if you lose the
21 election it could be a long three years.  Not
22 knowing exactly what that meant it made him
23 reconsider running for office."
24           Did you say that to

Page 107

1 Mr. Kieffer?
2     A.    I don't recall that, but, yeah.
3     Q.    Okay.  And he says that you did
4 not know exactly what that meant, correct?  Is
5 that what you said to Mr. Kieffer?
6     A.    I think they're his personal
7 words of what he took from the conversation.
8     Q.    Well, did you say to
9 Mr. Kieffer I took those words to mean a
10 threat from Mr. Dougherty?
11     A.    I mean, I probably -- when I
12 said it could be a long three years, the way I
13 took it when I was told it was, you know, you
14 could have a hard time finding work for the
15 next three years.
16     Q.    And it could have been
17 Mr. Dougherty pointing out that if you get
18 ineffective leaders on the board it could be a
19 long three years for the members because they
20 could get hurt, correct?
21           MS. DEBRUICKER:  Objection to
22     form.
23           THE WITNESS:  It could have.
24 BY MR. PODRAZA:

Page 108

1     Q.    All right.  So that was your
2 personal take on it, but there were several
3 interpretations of what those words could mean
4 that would be reasonable, wouldn't you agree?
5           MS. DEBRUICKER:  Objection.
6           THE WITNESS:  It could have.
7 BY MR. PODRAZA:
8     Q.    Well, did you consider in the
9 conversation that what Mr. Dougherty was
10 meaning is if you get on the board you're
11 totally inexperienced, you could make dumb
12 decisions that could hurt us all, and that
13 would be a three-year term?
14     A.    I mean, at that point -- I
15 mean, he was pretty angry at that point in the
16 conversation.
17     Q.    Was that after he was talking
18 about the website and all that filthy stuff
19 that was being said about him and his family?
20     A.    I think that was at the end of
21 the conversation, but -- if I'm not mistaken.
22 The website was at the very end.
23     Q.    Did you really think that
24 Mr. Dougherty thought that you would be a

Page 109

1 threat to win an executive board position if
2 you ran?
3           MS. DEBRUICKER:  Objection to
4     form.
5           THE WITNESS:  I'm not sure what
6     he thought.
7 BY MR. PODRAZA:
8     Q.    Well, why would a man threaten
9 another man about running for an election if
10 he doesn't even take him seriously in his
11 possibility of winning?
12           MS. DEBRUICKER:  Objection to
13     form.
14 BY MR. PODRAZA:
15     Q.    Can you explain that to me?
16     A.    I don't know what he thought.
17     Q.    All right.  So you weren't
18 certain that those words which you say
19 Mr. Dougherty relayed were actually telling
20 you that you could lose work if you ran?
21     A.    I'm not certain.
22     Q.    Then Mr. Kieffer goes on in the
23 following paragraph to say, "Brother McConnell
24 told me that business manager Dougherty and

28 (Pages 106 - 109)

TIMOTHY MCCONNELL

1 Local 98 agent Brian Eddis had a conference
2 call with Jim Ryan regarding Tim McConnell
3 running for e-board and how that may not be
4 good for the local union."
5         Did you say that to
6 Mr. Kieffer?
7     A.   I told him that Brian Eddis --
8 let me read this again.  Yeah.
9     Q.   Yeah, you said to Mr. Kieffer?
10     A.   Yes.
11     Q.   Yeah.  And an inexperienced
12 person making a decision on the executive
13 board would not be good for the local union;
14 is that correct?
15         MS. DEBRUICKER:  Objection to
16     form.
17         THE WITNESS:  I don't know.  I
18     mean, I guess it could go either way.
19 BY MR. PODRAZA:
20     Q.   Okay.  Then he goes on to say,
21 "again, Brother McConnell said there were no
22 direct threats but again made him feel
23 uncomfortable."
24         Did you say that to him?

1     A.   Probably did.
2     Q.   Well, explain this to me.
3 You've already decided you're not going to
4 run.  You spoke with Mr. Dougherty.  You had
5 some other conversations, and then you send
6 the text that we've gone over here on
7 June 8th, and you said that was it, I'm not
8 running.  And your conversation with Mr. Ryan,
9 according to you, was the next day, June 9th.
10         Why would that make you feel
11 uncomfortable when you've already told the
12 union I'm not running and -- explain to me how
13 there would be repercussions since you said
14 you were not running.
15     A.   I was getting phone calls all
16 day that day, the next day, people that talked
17 to a couple different agents, and they didn't
18 know that I wasn't running.
19     Q.   But certainly the leadership,
20 Mr. Dougherty and the rest, knew it through
21 Mr. Lynch, correct?
22     A.   A couple of the -- I think a
23 couple of the phone calls came from people
24 that worked in the Local.

1     Q.   Well, is it your belief that
2 Mr. Dougherty -- or excuse me -- that
3 Mr. Lynch didn't share your texts to him on
4 June 8th saying you're not running with
5 Mr. Dougherty, the business manager?
6         MS. DEBRUICKER:  Objection to
7     form.  Foundation.
8 BY MR. PODRAZA:
9     Q.   Does that make any sense?
10     A.   Say it again.
11     Q.   You would have expected
12 Mr. Lynch to tell Mr. Dougherty, hey, I just
13 got a text from Mr. McConnell saying he's not
14 running June 8th, correct?
15     A.   Yes.
16     Q.   All right.  So what do you care
17 if a business agent is calling you the next
18 day on the 9th, etc., if the senior
19 management, including the business manager,
20 are already aware that you're not running?
21     A.   It just -- I mean, the phone
22 calls by itself I guess was what I was talking
23 about.
24     Q.   That's what made you feel

1 uncomfortable, getting a bunch of calls?
2     A.   I don't know if I used that
3 exact word, but, yeah, I mean, I guess the
4 phone calls all day, you know -- well, in the
5 morning.
6     Q.   Well, by that point knowing
7 that you weren't running and expecting that
8 senior leadership at the union knew that, you
9 didn't feel that there would be any
10 retaliation by your saying I'm not running,
11 correct?
12         MS. DEBRUICKER:  Objection to
13     form.
14         THE WITNESS:  I didn't know at
15     the time.
16 BY MR. PODRAZA:
17     Q.   Who called you from inside the
18 Local?
19     A.   Oh, I don't remember.  It
20 didn't -- I'm not sure.
21     Q.   Well, how many business agents
22 are there?
23     A.   A lot.  I don't know.
24     Q.   Which ones would feel

29 (Pages 110 - 113)

TIMOTHY MCCONNELL

Page 114

1 comfortable enough to give you a call?
2     A.    Well, it didn't have to be --
3 it came from the -- it could have been
4 indirect, somebody that talked to the business
5 agent.
6     Q.    You respect that Mr. Dougherty
7 and other members of the union could decide
8 that they didn't want to support your
9 candidacy, right?
10    A.    Uh-hum.
11    Q.    Okay.  And you don't take
12 offense by the fact that Mr. Dougherty was
13 saying I don't think you are the guy for the
14 executive board, did you?
15    A.    No.
16        MS. DEBRUICKER:  Objection to
17 form.
18 BY MR. PODRAZA:
19    Q.    And I believe today we just
20 established that you could understand why he
21 would feel that way, that perhaps he thought
22 you could be inexperienced and not the right
23 person to be on the board, correct?
24    A.    His personal opinion?

Page 115

1     Q.    Yeah.
2     A.    That would be his personal
3 opinion.
4     Q.    Okay.  Mr. Kieffer goes on to
5 say, "Brother McConnell told me that even
6 though there were no direct threats he felt
7 that it would be best for him not to run for
8 office."
9        Is that what you told
10 Mr. Kieffer?
11    A.    Yeah.
12    Q.    Now, if you go to the last
13 page, Mr. Kieffer says, "I asked Brother
14 McConnell if our conversation was an official
15 complaint claiming intimidation of a candidate
16 running for office."
17        Did Mr. Kieffer say that to
18 you?
19    A.    I don't even remember that part
20 of the conversation.
21    Q.    All right.  But it's possible?
22    A.    It's possible.
23    Q.    Okay.  What I'm getting at, are
24 you saying it absolutely didn't happen or it's

Page 116

1 possible that it didn't?
2     A.    I mean, it's possible, but I
3 just don't recall that part of the
4 conversation.
5     Q.    All right.  And then
6 Mr. Kieffer goes on to say, "Brother McConnell
7 said he personally made the decision not to
8 run and does not want to file an official
9 complaint and is not interested in pursuing
10 any type of charges."
11        Did you say that to
12 Mr. Kieffer?
13    A.    I don't even remember that
14 being an issue at the time.
15    Q.    All right.  And Mr. Kieffer
16 then continues, "Brother McConnell told me he
17 was not a part of the complaint from Charles
18 Battle, but apparently he just wanted to
19 discuss the issue with someone."
20    A.    Again, I don't know -- I don't
21 remember having any of that part of the
22 conversation with him.
23    Q.    Did you ever say to Mr. Kieffer
24 that I want to be part of the protest by

Page 117

1 Mr. Battle?
2     A.    No, I didn't ever say -- I
3 mean, I didn't even know -- I didn't even know
4 nothing about that protest or that part of it.
5     Q.    Okay.  You can put aside the
6 Exhibit-4.
7        How did you learn that
8 Mr. Battle had appealed to the Federal
9 Department of Labor?
10        MS. DEBRUICKER:  Objection.
11 Foundation.
12        THE WITNESS:  I don't remember.
13 I don't recall.
14 BY MR. PODRAZA:
15    Q.    Do you recall speaking with
16 Mr. Battle about it, though, before any
17 representatives of the Department of Labor
18 contacted you?
19    A.    I couldn't tell you when --
20 when I talked to him about it, and I don't
21 know if they got in touch first or he got in
22 touch.  I don't remember that.
23    Q.    Well, before you gave a
24 statement to the Department of Labor you spoke

30 (Pages 114 - 117)

TIMOTHY MCCONNELL

Page 118

1 with Mr. Battle; is that correct?
2         MS. DEBRUICKER: Objection to
3     form.
4         THE WITNESS: Yeah, I mean,
5     before that -- yeah, I talked to him
6     before that.
7 BY MR. PODRAZA:
8     Q.    All right. And during that
9 conversation Mr. Battle would have told you
10 that he had filed an appeal to the Department
11 of Labor, correct?
12     A.    Again, I'm not a hundred
13 percent sure on when that conversations took
14 place.
15     Q.    Well, you wouldn't have been --
16     A.    I think the Department of Labor
17 reached out first. I want to say -- I want to
18 say that they left me a message, a voice mail.
19     Q.    And what did they want?
20     A.    I guess just an interview to
21 talk about what took place that day.
22     Q.    Did they explain to you why
23 they wanted to speak to you, I mean what
24 brought you to their attention?

Page 119

1     A.    I don't remember them ever
2 saying why. I'm guessing -- I'm guessing
3 because Charlie made the report. You know, I
4 guess my name came up. That's the only thing
5 I can --
6     Q.    Did you have any -- before you
7 gave your statement to the Department of
8 Labor, did you have any discussions with
9 Mr. Battle's lawyer, Clifford Haines?
10     A.    I never talked to his lawyer,
11 ever.
12     Q.    Okay. When you did have a
13 conversation with Mr. Battle, what was said?
14     A.    I don't remember. I don't
15 recall that phone conversation. I talked -- I
16 mean the one about the DOL -- or I don't
17 really recall the conversation.
18     Q.    Well, were you left with the
19 impression that DOL was interested in pursuing
20 the appeal of Battle's?
21         MS. DEBRUICKER: Objection to
22     form.
23         THE WITNESS: I mean, yeah,
24     they wanted to hear -- to hear my side

Page 120

1     of what happened. I got that out of,
2     you know, the conversation I guess.
3 BY MR. PODRAZA:
4     Q.    Well, didn't Battle at some
5 point say to you that, you know, by supporting
6 his claims of intimidation the DOL could take
7 action against the union and put pressure on
8 those union representatives under indictment
9 or words to that effect?
10         MS. DEBRUICKER: Objection to
11     form.
12         THE WITNESS: Again, I don't
13     recall him ever saying that.
14 BY THE WITNESS:
15     Q.    Are you saying it never was
16 said to you or are you saying you don't
17 recall?
18     A.    I don't recall. I don't
19 remember.
20     Q.    Do you recall Battle mentioning
21 to you that the criminal prosecution of the
22 indicted officials could be helped if DOL took
23 action against the union?
24     A.    I don't recall that

Page 121

1 conversation either.
2     Q.    Are you saying it never
3 happened or are you saying you don't recall
4 it?
5     A.    Again, I don't remember that,
6 so from what I remember, it never happened.
7     Q.    Well, before you gave your
8 statement to the Department of Labor, didn't
9 you understand that if you supported Battle's
10 appeal and DOL took action that would put
11 pressure on -- even more pressure on the union
12 leadership because of the indictment?
13         MS. DEBRUICKER: Objection.
14         THE WITNESS: I didn't really
15     pay much attention to -- I didn't
16     think nothing of that.
17 BY MR. PODRAZA:
18     Q.    You didn't understand what
19 would be possible consequences if DOL took
20 action against the union overall? Is that
21 your testimony?
22         MS. DEBRUICKER: Objection.
23         THE WITNESS: Say that again.
24         MR. PODRAZA: Yeah, can you

31 (Pages 118 - 121)

TIMOTHY MCCONNELL

Page 122

1  read that back, please?
2  - - -
3  (The court reporter reads back
4  the previous question.)
5  - - -
6  THE WITNESS:  I didn't expect
7  to happen what happened.
8  BY MR. PODRAZA:
9  Q.  What do you mean by that?
10  A.  I didn't expect any more
11  pressure.  I thought -- you know, I would have
12  thought it was two different things.
13  Q.  You didn't think that the U.S.
14  government through the Department of Labor
15  going after the union and the U.S. government
16  to the Department of Justice criminally going
17  after officials would put more pressure?
18  MS. DEBRUICKER:  Objection to
19  form.
20  BY MR. PODRAZA:
21  Q.  Being connected to.
22  A.  No, I didn't.
23  Q.  Battle did though.
24  A.  I don't know.

Page 123

1  MS. DEBRUICKER:  Objection to
2  form.
3  BY MR. PODRAZA:
4  Q.  Come on, didn't Battle tell you
5  that your support of DOL would put even more
6  pressure on the union with the criminal stuff?
7  We'll finally get rid of Dougherty and we'll
8  finally get rid of his cronies who are running
9  the union -- or words to that effect.
10  Didn't you have that
11  conversation before you spoke with DOL?
12  A.  I didn't actually.
13  MS. DEBRUICKER:  Objection.
14  BY MR. PODRAZA:
15  Q.  Never did?
16  A.  Never.
17  Q.  Never even crossed your mind?
18  A.  No.
19  Q.  Never.  Okay.
20  But you were aware that the
21  Department of Labor was going to be sharing
22  information with other federal officials,
23  correct --
24  MS. DEBRUICKER:  Objection to

Page 124

1  form.
2  BY MR. PODRAZA:
3  Q.  -- when you were giving your
4  statement?
5  A.  I don't know how that works,
6  no, I don't.
7  Q.  And you didn't suspect in your
8  mind that if I go in and give a statement that
9  that information might be shared with other
10  federal officials who were involved in the
11  union affairs, whether it's criminal
12  prosecution or otherwise?
13  A.  I wouldn't think the two were
14  connected.
15  Q.  Now, before you gave your
16  statement to the Department of Labor, you knew
17  that Battle had already given his statement,
18  correct?
19  MS. DEBRUICKER:  Objection to
20  form.
21  THE WITNESS:  Say that again.
22  BY MR. PODRAZA:
23  Q.  Sure.  Before you gave your
24  statement to the Department of Labor you knew

Page 125

1  that Battle had already given a statement to
2  the Department of Labor, correct?
3  A.  I did.
4  Q.  Okay.  How did you know that?
5  A.  I think they told me.
6  Q.  Who is "they"?
7  A.  The Department of Labor when
8  they called.
9  Q.  So what do they -- walk me
10  through this.  They call you, and what did
11  they say to you?
12  A.  Again, I can't say exactly -- I
13  would say somewhere along the lines it was
14  brought to our attention by Charlie that, you
15  know, there might have been some interference
16  in the election, you know, could you talk
17  about what happened.
18  Q.  So are you saying your first
19  contact with the Department of Labor occurred
20  after Battle had already given his statement
21  to the Department of Labor?
22  MS. DEBRUICKER:  Objection to
23  form.
24  THE WITNESS:  I don't remember

32 (Pages 122 - 125)

TIMOTHY MCCONNELL

Page 126

1     exactly what the date was like.
2  BY MR. PODRAZA:
3     Q.    Tim, you're under oath.  Are
4  you telling me that Battle didn't call you up
5  and say I've been -- and these are words to
6  this effect -- I've been to the Department of
7  Labor, I gave my statement, this is what I
8  said, and you're next?  Words to that effect.
9         MS. DEBRUICKER: Objection to
10        form.
11        THE WITNESS:  I don't recall.
12     I don't know who called who.  I don't
13     know who called me first.
14  BY MR. PODRAZA:
15     Q.    Well, how did you end up going
16  to the Department of Labor?
17     A.    They called me, and then, you
18  know, I called back, and then from there --
19     Q.    And what did they say to you?
20     A.    The same thing we just talked
21  about, how everything from text messages,
22  letting them know I was going to run, 'til
23  whatever, everything after that.
24     Q.    Well, did they say to you it's

Page 127

1  our understanding that there were threats and
2  intimidation to keep people from running in
3  the election and you're one of those guys,
4  come in and talk with us?  Is that what they
5  said to you?
6         MS. DEBRUICKER: Objection to
7        form.
8         THE WITNESS:  I don't remember
9        how that conversation went.  I just
10        don't remember.
11  BY MR. PODRAZA:
12     Q.    Well, how did they bring you
13  in?  Did they say, look, there's an issue and
14  we'd like you to come in and, you know, come
15  to our offices and let's talk about it?
16     A.    Would you mind, yeah, doing an
17  interview, you know, about what happened
18  during the Local 98 election.
19     Q.    Without telling you why?
20     A.    Again, they might have said,
21  you know, Charlie Battle, you know, is finally
22  complain -- don't know how it actually -- I
23  don't know the time line.
24     Q.    Your contact -- your first

Page 128

1  contact with the DOL, how was that done?  Was
2  it by cell phone, them calling your cell phone
3  or you calling somebody?  How was that done?
4     A.    I mean, I think that I -- I
5  think they left me a message on my cell phone.
6     Q.    Okay.  And you returned it.
7  Before you give a statement to the Department
8  of Labor how many times did you have contact
9  with representatives of DOL?
10        MS. DEBRUICKER: Objection to
11        form.
12        THE WITNESS:  I don't recall.
13  BY MR. PODRAZA:
14     Q.    More than twice?
15     A.    I would say more than twice.
16  Again, not a hundred percent, but I would
17  think it was more than that.
18     Q.    And how was that done?  Was it
19  done by telephone or in person or both?
20     A.    I would say telephone.
21     Q.    Okay.  How many times did you
22  speak with a representative from DOL before
23  your statement was done?
24        MS. DEBRUICKER: Objection.

Page 129

1         Counsel, do you mean the witness
2         statement or any other?
3         MR. PODRAZA:  Yeah, his written
4         -- well, he doesn't have a written --
5         it's a typed statement, but the DOL
6         statement that we're going to go over
7         soon.
8         THE WITNESS:  I don't recall
9         that part of it.
10  BY MR. PODRAZA:
11     Q.    More than five times?
12     A.    Again, I don't know.  I really
13  don't.
14     Q.    Why was there more than one
15  telephone call?  What's so hard about, hey,
16  what happened at the election, what happened
17  about your running?  You talk to him and
18  that's it.  Why did they have to have several
19  calls?
20        MS. DEBRUICKER: Objection to
21        form.
22        THE WITNESS:  I don't know.  I
23        don't know.
24  BY MR. PODRAZA:

33 (Pages 126 - 129)

TIMOTHY MCCONNELL

1      Q.    Was the DOL representative
2 suggesting to you that, hey, we've learned
3 this and, you know, take this into account
4 while you're thinking about what happened back
5 then?  It seems like a lot of contact going on
6 there for a pretty straightforward what
7 happened to you.
8          MS. DEBRUICKER:  Objection to
9      form.
10          THE WITNESS:  Yeah, I don't
11      recall how many times.  I just --
12 BY MR. PODRAZA:
13      Q.    Did you have to be subpoenaed
14 or did you voluntarily give a statement to
15 DOL?
16      A.    I went down voluntarily.
17      Q.    All right.  And did you go to
18 their location?  Or how was the statement put
19 together?
20      A.    I went to their location.
21          MR. PODRAZA:  Why don't we mark
22      then, it's McConnell-5.
23              - - -
24          (Exhibit McConnell-5 was marked

1      for identification.)
2              - - -
3 BY MR. PODRAZA:
4      Q.    All right.  You'll have a
5 chance to take a look at that.
6          But before we do, these calls
7 with the Department or Labor representatives
8 before you did your statement --
9      A.    Uh-hum.
10      Q.    -- you said that it was on your
11 cell; is that correct?
12      A.    Yes.
13      Q.    All right.  Were they during
14 working hours?
15      A.    I don't know.  I don't -- I
16 don't know.
17      Q.    Were you asked to produce any
18 documents or things of that nature?
19      A.    No.  I mean, maybe a couple
20 texts.  I don't really recall.
21      Q.    Do you remember who from DOL
22 was calling you?  Was it one person, multiple
23 people?  Who was it?
24      A.    I think it was Angela.

1      Q.    Angela -- is that Angela -- is
2 it Menges?
3      A.    I think so.
4      Q.    Okay.  That's the person who
5 predominantly called you?
6      A.    Yeah, that's who called me.
7      Q.    Okay.  Before we get into the
8 detail of your statement, I just wanted to --
9 did you type this?
10      A.    No.
11      Q.    All right.  Well, it's four
12 pages single typed.
13          Do you see that?
14      A.    Yeah.
15      Q.    Yeah.  Did you pick the words
16 that go into this statement?
17      A.    I mean, I read through it, and
18 that's why some of the stuff is changed on it.
19      Q.    Yeah, I understand that.  So
20 was this prepared, typed up, and then handed
21 to you and said, here, take a look at this and
22 see if it's accurate?  Is that how that was
23 done?
24      A.    I think I did the interview.

1      Q.    Where did you do the interview?
2      A.    At their office.
3      Q.    Was that on October 15th, 2020,
4 or was that a different day?
5      A.    I don't know.  I didn't -- I
6 think I did the interview, and then I signed
7 this at a later date.
8      Q.    So you did an interview --
9          MS. DEBRUICKER:  Form.
10 BY MR. PODRAZA:
11      Q.    -- and then you were asked to
12 come back, and at that point were handed a
13 typed-up statement and asked to review it for
14 accuracy?
15      A.    Yes.
16      Q.    So nobody was sitting there
17 with a typewriter saying, okay, Tim, tell us
18 your story, and just like this court reporter
19 here right now is taking down exactly your
20 words?
21          That didn't occur with DOL,
22 correct?
23          MS. DEBRUICKER:  Objection to
24      form.

34 (Pages 130 - 133)

TIMOTHY MCCONNELL

Page 134

1        THE WITNESS:  No.  There was
2    just two people taking notes.
3 BY MR. PODRAZA:
4        Q.    And two people.  Angela Menges?
5 I think that's how you pronounce it.
6 M-E-N-G-E-S.  And who else?
7        A.    I don't know who the other --
8    the other person in the room was.
9        Q.    Okay.  And when they were
10 taking notes, were they taking down word for
11 word verbatim what you were saying?  Like did
12 they say, whoa, Tim, slow down, I want to
13 (indicating) like the court reporter here is
14 doing?
15        A.    They weren't doing that, no.
16        MS. DEBRUICKER:  Objection to
17    form.
18 BY MR. PODRAZA:
19        Q.    No.  They were just -- but, you
20 know, some notes.
21        A.    Yeah.
22        Q.    And then after you leave
23 somehow this four-page, single-typed statement
24 is generated, right?

Page 135

1        A.    Yes.
2        Q.    And you have no idea how it was
3 done or who did it?
4        A.    Yeah, no, I don't know who
5 wrote that.
6        Q.    Except you know you didn't.
7        A.    No, I didn't type it, no.
8        Q.    Yeah.  And, you know, can you
9 agree with me then the selection of some of
10 the words here are not your words, right?
11        MS. DEBRUICKER:  Objection to
12    form.
13        THE WITNESS:  I mean, yeah, not
14    word for word, no.
15 BY MR. PODRAZA:
16        Q.    Okay.  So the context and the
17 sense of the statement is by whoever authored
18 it, correct, not you?
19        A.    Yes.
20        Q.    And then it was handed to you
21 to say, here, take a look at this and tell us
22 if you, you know, find any problems with its
23 factual content, right?
24        A.    Yes.

Page 136

1        Q.    All right.  So you didn't know
2 the attitude of the person who was drafting
3 this as to whether they were in favor of the
4 union, against the union, in favor of John
5 Dougherty, against John Dougherty, or
6 whatever, correct?
7        A.    No, I didn't.  Yeah, I don't
8 know who did it.
9        Q.    Okay.  And, you know, when you
10 were reading this, were you really careful to
11 like get down the -- you know, to make sure
12 that the words in these sentences, you know,
13 were how you would say it?  Or were you more
14 focused on the accuracy of the facts?
15        A.    Probably the accuracy of the
16 facts.
17        Q.    And you left it, then, to the
18 DOL representative to fill in the flavor of it
19 or how it came across, correct?
20        MS. DEBRUICKER:  Objection.
21        THE WITNESS:  I didn't leave it
22    to nobody.  I just gave a statement
23    and then read it over when -- you
24    know, after it was typed up, and

Page 137

1    changed a couple things, and then that
2    was it.
3 BY MR. PODRAZA:
4        Q.    All right.  Well, then let's
5 flesh that out a little bit.
6        How long was your interview
7 that led to this statement being generated?
8        A.    I was in there for quite
9 a while.  The exact amount of time I'm not
10 sure.
11        Q.    An hour?
12        A.    Could be two.
13        Q.    And then you leave?
14        A.    Then I left.
15        Q.    All right.  And then at some
16 point, what, you get a call saying we typed
17 it, we want you to come in and look at it?
18        A.    I don't remember.  I guess,
19 yeah, I got a call, and they wanted me to go
20 over the statement.
21        Q.    And you come back to DOL's
22 building?
23        A.    Yes.
24        Q.    All right.  And same two

35 (Pages 134 - 137)

TIMOTHY MCCONNELL

1 representatives?
2      A.   There was two different
3 buildings.  I think they were moving at the
4 time.  So I don't know what building was what.
5      Q.   All right.  Well, you went to
6 their location.
7      A.   Yes.
8      Q.   All right.  And are you there
9 during the workweek or are you on your
10 weekend, your free time?
11      A.   When I went -- when I went for
12 the interview it was during my free time, and
13 then when I went to sign the paperwork it was
14 at lunch.
15      Q.   How do you define your free
16 time?  Did you go at night after work?  Or did
17 you go during work?
18      A.   No, no, no.  Yeah, after work.
19      Q.   After work.  So kind of like
20 your deposition here today.
21      A.   Yes.
22      Q.   You work, and then you went
23 over to DOL, spent, you think, about two hours
24 talking with them?

1      A.   Yes.
2      Q.   Okay.  And then you leave, and
3 they say, you know, we got the statement, come
4 back, right?
5      A.   Yes.
6      Q.   Okay.  And then you come back.
7           Was this during the workweek
8 or, again, on your free time after work hours?
9      A.   So the first time was free
10 hours.  The second time was at lunch.
11      Q.   Okay.  So I'm sorry, the first
12 time was three hours?  Or free hours.  I'm
13 sorry, you said free hours.
14      A.   Yes, right.
15      Q.   And you thought it was about
16 like two hours in time.
17      A.   I think so.
18      Q.   How long is your lunch?
19      A.   Well, I took a half a day that
20 day.
21      Q.   Okay.  So you took a half a
22 day, you went down.  And walk me through.
23 What happens?  You arrive at DOL and what
24 happens?

1      A.   I went up in the -- I went up,
2 and then I went through -- you know, they give
3 me the statement typed up, and then they said,
4 you know, read it over, let me know if there's
5 any changes, you know, write the changes in
6 there.
7      Q.   Okay.  Before they handed that
8 to you -- well, is that the first time you saw
9 the statement when you got to DOL?  Was that
10 the first time or had they sent it to you in
11 advance to your house so you could spend time
12 looking at and reflecting on it?
13      A.   No.  That was the first time.
14      Q.   That was the first time.
15           So you're now there.  You
16 hadn't seen the statement before it was handed
17 to you.  And what did they ask you to do?
18      A.   Read it over and make sure
19 everything is truthful.
20      Q.   Okay.
21      A.   To what I had said I guess.
22      Q.   And you didn't spend two hours
23 reading this, correct?
24           MS. DEBRUICKER:  Objection to

1      form.
2           THE WITNESS:  No.  I mean, no,
3      I didn't spend two hours.
4 BY MR. PODRAZA:
5      Q.   All right.  So you picked it
6 up, you read it.  You were looking more
7 towards factual accuracy.  Is that what you
8 were looking for?
9      A.   I probably read it twice and
10 then made a couple changes, and then, yeah,
11 that was -- I might have been there an hour.
12      Q.   At most.  Maybe a half an hour?
13           MS. DEBRUICKER:  Objection to
14      form.
15           THE WITNESS:  I don't remember
16      to be honest with you exactly how
17      long.
18 BY MR. PODRAZA:
19      Q.   Okay.  But when you were
20 reading it, you were reading it for factual
21 accuracy or the tenor of the document?
22      A.   Factual, making -- the facts,
23 making sure the facts were right.
24      Q.   Okay.  Now, after you were done

TIMOTHY MCCONNELL

Page 142

1 reading it, making it -- it looks like some of
2 the handwritten changes on there -- then what
3 happened?
4      A.   Nothing.  I mean, I don't --
5      Q.   Did you leave it on the table
6 and walk out of the building or did you talk
7 to them?
8      A.   No.  They came back in.  I
9 guess they went over what the changes were,
10 and that was it.
11      Q.   Okay.  If you look at the first
12 page of your statement -- I'm looking at the
13 very bottom paragraph -- it starts out, "I've
14 been thinking."
15      A.   Yes.
16      Q.   It says, "I had been thinking
17 of running for an executive board position for
18 about six months.  I made my final decision to
19 run on June 8th, 2020, the day before the
20 nomination.  I sent a text message to safety
21 director Lynch on June 8th, 2020, to let him
22 know I was going to run."
23           Well, that's not accurate,
24 correct?  The text you sent to him on

Page 143

1 June 8th -- indicating you were thinking of
2 running, not that you were actually running,
3 right?
4           MS. DEBRUICKER:  Objection.
5           THE WITNESS:  No.  I mean, at
6      that point I was running.  I was going
7      to run.
8 BY MR. PODRAZA:
9      Q.   Well, take a look at your
10 Exhibit-1.  You told me before that on
11 June 8th you said I'm thinking of running, and
12 then later that day on June 8th you say I'm
13 not running.
14      A.   Yeah, that's what it says.
15      Q.   Yeah.
16      A.   But, I mean, at that point I
17 was going to run.
18      Q.   But you didn't pick these
19 words, right?
20      A.   Um --
21      Q.   These were written down by
22 whoever drafted this statement for you, right?
23      A.   Well, yeah, I mean, obviously I
24 didn't type it up, but, I mean, again, yeah, I

Page 144

1 mean, I was reading for --
2      Q.   Well, if you had actually typed
3 this statement up, wouldn't you have said I
4 sent a text saying I'm thinking of running,
5 and then at some point in your statement you
6 would have said, and later that night I sent a
7 text saying I'm not running?  Because that's
8 the truth based on your text as Exhibit-1,
9 right?
10           MS. DEBRUICKER:  Objection.
11      Foundation.  It mischaracterizes his
12      testimony.
13           THE WITNESS:  Yeah, I mean, I
14      wrote it, but I wouldn't have
15      remembered that's what I wrote.  I
16      would have just probably said that I
17      was running at the time because in my
18      head that's what I was going to do.
19 BY MR. PODRAZA:
20      Q.   Well, where in this statement
21 attributed to you does it say that you sent a
22 second text to Lynch on June 8th later in the
23 evening?
24           MS. DEBRUICKER:  Objection.

Page 145

1           THE WITNESS:  I don't know.
2 BY MR. PODRAZA:
3      Q.   Well, take your time.  Go
4 through it.  Show me where it is.
5      A.   No, I don't see it.
6      Q.   That's important information,
7 don't you think?
8           MS. DEBRUICKER:  Objection.
9           THE WITNESS:  Yes.
10 BY MR. PODRAZA:
11      Q.   Yeah, wouldn't it be important
12 to know that I initially said I'm thinking of
13 running, and as time passed, whatever happened
14 in between, I then said, I'm not running?
15 That's something you'd want to put factually
16 in your statement to be factually accurate,
17 correct?
18           MS. DEBRUICKER:  Objection.
19           THE WITNESS:  Yeah, if I -- I
20      mean --
21 BY MR. PODRAZA:
22      Q.   Yeah.  I mean, if you want to
23 leave a false impression that I told them I'm
24 going to run and never said I wasn't going to

37 (Pages 142 - 145)

TIMOTHY MCCONNELL

Page 146

1 run, then you wouldn't make reference to your
2 text, right?
3          MS. DEBRUICKER:  Objection to
4     form.
5          THE WITNESS:  Yeah.
6 BY MR. PODRAZA:
7     Q.    Now, if you turn to the next
8 page -- and I'm going down, let's see, one,
9 two, three, four full paragraphs down -- you
10 make some handwritten indications.  Then you
11 got, "after that call" -- you make reference
12 -- this is the call that you had with
13 Mr. Dougherty on June 8th, 2020, correct --
14     A.    Uh-hum.
15     Q.    -- "my phone blew up.  I sat in
16 my back yard for four hours fielding nonstop
17 phone calls."
18          All right.  Are you saying or
19 is that meant to try to convey that for four
20 hours you were receiving calls before you
21 decided to tell the union you weren't running?
22     A.    That was --
23          MS. DEBRUICKER:  Objection to
24     form.

Page 147

1          THE WITNESS:  No.  It was -- it
2     was after I told them I was running.
3 BY MR. PODRAZA:
4     Q.    But there's no reference in
5 here saying -- okay, after you said you were
6 running, right?
7     A.    Uh-hum.
8     Q.    But this says "after that
9 call." So you spoke with Mr. Dougherty --
10     A.    Uh-hum.
11     Q.    -- for that long call, right?
12     A.    Uh-hum.
13     Q.    Then it says, "my phone blew
14 up, and I sat in my backyard for four hours
15 fielding nonstop phone calls."
16     A.    Yeah.
17     Q.    Right?  Are you saying here
18 that you sat in your backyard for four hours
19 before you then sent that text to Lynch to say
20 I'm not running?
21     A.    No.  That just says I was
22 answering the phone for four hours.
23     Q.    Well, why doesn't it say in
24 here then that -- you know, while you may have

Page 148

1 been in your backyard fielding calls, you had
2 already told Lynch well before that that you
3 weren't running.  So why is that not in here?
4          MS. DEBRUICKER:  Objection.
5          THE WITNESS:  I don't know.
6 BY MR. PODRAZA:
7     Q.    And if you turn to your last
8 page, it says here, "I talked with Ryan the
9 following morning, June 9th, 2020.  Ryan said
10 to me, I guess you decided to run."
11          It doesn't say anything there
12 that -- even if you accept that, that you
13 said, no, I already told the union last night
14 I'm not running, it's not in there.
15          MS. DEBRUICKER:  Objection.
16 BY MR. PODRAZA:
17     Q.    Is it because of you or because
18 of the representative from the DOL didn't
19 include that?
20          MS. DEBRUICKER:  Objection.
21          THE WITNESS:  I don't recall.
22 BY MR. PODRAZA:
23     Q.    Well, you agree with me that at
24 least indicating that on June 8, 2020, you

Page 149

1 told the union you weren't running, and if
2 Ryan then called you and made that mistake,
3 you would have just said, look, it's a mistake
4 and I'm not running, correct?
5          MS. DEBRUICKER:  Objection.
6          THE WITNESS:  I don't remember.
7     I mean, yeah, if that's -- well, I
8     didn't talk to Jimmy -- I didn't talk
9     to Jimmy the day before, so I'm
10     betting -- or Jimmy didn't know that,
11     that I was out yet.  He just -- it was
12     from the conversation I had with Brian
13     Eddis the night before.
14 BY MR. PODRAZA:
15     Q.    But when speaking with Ryan,
16 even if he didn't know and accepting what
17 you're saying, you certainly told him, hey,
18 I'm out, I already told them, I gave them a
19 text, I'm out as of June 8, 2020, correct?
20          MS. DEBRUICKER:  Objection.
21     Foundation.
22          THE WITNESS:  Yeah.  I mean, I
23     probably told him after he said that.
24 BY MR. PODRAZA:

38 (Pages 146 - 149)

TIMOTHY MCCONNELL

Page 150

1      Q.   But I don't see that here in
2  this statement.  Don't you think that's
3  important information?
4          MS. DEBRUICKER:  Objection.
5          THE WITNESS:  Yeah.  I mean, I
6      don't know.
7  BY MR. PODRAZA:
8      Q.   Doesn't this kind of lead you
9  to believe that you're still a candidate on
10 June 9, 2020, when your text has already said
11 you're not as of June 8th, 2020?
12         MS. DEBRUICKER:  Objection.
13         THE WITNESS:  Yeah.  I mean --
14 BY MR. PODRAZA:
15     Q.   And I'm not blaming you.  I'm
16 just saying whoever prepared this statement
17 didn't seem to care about the fact that you
18 had texted Mr. Lynch, your good buddy, during
19 the night of June 8, 2020, to say I'm not
20 running.  Isn't that your impression?
21         MS. DEBRUICKER:  Objection to
22     form.
23         THE WITNESS:  I guess.
24 BY MR. PODRAZA:

Page 151

1      Q.   Yeah, and it probably didn't
2  cross your mind because you were just looking
3  for what was written here, right, whether it
4  was factually accurate, right?
5      A.   Yeah.  I checked -- I mean,
6  that's -- I read it over and made the changes
7  I had to.
8      Q.   And then I'm looking down -- if
9  you go one, two, three more full paragraphs
10 down.  It starts out with "sometime between
11 lunch."
12         Do you see where that is?
13     A.   Uh-hum.
14     Q.   It says, "sometime between
15 lunch and the end of the day on June 9, 2020,
16 I received a text message from an unknown
17 number.  I was included in a group text with
18 13 other phone numbers I did not recognize.
19 The text contained a link to the website,
20 quote, Know the Truth About Your Union.com,
21 end quote.  I didn't know the site existed
22 until I received the text."
23         Well, that's not true, correct?
24 You spoke with Mr. Dougherty on June 8th,

Page 152

1  2020, according to your testimony, and he made
2  reference to the website, and then you said
3  after the conversation with John Dougherty on
4  June 8, 2020, you even actually went to the
5  website and was disgusted by it and sent the
6  text to Mr. Lynch, correct?
7      A.   It was -- no, it was probably
8  -- I don't remember when I received that text.
9  I would have to -- I don't remember the date
10 to be honest with you.
11     Q.   Maybe you're not, and I'm not
12 faulting you.  I'm just saying whoever wrote
13 this puts this down as June 9th, and that
14 can't be the case that that's the first time
15 you learned of the website.
16     A.   I would say it was June 8th.
17     Q.   Sure.  This is inaccurate, is
18 what I'm getting at.  And I'm not saying it's
19 your fault because you didn't write this, did
20 you?  You were just asked to review it based
21 on somebody taking notes, right?
22         MS. DEBRUICKER:  Objection.
23         THE WITNESS:  Yeah, I guess.
24     Yeah.

Page 153

1  BY MR. PODRAZA:
2      Q.   And, in fact, when you get down
3  to the next paragraph, it says, "I sent a text
4  message to safety director Lynch."
5          That's finally the text that
6  we're talking about, right, on June 8, 2020?
7  Correct?
8      A.   Yes.
9      Q.   "I don't want it to be
10 personal.  I'm out because I don't agree with
11 what's on that website."
12         And they actually quoted,
13 right?
14     A.   I think so.
15     Q.   Yeah, it's in quotation marks,
16 isn't it?
17     A.   Yeah.
18     Q.   Well, if you're quoting
19 something, that means they had to have
20 (indicating) the text in their possession,
21 whoever wrote this statement for you, right?
22 How else would they quote something?  They had
23 to know what it said.
24     A.   Yeah.

39 (Pages 150 - 153)

TIMOTHY MCCONNELL

1    Q.   Yeah.  Well, it makes it even
2  worse.  They had the text in their possession,
3  they're writing the statement, and they're
4  still ignoring the fact that on June 8, 2020,
5  at 7:33 p.m., you told the union you were not
6  running and you were out.
7          MS. DEBRUICKER: Objection.
8  BY MR. PODRAZA:
9    Q.   How do you explain that?  And
10  I'm not asking you to, but how does this
11  statement just ignore that?  They had to have
12  it in their possession, right?
13          MS. DEBRUICKER: Objection.
14          THE WITNESS:  Yeah.  I mean,
15      I'm not sure.
16  BY MR. PODRAZA:
17    Q.   And then it says, "after
18  Dougherty screamed at me about the website, I
19  went onto the site to see what it was about."
20      That's what you previously
21  testified.  On June 8th, 2020, you checked the
22  website, right?
23    A.   I did.
24    Q.   And then you sent the text to

1  Mr. Lynch saying I'm out, I don't want to be
2  connected to the website, right?
3    A.   That's what I said, yeah.
4    Q.   What's Exhibit-1, correct?
5    A.   Yep.
6    Q.   Okay.  Did the DOL
7  representatives when you were reviewing this
8  statement, did they provide you with a copy of
9  the text that you had sent to Mr. Lynch so you
10  could have that available to compare it to
11  your statement?
12    A.   Um --
13    Q.   Or did they just hand you the
14  statement and say, you know, go through this
15  and see if it's accurate?
16    A.   I don't remember.  I think I
17  just went through the statement.
18    Q.   Now, are the inaccuracies in
19  the statement that were reviewed here, is that
20  due to you or due to the DOL representative
21  who put the statement together?
22          MS. DEBRUICKER: Objection.
23          THE WITNESS:  To be honest, I'm
24      not really sure.

1  BY MR. PODRAZA:
2    Q.   Well, they wrote the statement,
3  right?
4    A.   Yes, they did, yes.
5    Q.   And you just didn't catch what
6  they wrote if it was in error, correct?
7          MS. DEBRUICKER: Objection.
8          THE WITNESS:  Yeah.  I mean, I
9      didn't go through it.
10  BY MR. PODRAZA:
11    Q.   You looked at it.
12    A.   I would have never caught that
13  one day off.  Yeah, I mean, I would have never
14  caught June 9th to June 8th.
15    Q.   Well, that's a -- well, maybe a
16  better question is, the information in this
17  statement was already there when you were
18  asked to review it, correct?
19    A.   Say that again.
20    Q.   Yeah, the information, the
21  words and everything in this statement, were
22  already in the statement when it was handed to
23  you to review, right?
24    A.   It was typed up, yes.

1    Q.   Yes.  Okay.  And you didn't
2  type it up or have any involvement in the
3  typing of it, right?
4    A.   No.
5    Q.   As far as you know that was
6  done by DOL, right?
7    A.   Yeah.
8    Q.   Okay.  When you had your
9  interview, did any of the representatives from
10  the Department of Labor kind of encourage how
11  you viewed the nomination proceeding?  Did
12  they make any suggestions to you?
13    A.   I don't really recall.
14    Q.   Make any suggestions along the
15  lines of like, well, didn't you feel
16  intimidated by this, or, you know, didn't you
17  feel like there would be retaliation by that,
18  kind of suggesting these things to you?
19          MS. DEBRUICKER: Objection to
20      form.
21          THE WITNESS:  I don't remember
22      yes or no.  I mean, I don't know.
23  BY MR. PODRAZA:
24    Q.   Well, when you did your

40 (Pages 154 - 157)

TIMOTHY MCCONNELL

Page 158

1 interview for two hours, you didn't just sit
2 in a chair and just talk with them standing
3 there and just doing notes. You had a
4 conversation back and forth, right?
5     A.    Yeah, I mean --
6     Q.    Yeah, they contributed to the
7 discussion, right?
8     A.    Yes.
9     Q.    All right. And they would ask
10 you questions, and they would try to expand on
11 what you were saying, right?
12     A.    Yes.
13     Q.    And they would encourage you to
14 consider different views of what happened both
15 prior to and on the day of the election,
16 right?
17         MS. DEBRUICKER: Objection.
18         THE WITNESS: Yeah.
19 BY MR. PODRAZA:
20     Q.    Did you ever ask if you could
21 just do a written statement like Mr. Ryan did
22 that we've seen here today?
23         MS. DEBRUICKER: Objection.
24         THE WITNESS: No, I didn't ask.

Page 159

1 BY MR. PODRAZA:
2     Q.    Because, you know, we know from
3 Mr. Ryan's handwritten he wrote that.
4     A.    Yeah.
5         MS. DEBRUICKER: Objection.
6 BY MR. PODRAZA:
7     Q.    So there's no question those
8 are his words, right?
9     A.    Yeah.
10         MS. DEBRUICKER: Objection.
11 Foundation.
12 BY MR. PODRAZA:
13     Q.    Did they offer the opportunity
14 for you to handwrite?
15     A.    Not that I remember. I mean, I
16 don't know if I wrote it. No, I think -- no,
17 they wrote it.
18     Q.    Yeah. And they never offered
19 the opportunity for you to just put down in
20 handwriting what you understood happened so
21 you could just write it down without any
22 interference from anybody, correct?
23     A.    Yes.
24     Q.    All right. Now, yours is a

Page 160

1 statement. So is Battle's. The other ones
2 that we've seen from the Department of Labor
3 are typed impressions of the representatives
4 that people either signed or did not sign.
5         Were you aware of that?
6         MS. DEBRUICKER: Objection to
7     form.
8         THE WITNESS: I don't know.
9     No, not that I knew of.
10 BY MR. PODRAZA:
11     Q.    Well, isn't it a fact that the
12 Department of Labor did say to you that we
13 want a statement because it's more formal,
14 this is more formal, and it can be used for
15 helping us in our investigation of the union
16 or words to that effect? Didn't they tell you
17 that, that that's why they wanted a statement,
18 rather than something less formal?
19         MS. DEBRUICKER: Objection to
20     form and foundation.
21         THE WITNESS: I don't remember.
22     They just said they needed me to sign
23     my statement. They didn't really give
24     a reason why.

Page 161

1 BY MR. PODRAZA:
2     Q.    And within a day or two after
3 your statement and Battle's statements are
4 taken by DOL, search warrants are issued, and
5 the Spring Garden headquarters are raided.
6 I'll represent that to you.
7         Did it cross your mind that
8 there was a connection between what you were
9 doing with DOL and what Mr. Battle was doing
10 with these formal statements and the
11 government coming in again and raiding Local
12 98?
13         MS. DEBRUICKER: Objection.
14         THE WITNESS: Probably not at
15     the time of the statement.
16 BY MR. PODRAZA:
17     Q.    How about now?
18     A.    Probably now.
19     Q.    Yeah. Why do you think that
20 way now?
21     A.    I mean, I didn't realize it was
22 the day after.
23     Q.    And was there pressure -- well,
24 not pressure -- but did DOL seem to really

41 (Pages 158 - 161)

TIMOTHY MCCONNELL

Page 162

1 want to get you in to get this statement
2 signed or were they like, hey, well, Tim,
3 whenever you come around to it, you just pop
4 by our facilities and sign?
5        A.    I don't -- I kind of --
6 whenever I could -- I had time it seemed.
7 Like with everything, it was when I wasn't at
8 a soccer game or whatever, you know, doing the
9 stuff I do.
10        Q.    Well, let me ask you this.  How
11 much time passed from the time you met with
12 DOL representatives and spoke with them so
13 they could take notes to the time you came
14 back and were in the room reviewing the
15 statement?  How much time passed from then to
16 then?
17        A.    I don't remember.
18        Q.    Days, weeks, months?
19        A.    I would think it would be
20 weeks.
21        Q.    Weeks?
22        A.    I'm just guessing.
23        Q.    So do you have a calendar?
24        A.    I do.

Page 163

1        Q.    Do you keep your calendar on
2 your phone?
3        A.    I do.
4        Q.    This is dated October 15th,
5 2020.  Do you have your 2020 calendar still on
6 your phone?
7        A.    I don't write on my calendar
8 though.
9        Q.    If the statement was signed by
10 you on October 15th, 2020, is there any way
11 you could look at anything that can give us an
12 idea as to when you were at the DOL to meet
13 with the folks and spend a couple hours
14 talking with them about it?
15        A.    I mean, at home I know I kept
16 most of the stuff.  Here right now I don't
17 know for sure.
18        Q.    Can we follow up with you on
19 that?  Would you be able to supply us with
20 that?
21        A.    I probably could.
22            MR. PODRAZA:  Can you just make
23    a note of that?
24 BY MR. PODRAZA:

Page 164

1        Q.    And was this, the experience
2 that you had with DOL, as far as you know, was
3 that a similar experience that Charlie Battle
4 had?
5            MS. DEBRUICKER:  Objection.
6            THE WITNESS:  I didn't really
7        talk to Charlie too much back then, so
8        I don't really -- I mean, here and
9        there but not -- I didn't really --
10        you know, like I said, I didn't talk
11        to him that often.
12 BY MR. PODRAZA:
13        Q.    Okay.  The first two pages of
14 what we've marked here as McConnell-5, it's a
15 memo or I'm going to call it a memo from
16 Angela Menges.
17            Do you see that in front of
18 you?
19        A.    Uh-hum.
20        Q.    And it says, "prior to signing,
21 OLMS discussed the purpose of the statement
22 with McConnell."
23            What did they tell you?
24        A.    Who's OLMS?

Page 165

1        Q.    It's the Office of Labor
2 Management Standards.  Do you see at the very
3 top there?
4        A.    I don't remember.
5        Q.    Well, they say that they --
6 they discussed the purpose of the statement
7 with you to advise you that the Office of
8 Labor Management Standards was conducting an
9 official investigation pursuant to the Labor
10 Act.
11        A.    Uh-hum.
12        Q.    All right.  What did they tell
13 you was going to be the purpose of your
14 statement for their investigation and what
15 they were going to do?
16        A.    I took it as -- I don't know.
17 I don't know.  I don't remember.
18        Q.    Okay.  Now, there's a bunch of
19 -- you see that black stuff underneath the
20 first page?
21        A.    Yeah.
22        Q.    It goes on to the next page.
23 We don't know what that says.  That's been
24 redacted.

42 (Pages 162 - 165)

TIMOTHY MCCONNELL

1         Was there an impression at all
2 ever left with you that your statement may be
3 used by the government for purposes of
4 investigating the union or claims against the
5 union other than just the June 9th, 2020 --
6     A.   I just thought it was to do
7 with the election.
8     Q.   And as you said already, seeing
9 this now your view has kind of changed?
10        MS. DEBRUICKER:  Objection.
11        THE WITNESS:  Well, yeah.  Can
12 I use the bathroom again?
13        MR. PODRAZA:  All right.  Yeah.
14 Now would probably be a good time to
15 take a break.
16        THE VIDEOGRAPHER:  The time is
17 6:16.  Going off the video record.
18              - - -
19     (There was a brief recess in
20 the proceeding.)
21              - - -
22        THE VIDEOGRAPHER:  The time is
23 6:25.  We are on the video record.
24 BY MR. PODRAZA:

1     Q.   All right.  Mr. McConnell, you
2 said -- and correct me if I'm wrong -- that
3 after you signed the DOL statement that we
4 reviewed here today at some point you received
5 a telephone call from the FBI or from somebody
6 with the FBI?
7        MS. DEBRUICKER:  Objection to
8 form.
9        THE WITNESS:  It was the day I
10 got laid off, I was getting laid off
11 in the W.
12 BY MR. PODRAZA:
13    Q.   All right.  And we have some
14 dates here which we'll work on, and you'll see
15 that it comes after your statement.  But take
16 that representation by me, and if I'm wrong,
17 then you suffer no consequences on it.  I
18 suffer it.
19    A.   Uh-hum.
20    Q.   Who was the agent who called
21 you?
22    A.   I don't know.  I never talked
23 to him.
24    Q.   It was a male, though, right?

1     A.   Yes.
2     Q.   Okay.  And did they leave a
3 message or speak directly with you?
4     A.   I think I answered the phone.
5     Q.   I'm sorry?
6     A.   I think I answered the phone,
7 so I think I spoke directly to them.
8     Q.   Okay.  And it would have been
9 your cell phone; is that correct?
10    A.   Yes.
11    Q.   Okay.  And do you recall, was
12 it a workday or was it a weekend day?
13    A.   It was during work, the day --
14 the day I was getting laid off.
15    Q.   Okay.  And what was it that the
16 agent said to you?
17    A.   I don't know exactly.  It was
18 something in reference with I guess do you
19 think there's any reason you're getting laid
20 off?  Like is there any -- do you think -- I
21 don't know exactly.  It was something -- I
22 don't know exactly how he asked it.
23    Q.   How did you know that they were
24 with the FBI?

1     A.   He did tell me his name when he
2 called.  Like I just don't remember.
3     Q.   Did you -- besides that
4 conversation did you ever meet or go down to
5 the location for the FBI and discuss?
6     A.   No.
7     Q.   Did he ever come out and speak
8 with you?
9     A.   No.
10    Q.   And, I'm sorry, they asked you
11 what about being laid off?
12    A.   If I knew what the reason was
13 for being laid off.
14    Q.   And what did you say?
15    A.   Again, I'm not sure.  I mean, I
16 said that I guess it could have went either
17 way.  I just said I thought there was a little
18 more work here for what I was doing.
19    Q.   Well, at the W Hotel had other
20 people gotten laid off at that same time?
21    A.   Yes.
22    Q.   Okay.  So then that project was
23 coming to an end, was it not?
24    A.   It was towards -- yes.

TIMOTHY MCCONNELL

1      Q.    Yeah.  All right.  And was it
2 the very day that you were being laid off that
3 you get this call from the FBI?  Or how soon
4 after when you were laid off do you get the
5 call?
6      A.    Again, I don't recall the
7 dates.
8      Q.    Well, it was pretty close,
9 wasn't it?
10      A.    It was.
11      Q.    Okay.  And is that information
12 that becomes instantly known and published,
13 that, oh, these guys are laid off right now?
14      A.    I guess because of what was
15 going on a lot of people knew that I was
16 getting laid off.
17      Q.    Charlie Battle knew?
18      A.    Probably not right then, not in
19 the first couple -- maybe it was the first
20 couple days.  Well, I don't really remember.
21      Q.    Did the call come in after
22 Charlie Battle would have known that you were
23 laid off?
24      A.    I think it was -- I want to say

1 it was before I got laid off though because I
2 already knew I was getting laid off.
3      Q.    All right.  So you were given
4 notice that you were being laid off, but you
5 were still working at the time?
6      A.    Yes.
7      Q.    And that's when the FBI call
8 came in?
9      A.    Yes, somewhere in between.
10      Q.    All right.  Who would have you
11 shared that you were going to be laid off
12 shortly or, you know, within a few days or
13 whatever the period was?  Who would you have
14 spoken to to give them that information?
15      A.    I probably made a lot of phone
16 calls.  I probably made 10 to 15 phone calls
17 just looking for a job.
18      Q.    Yeah.  And you spoke with
19 Charlie Battle?
20      A.    I didn't talk to Charlie until
21 after I got laid off.
22      Q.    It's your testimony that the
23 guy that's going to get you a job within a
24 week after you were laid of, you didn't speak

1 to him right away?
2      A.    I think I talked to him Friday
3 or Saturday.  I got laid off -- I knew I was
4 getting laid off on a Tuesday.  I know I
5 talked to him over the weekend.
6      Q.    The weekend before that
7 Tuesday?
8      A.    No.  The weekend after.
9      Q.    The weekend after.
10      A.    Before I started that Monday at
11 University of Penn.
12      Q.    Who else then did you speak to
13 before Charlie Battle to ask about a job?
14      A.    Probably like -- I don't know,
15 eight -- I probably met the same like ten
16 people I talk to usually to see, you know,
17 what's going -- just to see where the jobs
18 are.  It's not -- we just don't -- you know,
19 it's not like I was just looking for any jobs.
20 Maybe seeing where they were.  It depended on
21 the contractor.
22           And then since I -- you know, I
23 didn't have anything by the weekend and I
24 already said I was going to start at Penn on

1 Monday.  And during the weekend I had a couple
2 more people call me for jobs, but I already
3 took that one.
4      Q.    Besides what you said here with
5 the FBI agent was there any further
6 discussions?
7      A.    No.  It was just on the phone
8 that -- whenever that was that week.
9      Q.    So nobody else from the
10 government called you about your employment
11 besides that one call?
12      A.    Maybe asked me questions, maybe
13 like who's foreman.  Like just -- I think I
14 was at work, so I told them I couldn't talk,
15 and then I think maybe they called me back
16 later that day or something.
17      Q.    So you think there may have
18 been two calls down at the FBI?
19      A.    Maybe.
20      Q.    This is before the W Hotel job
21 and you had to seek other employment?
22      A.    Yes.
23      Q.    At some point did you advise
24 the FBI that you, in fact, had other

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

TIMOTHY MCCONNELL

Page 174

1 employment?
2      A.   I don't think I knew at that
3 time.
4      Q.   What happened in the second
5 call?
6      A.   Well, it was later that day.  I
7 think they just asked me who the foreman was,
8 who the business agent was, just general
9 information.  Nothing -- I mean, that -- that
10 was it.
11      Q.   Did you ever suggest to them
12 that you thought it was retaliation?
13      A.   I mean, I just said I don't
14 know, I wasn't sure.
15      Q.   Had you ever suggested to
16 anybody that the reason you no longer were
17 working the project at W Hotel was because of
18 retaliation?
19      A.   Same thing.  Probably if they
20 -- yeah, I said, I'm not sure.  That's
21 probably -- I believe.
22      Q.   All right.  But we can agree
23 that the W Hotel project was coming to its end
24 and others were being laid off from that

Page 175

1 project?
2           MS. DEBRUICKER:  Objection.
3           THE WITNESS:  Yes.
4 BY MR. PODRAZA:
5      Q.   At that time.
6      A.   Yes.
7      Q.   Okay.  Let's talk about that
8 layoff in a little bit more detail.
9           In an Amended Complaint that
10 the Secretary's filed in this case, the
11 statement said -- or a representation is made,
12 "approximately one week after he provided the
13 Secretary with the signed statement in
14 connection with the investigation of Battle's
15 allegations McConnell was laid off from his
16 job where he had worked for approximately two
17 years."  And that's what's said.
18           Now, am I correct that you
19 never claimed that your employment at the W
20 Hotel ended because of retaliation or wrongful
21 action by the union?
22           MS. DEBRUICKER:  Objection.
23           THE WITNESS:  Again, yeah, I
24 didn't know.  I didn't -- no, I

Page 176

1 didn't.
2 BY MR. PODRAZA:
3      Q.   You never made that claim that
4 it was by retaliation or wrongful acts by the
5 union that you weren't working at the W Hotel
6 anymore, correct?
7           MS. DEBRUICKER:  Objection.
8           THE WITNESS:  In all honesty, I
9 probably -- I think I -- yeah, it
10 might have been in a prior
11 conversation, before -- I gave a
12 statement that most likely that's how
13 it was going to happen.
14 BY MR. PODRAZA:
15      Q.   Now I'm not following you.  Can
16 you explain that?
17      A.   I think if I'm not mistaken it
18 was before -- it was a conversation I had
19 before with maybe somebody that I said, you
20 know, after this statement is, you know, made
21 public I'm sure I'm probably going to get --
22 that's probably how I put it.
23      Q.   Was this a federal employee
24 that you were talking to or a member of Local

Page 177

1 98?
2      A.   I'm not sure who I said it to.
3 Back then there was a million conversations
4 going on.
5      Q.   Did you share it with the
6 representatives who were taking your
7 statement?  Did you say, hey, look, I'm going
8 to make a statement but I think I'm going to
9 be getting fired?
10      A.   I probably did.
11      Q.   All right.  And did you
12 probably reach out to them to let them know,
13 hey, I'm going to be laid off as of this date?
14           MS. DEBRUICKER:  Objection to
15           form.
16 BY MR. PODRAZA:
17      Q.   And when I mean "they," the
18 Department of -- let's put it this way.  After
19 you signed your statement and you left and
20 found out then you're going to no longer be at
21 the W Hotel working, did you speak with
22 anybody from the Department of Labor,
23 including Angela Menges or the people who
24 interviewed you?

45 (Pages 174 - 177)

TIMOTHY MCCONNELL

Page 178

1     A.    I don't know when I talked to
2  them.  I'm not sure.  I mean, like I said,
3  a lot of people at that time knew I was
4  getting laid off.  It was -- it went around
5  pretty fast.
6     Q.    All right.  But did you have
7  the telephone numbers for the DOL
8  representatives who took your statement?
9     A.    I think she give me her card.
10    Q.    Okay.  And do you recall
11 calling or speaking with one of them before
12 the FBI called about the fact that you were
13 going to be laid off now as of that Tuesday?
14    A.    I don't remember.  I don't.
15    Q.    Is it possible?
16    A.    I don't think so, but, again,
17 I'm not sure.
18    Q.    It's not possible that you gave
19 your statement -- well, strike that.
20          It's not possible that while
21 giving your statement you say I'm risking
22 getting laid off?
23    A.    I did say that.  I know I did
24 say that.

Page 179

1     Q.    And you said it to the DOL
2  representatives, right?
3     A.    I think so.
4     Q.    And then you take a statement
5  and you sign it.
6     A.    Uh-hum.
7     Q.    And then after you do that,
8  you, in fact, are notified you're going to be
9  laid off?
10    A.    Uh-hum.
11    Q.    It's not possible that you
12 called those DOL representatives up and said,
13 hey, you know what, it happened or words to
14 that effect?
15    A.    Again, I don't remember -- I
16 don't recall doing that.  Me, I don't know if
17 I was talking to them at the time and it maybe
18 came up in conversation, but I don't remember
19 personally reaching out to anybody.
20    Q.    Does your cell phone record or
21 store calls that you had back in 2020?
22    A.    No.
23    Q.    It deletes them as time goes
24 on?  Is that how it works?

Page 180

1     A.    I would think so.  I never
2  really checked to be honest with you.
3     Q.    Would you be willing to access
4  your phone records in that period of time to
5  see if, in fact, you did call somebody at the
6  Department of Labor after you signed your
7  statement on October 15, 2020?
8     A.    I don't know.  I would have to
9  talk to a lawyer before I decided anything
10 like that.
11    Q.    Okay.  Well, I'll ask you to go
12 talk to somebody because we'd be interested in
13 seeing if, in fact, you called a DOL
14 representative after you signed your statement
15 because it just seems kind of a coincidence
16 that Battle signs a statement, you sign your
17 statement, a search warrant gets issued, you
18 have your layoff, you may have called DOL, you
19 may have not, and then FBI calls you.
20    A.    Uh-hum.
21    Q.    All in a pretty short period of
22 time.
23    A.    Yeah.
24    Q.    You know, that's a lot of

Page 181

1  coincidences.  You know, and we'd be
2  interested in seeing if, in fact, there was
3  discussions -- let's put it that way --
4  between DOL and the FBI/DOJ.
5          So think about it, and some of
6  the other information we'll follow up with you
7  on for all of us here, and then you can let us
8  know if you'll voluntarily do it or if we have
9  to serve a subpoena.
10    A.    That's fine.
11    Q.    Okay.  Now, we've already
12 established that at the time of your DOL
13 statement you were working at the W Hotel,
14 right?
15    A.    Yes.
16    Q.    All right.  Let me show you
17 what we're going to mark here as McConnell-6.
18          - - -
19          (Exhibit McConnell-6 was marked
20       for identification.)
21          - - -
22 BY MR. PODRAZA:
23    Q.    And for the record, what we've
24 marked here as McConnell-6 -- well, let me

TIMOTHY MCCONNELL

Page 182

1 first ask you, have you ever seen a document
2 like this before, a printout?
3     A.    No.
4     Q.    This is a record of your work
5 --
6     A.    Uh-hum.
7     Q.    -- through the union.
8     A.    Uh-hum.
9     Q.    And if you can see where job ID
10 23444 is listed.  It's the W Hotel?
11    A.    Uh-hum.
12    Q.    And you had been there from
13 May 13, 2020, until October 19, 2020.
14    A.    Uh-hum.
15    Q.    And right after that you go
16 right to Penn Medicine?
17    A.    Uh-huh.
18    Q.    With Shaeffer Sons.  You see
19 that there?
20    A.    Yep.
21    Q.    And you've worked continuously
22 since then, right?
23    A.    Yes.
24    Q.    All right.  So there was no

Page 183

1 claim of retaliation or even thoughts of
2 retaliation by the union from the time you
3 were at Penn Medicine going forward, correct?
4         MS. DEBRUICKER:  Objection.
5         THE WITNESS:  Yeah, I mean --
6 BY MR. PODRAZA:
7     Q.    Yeah, you continued to work,
8 right?
9     A.    Yes.
10    Q.    Okay.  And the -- what, seven
11 days it was between the time of the W Hotel
12 work ended and you were at Penn Medicine
13 working?
14    A.    I went there the next day.
15    Q.    Really?  So you were there on
16 10/20?
17    A.    I went there -- I got laid off
18 on a Friday.  I went there Monday.
19    Q.    Okay.  So these records may be
20 a little bit off is what you're saying?
21    A.    Yes.
22    Q.    Okay.  So really there was no
23 delay between the time of the W Hotel 'til the
24 time of your next work at Penn, right?

Page 184

1     A.    Right.
2     Q.    Okay.  And you're not positive,
3 but it could be that the W Hotel, at least
4 your work, was completed, and that's what
5 accounts for why you were laid off?
6     A.    Um -- my -- I mean, no.  I
7 mean, I still had work on my floor, the floor
8 I was doing.
9     Q.    Okay.
10    A.    But it was towards the end of
11 the job.
12    Q.    Right.  So that means you're
13 kind of -- less and less employees are there.
14 There's some work, but less and less employees
15 are there; is that correct, as it winds down?
16    A.    Yes.
17    Q.    Okay.  And that could be, as
18 far as you know, the reason why you were laid
19 off?
20         MS. DEBRUICKER:  Objection.
21         THE WITNESS:  Yeah, it could be
22    the reason.
23 BY MR. PODRAZA:
24    Q.    Okay.  Now, looking at your

Page 185

1 employment record, I noticed that it's not
2 unusual for you to go from one job to the next
3 job, you know, with some period of time of not
4 working, is what I'm getting at.  Do you see
5 that here?
6     A.    Yeah.  This ain't -- this ain't
7 right.  I've never missed any time, so --
8     Q.    So you go from one to the next?
9     A.    Yeah, these records ain't
10 correct.  Yeah, I mean, I might have been a
11 couple weeks here and there.  I was out with a
12 torn ACL in 2019.  So the W has me there from
13 5/13 to 10/19, but I was there for almost two
14 years.  Yeah, I mean, like I said, I never
15 really missed more than a week here or a
16 couple weeks here.
17    Q.    All right.  So even with the
18 circumstances surrounding the June 9th, 2020
19 nomination proceedings before and after you
20 never lost any work?
21         MS. DEBRUICKER:  Objection.
22         THE WITNESS:  No.
23 BY MR. PODRAZA:
24    Q.    No, you didn't?

47 (Pages 182 - 185)

TIMOTHY MCCONNELL

Page 186

1    A.    No, I didn't lose any work.
2         MR. PODRAZA: Okay. I think at
3    this point, if I can just take a
4    moment, I think that's all the
5    questions I have at this time, you
6    know, subject to yours and maybe some
7    follow-up. So maybe if we take a
8    break.
9         THE VIDEOGRAPHER: The time is
10   6:44. Going off the video record.
11        - - -
12        (There was a brief recess in
13   the proceeding.)
14        - - -
15        THE VIDEOGRAPHER: The time is
16   6:52. We are on the video record.
17   This begins media unit three.
18   BY MR. PODRAZA:
19   Q.    Mr. McConnell, you made
20   reference that you had gone to a meeting with
21   Mr. Borthwick, Mr. Coppinger, Mr. Battle, and
22   yourself at Mr. Battle's house.
23        Do you recall when that was?
24   A.    Hum. I would say it was

Page 187

1    sometime this year.
2    Q.    Which month would you best
3    estimate?
4    A.    The month I don't know. It was
5    -- it had to be the spring. It was nice out
6    from what I remember, so it was probably
7    spring or summer. Probably spring of this
8    year.
9    Q.    Okay. We're in the summer
10   right now.
11   A.    April, May.
12   Q.    April, May.
13   A.    Maybe around there, yeah.
14   Q.    And what triggered having a
15   meeting at his house?
16   A.    I don't know. I guess the --
17   for like upcoming -- for some of the union
18   meetings coming up, and, you know, I don't
19   know -- yeah, I mean, nothing, just talking,
20   see how everything's going, you know what I
21   mean, what was going on.
22   Q.    Were there other meetings?
23   A.    I never, personally, never went
24   to any meeting.

Page 188

1    Q.    Do you know if there were other
2    meetings, though, that you didn't attend?
3    A.    I heard there was other
4    meetings. I've personally never been to them.
5    Q.    And who, as far as you know,
6    were at those other meetings?
7    A.    I'm not sure. I wasn't there.
8    You know, I just --
9    Q.    Did you hear it from Mr. Battle
10   that they had a meeting at his house?
11   A.    One of the three that were at
12   that other meeting would know who was there.
13   I personally was -- never went.
14   Q.    Does Mr. Battle have a drinking
15   problem?
16   A.    I personally never seen.
17   Q.    You've never seen him
18   incapacitated or under the influence?
19        MS. DEBRUICKER: Objection.
20        THE WITNESS: Not that I --
21        like I said, I didn't really know
22        Charlie before all this, so I don't
23        know him.
24   BY MR. PODRAZA:

Page 189

1    Q.    Well, you were at the recent
2    members' meeting, weren't you?
3    A.    Yes.
4    Q.    Did Mr. Battle appear to be
5    under the influence or any behavior, a little
6    odd behavior?
7    A.    I mean, I didn't think he was
8    under the influence.
9    Q.    Do others express to you
10   sometimes that their impression is that
11   Mr. Battle might have either a drinking or
12   other narcotic type problem?
13   A.    I know Mark Lynch said it to me
14   before when that was first going on, but
15   that's --
16   Q.    I'm not asking you to vouch for
17   him. I'm just asking, have others raised with
18   you concerns about Mr. Battle being under the
19   influence of something?
20   A.    Not really. I mean, like I
21   said, I don't really get into the personal
22   stuff, you know what I mean, so I don't really
23   know.
24   Q.    What did Mark Lynch say to you

48 (Pages 186 - 189)

TIMOTHY MCCONNELL

Page 190

1 about --
2      A.    He just said that -- this was
3 before when I heard that first night from --
4 that maybe he was on drugs.  They thought he
5 was on drugs.  Or I don't know.  I don't know
6 how exactly that conversation went.  I
7 personally don't know.
8      Q.    This is before the June 9th,
9 2020 nomination?
10      A.    Yes.
11      Q.    Have you ever seen odd behavior
12 by Mr. Battle?
13            MS. DEBRUICKER:  Objection.
14            THE WITNESS:  I don't know what
15      you would say would odd be.  I mean,
16      I've been to the last meeting where
17      him and John were arguing, I mean,
18      yelling back and forth a little bit.
19      I mean, that's -- again, I haven't
20      really known the guy that long, so I
21      don't really know personally anything.
22 BY MR. PODRAZA:
23      Q.    Does Mr. Battle frequent
24 Kelly's, the bar?

Page 191

1      A.    I don't know.
2      Q.    Do you drink?
3      A.    I do drink.
4            MS. DEBRUICKER:  Objection.
5 BY MR. PODRAZA:
6      Q.    But I'm not trying to get too
7 personal.  But have you ever gone out drinking
8 with him?
9      A.    With Charlie, no.
10      Q.    No.  Okay.
11            MR. PODRAZA:  That's all I had
12      at this time.  Thank you.
13 BY MS. DEBRUICKER:
14      Q.    Mr. McConnell, you okay to keep
15 going, to plow through?
16      A.    Good.  Let's go.
17      Q.    Mr. McConnell, I'm Lauren
18 DeBruicker, and I'm counsel for the Secretary
19 of Labor in this litigation.  I'm going to be
20 as quickly -- I'm going to be as quick as I
21 can.  And most of my questions are sort of
22 follow-up, so I may bounce around a little bit
23 in time, so bear with me.  My goal is to not
24 go over anything you already testified to.

Page 192

1      A.    You got it.
2      Q.    And I'll do my best to orient
3 you, and if my questions are at all unclear,
4 let me know.
5      A.    Okay.
6      Q.    I want to direct your attention
7 back to the text, which was McConnell-1.  Do
8 you have that in front of you?
9      A.    Yes.  Here it is.
10      Q.    And the first of those two
11 texts is dated 5:59 p.m.; is that right?
12      A.    Yes.
13      Q.    And it reads, you know, to
14 Mr. Lynch, "yo, I am thinking about running
15 for e-board."
16            At that time had you decided to
17 run for e-board.
18      A.    That's when I decided to run,
19 that day.
20      Q.    Okay.  And you told Mr. Lynch
21 I'm thinking around running.
22            Was that just to kind of float
23 the idea by him?
24      A.    Yeah.  I didn't really think

Page 193

1 that we'd be sitting here in front of lawyers
2 a year and a half later, that's all.
3      Q.    Okay.  Your text continues,
4 "just wanted to let you know that I had
5 nothing to do with the website, I swear on my
6 kids"; is that right?
7      A.    Uh-hum.
8      Q.    And you wanted Mr. Lynch to
9 know that up front?
10      A.    Yes.
11      Q.    And it's your understanding
12 that Mr. Lynch communicated this message to
13 Mr. Dougherty because you spoke with him very
14 shortly afterward?
15      A.    Yes, that was the -- because he
16 texted me on a prior text before this that my
17 name came up with that website, and I had
18 nothing -- you know.
19      Q.    Okay.  And to the best of your
20 recollection, about how long was it between
21 the time you sent this text to Mr. Lynch at
22 5:59 p.m., and when you got the call where you
23 spoke to Mr. Dougherty?
24      A.    Within a minute or two.

49 (Pages 190 - 193)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

TIMOTHY MCCONNELL

Page 194

1    Q.    Do you recall in your
2 conversation with Mr. Dougherty that you told
3 him that you had nothing to do with the
4 website?
5    A.    I did.
6    Q.    What was his response?
7    A.    He said that, you know, you're
8 with them, so you're a part of it.
9    Q.    So despite you telling him you
10 had nothing to do with the website, did you
11 take it that he was going to associate you
12 with the website regardless of what you told
13 him?
14   A.    Yes.
15   Q.    Did you want anything to do
16 with the website?
17   A.    No.
18   Q.    Would that have been damaging
19 to your reputation in your opinion?
20   A.    Yeah.  I didn't want to get
21 into anything personal.  It's not what I
22 wanted to do.
23   Q.    And was Mr. Dougherty's
24 statement that he would affiliate you with

Page 195

1 that website regardless of what you said one
2 of the reasons why you decided not to run?
3    A.    That was part of it.
4    Q.    Your text continues, "just
5 think anyone should be able to run without
6 repercussions."
7        What did you mean by that?
8    A.    Without worrying about, you
9 know, I guess somehow, you know, not being
10 able to get a job because of what happened.
11 You know, most unions ain't like this.  They
12 have elections every three years.
13   Q.    Elections where more than one
14 set of candidates runs?
15   A.    Yes.
16   Q.    And were you concerned about
17 just your own job if you ran?
18   A.    Well, I do have family members
19 in the Local which never had anything to do
20 with it, so to me it was -- I didn't want to
21 bring them involved in something I was doing.
22   Q.    Were you concerned that
23 something could happen to their job prospects
24 if you didn't back off?

Page 196

1    A.    I did.
2    Q.    Was there ever a concern that
3 something could happen to Mr. Lynch's work if
4 you didn't back out?
5    A.    I don't know.  I don't know how
6 -- I don't think so.  I don't think -- I don't
7 think so.
8    Q.    And then you texted Mr. Lynch
9 at 7:33, "yo, I'm out," correct?
10   A.    Uh-hum.
11   Q.    It's my understanding that the
12 meeting was the following day, correct?
13   A.    Yes.
14   Q.    And did you have to make a
15 decision as to whether you were in or out
16 until the time of the meeting?
17   A.    I did.
18   Q.    All right.  I'm next going to
19 ask you to look at McConnell-5, which is the
20 memo followed by your statement.  You've spent
21 a lot of time on this, so I don't want to
22 recover old ground, but I understand from your
23 testimony today that this statement was typed
24 up by someone from the Department of Labor.

Page 197

1    A.    Yes.
2    Q.    And that they -- prior to the
3 time that you saw this statement you had given
4 an interview to the Department of Labor?
5    A.    I did.
6    Q.    If Department of Labor records
7 show that -- that your interview with them was
8 on August 31st of 2020, would that jive with
9 your recollection?
10   A.    Probably.
11   Q.    And in your review of the
12 statement did you see things that you had
13 spoken with DOL about during that interview?
14   A.    That was -- that I didn't think
15 was --
16   Q.    No.  My question is, when you
17 reviewed this statement, did you recognize it
18 as having been based on the interview that you
19 had?
20   A.    Yes, yes.
21   Q.    And you had a chance to review
22 the statement before signing, correct?
23   A.    Yes.
24   Q.    Were you under any time

50 (Pages 194 - 197)

TIMOTHY MCCONNELL

1 pressure during that review?
2    A.    No.
3    Q.    All right.  And you were
4 encouraged to make changes to anything that
5 wasn't correct; is that right?
6    A.    Yes.
7    Q.    And, in fact, you did make some
8 changes that are noted here.  Mr. Podraza took
9 you through, you know, some of the content
10 here, and there's a mention that, you know,
11 maybe one of the dates had been an issue.
12       In your review, did you find
13 this statement factually accurate to the best
14 of your recollection at that time?
15    A.    Yes.
16    Q.    And do you stand by this
17 statement today?
18    A.    Yes.
19    Q.    Were you pressured by anybody
20 in the government into signing this statement?
21    A.    No.
22    Q.    Were you pressured by anyone
23 else to sign this statement?
24    A.    No.

1    Q.    Mr. Podraza asked you about
2 references to the texts that we just looked at
3 from June 8th, how and whether it was referred
4 to in your statement.
5       Do you recall that line of
6 questioning?
7    A.    Yes.
8    Q.    I'm going to have you look at
9 page 3 of 4 of your statement.
10       The first word of that page is
11 "financially" up at the top.
12    A.    Uh-hum.
13    Q.    And I'm going to direct your
14 attention -- one, two, three, four, five
15 paragraphs down.  It's the second to the last
16 paragraph on the page.
17       Do you see that?
18    A.    Yeah.
19    Q.    Which reads, "I sent a text
20 message to safety director Lynch and told him
21 I don't want it to be personal, and I'm out
22 because I don't agree with what's on that
23 website."
24       Do you see that?

1    A.    Yeah.
2    Q.    And are you referring there to
3 the second text on McConnell-1 that we looked
4 at?
5    A.    Yes.
6    Q.    Okay.  All right.  I'm going
7 to ask you to look at McConnell-3, which is
8 the statement from Mr. Ryan.
9    A.    Uh-hum.
10    Q.    And referencing, you know, the
11 very bottom three lines of Mr. Ryan's
12 statement:  "I told him it's not worth the
13 aggravation to run."
14       Do you recall Mr. Ryan saying
15 something to that effect to you?
16    A.    Something like that.
17    Q.    What did you understand it to
18 mean?
19    A.    Aggravation, just this, what
20 we're going through right now.
21    Q.    That there could be things that
22 come of -- consequences to your running.
23    A.    Yes.
24    Q.    Negative consequences to your

1 running.
2    A.    Yes.
3    Q.    His last statement, which he
4 says he said to you is "take care of your
5 family."
6       Do you recall him saying
7 something to that effect?
8    A.    Something.  Yeah, I mean, yes.
9    Q.    Okay.  Do you know what he
10 meant by that?
11    A.    Probably the same thing, that I
12 guess it personally could affect you, you
13 working, which in turn is personal towards
14 your family.
15    Q.    You've got four kids, right?
16    A.    Yes.
17    Q.    Okay.  I'm going to ask you to
18 look next at McConnell-4, which is the letter
19 from Mr. Kieffer.  And Mr. Podraza took you
20 through some of the language in this letter,
21 in particular on page 2, in the middle of the
22 second paragraph, the third line.  It begins,
23 "Brother McConnell said business manager
24 Dougherty did not directly threaten him not to

51 (Pages 198 - 201)

TIMOTHY MCCONNELL

Page 202

1 run for office."
2         Do you recall that line of
3 questioning?  Do you recall Mr. Podraza asking
4 you about that?
5     A.    Yes, I do.
6     Q.    To your recollection, did you
7 discuss with Mr. Kieffer what a direct threat
8 was?
9     A.    I didn't.
10    Q.    To the best of your
11 recollection, those were his words, not yours?
12    A.    Yes.
13    Q.    Mr. Podraza asked you about
14 that next line saying that the conversation
15 made him, meaning you, feel funny.
16        Do you recall using that
17 language?
18    A.    I don't.
19    Q.    And at the bottom of the next
20 paragraph it reads, "again, Brother McConnell
21 said there was no direct threats but, again,
22 made him feel uncomfortable."
23        Do you recall using those words
24 at all?

Page 203

1     A.    I don't.
2     Q.    Staying on that same page, the
3 beginning of the second paragraph, "Brother
4 McConnell said it was about that time that he
5 started to hear that sitting officers did not
6 want him to run for office."
7         Do you know what he means by
8 that?
9     A.    "It was about that time, he
10 said" --
11        MR. PODRAZA:  I'm sorry, where
12    are we on this?
13        MS. DEBRUICKER:  The first line
14    of the second paragraph on page 2.
15        THE WITNESS:  It doesn't really
16    make much sense.  I don't know what it
17    means "when McConnell said it was
18    about that time he started to hear
19    that sitting officers did not want him
20    to run for office."  I don't know what
21    that means.
22 BY MS. DEBRUICKER:
23    Q.    Okay.  To clarify your earlier
24 testimony, I believe you said that the board

Page 204

1 members had paid positions.
2         Do I have that right?
3     A.    Board members, yes.
4     Q.    Or e-board members have paid
5 positions.
6     A.    Executive board members all
7 have paid positions.
8     Q.    Okay.  And it's my
9 understanding that the position of executive
10 board member isn't a paid position; is that
11 right?
12    A.    I think you get some money but
13 not much.
14    Q.    Okay.  Are you referring to
15 other paid positions that these members have?
16    A.    They have actually, yes,
17 appointed jobs.
18    Q.    Appointed.  Who are those jobs
19 appointed by?
20    A.    The business manager.
21    Q.    In both Mr. Kieffer's report
22 and in your statement, there's a reference to
23 Mr. Dougherty saying during your phone call
24 something to the effect of it would be a long

Page 205

1 three years if you lose.
2         Do you recall that?
3     A.    Yes, yes.
4     Q.    Are those the words you recall
5 Mr. Dougherty saying to you?
6     A.    Yes.
7     Q.    What did you take that to mean?
8     A.    I guess, work-wise, and when I
9 -- you know, when he first said it was, it was
10 -- I was figuring he meant it would be hard to
11 find a job.
12    Q.    Mr. Podraza mentioned that
13 after you gave your statement to The
14 Department of Labor -- after you signed the
15 statement that the Department of Labor
16 prepared, following that, you lost your job at
17 the W Hotel.
18    A.    Yes.
19    Q.    Okay.  What's your best
20 recollection as to about how long after it was
21 that between when you gave your statement and
22 you lost your job?
23    A.    I'm not really sure, but I
24 thought they said a week.  I'm not really sure

52 (Pages 202 - 205)

TIMOTHY MCCONNELL

1 though. I'm not.
2      Q.     Okay. And Mr. Podraza showed
3 you McConnell-6, which was the one-page work
4 record?
5      A.     Oh, yeah, yeah.
6      Q.     All right. Which indicates
7 that your layoff date from the W Hotel was
8 October 19th.
9            And does that sound about right
10 to you?
11      A.     Yes.
12      Q.     From the time that you first,
13 you know, gave your interview to the
14 Department of Labor until today, are there
15 things that are different about your work
16 life?
17      A.     Yes.
18      Q.     In what way?
19      A.     I guess, you got to pick and
20 choose where you work. I'm trying to think.
21      Q.     What do you mean by that?
22      A.     I guess you just figure the
23 best place to work. Or, you know, I don't
24 know if there would be repercussions, but if

1 there was, you hid from them. Do you know
2 what I mean? You know, not talking to as many
3 people as you used to.
4      Q.     Are there people who you don't
5 speak with anymore who you did before?
6      A.     Yeah, good amount.
7      Q.     But are there people who you
8 don't socialize with anymore?
9      A.     No.
10      Q.     Has anyone from the union
11 talked to you about this case, about the
12 litigation arising from the complaint about
13 the election?
14      A.     Meaning from the actual working
15 for the union or just union members?
16      Q.     Union -- let's start with union
17 members.
18            Have any union members talked
19 to you about this case?
20      A.     A ton of them, a lot of them.
21      Q.     What did they say?
22      A.     Just asked what's going on,
23 just mainly trying to figure out how
24 everything's going and what's going on.

1      Q.     Has anyone from union
2 leadership talked to you about this case?
3      A.     Not recently.
4      Q.     When's the last time you recall
5 talking to them about it?
6      A.     Probably -- it would be before
7 the DOL statement, somewhere in between that
8 time.
9      Q.     Okay. Do you recall who that
10 was?
11      A.     Well, it could have been --
12 actually, it was probably a couple times. I
13 guess I ran into a couple of them on the
14 beach. I couldn't -- I mean, it was last
15 summer, so --
16      Q.     All right. So summer of 2020?
17      A.     Yes.
18      Q.     Do you recall what they said?
19      A.     Back then it was just normal
20 conversation. That's -- yeah, nothing out of
21 the ordinary. Just normal conversation.
22      Q.     Has anyone from the union tried
23 to influence your participation in this
24 matter?

1      A.     I don't understand the
2 question.
3      Q.     Has anyone from the union given
4 you any signals about your participation in
5 this litigation, like what you should say or
6 what you should do?
7      A.     No, not here, no.
8      Q.     I understand you were at the
9 August 2021 union meeting?
10      A.     Yes.
11      Q.     Was anything said to you by
12 union leadership at that meeting?
13      A.     No.
14      Q.     Did Mr. Dougherty speak to you
15 at that meeting?
16      A.     No.
17      Q.     Did Mr. Dougherty look directly
18 at you during that meeting?
19      A.     Yes.
20      Q.     What kind of look was it?
21      A.     I sat -- I sat right in front
22 of the stage, and I guess it was just looking
23 at each other. I don't know. I guess
24 smirking or whatever, like laughing.

53 (Pages 206 - 209)

TIMOTHY MCCONNELL

Page 210

1    Q.    Did he ever look directly at
2  you at a union meeting before?
3    A.    I never really sat right there,
4  but, no.
5    Q.    Did someone at the meeting
6  suggest the union had information on you that
7  could get you locked up?
8    A.    Yes.
9    Q.    Tell me about that.
10   A.    Somebody said they -- they were
11 talking to John, and he had an envelope,
12 anybody that was going to ask a question, and
13 then whatever he had -- I don't know what he
14 had, but whatever he had it was about each
15 person.
16   Q.    Was the implication that if
17 somebody spoke up he would have dirt on them?
18   A.    That's what was told.  And
19 nobody said it to me.  They said it through
20 somebody else.
21   Q.    So you got wind of it?
22   A.    Yes.
23   Q.    What did you understand that to
24 mean?

Page 211

1    A.    I don't know what to take from
2  it.  I didn't know -- I guess -- I don't know.
3  I didn't know what to think of it.
4    Q.    Did you have a sense as to what
5  other people took that to mean?
6    A.    Other people seemed like it was
7  -- if you stood up and, you know, made too
8  much of a stink that whatever was going to
9  come out in the meeting.
10   Q.    If someone said something that
11 leadership didn't like that there would be
12 consequences to it?
13   A.    Yes.
14   Q.    Do you recognize the person
15 sitting to your right?
16   A.    Yes, John Dougherty.
17   Q.    Who is that?
18   A.    John Dougherty.
19   Q.    Do you recognize the person
20 sitting to his right?
21   A.    I just know it's one of the
22 lawyers.
23   Q.    So you may not recognize him
24 specifically?

Page 212

1    A.    I know he ran for DA.  I forget
2  his name.
3    Q.    Did you expect to see either
4  one of them here today?
5    A.    No.
6    Q.    Did their presence here
7  influence your testimony here today?
8    A.    No.
9          MS. DEBRUICKER:  That's all the
10 questions I have.
11 BY MR. PODRAZA:
12   Q.    Mr. McConnell, I'd just like to
13 follow up a little about the files and the
14 union members' recent meeting that
15 Mr. Dougherty you said had.
16         Did you know what was in those
17 files?
18   A.    That somebody said that he said
19 that it was something that could get me locked
20 up.
21   Q.    And I hope that -- this is just
22 -- Mr. Dougherty didn't say that, right?
23   A.    I don't know.  He didn't say
24 anything.

Page 213

1    Q.    If I told you that what was in
2  the files was if an issue came up so that he
3  could have reference to show people and
4  respond to the question --
5    A.    I couldn't tell you either way.
6    Q.    Okay.  And you didn't take that
7  as a threat, did you?
8          MS. DEBRUICKER:  Objection to
9  form.
10         THE WITNESS:  I don't know what
11 -- I didn't know that to be true.
12         Yeah, no.
13 BY MR. PODRAZA:
14   Q.    All right.  Did Mr. Dougherty
15 refer to anything in those files while you
16 were at the meeting to embarrass you or
17 intimidate you or anything along those lines?
18   A.    He didn't.
19   Q.    Okay.  And if I told you within
20 those files was, again, just material that he
21 could make reference to if questions came up
22 so that he could be accurate in his response,
23 would that change your -- would that be
24 different than what you heard from that person

54 (Pages 210 - 213)

TIMOTHY MCCONNELL

Page 214

1  about information of a criminal nature on your
2  part?
3            MS. DEBRUICKER:  Objection to
4       form.
5            THE WITNESS:  Yeah, I don't
6       know.  Like I said, that was just
7       hearsay that I heard, and I didn't
8       personally hear it, so --
9  BY MR. PODRAZA:
10      Q.    Now, when you -- your good
11 friend, Mr. Lynch, when you sent him those
12 texts, in those texts you made no reference to
13 anyone, including Mr. Dougherty, saying, you
14 know, if you lose, it'll be a long three
15 years, correct?
16      A.    In the text messages?
17      Q.    Yeah.
18      A.    He used Mark Lynch's phone.
19 Mark Lynch was standing right next to him.
20      Q.    I'm just saying, when you
21 texted Mr. Lynch --
22      A.    Yeah, I didn't, no.
23      Q.    -- there's no reference in
24 there about anybody saying, whoa, whoa, whoa,

Page 215

1  you know, I'm here, and it could be a long
2  three years if I run and I lose?  There's no
3  reference to that, right?
4            MS. DEBRUICKER:  Objection.
5            THE WITNESS:  Not in the text
6       message to Mark Lynch, no.
7  BY MR. PODRAZA:
8       Q.    Okay.  Well, did you separately
9  say to Mr. Lynch in a phone call or any other
10 manner that, you know, Mr. Dougherty's
11 threatened me with work not being available if
12 I run and I lose?
13      A.    No.
14      Q.    And wouldn't it be fair to say
15 that whether it's true or not, from
16 Mr. Dougherty's vantage point, he didn't think
17 that you could win even if you did run?
18 Wouldn't that be fair to say your impression
19 was that Mr. Dougherty didn't think that you
20 were going to be a competitive candidate
21 anyway?
22      A.    In the phone conversation he
23 said I'll campaign 24/7.
24      Q.    You could go ahead and

Page 216

1  campaign?
2       A.    No.  He said he'll campaign
3  24/7.
4       Q.    Yeah, yeah.  So he thought that
5  his ticket would win even if you decided to
6  run.  That was your impression, right, whether
7  it was right or wrong.
8       A.    Yeah, that was his impression.
9            MS. DEBRUICKER:  Objection.
10      Mischaracterizes his testimony.
11 BY MR. PODRAZA:
12      Q.    Okay.  Let's not
13 mischaracterize it.
14            I just want to be clear that
15 when you're talking to Mr. Dougherty, your
16 impression was that he didn't really take any
17 campaign by you serious enough that you would
18 win against his ticket.
19            MS. DEBRUICKER:  Objection.
20            THE WITNESS:  I mean, serious
21      enough to where -- I mean, yeah, I
22      don't know.  I don't know.  I didn't
23      get that from that conversation.
24 BY MR. PODRAZA:

Page 217

1       Q.    You thought in speaking with
2  Mr. Dougherty he thought that you could win
3  and beat one of the members that would be part
4  of his ticket?
5       A.    I mean, I don't understand why
6  he'd have to campaign 24/7.  That's what he
7  said on the phone.
8       Q.    Well, he said to you even if I
9  had to campaign 24/7 we're going to do that
10 because we're going to beat you even if you
11 decide to run.
12            Wasn't that what he was saying
13 to you?
14            MS. DEBRUICKER:  Objection.
15      Mischaracterizes his testimony.
16 BY MR. PODRAZA:
17      Q.    Well, was that what he was
18 conveying to you?
19            MS. DEBRUICKER:  Objection.
20            THE WITNESS:  That he thought
21      he could win?
22            MR. PODRAZA:  Yeah.
23            THE WITNESS:  Yeah.
24 BY MR. PODRAZA:

55 (Pages 214 - 217)

TIMOTHY MCCONNELL

1    Q.   All right.  So when you're
2  speaking to him whether you thought he could
3  win or not is a different issue.
4       I'm asking you, the impression
5  that Mr. Dougherty gave to you was that his
6  ticket was going to win whether you decided
7  not to run of if you decided to run.  That's
8  the impression he left with you, right?
9       MS. DEBRUICKER:  Objection.
10       THE WITNESS:  Again, I don't --
11    I mean, I don't know.  I don't -- I
12    don't -- I didn't take it from that.
13  BY MR. PODRAZA:
14    Q.   Well, what did you take?  You
15  thought that Mr. Dougherty seriously thought
16  that if you ran you would beat one of the
17  incumbents or the other individuals who are
18  officers or had been officers of the union or
19  presently were, had financing that they could
20  back in a campaign that you didn't have,
21  participated in union activities in advance,
22  which you didn't do, and had a platform that
23  they had raised the union's rates by $10.50
24  over three years, had kept healthcare costs

1  stable so it didn't cost the members more and
2  they had a great healthcare program -- oh, and
3  work was steady.  You thought that you were
4  going to beat those guys?
5       Now, you may have, but do you
6  really think with those factors that
7  Mr. Dougherty was thinking that you were
8  really going to beat them?
9       MS. DEBRUICKER:  Objection to
10    form, foundation, and the preamble.
11       THE WITNESS:  I don't know what
12    he was thinking.
13       MS. DEBRUICKER:  And asked and
14    answered.
15  BY MR. PODRAZA:
16    Q.   Okay.  But with those factors
17  being taken into account, knowing
18  Mr. Dougherty, did you really think that he
19  thought you were a serious candidate against
20  his ticket?
21    A.   (No verbal response).
22       MS. DEBRUICKER:  Objection.
23    Asked and answered.
24       MR. PODRAZA:  Okay.  That's all

1  I have.
2       THE VIDEOGRAPHER:  Any further
3    questions.
4       MS. DEBRUICKER:  One more.
5  BY MS. DEBRUICKER:
6    Q.   Why do you think Mr. Dougherty
7  tried so hard to get you not to run?
8    A.   I don't think he wants anybody
9  -- I don't think he wanted anybody running.
10  That's all.  I just -- I don't think it was
11  any one person.  It was just in general.
12    Q.   He wants no opposition?
13    A.   No.
14    Q.   Doesn't matter who it is?
15    A.   Doesn't matter who it was.
16  BY MR. PODRAZA:
17    Q.   Well, I guess now I have to
18  follow up with that.
19       If you ran, that would make
20  then the Dougherty team ticket have to spend
21  money, have to spend money on publications
22  going out to the membership, have to go forth
23  on a foregone conclusion that they're going to
24  win, but it would come at great cost and

1  expense to them, and they want to avoid it.
2       Did that ever cross your mind
3  that perhaps that was a reason why he was
4  encouraging you to not create that problem?
5       MS. DEBRUICKER:  Objection.
6       THE WITNESS:  Maybe, but it's
7    not how a union's ran.
8  BY MR. PODRAZA:
9    Q.   Let me ask you something.  Do
10  you deny that in thinking about running for
11  the union that, you, Mr. Coppinger,
12  Mr. Battle, were just trying to needle
13  Mr. Dougherty and the union leadership, and
14  never really intending to follow through on
15  it, but you thought that you'd get a reaction
16  out of these guys because they would have to
17  then go through all of the motions of putting
18  money out, getting literature, campaigning,
19  and taking time away from union business?
20       MS. DEBRUICKER:  Objection to
21    form.
22       THE WITNESS:  I never had a
23    problem with the Dougherty team or
24    anybody on -- I never had a problem

56 (Pages 218 - 221)

TIMOTHY MCCONNELL

Page 222

1     with the union ever.
2  BY MR. PODRAZA:
3     Q.    So you endorsed the Dougherty
4  team?
5           MS. DEBRUICKER:  Objection.
6           THE WITNESS:  Before?
7           MR. PODRAZA:  Yeah.
8           THE WITNESS:  Yeah, before I
9     have.
10 BY MR. PODRAZA:
11    Q.    Yeah.  And that's the same team
12 that was running on 2020 in the Dougherty
13 ticket except for one guy, right?
14    A.    You're right.
15          MS. DEBRUICKER:  Objection.
16 BY MR. PODRAZA:
17    Q.    Yeah.  If they were good enough
18 in 2017 --
19          MS. DEBRUICKER:  Objection.
20          THE WITNESS:  Things happened
21    between '17 and '20.
22 BY MR. PODRAZA:
23    Q.    What, the indictment?
24    A.    That's one of the things.

Page 223

1     Q.    Okay.
2     A.    Benefits for wives are another
3  one.
4     Q.    All right.  Well, that was a
5  personal one for you, right?
6     A.    That's not just personal.
7  A lot --
8     Q.    But that's one thing that was
9  personal?
10    A.    That change affects a lot of
11 people.
12    Q.    Right.  But you had better
13 wages, correct?
14    A.    Uh-huh.
15    Q.    You had stabilized costs that
16 they weren't increased for your benefits,
17 right?
18          MS. DEBRUICKER:  Objection.
19    Asked and answered.
20          THE WITNESS:  Uh-hum.
21 BY MR. PODRAZA:
22    Q.    You had steady employment?
23    A.    Uh-hum.
24          MS. DEBRUICKER:  Objection.

Page 224

1     Asked and answered.
2  BY MR. PODRAZA:
3     Q.    They're all pretty solid
4  things, right?  That's what you want on your
5  executive board and out of your officers from
6  the union, wouldn't you?
7           MS. DEBRUICKER:  Objection.
8           THE WITNESS:  Yeah.  I'm not
9     arguing about it, but, yeah, all them
10    things were true.
11 BY MR. PODRAZA:
12    Q.    And are you happy with the
13 individuals who are in office right now and
14 how they're running the union?
15          MS. DEBRUICKER:  Objection.
16          THE WITNESS:  I don't know.  I
17    don't know how to --
18 BY MR. PODRAZA:
19    Q.    Well, have you complained to
20 leadership about anything that's going on with
21 the union right now?
22    A.    Who am I going to complain to?
23    Q.    I'm asking you, have you made
24 any effort to complain or raise -- you go to a

Page 225

1  membership meeting.  Did anybody have a gag in
2  your mouth and keep you from speaking up?
3           MS. DEBRUICKER:  Objection.
4     Argumentative.  Counsel, let's wrap
5     this up.
6  BY MR. PODRAZA:
7     Q.    So I'm missing something here
8  that -- these officers are acceptable, your
9  campaign's nonviable --
10          MS. DEBRUICKER:  Objection.
11    Asked and answered.
12 BY MR. PODRAZA:
13    Q.    -- and it seems as though three
14 guys just decided to try to needle the union
15 management because some representatives are
16 under an indictment with the government.
17          Is that the thrust of your
18 whole point, is to needle the management
19 because of the indictment and see if you can
20 get a rise out of the leaders of the union?
21          MS. DEBRUICKER:  Objection to
22    form.  Asked and answered.
23          THE WITNESS:  I never had a
24    problem with them.

57 (Pages 222 - 225)

TIMOTHY MCCONNELL

Page 226

1  BY MR. PODRAZA:
2       Q.    You never had a problem with --
3       A.    With the Dougherty team.
4            MR. PODRAZA:  Okay.  Thanks.
5            THE VIDEOGRAPHER:  Are there
6  any further questions?
7            MS. DEBRUICKER:  No.
8            THE VIDEOGRAPHER:  The time is
9  7:30.  We are going off the video
10  record.  This concludes today's
11  testimony of Timothy McConnell.
12            - - -
13       (Witness excused.)
14            - - -
15       (Videotaped deposition
16  concluded at 7:30 p.m.)
17            - - -
18
19
20
21
22
23
24

Page 227

      C E R T I F I C A T I O N
1
2       I do hereby certify that I am a Notary
3  Public in good standing, that the aforesaid
4  proceeding was taken by me stenographically
5  pursuant to notice at the time indicated; that the
6  proceeding was correctly recorded in machine
7  shorthand by me and thereafter transcribed under my
8  supervision with computer-aided transcription; that
9  the aforesaid is a true and correct record of the
10  proceeding; and that I am neither of counsel nor
11  kin to any party in said action, nor interested in
12  the outcome thereof.
13
14       WITNESS my hand and official seal this
15  24th day of August, 2021.
16
17
18
19            _Lauren Sweeney_
20            _____
21            Notary Public
22
23
24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# Ex. L

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARTIN J. WALSH, SECRETARY : Civil Action No. 21-0096
OF LABOR,                  :
                           :
          Plaintiff,       :
                           :
     v.                    :
                           :
LOCAL 98, INTERNATIONAL    :
BROTHERHOOD OF ELECTRICAL  :
WORKERS,                   :
                           :
          Defendant.       :


- - -


Friday, September 24, 2021


- - -


VIDEOTAPED DEPOSITION of MICHAEL

COPPINGER, taken pursuant to Notice, held at

Dranoff & Patrizio, P.C., 1500 John F. Kennedy

Boulevard, Philadelphia, Pennsylvania, commencing

at 4:38 p.m., before Taneha Carroll, Court

Reporter - Notary Public there being present.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 2

```
 1
      A P P E A R A N C E S:
 2

 3    U.S. DEPARTMENT OF JUSTICE, UNITED STATES
      ATTORNEY'S OFFICE
 4
      BY:        LAUREN DeBRUICKER, ESQUIRE
 5               615 Chestnut Street
                 Suite 1250
 6               Philadelphia, Pennsylvania 19106
                 (215)861-8492
 7               Lauren.DeBruicker@usdoj.gov

 8               Representing the Plaintiff

 9

10    LAMB McERLANE, P.C.

11    BY:        JOSEPH R. PODRAZA, JR., ESQUIRE
                 One South Broad Street
12               Suite 1500
                 Philadelphia, Pennsylvania 19107
13               (215)609-3170
                 jpodraza@lambmcerlane.com
14
                 Representing Defendant
15

16
      DRANOFF & PATRIZIO, P.C.
17
      BY:        STEPHEN P. PATRIZIO, ESQUIRE
18               2 Penn Center
                 1500 John F. Kennedy Boulevard, Suite 1205
19               Philadelphia, Pennsylvania 19102
                 (215)569-2121
20               spatrizio@dpesq.com

21               Representing Michael Coppinger

22
      ALSO PRESENT:
23
                 Sirod Denny, Videographer
24
```

Free State Reporting, Inc.  410-974-0947

1                        I N D E X

2

3    WITNESS                                    PAGE

4    MICHAEL COPPINGER

5    (Witness Sworn.)                            4

6

7    EXAMINATION:

8       By:  Ms. DeBruicker               6, 113

9

10      By:  Mr. Podraza                     110

11                        -   -   -

12

                         E X H I B I T S

13

14   NUMBER              DESCRIPTION           PAGE

15   M.Coppinger-1       Subpoena for
                         Deposition            11

16
     M.Coppinger-2       Mr. Borthwick's Signed
17                       Statement             37

18   M.Coppinger-3       Declaration of Ed
                         Coppinger             73

19
     M.Coppinger-4       Mr. McConnell's Signed
20                       Statement             93

21   M.Coppinger-5       Mr. Battle's Signed
                         Statement            100

22
     M.Coppinger-6       Letter of Assent     111

23
            (Exhibits Retained by Attorney)

24

Page 4

1              P R O C E E D I N G S
2                      -   -   -
3              THE VIDEOGRAPHER:  This is
4    Media No. 1, the Videotaped
5    Deposition of Michael Coppinger in
6    the matter of Martin J. Walsh,
7    Secretary of Labor, Plaintiff v.
8    Local 98, International Brotherhood
9    of Electrical Workers, Defendant,
10   being heard before the United States
11   District Court for the Eastern
12   District of Pennsylvania, Civil
13   Action No. 21-0096.
14              This deposition is being
15   held at the Law Office of Dranoff &
16   Patrizio, P.C. at 1500 JFK Boulevard,
17   2 Penn Center, Suite 1205,
18   Philadelphia, Pa 19102.  Today's date
19   is September 24, 2021, and the time
20   on the record is 4:38 p.m.  My name
21   is Sirod Denny.  I'm the
22   videographer.  The court reporter is
23   Taneha Carroll.
24

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1          introduce yourself and affiliations,

2          and then the witness will be sworn.

3                    MS. DeBRUICKER:  Lauren

4          DeBruicker, Assistant United States

5          Attorney for the Secretary of Labor.

6                    MR. PODRAZA:  And Joe

7          Podraza on behalf of the Defendant

8          IBEW Local 98.

9                    MR. PATRIZIO:  Stephen

10         Patrizio here on behalf of Michael

11         Coppinger.

12                   THE VIDEOGRAPHER:  Will the

13         court reporter please swear in the

14         witness.

15                       -  -  -

16                   ...MICHAEL COPPINGER,

17         having been duly sworn, was examined

18         and testified as follows:

19                       -  -  -

20                   THE COURT REPORTER:  Usual

21         stipulations?

22                   MR. PODRAZA:  Yes.

23                   MS. DeBRUICKER:  Anything

24         except objection to the form will be

```
 1              reserved for trial.

 2                        MR. PODRAZA:  That's

 3              correct.  Counsel, do you want the

 4              witness to read and sign?

 5                        MR. PATRIZIO:  Yes.

 6                        THE WITNESS:  What do you

 7              want me to do?

 8                        MR. PODRAZA:  Nothing right

 9              now.

10                        -  -  -

11                        EXAMINATION

12                        -  -  -

13   BY MS. DeBRUICKER:

14   Q.        With that, let me get started.

15   Mr. Coppinger, we met briefly off the record.

16   My name is Lauren DeBruicker.  Thank --

17   A.        Nice to meet you.

18   Q.        -- you for coming in today.  We

19   appreciate it.  As I mentioned, I'm an

20   attorney for the Secretary of Labor in a

21   lawsuit that the Secretary has filed against

22   Local 98.  The Secretary alleges that Local 98

23   violated federal union laws by pressuring

24   members out of running for office and
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    pressuring members out of supporting other

2    members running for office in its June 2020

3    Officer Election, so that's why we're here

4    today.

5    A.        Okay.

6    Q.        Have you ever had your deposition

7    taken before?

8    A.        No.

9    Q.        So it's mostly a question-and-answer

10   session.  I'll ask you questions and you'll

11   give answers.  When I'm finished, your counsel

12   and Mr. Podraza will have a chance to ask you

13   questions as well.  Okay?

14   A.        Okay.

15   Q.        You've been put under oath, so it's

16   the same oath that you would take if you were

17   on the witness stand in court.  Do you

18   understand that?

19   A.        Yes.

20   Q.        There's a videographer who will

21   record everything and we have a court reporter

22   who will write down everything that we say.

23   Okay?

24   A.        Okay.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 8

```
 1   Q.         Because it's hard to write down what
 2   two people are saying at the same time, it's
 3   important that we take turns in speaking.
 4   A.         Okay.
 5   Q.         Even if you're listening to my
 6   question and you know where I'm going with it
 7   and you know what your answer's going to be --
 8   A.         I'll wait.
 9   Q.         It's important to wait and let me
10   finish, and then I'll let you finish your
11   answer before I ask my next question.  Okay?
12   A.         Okay.
13   Q.         I'll do my best to do that.
14   A.         All right.
15   Q.         If you don't understand any questions
16   that I ask you, will you let me know?
17   A.         Yes.
18   Q.         I want to be sure that you're clear
19   on the question before you give me an answer.
20   Okay?
21   A.         Okay.
22   Q.         If at any point you don't hear me
23   clearly, will you let me know?
24   A.         Yes.
```

```
 1   Q.           I want to be sure again that you hear

 2   me clearly before you answer.  And towards the

 3   end of the day, my voice does tend to drop so

 4   I won't be offended if you say, can you say

 5   that again or can you speak up.  Okay?

 6   A.           Okay.

 7   Q.           Are you here with a lawyer today?

 8   A.           Yes.

 9   Q.           Who is your lawyer?

10   A.           Steve Patrizio.

11   Q.           Is he sitting here next to me?

12   A.           Yes, ma'am.

13   Q.           Did you do anything to prepare for

14   today's deposition?

15   A.           Showed up, sat with him before,

16   talking sports.

17   Q.           Did you meet with Mr. Patrizio at all

18   any time other than today?

19   A.           Yes, earlier this week.

20   Q.           Did you meet with anyone else to

21   prepare for this deposition?

22   A.           My wife.

23   Q.           Did you talk with her about it?

24   A.           Yes, when I'm nervous.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    Q.        Did you look at any documents to

 2    prepare for today?

 3    A.        Look at, no.

 4    Q.        When you met with Mr. Patrizio, was

 5    anyone else there or was it just you and him?

 6    A.        Just me and him.

 7    Q.        Did anyone from Local 98 contact you

 8    about your deposition today?

 9    A.        No.

10    Q.        Is there any reason why you wouldn't

11    be able to give complete and truthful

12    testimony today?

13    A.        No.

14    Q.        Not distracted by personal issues?

15    A.        Everybody's distracted by personal

16    issues, work, kids, you name it.

17    Q.        Are you taking any medications that

18    would affect your ability to recall facts

19    accurately?

20    A.        Zoloft.  It's an anxiety medicine.

21    Q.        Does that impact your memory at all?

22    A.        They say it can sometimes.

23    Q.        Have you ever experienced that?

24    A.        Yeah.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1   Q.        Anything else that would impact your

 2   ability to recall facts accurately or give me

 3   truthful answers today?

 4   A.        No.

 5   Q.        I'm going to show you what we'll mark

 6   as --

 7                  MS. DeBRUICKER:  We should

 8             probably mark this as M.Coppinger-1.

 9             I'm going to hand it to the court

10             reporter and then she's going to give

11             it to you.

12                  THE WITNESS:  Okay.

13                  (Exhibit marked

14             M.Coppinger-1 for identification.)

15   BY MS. DeBRUICKER:

16   Q.        I won't ask you to read the whole

17   thing, Mr. Coppinger, but I'll ask you to take

18   a look at the front of that and see if that's

19   something you've seen before.

20                  MS. DeBRUICKER:  And I'll

21             identify for the record it's a

22             subpoena for your deposition

23             testimony today.

24                  THE WITNESS:  No, I haven't
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 12

```
 1                 seen this before.

 2      BY MS. DeBRUICKER:

 3      Q.        Did you look for any documents?

 4      A.        Did I look for?

 5      Q.        Let me ask a better question.  About

 6      midway down that document that I gave you,

 7      there's a checkbox that says production.  Do

 8      you see that?

 9      A.        Yes.

10      Q.        Which reads you or your

11      representatives must also bring with you to

12      the deposition the following documents -- and

13      I'll skip ahead for the interest of time --

14      and it reads a few lines down, All records

15      including phone records and emails from the

16      time period of June 2, 2020 to June 12, 2020.

17      Do you see where I'm reading?

18      A.        Yes.

19      Q.        Which constitute or reflect any

20      communications between you and -- and then the

21      first listed is Ed Coppinger.  Do you see

22      that?

23      A.        Yes.

24      Q.        Did you look for any documents like
```

Page 13

1    that before today?

2    A.        I don't have any documents and I

3    don't email.  I don't know how to email.  My

4    wife does all that.

5    Q.        Does the same go for the second line

6    there, Anyone regarding Local 98's June 2020

7    Election of Officers?

8    A.        I don't really talk to any of them.

9    Q.        Did you look on your phone to see if

10   there was record of calls?

11   A.        I did look on my phone, but there's

12   nothing between -- there might be a record,

13   but it's so old, you know, 15 months ago.

14   Probably not there.

15   Q.        What cell phone service do you use?

16   A.        I think AT&T.  Is there AT&T still?

17   I don't know.  My wife handles all that.  I'm

18   sorry.  You probably should have her in here

19   though.

20   Q.        Can you give us your cell phone

21   number?  I'll represent that I won't contact

22   you directly.

23   A.        215-593-8586.

24   Q.        You can sit that down.  I don't have

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 14

```
 1   any more questions about that.  Thanks.
 2   Are you a member of Local 98?
 3   A.        Yes, ma'am.
 4   Q.        How long have you been a member --
 5   A.        28 years.  Sorry.  I jumped in.
 6   Q.        It's good practice.  Do you have any
 7   family members who are also members of Local
 8   98?
 9   A.        Yes, ma'am.
10   Q.        Who is that?
11   A.        I have I think there's 25 of us, yes.
12   Q.        And then the line of 25, do you know
13   who is first?
14   A.        My grandfather came home from World
15   War II and him and all his brothers got in, so
16   they were the original six.
17                   MR. PATRIZIO:  Could you
18           speak up?
19                   THE WITNESS:  Yes.  Sorry.
20   BY MS. DeBRUICKER:
21   Q.        So in the line of 25, where do you
22   think you fall in terms of if your grandfather
23   was among the first?
24   A.        I don't know.  I don't know where I
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    fall.

2    Q.        Have any of your family members held

3    office in the union before?

4    A.        Yes.

5    Q.        Who?

6    A.        Eddie Coppinger was a business agent.

7    Joe Coppinger was on the Board of Trustees,

8    and I think my cousin Mark was a union

9    delegate.

10   Q.        You said Ed Coppinger was a business

11   agent.  Do I have that right?

12   A.        Yes.

13   Q.        What is a business agent?

14   A.        They take care of jobs coming in,

15   send people out to work, the day-to-day

16   operations of the union.

17   Q.        Do you know about what time period he

18   served in that role?

19   A.        He's retired now, so I think -- I

20   don't know.  He probably retired in 2015

21   maybe, around there.

22   Q.        And you mentioned Mark Coppinger?

23   A.        Yes.

24   Q.        What position does he hold again?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1     A.          Years ago I believe he was a union

2     delegate before my time.  He's passed now.

3     Q.          I'm going to turn the topic to the

4     June 2020 Officers Election the Local 98 held.

5                 At any point in time, did you

6     consider running for office in Local 98's June

7     2020 election?

8     A.          I thought about it.

9     Q.          At some point, did you decide to seek

10    that office?

11    A.          No.

12    Q.          Describe for me your thought process

13    when you say you thought about it.

14    A.          At the time, I was thinking about

15    running for office.  A lot of my friends on

16    the job and all said I should run, but I had a

17    lot of medical issues at the time and things

18    going on with the family, so I decided not to.

19    Q.          Can you give me a sense of the time

20    period when you were thinking about running?

21    A.          Probably a few months before the

22    election, up to maybe a month before the

23    election.

24    Q.          Was there a position you were

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    considering running for?

2    A.          I was thinking maybe E Board.

3    Q.          Do I understand that correctly to be

4    Executive Board?

5    A.          Yes.

6    Q.          You mentioned a few reasons why you

7    decided not to seek office?

8    A.          Yes.

9    Q.          Is there any other reason that you

10   decided not to seek office?

11   A.          No.

12   Q.          Was there anything in particular that

13   prompted you not to seek office?

14   A.          Just my health reasons.

15   Q.          I don't want to get too much into

16   your personal business, but can you give me a

17   general description of what that is?

18   A.          I had two diabetic ulcers on my feet.

19   I had a tumor near my spine that had to be

20   removed.  I had high anxiety over them two

21   issues, three issues.  So it kind of takes

22   you -- when it comes up medical, you know what

23   I mean, like nothing else really matters, you

24   know what I mean, so.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 18

```
1   Q.          Did you talk to anybody about your

2   consideration of running for office?

3   A.          Probably guys on the job, day-to-day

4   talk.

5   Q.          Anyone you recall specifically?

6   A.          In the beginning, no.

7   Q.          And at some other point?

8   A.          I did talk to Charlie Battle about

9   it.

10  Q.          About when did you talk to him about

11  it, do you recall?

12  A.          Maybe a few weeks before the

13  election -- or the nominations, I'm sorry.  It

14  wasn't the election.

15  Q.          Understood.  And what was the nature

16  of your conversations with Mr. Battle?

17  A.          Bouncing ideas off of each other.

18  Asking what we would do different, stuff like

19  that.

20  Q.          Did you have an understanding that

21  Mr. Battle was thinking about running?

22  A.          Later on, yes.

23  Q.          About when did you have that

24  understanding?
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 19

```
 1    A.          Maybe a week to 10 days before the
 2    nominations.
 3    Q.          Then how did you learn about that?
 4    A.          I think he told me.
 5    Q.          Was this a conversation you had in
 6    person or over the phone?
 7    A.          Probably over the phone.  With three
 8    kids, I don't -- I'm running to field hockey,
 9    soccer, hockey, you name it.
10    Q.          Did your consideration of seeking
11    office have any relationship to Mr. Battle or
12    his decision to run?
13    A.          No, no.
14    Q.          Did Mr. Battle's decision to run for
15    office affect whether you did or not?
16    A.          No.
17    Q.          Are you familiar with a gentleman
18    named Timothy McConnell?
19    A.          I think I might have talked to him
20    two or three times.
21    Q.          I'll ask you about that in a little
22    bit.  We've heard testimony that Mr. McConnell
23    was considering running.  Did your decision
24    whether to run or not have any relationship to
```

 1   whether Mr. McConnell was also running?

 2   A.        Not really.  I didn't know him.  But

 3   when he decided not to run, my mind was

 4   already made up.

 5   Q.        How did you learn that he had decided

 6   not to run?

 7   A.        I don't know if somebody on the job

 8   told me or he might have tol -- I think he

 9   might have told me.

10   Q.        Do you know about when that was?

11   A.        Probably a couple of days before the

12   nominations.

13   Q.        Do you recall specifically?

14   A.        No, sorry.

15   Q.        Would that be another conversation

16   that happened over the phone?

17   A.        Yes.

18   Q.        Did you have an understanding as to

19   how to seek nomination at the June 2020

20   nomination meeting?

21   A.        Yeah, you have to go down and fill

22   out a paper.

23   Q.        Anything else you needed to do?

24   A.        You don't have to, but it's good

Page 21

1    sometimes if somebody nominates you.

2    Q.        Why is it good if somebody does that?

3    A.        I don't know.  That's just how they

4    always do it.  You're better off not

5    nominating yourself.

6    Q.        Why is that?

7    A.        It seems like you're doing, you know

8    what I mean, you're out for you, you know what

9    I mean.  It's better if somebody nominates

10   you.

11   Q.        When you were considering running,

12   did you have a plan as to who might nominate

13   you?

14   A.        No, never got that far.

15   Q.        Do you know if a seconder, if

16   someone's to second the nomination would be

17   required?

18   A.        I don't know.  I don't even know if

19   the first person is required.  You could

20   probably nominate yourself.

21   Q.        Did you have any plans in connection

22   with the June 2020 election to nominate anyone

23   for office?

24   A.        I didn't have any plans, but I know

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 22

1   Charlie wanted me to nominate him.

2   Q.        How do you know that?

3   A.        He had asked me to nominate him.

4   Q.        When did he ask you to do that?

5   A.        I think the day before or the day of.

6   Q.        How did he ask?  Was it a phone call

7   or --

8   A.        Yeah, it was a phone call.

9   Q.        Did he say what he was running for?

10  A.        I believe he wanted to run for

11  president.

12  Q.        What was your response to him?

13  A.        In the beginning I was like lukewarm,

14  I was like okay, you know.  But I wasn't -- if

15  I wasn't running, I wasn't too keen on

16  nominating anybody else, you know what I mean.

17  Q.        At any point, did you give him any

18  indication that you would nominate him?

19  A.        Yeah, after a few phone calls.

20  Q.        And then I take it at some point you

21  decided not to nominate him?

22  A.        Yes.

23  Q.        We'll talk about that more later.

24  A.        Okay.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 23

1    Q.        How did you know Mr. Battle?

2    A.        Just through work.

3    Q.        You've been on job sites together?

4    A.        One or two.

5    Q.        Were you currently on a job site with

6    him at that time?

7    A.        No.

8    Q.        And when you were going to nominate

9    him, what did you understand was necessary to

10   do that?

11   A.        I think I had to go down and sign a

12   paper.  I think that was it.

13   Q.        When you say go down, go down where?

14   A.        The union hall.

15   Q.        What was that understanding based on,

16   your understanding of what you had to do to

17   nominate somebody?

18   A.        A phone call I had with him.

19   Q.        Help me understand this as closely in

20   time as you can when you decided not to seek

21   nomination for yourself?

22   A.        Like I said, probably a month before

23   the election or the nominations.

24   Q.        And at some point, did you change

Page 24

1    your mind about nominating Mr. Battle?

2    A.        Yes.

3    Q.        When did you make that decision?

4    A.        Probably the day of.

5    Q.        The day of the nominations meeting?

6    A.        Yes.

7    Q.        Why did you make that decision?

8    A.        Like I said, I have health reasons.

9    I have -- I didn't want to get caught up in

10   anything so.

11   Q.        So I'm clear, did your health reasons

12   prevent you from nominating Mr. Battle?

13   A.        No.  But with the cuts on both my

14   feet just going to a meeting was a problem.

15   Q.        And I think you also said you didn't

16   want to get caught up in anything; do I have

17   that right?

18   A.        Yes.

19   Q.        What do you mean by that?

20   A.        It seemed like rumors that fly around

21   the Local, it was back and forth going on.  I

22   didn't need that in my life at the time.

23   Q.        What kind of rumors were going back

24   and forth?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 25

1    A.        Probably just, you know, who was

2    running, who didn't want, you know, just

3    hearsay.  You don't pay much attention to it.

4    There's three ways new travels, telephone,

5    telegraph and tele-electrician.

6    Q.        At any point, did you tell Mr. Battle

7    that you were going to seek office?

8    A.        Maybe like a month before nominations

9    I told him I was thinking about it.

10   Q.        What do you recall was the substance

11   of that conversation?

12   A.        I believe it was just a phone

13   conversation.  He just asked me where my head

14   was at the time and that was it, you know.  I

15   thought maybe run.

16   Q.        I may have asked you this, but I just

17   want to be clear.  Did Mr. Battle's decision

18   to run for office affect your decision to run

19   for office?

20   A.        No.

21   Q.        And at some point, did you tell

22   Mr. Battle that you were not going to run for

23   office?

24   A.        Yes.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 26

1    Q.        When did you tell him that?

2    A.        Like I said, probably two weeks

3    before.

4    Q.        Was that a phone conversation?

5    A.        Yes.

6    Q.        What was the substance of that

7    conversation?

8    A.        I just told him what was going on.

9    That I wasn't -- that I didn't, you know,

10   health reasons, personal reasons, I didn't

11   want to run anymore.  I think he probably

12   wanted me to still run.

13   Q.        Why did you think that?

14   A.        Because he said I want you to still

15   run.

16   Q.        Did he say why?

17   A.        No.

18   Q.        So you told Mr. Battle that you were

19   not running?

20   A.        Yes.

21   Q.        But I understand you did tell him you

22   would nominate him, correct?

23   A.        Yes.

24   Q.        Tell me the substance of that

1   conversation.

2   A.        He asked me to -- I think he texted

3   me and asked me to nominate him.  Then we

4   talked on the phone.  I explained I would

5   nominate him, but you know.  I said there

6   would be other people there who you want them

7   to nominate you, you know what I mean.

8   Because like I said, I can't really help you

9   with everything that was going on with me.

10  You might wanted somebody to nominate you that

11  would help you with your campaign.  I can't do

12  that.

13  Q.        Why couldn't you help him with his

14  campaign?

15  A.        Health reasons with the tumor and

16  all.

17  Q.        Prior to the June 2020 nominations

18  process, did you know Timothy McConnell?

19  A.        No.

20  Q.        Did you come to know him during that

21  process?

22  A.        No.

23  Q.        At some point, were you introduced to

24  him during that process?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 28

1    A.         Over the phone.

2    Q.         How were you connected with him?

3    A.         We both work for Local 98.  I didn't

4    really know him before or after.

5    Q.         How did you come to speak with him by

6    phone?  Did someone put the two of you in

7    touch?

8    A.         Charlie said he was going to have Tim

9    call me.

10   Q.         Did you understand why he said that?

11   A.         I believe Timmy was probably on the

12   fence of what he wanted to do too.  So he

13   probably wanted to call me and see where my

14   thinking was.

15   Q.         At any point, did you find out that

16   Mr. McConnell was running for office?

17   A.         I don't think he did.  I didn't hear

18   that he went down and filled out any paperwork

19   or anything to run.

20   Q.         At any point, did you hear that he

21   had decided to run for office?

22   A.         No.  He actually called me and said

23   that he decided not to.

24   Q.         When was that?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    A.          A few days before nominations.

2    Q.          Did Mr. McConnell's decision --

3    excuse me.  Did Mr. McConnell's decision to

4    run for office affect yours?

5    A.          No.

6    Q.          At some point, did you tell

7    Mr. McConnell that you were thinking about

8    running for office?

9    A.          After I had already decided not to.

10   Q.          You had already made up your mind?

11   A.          Yes.

12   Q.          Tell me what you did tell him.

13   A.          I told him I was thinking about

14   running, but I chose not to for health

15   reasons.

16   Q.          Do you recall how that conversation

17   went?

18   A.          I believe he said he decided not to

19   run either.

20   Q.          At some point, did you tell

21   Mr. McConnell that you were not running?

22   A.          During that phone conversation.

23   Q.          During that same conversation?

24   A.          Yup.

```
 1    Q.        Did you tell him why you weren't

 2    running?

 3    A.        I said health reasons.

 4    Q.        Were you contacted by anyone else

 5    about your consideration of running?

 6    A.        No.

 7    Q.        Do you recall telling Mr. McConnell

 8    that you had been taking a nap before he

 9    called?

10    A.        I probably was, yeah.

11    Q.        Do you recall telling Mr. McConnell

12    that you woke up to about 50 phone calls on

13    your phone?

14    A.        Probably, yeah.

15    Q.        Why would you have gotten 50 phone

16    calls?

17    A.        Like I said, electricians are like

18    girls, grade school girls.  They want to know

19    everything that's going on.  They want to know

20    who's running, what's going on, you know.

21    Q.        So why would you have gotten those

22    calls?

23    A.        I know a lot of people and a lot of

24    people were speculating whether I was going to
```

1    run or not.

2    Q.        Do you recall who those calls were

3    from?

4    A.        No.  It was 15 months ago.

5                    MR. PATRIZIO:  He's a

6            modest guy.  He's very popular.

7                    MS. DeBRUICKER:  So I hear.

8    BY MS. DeBRUICKER:

9    Q.        Did any Local 98 business agents

10   contact you during that time?

11   A.        No.

12   Q.        Do you recall telling Mr. McConnell

13   that you weren't running for office because it

14   wasn't worth it?

15   A.        No.

16   Q.        Did Mr. McConnell tell you that he

17   had received calls from people about the

18   election?

19   A.        I believe he did.

20   Q.        What do you recall of what he told

21   you?

22   A.        He said him and somebody got into an

23   argument and he wasn't running anymore or

24   something.  He didn't say who it was.  He

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

 1   didn't say -- he just -- there was an argument

 2   and he decided not to run.

 3   Q.        Is it your understanding that that

 4   argument is what made him decide not to run?

 5   A.        Well, he said there was a lot of

 6   things that made him not run, but that was

 7   just one factor.

 8   Q.        Did he mention anything else?

 9   A.        I don't really remember what was

10   said.

11   Q.        Are you aware of anything else that

12   made him not run?

13   A.        No.

14   Q.        So did Mr. McConnell tell you that he

15   spoke with Mr. Dougherty?

16   A.        He said somebody at the hall.  I

17   don't know if he said the name.

18   Q.        What else did Mr. McConnell tell you

19   about that conversation?

20   A.        I don't know.  The conversation

21   really wasn't that long.

22   Q.        Your conversation with McConnell

23   wasn't that long?

24   A.        No.  I think like I said we only

 1   talked three times.

 2   Q.        I just want to make sure.  When you

 3   say the conversation wasn't that long, I want

 4   to make sure I understand which conversation

 5   you're talking about?

 6   A.        When I was talking to him that night,

 7   the conversation really wasn't that long.

 8   Q.        Your conversation with Mr. McConnell

 9   that night wasn't that long?

10   A.        Yes.

11   Q.        Did learning about the conversation

12   that Mr. McConnell described to you that he

13   had with someone at the hall, did that have

14   any effect on you --

15   A.        No.

16   Q.        -- and your decision to run?

17   A.        No.

18   Q.        Did that have any effect on your

19   decision to nominate anyone?

20   A.        No.

21   Q.        Did Mr. McConnell mention that he was

22   contacted by a Local 98 business agent?

23   A.        That night in the conversation he

24   said he talked to somebody at the hall.

 1   Q.        So that could be a business agent?

 2   A.        Yeah, it could be anybody.

 3   Q.        Do you have any information as to who

 4   that was?

 5   A.        No.

 6   Q.        Did Mr. McConnell mention speaking

 7   with Rodney Walker?

 8   A.        Not that I know of, no.

 9   Q.        Did you draw any connection between

10   the calls that you received that night and the

11   calls Mr. McConnell received?

12   A.        No.  Like I said, that's just like

13   they're a bunch of schoolgirls.  You can't

14   take, you know, any of that -- stock in any of

15   that, you know.

16   Q.        Do you have reason to believe that

17   your decision whether or not to run for office

18   had an impact on Mr. McConnell's decision

19   whether or not to run for office?

20   A.        I don't think so.

21   Q.        Are you familiar with a gentleman

22   named Philip Borthwick?

23   A.        Yes.

24   Q.        Did you have any --

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1                    MR. PATRIZIO:  Philip who?

2                    MS. DeBRUICKER:  Borthwick,

3           B-o-r-t-h-w-i-c-k.

4    BY MS. DeBRUICKER:

5    Q.          At any point, did you tell

6    Mr. Borthwick that you were considering

7    running?

8    A.          Yeah, a month before the election

9    probably.

10   Q.          Why did you tell him you were

11   consider running?

12   A.          I had a problem with the health care.

13   Q.          A problem with Local 98's health

14   care?

15   A.          Yes.

16   Q.          What was the issue?

17   A.          They were trying to knock wives and

18   children off the health care.

19   Q.          And what do you recall you told

20   Mr. Borthwick about your intention to run?

21   A.          Just that I was thinking about

22   running.  That was it really.

23   Q.          Do you recall what his response was?

24   A.          Yeah.  He said I should.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 36

1    Q.          Why did he think you should as far as

2    you know of?

3    A.          I know a lot of people in the Local.

4    My family's been around a long time so.

5    Q.          Did Mr. Borthwick think you could

6    make a difference?

7    A.          He did.

8    Q.          Did you think you could make a

9    difference?

10   A.          I did.

11   Q.          At some point, did you tell

12   Mr. Borthwick that you were not running for

13   office?

14   A.          Yes.

15   Q.          When was that?

16   A.          When I told Charlie.  I let everybody

17   know that two weeks before the election -- the

18   nominations.  I'm sorry.  I keep saying that.

19   Q.          I do that sometimes.  And how did you

20   tell Mr. Borthwick that you were not running?

21   A.          I said, Phil, I'm not running, I

22   decided not to run.  He said, why?  I said, I

23   got too many problems going on with my health

24   right now.

```
 1   Q.         Was that an inperson conversation?

 2   A.         I believe it was over the phone, I

 3   believe.

 4   Q.         Did you tell him any other reason why

 5   you were not running?

 6   A.         Probably said I don't need the

 7   headache.

 8   Q.         What would the headache be?

 9   A.         Just be pressure all around, you

10   know, who's going to cheer you on, who's not

11   going to cheer you on, you know.  I didn't

12   need that in my life.

13   Q.         Tell me more about what you mean by

14   who's going to cheer you on and who's not

15   going to cheer you on?

16   A.         Well, if you're going to decide to

17   run, you're going to have to have a campaign.

18   With health issues, I can't do a campaign at

19   the time.

20   Q.         Now, I'm going to show you what we're

21   going to mark as M.Coppinger-2.

22   A.         Okay.

23                     (Exhibit marked

24                     M.Coppinger-2 for identification.)
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    BY MS. DeBRUICKER:

2    Q.        I'm not going to ask you to read the

3    whole thing.  I'll give you a second to look

4    at it, and then I'll direct your attention to

5    a couple of specific items.

6                  Mr. Coppinger, I'll represent to

7    you that this is a signed statement from

8    Mr. Borthwick that he gave to the Department

9    of Labor as the Department of Labor was

10   investigating Local 98's elections.  I'll ask

11   you some specific questions.  But first of

12   all, just look at the last page for me real

13   quick.  And I will show you there's some

14   signatures there, and I'll represent that that

15   was the signature that Mr. Borthwick put on

16   the document.

17   A.        Okay.

18   Q.        And just above that in the

19   typed-written language it says, I declare

20   under penalty of perjury that the foregoing

21   statement consisting of three pages is truly

22   correct.  Do you see that?

23   A.        Yes.

24   Q.        I'm going to direct your attention to

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   the first page of the statement where it says

2   statement at the top.

3   A.        Yes.

4   Q.        And I'm going to direct your

5   attention to the third paragraph that's

6   highlighted in yellow that begins, I was

7   trying to keep Battle.  Do you see that?

8   A.        Yes.

9   Q.        It reads, I was trying to keep Battle

10  and McConnell a secret but eventually I

11  decided to connect them to each other.

12            Did you have an understanding as

13  to whether Mr. Borthwick connected Mr. Battle

14  and Mr. McConnell?

15  A.        I don't know.

16  Q.        Did Mr. Borthwick connect you with

17  either Mr. Battle or Mr. McConnell?

18  A.        He had said, you know, Charlie wanted

19  to talk to me.

20  Q.        That same paragraph continues, when

21  Battle appeared to be moving ahead with his

22  plans to run for office, I said to him,

23  Mike's -- why don't you guys talk to each

24  other.  Do you see that?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 40

```
 1   A.         Mm-hmm.

 2   Q.         Do you understand Mr. Borthwick to be

 3   referring to you?

 4   A.         Yeah, probably.

 5   Q.         And at some point, had you told

 6   Mr. Borthwick that you were in?

 7   A.         Probably.  Like I said, when I was

 8   thinking about running a month before.

 9   Q.         I'm going to jump down to the bottom

10   paragraph of that page.  And again, focusing

11   on the yellow where Mr. Borthwick states, I

12   thought --

13              MR. PODRAZA:  Let me object

14              to that, counsel.  This is a

15              statement that was written by the

16              agents of the Department of Labor.

17              These are not the words of

18              Mr. Borthwick.  And we already know

19              this, he was interviewed, the agents

20              put this thing together and then they

21              gave it to him and he signs it.

22                   This is not Borthwick like

23              we're doing here today, so I don't

24              want you to be misled this is
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1              Borthwick's words.  And we've already

 2              established that there's a lot of

 3              inaccuracies between Mr. Battle's

 4              testimony and what was in his

 5              statement and also what Mr. McConnell

 6              said and what was in his statement.

 7              So this is not gospel truth is what

 8              I'm trying to say to you.

 9                      THE WITNESS:  Right.

10                      MR. PODRAZA:  And I don't

11              want you to misrepresent to him that

12              this is Mr. Borthwick sitting down

13              here typing this thing out and saying

14              this is, you know, gospel.  Okay?

15                      THE WITNESS:  Okay.

16                      MS. DeBRUICKER:  Are you

17              done?

18                      MR. PODRAZA:  I am.

19      BY MS. DeBRUICKER:

20      Q.      It's indicated here that

21      Mr. Borthwick thought he was also --

22                      MR. PATRIZIO:  Where are

23              you, Lauren?

24                      MS. DeBRUICKER:  Bottom --
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 42

```
 1                    THE WITNESS:  Bottom
 2          paragraph.
 3                    MS. DeBRUICKER:  --
 4          paragraph beginning of the yellow --
 5                    MR. PATRIZIO:  Thanks,
 6          Mike.
 7                    THE WITNESS:  Yes --
 8                    MR. PATRIZIO:  But stop.
 9          I'm asking her to direct me.  I don't
10          need your help.  She's going to help
11          me.
12                    THE WITNESS:  Sorry.
13                    MR. PATRIZIO:  All right.
14          Wait for the question.  Okay?
15                    THE WITNESS:  Okay.
16                    MS. DeBRUICKER:  He's
17          better at this than I am so --
18                    MR. PATRIZIO:  He probably
19          is, but I want to understand where
20          you're going.
21                    MS. DeBRUICKER:  Sure.  At
22          the bottom paragraph at the beginning
23          of the yellow.
24                    MR. PATRIZIO:  Okay.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 43

```
 1   BY MS. DeBRUICKER:

 2   Q.        Which reads I thought Coppinger was

 3   also going to run for an executive board

 4   position.  Do you see that?

 5   A.        Yes, I do.

 6   Q.        And do you remember speaking with

 7   Mr. Borthwick about that?

 8   A.        Yes, I do.

 9   Q.        It continues, Coppinger was the key

10   because he and Battle have great reputations.

11   Do you see that?

12   A.        Yes.

13   Q.        Do you have a great reputation?

14   A.        Yes.

15   Q.        Everyone thought if Coppinger runs,

16   that's the game changer.  Do you see that?

17   A.        Yes.

18   Q.        Was that your understanding?

19   A.        No.

20   Q.        Did you have an indication that other

21   people thought that?

22   A.        Yes.

23   Q.        Who thought that as far as you know?

24   A.        Charlie, Phil, half the, you know, a
```

Page 44

1    lot of people.

2    Q.       Did people tell you that?

3    A.       Yes.

4    Q.       Do you know why they thought that?

5    A.       I know a lot of people in the Local,

6    and a lot of people for some reason like me.

7    Q.       He continues, Coppinger is a great

8    guy and is very funny.  If anyone scares the

9    union the most, it's him because he's so well

10   liked.  He comes with votes.  Do you see that?

11   A.       Yes.

12   Q.       Did people tell you that?

13   A.       Yes.

14   Q.       It continues, he was the biggest one

15   they wanted to shut down because of the votes.

16   Do you see that?

17   A.       Yes.

18   Q.       Did you have an understanding that

19   anyone would want to shut down your nomination

20   if you were to seek it?

21   A.       No -- sorry, no.

22   Q.       You can set that aside.  I don't have

23   any more questions about it right now.

24   A.       I'm sorry.  Okay.

 1   Q.        The night of the nominations

 2   meeting --

 3   A.        Yes.

 4   Q.        -- did you go to the union hall?

 5   A.        I did.

 6   Q.        Who did you see when you were there?

 7   A.        I came late.  I remember that because

 8   I had to get my feet wrapped because of the

 9   ulcers on them, and I seen all the officers of

10   the hall.  I seen -- Phil was there, just my

11   friends.  That's it really.

12   Q.        When you say you came late, do you

13   have a sense about what time it was that you

14   came?

15   A.        I was probably there maybe like 20

16   minutes after the nominations had started.

17   Q.        Do you know what time the nominations

18   started?

19   A.        The nominations probably started at

20   7:00.

21   Q.        And did you know the nominations were

22   under way by the time you got there?

23   A.        Yeah.

24   Q.        How did you know?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1   A.          I seen Phil.  And he said, they

 2   started the nominations.

 3   Q.          Tell me about your conversation with

 4   Mr. Borthwick.

 5   A.          When I got there or he might have

 6   called me before I even got there.  He said,

 7   where you at?  I said, I'm on my way.

 8   Q.          Why would he have called you and

 9   asked you where you are?

10   A.          I don't know.

11   Q.          Was he expecting you to be there?

12   A.          Probably.

13   Q.          At some point, did you have another

14   conversation with Mr. Borthwick after he

15   called to see where you were at?

16   A.          When I got there.

17   Q.          Tell me about the conversation you

18   had with Mr. Borthwick after you got to the

19   union hall?

20   A.          What I can remember, I said hey,

21   what's going on.  We talked for a minute.  I

22   was saying hello to everybody.  And then I

23   said, well, where's Charlie?  He said, he left

24   already.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    Q.        By Charlie, do you mean Mr. Battle?

2    A.        Yes.

3    Q.        Why were you asking where Mr. Battle

4    was?

5    A.        Well, that's where all the buzz was,

6    Charlie.  He had told me that he wanted to

7    run.  So I said like, what's going on, where

8    is he, is he running, what's happening?  And

9    he said, no, he left already.

10   Q.        When you came to the union hall that

11   night, was it your intention to nominate

12   Mr. Battle?

13   A.        No.

14   Q.        So by that time, you had decided not

15   to nominate Mr. Battle; is that right?

16   A.        Yes.

17   Q.        Were Mr. Battle aware that you were

18   not going to nominate him that night?

19   A.        I believe -- I believe so, yes.  I

20   don't know how -- maybe Phil told him.  I

21   don't know.  I know he knew because he

22   obviously wasn't there.

23   Q.        Did you ever tell Mr. Battle that you

24   would not nominate him?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    A.          I called him the day off, but he
 2    never answered the phone.
 3    Q.          So I take it at some point Mr. Battle
 4    learned that you were not going to nominate
 5    him?
 6    A.          Probably from Phil.
 7    Q.          Did you tell Phil that you were not
 8    going to nominate Mr. Battle?
 9    A.          Yes.
10    Q.          When did you tell Phil that?
11    A.          Either the day of or the day before.
12    Q.          Was that an inperson conversation or
13    by the phone?
14    A.          That was on the phone.
15    Q.          Bear with me.  I don't want to ask
16    anything I don't need to ask?
17    A.          Yeah, take your time.
18    Q.          And I should say at any point you
19    want to take a break or get some water, please
20    let me know.
21    A.          No, I'm good.  Thank you.
22    Q.          I'm going to turn you back to --
23    you're already there.  You're ahead of me --
24    the document that Mr. Borthwick signed, and
```

```
 1    before we were looking at the page that had

 2    the word statement at the top.

 3    A.        You want to go back to that page?

 4    Q.        That and I'm going to have you turn

 5    to the next page, which will be the second

 6    page of the statement which has a little

 7    number at the bottom that ends in 415?

 8    A.        Yup.

 9    Q.        This statement reads, I stayed on the

10    grounds of the union hall until about 7:30 or

11    8:00 p.m.  I was waiting for Coppinger to

12    arrive, as it was still up in the air what guy

13    is going in to get nominated.  Do you see

14    that?

15    A.        Mm-hmm.

16    Q.        Does that sort of jive with the

17    timing that you've described to me?

18    A.        I guess.

19    Q.        Did you understand that Mr. Borthwick

20    was waiting for you at the union hall?

21    A.        Yeah.  Like I said, I had talked to

22    him.

23    Q.        The statement continues, I knew at

24    that point McConnell was not coming.  Do you
```

1    see that?

2    A.        Yes.

3    Q.        Did you have any understanding before

4    the meeting that Mr. McConnell would not be

5    coming?

6    A.        No.  Like I said, I really didn't

7    have a lot of contact with him.

8    Q.        The statement continues, Coppinger

9    showed up minutes before the meeting started.

10   Do you see that?

11   A.        Yup.

12   Q.        It's your testimony you arrived after

13   the meeting was under way?

14   A.        After nominations.  The nominations

15   start before the meeting, so the nominations

16   probably started at 7:00 and the meeting

17   starts at 8:00.

18   Q.        The statement continues, Battle was

19   really counting on Coppinger to nominate him?

20   Do you see that?

21   A.        Where are we at?

22   Q.        We're at the second paragraph on the

23   page that we're looking at kind of in the

24   middle of the yellow --

Page 51

1    A.        Yes, I got you.

2    Q.        Battle was really counting on

3    Coppinger to nominate him.  Do you see that?

4    A.        Mm-hmm.

5    Q.        Did you know Mr. Battle was counting

6    on you to nominate him?

7    A.        I know up to the day of they were

8    still asking me.

9    Q.        It continues, If there's anyone they

10   couldn't shake, it would be Coppinger.

11   Coppinger knows everyone.  When Coppinger

12   showed up, he called McConnell and told him

13   I'm out.  Do you see that?

14   A.        Mm-hmm.

15   Q.        Did you call Mr. McConnell when you

16   arrived at the union hall?

17   A.        I don't remember calling Timmy.

18   Q.        But at some point, you did tell

19   Mr. Coppinger that you weren't running -- I

20   mean, sorry --

21   A.        I never told --

22   Q.        Let me ask a better question because

23   I messed up.  At some point, you had told

24   Mr. McConnell that you weren't running?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 52

1   A.          I believe Phil and Charlie probably

2   told him.  I told him the one time we talked,

3   like I said, that I wasn't running I think it

4   was two weeks before.

5   Q.          So I understand clearly, you had told

6   Mr. McConnell that you were not going to run?

7   A.          Yes, before the meeting.

8   Q.          The statement continues to the next

9   paragraph.  It reads, I called Battle who was

10  in his car and told him Coppinger was out.  Do

11  you see that?

12  A.          Yes.

13  Q.          And from your testimony, it sounds

14  like you understood that Mr. Borthwick would

15  have given Mr. Battle the information that you

16  were not coming and were not going to nominate

17  him?

18  A.          Mm-hmm.

19  Q.          Battle was angry that they had gotten

20  to Coppinger.  Do you see that?

21  A.          Yes.

22  Q.          Do you have an understanding as to

23  what Mr. Borthwick may have meant by that?

24  A.          No.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    Q.         In the fourth paragraph on that page,

2    which is also yellow and begins with the words

3    Kerr, K-e-r-r, also backed out?

4    A.         The fourth paragraph, yes, I got you.

5    Q.         Third yellow paragraph?

6    A.         Yes.

7    Q.         Mr. -- the statement continues on.

8    I'm going to jump to the third line of that

9    paragraph where it reads Coppinger looks

10   scared to death.  Do you see that?

11   A.         Yes.

12   Q.         Were you scared the night of the

13   meeting?

14   A.         No.  I was in pain, but not scared.

15   Q.         Do you know why Mr. Borthwick would

16   have had that impression?

17   A.         No.

18   Q.         Did you see Mr. Battle at all the

19   night of the nominations meeting?

20   A.         No.

21   Q.         Did you speak with Mr. Battle at all

22   the night of the nominations meeting?

23   A.         No.

24   Q.         I'm going to ask you to turn to the

1    last page of that document, which is the one

2    that has the signatures on it.

3    A.        Okay.

4    Q.        And it reads, I called Coppinger

5    after the nomination meeting.  Do you see

6    that?

7    A.        Yes.

8    Q.        Do you recall getting a phone call

9    from Mr. Borthwick after the nominations

10   meeting?

11   A.        Yes.

12   Q.        What was the substance of that

13   conversation?

14   A.        Just back and forth.  He was asking

15   me why I decided not to nominate him, decided

16   not to run, so just like back and forth.  Like

17   I said, it's 15 months ago.  We kind of had a

18   pandemic so I can't remember exactly

19   everything.  But, yeah, that was like kind of

20   just why aren't you running, you know.  So we

21   were going back and forth for a little bit.

22   Q.        Recognizing it was 15 months ago,

23   give me your best recollection of what was

24   said during that conversation?

1    A.          He probably asked me why ain't I

2    running and, you know, I probably said again

3    for health reasons, you know.  Well, you can

4    run and do what you have to do for your

5    health, just back and forth, you know what I

6    mean.  It's something I don't want to do, you

7    know what I mean.  Like, at that time I didn't

8    want to do it.  They want something so bad

9    that they want to push you to do it.  I made

10   clear that because of the health reasons, my

11   family, I didn't want to do it.

12   Q.          That paragraph continues, I know who

13   talked Coppinger out of it and what they said.

14   Do you see that?

15   A.          Mm-hmm.

16   Q.          Do you have any understanding as to

17   what Mr. Borthwick may have been referring to?

18   A.          Yeah.

19   Q.          What?

20   A.          He's probably talking about my uncle

21   talking me out of it.

22   Q.          Tell me more about that.

23   A.          Phil said, you know, why don't you

24   want to run?  I said, health reasons.  He

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   said, well, you can run, dah, dah, dah.  I

2   said, Phil, I don't want to.  I got too much

3   going on.  He kept pushing, pushing.  I said,

4   I talked to my uncle, you know.  He never told

5   me not to run, but he was like, what are you

6   doing, you got a great reputation, you know,

7   so that was it really.

8   Q.        Who is the uncle you're referring to?

9   A.        Ed Coppinger.

10  Q.        Did you speak with Mr. Coppinger

11  prior to the nominations meeting?

12  A.        I think the day before maybe or the

13  day of.

14  Q.        Did you tell Mr. Borthwick anything

15  else about that conversation with Ed

16  Coppinger?

17  A.        No, just I didn't want to run.  I

18  didn't need the headache.  I don't need the

19  aggravation.

20  Q.        The statement continues, Coppinger

21  had been with the contractor for nine years.

22  Do you see that?

23  A.        Yes.

24  Q.        Is that the case?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    A.          Yes.

 2    Q.          The statement continues and says,

 3    That's unheard of.  Do you see that?

 4    A.          Yes.

 5    Q.          Is that pretty rare for someone to

 6    have that consistent work?

 7    A.          Yes.

 8    Q.          And the statement continues, He could

 9    not risk losing that.  Do you see that?

10    A.          Yes.

11    Q.          Did you have any understanding that

12    you could risk losing that?

13    A.          No, but you heard of other people,

14    you know, rumors of other people that, you

15    know, whatever conflict can happen things can

16    happen.  We're a family, but we fight.

17    Q.          Have you ever heard of people losing

18    work?

19    A.          One guy told me that he had lost work

20    over it.

21    Q.          Do you know who that was?

22    A.          Kenny Rocks.

23    Q.          When you say he had lost work over

24    it, what was your understanding of what he
```

1   lost work over?

2   A.        I guess when he was running for

3   office a few years prior to.

4   Q.        When did you have that conversation

5   with Mr. Rocks?

6   A.        I never had -- I don't think me and

7   him had that conversation.  I think that's

8   more through the grapevine.

9   Q.        I thought you said Mr. Rocks had told

10  you that.  Do I have that wrong?

11  A.        He may have told me.  But, you know,

12  you hear more stuff -- I know when Kenny was

13  running me and him weren't that close.  So it

14  might have been after the fact, you know.  And

15  I'm not saying that's even true, that that's

16  why he lost work.  He might have lost work

17  because of other reasons, you know.

18  Q.        But you had heard that?

19  A.        Yes.

20  Q.        Had you heard that prior to the

21  June 9, 2020 nominations meeting?

22  A.        Yes.

23  Q.        Is it your understanding that when

24  you decided not to nominate Mr. Battle, that

Page 59

1    he would need somebody else to do it?

2    A.        No.  Like I said, he could probably

3    nominate himself.

4    Q.        And just so I'm clear, what was that

5    understanding based on?

6    A.        Which understanding?

7    Q.        Your understanding that he could

8    nominate himself?

9    A.        Years prior to, there was a

10   nominations meeting and I thought somebody

11   stood up and nominated themselves.

12   Q.        Did you regularly go to nominations

13   meetings when there were elections?

14   A.        Yeah.

15   Q.        Would you say it was unusual for

16   someone to nominate themselves?

17   A.        No.  I mean, you could do it.  It's

18   your preference.

19   Q.        I'm curious as to whether people

20   actually did it or whether usually someone

21   would nominate them.

22   A.        Yeah.  I mean, for the most part I

23   think somebody nominates you, but there's like

24   no rule against you nominating yourself I

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 60

1    don't think.

2    Q.         When you decided not to nominate

3    Mr. Battle, was it your understanding that he

4    would still run for office?

5    A.         I don't know.  He kind of left it up

6    in the air of what he was going to do.

7    Q.         Did you have a conversation with him

8    about that?

9    A.         Probably after the fact.

10   Q.         Prior to the nominations meeting, did

11   you have a conversation with anyone else about

12   that?

13   A.         Probably my wife.

14   Q.         Anyone else from the union that you

15   had a conversation with about that?

16   A.         Maybe guys on the job.  I don't know.

17   Q.         When you got to the union hall the

18   night of the nominations meeting, do you have

19   a sense of about how many people were there?

20   A.         Maybe 500.  They tend to be big

21   meetings.  There's beer.

22   Q.         Even during COVID, there'd be beer?

23   A.         Yes.  We couldn't go in the building

24   so we were out in the parking lot.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 61

```
 1    Q.        Who arranges for the beer?

 2    A.        I don't know.  I just drink it.

 3    Q.        Were people wearing campaign

 4    T-shirts?

 5    A.        Yes.

 6    Q.        What T-shirts were they wearing?

 7    A.        I believe Dougherty T-shirts.  Not

 8    everybody, but a lot of people.

 9    Q.        Was anybody wearing any other

10    campaign T-shirts?

11    A.        No.

12    Q.        Were there food trucks there?

13    A.        Yeah.

14    Q.        Do you know arranges for those?

15    A.        No.

16    Q.        Was anybody talking about potential

17    candidates there?

18    A.        By the time I got there -- like I

19    said, word travels fast with electricians, so

20    they already knew nobody else was running.

21    Q.        Was there any discussion of anyone

22    else who might have run?

23    A.        Charlie.

24    Q.        Were people talking about Charlie
```

1    that night?

2    A.        Some people.

3    Q.        What were they saying?

4    A.        Some were saying good.  Some people

5    were saying bad.

6    Q.        What do you mean when they say good,

7    good that he wasn't running or --

8    A.        Some people liked the fact that he

9    wasn't running.  Some people wanted him to

10   run.

11   Q.        Do you have a sense that if he ran

12   some people would have voted for him?

13   A.        Some people would have voted for him

14   for sure.

15   Q.        Was anybody asking about who was

16   going to nominate candidates?

17   A.        No.  At that point, it was already --

18   it was over.

19   Q.        Do you recall anyone asking about who

20   was going to nominate Battle if he ran?

21   A.        No.

22   Q.        You went to the union hall that

23   night.  Did you attend the nominations meeting

24   itself?

1    A.        Yes, it was in the backyard

2    (inaudible).

3    Q.        Did anyone nominate themselves at the

4    meeting while you were there?

5    A.        I don't know.  At that point, I was

6    talking to all my friends and hanging out.  We

7    knew that no one else was running so.

8    Q.        Did you see anyone read out

9    nomination forms at the meeting?

10   A.        No.

11   Q.        Did you see any nomination forms that

12   night at all?

13   A.        No.

14   Q.        Do you know where you could have

15   gotten a nomination form?

16   A.        I guess if you went in the building

17   you could ask for one.

18   Q.        Is there a particular person you

19   would ask?

20   A.        Maybe the secretary in the main hall.

21   Q.        Was that like a designated person or

22   is it just that's who you would ask if you

23   did?

24   A.        Well, the lady at the hall knows

Page 64

1    everything.  So if you want something, you go

2    and she tells you where to go.

3    Q.        Do you know her name?

4    A.        No.  They have changed.  My cousin

5    used to be there, Missy, but it changed over

6    time.

7    Q.        I'm going to take you back to the

8    conversation or the communication you

9    mentioned you had with Ed Coppinger prior to

10   the nominations meeting.

11   A.        Okay.

12   Q.        How did you communicate with Ed

13   Coppinger?  Did he call you?

14   A.        Yes.

15   Q.        Do you recall about when that was?

16   A.        Somewhere around the nominations

17   meeting.

18   Q.        Do you know what time of day it was?

19   A.        It was during the day.  I was at

20   work.

21   Q.        Did you take the call or did you talk

22   to him some time later?

23   A.        No, I took the call.

24   Q.        Tell me about what you recall of that

1   conversation.

2   A.        He was just first -- he asked me what

3   was going on and then he was like, he said,

4   well, I'm hearing some stuff, I don't want you

5   to get yourself in trouble, you know.

6   Q.        Did he say who he was hearing stuff

7   from?

8   A.        He did not say who, no.

9   Q.        At that point, he was retired?

10  A.        Yes.

11  Q.        Do you know who would have in been in

12  communication with him?

13  A.        No.

14  Q.        Did he say what stuff he was hearing?

15  A.        That I was getting into things I

16  shouldn't be involved in.  You know, just be

17  careful.

18  Q.        Did he say what he thought you were

19  involved in or heard you were involved in?

20  A.        No, I just figured that was what he

21  alluded to.

22  Q.        What did you figure he was alluding

23  to?

24  A.        Me thinking about running.

1   Q.        Did you tell him that you were

2   thinking about running?

3   A.        No.

4   Q.        How would he have heard that you were

5   thinking about running?

6   A.        I don't know.

7   Q.        And I think you said, he said he

8   didn't want you to get in trouble.  Do I have

9   that right?

10  A.        Yeah.

11  Q.        What did he mean by that?

12  A.        I don't know.  He's probably like,

13  you know, you're nine years with a company.

14  You don't need any unwarranted headaches.

15  Q.        Was it your understanding if you got

16  into trouble those nine years with the company

17  might be in jeopardy?

18  A.        No.

19  Q.        Then why did he mention it?

20  A.        I don't know.  If I did get elected,

21  I would have to give up that job to go take

22  another job.

23  Q.        Why is that?

24  A.        Because if you sit on the Board or

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    you're a business agent, you can no longer

 2    work for the company.  Now, you got to work

 3    for the union.

 4    Q.        What was Ed Coppinger concerned

 5    about?

 6    A.        Probably me.

 7    Q.        How so?

 8    A.        Well, him and my dad were close.  So

 9    he, you know, probably just heard something

10    and wanted to see what was going on.

11    Q.        What was he concerned would happen?

12    A.        I don't know.

13    Q.        Did you decide not to nominate

14    Mr. Battle after speaking with Ed Coppinger?

15    A.        I don't know if it was before or

16    after.  Talking to Eddie really had no bearing

17    on what I was going -- I mean it did, but it

18    didn't, you know what I mean.

19    Q.        No.  What do you mean?

20    A.        Well, it wasn't like he told me not

21    to do anything.  But if your relative's

22    telling you -- an older relative's telling you

23    something, hey, think about what you're doing,

24    you might want to think about it.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 68

1    Q.        Would nominating Coppinger have

2    gotten you into the kind of trouble --

3    A.        I wouldn't nominate myself.

4    Q.        Let me ask a better question because

5    I messed it up.  It's the end of the day.

6    A.        I hear you.

7    Q.        Was it your understanding that Ed

8    Coppinger thought nominating Mr. Battle could

9    get you in trouble?

10   A.        I don't -- I don't know.

11   Q.        After speaking with Ed Coppinger,

12   what did you believe would happen if you

13   nominated Mr. Battle for office?

14   A.        I don't know what would have

15   happened.  Hypothetical, I don't know.

16   Q.        Did your call with Mr. Coppinger have

17   any influence on your decision whether to

18   nominate Mr. Battle or not?

19   A.        Oh, with Eddie, no.

20   Q.        Did Mr. Coppinger indicate that he

21   had gotten word from current union members?

22   A.        He just said he got word from

23   somebody.

24   Q.        Did you know who that somebody was?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

    1   A.        No.

    2   Q.        Did you have any reason to speculate

    3   who that somebody was?

    4   A.        No.

    5   Q.        Did you ever ask Ed Coppinger who

    6   that somebody was?

    7   A.        No.  I don't think we ever talked

    8   about it after.

    9   Q.        Recognizing it was 15 months ago,

   10   what's your best recollection of what your

   11   uncle said to you, what Ed Coppinger said to

   12   you?

   13   A.        You know, hey, what's going on.

   14   Nothing.  Oh, well -- I think he said he got a

   15   phone call from somebody, he didn't say who,

   16   and you know, just to be careful, watch what

   17   I'm doing, you know.  Don't, you know.  That

   18   was it really.

   19   Q.        What did you take that statement to

   20   mean?

   21   A.        Just be careful of what I'm doing in

   22   general.

   23   Q.        Did he raise any specifics about what

   24   he thought you were doing or what someone

```
 1   thought you may have been doing?

 2   A.        I don't remember.

 3   Q.        Did he mention a website at all?

 4   A.        No.

 5   Q.        Did he mention the election at all?

 6   A.        No.

 7   Q.        Why do you think someone would have

 8   contacted Ed Coppinger about you?

 9   A.        I don't know.  Your guess is as good

10   as mine.

11   Q.        Did anyone contact you directly about

12   what they may have thought you were doing --

13   A.        No.

14   Q.        -- from the union?

15   A.        No.

16   Q.        By the time you had this conversation

17   with Ed Coppinger, had you already decided not

18   to seek office?

19   A.        Yes.

20   Q.        Just so I'm clear, you don't recall

21   whether you had decided not to nominate

22   Charlie Battle at the time you had that

23   conversation with Ed Coppinger?

24   A.        I don't remember whether I -- it
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    didn't play a factor in it, so I don't really

 2    remember if it did or it didn't.

 3    Q.        How often does Ed Coppinger call you?

 4    A.        Not that often.

 5    Q.        When you got the call that we were

 6    just speaking about with Ed Coppinger, when

 7    was the last time he had called you?

 8    A.        Before that, two or three months.

 9    Q.        You mentioned you didn't want the

10    aggravation from running.  Do you recall

11    telling me that?

12    A.        Yes.

13    Q.        What did you mean the aggravation?

14    A.        Like I said, Kenny Rocks ran a few

15    years before that and I heard he had, you

16    know, headaches.  I guess, you know, with any

17    campaign, whatever, arguing back and forth.

18    Q.        When you say headaches, what do you

19    mean?

20    A.        The arguing and bickering, you know.

21    It's before in the hall, so when you go there,

22    who's saying what, who's screaming what, you

23    don't need to be at the center of that.

24    Q.        Well, if I remember right, you told
```

1    me that you had heard that there were

2    consequences to Mr. Rocks for running,

3    correct?

4    A.       I heard he lost work, but that's, you

5    know, hearsay.

6    Q.       Do you recall hearing that from more

7    than one person?

8    A.       From who?

9    Q.       More than one person?

10   A.       Yeah, I probably did.

11                MS. DeBRUICKER:  Are you

12           okay to keep going?

13                MR. PATRIZIO:  How much

14           more do you have?

15                MS. DeBRUICKER:  Not much.

16                MR. PATRIZIO:  Okay.  Are

17           you okay to go forward?

18                THE WITNESS:  Yes, sir.

19                MR. PATRIZIO:  Okay.  It is

20           Friday.  I'm trying to get you out of

21           here --

22                THE WITNESS:  I'm fried,

23           man.  I'm fried.

24                MS. DeBRUICKER:  I hear

1          you.

2                          THE WITNESS:  Besides

3          working all day, I'm stressed.

4    BY MS. DeBRUICKER:

5    Q.       Caffeine break?

6    A.       No, I'm good.

7                          MS. DeBRUICKER:  We're

8          going to have this document marked as

9          M.Coppinger-3.

10                         (Exhibit marked

11         M.Coppinger-3 for identification.)

12   BY MS. DeBRUICKER:

13   Q.       Mr. Coppinger, I will have you take a

14   quick look at that and then I'll give you some

15   context and ask you some questions.

16   A.       Mm-hmm.

17   Q.       Mr. Coppinger, what we've marked as

18   M.Coppinger-3 has a title on the first page

19   that says, Declaration of Ed Coppinger.  Do

20   you see that?

21   A.       Yes.

22   Q.       And if you skip to the last page,

23   you'll see it's dated the 16th of September

24   and has a signature of Ed Coppinger.  Do you

1   see that?

2   A.       Yes.

3   Q.       Have you seen this document before?

4   A.       Yes.

5   Q.       When did you see this document?

6   A.       The other day.

7   Q.       How did you come across this

8   document?

9   A.       I believe Steve showed it to me.

10  Q.       Did Steve show you any other

11  documents when you met with him?

12  A.       No.

13  Q.       Were you involved in the preparation

14  of this document at all?

15  A.       No.

16  Q.       I understand this to be a statement

17  of Ed Coppinger.  Did Ed Coppinger talk to you

18  about this statement at all before he made it?

19  A.       No.

20  Q.       Recognizing that this is at least

21  understood to be a statement from Ed

22  Coppinger, I'm going to ask you a little bit

23  about some portions of the statement that deal

24  with you.

```
 1   A.        Okay.

 2   Q.        The paragraphs have numbers on them,

 3   so that's a little bit easier to find them at

 4   this time.  If you look at Paragraph No. 4 it

 5   reads, In or about early June 2020, I believe

 6   June 5, 2020, I received a telephone call from

 7   a member of the union while I was golfing at

 8   Stone Harbor Golf Club.  Do you see that?

 9   A.        Yes.

10   Q.        Would you have any information as to

11   who that union member was?

12   A.        No.

13   Q.        Paragraph No. 5 reads, The member

14   called to give me a heads-up that Michael

15   Coppinger, my cousin's son, was involved in

16   certain other union members who were believed

17   to be agitators.  Do you see that?

18   A.        Yes.

19   Q.        Did Ed Coppinger convey that

20   information to you at all?

21   A.        Yeah, in so many words.

22   Q.        That you were involved with members

23   who some people considered to be agitators?

24   A.        No, he was just like you just got to
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    watch who you're hanging around with and

2    associated with.

3    Q.        And what did you take from that?

4    A.        That I should watch who I hang around

5    with and associate with.

6    Q.        Did you take from that there were

7    certain people that were disfavored in the

8    union?

9    A.        No.  But, you know, sometimes when

10   people argue or whatever.  I don't know.

11   Q.        Paragraph 6 continues, I was

12   surprised that Michael might be associating

13   with such members who I consider to be

14   troublemakers.  Do you see that?

15   A.        Mm-hmm.

16   Q.        Did Ed Coppinger tell you who he

17   considered to be a troublemaker?

18   A.        He didn't say who, no.  I don't

19   believe.

20   Q.        Did he say that he considered some

21   people to be troublemakers?

22   A.        Yes.

23   Q.        Did he say why he thought they were

24   troublemakers?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    A.          I think he said certain people run

 2    for certain positions for their own sake, not

 3    for the good of the union.

 4    Q.          Did he say why he thought some people

 5    may be doing that?

 6    A.          I don't remember.

 7    Q.          Do you recall him saying people who

 8    were running for election?

 9    A.          Unh-unh.

10    Q.          Then I may have misunderstood your

11    testimony just now.

12    A.          Why is that?

13    Q.          About people running for their own

14    themselves as opposed to the good of the

15    union.

16    A.          He didn't say he knew who was

17    running.  He just said, the people who you're

18    associating with, just watch, be careful.  You

19    know, some people run for their own sake

20    rather than the good of the union.

21    Q.          And when he said people who run for

22    their own sake, did you understand that to

23    mean people running for officer election?

24    A.          Certain people, yeah.
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
1    Q.          Paragraph 6, just to finish Paragraph
2    6 it says, Members who I consider to be
3    troublemakers or guys with just personal
4    grievances who have no interest in or clue on
5    how to run or operate a union.  Do you see
6    that?
7    A.          Mm-hmm.
8    Q.          Did Ed Coppinger mention anything to
9    you at all about that in his call with you?
10   A.          Yeah, if he says he did.
11   Q.          Well, I'm asking what you recall?
12   A.          I don't remember a 10-minute phone
13   call 15 months ago.  So much has happened
14   since then.
15   Q.          Do you know where he was when he
16   called you?
17   A.          He said he was on the golf course.
18   Q.          Well, he says here he was on the golf
19   course when he got the call.
20   A.          Oh, well, I don't know where he was
21   when he called me.
22   Q.          Are there any qualifications to run
23   for office?
24   A.          Yeah.  You have to be a dues-paying
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   member and your dues have to be up-to-date.

2   Q.        Any other criteria for seeking

3   office?

4   A.        Not that I know of.

5   Q.        Continue on the next page, Paragraph

6   7 says, After the call, I called Michael.  Do

7   you see that?

8   A.        Yes.

9   Q.        And I understand that to be you?

10  A.        Yes.

11  Q.        Do you know about how much time

12  passed between when Ed Coppinger got the call

13  on the golf course and when he called you?

14  A.        No.

15  Q.        He didn't say that, do you recall?

16  A.        No.

17  Q.        Paragraph 8 reads, I told Michael

18  that I got a call from a union member who was

19  concerned about him getting involved with

20  members who are interested only in their

21  personal interests and not the union's.  Do

22  you see that?

23  A.        Yes.

24  Q.        And again, he didn't identify who the

1    union member was?

2    A.         He might have.  I don't -- when I got

3    this phone call, I'm at work.  I was the

4    steward on the job.  So I'm trying to do my

5    job, dealing with guys' problems, talking to

6    him on the phone.  It was a lot, you know.

7    Q.         Do you recall either way whether he

8    mentioned the union member's name or not?

9    A.         I really don't.  I'm sorry.

10   Q.         I'm just trying to make sure that I

11   understand.  If you don't remember either way

12   or if you have an absolute recollection that

13   he didn't mention it?

14   A.         I don't really remember either way.

15   Q.         I don't mean to drill into you.  I

16   just need to understand whether it's, oh, he

17   may have or I remember and he didn't say?

18   A.         Yeah, I don't remember either way.

19   Q.         And again, member was concerned about

20   you getting involved with members.  Did he say

21   anything more about what he meant by you

22   getting involved with people?

23   A.         No.

24   Q.         Did you have any understanding as to

Page 81

1   what he may have meant by that?

2   A.          I don't know.  I don't know exactly

3   what he meant.  At that time I was running

4   Florence Rigid, dealing with him, like I said

5   dealing with guys, across the street we had a

6   nonunion job going.  Pandemic was just

7   starting.  A lot was going on in my head.

8   Q.          The last sentence in Paragraph 8

9   reads, I said to Michael that by being

10  involved with such members, he was only

11  hurting the union.  Do you see that?

12  A.          Yes.

13  Q.          Do you recall him saying something to

14  that effect?

15  A.          Something like that, yes.

16  Q.          Do you understand why he said that?

17  A.          No, but it was probably related to

18  the next thing that he said on the paper.

19  Q.          What I say about getting ahead of me.

20  A.          Oh, I'm sorry.

21  Q.          Did you have an understanding as to

22  how your involvement with anybody could hurt

23  the union?

24  A.          No.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 82

1   Q.          No. 9 reads, I told Michael that I

2   was hearing that he might be involved with the

3   website which had inflammatory comments that

4   were harmful to the union and that he was

5   holding meetings at the house with these self-

6   serving members.

7   A.          Both of that's untrue.

8   Q.          So I'm going to be sure I understand,

9   hearing that you might be involved with the

10  website, do you know what website he's

11  referring to?

12  A.          I know what website he's talking

13  about, but I have nothing to do with that.

14  Q.          Just so I'm clear, what website was

15  he referring to?

16  A.          There was a website that went around,

17  truth about the union or something.  I don't

18  do websites or anything.  I'd rather talk, me

19  and you.  I don't -- if I have something to

20  say, I'm just going to tell you.  You might

21  not like it, but I'm going to tell you.  So I

22  don't get behind -- I'm not a keyboard tough

23  guy.  I'd rather just say what I have to say

24  to you.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1   Q.        Was it your understanding that this

 2   website did have inflammatory comments about

 3   the union?

 4   A.        Yes.

 5   Q.        Had you ever visited the website?

 6   A.        The one time when I first heard about

 7   it.

 8   Q.        Would you want to have any

 9   affiliation with that website at all?

10   A.        No.

11   Q.        And would you, in fact, want not to

12   be affiliated with that website?

13   A.        I would rather not be affiliated.

14                  MR. PATRIZIO:  Continue

15             with the deposition.  I just have to

16             step out for a minute.  Keep going.

17   BY MS. DeBRUICKER:

18   Q.        And the second line in the paragraph

19   says that he was holding meetings at his house

20   with these self-serving members.  Do you see

21   that?

22   A.        Yes.  I never had a meeting at my

23   house.

24   Q.        Do you know what kind of meeting he
```

```
 1    would be referring to?

 2    A.        I know -- you okay?

 3    Q.        Yeah.

 4    A.        I know Charlie had a few meetings at

 5    his house.

 6    Q.        Did you ever attend those meetings?

 7    A.        I attended one.

 8    Q.        Do you remember about when that was?

 9    A.        A couple of months before the

10    nominations.

11                   THE WITNESS:  You okay,

12              buddy?

13                   MR. PATRIZIO:  I told your

14              wife I'd give you a ride home, but

15              then I remembered you live in New

16              Jersey.  So I said I'm going to send

17              you in an Uber.

18                   THE WITNESS:  No.

19                   MS. DeBRUICKER:  Wish I had

20              a lawyer --

21                   THE WITNESS:  You'll be

22              Uncle Steve by the end of this.

23    BY MS. DeBRUICKER:

24    Q.        Did you take it from your uncle's or
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 85

1    from Ed Coppinger's statement that he didn't

2    consider meetings to be a good thing, these

3    kinds of meetings to be a good thing?

4    A.        Yeah.

5    Q.        Why is that?

6    A.        Well, in the thing he said, you know,

7    troublemakers or whatever.

8    Q.        And then he continues, Michael denied

9    any involvement with the website or having any

10   such meetings at his house.  Do you recall

11   telling him that?

12   A.        Yup.

13   Q.        And you've never had a meeting at

14   your house about the union?

15   A.        No.

16   Q.        I will try to skip where I can.

17   Paragraph 12, I reminded Michael that he

18   carries the Coppinger name, and I told him he

19   should not disgrace our name by allowing

20   himself to be manipulated by other members who

21   have their own agendas.  Do you see that?

22   A.        Yes.

23   Q.        Do you recall him saying that?

24   A.        Something like that, yes.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    Q.        Something to that effect?

2    A.        Yes.

3    Q.        I take it you wouldn't want to

4    disgrace the Coppinger name?

5    A.        No.

6    Q.        Did you understand him to be saying

7    that by being affiliated with certain people,

8    it could disgrace the Coppinger name?

9    A.        Yes.

10   Q.        It continues on Paragraph 13, I

11   additionally asked him why would you, Michael,

12   want to get into someone else's problems.  Do

13   you see that?

14   A.        Yes.

15   Q.        Do you recall him asking you that?

16   A.        Yeah, something like that.

17   Q.        Do you know what he meant by someone

18   else's problems?

19   A.        I didn't when he was first saying it,

20   but then, you know.

21   Q.        Did you come to understand what he

22   meant?

23   A.        Yes.

24   Q.        And how?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   A.          Well, as he went on, he just said,

2   you know, certain people that are running have

3   grievances with the hall for personal reasons

4   and, you know, basically don't put yourself,

5   like, you know, he's an older uncle or

6   whatever, so he's just trying to look out for

7   me.

8   Q.          And do you know how he thought you

9   may have been getting into someone else's

10  problems?

11  A.          I guess whatever was going on between

12  Charlie and the hall.

13  Q.          Was it your understanding that's what

14  he was speaking about?

15  A.          I probably believe that's what he was

16  alluding to, yes.

17  Q.          Did he say that specifically or did

18  you make that connection?

19  A.          No, I just made the connection.

20  Q.          It continues, And why would you get

21  involved with anyone who was just asking for

22  selfish personal reasons.  Do you see that?

23  A.          Yes.

24  Q.          Do you recall him asking you that?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   A.          Yeah, he probably said something to

2   that effect.

3   Q.          He continues, I believe Michael

4   understood that the someone I was referring to

5   was Member Charlie Battle.  Do you see that?

6   A.          Yes.

7   Q.          Do you recall he naming Charlie

8   Battle in your --

9   A.          I don't remember him actually giving

10  any names.

11  Q.          Would there be a reason for him not

12  to tell you a name?

13  A.          Not that I know of.

14  Q.          14 continues, Michael assured me that

15  if he had any issues with the union, he would

16  speak directly to the business manager.  Do

17  you see that?

18  A.          Yup.

19  Q.          Do you recall telling him that?

20  A.          Yup.

21  Q.          Who is the business manager?

22  A.          Johnny Doc.

23  Q.          I take that John Dougherty?

24  A.          Yes.

1   Q.        It's being written down.

2   A.        Oh, sorry.

3   Q.         It continues, He even gave me an

4   example where he did go directly to the

5   business manager.  And according to him, the

6   problem was resolved after he had done so.  Do

7   you see that?

8   A.        Yes.

9   Q.        Do you recall giving Ed Coppinger

10  that example?

11  A.        Mm-hmm.

12  Q.        What example did you give him?

13  A.         I had a problem with the wives being

14  knocked off the health care.  I just think we

15  paid too much money for health care for our

16  wives and kids to not be on our health care.

17  So I brought it to John.  He said, give me a

18  few days, let me see what I can do and

19  everything got worked out.

20  Q.        Do you recall when that was?

21  A.        Around the same time as the

22  nominations meeting, I believe.

23  Q.        Do you recall whether it was before

24  or after?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    A.        It was before.

2              (Background noise.)

3              THE WITNESS   What the hell

4         is that?

5              MR. PATRIZIO:   The

6         partition next door.

7              MS. DeBRUICKER:   It's a

8         thin wall.   You don't have to answer

9         those questions.   You only have to

10        answer these.

11   BY MS. DeBRUICKER:

12   Q.        Paragraph 15 reads, When I spoke with

13   Michael, I had no idea he might be considering

14   running or nominating another member for an

15   elective office with the union.   Do you see

16   that?

17   A.        Mm-hmm.

18   Q.        So why do you think he was calling

19   you about Charlie Battle?

20   A.        Like I said, he's an older member of

21   the family.   He doesn't want to see any of us

22   get in trouble or jammed up.

23   Q.        What involvement did he think you had

24   with Charlie Battle?

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    A.         I don't know for sure what he

2    thought, you know.  But he initially did ask

3    me about the meetings, so he was probably

4    alluding to that.

5    Q.         Did this conversation with Ed

6    Coppinger affect your decision whether to

7    nominate Charlie Battle for office or not?

8    A.         I don't think so, no.

9    Q.         Did Ed Coppinger give you any

10   impression that your career would be finished

11   if you affiliated yourself with the people he

12   was concerned about?

13   A.         No.  But you can read here that, you

14   know, he didn't want me hanging out with them

15   or whatever.

16   Q.         Why did he feel so strongly about it,

17   do you think?

18   A.         He probably didn't want me to get in

19   trouble.

20   Q.         And being affiliated with these

21   people would get you in trouble?

22   A.         I don't know.  I'm just like -- in my

23   mind, he's probably like we're four

24   generations in the Local.  We have pretty good

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 92

1    names in the Local.  So, you know, his son's

2    in the Local, my cousin Eddie, you know.  He

3    just wants to see us do good.

4    Q.        He doesn't want you making any waves?

5    A.        (Nodded head).

6    Q.        Is that a yes?

7    A.        I mean, I guess.

8                   MR. PATRIZIO:  You have to

9              answer.  You can't shake your head.

10                  MS. DeBRUICKER:  She has to

11             write it down.

12                  THE WITNESS:  Sorry.

13   BY MS. DeBRUICKER:

14   Q.        Are you aware that other people

15   thought you were running for office as of the

16   time --

17   A.        Probably, yeah.

18   Q.        And who do you think was aware?

19   A.        Just other guys at work, out on the

20   job site or whatever.

21   Q.        Are you aware that other people

22   thought you were nominating Charlie Battle?

23   A.        That I wasn't aware of.  It should

24   have just been a select few.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1   Q.        And who would the select few be?

 2   A.        Probably me, Charlie and Phil.

 3                  (Exhibit marked

 4             M.Coppinger-4 for identification.)

 5   BY MS. DeBRUICKER:

 6   Q.        I'm going to show you what we'll mark

 7   as M.Coppinger-4.

 8                  MS. DeBRUICKER:  Why don't

 9             we go off the record so you can

10             change the videotape.

11                  THE VIDEOGRAPHER:  Yeah.

12             This concludes Media 1.  We are going

13             off the video record at 6:19 p.m.

14                  (Brief recess.)

15                  THE VIDEOGRAPHER:  This is

16             the beginning of Media No. 2.  We are

17             back on the video record at 6:22 p.m.

18   BY MS. DeBRUICKER:

19   Q.        Mr. Coppinger, I'm going to ask you

20   to look at what we've marked as M.Coppinger-4,

21   which is another statement at the top.  And if

22   you turn to the back, you see it was a

23   statement signed by Timothy McConnell on

24   October 15, 2020.  Do you see that?
```

Page 94

1    A.        Yes.

2    Q.        I'll represent this is a statement

3    Mr. McConnell signed on that date.

4                    MR. PODRAZA:  And again, my

5                    objection, that the witness should

6                    know that this was a statement

7                    prepared by a representative of DOL.

8                    It was not typed by Mr. McConnell.

9                    He reviewed it and signed.  These

10                   words were put in by a representative

11                   of DOL.

12   BY MS. DeBRUICKER:

13   Q.        I'm going to move as quickly through

14   this as I can.  Mr. Coppinger, on the second

15   page there's some highlighting?

16   A.        Yes.

17   Q.        In the second yellow paragraph that

18   begins, Dougherty began --

19   A.        Mm-hmm.

20   Q.        Statement reads, Dougherty began the

21   conversation by saying, Tim, why are you

22   running.  Why do you want to fix something

23   that isn't broken.  Do you see that?

24   A.        Yes.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 95

```
 1   Q.          You mentioned that Mr. McConnell
 2   mentioned to you that he had had a
 3   conversation with Mr. Dougherty?
 4   A.          He said he had a conversation with
 5   somebody at the hall, yes.
 6   Q.          Did he mention that someone had asked
 7   him why he was running?
 8   A.          I don't think so.  Because if you say
 9   you're running, a lot of people are going to
10   ask you.
11   Q.          The next paragraph begins, Dougherty
12   told me it would be a long three years if you
13   lose.  Do you see that?
14   A.          Mm-hmm.
15   Q.          Did Mr. McConnell share that
16   statement with you when he spoke with you?
17   A.          I don't know if he told me directly,
18   but it was hearsay.  It works its way around.
19   Q.          So you --
20   A.          A lot of things worked their way
21   around --
22   Q.          So you heard it?
23   A.          Yeah.
24   Q.          Did you have an understanding as to
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    what was meant by that?

2    A.          No, he said it to Timmy.  He didn't

3    say it to me.

4    Q.          When did you hear of this?  When did

5    it work its way around?

6    A.          I don't know if I heard it -- maybe

7    the week following the nomination I heard it.

8    Q.          Did Mr. McConnell say that someone

9    told him he would be affiliated with the

10   website if he ran?

11   A.          Not that I remember, no.

12   Q.          I'm going to direct your attention to

13   the last yellow paragraph on that page.  It

14   begins, I called Battle and Borthwick to tell

15   them what happened --

16   A.          Mm-hmm.

17   Q.          -- which immediately follows the

18   discussion of the phone call we were talking

19   about.

20   A.          Okay.

21   Q.          It reads, They told me to get in

22   touch with Member Mike Coppinger.  Do you see

23   that?

24   A.          Yes.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 97

1    Q.          And did he, in fact, get in touch

2    with you?

3    A.          Yes.

4    Q.          The statement continues, I did not

5    know Coppinger, but I remember he was thinking

6    of running for office.  Do you see that?

7    A.          Yes.

8    Q.          Do you know how he would have known

9    that?

10   A.          I guess he's friends with Charlie.

11   Q.          It continues, Coppinger told me he

12   was taking a nap and woke up to 50 phone

13   calls.  Do you see that?

14   A.          Yes.

15   Q.          Do you recall telling him that?

16   A.          Yes.

17   Q.          Did that actually happen?

18   A.          Yes.

19   Q.          It continues, Coppinger told me I'm

20   out, it ain't worth it.  Do you see that?

21   A.          Yes.

22   Q.          Do you recall telling him that?

23   A.          Yes.

24   Q.          Do you recall telling him that during

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

 1   that phone call?

 2   A.        I believe so.

 3   Q.        And why did you tell him at that

 4   time?

 5   A.        Well, I had been already telling

 6   Charlie and Phil my whole situation.  I just

 7   couldn't do it.

 8   Q.        When you say it ain't worth it, what

 9   did you mean?

10   A.        It just wasn't worth that much to me

11   anymore.  The situation with the health care

12   got resolved and...

13   Q.        The aggravation we talked about?

14   A.        Mm-hmm.

15   Q.        Did that include the trouble that

16   your uncle mentioned?

17   A.        I -- you have to ask him.  I guess.

18   Q.        Well, I'm asking what your

19   calculation as to why it wasn't worth it?

20   A.        I guess.  I don't know.

21   Q.        Do you recall specifically either

22   way?

23   A.        No.

24   Q.        It continues, I was surprised because

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

 1    all along Battle and Borthwick said Coppinger

 2    was 100 percent in.  Do you see that?

 3    A.        Mm-hmm.

 4    Q.        Do you understand how he could have

 5    gotten that impression?

 6    A.        Well, I understand that they wanted

 7    me to be 100 percent in.

 8    Q.        At any time, were you 100 percent in?

 9    A.        No.

10    Q.        It's my understanding you were

11    considering being in?

12    A.        Mm-hmm.

13    Q.        And then decided not to be in?

14    A.        Right.

15    Q.        It continues, I'm not certain why

16    Coppinger did not run, but I'm sure Coppinger

17    got a call, and it continues on to reference

18    your uncle.  Do you see that?

19    A.        Yes.

20    Q.        How would Mr. McConnell have known

21    about the call with your uncle?

22                  MR. PODRAZA:  Objection.

23              It doesn't say he knew about the

24              call.  He's speculating.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

 1                    THE WITNESS:   I have no

 2         idea.

 3    BY MS. DeBRUICKER:

 4    Q.        Do you know how Mr. McConnell could

 5    have gotten this information?

 6    A.        Maybe from Phil.  I don't know.

 7    Q.        Did you tell Mr. McConnell about your

 8    call with your uncle, about your call with Ed

 9    Coppinger?

10    A.        No.

11    Q.        Besides Phil Borthwick, who else did

12    you tell about your call with Ed Coppinger?

13    A.        I don't remember if I told Charlie or

14    not.  Probably just Phil.

15                    (Exhibit marked

16         M.Coppinger-5 for identification.)

17    BY MS. DeBRUICKER:

18    Q.        I'm going to ask you to look at what

19    we've marked as M.Coppinger-5.  And you have

20    to page back two pages to get to the similar

21    statement.  Do you see that?

22    A.        Mm-hmm.

23    Q.        And if you turn to the last page --

24    A.        Mm-hmm.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1  Q.          -- this is a statement that was

2  signed by Mr. Battle.  Do you see that?

3  A.          Yes.

4  Q.          And if you turn to the second page of

5  the statement where there's some yellow

6  marking on it, do you see that?

7  A.          Yes.

8  Q.          The statement reads, I sat in my

9  truck until 6:40 p.m. and then went to the

10  hall to meet up with Members John Kerr and

11  Phil Borthwick who were among those gathered

12  outside the union hall.  Do you see that?

13  A.          Yes.

14  Q.          Do you know who John Kerr is?

15  A.          I think I met him a long time ago

16  when I was an apprentice.

17  Q.          Would you recognize him if you saw

18  him?

19  A.          No.

20  Q.          Do you remember seeing him at the

21  union hall that night?

22  A.          No.

23  Q.          It continues, At 6:50 p.m. Coppinger

24  called Borthwick and told him he was not

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    coming to nominate me.  Do you see that?

 2    A.         Yes.

 3    Q.         Did you communicate to Mr. Borthwick

 4    that night that you were not nominating

 5    Mr. Battle?

 6    A.         Yes.

 7    Q.         It's my understanding you didn't tell

 8    Mr. Battle that directly?

 9    A.         No.

10    Q.         Why not?

11    A.         He was already -- when I got there, I

12    said where's he at.  They said, he left.  He

13    was all mad.  I don't know.

14    Q.         You didn't think to call him?

15    A.         No.  I thought if he wanted to call,

16    he would have called me.

17    Q.         It continues, It was at that point I

18    learned Coppinger had been intimidated out of

19    nominating me for office.  There's an

20    handwritten correction.

21    A.         Yeah, I see it.

22    Q.         You hadn't communicated to Mr. Battle

23    that you were not nominating him prior to that

24    point, correct?
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1    A.          I don't believe so.

 2    Q.          It continues, Some time between

 3    5 o'clock and 6:50 p.m. on June 9th, Coppinger

 4    received a phone call from his Uncle Ed

 5    Coppinger.  Do you see that?

 6    A.          Yeah.

 7    Q.          Does that recitation of the timing

 8    jive with your recollection as to when you got

 9    that call?

10    A.          I think the call was earlier in the

11    day.

12    Q.          I think you said you were on the job?

13    A.          I was working.

14    Q.          Do you recall what time you left work

15    typically that --

16    A.          3:30 every day usually.

17    Q.          And by that point, had you shared

18    with Mr. Borthwick your call with Ed

19    Coppinger?

20    A.          Probably.

21    Q.          Do you have an understanding as to

22    what impact your decision not to nominate

23    Mr. Battle would have on his candidacy?

24    A.          I didn't think it would have much
```

1    impact.  Because if he still wanted to run,

2    there was other people that could have

3    nominated him.  Like I said, he could have

4    nominated himself.

5    Q.        Do you think other people who -- if

6    someone else nominated him, they would have

7    gotten in the kind of trouble Ed Coppinger

8    talked to you about?

9    A.        I don't know.

10   Q.        Did you have any concerns that

11   seeking office would have an impact on your

12   job or your income?

13   A.        No.

14   Q.        Did you think that seeking office

15   could impact your reputation at the union?

16   A.        Maybe.

17   Q.        Why do you say that?

18   A.        Like they said earlier, different

19   things that had happened.  You hear things

20   through the grapevine, like what happened with

21   Kenny or whatever.

22   Q.        Kenny Rocks?

23   A.        Yes.

24   Q.        And Ed Coppinger had mentioned the

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1   Coppinger name?

2   A.          Yes.

3   Q.          Would there be concern about the

4   Coppinger name if you ran?

5   A.          Yes.

6   Q.          Did you have concern you would be

7   affiliated with the website if you ran?

8   A.          I wasn't too worried about that.

9   Most people know how I am and that I wouldn't

10  have anything to do with that.

11  Q.          If someone did affiliate you with the

12  website, would you consider that harmful to

13  your reputation?

14  A.          Yes.

15  Q.          Did you think that running would lead

16  to any other consequences for you?

17  A.          No.

18  Q.          Did you think that supporting a

19  challenger candidate like Mr. Battle could

20  impact your job?

21  A.          Probably not.

22  Q.          Why probably?

23  A.          You never can tell what's going to

24  happen in a hypothetical situation, but I

Page 106

1    don't think it would have.

2    Q.        Did you think that supporting a

3    challenger candidate like Mr. Battle can

4    impact your reputation in the union?

5    A.        Yes.

6    Q.        Why do you say that?

7    A.        Like I said, there will be guys that

8    like Charlie and guys that don't like Charlie.

9    Q.        So it could be a good impact to your

10   reputation or a bad impact to your rep --

11   A.        It could be both at the same time.

12   Q.        Did you think that supporting a

13   challenger candidate like Mr. Battle would

14   lead to any other consequences for you?

15   A.        No.

16   Q.        If you could have done so without any

17   consequences, would you have nominated

18   Mr. Battle?

19   A.        I don't know.

20   Q.        What did you have to lose by

21   nominating Mr. Battle?

22   A.        Like we just said, my reputation.

23   Q.        Did any Local 98 business agent ever

24   contact you about meetings held outside of the

 1    union?

 2    A.        No.

 3    Q.        Did any Local 98 business agent ever

 4    think that you were holding meetings at your

 5    house?

 6    A.        If they did, they never brought it to

 7    me.

 8    Q.        Has anyone from the union talked to

 9    you about this case?

10    A.        No.

11    Q.        Has anyone from the union tried to

12    influence your participation in this case of

13    what you might say?

14    A.        No.

15    Q.        Are you aware that Local 98 has

16    brought a lawsuit against Charles Battle?

17    A.        I heard.

18    Q.        Did you get a subpoena to testify in

19    that case?

20    A.        I don't know.  I don't think so.

21    Q.        Did you attend Local 98's August 2021

22    meeting?

23    A.        I think I went to the July meeting, I

24    think.

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

 1   Q.          It's my understanding that Local 98

 2   just started having meetings again?

 3   A.          The first meeting that they had after

 4   the COVID stopped, I did go to that meeting.

 5   I don't know if it was August or July.

 6   Q.          Was anything said to you by union

 7   leadership at that meeting?

 8   A.          No.

 9   Q.          Did Mr. Dougherty speak to you at

10   that meeting?

11   A.          Nope.

12   Q.          Did someone at the meeting suggest

13   that the union had information that could get

14   Mr. McConnell locked up?

15   A.          Not that I recall.  I'm not saying

16   that that didn't happen.  But when you're at

17   the meeting, people are talking.  Not

18   everybody is paying attention to the meeting

19   thing that's going on.

20   Q.          Did you hear anything to that effect?

21   A.          No.

22   Q.          As best as you recall, help me

23   understand the timing between when you spoke

24   with Ed Coppinger and when you told

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1    Mr. Borthwick you would not nominate

2    Mr. Battle?

3    A.        I probably spoke to Eddie late in the

4    day, whatever day it was, whatever the day the

5    nominations meeting was.  And I probably

6    talked to Phil because I know I called him

7    after work but he didn't answer the phone, so

8    I probably talked to him while I was driving

9    down to the meeting.  I was already late, so I

10   probably called him on the way.

11   Q.        What's your best recollection of when

12   you began discussing or considering seeking

13   office in June 2020 election?

14                  MR. PODRAZA:  Objection.

15             Asked and answered.  You can proceed.

16                  THE WITNESS:  Oh, like I

17             said earlier, a couple of months

18             before when we had the health care

19             thing.

20   BY MS. DeBRUICKER:

21   Q.        Do you recall about when that was?

22   A.        No, just a couple months before the

23   nomination.

24   Q.        Do you know if it was before COVID?

Page 110

```
 1    A.          I believe, yeah.  I believe it was

 2    before COVID.

 3    Q.          In my head, I associate COVID with

 4    March 2020.

 5    A.          I believe it was before.

 6                          MS. DeBRUICKER:  I think

 7              those are all the questions I have.

 8                          THE WITNESS:  Thank you.

 9                          MR. PODRAZA:  You're not

10              off that easy.

11                          THE WITNESS:  Oh, God.

12                          MR. PATRIZIO:  He may have

13              a question or two.

14                          MR. PODRAZA:  I only have a

15              few.  It won't be long.

16                             -   -   -

17                          EXAMINATION

18                             -   -   -

19    BY MR. PODRAZA:

20    Q.          If you can put before you again

21    Exhibit 3, that's Ed Coppinger's Declaration.

22    And if we can go to Paragraph 15?

23    A.          Yes.

24    Q.          All right.  The very last sentence Ed
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

1  Coppinger says, Michael and I did not speak

2  about any nominations, election or running for

3  office during the call he had; is that true?

4  A.      That's true.

5              MS. DeBRUICKER:  I'll

6           assert the same objection that

7           someone else probably typed this up.

8           We don't yet have confirmation

9           that --

10             MR. PODRAZA:  Okay.

11  BY MR. PODRAZA:

12  Q.      Then in Paragraph 16 it stated, the

13  second sentence, And it is untrue that I

14  called Michael to deliver a message from John

15  Dougherty that Michael's career would be

16  finished if he ran for office.

17             Did Ed Coppinger ever make such

18  a threat or words to that effect to you during

19  that call?

20  A.      No.

21             (Exhibit marked

22           M.Coppinger-6 for identification.)

23  BY MR. PODRAZA:

24  Q.      I'd like to show what we're going to

1    mark as M.Coppinger-6.  What I've shown you

2    and what we're marking as M.Coppinger-6 is a

3    letter of assent.  Stacy Coppinger, is that

4    your wife?

5    A.        Yes.

6    Q.        And do you and your wife run

7    Coppinger Electric?

8    A.        We did.

9    Q.        But you did in 2020; is that correct?

10   A.        Yes, sir.

11   Q.        And am I correct then that the

12   company was a signatory contractor business

13   with IBEW Local 98 as of May 12, 2020

14   according to this; is that correct?

15   A.        I believe so.

16   Q.        And you helped run the company when

17   it was in operation?

18   A.        Really didn't go too far in

19   operation.  We opened up the company, kind of

20   was like still structuring it when COVID hit

21   and after that we just folded.

22   Q.        But up to that point, you had worked

23   with your wife in organizing the company with

24   the intent to go forward with it?

Page 113

1    A.        Yes.

2    Q.        And you said it's no longer a

3    signatory contractor business; is that

4    correct?

5    A.        No.

6    Q.        Just give me one second.

7    A.        Take your time.

8    Q.        And just so with respect to

9    M.Coppinger-6, you recognize your wife's

10   signature there; is that correct?

11   A.        Yes.

12   Q.        And you also recognize the business

13   manager for Local 98 signature?

14   A.        Yes.

15   Q.        And both are dated May 12, 2020?

16   A.        Yes.

17             MR. PODRAZA:  Thank you,

18             sir.  Those are all the questions

19             that I have.

20                  -  -  -

21             EXAMINATION

22                  -  -  -

23   BY MS. DeBRUICKER:

24   Q.        One follow-up question:  What is a

Page 114

```
 1   signatory business?

 2   A.        So when you decide to open a union

 3   shop, you have to sign with the Local if you

 4   want to be union.

 5   Q.        And I take it at some point you

 6   formulated an intent to become a signatory

 7   business?

 8   A.        Yes, we were going to open up a

 9   company.

10   Q.        When did you decide to do that?

11   A.        Just before my health scare.

12   Q.        And can you give me a sense in time

13   as to when your health scare began?

14   A.        20 -- the end of 2019 maybe, the

15   beginning of 2020 they discovered the tumor.

16   And then they went in to look to see if it was

17   growing and they thought it was too close to

18   the spine and we should remove it.  And all of

19   this was another doctor's appointment, another

20   MRI, another CT scan, another, you know, my

21   wife ripping her hair out.

22   Q.        And at some point, did you decide not

23   to pursue that business?

24   A.        Yeah.  When -- like I said, when all
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

```
 1   the health stuff was going on, it was too much

 2   on my plate to do really anything.  I was

 3   struggling to take my kids to sporting events,

 4   you know, their games so.

 5   Q.        Can you give me a sense as to a point

 6   in time when you made that decision not to go

 7   forward with the business?

 8   A.        We were still going back and forth.

 9   And then I think once everything started up

10   with COVID, that was it.

11   Q.        But you signed -- the signatures on

12   this is May 2020?

13   A.        Yes.

14   Q.        So at this point, you still intended

15   to move forward?

16   A.        We already had everything in place,

17   so she was like we'll put a few bids out and

18   see what happens.  So that's basically -- it

19   was the last straw then, let's see what

20   happens.  But there just wasn't enough work

21   out there during the pandemic to, you know.  I

22   don't want to leave a job I was securing for

23   nine years to chase a dream when it obviously

24   just wasn't going to happen at that point in
```

1    time.

2    Q.       So if these papers were signed in May

3    2020, give me your best estimate as to when

4    you decided we're not doing this?

5    A.       Probably right around that time.  I

6    probably had bids out already and nothing was

7    coming in.  So right around that time we

8    decided.

9    Q.       When you say right around that time,

10   do you mean May of 2020?

11   A.       Yes.  Because if you keep moving

12   forward, you still have to pay for your

13   insurances, you still have to pay for -- so at

14   some point we just really, you know, I was in

15   and out of the hospital, let's just cut our

16   losses and when I'm healthy again, I'll go

17   back to work.

18   Q.       Did anyone from the union talk about

19   your intentions to start this business?

20   A.       I might have told Bobby Bark and

21   Rodney about starting the business.

22   Q.       Did anyone try to talk you out of

23   doing it?

24   A.       No, they were more encouraging.

Page 117

```
 1    Q.        When you had your conversation with

 2    Ed Coppinger the day of the nominations

 3    meeting, did you understand him to be

 4    referring to your business plans at all?

 5    A.        No, not that I know of.

 6                    MS. DeBRUICKER:  Thank you.

 7                    MR. PODRAZA:  No further

 8              questions.  Thank you, Mr. Coppinger.

 9                    THE VIDEOGRAPHER:  This

10              concludes Media No. 2 and the end of

11              the Videotaped Deposition of Michael

12              Coppinger.  We are going off the

13              video record on September 24, 2021 at

14              6:50 p.m.

15                    (Videotaped Deposition

16              concluded at 6:50 p.m.)

17

18

19

20

21

22

23

24
```

Eugene Scalia, DOL v. Local 98, IBEW, 9/24/2021

Page 118

1              C E R T I F I C A T I O N

2                   I, hereby certify that the

3       proceedings and evidence noted are contained

4       fully and accurately in the stenographic notes

5       taken by me in the foregoing matter, and that

6       this is a correct transcript of the same.

7

8

9

10

11              _____

                TANEHA CARROLL
12              Court Reporter - Notary Public

13

14

15

16

17

18                   (The foregoing

19              certification of this transcript does

20              not apply to any reproduction of the

21              same by any means, unless under the

22              direct control and/or supervision of

23              the certifying reporter.)

24

# Ex. M

## LETTER OF ASSENT - A

In signing this letter of assent, the undersigned firm does hereby authorize[1] _Penn-Del-Jersey Chapter, NECA, Philadelphia Division_

as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent

approved[2] _Inside Commercial_ labor agreement between the

[1] _Penn-Del-Jersey Chapter, NECA, Philadelphia Division_ and Local Union[3] _98_ , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective

on the[4] _12TH_ day of _May_ , _2020_ .

It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1] _Penn-Del-Jersey Chapter, NECA, Philadelphia Division_ and to the Local Union at least one hundred fifty (150)

days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

[5] Name of Firm _Coppinger Electric_

Street Address/P.O. Box Number _103 Lantern Way_

City, State (Abbr.) Zip Code _Deptford NJ 08096_

[6] Federal Employer Identification No. _83-0518944_

| SIGNED FOR THE EMPLOYER | SIGNED FOR THE UNION[3] _98_ , IBEW |
|---|---|
| BY[7] _Stacy Coppinger_ (original signature) | BY[7] _(signature)_ (original signature) |
| NAME[8] _Stacy Coppinger_ | NAME[8] John J. Dougherty |
| TITLE/DATE _Owner 5-12-20_ | TITLE/DATE Business Manager _5|12|20_ |

INSTRUCTIONS (All items must be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
   Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
   Insert type of agreement. Example: Inside, Outside Utility, Outside Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree Trimming, etc. The Local Union must obtain a separate assent to each agreement the employer is assenting to.
[3] LOCAL UNION
   Insert Local Union Number.
[4] EFFECTIVE DATE
   Insert date that the assent for this employer becomes effective. Do not use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
   Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
   Insert the identification number which must appear on all forms filed by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
   Print or type the name of the person signing the Letter of Assent. International Office copy must contain actual signatures-not reproduced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING. AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCAL UNION SHALL RETAIN ONE COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.

IBEW.FORM 302 REV. 9/01

# Ex. N

# INTERNATIONAL BROTHERHOOD
# OF ELECTRICAL WORKERS



# CONSTITUTION

## AND RULES FOR LOCAL UNIONS
## AND COUNCILS UNDER ITS JURISDICTION

as amended at the 39th IBEW Convention
St. Louis, Missouri, September 2016

DOL_LOCAL 98_00001

shows good cause for not doing so. Seven (7) members in good standing shall constitute a quorum, provided the L.U. has a membership of seventy-five (75) or more. If the L.U. has less than seventy-five (75) members, then five (5) shall constitute a quorum.

Sec. 4. L.U.'s shall affiliate, or shall not affiliate, with state, provincial, central, or trades councils or bodies, as decided by the I.P.

Sec. 5. No L.U. shall allow any member who becomes an electrical employer, a partner in an electrical employing concern, a general manager, or other managerial position, to hold office in the L.U. or attend any of its meetings, or vote in any election of a L.U. The L.U. may allow such a member to continue his membership in the L.U., or the member may apply to the F.S. for a withdrawal card. It shall require a majority vote at a meeting to grant such card. But the L.U. has the right to require such a member to take out a withdrawal card if it so decides.

Sec. 6. L.U.'s are empowered to make their own bylaws and rules, but these shall in no way conflict with this Constitution. Where any doubt appears, this Constitution shall be supreme. All bylaws, amendments and rules, all agreements, jurisdiction, *etc.*, of any kind or nature, shall be submitted to the I.P. for approval. No L.U. shall put into effect any bylaw, amendment, rule, or agreement of any kind without first securing such approval. All these shall be null and void without I.P. approval. The I.P. has the right to correct any bylaws, amendments, rules, or agreements to conform to this Constitution and the policies of the I.B.E.W. Bylaw amendments shall be submitted to the I.V.P. of that district, who will forward them to the I.P. with his recommendations.

ART. 15

# Ex. O

# Basic Laws & Policies

## International Brotherhood of Electrical Workers®



DOL_LOCAL 98_00117



## MEMBER ELIGIBILITY TO VOTE AND HOLD OFFICE

No local union may allow any member who becomes an electrical employer, a partner in an electrical employing concern, or a general manager or other managerial position, to hold office in the local union or attend any of its meetings or vote in any of its elections. Because of the wide variety of employment practices in the industry, the determination of who is and who is not an employer must be made by the local union. Members who form their own electrical contracting business, control and operate these businesses, or make policy and management decisions will be considered employers and deemed ineligible to participate in local union affairs or elections.

Some IBEW members own stock in the companies that employ them but have no say in company policy or operations. They are not considered employers or partners, unless they own so large a proportion of stock that they significantly affect company policy or operations.

In general, members who are covered by an IBEW-negotiated collective bargaining agreement are entitled to vote in local union elections and participate in local union affairs. In the construction branch, members who work as foremen and general foremen are generally entitled to participate in local union affairs and elections.

When a member becomes an owner or a partner in an electrical employing concern, the local union shall determine whether the member shall retain membership in the local union or transfer membership to the International Office. If the local union permits the member to retain membership, such a member would not be permitted to attend meetings, hold any office in the local union, vote in any local union election, or vote on acceptance or rejection of the collective bargaining agreement.

## PARLIAMENTARY RULES

Local union meetings should be handled expeditiously and in the most simple and direct manner. Accordingly, the parliamentary rules set forth in the IBEW Constitution were designed to assist the chairperson in conducting a local union meeting and in handling procedural problems that may arise. Whether a local union meeting is regular or special, it should be well organized and intelligently run. Parliamentary procedure was designed specifically for this purpose.

A chairperson should be well-versed in the rules of order and should have patience, tolerance, impartiality, and good sense. These qualities will aid in conducting an orderly meeting and are more important than having an encyclopedic knowledge of parliamentary law. The chairperson should be familiar with *Robert's Rules of Order, Newly Revised*; the IBEW Constitution; and the local union bylaws. This is very important, as the chairperson will rule at times on questions of order and law. In this context, Parliamentary Rule Number 5 (Article XV, IBEW Constitution) provides that an appeal cannot be taken to the meeting from a ruling of the chairperson when a question of law is involved.

Any part of the IBEW Constitution or the approved local union bylaws and any decisions rendered by proper IBEW authority are questions of law, as dues to be paid by members and salaries of officers are questions of law. An appeal of the chairperson's ruling on all such questions of law would be out of order, and final determination as to the correctness of the ruling should be made by the International President.

One common problem is the matter of reconsideration of a question. The purpose of the motion to reconsider is the correction of a mistake made by a group or the reversal of action on a motion. It must be made and seconded by two members who voted with the majority. The procedure to be followed is set forth in Parliamentary Rule Number 6, Article XV.

When a motion to reconsider passes, the original motion in question is brought before the group as it was before the vote was taken, and debate about the motion continues. Members who exhausted their right to speak on the question during the original debate cannot speak again unless given permission by the body. No question can be reconsidered twice.

DOL_LOCAL 98_00143

# Ex. P

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor,<br>United States Department of Labor, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION NO.<br>2:21-cv-00096 |
| | : | |
| v. | : | |
| | : | |
| LOCAL 98, INTERNATIONAL<br>BROTHERHOOD OF ELECTRICAL<br>WORKERS, | : | Hon. Gerald Austin McHugh |
| | : | |
| *Defendant*. | : | |

**DECLARATION OF DON SIEGEL**

I, Don Siegel, hereby declare and state as follows:

1. I submit this declaration based on my personal knowledge.

2. I reside at 103 Marble Drive, McMurray Pennsylvania 15317.

3. I am a member of IBEW for fifty (50) years, and have served in many positions, including as the Third District International Vice President, International Representative, Business Manager, and Executive Board Member. I also have served as vice president of the Pennsylvania AFL-CIO and on the boards of Team Pennsylvania Foundation and the Ben Franklin Technology Development Authority. Presently, I am President of Electrical Workers Without Borders, North America.

4. I am intimately familiar with the provisions governing signatory contractors under the Constitution of the IBEW and IBEW's Basic Laws & Policies with which all local unions of the IBEW must comply. I am familiar with them, and their applications, because I have enforced them and applied them throughout the fifteen (15) years that I served as the Third District International Vice President.

5. Article XV, Sec. 5 of IBEW's Constitution provides, "No L.U. [labor union] shall allow any member who becomes an electrical employer, a partner in an electrical employing concern, a general manager, or other managerial position, to hold office in

the L.U. or attend any of its meetings, or vote in any election of a L.U.  The L.U. may allow such a member to continue his membership in the L.U., or the member may apply to F.S. [Financial Secretary] for a withdrawal card.  It shall require a majority vote at a meeting to grant such a card.  But the L.U. has the right to require such a member to take out a withdrawal card if it so decides."

6. The "Member Eligibility To Vote and Hold Office" section of IBEW's Basic Laws & Policies states, "No local union may allow any member who becomes an electrical employing concern, or a general manager or other managerial position, to hold office in the local union or attend any of its meetings or vote in any of its elections. Because of the wide variety of employment practices in the industry, the determination of who is and who is not an employer must be made by the local union. Members who form their own electrical contracting business, control and operate these businesses, or make policy and management decisions will be considered employers and deemed ineligible to participate in local union affairs or elections."

7. The purpose for these provisions is to prevent conflicts of interest: conflicts which could prove to be harmful to the interests of the other members of the local union and IBEW.

8. In order to become a signatory contractor, a Letter of Assent must be completed between the local union and the contracting firm, and approved by the International President, IBEW.

9. The assent for the employer/contractor becomes effective on the date specified in the Letter of Assent.

10. I am aware that Coppinger Electric, LLC, an employer owned by Member Michael Coppinger and Stacy Coppinger, his wife, entered into a Letter of Assent with Local 98, IBEW, on May 12, 2020.  A copy of the Letter is attached to this Declaration as Exhibit "A."

11. The Letter of Assent between Coppinger Electric, LLC, and Local 98, IBEW, was approved by the International President on June 12, 2020, as evidenced by Exhibit "B" attached hereto.

12. The Letter of Assent specifies that its effective date was May 12, 2020.

13. The Letter of Assent also provides that, "It shall remain in effect until terminated by the undersigned employer giving written notice to the Penn-Del-Jersey Chapter, NECA, Philadelphia Division and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement."

14. To date, the records of the Penn-Del-Jersey Chapter, NECA, Philadelphia Division establish that Coppinger Electric, LLC, has not served a written notice of termination to the NECA chapter as required under the Letter of Assent.

15. To date, Local 98's records establish that Coppinger Electric, LLC, has not served a written notice of termination to Local 98 as required under the Letter of Assent.

16. Effective May 12, 2020, through the date of this Declaration, Member Michael Coppinger was deemed ineligible to participate in local union affairs or elections, including running for or holding office in the local union, nominating other members for office in the local union, voting in any elections held by the local union, or attending any of the member meetings held by the local union.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this _5th_ day of _October_, 2021.

_____
Don Siegel

EXHIBIT "A"

## LETTER OF ASSENT - A

In signing this letter of assent, the undersigned firm does hereby authorize[1]  Penn-Del-Jersey Chapter, NECA, Philadelphia Division

as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent

approved[2]                    Inside Commercial                    labor agreement between the

[1]  Penn-Del-Jersey Chapter, NECA, Philadelphia Division          and Local Union[3]   98   , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent
approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective
on the[4]  12TH  day of  May  , 2020 .

It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1]          Penn-Del-Jersey Chapter, NECA, Philadelphia Division          and to the Local Union at least one hundred fifty (150)

days prior to the then current anniversary date of the applicable approved labor agreement.

    The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective
bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all
employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

    In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980,
in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of
assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry
Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

[5] Name of Firm  Coppinger Electric

Street Address/P.O. Box Number  103 Lantern Way

City, State (Abbr.) Zip Code  Deptford  NJ  08096

[6] Federal Employer Identification No.  83-0518944

| SIGNED FOR THE EMPLOYER | SIGNED FOR THE UNION[3]   98 , IBEW |
|---|---|
| BY[7] *Stacy Coppinger* | BY[7] *signature* |
| (original signature) | (original signature) |
| NAME[8] Stacy Coppinger | NAME[8] John J. Dougherty |
| TITLE/DATE Owner 5-12-20 | TITLE/DATE Business Manager  5/12/20 |

INSTRUCTIONS (All items must be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
   Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
   Insert type of agreement. Example: Inside, Outside Utility, Outside
   Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree
   Trimming, etc. The Local Union must obtain a separate assent to each
   agreement the employer is assenting to.
[3] LOCAL UNION
   Insert Local Union Number.
[4] EFFECTIVE DATE
   Insert date that the assent for this employer becomes effective. Do not
   use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
   Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
   Insert the identification number which must appear on all forms filed
   by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
   Print or type the name of the person signing the Letter of Assent.
   International Office copy must contain actual signatures-not repro-
   duced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING.
AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW
DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCAL UNION SHALL RETAIN ONE
COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.

IBEW.FORM 302 REV. 9/01

EXHIBIT "B"

### LETTER OF ASSENT - A

In signing this letter of assent, the undersigned firm does hereby authorize[1]  Penn-Del-Jersey Chapter, NECA, Philadelphia Division

as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent

approved[2]            Inside Commercial            labor agreement between the

[1]  Penn-Del-Jersey Chapter, NECA, Philadelphia Division            and Local Union[3]  98  , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent

approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective

on the[4]  12TH  day of  May  , 2020 .

It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1]       Penn-Del-Jersey Chapter, NECA, Philadelphia Division       and to the Local Union at least one hundred fifty (150)

days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

**APPROVED**
INTERNATIONAL OFFICE - I.B.E.W.

**June 12, 2020**

Lonnie R. Stephenson, Int'l President
This approval does not make the
International a party to this agreement

Coppinger Electric
[5] Name of Firm

103 Lantern Way
Street Address/P.O. Box Number

Deptford   NJ   08096
City, State (Abbr.) Zip Code

[6] Federal Employer Identification No.  83-0518944

SIGNED FOR THE EMPLOYER

BY[7]  Stacy Coppinger
            (original signature)

NAME[8]  Stacy Coppinger

TITLE/DATE  Owner  5-12-20

SIGNED FOR THE UNION[3]  98  , IBEW

BY[7]  Jegoey
            (original signature)

NAME[8]  John J. Dougherty

TITLE/DATE  Business Manager  5/12/20

---

**INSTRUCTIONS** (All items must be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
   Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
   Insert type of agreement. Example: Inside, Outside Utility, Outside Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree Trimming, etc. The Local Union must obtain a separate assent to each agreement the employer is assenting to.
[3] LOCAL UNION
   Insert Local Union Number.
[4] EFFECTIVE DATE
   Insert date that the assent for this employer becomes effective. Do not use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
   Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
   Insert the identification number which must appear on all forms filed by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
   Print or type the name of the person signing the Letter of Assent. International Office copy must contain actual signatures-not reproduced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING. AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCAL UNION SHALL RETAIN ONE COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.

IBEW.FORM 302 REV. 9/01

# Ex. Q

**U.S. Department of Labor**　　Office of Labor-Management Standards
Philadelphia-Pittsburgh District Office
Mailstop OLMS/21
1835 Market Street
Philadelphia, PA  19103-2968
(215) 861-4820  Fax: (215) 861-4849



DATE:　　October 13, 2020

TO:　　140-6019880(01)

FROM:　　*Angela Menges*
Angela B. Menges
Investigator

SUBJECT:　　International Brotherhood of Electrical Workers (IBEW) Local 98
1701 Spring Garden Street
Philadelphia, PA 19130
LM: 001-938

RE:　　Signed Statement of Local 98 Member/Complainant Charles Battle

On the above date, PHIPGHDO District Director Megan Underwood and I met with IBEW Local 98 member/Complainant Charles Battle at the PHIDO for the purpose of obtaining a signed statement **(see attachment)**.  Battle voluntarily agreed to provide the signed statement. Battle reviewed the content of the signed statement prior to signing.   Prior to signing, OLMS discussed the purpose of the statement with Battle and advised him OLMS is conducting an official investigation pursuant to the LMRDA.



IBEW Local 98
October 13, 2020
Page 2 of 2



**<u>Attachment</u>:**

Signed statement of Complainant Charles Battle, October 13, 2020.

<u>STATEMENT</u>

I, Charles Battle, residing at 8710 Lykens Lane, Philadelphia, PA 19128, make the following voluntary statement to Angela B. Menges and *Megan Underwood* who have identified themselves to me as Investigators of the Office of Labor-Management Standards, U.S. Department of Labor. Investigators Menges and *Underwood* have advised me that they are conducting an official investigation for the U.S. Department of Labor, Office of Labor-Management Standards, pursuant to the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA).

I, Charles Battle, have personal knowledge of all of the facts in this statement.

I am employed as an electrician for Shaeffer Electric. I have been a member of IBEW Local 98 for 30 years.

I was going to run for president on a slate with Timothy McConnell and Michael Coppinger, both of whom intended to run for the executive board positions. I did not campaign because I did not want to tip my hand and get blowback from the local. My family would have been harassed, and I would have received phone calls from members and officers asking, "What are you doing?"

I have stood up during membership meetings and said some hard words for Business Manager John Dougherty. It's a disgrace the way the union is being run. It's a problem when members don't have a voice or say and are told 'Do as I say and shut up.'" Business Agent Bobby Bark has called me numerous times in the past after membership meetings asking, "What are you doing? Why are you asking questions?"

I got calls from Bark after the November 2019 membership meeting and after the January and February 2020 meetings. Bark also came to my job site and harassed me on two occasions. Bark showed up at my home after a membership meeting in January 2020 where I stood up and asked Dougherty if the local was going to get back money it had donated to a man who actually stole it. I was working in my garage when I received a phone call from Bark saying he wanted to speak with me. Bark told me he was standing in my driveway. My wife was scared because a union officer showed up at our house. I agreed to go out with Bark to get him away from the house.

One week before the nomination meeting, Bark wanted to talk with me over beers and I told him no. I kept asking Bark what he wanted, but Bark would not say. On Sunday, June 7, 2020 — two days prior to the nomination meeting — my doorbell rang at 8:30 p.m. Bark showed up unannounced and uninvited. I asked him, "What are you doing? I made it clear do not come to my house for this B.S.!"

Bark wants to know why I'm so upset with the union. I've said to Bark, "I can't ask questions without being harassed." Bark wants to know why I'm questioning their leaders, and I've told him I'm a dues-paying member and I have a right to do so. Ask any person in the local — they're afraid to stand up and ask questions. They're petrified of what's going to happen because you're not going to work. I'm currently working because my contractor knows Dougherty and

Initials: C B

Page 1 of 3

DOL_LOCAL 98_00408

how he operates. However, I know guys who have been out of work two years because of Dougherty. One such member is Rob Mission. Once the unemployment rate gets so high, we go to a 50/50 list and solicit our own job (SOJ). You can't take a job unless the hall hires four guys off the list. If you take it, the contractor is going to pay a price, so the contractor is not going to hire you.

On June 7, 2020, the Sunday before the nomination meeting, I learned that McConnell and Coppinger, my intended running mates, were not going to run for office. McConnell told me that Dougherty talked to McConnell on the phone and said, "You're either with us or against us. If you're against us, it'll be a long three years."

I entered the union hall at 4:50 p.m. on June 9, 2020, and was handed a nomination slip by Local 98 Attorney Tara Chupka. The nomination slip asked for the name of the nominee and the office for which he was being nominated; the name, signature, and card number of the nominator; and the name, signature, and card number of the nominee. I completed the slip with my own information and gave the slip to Chupka. Coppinger, who was supposed to nominate me, had not yet arrived at the union hall to complete the nominator portion of the form. I told Chupka when my nominator arrived, he would fill out his portion. I did not tell Chupka the name of my nominator.

Word quickly spread that I had submitted my nominating slip. After I submitted the slip, I sat in my truck to wait until the nomination meeting began at 7:00 p.m. Ten minutes after submitting my slip, member David Kelly called and asked me if I was running for president. Kelly lives in Flourtown, Pennsylvania. I was blown away that the news had reached Flourtown so quickly. ~~Sitting in my truck, I saw~~ business agents going around talking to the crowd that had gathered. [handwritten: CB] [handwritten: I heard] Member Dominic Bassiano said the business agents told him they heard he was going to nominate me for office. Bassiano had no idea I intended to run for office. I think the agents were fishing to find out who was doing what.

I sat in my truck until 6:40 p.m. and then went to the hall to meet up with members John Kerr and Phil Borthwick, who were among those gathered outside the union hall. At 6:50 p.m., Coppinger called Borthwick and told him he was not coming to nominate me. It was at that point [handwritten: CB] I learned that Coppinger had been intimidated out of ~~running~~ for office. Sometime between 5:00 [handwritten: Nominating] and 6:50 p.m. on June 9, 2020, Coppinger received a phone call from his uncle, Ed Coppinger. Ed Coppinger used to be a Local 98 business agent. Dougherty had called Ed Coppinger, who relayed the message to his nephew Mike Coppinger. Mike Coppinger was told his career would be finished if he ran. Mike Coppinger is young and has a wife, child, and mortgage — a lot at stake.

When we learned Coppinger was not coming, Kerr and Borthwick expressed willingness to nominate me instead. However, I was scared for them. I told Borthwick, "We're cows walking to the slaughterhouse." We would have to walk the gauntlet, down a walkway past 300 guys to the hall. With this in mind, as well as both of my running mates now out of the race and having just learned Coppinger was not coming to nominate me, I was intimidated. I saw how aggressively they were trying to find out who nominated me. Out of 3,500-4,000 members in the local, they zeroed in that fast. I told Kerr and Borthwick, "Let's just leave and deal with this another day." Kerr later told me he was glad I decided not to run. I didn't know at the time that I could

Initials: _CB_

Page 2 of 3

nominate myself. If I'd known that, there's not a chance I'd put anyone else or their career in jeopardy. They'd already be out of work by now if they had gone through with nominating me.

I left at 7:05 p.m. without attending the meeting or attempting to do so. The local has a pattern of intimidating people out of running. If they're on the outs with a guy, the hall will tell the contractor, "The next five guys we send you are bums," so the contractor fires the guys. The owner of contractor Par 4 is good friends with McConnell and told McConnell this.

I declare under penalty of perjury that the foregoing statement consisting of three pages, each of which I have initialed, is true and correct.

| 10-13-2020 | _Charles Batts_ |
|---|---|
| Date | Signature |
| 10-13-2020 | |
| Date | Witness Signature |
| 10/13/2020 | _Angela Menges_ |
| Date | Witness Signature |

Signed at: OLMS - 170 S. Independence Mall West, Suite 760u
Location      Philadelphia, PA 19106

Initials: _CB_

Page 3 of 3

DOL_LOCAL 98_00410

# Ex. R

## William Trask

| | |
|---|---|
| **From:** | DeBruicker, Lauren (USAPAE) <Lauren.DeBruicker@usdoj.gov> |
| **Sent:** | Friday, August 6, 2021 2:42 PM |
| **To:** | Joseph Podraza |
| **Cc:** | William Trask |
| **Subject:** | RE: Secretary/Local 98 |

Thanks. We do not have a statement by Coppinger. (I will confirm in a more formal response to your discovery letter in the next few days).

- Lauren

**From:** Joseph Podraza <jpodraza@lambmcerlane.com>
**Sent:** Friday, August 6, 2021 2:37 PM
**To:** DeBruicker, Lauren (USAPAE) <LDeBruicker@usa.doj.gov>
**Cc:** William Trask <wtrask@lambmcerlane.com>; Joseph Podraza <jpodraza@lambmcerlane.com>
**Subject:** Re: Secretary/Local 98

Thanks.  No luck with Coppinger despite repeated attempts. Do you folks have a statement to DOL by Coppinger?  Joe

Sent from my iPhone

> On Aug 6, 2021, at 2:29 PM, DeBruicker, Lauren (USAPAE) <Lauren.DeBruicker@usdoj.gov> wrote:
>
> Thanks, Joe. I will be attending; Anna Laura Bennett from DOL will participate by phone. Any updates on Coppinger?
>
> Lauren DeBruicker
> 215.764.2231 (M) | Lauren.DeBruicker@usdoj.gov

**From:** Joseph Podraza <jpodraza@lambmcerlane.com>
**Sent:** Friday, August 6, 2021 12:02 PM
**To:** DeBruicker, Lauren (USAPAE) <LDeBruicker@usa.doj.gov>
**Cc:** Joseph Podraza <jpodraza@lambmcerlane.com>; William Trask <wtrask@lambmcerlane.com>
**Subject:** Secretary/Local 98

Lauren:

Could you let me know who will be attending the upcoming depositions for the Plaintiff so I may notify security?  Thanks and have a nice weekend.  Joe

This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination

or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at 610.430.8000 or notify us by e-mail at info@lambmcerlane.com.

This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at 610.430.8000 or notify us by e-mail at info@lambmcerlane.com.

**Ex. S**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor, | : : : | |
| | : | |
| *Plaintiff,* | : : | CIVIL ACTION NO. 2:21-cv-00096 |
| v. | : : | |
| | : | |
| LOCAL 98, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | : : : | Hon. Gerald Austin McHugh |
| | : | |
| *Defendant.* | : : | |

## DECLARATION OF ED COPPINGER

I, Ed Coppinger, hereby declare and state as follows:

1.   I submit this declaration based on my personal knowledge.

2.   I reside at 2712 Elysia Lane, Audubon, Pennsylvania  19403.

3.   I was a member of IBEW, Local 98 for forty-seven (47) years, and over the years held many positions with the Union, including positions on the Union's Executive Board, Labor Management Committee, and Health and Welfare Fund.

4.   In or about early June 2020, I believe June 5, 2020, I received a telephone call from a member of the Union while I was golfing at the Stone Harbor Golf Club, 905 Route 9 North, Cape May Court House, New Jersey 08210.

5.   The member called to give me a "heads up" that Michael Coppinger ("Michael"), my cousin's son, was involved with certain other Union members who were believed to be agitators.

6.   I was surprised that Michael might be associating with such members who I considered to be troublemakers, or guys with just personal grievances who have no interest in or clue on how to run or operate a Union.

7. After receiving the call, I called Michael.

8. I told Michael that I got a call from a Union member who was concerned about him (Michael) getting involved with members who are interested only in their personal interests, and not the Union's. I said to Michael that by being involved with such members, he was only hurting the Union.

9. I told Michael that I was hearing that he might be involved with the website, which had inflammatory comments that were harmful to the Union, and that he was holding meetings at his house with these self-serving members.

10. Michael denied any involvement with the website or having any such meetings at his house.

11. I told Michael that I had put a lot of hours and time into the Union, and because of these efforts our name is well respected in the Union.

12. I reminded Michael that he carries the Coppinger name, and I told him he should not disgrace our name by allowing himself to be manipulated by other members who have their own agendas.

13. I additionally asked him, "Why would you (Michael) want to get into someone else's problems? And why would you get involved with anyone who was just acting for selfish, personal reasons?" I believe Michael understood that the someone I was referring to was Member Charlie Battle.

14. Michael assured me that if he had any issues with the Union he would speak directly with the Business Manager. He even gave me an example when he did go directly to the Business Manager and, according to him, the problem was resolved after he had done so. The issue dealt with healthcare coverage under the Union's policy.

15. When I spoke with Michael I had no idea he (Michael) might be considering running, or nominating another member, for an elected office with the Union, and it was not raised in the earlier call I received while at the golf course. Michael and I did not speak about any nominations, elections or running for office.

16. Michael and I never discussed the June 2020 nominating proceeding or the election. And it is untrue that I called Michael to deliver a message from John Dougherty that Michael's career would be finished if he ran for office. Any suggestion that I did would be laughable.

17. I believed Michael when he told me he was not associated with these other members or the website, and we ended our call, which had only lasted about 5-8 minutes.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this *16th* day of *September*, 2021.

DocuSigned by:

*Ed Coppinger*

05C6AC8C0093459...

Ed Coppinger

**Ex. T**

**U.S. Department of Labor**       Office of Labor-Management Standards
Philadelphia-Pittsburgh District Office
Mailstop OLMS/21
1835 Market Street
Philadelphia, PA  19103-2968
(215) 861-4820  Fax: (215) 861-4849



DATE:      October 15, 2020

TO:        140-6019880(01)

FROM:      *Angela Menges*
           Angela B. Menges
           Investigator

SUBJECT:   International Brotherhood of Electrical Workers (IBEW) Local 98
           1701 Spring Garden Street
           Philadelphia, PA 19130
           LM: 001-938

RE:        Signed Statement of Local 98 Member Philip Borthwick


On the above date, PHIPGHDO District Director Megan Underwood and I met with IBEW
Local 98 member Philip Borthwick at the PHIDO for the purpose of obtaining a signed
statement **(see attachment)**.  Borthwick voluntarily agreed to provide the signed statement.
Borthwick reviewed the content of the signed statement prior to signing.  Prior to signing, OLMS
discussed the purpose of the statement with Borthwick and advised him OLMS is conducting an
official investigation pursuant to the LMRDA.

**Attachment:**

Signed statement of Philip Borthwick, October 15, 2020.

DOL_LOCAL 98_00413

<u>STATEMENT</u>

I, Philip Borthwick, residing at 4002 Pechin Street, Philadelphia, PA 19128, make the following voluntary statement to Angela B. Menges and **Megan Underwood** who have identified themselves to me as Investigators of the Office of Labor-Management Standards, U.S. Department of Labor. Investigators Menges and **Underwood** have advised me that they are conducting an official investigation for the U.S. Department of Labor, Office of Labor-Management Standards, pursuant to the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA).

I, Philip Borthwick, have personal knowledge of all of the facts in this statement.

I am employed as an electrician for the Gordon Group. I have been a member of IBEW Local 98 since October 1996.

After Charles Battle began asking questions at membership meetings in November 2019, people began to talk. Battle, Timothy McConnell, and Mike Coppinger all wanted to see change in the union. About six months before the nomination meeting, little garage meetings were held. In our neighborhood, we might've had 15 people at our garage meeting. Coppinger told me he had 60 to 80 guys show up at his garage meeting. McConnell was in the middle like me. McConnell eventually said, "Maybe I'll jump in," meaning run for office. McConnell is more knowledgeable than most members and understands politics.

Someone leaked about the garage meetings and it got back to Dougherty. Dougherty said, "Stop everything. I want to know what's going on." Dougherty sent his business agents to Coppinger and they asked him, "What's going on? Why are you having these meetings?" They did not realize Coppinger was thinking of running for office.  *or Coppinger* *PB.*

I was trying to keep Battle and McConnell a secret, but eventually I decided to connect them with each other. When Battle appeared to be moving ahead with his plans to run for office, I said to him, "Mike's in. Why don't you guys talk to each other? You know, strength in numbers." I did not know which position Battle wanted until the last minute. You have to keep quiet because Dougherty will put the fire out before it even starts. You're better off leaving it until the very end because they'll discredit you right off the bat. It happened so fast — Dougherty got to Battle through other guys. That's how far he'd go to make sure these guys didn't run.

No one was going to try to take Dougherty's position. Battle was going to run for president. The president and vice president positions are the weakest; they rubber stamp everything. Dougherty has them all in his pocket. McConnell was going to run for an executive board position. I thought Coppinger was also going to run for an executive board position, but Coppinger never really said it. Coppinger was the key because he and Battle have great reputations. Everyone thought, If Coppinger runs, that's the game changer. Coppinger is a great guy and is very funny. If anyone scares the union the most, it's him because he's so well-liked — he comes with votes. He was the biggest one they wanted to shut down because of those votes. McConnell knows a lot of people, but not as many as Coppinger and Battle.

Initials: *PB.*

Page 1 of 3

**DOL_LOCAL 98_00414**

I arrived at the union hall on June 9, 2020, around 5:00 or 5:30 p.m. There were about 150 people on the grounds of the union hall that night, all from Dougherty's neighborhood. That's what Dougherty does — he fills the hall with his supporters. I knew from the nomination notice that members had to give advance notice if they wanted to attend the meeting. They had to go into the building where all the business agents were. Battle entered the building and filled out a paper. They knew he was coming; they expected it. After he filled out the paperwork, Battle was nervous and pacing, wondering what was coming.

I stayed on the grounds of the union hall until about 7:30 or 8:00 p.m. I was waiting for Coppinger to arrive, as it was still up in the air with guys going in to get nominated. I knew at that point McConnell was not coming. Coppinger showed up minutes before the meeting started. Battle was really counting on Coppinger to nominate him. If there was anyone they couldn't shake, it would be Coppinger. Coppinger knows everyone. When Coppinger showed up, he called McConnell and told him, "I'm out," meaning he was not going to run for office. Coppinger never put his paperwork in to run.

I called Battle, who was in his car, and told him Coppinger was out. Battle was angry that they had gotten to Coppinger. The only saving grace was only a few people knew who was nominating Battle. I told Battle, "We're like lambs going to slaughter." Battle told me, "I don't want to put you or your job in jeopardy," and I respected him for that. If OLMS were to supervise a rerun election, I would nominate Battle.

Kerr also backed out of nominating Battle because Kerr was scared. I did not know who was going to nominate McConnell or Coppinger. I would have nominated them until I saw what happened to Coppinger. Coppinger looked scared to death. ~~I'd never have thought~~. ~~If someone jumped me or wanted to fight me, Coppinger would be all in~~. But Coppinger does not have a lot of money. He's got three kids, a mortgage. What would he do without benefits? I wondered why Coppinger even put up a fight to begin with. *P.B.*

I thought about Kenny Rocks. I thought, What'll happen to me in a month or six months down the line? I'm usually the last to be laid off, then suddenly I'd be the first — like Kenny Rocks. Rocks suffered retaliation after an OLMS-supervised election in 2014. Rocks had protested the initial election to OLMS and was ultimately a defeated candidate in the supervised election. Rocks was out of work for quite a bit and had a hard time getting work. This was a retaliatory measure by the union. Dougherty doesn't care about you or your family. He chokes you off financially and lets everyone know. No one has ever opposed Dougherty. Rocks was the only one ~~in 20 years~~. *SINCE I WAS IN the local to ever challenge DOC. P.B.*

McConnell and Coppinger were both intimidated out of running for office. The union figured out who was who by calling around. McConnell told me he got a phone call one or two days before the nomination meeting from Dougherty. Dougherty never calls from his own phone. They all have burner phones. We joke and call them the "Bat phones." When McConnell got the phone call, he called Coppinger. McConnell said he was on the phone with Dougherty for about an hour. He said at first the call was cool — everything was fine. They were talking politics and Dougherty was talking about what direction he was going. He was talking to McConnell because McConnell knows people. McConnell said Dougherty was reading the website "The Truth About Your Local.com" and suddenly started cursing. He said to McConnell, "Make your effing mind up — you're either with me or against me!"

Initials: *P.B.*

DOL_LOCAL 98_00415

Brian Eddis, a politician, delivered a message to McConnell from Dougherty: "You've got a lot of years left and you won't be working for a lot of them." McConnell is also friends with an electrical contractor who owns a company called Par 4. They said we'll run this guy out of business if McConnell runs for office. I could tell McConnell was shaken — I could hear it in his voice he was scared. I asked McConnell, "You're not even going to *try* to run?" McConnell said, "Nope. I'm out."

I called Coppinger after the nomination meeting. I know who talked Coppinger out of it and what they said. Coppinger has been with a contractor for nine years, which is unheard of, and he could not risk losing that. I have never had anything happen to me personally. I don't feel physically threatened because I can handle a physical altercation. But you don't do it to a guy financially.

I declare under penalty of perjury that the foregoing statement consisting of three pages, each of which I have initialed, is true and correct.

| | |
|---|---|
| 10/15/20 | _Philip Borthwick_ |
| Date | Signature |
| 10-15-20 | |
| Date | Witness Signature |
| 10/15/2020 | _Angela Menges_ |
| Date | Witness Signature |

Signed at: OLMS- 1835 Market St., 21st Fl., Philadelphia, PA 19103

Location

Initials: _P.B._

Page 3 of 3

# Ex. U

**Tara Chupka**

| | |
|---|---|
| **From:** | magapie <magapie@comcast.net> |
| **Sent:** | Monday, October 24, 2016 12:53 PM |
| **To:** | JJDoc@ibew98.org |
| **Subject:** | Son in law |

Hey John its Charlie Battle just dropping you a reminder about my son inlaw Joshua Vincent DeLong thanks for everything

Battle

Sent from my Verizon, Samsung Galaxy smartphone



**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Tuesday, May 30, 2017 8:52 AM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | son in law |

Hello JD greetings from Poland hope things are good with you and all is well back in Philly just a friendly reminder my son in law is trying for the third year to get in to program his name is Joshua Vincent Delong I also spoke to someone from Miller Bros they said they are willing to put him on as a helper if it was ok with hall thanks for everything

Best Regards

Charlie Battle

**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Friday, June 9, 2017 7:08 AM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | [No Subject] |

Joshua Vincent Delong

**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Friday, September 22, 2017 3:22 PM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Hello |

Hello John from Poland hope things are good back in philly I really miss the food.

Anyhow I just wanted to remind you of my son inlaw he's trying to get into the local, this is his 3rd trying he's a good guy that would work hard and be a good asset for our great local his name is Joshua Vincent Delong.

Hope your doing well and thanks for all the hard work and hours you put in

Charlie Battle

**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Friday, September 22, 2017 3:22 PM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Hello |

Hello John from Poland hope things are good back in philly I really miss the food.

Anyhow I just wanted to remind you of my son inlaw he's trying to get into the local, this is his 3rd trying he's a good guy that would work hard and be a good asset for our great local his name is Joshua Vincent Delong.

Hope your doing well and thanks for all the hard work and hours you put in

Charlie Battle

**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Tuesday, September 24, 2019 5:57 PM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Joshua Vincent DeLong |

Hello John Its Charles Battle I hope all is well with you and your family.


I know you are extremely busy with everything going on but I'm Writing you this email to ask for your help, its 5 years in and I'm still trying to get my son inlaw in the program. We just had a brand new apprentice start on our job on Monday and I'm worried that my son inlaw will be passed up again. If there is anything you can do to help this situation it would be greatly appreciated.




Thanks Charles Battle

**Tara Chupka**

| | |
|---|---|
| **From:** | JEANETTE BATTLE <magapie@comcast.net> |
| **Sent:** | Saturday, September 28, 2019 1:05 PM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Charles Battle |

Hello John Its Charles Battle I hope all is well with you and your family.

I know you are extremely busy with everything going on but I'm Writing you this email to ask for your help, its 5 years in and I'm still trying to get my son inlaw in the program. We just had a brand new apprentice start on our job on Monday and I'm worried that my son inlaw will be passed up again. If there is anything you can do to help this situation it would be greatly appreciated.

Thanks Charles Battle

**Tara Chupka**

| | |
|---|---|
| **From:** | magapie <magapie@comcast.net> |
| **Sent:** | Monday, September 30, 2019 9:58 AM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Charles Battle |

Good Morning

My son inlaws name is Joshua V. Dilong

Thanks John. I really appreciate this

Charlie
Sent from my Verizon, Samsung Galaxy smartphone

**Tara Chupka**

| | |
|---|---|
| **From:** | magapie <magapie@comcast.net> |
| **Sent:** | Friday, November 15, 2019 11:02 AM |
| **To:** | jjdoc@ibew98.org |
| **Subject:** | Charles Battle |

Hey John hope all is well with you.
I writing a follow up email for my son in law
We still didn't hear back from anyone. His name is Joshua Vincent Delong.

Thanks again Charles Battle

Sent from my Verizon, Samsung Galaxy smartphone

**Tara Chupka**

| | |
|---|---|
| **From:** | magapie <magapie@comcast.net> |
| **Sent:** | Wednesday, November 27, 2019 12:00 PM |
| **To:** | JJDoc |
| **Subject:** | Re: Charles Battle |

General construction like a handy man for someone

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: JJDoc <JJDoc@ibew98.org>
Date: 11/27/19 11:14 AM (GMT-05:00)
To: magapie <magapie@comcast.net>
Subject: Re: Charles Battle

That was ,,,,,,WHAT is he doing now ???

Sent from my iPhone

> On Nov 27, 2019, at 11:12 AM, magapie <magapie@comcast.net> wrote:

John here is my son inlaws name again.
Joshua Vincent Delong

Thanks

Sent from my Verizon, Samsung Galaxy smartphone

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

# Ex. V



# Ex. W



2016

# U.S. LOCAL UNION
# ELECTION GUIDE



International Brotherhood of Electrical Workers®

# IBEW® U.S. Local Union Election Guide

Members of the International Brotherhood of Electrical Workers (IBEW) in the United States are regularly afforded the most fundamental of democratic rights: the right to vote for representatives of their choice who will lead their union. This freedom to vote is a continuation of the principles of the IBEW, guaranteed by our Constitution and local union bylaws, with local union elections taking place every 3 years. The purpose of this guide is to assist local union Election Boards in conducting these elections.

The rules that govern the election procedure are contained in the following:

- Labor-Management Reporting and Disclosure Act of 1959 (LMRDA)
- IBEW Constitution
- IBEW Basic Laws & Policies
- Local union bylaws

These publications play an integral part in the election of union officers, and it is important to be aware of the relationships among them.

The LMRDA contains those provisions that are mandated by law. Many of the guidelines referenced in the LMRDA are already incorporated into the IBEW's rules concerning elections in its constitution and in local union bylaws. Even though the LMRDA includes some explicit rules, it also gives the union some leeway in addressing certain issues. Among other things, the LMRDA requires unions to comply with their own constitutions and bylaws when conducting local union elections. Violations of the election procedure contained in the IBEW Constitution or local union bylaws might therefore be a violation of federal law.

Article XVI of the IBEW Constitution addresses election issues of a more general nature, whereas those contained in Article III of the local union bylaws are more specific. Although it is important to adhere to the LMRDA, the IBEW Constitution, and the local union bylaws, decisions must also be made on a basis of equality and fairness to guarantee a successful, trouble-free election. The rules must be the same for everyone, with all candidates treated equally. There should be no variation in your interpretations of the rules.

After the election judge and tellers have been appointed or elected, per the local union bylaws, the election judge assumes authority over the election process. It is the responsibility of the election judge to oversee the conduct of the election until the election results are certified. Only members in continuous good standing for 2 years are eligible to serve as election judges or tellers.

## NOMINATIONS

Nominations for officers shall be held in the month of May of the election year unless the International President grants permission or the local union bylaws state otherwise. The local union shall decide the manner in which the nominations and elections shall be held, and such shall be stated in the local union bylaws.

No member shall be nominated for office unless he or she is present or signifies his or her willingness in writing. Written acceptance of a nomination must be presented at the meeting when nominations are held. Members who are not in attendance can make or accept nominations by written letter. A member is eligible for nomination only if in continuous good standing for the 2 years immediately prior to nominations. No member may be a candidate for more than one office. Anyone nominated to more than one office must choose the office for which he or she will be a candidate. Members can nominate themselves for office.

All local union bylaws provide that notice of nominations and elections must be mailed to the last known home address of all members in good standing in the local union at least 20 days prior to the date of nominations. (A sample notice is included at the end of this guide.)

A single notice shall be used for notification of both nominations and elections. The notice shall state the following:

- Offices to be filled and/or the number of delegates to the International Convention to be chosen
- The date, time, and place for nominations
- The proper form and manner for nominations
- The date, time, and place of the election

Where local union bylaws require that a candidate receive a majority of the votes cast to be elected, notice of the

# Ex. X





Tim McCOnnel >

Mon, Jun 8, 5:59 PM

Yo I am thinking about running for e-board I'm not on a team and just wanted to let you know that I had nothing to do with the web site I swear on my kids I'm just doing it for the better of the local hope there is no hard feelings. I'm not trying to make waves just think anyone should be able to run without repercussions if anyone wants to call me I'm free to talk

Mon, Jun 8, 7:33 PM

Yo I'm out I thought about it and I'm 100% against what happened on that website and don't want to be tied in with that just wanted a different face

  

D 00284

# Ex. Y

| **U.S. DEPARTMENT OF LABOR**<br>OFFICE OF LABOR-MANAGEMENT STANDARDS | **REPORT OF INTERVIEW** |
|---|---|

John Dougherty, 1933 East Moyamensing Avenue, Philadelphia, PA 19140 (residence), (215) 409-5532 (cell), in the presence of IBEW Local 98 attorneys Joseph Cleary and Bill Josem of Cleary Josem & Trigiani LLP, IBEW Local 98 in-house counsel Jack O'Neill, and attorney Terence Grugan of Ballard Spahr LLP, provided the following information when interviewed at the International Brotherhood of Electrical Workers (IBEW) Local 98 building:

Dougherty has been a member of IBEW Local 98 since 1979 or 1980. From March 1990 to July 13, 1993, he held an executive board position. From July 13, 1993 to the present he has been the business manager. Dougherty is employed by Local 98. His job as business manager is to create employment opportunities for members of Local 98. When asked whether employers Local 98 bargains with hire and fire members based on his recommendations, Dougherty stated, "No. Absolutely no."

The attorneys objected to Dougherty being questioned about nomination procedures, stating they believed he was going to be questioned only regarding the intimidation allegations. The attorneys were advised all questions were going to be asked and that they were free to object to each question. They allowed the interview to proceed, but Attorney Josem stated it was not a "good start."

Dougherty advised self-nominations for union officer positions are permitted during elections. Dougherty did not know the last election cycle during which a member self-nominated. When asked how self-nominations can be made, Dougherty stated, "Just get nominated at the nomination meeting." When asked whether a self-nomination must be made in writing, Dougherty stated, "I've never followed the specifics of that," and "members are free to speak at meetings."

Dougherty then interjected, "For example, Charlie Battle said he was not running about two months before. He said at a meeting he'd never run against me or the president because we do a good job." Dougherty did not know whether this was documented in the meeting minutes, but it was understood by the 200-300 members who were at the meeting. Dougherty believed Battle stated this at the April 2020 membership meeting. Dougherty added, "Charlie created havoc. He was walking down the middle of the room like this – " [Dougherty raised his arms and extended his middle fingers]. "He was the only person in 30 years I've ever seen do that."

When asked how members are made aware that self-nominations can be made, Dougherty stated, "I've never really been involved in the day-to-day activities with how they run nominations." Dougherty did not know where it was stated in the union's governing documents or how members were made aware that nominations must be made in-person. He stated, "My whole time in the union, everyone's always known when elections are. There's always tons of people here for elections. Charlie Battle was here. I saw him. I said 'hi' to him. He had 6 to 10 people with him – from Phil Borthwick on down – who could've nominated him."

| Interview Date: November 19, 2020 | Date Drafted: November 19, 2020 | Date Completed: November 19, 2020 |
|---|---|---|

Interview Location: Philadelphia, PA

By: Investigator Angela B. Menges and Sr. Investigator Nicole Spallino     Case File: 140-6019880(01)

This document is the property of the Office of Labor-Management Standards and is not to be disclosed to unauthorized persons.

OLMS-12
November 2011

DOL_LOCAL 98_00585

Dougherty advised Battle could have nominated himself but that it was "pretty much understood" based on what Battle stated at the membership meeting and from "talk on job sites" that he was not running. Dougherty advised Battle did not need a nominator or second nominator.

Dougherty was advised Battle submitted his nomination form indicating his willingness to accept nomination for president prior to 5:00 p.m. on the day of the nomination meeting. Dougherty was asked what other step(s) Battle was required to take to be nominated for the office of president. He was also asked where in the union's governing documents the requirement of the additional step(s) is stated. Dougherty replied, "I have no idea. That's why we have election boards."

When asked why members who were not attending the nomination meeting were gathered in the parking lot outside the union hall prior to the nomination meeting and whether Dougherty contacted anyone to rally members to the parking lot for a show of support, Dougherty replied, "I let people know we were having nominations – whoever I'd see or talk on the phone with. I've been doing that for 30 years."

When asked whether Dougherty directed any member or staff to speak with members in the parking lot prior to the nomination meeting, he replied, "They were doing what they always do. People come down, they get something to eat or drink." The union provided food trucks and hand sanitizer for the event. Dougherty noted some members only see each other every three years during the elections.

When asked why business agents were attempting to find out which member was nominating Battle for office, Dougherty replied, "I don't know that to be the case. That's normal – people want to know who's running. If you're assuming business agents were going around, in a business agent capacity, that's absolutely not true. That's the first time I've heard that." Dougherty added, "This is a pretty family-driven union, social – that's the reason 1,000 people were here that night. People were thanking me, shaking my hand…"

When asked how many people attended the nomination meeting, Dougherty replied, "Whatever the stipulations were. It was highly posted." Dougherty attended the nomination meeting and estimated there were 30 to 50 people at the meeting. When asked why they were there, Dougherty replied, "They were either there in support – it's never been limited. If someone nominated someone or wanted to speak about anything..." When asked to clarify his statement that nomination meetings have never been limited but that attendance was limited at the June 2020 nomination meeting, Dougherty advised the reason for limiting attendance was due to the CDC recommendations regarding COVID-19.

Dougherty explained the "magnitude" of three events in his life: the birth of his baby, saving his father's life after his father passed away and was revived, and "looking around the union hall after I won the business manager position the first time. The union has an unbelievable amount of respect – everyone treats everyone fair."

When asked whether it is stated in any of the union's governing documents that the union must permit nominees to see the names of the other nominees, Dougherty replied, "No. I don't know any of that." Dougherty was asked about Complainant Battle's request to see the nominees' forms and the reason his request was denied. Dougherty replied, "I don't know. I have no idea why he'd want to do that."

Dougherty did not think anyone else was permitted to see the forms.  When asked whether Dougherty's co-candidates saw the nominee forms, Dougherty replied, "I'd imagine if Charlie didn't see them, no one saw them."  Dougherty explained IBEW Local 98 employee Tara Chupka [Dougherty's daughter] was filling in that day until Sergeant-at-Arms Rodney Walker arrived at the union hall.  Nominees probably got their forms from Chupka and handed them back to Chupka after completing them.

Dougherty did not speak with anyone about their nomination form submission.  When asked whether Dougherty directed anyone to contact people who had submitted the forms, Dougherty replied, "I had no contact with anyone about anything about the election, other than showing up.  I made sure everything they did, they did by the book."  Dougherty added, "People weren't running to win.  They were running to tear the union down and to tear me down personally.  They've been doing it since 2014.  I've never once shown disrespect to anybody."

Dougherty was asked how, after Battle submitted his nomination form indicating his willingness to run for president, other members who were not previously aware he was running for president became aware that he was running for president.  Dougherty replied, "I didn't know he was running for president.  I never saw anything until later."  Dougherty interjected, "We just got a 1050 contract [Dougherty was not asked for clarification] – the best healthcare in the world – full employment – I put us back to work during COVID faster than any other industry, OSHA adopted our procedures that I put in place, the health and welfare fund will not have any increases for three years, we faced the opioid crisis and resolved it… There is not any member out there who will tell you they have any issue with anything, unless they have an alternate agenda."  Dougherty added that in his many years as a business manager he has received complaints, but members are content right now.

When asked to clarify what he meant about an "alternate agenda," Dougherty explained, "Charlie Battle was walking around with copies of the indictment [against Dougherty and other Local 98 officials].  His agenda is to destroy the union."  Dougherty explained, "Charlie's step-son [whom Battle later referred to as his son-in-law and son] got dismissed, ok?  For failing a drug test, ok?  And he [Battle's step-son] may have been associated with distributing drugs too."  Battle was putting a "lot of pressure" on Business Agent Robert Bark – one of Battle's "best buddies" – to get Battle's step-son into the union.  Dougherty noted Battle has three million dollars that he refers to as his "fuck you money."

Dougherty also explained when Battle worked in Poland, Battle came up with a policy on how he thought he should have been given back his union dues.  Another electrician who was working there with him tried to do this five times and went through thorough legal reviews which determined he should not be given back his union dues.  Dougherty explained there were "multiple issues" Battle had and that Battle "burned" his relationship with Bark.

Dougherty added, "There was even that sexist, racist, disrespectful website that was anonymous that Charlie and his wife paid for.  There are not only two sides – there's a right side and a wrong side."  Dougherty learned about Battle's involvement with the website after the June 2020 nominations.  When asked what he thought Battle was so angry about, Dougherty explained, "I just couldn't do what Charlie wanted me to do."  Dougherty added, "I understand he's been drinking an awful lot – a tremendous

amount." When asked how he knows this, Dougherty explained he knows people Battle drinks with and that Bark is one of them.

Dougherty added that Battle called him at night and he returned the call, and then Battle ran around saying Dougherty did not return his call. Dougherty stated, "I'm a man who gets death threats at home. I'm not one bit surprised Charlie didn't run and that he went to the government. His intention was not to become an officer but to use a campaign to post an indictment online and run around saying things."

Dougherty advised he asked Battle one day at a membership meeting to tell him one thing he is upset about structurally because Dougherty cannot say anything on the floor during a meeting about Battle's step-son. Dougherty stated, "All of a sudden Charlie's becoming very angry, very disrespectful, flicking his finger at people's faces, coming out of Kelliann's Bar into meetings…" When asked what Battle's response was to Dougherty's question, Dougherty stated Battle did not answer and was just screaming, "You don't want to hear…" Dougherty explained Battle behaved in this way during at least three membership meetings. Battle approached Dougherty about his step-son during a meeting as recently as six months before the June 2020 nomination meeting.

Dougherty was asked whether there was a "buzz" about Battle submitting a nomination form and how Dougherty knew about it. Dougherty replied, "I don't know. I wanted an election. I don't have a problem if someone runs because it gives you six weeks' chance to say things you can't otherwise say, to tell the stories," meaning a campaign.

Dougherty was asked whether anyone, including Chupka, told him Battle submitted a nomination form. Dougherty replied, "No. Nobody cares! Listen, I got $10.50/hour raises. How many unions do that?" Dougherty heard "later" that Battle had submitted a nomination form. Dougherty added, "All I was waiting for was the excitement of getting up and giving an acceptance speech, talking about the union – we just had the best three years in the union. If my wife wasn't sick, it would've been the best three years in 30 years."

Dougherty was asked when he learned that members other than incumbent officers planned to run for office. Dougherty advised he had a conversation with Tim McConnell the night before the nomination meeting, at which point he learned McConnell had an interest in running for office. Dougherty stated, "I have all these young guys around me all the time who want to know who's retiring. There are only so many positions in the union. I try to get more people involved about having full-time people not sit on the board so there are more opportunities for more people. I opened it up. I hired outside people to run the allied assistance program, the political side…" Dougherty was asked about the elected positions and he replied, "I don't control elected positions."

When asked who specifically Dougherty has spoken with who may have had an interest in running for office, Dougherty replied, "Kids in my neighborhood talk to me all the time. I stop by the apprentice program and they say to me, 'Someday when my kids get a little older…' – a ton of people." Dougherty was not able to name any members he spoke to about running for office, aside from Tim McConnell. Dougherty told McConnell not to get involved for the sake of raising his hand and that he "has to want it." Dougherty explained McConnell never comes to meetings. Dougherty got to know Safety

DOL_LOCAL 98_00588

Coordinator Mark Lynch because Dougherty has walked with Lynch and his wife during Labor Day parades. Dougherty told McConnell "you gotta do stuff like that" and that he needs to become more involved with the union.

Dougherty was asked why he felt the need to tell McConnell these things and Dougherty replied, "Because he asked my opinion. He called Mark Lynch and said he wanted to talk to somebody and that somebody was me." Dougherty explained someone once advised him, "If you want to do something, do it right then and there," so he spoke with McConnell.

Dougherty and Lynch were at a "powwow" outside the union hall the night before the nomination meeting when McConnell called Lynch. Dougherty wanted to gather everyone together to discuss plans in the event they needed to campaign. He advised everyone, for example, there could be no politics on the job site and that they would have to get separate phones if they ran because union phones cannot be used to campaign.

McConnell said he was thinking about running for office, and Dougherty told him, "Great. What would you be running for – as an independent or on a ticket?" McConnell told Dougherty he did not yet know. McConnell mentioned something along the lines of, "If there's a chance you might not be around, I'd like to be a business agent."

Dougherty was "pretty sure" McConnell is "really good friends" with Business Agent Rodney Walker. Walker's son drives to work with McConnell. Dougherty thought McConnell's wife is related to the Gillespie family. Pat Gillespie was a former Philadelphia Building and Construction Trades Council business manager. Dougherty stated, "There were a lot of reasons I'd take a moment or two to help him out because he's green; he doesn't come to meetings."

When asked whether Dougherty thought McConnell wanted his advice, Dougherty replied, "Yeah, and I think he was hoping – he sits on the beach in North Wildwood – in five square blocks there are guys, like Jim Foy who's my nephew – who all know each other. Timmy never expressed interest in running." [Around this point, Dougherty removed his face mask. He removed it and replaced it several more times, usually as he took phone calls.]

During his telephone conversation with McConnell the night before the nomination meeting, McConnell told Dougherty Battle approached him about running. Dougherty believed McConnell and Battle worked on four or five jobs together. Dougherty stated, "I said, 'make sure you're on a campaign that helps and not hurts the union.'" Dougherty added, "Charlie just wanted to run a campaign for six weeks about the indictment." He continued, "The kid'll tell you I told him to run," meaning McConnell.

Dougherty had a second phone conversation with McConnell on the same night. Dougherty explained, "Whoever was handing me a phone… I talked to a lot of people that night." Dougherty stated, "I want everybody to run, but to follow the rules and laws." He explained around the time of his conversation with McConnell, an anonymous website was started that said Dougherty was holding meetings with agents and, "I guess he's gonna hide behind his sick wife." Dougherty described the statements on the website as "sexist, racist stuff." McConnell told Dougherty, "I don't want anything to do with this."

DOL_LOCAL 98_00589

Dougherty told McConnell, "They're talking about my wife.  I want you to take a look at what they're doing."  Dougherty described the site as an "anonymous thing just to rip apart my family."

When asked why McConnell changed his mind about running, Dougherty replied, "I wanted him to run.  I had no problem if he ran.  He's a nice guy, a smart guy.  I don't think he understood he was being played a little bit."  Dougherty told McConnell there are a lot of other opportunities for him.  Dougherty stated, "I just want these kids not to be used.  I don't care who runs.  I've taken this union from bankruptcy to hundreds of millions of dollars in surpluses – 90% of unions have nowhere near the resources."  Dougherty went on to talk about "Johnny Crock of Shit" [a Facebook user] who alleged "a million things" on social media sites such as Facebook.

Dougherty then mentioned Local 98 member Ken Rocks.  He stated, "Every little thing I do – the Convention Center – Kenny Rocks made a big stink over what I did."  Dougherty explained Rocks would go to a go-go bar called the Handle Bar with members from a carpenters union and would call Dougherty from there late on a Friday or Saturday night.  Rocks worked across the street from the union hall for two years as a foreman.  Dougherty stated, "He waves to me.  And then he gets all banged up [drunk] during work days."  This occurred in 2016, 2017 or 2018 after the last election.

Dougherty then raised his voice and stated, "I want them to understand!  Ken Rocks says he's being discriminated against – a contractor does not want his foreman all banged up!  When they talk about, 'Oh my God, whoa is me.'  He [Rocks] told me to come on down – I took pictures – he posted it on Facebook – I visited him on the last job at his job site.  I do a lot of work with Rock Ministries.  He shook my hand."  Dougherty proceeded to read aloud a Facebook message on his phone posted by Rocks, "12:52 8/28 – about an article in the paper about the lawsuit against Charlie: 'Let it go or I'll do something with ya… I'm still waiting for you to admit… Stop using union funds to rig elections… Pussy…'"

At this point the attorneys interrupted Dougherty and questioned the relevance of reading the Facebook postings.  Dougherty stated, "Let me keep reading.  'I heard what you said.  I heard the wire taps… Back off of Battle or else… Is this another kangaroo court?… Free the membership… You're pathetic, weak… You're mismanaging things…'"  In regards to Rocks' Facebook messages, Dougherty stated, "This ain't a game."

Dougherty was asked why Rocks seemed to think Dougherty is "messing up" his life.  Dougherty replied, "I've helped him his whole life."  He added [while putting his face mask back on], "I think he's got demons."  Dougherty added, "Kenny's dad died a few years ago.  I went to his father's funeral.  His family gave me hugs.  Kenny nodded to me.  I went to his father's funeral, ok?"  Dougherty added, "There was never an intent to have an election.  No one ever thought anyone was going to win anything."

Dougherty was asked again about his conversation with McConnell.  Dougherty had told all the business agents and other people who worked for him to meet outside the union hall at 6:00 p.m. to go over nominations the next night.  He stated, "I'm hearing we might have some competition.  I'm looking

forward to it. But we may have to raise some money." Dougherty heard Phil Borthwick told someone he might run for a position, but Dougherty did not discuss it with Borthwick.

When Dougherty spoke on the phone with McConnell, he was within earshot of others who were gathered outside the union hall. Brian Eddis and Rodney Walker were in the immediate vicinity. They knew Dougherty was speaking with McConnell, but they did not participate in the conversation. Dougherty did not speak with Eddis or Walker about McConnell.

Dougherty was uncertain how Eddis knew McConnell but thought Eddis may have mentioned they knew each other through Alcoholics Anonymous or something of that nature. Eddis and McConnell are both from the Fox Chase vicinity.

Dougherty was asked which business agent remarked during his conversation with McConnell that he never thought that McConnell would have been the member running for office. Dougherty replied, "Most people don't know who he [McConnell] is."

Dougherty had never talked with McConnell prior to that phone call because McConnell does not come around. Dougherty noted McConnell is on a big job with a good friend of Dougherty's. Dougherty "pops in" on jobs as he does with all the trades.

Dougherty was asked whether his intention in talking with McConnell was to persuade him to withdraw from running. Dougherty replied, "Never. I told him at least three times if he wants to run, run. I did ask him what would be his campaign – what was he uncomfortable with. He said he wasn't uncomfortable with anything." Dougherty explained there had been some issue with spousal health benefits for a short time that McConnell may have mentioned, but the issue had been addressed. McConnell said something in a "very naive way" along the lines of, "If something happens to you, if the business agents aren't around…"

Dougherty was asked whether he told McConnell, "You're either with us or against us. If you're against us, it'll be a long three years." Dougherty replied directly and without hesitation, "No, I didn't say that." He added, "Because Tim was a nervous wreck on the phone. I told him, 'There's a hundred kids who wanna do what you're doing, there just aren't the opportunities.'" Dougherty explained there are only five executive board positions.

Dougherty told McConnell, "Most people are only gonna remember that you said, 'Marita Crawford takes it in the butt' and 'we're hiring too many of those guys' meaning Latinos." Dougherty explained these were statements made on the anonymous website. He was not implying McConnell made the statements, only that he would be associated with them if he ran with that campaign.

Dougherty explained his first conversation with McConnell the night before the nomination meeting was a "very nice" conversation. The second conversation took place about an hour later. That was when Dougherty told McConnell, "This is the direction the campaign is going. I don't think you wanna be associated with that. Run as an independent. I ran as an independent." Dougherty noted McConnell is

about 33 years old, which is about the same age Dougherty was when he became an officer.  Dougherty advised McConnell to talk with his wife.  Dougherty explained, "I missed a lot of piano recitals."

Dougherty explained word got out they were having a meeting at the union hall the night before the nomination meeting.  Dougherty explained they did not have any meetings prior to that and that holding a meeting was what they would normally do.  They held the meeting to discuss safeguards for the nomination meeting.  It was that night Lynch showed Dougherty the anonymous website.  Lynch thought it would be a good idea to call McConnell.  Lynch knew McConnell, so Dougherty respected his decision.

McConnell asked Dougherty whether [Vice President] Timmy Browne was running for office and Dougherty said "yes."  Dougherty stated, "Tim [McConnell] thought he would have a better chance at becoming a business agent if I went away."  Dougherty was asked to clarify whether he said "business agent" or "business manager."  He clarified he said "business agent" but added, "Hey, whoever wants it can have it."

Dougherty reiterated that during his conversations with McConnell he explained the "reality," that if he ran with a ticket he would "spend the whole time being a sexist, racist," etc.  Dougherty stated, "Ninety-eight percent of the local is happy with what goes on.  They have better healthcare, better benefits.  He'd probably never win an election again if he ran with that ticket."  Dougherty added they have an apprentice training program that is second-to-none.  He stated, "Tim couldn't even tell me what committees we have."  Dougherty added that he believed Battle is trying to "punish" him for not bringing his step-son back into the union.

Dougherty was asked whether he had any contact with Eddis about the union election in the days leading up to nominations, specifically with regard to McConnell.  Dougherty replied, "No, I never talked to him.  I didn't talk to anybody about the election about anything."  Dougherty explained their jobs are pretty time-consuming, working nights, lunch hours, and on weekends.  He stated, "Some of these kids coach kids, are involved in church activities, have pregnant wives…"  He added, "I was looking for a platform to get out there and tell my story."

Dougherty was asked whether he thought he was not going to have any opposition in the 2020 election.  He said, "Nah" and went on to talk about his wife and how he was up at 2:00 a.m. getting her probiotics and taking a urine sample because of catheter infections, how he found out that day his father has COVID-19.  Dougherty stated, "You think I care about a kid who doesn't have a snowball's chance in hell of winning?"  Dougherty was asked, "Then why talk to him [McConnell]?" and he replied, "I talk to everybody."

Dougherty went on to talk about Local 98 member Kevin O'Sullivan who, the night before he retired, said to Dougherty, "I beat the crap out of you and you never came after me."  Dougherty noted O'Sullivan "went off the railroad" when his wife died; he became an alcoholic.  Dougherty said, "I called him a hundred times and said, 'Please go to work tomorrow.'"  Dougherty added, "The last election, you would've thought I didn't like Kevin O'Sullivan – I love Kevin O'Sullivan."  Dougherty

helped O'Sullivan when his wife was sick and they needed money.  Dougherty noted he once paid some tuition on behalf of O'Sullivan.

Dougherty noted he got Rocks a lawyer when Rocks first "got in trouble."  Dougherty said, "It's no problem.  It goes with the territory."  Dougherty stated, "Now you understand why I wanted to meet with you guys."  Dougherty noted, "Never once did I say anything to Kenny when he attacked me."

Dougherty was asked whether he has ever heard any contractors complain about Rocks.  He replied, "I don't do management."  He was asked whether he has had conversations with employers and he stated, "Absolutely not."  Dougherty was specifically asked whether he spoke with any employer regarding McConnell's candidacy.  He answered, "No.  I don't know who he's even working for."

The IBEW International in its investigation did not contact Dougherty to ascertain his description of the phone calls with and alleged intimidation of McConnell.  Dougherty had "no idea" whether the IBEW International in its investigation contacted any witnesses to the phone calls.

Dougherty was asked why McConnell was laid off from his employer last month.  He replied, "Where was he laid off at?  I have no idea.  He can work wherever he wants."  McConnell was working at "The W," but Dougherty did not know for whom McConnell was working.  There are a lot of contractors working there who are wrapping up the jobs.  At one time there were 800 people working there.  There were 100 Local 98 members at Penn, and now there are 30.  The casino job and Amazon job are wrapping up.  About 800-900 Local 98 members are going to be laid off soon.  Dougherty stated, "If Tim was laid off, he's probably one of many."

Attorney Josem explained members get work through a referral system and can also can solicit their own jobs.  When the unemployment level is high, the union goes to a mandatory 50/50 system.  Members can sit on the referral list if they want to and not solicit their own jobs.  Dougherty noted many members took four weeks off and went to the shore when COVID-19 happened.

Dougherty was asked whether he contacted McConnell's employer or directed someone else to contact McConnell's employer to have him laid off, and he stated, "No."  Attorney Josem advised members are laid off all the time, especially if they are not working with a contractor for many years.  Josem asked the other attorneys to check the records to see where McConnell is working.

Dougherty was asked whether he spoke with any other potential candidates who were not incumbents.  He replied, "I had guys – John Donohue who works with me now – organizers – guys who would love to be president or vice president someday."  Dougherty did not know who intended to run for office.  Dougherty was asked whether he spoke with Borthwick about running for office, and he said, "No.  My history with Phil – I helped Phil.  He is the only person who ever left the apprentice program and came back – because of drugs.  I helped him multiple times."

Dougherty was asked whether he directed any of his co-candidates to speak with other potential candidates to dissuade/talk them out of running.  He responded, "Let me tell you what I did that night.  My wife – I made some medicine at 2:00 a.m., got up at 4:00 a.m., rushed home, mixed the medicine…

DOL_LOCAL 98_00593

Do you think that I care who ran for executive board?  I was actually looking forward to running so I could expose all the frauds out there.  Everybody runs to you guys now."

Dougherty was asked whether he spoke with anyone – business agents, any other current or former officers, union member, employers, or anyone – in an attempt to persuade them, or their friend/associate/relative, not to run for office.  Dougherty responded, "no" but was looking down at his phone and seemed not to be paying attention.  He was advised the questioning would pause and wait for him to finish.  He replied that he was working on a multi-million dollar job but was paying attention and advised the questioning could continue.

Dougherty was asked for his response to the allegations that nominees and nominators did not seek office or nominate out of fear of reprisal from the current administration.  He replied, "Oh stop, will you please?  It's nonsense, it's nonsense, it's nonsense."  He continued, "Did Charlie tell you his son got thrown out?  He put his finger up, stood on the floor and said he's not gonna run for office.  He told me he'd beat the shit outta me one day.  I said, 'Why don't you talk to your friend Bobby Bark?'  And Charlie said, 'Bobby Bark ain't my friend anymore.'"

Dougherty stated, "Jack Kelly came to me and said, 'Charlie thinks he's not getting in because he's African-American.'  I told Jack, 'You helped him write the letter.'"  Dougherty explained Dan Prendergast and Jack Kelly were very prominent in the local.  Battle told Dougherty, "I was on your team until you didn't help my son."  Dougherty explained everyone knows he [Dougherty] believes in legalizing marijuana, but that is no reason for a kid to start using it.

Dougherty was asked whether he was aware of any other members who claimed they did not make nominations because of fear/intimidation, and he replied, "No."

Battle and Bark had been friends for many years.  Dougherty knew this because they talked about it all the time.  There were three to five of them who always hung out and went to the shore together all the time.  They used to be "out for days together."  Dougherty explained he tries to have representatives on his staff who can communicate with the whole union.  He stated, "The rodeo guys, the bikers – Barkie is my connection to that."  Bark was "devastated" because he was not present at the meeting when Battle said they were no longer friends.  Bark told Dougherty that he and Battle had Thanksgiving dinner together at Battle's home last year.  Dougherty believed their friendship to be a continuing friendship up to at least Thanksgiving.  He stated, "Bark believed they were friends."

Dougherty told Battle, "If you don't think I'm not returning your call – I have this Blackberry – you wanna set something up to look at stuff – I told him, 'Why don't you go to Bark and set something up?'"

At this point during the interview, the attorneys advised the union records reflect McConnell solicited his own job with Shaeffer Electric on October 26, 2020.  Dougherty remarked, "I bet he's working with Charlie Battle.  Charlie is running the job at Children's Hospital."  Dougherty added that there are a lot of ways he could "play stupid games legally."  He stated, "I don't play with anyone's job."

Dougherty was asked about Bark's response when he learned Battle wanted to run for office. [Dougherty requested and was granted a short break to address numerous phone calls he was receiving about the multi-million dollar job he was working on.]

Upon his return to the interview, Dougherty was reminded he had stated McConnell told him during their phone conversation the night before the nomination meeting that Battle was going to run for office and was again asked what Bark's response was when he learned that. Dougherty did not remember his specific conversation with Bark. Dougherty explained, "Barkie is a different type of guy. He's not a big talker – " [Attorneys Josem and O'Neill laughed at Dougherty's remark.] Dougherty explained, "He's not a big drama guy. He's a no-nonsense type, a rough kid, a street kid – he grew up on 30th and Tasker. He's a very good business agent, but he's not very political."

Dougherty was asked about Bark's visit to Battle's home prior to the nomination meeting. Dougherty heard after-the-fact about the visit. Dougherty said to Bark, "You yourself said something was wrong, so stay away." Dougherty said, "He got told to stay away." Dougherty stated, "He's been a career friend of his and now he's treating him like a – I still believe Bark is dazed and confused and doesn't understand what happened to their relationship." Dougherty thought Battle just wanted Bark to help him with regard to his step-son. Dougherty would not have any involvement if a member such as Battle's step-son was dismissed from the apprentice program.

Dougherty was asked why Bark would have brought Rich Kee with him to Battle's house. Dougherty explained Kee was another good friend of Bark's and Battle's and that they used to go out all weekend together. Dougherty stated, "I helped Kee get help. He's from the same neighborhood I'm from."

Dougherty was asked to clarify how recent the friendship was between Battle, Bark and Kee. He believed they were going out together up until a year ago. They would drink in Battle's garage, at the Corner Bar, and they would get guys together after work to play cards or play ball.

When asked whether Dougherty thought Bark's intention was to persuade Battle to withdraw from running or to withdraw from nominating others, he replied, "I don't know what was in Barkie's mind. When he did go there, I told him, 'Don't go there ever again.'" Bark could not understand why Battle seemed so angry – it happened "out of nowhere." Dougherty was again asked whether Bark was trying to talk Battle out of running for office, and he replied, "Nah. It seemed like after Poland, there must've been more drinking." Dougherty's understanding was that after Battle filled out the paperwork to run for office, three hours later he was still at Kelly's Bar drinking; he never left the bar.

Dougherty was asked for his response to the allegation that Battle was intimidated by Bark to not run for office. Dougherty responded, "Are you kidding? Charlie's a big guy, a tough kid. Bobby Bark might not be capable of that. Charlie is bigger, more aggressive." Dougherty noted he thought all three [i.e., Battle, Bark and Kee] were on their second or third wives. Dougherty added, "If you said to me Bobby Bark is going to Charlie's house, I'd have told him not to go."

Dougherty continued, "Nobody's upset about an election. The membership is ecstatic. The union is booming. My big fear about an election is people participating because then it'd be over. You're

winning elections left and right, doing everything right.  The members sometimes get complacent like, 'Eh, I'm not gonna vote.  They're doing great.'  No one's gonna win anything.  No one cares about elections.  They care about the union doing great."

Dougherty was asked whether he has ever directed any business agents in any capacity to talk to a member about a problem.  He responded, "If I thought a member had a problem or a drug problem or was out until 5:00 a.m., I might say, 'Hey, go make sure he's ok.'"  It would be all work-related.

Dougherty has known Rocks for about 20 years since Rocks has been a member of Local 98.  Dougherty was advised Local 98's attorneys had provided Rocks' work history since the 2014 election.   Dougherty was asked why there was a gap in Rocks' employment between May 2015 and February 2016.  Dougherty was asked whether he had any idea why that was, and he replied, "Nah, no.  If Kenny wanted to work, he would've worked.  He's a good electrician – a little rough around the edges."

Dougherty was asked whether he directed Rocks' employer, Union Electric, to lay him off in May 2015.  Dougherty responded, "I can't tell you the last time – I wouldn't even know."  He was asked, "Is that a 'no'?"  Dougherty looked directly at the investigator and replied with a smirk, "You know that's a 'no.'"  Dougherty was asked whether he directed someone else to tell Rocks' employer to lay him off, and he replied, "Absolutely not."

Dougherty was asked whether he directed any other employers not to hire Rocks during his period of unemployment, and he replied, "Absolutely not."  Dougherty was asked whether he directed someone else to tell employers not to hire Rocks, and he replied, "Absolutely not.  I never talked to anybody about any job, ever."  Dougherty was asked whether he helped Rocks to obtain employment in 2016, and he replied, "No."

Dougherty was asked whether he ever directed Business Agent Mark Bennett or any other officers or staff to go to Rocks' home.  Dougherty advised Bennett was never a business agent.  He added, "Do you know Mark Bennett?  He's 5'2" and – no offense – built like a bowling ball.  Kenny would tell Mark, 'Get outta here.'"  Dougherty explained Bennett was a steward.  Dougherty was asked, "Is that a 'no'?"  He replied, "That's absolutely a 'no.'"  Dougherty continued, "Let me give you some context.  Kenny is 6'4" and 250 pounds.  He's a rough kid, goes to go-go bars, hangs with bikers, he's tough as nails.  Mark scares easily."  Dougherty added, "There's a continuing pattern here.  Somebody's misleading you on almost everything."

Dougherty was asked about Rocks' lapse in employment and whether it was connected to Rocks running for office in the 2014 election.  Dougherty stated, "I didn't even know he was out of work.  I spend most of my day on issues like this [pointing to his phone] – tax code, contracts, COVID assistance."

Dougherty had "no idea" when he learned Rocks intended to run for office in the 2014 election.  Dougherty stated, "Kenny probably told me.  I don't care what he does.  It doesn't hurt my feelings a bit.  Guys he's running against might be offended."  Dougherty reiterated Rocks "rips" people apart on social media, he's "all banged up," and goes to go-go bars.  Dougherty noted Rocks' profile photo on his Facebook account for a long time was a picture of Dougherty with his hands up like Richard Nixon with

a quote, "I'm a crook!"  Dougherty said, "Kenny's been doing this for years.  I laugh and tell him, 'Would you grow the hell up?'"

[Dougherty requested and was granted another short break to address phone calls.]  Upon his return Dougherty stated, "I've never taken anybody's job.  I've never thought to even call anyone.  Charlie and Kenny don't need me to get a job.  They're good mechanics, good electricians.  If there was a lapse, it's because they wanted it."

Dougherty was asked about the nature of the disciplinary hearing and the $50,000 fine which was imposed against Rocks in June 2014.  Dougherty stated, "I don't know what it was about.  I wasn't a part of it."  Dougherty was advised he was the one who preferred charges against Rocks.  He replied, "I probably filed it.  I wasn't part of the hearing.  Kenny threatened to kill me a couple times.  He went bonkers for a couple weeks."  Dougherty was asked whether he ever filed a police report.  He did not file a police report, but Rich Ross (the police commissioner at the time) and a representative from Homeland Security told Dougherty they were legitimate threats.  Dougherty guessed they "picked it up on a wire."  Dougherty stated, "It didn't bother me.  I still did what I wanted to do."

The attorneys interjected several times that they were "blindsided" with this and that they would like to see records of the charges.  They objected to Dougherty being asked to remember something that happened many years ago without having any records to review.  The attorneys were advised records were not available to review at that time and that the matter was raised in the presence of the attorneys during prior officer interviews.

Dougherty was again asked about the charges against Rocks, but he stated he did not know.  He stated, "You can't go around saying you're gonna kill somebody."  Attorney Josem advised there are limits to free speech rights under the Landrum-Griffin Act.

Dougherty was asked whether disciplinary hearings are a frequent occurrence.  He stated "in the early years" disciplinary hearings occurred "a lot."  Dougherty explained during a federal inquiry years ago, a recommendation was made that the business manager stay out of the business of the executive board and to not be a trustee.  Dougherty explained the executive board is the trial board.

Dougherty was asked whether he would have attended a disciplinary hearing for which he had preferred charges.  He stated, "Yeah.  I know he had it.  I don't know where I was."  Dougherty was asked why he preferred charges against Rocks for a threat that he had made two years prior, and why he preferred them when he did (in June 2014).  He stated, "I don't remember.  He hasn't stopped.  He still does it."

Dougherty was asked why he withdrew the charges against Rocks.  He replied, "It's not really my style. I don't remember exactly.  I never want to do anything to anyone.  The guy has threatened to kill me – maybe one day he will.  Maybe I was just trying to address it."  Dougherty surmised the time frame may have been around the time when organized crime and the Pagans were trying to interfere with the Convention Center and were trying to kill Dougherty.  Dougherty had an argument with them at the Convention Center.  Rocks called Dougherty and put a carpenter on the phone then got back on and said, "They're gonna kill you."

Dougherty was advised Rocks had made a comment on a Facebook post about retaliation and that clarification was needed to ensure Rocks was not retaliated against for running for office. Dougherty responded, "Again, it's a continuing pattern with Kenny… The environment of what was going on at that time…" Dougherty was advised there were allegations among the membership that if they run for office, they are going to be brought up on charges or go through some sort of financial loss. Dougherty was looking at his cell phone, seemingly ignoring the questions. Josem noted McConnell was rehired immediately after he was laid off and asked, "What are you guys talking about here?"

Dougherty was asked whether the charges brought against Rocks were connected to him running for office in the 2014 election, and he replied, "No." Dougherty was asked why Rocks was told that the supervised rerun election in 2014 cost the union $50,000. Dougherty questioned who said that. Dougherty stated, "You're going off of Kenny Rocks, Charlie Battle, and unsigned letters." Dougherty was again asked whether Rocks was told the election cost $50,000 and whether this was connected to the charges/fine against Rocks. Dougherty explained elections cost money, but there was "no way" it would cost $50,000. He asserted there was no connection with the fine levied against Rocks and the election.

Dougherty stated, "Kenny wasn't ready to go back to work. I told him, 'You can get work anywhere you want. Go to work.'" Rocks called Business Agent Brian Stevenson some years ago and asked if other members were called before and after him for jobs. Dougherty stated, "I'd recommend Kenny to work for anyone as an electrician."

Dougherty was asked what his response was to allegations that business agents have told members that it would be "career suicide" to run for office. Dougherty responded, "Oh come on, would you please? That's absolute nonsense. You gotta put names to this. These are rumors and innuendos." Dougherty lamented the government is giving credibility to unsigned letters. He stated, "I can't be picked on every single day."

Dougherty was advised Rocks mentioned that once it was made known he was running for office in 2014, he got phone calls, his family got phone calls, almost as though they were being attacked. Dougherty was asked, "Why not just let him run?" He replied, "Rules are rules. If they'd have just followed the rules and said they wanted to run, came down… Tara [Chupka] buried her parents to drugs. She's my daughter. I think he [Battle] almost knocked her over one night at the meeting." Dougherty explained Chupka and Battle usually sit in the same row during membership meetings, and that when Battle got up and was walking down the aisles waving his arms he almost knocked Chupka over. Dougherty talked to Battle about it and told him to be careful. Dougherty told Battle, "They come to meetings to hear information, not to see your sideshow."

Dougherty continued, "Charlie Battle knows what he's doing. No one's intimidating Charlie or Kenny. They can go and get jobs anywhere. There's no pattern here. They're big boys. They're not gonna send a piece of literature out. The latest Kenny Rocks argument is he said I don't have the power to put people to work." Dougherty continued, "That's his dad's brother-in-law, Mike Driscoll – he's married to Kenny's aunt. There's not much love between the two of them. Mike owned Finnegan's Wake. Kenny used to drink there. His dad was the number two FOP [Fraternal Order of Police] guy –a

legendary guy.  He didn't even communicate with Kenny.  He used Mike.  It was his father calling his brother-in-law saying, 'What are you doing, rocking the boat?  Johnny's doing so much.  What're you bringing to the table?'"

Dougherty was asked whether he would be willing to provide a written statement.  He and the attorneys emphatically stated, "No."